```
 1                IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                      JACKSONVILLE DIVISION

 3   LAREESA BERMAN,                  Jacksonville, Florida

 4          Plaintiff,               Case No. 3:13-cv-1109-J-JBT

 5       -vs-                        Monday, March 9, 2015

 6   THOMAS KAFKA,                   9:03 a.m.

 7          Defendant.               Courtroom 5A
     _____
 8

 9            TRANSCRIPT OF JURY SELECTION AND TRIAL
                            (VOLUME I)
10             BEFORE THE HONORABLE JOEL B. TOOMEY
                 UNITED STATES MAGISTRATE JUDGE
11

12

13

14

15

16

17

18

19

20

21   OFFICIAL COURT REPORTER:

22       Shelli Kozachenko, RPR, CRR
         221 N. Hogan Street, #185
23       Jacksonville, FL  32202
         Telephone:  (904) 301-6842
24
                        (Proceedings reported by stenography;
25                          transcript produced by computer.)
```

1                    <u>A P P E A R A N C E S</u>

2

    COUNSEL FOR PLAINTIFF:

3

        **Lareesa Berman, Pro Se**
4        303 Augusta Circle
        St. Augustine, FL  32086

5


6

    COUNSEL FOR DEFENDANT:

7

        **Paul Jones, Esquire**
8        Luks, Santaniello, Petrillo & Jones, LLC
        225 South Orange Avenue, Suite 750
9        Orlando, FL  32801

10       **Todd Springer, Esquire**
        Luks, Santaniello, Petrillo & Jones, LLC
11       301 West Bay Street, Suite 1050
        Jacksonville, FL  32202

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# T A B L E   O F   C O N T E N T S

**PROCEEDINGS:**                                                    **Page No.**

JURY SELECTION.................................        26

PRELIMINARY INSTRUCTIONS OF THE COURT..........        73

OPENING STATEMENT BY MS. BERMAN................        85

OPENING STATEMENT BY MR. SPRINGER..............        97


**PLAINTIFF'S WITNESS:**                                            **Page No.**

  **THOMAS A. KAFKA**

      DIRECT EXAMINATION BY MS. BERMAN..........       116

1       **P L A I N T I F F   E X H I B I T S   R E C E I V E D**

2                                                               Page No.

3   PLAINTIFF'S EXHIBIT 1 ..........................       120
    PLAINTIFF'S EXHIBIT 2 ..........................       125
4   PLAINTIFF'S EXHIBIT 2A .........................       126
    PLAINTIFF'S EXHIBIT 3 ..........................       129
5   PLAINTIFF'S EXHIBIT 6 ..........................       149
    PLAINTIFF'S EXHIBIT 11 .........................       169
6   PLAINTIFF'S EXHIBIT 22C ........................       185
    PLAINTIFF'S EXHIBIT 24A ........................       193
7   PLAINTIFF'S EXHIBIT 24B ........................       193
    PLAINTIFF'S EXHIBIT 25B ........................       185
8   PLAINTIFF'S EXHIBIT 26 .........................       185
    PLAINTIFF'S EXHIBIT 27 .........................       194
9   PLAINTIFF'S EXHIBIT 34B ........................       185
    PLAINTIFF'S EXHIBIT 35 .........................       200
10  PLAINTIFF'S EXHIBIT 36 .........................       201
    PLAINTIFF'S EXHIBIT 36A ........................       201
11  PLAINTIFF'S EXHIBIT 37 .........................       201
    PLAINTIFF'S EXHIBIT 38 .........................       202
12  PLAINTIFF'S EXHIBITS 42 AND 42A ................       186
    PLAINTIFF'S EXHIBIT 45A ........................       205
13  PLAINTIFF'S EXHIBIT 46 .........................       186
    PLAINTIFF'S EXHIBIT 47 .........................       186
14  PLAINTIFF'S EXHIBIT 50 .........................       186
    PLAINTIFF'S EXHIBIT 50A ........................       186
15  PLAINTIFF'S EXHIBIT 50B ........................       187
    PLAINTIFF'S EXHIBIT 51 .........................       187
16  PLAINTIFF'S EXHIBIT 55 .........................       187
    PLAINTIFF'S EXHIBIT 55A ........................       187
17  PLAINTIFF'S EXHIBITS 56 AND 56A ................       187
    PLAINTIFF'S EXHIBIT 58 .........................       188
18  PLAINTIFF'S EXHIBIT 59 .........................       188
    PLAINTIFF'S EXHIBIT 59A ........................       188
19  PLAINTIFF'S EXHIBIT 59B ........................       188
    PLAINTIFF'S EXHIBIT 59C ........................       188
20  PLAINTIFF'S EXHIBIT 61 .........................       210
    PLAINTIFF'S EXHIBIT 64 .........................       188
21  PLAINTIFF'S EXHIBIT 64A ........................       188
    PLAINTIFF'S EXHIBIT 67 .........................       213
22  PLAINTIFF'S EXHIBIT AND 67A.....................       214
    PLAINTIFF'S EXHIBIT 70 .........................       188

23

24

25

1          **D E F E N S E   E X H I B I T S   R E C E I V E D**

2                                                              **Page No.**

3   DEFENDANT'S EXHIBIT 1..........................      112

4   DEFENDANT'S EXHIBIT 2..........................      112

5   DEFENDANT'S EXHIBITS 7, 8, 10A-10C, 19A-19L, ..      114

6   25, and 28

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2     Monday, March 9, 2015                          9:03 a.m.

3                            -   -   -

4        (Outside the presence of the prospective jurors:)

5            COURT SECURITY OFFICER:  All rise.  United States

6     District Court in and for the Middle District of Florida is now

7     in session, the Honorable Joel B. Toomey presiding.

8            Please be seated.

9            THE COURT:  This is the case of Berman versus Kafka.

10    It's Case No. 3:13-cv-1109, and we're here for the trial.

11           And let's see.  Ms. Berman, I see, is here, and then

12    the if the attorneys want to go ahead and introduce themselves

13    and their client.

14           MR. SPRINGER:  Todd Springer on behalf of Thomas

15    Kafka.

16           MR. JONES:  Paul Jones, Your Honor, on behalf of

17    Thomas Kafka.

18           THE COURT:  Okay.  And Mr. Kafka is here.  All right.

19           MR. KAFKA:  Yes.

20           THE COURT:  All right.  Well, let's go over some

21    preliminary matters before we bring in the jury.

22           First let me ask, are both sides ready for trial?

23           Ms. Berman?

24           MS. BERMAN:  Yes.

25           THE COURT:  Okay.

1    MR. SPRINGER:  Yes, Your Honor.

2    THE COURT:  All right.  Let me ask again.  I think I

3  asked this before, but I think I was told the trial length

4  would probably be -- I think the defendant estimated three or

5  so days.  I think the plaintiff had said four days.

6    Are we still looking at probably that --

7    MR. JONES:  I would imagine three.

8    MR. SPRINGER:  Three likely, but it will probably be

9  two and a half, I think.

10    THE COURT:  Okay.  And, Ms. Berman, do you agree with

11  that?

12    MS. BERMAN:  It's hard for me to estimate as I'm not

13  an attorney, and my -- it's not in my hands.

14    THE COURT:  All right.  Well -- all right.  I'll tell

15  the jury three to four days.

16    One thing, I have the jury -- on the jury

17  instructions, voir dire instructions, I had said we would do

18  eight jurors.  We could do seven.  We'd probably -- we'd

19  probably be okay if we lose one.  I think we need a minimum of

20  six.

21    So I'm inclined to go with seven jurors instead of

22  eight, but does either side have a problem going with seven

23  jurors?

24    MS. BERMAN:  No.

25    MR. SPRINGER:  No objection, Your Honor.

1           THE COURT:  Okay.  The statement of the case.  I know

2     both sides provided me with a statement of the case, and this

3     is just the statement for the jury selection so they have some

4     idea of what the case is about.

5           I'm just going to say plaintiff, Lareesa Berman, has

6     sued defendant, Thomas A. Kafka, for defamation, alleging that

7     defendant defamed her by publishing false statements about her.

8     Defendant, Thomas Kafka, denies this claim and raises a number

9     of affirmative defenses to plaintiff's claim.  That's all I'm

10    going to say.

11          Is that --

12          MR. SPRINGER:  That's fine.

13          THE COURT:  Ms. Berman?

14          MS. BERMAN:  That's fine.

15          THE COURT:  All right.  And then in terms of the

16    stipulated facts, I was going to read what you have in the

17    pretrial statement.  I would presume to read this probably at

18    the beginning of the evidence, right before plaintiff starts

19    her case.

20          You have it at the pretrial stipulation document 144,

21    page 7:  Defendant, Thomas A. Kafka, sent the electronic mails

22    to James Bellflower between August 10th, 2011, and August 16th,

23    2011, which contain the alleged libel per se.

24          Defendant, Thomas A. Kafka, sent a document to Janice

25    Connell which contains the alleged libel per se.  And plaintiff

 1    was never employed by defendant, Thomas A. Kafka's companies.

 2            So that seems to be the only real stipulated facts

 3    that I see.

 4            MR. SPRINGER:  Yes, sir.

 5            MS. BERMAN:  Yes, Your Honor.

 6            THE COURT:  All right.  Does either party want to

 7    invoke the rule?

 8            MR. JONES:  Yes, Your Honor.  We'll invoke --

 9            THE COURT:  Okay.

10            MR. JONES:  -- the rule of sequestration.

11            THE COURT:  All right.  Do you know what that means,

12    Ms. Berman?  Just that the witnesses remain outside the

13    courtroom and not speak with each other while the trial is

14    going on.

15            MS. BERMAN:  Okay.

16            THE COURT:  Does anybody have their witnesses here

17    yet?  Do you have your witnesses present?

18            MS. BERMAN:  Yes.

19            THE COURT:  Are they all out there?

20            MS. BERMAN:  Not all, one.  One I have to -- the

21    defense -- I have one witness, and I have to call during the

22    break to tell her when to come, tomorrow or --

23            THE COURT:  Okay.

24            MS. BERMAN:  Because I didn't call her today.  I

25    thought this would be, like, long jury selection.  That's why I

1  said I would call her today during the break.

2      THE COURT:  Well, I think you should be ready to put

3  all your witnesses on today, because you've only listed three

4  witnesses.  I will get to your witnesses today, so you need to

5  try to get whoever it is -- who are you talking about?

6      MS. BERMAN:  Sheri Cobb.

7      THE COURT:  Well, we should be able to get to all

8  your witnesses today.  The jury selection probably isn't going

9  to take all that long.  The opening statements shouldn't take

10  too long, and then we're going to start with your witnesses.

11      And, I mean, it looks like you only have three, plus

12  I assume you're going to testify, so there's a good chance

13  we're going to get to Ms. Cobb today.

14      MS. BERMAN:  I told her that I'd call her and let her

15  know if it's tomorrow or the 11th because I thought this would

16  be much longer, so that's why I estimate, like, maybe tomorrow.

17  So she's not ready for today.

18      THE COURT:  Would you be able to put on some of your

19  witnesses?  We may have to go out of -- out of order then.

20      MR. SPRINGER:  Your Honor, we have three witnesses

21  basically that we'll call, Mr. Kafka, who could go today, and

22  then we have -- our other two witnesses are traveling from

23  Tallahassee today and will be here tonight, so --

24      THE COURT:  All right.

25      MR. SPRINGER:  But they're short, Your Honor.

```
 1            THE COURT:  Okay.  Well, would you have an objection
 2   to Mr. Kafka, then -- we may have to go out of order.
 3            And we'll see how the trial's going, but, I mean, I'm
 4   not going to stop the trial at 3 o'clock, so we'll see.
 5            MR. SPRINGER:  Your Honor, if I may?
 6            THE COURT:  Yes.
 7            MR. SPRINGER:  On that note, with Sheri Cobb, there
 8   was an in limine ruling with regard to her testimony.  The only
 9   purpose I can see her being called for was the alleged
10   fraudulent opening of that bank account, and that's been kept
11   out.  So I would ask for a proffer anyway as to what she
12   expects to elicit from Ms. Cobb.
13            THE COURT:  All right.  It may be that I'm not going
14   to let Ms. Cobb testify anyway.
15            MS. BERMAN:  Your Honor, defendant listed Ms. Cobb as
16   a witness because she has a knowledge of corporate
17   investigation by Trifecta Gaming, and she has a knowledge of
18   investigation --
19            THE COURT:  Hold on.  Let me just stop you for a
20   moment.  I think the court reporter's having trouble
21   understanding you.
22            MS. BERMAN:  I'm sorry.
23            THE COURT:  And so you probably need to stand up so
24   she can see you.
25            MS. BERMAN:  I'm sorry.  Defendant said in his
```

1   initial disclosure --

2        THE COURT:  You don't need to worry so much about the

3   microphones.  That's for when we record.  We have a court

4   reporter here so --

5        MS. BERMAN:  That Ms. Cobb has a knowledge of

6   investigation by Trifecta Gaming about my husband embezzling

7   money, so I need this witness.

8        THE COURT:  All right.  Well, just because they list

9   somebody as a potential witness, that doesn't make it relevant,

10  so we'll -- we'll get to that, okay?  I don't know enough about

11  the case at this point.  I'm not making any rulings.

12       But you might remember that I did enter an order on a

13  bunch of motions in limine that ruled, at least preliminarily,

14  on evidentiary issues.  And so the way that works is if you

15  have something that you want to present that I've said is

16  likely to be kept out, you have to take that outside of the

17  presence of the jury.

18       You have to let me know --

19       MS. BERMAN:  Okay.

20       THE COURT:  -- and then I'll let you proffer it.  In

21  other words, I'll let you tell -- tell the Court what it is

22  you're trying to put on, and I'll make a ruling at that point.

23       MS. BERMAN:  Okay.

24       THE COURT:  Okay.  I was thinking of putting a --

25  maybe a time limit of 20 minutes or so on opening.  Is that --

1           MR. SPRINGER:  That should be fine, Your Honor.  I

2      may have at the outside 30 minutes, but I'll try to keep it

3      shorter.

4           THE COURT:  All right.  I'll make it 30 minutes then.

5           Is that good with you, Ms. Berman?

6           MS. BERMAN:  I don't know how -- I try to do 30

7      minutes.  Maybe I go a little bit longer, but I will try.

8           THE COURT:  Yeah.  You're just going to need to stand

9      up, Ms. Berman, so the court reporter can see you.

10          MS. BERMAN:  I try to do in 30 minutes, but maybe it

11     will take longer.  I don't know.

12          THE COURT:  All right.  Well, I'll -- try to stick to

13     30 minutes.  I will tell you if it's starting to go

14     significantly longer than that -- don't forget, you're going to

15     be able to testify also as a witness.

16          This is not -- I'm not talking about your testimony.

17     This is just the opening statement where normally the attorneys

18     would give it, and they would just tell the jury what they

19     expect the evidence to show.

20          It's not meant for argument, and it's not meant for

21     you to talk about the law, but just what you think the evidence

22     is going to show, all right?

23          So you'll also get to get up to take the stand as a

24     witness and tell the jury what you want to tell them as a

25     witness, but this is not an evidence portion.  This is just

```
 1   kind of a preview of the evidence, okay?
 2            MS. BERMAN:  Uh-huh.
 3            THE COURT:  All right.  Okay.  I am going to allow
 4   the jurors to take notes, and I'll give them an instruction
 5   about that, but I'm not going to let them ask questions, all
 6   right, so just so you know.
 7            In terms of the --
 8            MS. BERMAN:  Excuse me, Your Honor.
 9            THE COURT:  Yeah.
10            MS. BERMAN:  I don't understand.  Can I ask a
11   question for -- am I allowed to ask a question to jury?
12            THE COURT:  You mean when we're selecting -- when
13   we're selecting the jury?
14            MS. BERMAN:  Yes.
15            THE COURT:  No.  I'm going to do the jury selection
16   myself.
17            MS. BERMAN:  Okay.
18            THE COURT:  I'm not going to let either you or the
19   defense ask the jury questions.
20            Now, I may ask some of the questions you gave me to
21   ask, and I'll go over that in a minute.  In fact, since you
22   bring that up, I'm going to ask, like, general questions that
23   pretty much apply to every case.
24            I will ask them if anybody knows any of the witnesses
25   on the lists that you gave me.  I'm going to ask them if any --
```

1    has anyone ever been employed by or does anyone know someone

2    who is or has been employed by Maitland Furniture, Inc.,

3    Maitland Trifecta, Inc., Trifecta Gaming USA, Inc., or the

4    Florida Department of Economic Opportunity, or any related

5    department or agency.

6            Are there any other corporations or companies that I

7    should ask them if they have any association with?

8            MR. JONES:  No, Your Honor.

9            THE COURT:  Okay.  I'll ask them has anyone been

10   involved in any way with an unemployment compensation

11   proceeding, either as a claimant receiving or attempting to

12   receive benefits or an employer paying or disputing an

13   unemployment compensation claim.

14           And then if they answer in the affirmative, I'll tell

15   them that the statements at issue in this case may have been

16   made in connection with an unemployment compensation

17   proceeding.  Knowing that, is there anything about your

18   experience that would make it difficult for you to be fair and

19   impartial in this case?

20           So that's pretty much the way I'm going to cover

21   that.

22           Any comments on that from the defense?

23           MR. JONES:  Would you be getting into, Your Honor,

24   whether -- if, in fact, they answer in the affirmative, they

25   had some experience in unemployment, seeking unemployment

```
1  compensation benefits, whether it was a negative or a positive
2  experience for them?
3           THE COURT:  I mean, I could ask them that.
4           I mean, I'll ask them --
5           MR. JONES:  I guess --
6           THE COURT:  I don't want to get too much into it
7  because I don't want them to say anything that might affect
8  other jurors, but . . .
9           MS. BERMAN:  Well, I would like if you ask question
10 if -- do you believe someone who has been libeled and falsely
11 accused of a crime should stand up for themselves.
12          THE COURT:  Should what?
13          MS. BERMAN:  Do you believe someone who has been
14 libeled and falsely accused of a crime should stand up for
15 themselves?
16          THE COURT:  Yeah, I saw that.  I'm not going to ask
17 that question.  That's got nothing to do with their
18 qualifications.
19          This isn't a time for argument, Ms. Berman.  This is
20 just to see if they're -- if they could be fair and impartial,
21 so I'm not going to ask questions that sort of skew one side or
22 the other.
23          MS. BERMAN:  I --
24          THE COURT:  So I've made my ruling on that.
25          MS. BERMAN:  Okay.  I would like one more question.
```

1    If they understand my accent, if they understand some --

2             THE COURT:  I'm getting to something like that.

3             MS. BERMAN:  Okay.  Thank you.

4             THE COURT:  If they understand your accent?

5             MS. BERMAN:  Uh-huh.

6             THE COURT:  Well, let me -- in terms of getting back

7    to what you were talking about, I can ask them if it's a

8    negative or -- if they have any negative experience.

9             MR. JONES:  Okay.  And I guess the only concern, Your

10   Honor, is if they had an employer that they felt had shorted

11   them of, you know, unemployment benefits, and as the evidence

12   starts to come out, if they can start identifying, through

13   their own personal experience, with the plaintiff's side or

14   Mr. Berman in particular.

15            THE COURT:  All right.  Well, what I might do is -- I

16   don't think there probably is likely to be too many people.  We

17   could single those people out and ask them -- question them

18   individually and then just ask them what their experience was.

19            MS. BERMAN:  I just --

20            THE COURT:  Ms. Berman, hold on a second.  First of

21   all, you can't keep interrupting, okay?  I'm not going to let

22   you do that.

23            And let me get to what you were talking about

24   earlier.  First of all, did you have any comment on the

25   questions about the unemployment compensation that I just said?

1        MS. BERMAN:  My comment is I never was employee of

2   either com- -- it doesn't related to me unemployment.

3        THE COURT:  Why don't you stand up again.

4        MS. BERMAN:  The unemployment receiving is not

5   related to me --

6        THE COURT:  Okay.

7        MS. BERMAN:  -- so I don't want the jury to be

8   confused that I am somehow employee or have some kind of

9   fiduciary relationship with the defendant.

10       THE COURT:  I understand that, and in fact that's an

11  admitted fact, that you were never employed by him.

12       What I'm going to ask is would the fact that

13  Ms. Berman was born in another country but is now a naturalized

14  United States citizen, would that fact affect you as a juror in

15  any way?

16       So that's what I was going to cover in terms of your

17  citizenship.

18       Is that accurate?

19       MS. BERMAN:  Yes.  Yes.  Thank you.

20       THE COURT:  Okay.  And is that what you were getting

21  at in terms of your accent?

22       MS. BERMAN:  Yes.

23       THE COURT:  All right.  And then I'll -- the other

24  question I'll ask is Ms. Berman is representing herself without

25  counsel in this action.  Mr. Kafka is represented by counsel.

```
 1          Will the fact that one party has counsel and one
 2   party does not affect your views of this case or of either
 3   party in any way?  So that's the way I was going to cover that.
 4   All right, Ms. Berman?
 5          So those are the only questions I'm going to ask that
 6   really pertain particularly to the case itself.
 7          Does anybody have any objection to that?
 8          MS. BERMAN:  No, Your Honor.
 9          MR. JONES:  No, Your Honor.
10          THE COURT:  All right.
11          MR. JONES:  Excuse me, Your Honor.
12          THE COURT:  Yes.
13          MR. JONES:  As part of your general voir dire, you
14   ask, I imagine, whether people have been involved in their own
15   lawsuits?
16          THE COURT:  Yes.
17          MR. JONES:  Okay.
18          THE COURT:  Yeah, whether they've been parties to
19   a . . .
20          MR. JONES:  Okay.
21          THE COURT:  And I'll give you a chance at the end of
22   voir dire to -- once I'm done questioning, we'll come up to
23   sidebar and see if you have any other questions you want me to
24   ask.
25          In terms of the preliminary instructions, I'm going
```

1  to pretty much give the standard Eleventh Circuit preliminary

2  instructions.  I think they -- they're pretty close to what the

3  defendant provided.

4         Again, I'm just going to keep the description of the

5  case very vanilla, just the same statement that I just gave.

6         We don't need -- I don't think anybody provided this

7  instruction, but we don't need the clear and convincing

8  evidence instruction.  I'm not going to give that.  I'm not

9  going to give the instruction about jury questions since I'm

10 not going to allow jury questions.

11        I'm not going to give the instruction about interim

12 statements since there's not going to be any interim

13 statements.

14        So that's pretty much the preliminary instructions.

15 Does anyone have any comment on that?

16        MS. BERMAN:  Yes, I do, Your Honor.  Under Florida

17 law 503.2, it's for libel per se and punitive damages.  I would

18 like if you add that.

19        THE COURT:  That's going to be -- we'll talk about

20 that when we get to the closing instructions.  That's at the

21 end of the case.  This is just now for the beginning.

22        MS. BERMAN:  Yes, sir.

23        THE COURT:  Mr. Jones, Mr. Springer, do you have

24 any --

25        MR. JONES:  No objection.

```
 1            THE COURT:  All right.

 2            All right.  Well, that's all I had as a preliminary

 3    matter that we need to talk about now.

 4            Does anyone else have anything else?

 5            MR. SPRINGER:  Your Honor, there -- in some of the

 6    documents that will come into evidence in this case from the

 7    agency, there -- it lays out a timeline of the events that took

 8    place during the unemployment compensation proceedings for

 9    Mr. Berman.

10            In a couple of those documents, there is a mention of

11    a trademark case, and that's the reason for delaying some of

12    the proceedings, so it provides context.

13            My concern is this.  I think in order to tell the

14    story, I have to use a couple of those documents that mention

15    that, but I do not want to open the door to the specific facts

16    of that lawsuit or the other myriad of lawsuits between

17    Mr. Berman and Mr. Kafka.  I'm afraid of doing that, and I

18    wanted to get the Court's ruling on that or opinion on that.

19            THE COURT:  All right.  So tell me -- so in the

20    documents, in the unemployment documents, there's --

21            MR. SPRINGER:  For instance, there was another

22    hearing that was supposed to take place, and that hearing was

23    continued, did not take place, because Mr. Berman claimed that

24    the pending trademark case needed to be resolved first.

25            Well, that resulted in things being delayed and
```

1    continued and continued in that trademark case, and those two

2    words are mentioned in that document.

3          And just to bring that up to provide context of why

4    things didn't take place at a certain time, I don't want to

5    open the door to four other lawsuits coming in and being talked

6    about in this case when they're not relevant.

7          THE COURT:  All right.  And --

8          MS. BERMAN:  Your Honor, I object to this.

9          THE COURT:  Why don't you stand.

10         MS. BERMAN:  I object to what the defendant just say

11   because he say about trademark.  There is an order from the

12   unemployment appeal which said that any -- if you decided to

13   reopen the case, they give to him until September 9, 2010.

14   That's the order to any issue with trademark.  You have to open

15   in writing.

16         So I do not want the defendants bring an entire

17   unemployment appeal which not relevant to this -- to my case,

18   and I don't want he confuse jury about that.

19         THE COURT:  You don't want what coming in?

20         MS. BERMAN:  I do not want that he try to confuse

21   jury about the order that there is no second hearing.  There is

22   an order that he had -- the defendant has a chance until

23   September 9, 2010, to appeal --

24         THE COURT:  All right.

25         MS. BERMAN:  -- this order.

```
1              THE COURT:  And what --

2              MR. SPRINGER:  That's not my intent.  My intent --

3     the reason I bring this up is because there's a document that I

4     think we're both going to use that mentions a trademark case.

5              I just -- if we say the word "trademark case," I

6     don't want that to open to door, "Well, here's what happened in

7     that lawsuit, and now we've talked about this one, let's talk

8     about the three or four other ones that are out there."

9              THE COURT:  Are you planning on talking about these

10    other lawsuits, Ms. Berman?

11             MS. BERMAN:  If there is unemployment appeal and

12    there is about trademark application, I do need to show that,

13    that my husband is an owner of Trifecta Gaming.  He never was

14    employee of Trifecta Gaming.  And by Florida law, the law says

15    when you are an owner and shareholder, you cannot embezzle

16    money from your own company.

17             Defendant tries to convince that my husband was

18    somehow employee by Trifecta Gaming, but this is not the case.

19             THE COURT:  Sounds like -- is that a different issue?

20             MR. SPRINGER:  There are a couple of exhibits --

21             MS. BERMAN:  There is --

22             THE COURT:  Hold on, Ms. Berman.

23             MR. SPRINGER:  There are a couple of exhibits I

24    believe Ms. Berman will try and enter about where Mr. Berman

25    applied for a trademark, like a slogan or a phrase for a
```

 1   company, but these are apples and oranges.  Applying for a

 2   trademark doesn't mean you're an owner of a company, so --

 3          THE COURT:  Okay.  Well, you know, Mr. Springer, it's

 4   hard for me to rule on that definitively at this point.  I

 5   mean, I'm going to have to hear the evidence.

 6          And I don't know -- from what you're saying it

 7   doesn't sound like that's going to open the door.  Now, whether

 8   that evidence may be relevant for some other reason, I don't

 9   know at this point.  But I'm not going to allow, you know,

10   extended evidence about other lawsuits that -- especially --

11   now, Ms. Berman, you -- was Ms. Berman a party to any of these

12   lawsuits?

13          MR. SPRINGER:  I don't believe so, no, sir.

14          THE COURT:  All right.  Well --

15          MS. BERMAN:  No.  I never was a party to anything

16   between defendant and my husband.

17          THE COURT:  Okay.  So I don't see the relevance of

18   them at this point.

19          MS. BERMAN:  Yes, Your Honor.  But I would like to

20   say that defendant made case against my husband under name of

21   Trifecta Gaming, and I really need to show this evidence.  It's

22   very relevant to my case.

23          THE COURT:  All right.  Well, I'm not making any

24   rulings at this point.

25          But this seems to me to be a fairly simple case on

1   these statements that were made, and the parties seem to agree

2   that these statements were made.  And then it becomes a

3   question of what the -- what the effect, what the damages, if

4   any, from these statements are, whether the statements were

5   true, whether there was some privilege that might apply; if so,

6   whether that privilege can be overcome, if it's a qualified

7   privilege.

8          So those are the issues, and I'm not sure why we'd

9   have to get into technicalities about other companies and about

10  your husband.  You keep saying this case is about you, so let's

11  stick with you.

12         MS. BERMAN:  I agree, Your Honor, but the problem is

13  during the entire discovery, all was about my husband.  They

14  never even unemployment appeal the question of Janice Connell

15  and Mr. Bellflower.  It was question all about my husband and

16  defendant.  It seems like I am a counsel for my husband.  I

17  have to address those issues.

18         THE COURT:  Well, we'll see.  This is not discovery

19  anymore, though.  Discovery's over with, and discovery

20  sometimes does get into other areas that are not going to be

21  admissible at trial.

22         MS. BERMAN:  Yes, but all documents will be produced,

23  it's all about my husband.

24         THE COURT:  All right.  Is there anything else that

25  we need to take up before the jury comes in?

```
 1              MR. SPRINGER:  No, sir.

 2              THE COURT:  All right.

 3              All right.  The Court's going to take a short recess

 4    and the jury will be brought in.

 5              COURT SECURITY OFFICER:  All rise.

 6         (Recess from 9:41 a.m. until 9:54 a.m.; all parties

 7    present.)

 8         (In the presence of the prospective jury:)

 9              COURT SECURITY OFFICER:  All rise.  This Honorable

10    Court is now in session.

11              Please be seated.

12              THE COURT:  Good morning, ladies and gentlemen.

13              The case set for trial is Berman versus Kafka.  It's

14    Case No. 3:13-cv-1109.

15              Is the plaintiff ready to proceed?

16              MS. BERMAN:  Yes, Your Honor.

17              THE COURT:  And is the defendant ready to proceed?

18              MR. SPRINGER:  Yes, sir.

19              THE COURT:  Okay.  Good morning.  My name is Judge

20    Toomey, and I will be presiding over this case.  Today we will

21    seat a jury to try this case.

22              This is a civil case.  I will be getting into this in

23    more detail as the case progresses, but the trial of a civil

24    case is different from the trial of a criminal case.  So if any

25    of you have ever had any experience with a criminal case,
```

1    you'll need to understand these differences.

2         Now, you're about to participate in one of the most

3    significant responsibilities that you will have as a citizen of

4    this country.  Our system of trial by jury is guaranteed in our

5    Constitution and is one of our unique institutions.  Indeed, it

6    has frequently been said that fulfilling one's responsibility

7    through jury service is every bit as patriotic as serving in

8    defense of one's country.

9         Sometimes we hear criticism of our justice system.

10   Perhaps you've had occasion to be critical, and I would not

11   disagree with some of that criticism.  But you should know now,

12   if you don't already, that with all of its faults, the American

13   justice system is respected throughout the world and is

14   considered to be a fair and effective system of justice.

15        While some people look upon jury service as a burden,

16   most people who actually are selected to serve on a jury find

17   the experience to be rewarding and are glad that they were

18   selected.

19        Now, this trial is expected to take no more than

20   three or four days.  We will work today to select a jury and

21   then begin with the opening statements and get as far as we can

22   in the trial today.  We will stop for today no later than

23   5 o'clock.

24        Beginning tomorrow, the trial will start promptly at

25   9 o'clock and will go until no later than 5 o'clock in the

1    afternoon, with appropriate breaks and a lunch break.  That

2    will be from today until the trial's completed.

3         When the trial's concluded for the day, you will not

4    be kept together but will be allowed to return to your home.

5    If you live more than 50 miles away, there is a possibility of

6    hotel accommodations.

7         Now, I'm not going to ask you if serving on this jury

8    will be an inconvenience to you.  That's a given.  Most of you

9    would rather be elsewhere attending to your job or home or

10   other things that you had planned for this time.

11        Each of you has the required qualifications to serve

12   as a juror, and no one should seek to avoid fulfilling this

13   responsibility except for the most pressing circumstances.

14        Even though the jury administrator has already

15   screened you for hardships, I recognize that there may be

16   instances where service would cause an extraordinary hardship

17   to a particular individual or his or her family.

18        So the question I want to ask you now is this, if you

19   believe that you will qualify to be excused based on an

20   extraordinary hardship, a hardship that you believe would

21   persuade a fellow citizen, perhaps the one seated next to you,

22   that he or she should sit in your place as a juror.

23        I will now give you an opportunity to make that

24   request by raising your hand.

25        (No response.)

```
1              THE COURT:  Anyone?
2         (Hand raised.)
3              THE COURT:  All right.  I see one hand, and let me
4    get my jury list before you --
5              PROSPECTIVE JUROR:  My name --
6              THE COURT:  Hold on just a second.
7              Okay.  Go ahead.  I'm sorry.
8              PROSPECTIVE JUROR:  Good morning, Your Honor.  My
9    name's Warren Madridejos.  I have extraordinary circumstances.
10             My wife is being treated for papillary thyroid
11   cancer, and she has a trach that needs constant monitoring.  I
12   had arrangements for last week when I originally had my notice
13   to show up, but then I got excused and had to call this week.
14             But unfortunately right now my daughter is home right
15   now with her, and she has to get back to school because I
16   already made plans for her to be at home last week, and my wife
17   needs somebody there all the time, so --
18             THE COURT:  Okay.
19             PROSPECTIVE JUROR:  -- it's . . .
20             THE COURT:  And how old is your daughter?
21             PROSPECTIVE JUROR:  She is 20.
22             THE COURT:  And when does she have to --
23             PROSPECTIVE JUROR:  She was supposed to be back this
24   morning.
25             THE COURT:  Does she go to college or --
```

```
1              PROSPECTIVE JUROR:  She goes to college at UCF.

2              THE COURT:  Okay.  All right.  Thank you.

3              PROSPECTIVE JUROR:  All right.

4              THE COURT:  Anybody else?

5         (No response.)

6              THE COURT:  All right.  Now, if all of you could give

7    us your close attention, we're about to start the jury

8    selection process.

9              The questions which I will be asking each of you in

10   open court are designed to determine your qualifications to

11   serve as a juror in this particular case.  Under your oath as a

12   prospective juror, you agree to truthfully answer these

13   questions concerning your qualifications.

14             Please understand that this questioning is not for

15   the purpose of prying into your personal affairs but is only

16   for the purpose of obtaining a fair and impartial jury.

17             If anyone wants to answer a question privately, you

18   can let me know by raising your hand and letting me know that

19   you would prefer to discuss this matter with me and the parties

20   in private.

21             Jury selection, also called voir dire examination, is

22   for the purpose of determining if your decision in this case

23   would in any way be influenced by opinions which you now hold

24   or by some personal experience, special knowledge, or

25   relationship which you may have concerning the subject matter
```

1   to be tried.

2           So the questions that will be asked of you are

3   designed to allow us to get persons who will impartially try

4   this case upon the evidence presented in court without being

5   influenced by other factors.

6           If you're excused from serving on the jury, please do

7   not take that personally.  It is all just part of the process

8   designed to get a fair and impartial jury for this case.

9           Now, just to tell you a little bit about this case,

10  the plaintiff, Lareesa Berman, has sued the defendant, Thomas

11  A. Kafka, for defamation, alleging that the defendant defamed

12  her by publishing false statements about her.  The defendant,

13  Mr. Kafka, denies this claim and raises a number of what we

14  call affirmative defenses to this claim.

15          Now, I'm going to ask you some general questions.

16  Please listen carefully and give me your -- and give me a clear

17  and audible response to each question.  I'm speaking to all of

18  you collectively when I ask these questions, and all of you

19  should listen and answer these questions.

20          Now, I've just explained the general nature of the

21  case.  Do any of you know anything about this case either

22  through your own personal knowledge or by discussion with

23  anyone else or by reading or hearing about it in any of the

24  news media?

25      (Negative response.)

1          THE COURT:  Okay.  And if you do have an affirmative

2     response on these, if you could also raise your hand in

3     addition to answering yes so I could see you.

4        (No response.)

5          THE COURT:  Now, just -- all right.  And now I'm

6     going to introduce the -- or have the parties themselves

7     introduce themselves and everyone at counsel table.

8             So for the plaintiff?

9             MS. BERMAN:  My name is Lareesa Berman, and I am

10    plaintiff.

11            THE COURT:  Okay.

12            MR. SPRINGER:  Good morning.  My name is Todd

13    Springer, my partner Paul Jones, and Thomas Kafka.

14            THE COURT:  Okay.  Thank you.

15            Now, are any of you related by blood or marriage to

16    any of the people that have been identified, or do you have any

17    knowledge of them or know any of them from any business or

18    social relationship?

19        (Negative response.)

20            THE COURT:  Are any of you related by blood or

21    marriage to any of the attorneys that have just been introduced

22    or their law firms or anybody that may be -- that you know of

23    associated with that law firm?

24        (Negative response.)

25            THE COURT:  I'm now going to read to you the names of

1   those who may possibly testify in this case.  I ask that if you

2   know any of these individuals in any way, you tell me of that

3   fact.

4           Christopher Berman, Sheri Cobb, Julie Kafka, James

5   Bellflower, or Janice Connell or Lora Katsavrias.

6           Do any of you know any of these individuals in any

7   way?

8       (Negative response.)

9           THE COURT:  Now let me ask, do any lawyers or parties

10  or anyone else in the courtroom recognize or know any of the

11  prospective jurors?

12          MS. BERMAN:  No, Your Honor.

13          MR. SPRINGER:  No, Your Honor.

14          THE COURT:  Now, has anyone ever been employed by or

15  does anyone know someone who is or has been employed by any of

16  the following companies or agencies:  Maitland Furniture, Inc.;

17  Maitland Trifecta, Inc.; Trifecta Gaming USA, Inc.; or the

18  Florida Department of Economic Opportunity or any related

19  department or agency?

20      (Negative response.)

21          THE COURT:  All right.  Now, I'm going to direct the

22  following questions to you individually.  Now, I'm going to --

23  I'm actually going to let you answer the questions that you

24  have on the sheet in front of you, and then if I need to

25  interject and ask you a little bit more, I'll go ahead and do

1    that.

2          So we'll start with juror No. 1, who is Ms. -- is it

3    Douthitt?

4          PROSPECTIVE JUROR:  Brianna Douthitt.

5          THE COURT:  Okay.  You can answer those questions,

6    please.

7          PROSPECTIVE JUROR:  I live in Neptune Beach, Florida,

8    and I've been there four years.  Nine years total in Florida.

9          I have a master's degree in accounting, and I'm a

10   public tax accountant.

11         I'm single and have no children and have no previous

12   military service.

13         I have no previous jury service.

14         THE COURT:  All right.  And you can sit down.

15         Hold on a second, ma'am.

16         And, I'm sorry, did you say who you work for?

17         PROSPECTIVE JUROR:  Deloitte Touche.

18         THE COURT:  All right.  Thank you.

19         And -- all right.  Ms. Dobbins?

20         PROSPECTIVE JUROR:  Hi.  I'm Wendy Dobbins.  I live

21   in Jacksonville, Florida, about 45 years.  Same length of time

22   living in Florida.

23         Level of education is a four-year degree in

24   education.  I'm a science teacher at the Broach private school.

25         I'm married.  My husband is self-employed.  He fixes

     1     air conditioners and heaters.

     2              No children.  Never been in the military.

     3              I did serve about 30 years ago as an alternate on

     4     Duval County courts, and I believe it was civil, but I was an

     5     alternate so I don't know if there was a verdict.

     6              THE COURT:  Okay.  Thank you.

     7              All right.  Ms. Petty?

     8              PROSPECTIVE JUROR:  My name is Joycelyn Baker Petty.

     9     I'm a current resident of Jacksonville, Florida, about 14

    10     years.  I've lived in Florida for 14 years.

    11              Education level, I have my bachelor's in

    12     administration management.  I'm a receipt specialist for First

    13     Coast Service Options.

    14              My marital status is divorced.  I have one child, age

    15     15.

    16              I have no previous military experience or -- this --

    17     and this is my first jury duty.

    18              THE COURT:  Okay.  Thank you.

    19              Mr. Alvarez?

    20              PROSPECTIVE JUROR:  My name is Andrew Alvarez.  I've

    21     lived in Jacksonville for four years now.  Previous to that I

    22     grew up in Miami for 19 years.

    23              My level of education is high school.  My occupation

    24     is an aircraft mechanic with Boeing Aerospace.

    25              Marital status is divorced.  I have no children.

```
1              I served in the United States Marine Corps.

2              And I've been on two previous juries in North

3    Carolina.

4              THE COURT:  All right.  And then -- so were those

5    juries civil or criminal, if you remember?

6              PROSPECTIVE JUROR:  Criminal.

7              THE COURT:  Okay.  You don't need to tell me what the

8    verdict was, but were verdicts reached in those cases?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  All right.  Were you the foreperson --

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  -- by any chance?

13             All right.  And is there anything about that jury

14   experience which would make it difficult for you to serve on

15   this jury?

16             PROSPECTIVE JUROR:  Both of them were -- reached a

17   verdict in technicalities.  That's the only issue I had with

18   it.

19             THE COURT:  All right.  Knowing this is a civil case,

20   would that have any impact on your ability to serve in this

21   case?

22             PROSPECTIVE JUROR:  Really, I don't believe so, but

23   I've never served on a civil case, so I don't know really how

24   it goes.

25             THE COURT:  All right.  Thank you.
```

 1          Okay.  Mr. Levitt?

 2          PROSPECTIVE JUROR:  My name is Michael Levitt.  I

 3   live in Ponte Vedra.  I've lived there for 22 years and lived

 4   in Florida all my life, 52 years.

 5          I have a four-year degree in political science.  I'm

 6   a retired banker.

 7          I'm married with two children.  My wife works for

 8   EverBank in the marketing department.

 9          My children are 20 and 18.

10          I have no previous military experience.

11          I have served on a jury before in a criminal case.

12   There was a verdict.

13          THE COURT:  Okay.  I'll ask a general question at the

14   end of everybody who served on the -- who served on a jury.

15          Were you the foreperson, by any chance?

16          PROSPECTIVE JUROR:  Yes, I was.

17          THE COURT:  You were the foreperson?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Okay.  All right.  Thank you.

20          And, Mr. Alvarez, were you the foreperson of either

21   of those juries?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  Okay.

24          All right.  Is it Ms. Carcaba?

25          PROSPECTIVE JUROR:  Hi, Nadine Carcaba.

1    St. Augustine, Florida.  Been there 11 years.  Lived in Florida

2    26 years.

3              Some college education.  I'm a bakery manager for

4    Publix.

5              Married, no children.

6              No military experience.

7              Previous jury service in 1977, Cook County, Illinois.

8    Civil case, no verdict.

9              THE COURT:  Okay.  Were you the foreperson?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Okay.  Mr. Kim?

12             PROSPECTIVE JUROR:  Hello, Your Honor, my name's Tony

13   Kim.  I've lived in the city coming up on close to 14 years and

14   same amount of time in Florida.

15             My level of education is a two-year associate degree

16   in physical therapy.  I am currently unemployed.

17             I am single.  I have not been married.  I don't have

18   any children.

19             I have not been in previous military service, and

20   this is my first jury service.

21             THE COURT:  Okay.  Thank you.

22             Ms. Newman?

23             PROSPECTIVE JUROR:  Hi.  My name's Robin Newman.  I

24   have lived in Florida 20 years.  I live in Jacksonville.

25             I have a high school education.  I am a loss assignor

1     for Progressive Insurance.

2              I'm married.  My husband works for the government.

3              And I have three children, 31, 27, and 24.

4              I have no military service, and I haven't served on a

5     jury.

6              THE COURT:  Okay.  And when you say your husband

7     works for the government, is that state or federal --

8              PROSPECTIVE JUROR:  Oh, that --

9              THE COURT:  -- or local?

10             PROSPECTIVE JUROR:  NAS Jax, government.

11             THE COURT:  NAS Jax?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Okay.  All right.  Thank you.

14             PROSPECTIVE JUROR:  Hello, my name's Byron Gaudry.

15    I've lived in Jacksonville consistently for 16 years.  I was

16    born here so I've been here 43 years with a short stint in the

17    military.  The same thing with Florida.

18             I have a four-year degree, a bachelor's of science in

19    construction management.

20             I'm a construction cost estimator.

21             I am married.  My wife is an administrative

22    assistant, and I have three children, 13, 10, and 5.

23             I served in the Navy as an avionics technician.

24             And I've never served on a jury.

25             THE COURT:  Thank you.

```
 1              PROSPECTIVE JUROR:  Good morning.

 2              THE COURT:  Good morning.

 3              PROSPECTIVE JUROR:  Joanne Rodriguez, Jacksonville,

 4    19 years.  In the state of Florida 19 years.

 5              My level of education is associate's degree.  I work

 6    for -- as an office manager for St. Peter's Episcopal Church.

 7              I'm married, and my husband works for the Army Corps

 8    of Engineers.

 9              I have two daughters, 32 and 21.

10              No military service.

11              And I have been on a jury for a civil case in

12    California.

13              THE COURT:  Okay.  And how long ago was that,

14    approximately?

15              PROSPECTIVE JUROR:  That was --

16              THE COURT:  A long time?

17              PROSPECTIVE JUROR:  -- more than ten years ago, yes.

18              THE COURT:  Okay.  And was a verdict reached, do you

19    remember?

20              PROSPECTIVE JUROR:  Yes.

21              THE COURT:  And were you the foreperson by any

22    chance?

23              PROSPECTIVE JUROR:  No.

24              THE COURT:  Okay.

25              Mr. Peacock.
```

```
1              PROSPECTIVE JUROR:  I'm Cody Peacock.  Yulee,
2    Florida, 25 years.  Lived in Florida 25 years.
3              High school diploma.  I am a gas station attendant.
4              Not married, no children.
5              No military service, and I've never served on a jury.
6              THE COURT:  Okay.  Thank you.
7              Ms. Bean?
8              PROSPECTIVE JUROR:  My name is Thelma Bean.  I've
9    lived in Jacksonville and Florida for 19 years.
10             I have an associate's degree in pre-veterinary
11   medicine.  I am currently unemployed as a full-time student.
12             I am single.  I have no children.
13             And I have no previous military or jury service.
14             THE COURT:  Thank you.
15             PROSPECTIVE JUROR:  My name is Shirley Dixon.  I live
16   in Jacksonville, Florida, for 68 years, and I've lived in
17   Florida for 68 years.
18             And I'm -- I have a 12th grade education, and I
19   retired from Tyson Foods as a box machine operator.
20             I'm single.  I have one son.  He's 42 years old.
21   He's a heavy machine operator for Tyson Foods -- not -- for the
22   City of Jacksonville.
23             I have no military experience.
24             Yes, I've served on a jury before in Duval County
25   here --
```

```
 1              THE COURT:  Okay.

 2              PROSPECTIVE JUROR:  -- and we reached a verdict.

 3              THE COURT:  And was that a civil or a criminal case?

 4              PROSPECTIVE JUROR:  Huh?  Criminal.

 5              THE COURT:  Criminal?  Okay.

 6              Were you the foreperson?

 7              PROSPECTIVE JUROR:  Huh?  No.

 8              THE COURT:  Okay.  Thank you, ma'am.

 9              PROSPECTIVE JUROR:  Warren Madridejos.  I live in

10  St. Augustine.  Been there for nine years.  Been in Florida for

11  nine years.

12              I have some college.  I'm currently manager of

13  information systems at Baptist.

14              My wife is medically retired.  I'm married.  Have

15  three kids, 20, 13, and 15.

16              I served in the Army.

17              And, no, I've not had any jury duty.

18              THE COURT:  Thank you.

19              PROSPECTIVE JUROR:  Mary Crowley, St. Johns, Florida,

20  for four years.

21              High school diploma.  I'm a restaurant manager.

22              And I am married.  I have two kids, six and eight.

23  My husband is in construction.

24              No military experience, no jury experience.

25              THE COURT:  Thank you.
```

1          PROSPECTIVE JUROR:  Reese Chappell, Your Honor.  I

2     live in Orange Park, lived there about six years.  In Florida

3     for about six years as well.

4          I have a bachelor of science in industrial

5     engineering.  I work for the Navy Bureau of Medicine and

6     Surgery.

7          I'm married.  I have two boys.  My wife is a

8     homemaker.

9          My boys are 22 and 15.  My oldest son just went to

10     work for Honeywell in Louisiana.  My youngest son is a student.

11          No military service and no previous jury duty.

12          THE COURT:  Okay.  Thank you.

13          PROSPECTIVE JUROR:  My name is Dirk Drehobl.  I live

14     in Palm Coast, Florida.  Been there for 15 years.  Lived in the

15     state for 15.

16          I'm a high school graduate.  My occupation is a truck

17     driver.

18          I'm married.  My wife works for a mini storage in

19     Palm Coast.

20          Two kids, 38 and 36.  My daughter's an LVB teacher,

21     and my son's a tile finisher.

22          No military service.

23          I had one jury duty back in Illinois back in

24     the '70s, and it never made it to trial.  It settled out of

25     court.

```
 1            THE COURT:  All right.  So I assume -- well, what
 2   type of case was it?
 3            PROSPECTIVE JUROR:  It was a civil case.
 4            THE COURT:  Civil case?  Okay.
 5            PROSPECTIVE JUROR:  My name is Albert Andino.  I live
 6   in Orange Park, Florida, about 15 years.  Been in Florida about
 7   19.
 8            High school.  I'm a correctional officer for
 9   Jacksonville Sheriff's Office.
10            Married.  Wife works for CSX.  Two children, 15 and
11   8.
12            No military.
13            I had a jury back in '91 or '92 in New Jersey.  It
14   was criminal, and we reached a verdict.
15            THE COURT:  Were you the foreperson?
16            PROSPECTIVE JUROR:  No, sir.
17            THE COURT:  Okay.  Thank you.
18            Okay.  Thank you, ladies and gentlemen.
19            Let me ask this as a general question, and I know
20   Mr. Alvarez has already responded to this.
21            As to those of you who have served on a jury, did
22   anything happen during that jury service that you believe would
23   make it difficult for you to be fair and impartial in this case
24   here?
25        (Negative response.)
```

1          THE COURT:  Now, the following questions are

2    addressed to you collectively, but if you can go ahead and keep

3    up the audible responses.

4          Do any of you know any of the other jurors, potential

5    jurors, sitting here today?

6       (Negative response.)

7          THE COURT:  Okay.  Now, do you happen to know me or

8    anyone else that you see here in the courtroom today?

9       (Negative response.)

10         THE COURT:  Have any of you ever studied law or had

11   paralegal training?

12      (Negative response.)

13      (Hand raised.)

14         THE COURT:  Okay.  Ms. Dobbins?

15         PROSPECTIVE JUROR:  Hi, Wendy Dobbins.  I mean, I

16   went to paralegal school for a year but never did anything with

17   it.

18         THE COURT:  Okay.  Anyone else?

19      (No response.)

20         THE COURT:  Has anyone ever appeared in court as a

21   witness?

22      (Negative response.)

23      (Hand raised.)

24         THE COURT:  Okay.  Mr. Chappell?

25         PROSPECTIVE JUROR:  I did, Your Honor, for a friend

```
 1    of mine during his divorce.
 2              THE COURT:  All right.  And is there anything about
 3    that experience which would have any impact on you in this
 4    case?
 5              PROSPECTIVE JUROR:  No, sir.  I went and testified
 6    and left.
 7              THE COURT:  Okay.  Thank you.
 8              Now, has anyone here ever been a party to a civil
 9    lawsuit; that is, have you ever been sued by anyone or sued
10    anyone else?
11         (Negative response.)
12         (Hand raised.)
13              THE COURT:  Mr. Alvarez?
14              PROSPECTIVE JUROR:  It was a civil suit.  My neighbor
15    claimed that I broke her door by knocking on it too hard.
16              THE COURT:  Okay.  And was it some type of
17    small-claims type lawsuit?
18              PROSPECTIVE JUROR:  Yes.  It resulted in me having to
19    pay to get the door fixed, even though it was broken
20    beforehand.
21              THE COURT:  Okay.  And is there anything about that
22    experience that would impact you as a juror in this case?
23              PROSPECTIVE JUROR:  I don't believe so.
24              THE COURT:  Okay.  All right.  Thank you.
25              Anyone else?
```

```
1        (No response.)

2             THE COURT:  And, again, I warned you that some of

3   these -- some of these questions are a little bit personal, so

4   if you need to answer them in private, just let me know.

5             Has anyone here been charged -- ever charged with a

6   crime?  And I don't mean a traffic ticket.  I actually mean

7   either a misdemeanor or a felony.

8        (Negative response.)

9        (Hand raised.)

10            THE COURT:  Okay.  Mr. Peacock?

11            PROSPECTIVE JUROR:  When I was 22 I got a DUI.

12            THE COURT:  And is there anything about that

13   experience that would impact you as a juror in this case?

14            PROSPECTIVE JUROR:  Not that I believe so.

15            THE COURT:  Okay.  Thank you.

16            Anybody else?

17       (No response.)

18            THE COURT:  Now, you will be instructed that during

19   the trial you should keep an open mind and not form or express

20   any opinion about the testimony and evidence until you've

21   heard -- until you've heard all the evidence, the closing

22   arguments, and the instructions on the law.

23            Can all of you wait until you've heard everything to

24   express or form an opinion about this case?

25       (Affirmative response.)
```

1          THE COURT:  Do you believe in trial by jury under our

2   judicial system?

3      (Affirmative response.)

4          THE COURT:  Does anybody not believe in the jury

5   trial system?

6      (No response.)

7          THE COURT:  Do any of you have a medical or physical

8   condition or impairment such that it would be difficult for you

9   to serve as a juror?

10      (Negative response.)

11          THE COURT:  Now, as I told you earlier, the case will

12   move as expeditiously as possible, but it's estimated by

13   counsel and by the parties that it may take three to four days.

14          And other than what's been expressed earlier, is

15   there any reason why any of you would not be able to give this

16   matter your full attention during that time?

17      (No response.)

18          THE COURT:  Now, has anyone ever been involved in any

19   way with an unemployment compensation proceeding either as a

20   claimant receiving or attempting to receive benefits or an

21   employer paying or disputing an unemployment compensation

22   claim?

23      (Hands raised.)

24          THE COURT:  And I have a couple of hands here.  All

25   right.

```
1              PROSPECTIVE JUROR:  25 or more years ago.

2              THE COURT:  I'm sorry.  Can you speak up a little?

3              PROSPECTIVE JUROR:  25 or more years ago I was --

4    filed an unemployment compensation claim, a Workmen's Comp

5    claim, from a tractor-trailer accident I was driving around.

6              THE COURT:  All right.  So was there both an

7    unemployment compensation claim and a Workers' Compensation

8    claim?  Because they are different.

9              PROSPECTIVE JUROR:  I don't recall.

10             THE COURT:  Okay.  And you said it was 25 years ago?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  All right.  Was there anything about that

13   experience or the way it was handled that you were unhappy

14   about?

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  All right.  Okay.  Thank you.

17        (Hand raised.)

18             PROSPECTIVE JUROR:  Hi.  Are you saying if we ever

19   got unemployment or Workers' Comp or --

20             THE COURT:  No, not Workers' Comp.  I'm not asking

21   about Workers' Comp --

22             PROSPECTIVE JUROR:  Unemployment?

23             THE COURT:  -- just an unemployment compensation

24   claim.

25             PROSPECTIVE JUROR:  I got unemployment when a school
```

1    let me go, and then the -- they said that it was for cause and

2    there was like an investigation over the phone, but I won and

3    so I got unemployment.

4              THE COURT:  Okay.  And was there anything about that

5    experience that you felt was unpleasant or unfair?

6              PROSPECTIVE JUROR:  It was unpleasant having to, you

7    know, speak over the phone to these questions of things that I

8    was accused of.

9              THE COURT:  Okay.  And you said you did obtain

10   benefits?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  All right.  Okay.  Thank you.

13             Anyone else?

14        (No response.)

15             THE COURT:  Now, let me ask both Ms. Dobbins and

16   Ms. Carcaba, some of the allegedly defamatory statements that

17   were made in this case may have been made in circumstances

18   related to an unemployment compensation proceeding.

19             Knowing just that much, is there anything about your

20   experience in your unemployment compensation case that you

21   believe would make it difficult for you to be fair and

22   impartial in this case?

23             And Ms. Dobbins?

24             PROSPECTIVE JUROR:  I just still have really bad

25   feelings about the administration lying about me and making all

 1   these accusations that I then had to defend myself on.

 2          THE COURT:  Okay.  We might question you a little bit

 3   more individually later.

 4          PROSPECTIVE JUROR:  Okay.

 5          PROSPECTIVE JUROR:  No.

 6          THE COURT:  No?  Okay.  Thank you.

 7          Now, as you probably have noticed, Ms. Berman, who's

 8   the plaintiff, is representing herself without an attorney in

 9   this case.  Mr. Kafka, who's the defendant, is represented by

10   counsel.

11          Will the fact that one party has counsel and one

12   party does not affect your views of this case or of either

13   party in any way?

14      (Negative response.)

15          THE COURT:  Now, would the fact that Ms. Berman was

16   born in another country but is now a naturalized United States

17   citizen affect you as a juror in any way?

18      (Negative response.)

19          THE COURT:  Now, the Court will decide the questions

20   of law that arise during the trial, and before you retire to

21   deliberate, the Court will instruct you on the law you are to

22   follow in reaching your verdict.

23          Regardless of any opinion you may have as to what the

24   law ought to be, it would be a violation of your sworn duty to

25   base a verdict upon any other view of the law than that which

1    will be given in the instructions of the Court, just as it

2    would be a violation of your sworn duty as judges of the facts

3    to base a verdict upon anything but the evidence in this case.

4            Can you each perform your sworn duty as a juror?

5        (Affirmative response.)

6            THE COURT:  Does anyone feel that they cannot?

7        (No response.)

8            THE COURT:  Now, if you're selected as a juror in

9    this case, can and will each of you render a fair and impartial

10   verdict based upon the evidence presented in this courtroom and

11   the law as it pertains to this particular case as instructed by

12   the Court?

13       (Affirmative response.)

14           THE COURT:  Is there anything regarding any of your

15   backgrounds, experiences, or strong feelings which you believe

16   might be significant or important to whether you would be a

17   fair and impartial juror in this case but which you have not

18   shared with us because we have not asked you the right

19   question?

20       (Negative response.)

21           THE COURT:  Is there anything else that anybody would

22   like to tell us or needs to tell us that might affect your

23   ability to be a fair and impartial juror in this case?

24       (Negative response.)

25           THE COURT:  Anyone?

1     (No response.)

2          THE COURT:  Okay.  If I could see Ms. Berman and the

3     attorneys at sidebar, please.

4     (At sidebar, out of the hearing of the jury:)

5          THE COURT:  All right.  What I'm going to do now --

6     first of all, are there any objections to the voir dire?

7          MR. JONES:  No, Your Honor.

8          MS. BERMAN:  No.

9          THE COURT:  Okay.  Did you want to question that one

10    juror any more, or have you heard enough?  You each have three

11    peremptories, by the way.

12         MR. JONES:  Right.  Ms. Dobbins?

13         THE COURT:  Yes.

14         MR. JONES:  I mean, I -- if you're -- I mean, I would

15    move for cause on Ms. Dobbins.

16         MS. BERMAN:  No, I do not.

17         THE COURT:  Wait, wait.  Don't interrupt, okay?

18         We'll need to question her some more.

19         MR. JONES:  Okay.  Sure.

20         THE COURT:  We'll bring her out and question her

21    more.

22         Is there anybody else that we need to keep?  What

23    I'll do is I'll let them go except for the jurors that we may

24    need to question some more, and I'll tell the rest of them to

25    come back in about 15 minutes.

1        So are there any other jurors individually that we

2   need to question?

3        MR. JONES:  I would just recommend -- Mr. Madridejos

4   and his wife, I mean, I would agree that he could be excused

5   for cause.

6        THE COURT:  Do you agree with that?

7        MS. BERMAN:  What's that?

8        MR. JONES:  Mr. Madridejos, he's No. 14.  His wife

9   has to have her trach taken care of.

10        MS. BERMAN:  Yes.  Yes.

11        THE COURT:  Okay.

12        MR. JONES:  Other than that, that's all I have,

13   Judge.

14        THE COURT:  Okay.  So we'll just keep those two, and

15   then we'll keep -- we'll question Ms. Dobbins a little bit

16   more.

17        MR. JONES:  Yes.

18        THE COURT:  Is there anybody else you wanted to --

19        MS. BERMAN:  No.  I agree with defendant's counsel to

20   excuse No. 14.

21        THE COURT:  Excuse Mr. Madridejos.

22        MS. BERMAN:  Uh-huh.

23        THE COURT:  Then we'll question Ms. Dobbins more.

24        Anyone else?

25        MS. BERMAN:  Maybe No. 5 and 6.

```
 1            THE COURT:  What do you want to question them about?
 2            MS. BERMAN:  And 1.
 3            THE COURT:  This is just to ask them more questions.
 4            MS. BERMAN:  Just --
 5            THE COURT:  You can -- you've got peremptory
 6   challenges where you can strike them --
 7            MS. BERMAN:  Okay.  Okay.
 8            THE COURT:  -- if you want.
 9            MS. BERMAN:  All right.
10            THE COURT:  Anybody else you want to --
11            MS. BERMAN:  No.
12            THE COURT:  -- that I need to --
13            MS. BERMAN:  No.  I think no.
14            THE COURT:  Well, right now, this is it though.
15            I'm going to give you a chance to strike --
16            MS. BERMAN:  And after this we will have a break
17   or --
18            THE COURT:  Yes.
19            MS. BERMAN:  And short break when I can call --
20   contact my witness?
21            THE COURT:  Yeah.  Well, we're going to go on to the
22   opening statements will be next --
23            MS. BERMAN:  Okay.
24            THE COURT:  -- but, yeah, we'll take a break.
25            MS. BERMAN:  Okay.  Will it be long to --
```

```
 1              THE COURT:  I don't know what you mean by long.
 2              MS. BERMAN:  Well, that I have time to call my
 3    witness.
 4              THE COURT:  To make a phone call?
 5              MS. BERMAN:  Yeah.
 6              THE COURT:  Like 15 minutes?
 7              MS. BERMAN:  I don't know exactly.
 8              THE COURT:  Well, it's 10:30.  There will be breaks.
 9    You'll have time.
10              MS. BERMAN:  Okay.  Thank you.
11         (End of discussion at sidebar.)
12              THE COURT:  Okay.  What I'm going to do now is I'm
13    going to let almost all of you go just temporarily, just --
14    we're taking a break and ask you to come back in about 15
15    minutes.
16              I am going to ask Ms. Dobbins to stay and
17    Mr. Madridejos to stay as well.  And so for the rest of you,
18    you're free to take a break.  Like I said, if you could be back
19    outside -- stay outside the courtroom -- in about 15 minutes.
20              And don't discuss -- I'll probably be giving you this
21    instruction over and over, but -- for those of you who are
22    selected.
23              But please let me tell you not to discuss this case
24    with anyone, including your fellow prospective jurors, not to
25    do any research on it.  I know you may not have your devices
```

1  with you, but any -- you know, any type of Internet research or

2  anything like that, any type of communication, any electronic

3  communication from here on out is prohibited.

4         So don't try to search or find anything about the

5  case or the parties.  And it's very important that you follow

6  that instruction because if you are selected for this jury,

7  you're going to be asked to base your verdict just solely on

8  what you hear in the courtroom, solely on this evidence,

9  without any outside influences.

10        So, again, if those two prospective jurors could

11 remain in the courtroom, and then everyone else could be back

12 in about 15 minutes.

13        Thank you.

14        COURT SECURITY OFFICER:  All rise for the jury.

15    (Prospective jury out at 10:38 a.m.)

16    (Mr. Madridejos and Ms. Dobbins in courtroom.)

17        COURT SECURITY OFFICER:  Please be seated.

18        THE COURT:  All right.  The parties can have a seat.

19        First of all, Mr. Madridejos, we appreciate your

20 situation, and we're going to allow you to be excused from this

21 jury.

22        Now, you do need to report back downstairs and see if

23 they have anything else for you before you leave.  But assuming

24 there's nothing else, you're excused from this jury, so --

25        PROSPECTIVE JUROR:  Thank you, Your Honor.

1          THE COURT:  Okay.

2     (Mr. Madridejos left the courtroom.)

3          PROSPECTIVE JUROR:  Want me to stand up?

4          THE COURT:  You can remain seated.  Thank you.

5          So, Ms. Dobbins, it sounds like you've had some prior

6     experience with an unemployment compensation proceeding.  And,

7     again, can you tell us a little bit more?

8          First of all, when was that?

9          PROSPECTIVE JUROR:  About ten years ago.

10         THE COURT:  All right.  And who were you working for?

11         PROSPECTIVE JUROR:  Crossroads Christian School.

12         THE COURT:  Okay.  And then so you wound up filing an

13    unemployment compensation claim?

14         PROSPECTIVE JUROR:  Yeah.  They fired me kind of

15    right before spring break, like now.  Right before spring break

16    they fired me.

17         THE COURT:  Okay.  And then they contested the claim?

18         PROSPECTIVE JUROR:  Yeah.  So then I filed for

19    unemployment, and they must have contested because I got calls

20    from, I guess, the unemployment agency.  And they started

21    interrogating me over the phone, asking me questions about what

22    the administration said I did wrong.

23         And I think I had to go through two phone calls, and

24    then they recorded my responses and investigated it, and then

25    they said that I did qualify for unemployment.

1      THE COURT:  Okay.  So how long a process did that

2  take?

3      PROSPECTIVE JUROR:  Just -- I mean, I filed for the

4  unemployment, and then, like, within a couple of weeks I was

5  getting phone calls, and then I answered the questions.  And

6  then I got a letter saying I was approved, and then I got the

7  unemployment.

8      THE COURT:  Okay.  Now, knowing that -- and I know

9  you don't know too much about this case at this point, but

10  knowing that the statements that were -- that are claimed to be

11  defamatory in this case were made in connection with an

12  unemployment compensation proceeding, is there anything about

13  that that would make it difficult for you to sit as a juror and

14  be fair and impartial in the case?

15      PROSPECTIVE JUROR:  Well, I mean, I was just really

16  upset that the principal was saying I did stuff I didn't do or

17  just kind of tweaking it, taking, like, part of the truth and

18  then tweaking it to make it look like I wasn't doing the right

19  thing.

20      I mean, it's gut wrenching when you try your best

21  and --

22      THE COURT:  And what were they saying that you did?

23      PROSPECTIVE JUROR:  Well, I was in, like, a school

24  with behavior problem kids, and I was a new teacher.  I went

25  back to college in my 40s to get a teaching degree, so I had no

 1    training as far as how to manage behaviors, so I was doing the

 2    best that I could.

 3            So the administration wrote me up for classroom

 4    management, and there was a miscommunication where we were

 5    supposed to meet once a week to see if I'm improving.

 6            Well, we talked in the office, and for her, I think

 7    she was thinking once a week meant I go to her office and talk,

 8    but she kept coming to my classroom after school and we would

 9    talk, so I thought I was -- that's what we were doing.

10            So she told the unemployment office that I refused to

11    come to the meetings to get better, you know, improvement, you

12    know, thing, but I thought that was happening all along.

13            And then something out of the blue, she said that I

14    did nothing when two students were doing something sexually

15    inappropriate out on the playground, and I was like -- I was on

16    the playground.

17            And the investigator says, "Well, how old were the

18    kids?"

19            I said, "They were like 11 years old," you know.

20            And so they just -- they threw that one out too.

21            THE COURT:  Did you ever have to go to a hearing?

22            PROSPECTIVE JUROR:  Uh-uh.

23            THE COURT:  Did you ever -- and just for the record

24    that's a no?

25            Did you ever have -- let me ask it again.

1           The court reporter has to take down what you say so

2    uh-huhs or --

3           PROSPECTIVE JUROR:  Oh, okay.

4           THE COURT:  Yeah.

5           Did you ever have to go to a hearing?

6           PROSPECTIVE JUROR:  Just talked to somebody over the

7    phone a couple times to clarify my side of the story.

8           THE COURT:  Okay.  And did you ever have any further

9    dealings with the employer?

10           PROSPECTIVE JUROR:  No.  I think the letter that I

11   finally got was that they then went back to my employer with my

12   responses and they didn't say anything, so I think I won by

13   default because they didn't argue what I said.

14           THE COURT:  Okay.  All right.

15           Mr. Jones, did you want to ask any questions or --

16           MR. JONES:  Thank you.  Yes, Your Honor.

17           Hi, Ms. Dobbins.

18           PROSPECTIVE JUROR:  Hi.

19           MR. JONES:  I understand that -- what you described,

20   that your experience was gut wrenching, and I wrote down that

21   you still have bad feelings about the administration what you

22   said lying about you.

23           And I know you know very little about the case so

24   far, but, again, the comments that are being sued over in this

25   case is involving an employer's comment to the unemployment

1  administration.

2        You having that experience, would you feel that maybe

3  my client, Mr. Kafka, the employer, would be starting maybe one

4  step behind?

5        PROSPECTIVE JUROR:  Maybe --

6        MR. JONES:  All right.

7        PROSPECTIVE JUROR:  -- just because it happened to

8  me.

9        MR. JONES:  Thank you.  That's the only question I

10  have.

11        THE COURT:  Okay.  Ms. Berman, do you have any

12  questions?

13        MS. BERMAN:  Defendant's counsel said that Mr. Kafka

14  employer, and we already established that I never was employed.

15        So does this still be affecting you if he lie about

16  me in unemployment proceeding without my knowledge, and I'm not

17  employee?

18        PROSPECTIVE JUROR:  I'm -- I don't even -- that's,

19  like, over my head.

20        THE COURT:  Yeah.

21        PROSPECTIVE JUROR:  I don't even know what that

22  means.

23        THE COURT:  Do you have a -- do you have a question

24  that you want to ask --

25        MS. BERMAN:  I . . .

```
 1          THE COURT:  Okay.  All right, ma'am.  If you can then
 2  step outside.  You have a little bit shorter break than
 3  everybody else, but you probably have about --
 4          PROSPECTIVE JUROR:  Can I leave my stuff here?
 5          THE COURT:  You can leave it.  We're all going to be
 6  in here, so yeah.
 7          PROSPECTIVE JUROR:  Okay.
 8          THE COURT:  Thank you, ma'am.
 9      (Ms. Dobbins left the courtroom.)
10          THE COURT:  All right.  Okay.  So let the -- all the
11  jurors are out of the courtroom now.  Let the record reflect
12  that Mr. Madridejos has been dismissed with the consent of both
13  parties for cause.
14          And does anybody else, first of all, have any other
15  cause challenges?
16          Do you have any cause challenges, Ms. Berman?
17          MS. BERMAN:  I don't know yet.
18          THE COURT:  Well, this is the time.  You have to make
19  it right now.
20          MS. BERMAN:  I guess not.
21          THE COURT:  All right.  Does the defendant have any
22  cause challenges?
23          MR. JONES:  Yes, Your Honor.  Defense would challenge
24  Ms. Dobbins.
25          THE COURT:  All right.  And I would tend to agree
```

1   with that.  I think Ms. Dobbins's prior experiences, I think

2   she's indicated sufficiently that she would have a difficult

3   time being fair and impartial, and I have a doubt about whether

4   she could put that experience aside and be fair.

5           Do you have any response to that, Ms. Berman?

6           MS. BERMAN:  Just objection to that.

7           THE COURT:  All right.  Okay.  I'm going to grant

8   that motion, and Ms. Dobbins will be excused for cause.

9           Okay.  So that means that we're up to -- right now

10  we're up to juror No. 8.  We're picking a jury of seven people,

11  and so right now we have 1, 3, 4, 5, 6, 7, and 8.

12          All right.  So you each have three peremptory

13  challenges, and we'll go -- we'll alternate.  First the

14  plaintiff will exercise any peremptories, then the defendant,

15  and we'll go from there until the parties have either run out

16  of peremptories or they've accepted the jury.

17          So -- and this will pertain only up through juror

18  No. 8 at this point.

19          MR. JONES:  Your Honor?

20          THE COURT:  Yes.

21          MR. JONES:  Could you give me just a couple minutes

22  to confer with my client over the jury pool?

23          THE COURT:  Yes.  We could -- why don't we go ahead

24  and take about a five-minute break, and then you'll be asked to

25  make your peremptory challenges.

1            Okay.  So court will be in recess.

2            COURT SECURITY OFFICER:  All rise.

3       (Recess from 10:49 a.m. until 10:58 a.m.; all parties

4    present.)

5       (Outside the presence of the prospective jury:)

6            COURT SECURITY OFFICER:  All rise.  This Honorable

7    Court is now in session.

8            Please be seated.

9            THE COURT:  Okay.  Let the record reflect that the

10   parties and the attorneys are back in court, and the jurors are

11   still out of the courtroom.

12           So, Ms. Berman, did you have any peremptory

13   challenges you wanted to make to jurors numbered 1 through 8?

14   In other words, you can strike these -- you can strike one of

15   these jurors if you want to, as long as it's not for certain

16   legally improper reasons.

17           MS. BERMAN:  I'm thinking about juror No. 6 because

18   this case is like --

19           THE COURT:  Okay.  You don't need to give me an

20   explanation.

21           You want to strike juror No. 6?  That would mean

22   juror No. 9 would come on the jury.

23           MS. BERMAN:  Yeah.  I understand.

24           THE COURT:  Okay.  All right.  So plaintiff has

25   exercised a peremptory challenge as to juror No. 6.

1            All right.  And the defendant?  We're now up to juror

2   No. 9.

3            MR. JONES:  Right.  Defendant would exercise its

4   first peremptory against Ms. Petty, No. 3.

5            THE COURT:  No. 3?  Okay.

6            All right.  So now we're up to juror No. 10.

7            Ms. Berman, do you wish to exercise your second

8   peremptory challenge as to any of the jurors that are numbered

9   1 through 10 who have not already been deleted from the jury?

10           MS. BERMAN:  I think not.

11           THE COURT:  No?

12           MS. BERMAN:  No.

13           THE COURT:  Are you accepting the jury as

14   constituted?

15           MS. BERMAN:  I maybe exercise my rights on juror

16   No. 5.

17           THE COURT:  No. 5?

18           MS. BERMAN:  Uh-huh.

19           THE COURT:  All right.  So No. 5 will be stricken.

20   That's plaintiff's second.  That will put us up to juror

21   No. 11.

22           And does the defendant wish to exercise a second

23   peremptory?

24           MR. JONES:  Yes, Your Honor.  We'll -- defense will

25   exercise a second peremptory against Mr. Kim, No. 7.

```
1              THE COURT:  No. 7?  All right.  That will put us up
2    to juror No. 12.
3              All right.  So, Ms. Berman, you have one last
4    peremptory, if you wish to exercise it, as to any of the jurors
5    1 through 12 who have not already been omitted.
6              MS. BERMAN:  Juror No. 12.
7              THE COURT:  You want to strike juror No. 12?
8              MS. BERMAN:  Yes.
9              THE COURT:  Okay.  And that's your last peremptory.
10             Okay.  That brings us up to juror No. 13, and
11   defendant has one more peremptory.
12             MR. JONES:  All right.  Yes.  The defendant would
13   exercise its third peremptory against Ms. Douthitt, the first
14   juror.
15             THE COURT:  All right.  No. 1?
16             MR. JONES:  Yes.
17             THE COURT:  All right.  So that will bring us up to
18   juror No. 15.
19             Both sides have exhausted their peremptory
20   challenges, so the jury will be -- I'll just go by their juror
21   number -- well, I'll say their names also:  Juror No. 4,
22   Mr. Alvarez; juror No. 8, Ms. Newman; No. 9, Mr. Gaudry;
23   No. 10, Ms. Rodriguez; No. 11, Mr. Peacock; No. 13, Ms. Dixon;
24   and No. 15, Ms. Crowley.  And that should be seven jurors.
25             All right.  Is that what everyone shows?
```

1          MR. SPRINGER:  Yes, Your Honor.

2          THE COURT:  All right.  Are there any other matters

3     we need to take up before we bring the jury back in?

4          We'll go ahead and -- go ahead, and what I plan to do

5     is we'll go ahead and seat the jury, and then I don't see any

6     reason why we can't go right into openings from that.

7          Well, I'll give the -- I'll give the jurors their

8     preliminary instructions.  I'll excuse the jurors who are not

9     selected.

10         Prior to opening would be the time to invoke the

11    rule, so does anybody have any of their witnesses present?

12         MS. BERMAN:  I have witnesses present.

13         THE COURT:  Are they here?

14         MS. BERMAN:  Yes.

15         THE COURT:  Okay.  Do you have any, Mr. Springer?

16         MR. SPRINGER:  No, sir.

17         THE COURT:  All right.  Why don't you go ahead and

18    have your witnesses come in and let me instruct them to stay

19    out of the courtroom and to not speak with anybody about the

20    case --

21         MS. BERMAN:  Okay.

22         THE COURT:  -- okay?

23         Are they right outside the courtroom?

24         MS. BERMAN:  Right now?

25         THE COURT:  Yes.

```
 1            MS. BERMAN:  Yeah.

 2            THE COURT:  Okay.  If you can -- can you help her,

 3   Mr. Sowards?

 4            COURT SECURITY OFFICER:  Yes, sir.

 5       (Brief pause.)

 6       (Mr. Berman entered the courtroom.)

 7            THE COURT:  Okay.  If you can just come up to the

 8   podium, please, sir.

 9            Is this the only witness you have right now,

10   Ms. Berman?

11            MS. BERMAN:  Yes.

12            THE COURT:  Okay.  And what is your name, sir?

13            THE WITNESS:  Christopher Berman.

14            THE COURT:  Okay.  Mr. Berman, we're going to start

15   with the opening statements soon, once the jury has come back

16   in.

17            And so the rule has been invoked, meaning that all

18   the witnesses have to remain outside the courtroom until

19   they're called as a witness, so you can't sit in the courtroom.

20   Also, you can't talk to anybody about the case as the case

21   progresses.

22            Now, Ms. Berman is acting as her own attorney though,

23   so I believe it's all right for Mr. Berman to speak with

24   Ms. Berman, unless somebody has an objection to that.

25            MR. JONES:  Just to be clear, not about the substance
```

```
 1   of any of the testimony from the trial.  I mean, obviously, for
 2   practical matters, since they're husband and wife --
 3           THE COURT:  Right.
 4           MR. JONES:  -- they're going to have to be able
 5   speak.
 6           THE COURT:  I believe that's right, Ms. Berman.
 7           So you'll be able to obviously communicate -- you're
 8   Ms. Berman's husband; is that correct?
 9           THE WITNESS:  That is correct.
10           THE COURT:  You could communicate with him just
11   about, I'll say, housekeeping matters, about what time he needs
12   to be here and things like that, but you're not to act -- to
13   tell him what the evidence has been.
14           Do you understand that?
15           MS. BERMAN:  Yes.
16           THE COURT:  All right.  Okay.  So you understand your
17   responsibilities --
18           THE WITNESS:  Yes, Your Honor.
19           THE COURT:  -- Mr. Berman?
20           Okay.  Thank you.
21           THE WITNESS:  And may I --
22           THE COURT:  Yes.  And you can -- you can leave.
23       (Mr. Berman left the courtroom.)
24           THE COURT:  All right.  Okay.  You can bring the
25   prospective jurors back in.
```

1          MS. BERMAN:  Your Honor, I have a question.

2          THE COURT:  Hold on.  Tell Mr. Sowards to hold on for

3    a second.

4          MS. BERMAN:  Maybe I --

5          THE COURT:  Hold on.  Hold on.

6          Okay.  Go ahead.

7          MS. BERMAN:  And maybe I miscalculated because I --

8          COURT REPORTER:  I'm sorry.  I --

9          THE COURT:  The court reporter can't understand what

10   you're saying.

11         MS. BERMAN:  I said maybe I miscalculated.  In my

12   calculation we excuse eight jurors, but we have -- supposed to

13   have, like, six challenges and we excuse one juror so I don't

14   understand how it's become eight.

15         THE COURT:  Well, there are two that were excused for

16   cause.  Each side had three peremptories, but two jurors were

17   excused for cause, remember?

18         MS. BERMAN:  I remember juror 14.

19         And second one?

20         THE COURT:  And juror No. 2 was excused for cause.

21         MS. BERMAN:  Oh, okay.  Thank you.

22         THE COURT:  Okay.

23         COURT SECURITY OFFICER:  All rise for the jury.

24      (Prospective jury in at 11:11 a.m.)

25         COURT SECURITY OFFICER:  Please be seated.

1          THE COURT:  Yes.  If the courtroom deputy calls your

2     name, if you can please come forward.

3          COURTROOM DEPUTY:  Andrew Alvarez, Robin Newman,

4     Byron Gaudry, Joanne Rodriguez, Cody Peacock, Shirley Dixon,

5     Mary Crowley.

6          THE COURT:  Okay.  Let me say first of all, as to

7     those of you who are still seated in the audience, obviously

8     you've not been selected for this jury.  Again, obviously it's

9     nothing to be taken personally if you are disappointed.

10         But you may or may not be done with your service for

11    today, but if you can please report back downstairs where you

12    started, your services may be needed.

13         Again, let me thank you though.  This is obviously an

14    important part of our society, that people are able to resolve

15    their disputes in court as opposed to some other methods which

16    we don't want to even imagine.  So you know how important this

17    is.

18         So, again, you're free to leave and to go back

19    downstairs, and thank you for being here this morning.

20       (The venire left the courtroom.)

21         THE COURT:  Okay.  Ladies and gentlemen, obviously

22    you have been selected to be jurors in this case.

23         And, Madam Clerk, if you could swear in the jury,

24    please.

25         COURTROOM DEPUTY:  Please raise your right hand.

1         Do each of you solemnly swear or affirm that you will

2    well and truly try the case now before the Court and render a

3    true verdict according to the law, evidence, and instructions

4    of this Court?

5         THE JURORS:  Yes.

6         THE COURT:  Okay.  Now that you've been sworn as the

7    jury to try this case, before we get into any further

8    discussions, let me just introduce some of the people who will

9    be working here today in court.

10        As I said to you earlier, my name is Judge Toomey,

11   and I will be the judge in this case.  Now, I will not be able

12   to socialize with you during the case, but I will be kept

13   informed of any matters which relate to your welfare, and I

14   will see to it that your jury service is as pleasant as

15   possible.

16        My courtroom deputy here, who just swore you in,

17   is -- her name is Tracee Perrotti.  She's in charge of the

18   courtroom and will also be in charge of the exhibits.

19        Next to Ms. Perrotti, you may have noticed somebody's

20   taking down everything that is being said.  That's our court

21   reporter, Shelli Kozachenko, and so that we have a permanent

22   record of these proceedings.

23        You probably met the court security officer, Steve

24   Sowards.  Now, he may be the most important person that I'm

25   introducing to you.  He will provide security for the courtroom

1    and will also attend to your needs during your jury service.

2         If you have any questions relating to your

3    accommodations or your needs, please direct them to Mr. Sowards

4    during any of the breaks.  He will be able to handle the

5    situation or bring it to my attention as necessary.

6         Over to my left over there is one of my law clerks,

7    Trey Mitchell.  He's assisting me in the case.  He may or may

8    not be in court.  When he's not in court, he's attending to

9    other matters.

10        Now, you've been introduced to the lawyers and their

11   clients, so I'm not going to do that again.

12        I will tell you that any personal items that you wish

13   to bring with you can be kept in the jury room, which will be

14   locked when you're in court.  There's also a refrigerator, a

15   microwave, and a coffee maker that's available for your use

16   during your jury service.

17        As I said, the trial will run from 9 a.m. to 5 p.m.,

18   so you'll need to be here -- I would plan on being here no

19   later than 8:45.  And we will take a lunch break.  We will take

20   normal breaks throughout the testimony.  There are restroom

21   facilities in the jury room, and there are also larger restroom

22   facilities out in the hallway.

23        Now, as you may have already discovered, parking is

24   not so great in this area downtown around the courthouse,

25   and -- but if you talk to Mr. Sowards, he can advise you

 1    concerning voucher parking.

 2         If there's anything else we could do to make your

 3    jury service more comfortable, please let him know, and we will

 4    do everything we can to accommodate you.  We realize that this

 5    is an imposition, and we understand that, so we do want to try

 6    to make it as pleasant as we can for you.

 7         Now, in order to make sure that you maintain the

 8    impartiality necessary of being a juror, I've instructed all

 9    the lawyers and the parties in this case, and I will remind

10    them and instruct them right now again, as well as any members

11    of their staffs, not to attempt to speak with you during the

12    course of this trial.

13         Thus, if you find yourself in proximity with one of

14    them, do not be offended if they do not speak with you because

15    they are just simply following my instruction.

16         Likewise, you should not speak with them or with

17    anyone else about this case while it's being tried.  If anyone

18    attempts to discuss the case with you, you should immediately

19    tell them to stop and should report any such contact to the

20    court security officer, who will report it to me.  And

21    obviously this is very important.

22         While you're serving on the jury, you will have

23    badges that identify you as a juror which should make it less

24    likely that someone will approach you to discuss the case.

25         Now, I will decide all questions of law and procedure

1    that arise during the trial, and before you retire to the jury

2    room at the end of the trial to deliberate upon your verdict

3    and decide the case, I will explain to you the rules of law

4    that you must follow and apply in making your decision.

5           Now, I need to explain some basic principles about a

6    civil trial and your duty as jurors.  These are preliminary

7    instructions.  I'll give you more detailed instructions at the

8    end of the trial.

9           It is your duty to listen to the evidence, decide

10   what happened, and apply the law to the facts.  It's my job to

11   provide you with the law you must apply, and you must follow

12   the law, even if you disagree with it.

13          You must decide the case on only the evidence

14   presented in the courtroom.  Evidence comes in many forms.  It

15   can be testimony about what someone saw, heard, or smelled.  It

16   can be an exhibit or a photograph.  It can be someone's

17   opinion.

18          Some evidence may prove a fact indirectly.  Let's say

19   a witness saw wet grass outside and people walking into the

20   courthouse carrying wet umbrellas.  This may be indirect

21   evidence that it rained, even though the witness didn't

22   personally see it rain.  Indirect evidence like this is also

23   called circumstantial evidence.  It's simply a chain of

24   circumstances that likely prove a fact.

25          As far as the law is concerned, it makes no

difference whether evidence is direct or indirect.  You may

choose to believe or disbelieve either kind.  Your job is to

give each piece of evidence whatever weight you think it

deserves.

During the trial you'll hear certain things that are

not evidence, and you must not consider them.  First, the

parties' statements and arguments when they're not testifying

as a witness are not evidence.

In their opening statements and closing arguments,

the lawyers and Ms. Berman will discuss the case.  Their

remarks may help you follow each side's argument and

presentation of evidence, but the remarks themselves aren't

evidence and shouldn't play a role in your deliberations.

Second, the lawyers and Ms. Berman -- and I may refer

to her sometimes as a pro se party, which just simply means

that she's representing herself, so if I use that term, that's

what it means.

So the lawyers and the pro se party's questions and

objections aren't evidence.  Only the witness's answers are

evidence.  Don't decide that something is true just because a

lawyer or a party -- party's question suggests that it is.

For example, a lawyer or a party may ask a witness,

"You saw Mr. Jones hit his sister, didn't you?"  That question

is not evidence of what the witness saw or what Mr. Jones did

unless the witness agrees with it.

1    There are rules of evidence that control what the

2    Court can receive into evidence.  When a lawyer or party asks a

3    witness a question or presents an exhibit, the opposing lawyer

4    or party may object if he or she thinks the rules of evidence

5    don't permit it.

6         If I overrule the objection, then the witness may

7    answer the question or the Court may receive the exhibit.  If I

8    sustain the objection, then the witness cannot answer the

9    question and the Court cannot receive the exhibit.

10        When I sustain an objection to a question, you must

11   ignore the question and not guess what the answer might have

12   been.

13        Sometimes I may disallow evidence -- this is also

14   called striking evidence -- and order you to disregard it or

15   ignore it.  That means that you must not consider that evidence

16   when you are deciding the case.

17        I may allow some evidence for only a limited purpose.

18   When I instruct you that I have admitted an item of evidence

19   for a limited purpose, you must consider it only for that

20   purpose and no other.

21        Now, to reach a verdict, you may have to decide which

22   testimony to believe and which testimony not to believe.  You

23   may believe everything a witness says, part of it, or none of

24   it.

25        When considering a witness's testimony, you may take

1   into account the following things:

2          (1) the witness's opportunity and ability to see,

3   hear, and know the things the witness is testifying about.

4          I'm not going to number these.

5          Next is the witness's memory, the witness's manner

6   while testifying, any interest the witness has in the outcome

7   of the case, any bias or prejudice the witness may have, any

8   other evidence that contradicts the witness's testimony, the

9   reasonableness of the witness's testimony in light of all the

10  evidence, and any other factors affecting believability.

11         At the end of the trial I'll give you additional

12  guidelines for determining a witness's credibility.

13         Now, as I told you earlier, this is a civil case.  To

14  help you follow the evidence, I'll summarize the parties'

15  positions.

16         The plaintiff, Ms. Berman, claims the defendant,

17  Mr. Kafka, defamed her by publishing false statements about

18  her.  Mr. Kafka denies this claim and raises a number of

19  defenses to plaintiff's claim, what we call affirmative

20  defenses.

21         Now, the plaintiff, Ms. Berman, has the burden of

22  proving her case by what the law calls a preponderance of the

23  evidence.  That means that Ms. Berman must prove that in light

24  of all the evidence, what she claims is more likely true than

25  not.

1        So if you could put the evidence favoring the

2   plaintiff and the evidence favoring the defendant on opposite

3   sides of balancing scales, the plaintiff needs to make the

4   scales tip to her side.  If she fails to meet this burden, you

5   must find in favor of the defendant.

6        To decide whether any fact has been proved by a

7   preponderance of the evidence, you may, unless I instruct you

8   otherwise, consider the testimony of all witnesses, regardless

9   of who called them, and all exhibits that the Court allowed,

10  regardless of who produced them.

11        After considering all the evidence, if you decide a

12  claim or fact is more likely true than not, then the claim or

13  fact has been proved by a preponderance of the evidence.

14        On certain issues called affirmative defenses, the

15  defendant, Mr. Kafka, has the burden of proving the elements of

16  the defense by a preponderance of the evidence.  I'll instruct

17  you on the facts that the defendant must prove for any

18  affirmative defense.

19        After considering all the evidence, if you decide

20  that the defendant has successfully proven that the required

21  facts are more likely true than not, the affirmative defense is

22  proved.

23        Now, as I said, while serving on the jury, you may

24  not talk with anyone about anything related to the case.  You

25  may tell people that you're a juror and give them information

1   about when you must be in court, but you must not discuss

2   anything about the case itself with anyone.

3          You shouldn't even talk about the case with each

4   other until beginning your deliberations.  You want to make

5   sure you've heard everything, all the evidence, the closing

6   arguments, and my instructions on the law, before you begin

7   deliberating.

8          You should keep an open mind until the end of the

9   trial.  Premature discussions may lead to a premature decision.

10         In this age of technology, I want to emphasize that

11  in addition to not talking face-to-face with anyone about the

12  case, you must not communicate with anyone about the case by

13  any other means.  This includes e-mails, text messages, the

14  Internet, social networking sites such as Facebook, Myspace,

15  Twitter, anything else you could possibly think of.

16         You also shouldn't Google or search online or offline

17  for any information about the case, the parties, or the law.

18  Don't read or listen to the news about this case, visit any

19  places related to the case, or research any fact, issue, or law

20  related to the case.

21         The law forbids the jurors to talk with anyone else

22  about the case, and it forbids anyone else to talk to the

23  jurors about it.  It's important that you understand why these

24  rules exist and why they're so important.

25         You must base your decision only on the testimony and

1    other evidence presented in the courtroom.  It is not fair to

2    the parties if you base your decision in any way on information

3    you acquire outside of the courtroom.

4           For example, the law often uses words and phrases in

5    special ways, so it's important that any definitions you hear

6    come only from me and not from any other source.

7           Only you jurors can decide a verdict in this case.

8    The law sees only you as fair, and only you have promised to be

9    fair.  No one else is so qualified.

10          Now, if you wish, you may take notes to help you

11   remember what the witnesses said, and you'll be given notepads

12   and pens and pencils.  If you do take notes, please don't share

13   them with anyone until you go to the jury room to decide the

14   case.

15          Don't let note-taking distract you from carefully

16   listening to and observing the witnesses.  When you leave the

17   courtroom you should leave your notes hidden from view in the

18   jury room.

19          Whether or not you take notes, you should rely on

20   your own memory of the testimony.  Your notes are there only to

21   help your memory.  They're not entitled to greater weight than

22   your memory or impression about the testimony.

23          Now, let's walk through the trial.  First, each side

24   may make an opening statement, but they don't have to.

25   Remember, an opening statement isn't evidence, and it's not

1    supposed to be argumentative.  It's just an outline of what

2    that party intends to prove.

3            Next, the plaintiff, Ms. Berman, will present her

4    witnesses and ask them questions.  After she questions the

5    witness, the defendant's attorneys may ask the witness

6    questions.  This is called cross-examining the witness.

7            Then the defendant, Mr. Kafka, will present his

8    witnesses, and the plaintiff, Ms. Berman, may cross-examine

9    them.

10           You should base your decision on all the evidence

11   regardless of which party presented it.

12           After all the evidence is in, the parties' lawyers

13   will present their closing arguments to summarize and interpret

14   the evidence for you, and then I'll give you instructions on

15   the law.  You'll then go to the jury room to deliberate.

16           All right.  I'm going to ask the parties to see me at

17   sidebar for a minute.

18           And then also, Ms. Perrotti, if you can go ahead and

19   provide the jurors with paper and pen.

20       (At sidebar, out of the hearing of the jury:)

21       THE COURT:  All right.  Is there any objection to the

22   preliminary instructions?

23       MR. SPRINGER:  No, sir.

24       MS. BERMAN:  No.

25       THE COURT:  Okay.  So at this point I'm going to say

1    that you'll present your opening statement, okay, so you'll

2    give your opening and you'll give your opening.  At that point

3    we'll probably be ready to take a lunch break, I assume.

4             So is there anything else that you want to bring up

5    at this point?

6             MS. BERMAN:  Can I have, like, five minutes break?

7    My throat is --

8             THE COURT:  Dry?  We're taking an awful lot of

9    breaks.

10            I don't -- I don't -- no.  We're getting too close to

11   lunchtime to take a break, so I think we need to start with the

12   openings or else it will be -- it will be too late, so . . .

13            Let me just caution you again that what you say in

14   opening is supposed to be a preview of the evidence, okay?

15   It's not your testimony.  You'll have to have your testimony

16   under oath from the witness stand.

17            Again, we talked about limiting each side to a half

18   hour, so that's -- that's my plan, unless it's -- I really see

19   a need for it to go longer than that, all right?

20            MS. BERMAN:  Okay.

21         (End of discussion at sidebar.)

22            THE COURT:  Okay.  We're now going to start with

23   the -- as I told you, with the parties' opening statements.

24            So, Ms. Berman, if you want to come to the podium and

25   give your opening statement.

1      MS. BERMAN:  Good morning, ladies and gentlemen.  My

2  name's Lareesa Berman, and I am plaintiff in this case.

3      I am not an attorney, and I never speak in -- have my

4  public speech, so if you excuse me, I prepare my notes and I

5  will be reading from my notes.  And before I begin my

6  statement, I would like to thank you for being here to judge my

7  case.

8      Shoot first and then ask questions later.  This

9  expression exactly applies to this case as what you're about to

10  hear because when the defendant fire off accusation based on

11  his guesses, his assumption, and his prejudice, real and

12  permanent damage is the result.  And just like the defendant,

13  those who shoot first, they try to justify their actions later,

14  but damage is done.

15      The defendant, Thomas Kafka, will be asking you to

16  prove in 2015 what he already stated as a proven fact in 2011.

17  The defendant has stated in writing that he already prove that

18  they have committed a crime, but now, four years later, he's

19  seeking the proof he stated as a fact in 2011.

20      He'll try to convince you of his good motives, truth,

21  or even his protected speech, but there is no protection about

22  his deliberate malice used to destroy my name and reputation.

23      There is truth here, but it is not defendant's

24  version of the truth.  The crime that the defendant claims I

25  committed, I would have to be his employee or work for one of

1  the defendant's many companies.  I never worked for the

2  defendant.  The defendant has stated in his own testimony that

3  I was never employee or held any fiduciary position with his

4  companies.

5       Although my case against the defendant is for libel

6  but there is a darker side for the defendant's actions beyond

7  his malice and untruthful statements.  The evidence will show a

8  deliberate and premeditated plan on the part of the defendant

9  to do maximum financial and emotional harm to my family and

10  myself.

11       Excuse me.

12       The evidence will show not only did the defendant lie

13  about me without cause and without the facts, he stated that --

14  he claim -- he had bad -- his motive for doing was so planned

15  years earlier.

16       What is the value of good name, anyone's good name?

17  It's not that we have a big house or what kind of car we drive

18  or where we went for vacation.  It's about your name, your

19  reputation, what you pass along to your children.

20       That's how people do remember as to when you are

21  pass, and when your name is taken away from you and damage your

22  name, it's very hard to -- it's very hard to bring it back.

23       I was name Lareesa by my parents in the name of the

24  woman who -- who helped my father restore his health.  The

25  doctors was telling him that he will be paralyzed for the rest

```
 1    of his life.  He wouldn't be able to walk, and --

 2              MR. SPRINGER:  Judge --

 3              MS. BERMAN:  But this woman --

 4              MR. SPRINGER:  Pardon me.  Objection, relevance as

 5    part of the opening.

 6              MS. BERMAN:  I --

 7              THE COURT:  Hold on, Ms. Berman.  Hold on.

 8              All right.  I'll let you go -- I'll let you go a

 9    little bit further with this, but this is not supposed to be an

10    argument.  It's just supposed to be what the facts of the case

11    are going to show.

12              MS. BERMAN:  But this woman didn't think about

13    decision what doctor was saying, he will be lying down.  And

14    she was natural healer and cure my dad, and he still walking.

15    And I'm very proud about my name.  I'm very proud and honored

16    to be named by this name.  But it will be dishonor for

17    defendant to harm my name, to do it in my name.

18              I'm here presenting myself in open court, without

19    benefit of counsel, while the defendant sits behind a wall of

20    villainy.  It's the most difficult things what I did in my

21    life.  It's very difficult for me.  But I wouldn't be here if I

22    wasn't right.

23              You are here as a jury to decide the value of my

24    name.  You're here, away from your job, from your families, but

25    if defendant just apologize for me or retract his statement, we
```

 1  wouldn't be here today in this court.

 2          THE COURT:  I'm going to --

 3          MR. SPRINGER:  Judge, relevance.  We'd like a

 4  sidebar.

 5          THE COURT:  Let's take a sidebar for a minute.

 6      (At sidebar, out of the hearing of the jury:)

 7          THE COURT:  Okay.  That gets into settlement

 8  discussions, and that's improper to bring up, okay, so you

 9  shouldn't have brought that up.

10          MS. BERMAN:  It's about my name.

11          THE COURT:  You shouldn't have brought that up, and

12  I'm going to instruct the jury to disregard it, and don't bring

13  it up again.

14          Do you understand that?

15          MS. BERMAN:  Okay.  Can I say that I never stole

16  anything?

17          THE COURT:  That you never stole anything?

18          MS. BERMAN:  Can I say that?

19          THE COURT:  Are you going to object to that?

20          MR. SPRINGER:  That's fine.

21          THE COURT:  You can say that.

22      (End of discussion at sidebar.)

23          THE COURT:  Okay.  Ladies and gentlemen of the jury,

24  I want you to disregard that last comment that Ms. Berman made.

25  That gets into what we call settlement discussions that may or

1   may not have occurred but have no relevance to the case and

2   should not be considered by you in any way.

3            All right.  Ms. Berman?

4            MS. BERMAN:  The law in Florida says that before you

5   file a lawsuit, you have five days to --

6            THE COURT:  Hold on.  Hold on, Ms. Berman.  I'm going

7   to instruct the jury on the law.  You're not to instruct the

8   jury on the law.

9            MS. BERMAN:  Okay.

10            THE COURT:  This is to say what the facts -- what you

11   expect the facts, the evidence in this case, to show so if you

12   can proceed in that fashion.

13            MS. BERMAN:  I am unrepresented because it is very

14   expensive to fight those who can afford to say what is not true

15   without fear.

16            MR. SPRINGER:  Objection --

17            THE COURT:  I'm going to --

18            MR. SPRINGER:  -- relevance, Judge.

19            THE COURT:  I'll sustain the objection.

20            Ms. Berman, I already asked the jury in jury

21   selection if they were going to be prejudiced either for or

22   against you or the defendant because you were pro se and

23   because they were being represented by an attorney.  They said

24   they would not be prejudiced, and they are not to be swayed by

25   that.

1          So you've already said -- it's obvious you're

2    representing yourself.  You don't need to say it again, and if

3    you could get on to what the facts and the evidence you intend

4    to show.

5          MS. BERMAN:  You can hear that English is not my

6    first language.  It's not even second one.  But I'm here in the

7    court to stand for the truth.

8          I grew up in a country where those with power were

9    immune from their actions.  If you were brave enough or foolish

10   enough to speak out against someone powerful, you would suffer

11   a terrible fate.

12         But I'm here in America where the motto is liberty

13   and justice for all, so I will not be silent to someone with

14   power and money, and I stand for myself because it is right to

15   be here defending my good name.

16         I will show you by the evidence, the exhibits and

17   testimony, the defendant has no defense against statement he

18   made.  Mr. Kafka will try to prove what he claim he already

19   prove four years ago.

20         When defendant says that I committed a serious crime,

21   the defendant has the burden of proof.  Making the statement of

22   fact without any -- anything more than guesses and assumptions

23   it's with malice.  It's very damaging.

24         The evidence will further show a darker motive in the

25   defendant's actions going far beyond negligence and malice.

```
 1    During this trial the defendant's attorney will argue his

 2    defense.  The defendant never deny writing the statements that

 3    lie about me.  Instead he offer what called affirmative

 4    defense, and affirmative defenses is like excuses.  It's

 5    like --

 6              MR. SPRINGER:  Objection, Judge.  It's argumentative

 7    and --

 8              THE COURT:  Yeah.  I sustain the objection.

 9              Ms. Berman, you're not to continue to argue.

10    Affirmative defenses are not excuses.  The jury should

11    disregard that statement.  They're legal defenses.

12              Now, if you can get on to what the facts -- you

13    haven't said what the statements are.  Why don't you start with

14    telling the jury what the statements are that you're

15    complaining about.

16              MS. BERMAN:  He lie about me to unemployment appeal

17    for my husband.  I never was employee or have any fiduciary

18    position with the defendant.  He lie about my name without my

19    knowledge when unemployment appeal found in favor of my

20    husband, and he lie about me.  And I wasn't even aware about

21    those statements.

22              The defendant's first statement isn't truth, and our

23    evidence will show and testimony will show the defendant's

24    statements are not truthful.  He stated the fact that I

25    embezzle money from his company.  The crime of embezzlement can
```

1  be carried out by employee or someone with access to company

2  finances.

3       I was never employed or held a position in any of

4  Mr. Kafka's corporations.  The evidence will show that for the

5  defendant, truth is irrelevant and any statement of fact had no

6  basis of truth.

7       The defendant made the same claim of embezzlement

8  about my husband to the Florida Department of Economic

9  Opportunity and what did they find, anything?  Nothing.  No

10  embezzlement, no truth, no fraud on part of my husband.

11       But that did not satisfy defendant.  He lie about me

12  in attempt to open an appeal, a new appeal, and after complete

13  investigation the Department of Economic Development found no

14  evidence to open new appeal.

15       I'm sorry.

16       The defendant's second affirmative defense is good

17  motive-fair comment.  He will say he had a good motive to lie

18  about me, but the evidence will show he had no good motive.

19  The evidence will show the defendant's good motive was to

20  confuse the Department of Economic Opportunity, making them

21  believe my husband was an employee of Trifecta Gaming, a

22  company founded and owned by my husband.

23       The defendant will try to make this case about my

24  husband, but my husband make only one mistake.  He trusted

25  defendant.

```
 1          Finally, the evidence will show the defendant's good

 2    motive was well calculated one to deprive my husband of the

 3    years of work he has invested in developing his business.

 4          Next defense is statutory privilege.  The defendant

 5    will try and tell you that the Florida statute gives him

 6    privilege and protection for the libel he wrote about me.  The

 7    defendant's counsel even tried to cite this statute to dismiss

 8    my case --

 9          MR. SPRINGER:  Your Honor, objection.

10          MS. BERMAN:  -- over a year ago.

11          THE COURT:  Ms. Berman, that's improper argument.

12    You're getting into the law, and you're getting into prior

13    developments in this case which you should not get into.

14          I'll instruct the jury to disregard that comment as

15    well.

16          And do you have anything else to say --

17          MS. BERMAN:  Yes.

18          THE COURT:  -- about the evidence in the case?

19          MS. BERMAN:  The defendant doesn't have privilege,

20    litigation privilege, as unemployment appeal was closed in

21    September 9, 2010, and no judicial proceeding was after that.

22    But defendant lie about me in e-mail on August 16, 2011, almost

23    a year after unemployment appeal was closed for my husband, not

24    me.

25          The defendant wrote in e-mails that libel me on
```

1    August 16, 2011, to open a new appeal and investigation into

2    his claim of benefits fraud against my husband.

3            A fraud investigation didn't find -- begins on

4    September 2011, but they didn't found any allegation what

5    defendant made.  That means defendant has no privilege to the

6    libel he wrote about me.

7            The defendant claims he lied only to a few people at

8    the Department of Economic Opportunity, but the evidence will

9    show that many other people must have received the defendant's

10   statement that I am a criminal.

11           The next defense is good opinion.  Opinion are not

12   facts.  The evidence will show that defendant's statements were

13   not his opinion but were stated as a fact that he said were

14   already proved, in the past tense, not that he will prove or

15   can prove.

16           If a statement can be answered yes or no, it is not

17   an opinion.  It is a statement of a fact.  And -- can I say

18   United States Supreme Court --

19           THE COURT:  No.  No.  No.

20           MS. BERMAN:  Hiding false statement of a fact as

21   opinion won't protect you, nor will trying to cover yourself by

22   saying your neighbor is -- allegedly is a drug dealer.  Facts

23   are statements that can be proven true or false.

24           MR. SPRINGER:  Judge, objection.

25           MS. BERMAN:  Opinions --

1          THE COURT:  Yeah.  I'm going to instruct the jury on

2     the fact or opinion defense.  Again, you're getting into the

3     law, and that's my domain.

4          So what other facts, if any, do you have to talk

5     about --

6          MS. BERMAN:  The defendant wants you to believe that

7     his words did not harm me.  They're just words and I do not

8     deserve compensation, but that's not true.  Once your name is

9     soiled by false and malicious words, it is very hard to clean.

10    Someone always will question your innocence.  It was proven

11    time and again.

12         The defendant will try to convince you I do not

13    deserve compensation, but that is not what the -- okay.  Fine.

14    I'm sorry.

15         I am the plaintiff, but I have been made to feel like

16    a defendant.  The defendant said he already prove I'm a

17    criminal.  I have never take anything in my life that didn't

18    belong to me.

19         My parents raised me as an honest person.  And I

20    recall from my childhood that one time my dad bought a bicycle

21    on credit, and when he came home --

22         MR. SPRINGER:  Objection, Judge.

23         THE COURT:  I'll let her proceed.

24         MS. BERMAN:  And when he came home, he look at the

25    receipt and they by mistake say "paid in full."  Even though

1  the shop was far away from our home, he went back and said,

2  "This is mistake," because he didn't wanted that person will be

3  responsible for that, make mistake.

4       And it was not possible for me to commit any crime

5  the defendant have prove I committed.  I never committed any

6  crime, and defendant doesn't have any proof when the evidence

7  will show I was never employee or worked for any of defendant's

8  companies.

9       So the embezzlement is only when you work for this

10 company or have fiduciary relationship with a company, but when

11 you are --

12       MR. SPRINGER:  Objection, Judge.  She's talking about

13 the law.

14       THE COURT:  Yeah.  I think that's getting into the

15 law.

16       MS. BERMAN:  The burden of proof rests with the

17 defendant.  The defendant will be looking for you to say his

18 defenses was truth, that he was only expressing his opinion or

19 that he was allegedly protected for what he wrote, but the

20 evidence will show the defendant lie about me deliberately and

21 maliciously.

22       The evidence will show that not only defendant shoot

23 first and ask questions later.  The evidence will show that he

24 was armed with the weapons of malice to harm my name and to do

25 dirty my name.

```
 1            Finally, the evidence will not only show the malice

 2   in the defendant's action and his disregard for the truth, but

 3   it will show a far more sinister motive behind the defendant's

 4   actions.

 5            Thank you.

 6            THE COURT:  All right.  Thank you.

 7            Okay.  Mr. Springer?

 8            MR. SPRINGER:  Yes, sir.

 9            May it please the Court?

10            THE COURT:  Yes.

11            MR. SPRINGER:  Ms. Berman?

12            Good morning.

13            THE JURORS:  Good morning.

14            MR. SPRINGER:  Thank you for being here.

15            Ms. Berman would have you believe that she's a victim

16   in this case, when in actuality it's the other way around.  Our

17   client, Thomas Kafka -- and, Mr. Kafka, if you'd stand up for a

18   second, please -- you'll get to hear from him during the course

19   of the trial, and he'll tell you that he's married.  He has a

20   couple of children.

21            You can sit down.

22            He's a businessman, and he owns two companies,

23   Maitland Furniture and Trifecta Gaming.  Those are two

24   companies you'll hear about.

25            Maitland Furniture manufactures tables, liquor
```

1   cabinets, bars for restaurants.  They also manufacture little

2   desks that people can sit at in casinos or racetracks while

3   placing bets.

4          Mr. Kafka performs his physical labor himself.  He

5   goes in every day, whether it's calibrating machines that he

6   uses to cut the wood or sand or actually sawing materials.  He

7   goes home at night after a long day at work and literally has

8   sawdust in his hair and on his clothes.

9          Trifecta Gaming -- now that's Maitland Furniture.

10  Trifecta Gaming, you'll hear, was the sales arm.  It's a sales

11  company, sold the products manufactured by Maitland Furniture.

12         This case really boils down to a few key facts, and

13  the evidence will show you that Mr. Kafka employed Lareesa

14  Berman's husband, Chris Berman, with Maitland Furniture.

15  Mr. Kafka fired Chris Berman from his employment with Maitland

16  Furniture.

17         Chris Berman turns around and applied for

18  unemployment benefits at the Department of Economic

19  Opportunity.  You'll hear different names, Department of

20  Economic Opportunity, Agency for Workforce Innovation.  They're

21  one and the same.  The bottom line is that you'll be told they

22  deal with and distribute the process of unemployment

23  compensation.

24         Mr. Kafka presented evidence of embezzlement to the

25  Agency for Workforce Innovation, and this evidence was not only

1    that Chris Berman embezzled money but also Lareesa Berman took

2    part in that embezzlement, and the evidence consists of two

3    business checks.

4         Each check was made out to Chris Berman care of

5    Trifecta Gaming, and you'll hear testimony and Mr. Kafka will

6    tell you that those checks were not to be made personal --

7    personally to Chris Berman.

8         On the back of these checks was the signature of

9    Chris Berman.  He shouldn't have signed the checks.  Chris

10   Berman was not an authorized signer of the business checks for

11   the Trifecta Gaming business account at SunTrust account.

12        Underneath his signature was printed, "Pay to the

13   order of Lareesa Berman," on the back of the business check.

14   And you'll hear Mr. Kafka say her name should not have been on

15   these business checks.

16        Underneath that was the signature of Ms. Berman,

17   Lareesa Berman, and her signature should never have been on the

18   back of these business checks.

19        Ms. Berman cashed these checks.  The moneys from

20   these two checks were never placed into the SunTrust Bank

21   account for Trifecta Gaming.  Mr. Kafka told the Agency for

22   Workforce Innovation about how Chris Berman embezzled this

23   money and how he was assisted by or Ms. Berman took part in

24   this embezzlement.

25        The evidence will show you that Ms. Berman was not

1   the victim, Mr. Kafka was.

2          MS. BERMAN:  Your Honor, objection because Workforce

3   Innovation found in favor of my husband.

4          THE COURT:  Well, that gets into the evidence.  I'll

5   overrule the objection.

6          MR. SPRINGER:  There are two statements at issue in

7   this case, the two alleged libel per se statements and they are

8   this.  One, a statement in an e-mail sent to Jamie Bellflower

9   of the Agency for Workforce Innovation, and I'll refer to them

10  as the agency, on August 16th, 2011.  And in that e-mail

11  Mr. Kafka wrote:  "Chris Berman and his wife embezzled money

12  from our company."

13          The second libel per se statement at issue in this

14  case is a September 2011 document sent to Janice Connell, and

15  Ms. Connell will come in here, and she'll sit on the witness

16  stand, and she'll tell you that she works in the benefits

17  payment and control unit.  And that's the unit involved in

18  investigating whether or not someone's working while receiving

19  benefits.

20          And in this document that Mr. Kafka sent to

21  Ms. Connell, it was stated, "Mr. Berman was terminated for

22  embezzling money, and part of the money was embezzled by his

23  wife."  Those are the only statements at issue in this case.

24  It will be your job to determine whether or not they were

25  libels per se.

1          Now, we've set forth several defenses, including that

2    the statement was true, substantially true; they were

3    privileged pursuant to -- it's called a litigation privilege,

4    in that they were made during the course of a judicial or

5    quasi-judicial proceeding, in other words, the unemployment

6    proceeding; they were pure opinion; and they were privileged

7    pursuant to a qualified privilege.

8          Now, a background as to what led to these statements

9    will help put everything in context.  Mr. Kafka, as I told you,

10   is a businessman.  He owns Maitland Furniture and Trifecta

11   Gaming, two companies.  Up until December 26, 2005, Trifecta

12   Gaming was owned by Thomas Kafka, his wife, Julie Kafka, and

13   Chris Berman, Ms. Berman's husband, and he was a minority

14   shareholder.

15         However, on December 26, 2005, Mr. Berman was no

16   longer a minority shareholder in Trifecta Gaming.  Chris

17   Berman's poor job performance led to Mr. Kafka wanting to

18   dissolve the company, but instead, Mr. Kafka agreed and it was

19   decided that Mr. Berman would no longer be a minority

20   shareholder in Trifecta Gaming.  Instead, he would be a paid

21   employee of Maitland Furniture with the title of vice president

22   of sales for Trifecta Gaming.  So he was a paid employee of

23   Maitland Furniture from that point forward.

24         Mr. Kafka will tell you that both Maitland Furniture

25   and Trifecta Gaming had common interests, two different

1    companies with common interests.  Maitland Furniture produced

2    the products, Trifecta Gaming sold the products, and moneys

3    that were brought in through the sale of Trifecta Gaming were

4    used towards common expenses for both companies, including

5    employees, and employees including Chris Berman.  The only

6    company that had employees at that time was Maitland Furniture.

7         Moneys brought in would pay for salaries, would pay

8    for products, the raw materials necessary to buy the -- make

9    these products that Maitland Furniture produced.

10        In January 2009 Mr. Kafka fired Mr. Berman for

11   embezzling money.  As a result, Mr. Berman applied for

12   unemployment benefits.

13        And you'll hear from Jamie Bellflower and Janice

14   Connell of the Department -- or the Agency for Workforce

15   Innovation, and they'll tell you that that's the agency that

16   administers unemployment compensation benefits in the state of

17   Florida.

18        The agency is judicial in nature.  They'll tell you

19   that they were the recipients of the alleged libel per se

20   statements.  So two statements, the e-mail and the document,

21   they're the ones that got them.

22        The e-mail to Jamie Bellflower.  Mr. Kafka appealed

23   an award of unemployment benefits for Mr. Berman.  The hearing

24   was held in May 2009.

25        During that hearing Mr. Kafka produced the evidence,

two checks, business checks, that showed embezzlement by Chris

Berman, who was assisted by Lareesa Berman.  Again, they were

made payable to Chris Berman care of Trifecta Gaming, and

Mr. Kafka will tell you at no time should they ever have been

made payable personally to Chris Berman.

He was simply to take these checks, the business

checks, deposit them into the Trifecta Gaming SunTrust Bank

account, and that's it.

The evidence will demonstrate that the statements

made by Mr. Kafka to Mr. Bellflower and Ms. Connell -- there

are two documents at issue, two statements at issue -- were

substantially true, that Ms. Berman took part in the

embezzlement of the money from Mr. Kafka's company.

Ms. Berman never was an owner of either Maitland

Furniture or Trifecta Gaming, never an employee of either

company.  That's true.  But her name wasn't supposed to be, as

Mr. Kafka will tell you, on the back of the checks.  Her

signature was not supposed to be on the back of the checks.

Mr. Kafka will also tell you that had Ms. Berman's

name not been on the back of the two checks at issue, her

name -- not even her name, reference to her as Chris Berman's

wife would never have come up in any hearing at the

unemployment compensation division, ever.  It's only because

her name was on the back of the two business checks he

presented as part of his evidence.

1       The evidence will also demonstrate that his

2   statements were either absolutely or qualified and privileged.

3   They were made to persons employed by the agency, Jamie

4   Bellflower and Janice Connell, during part of the unemployment

5   compensation process.

6       Mr. Bellflower will tell you that from the time

7   someone applies for unemployment benefits until the time the

8   benefits are exhausted or stop being paid, that claim remains

9   active.

10      A timeline of the events for this --

11      MS. BERMAN:  Objection.  It's a legal argument.

12      THE COURT:  Overruled.

13      MR. SPRINGER:  A timeline of the events for the

14   unemployment compensation process will provide helpful.

15      As a result of the May 2009 appeal, an order was

16   issued by the unemployment compensation appeals that Mr. Berman

17   was disqualified from receiving unemployment compensation

18   benefits for misappropriation of funds or embezzlement.

19      However, Mr. Berman claimed that he was disconnected

20   from the phone toward the end of that telephonic hearing, and

21   as a result, an order came down sending back the September --

22   the May order stating that there needed to be another hearing

23   for Mr. Berman to present more evidence if he had it.  So for a

24   procedural reason, it was sent back down.

25      However, that hearing never took place.  You'll hear

1  that at one point there were documents issued by the agency,

2  after this October order, that said Mr. Berman could present

3  more evidence if he wanted to that conflicted one another.

4        And on March 26, 2010, Mr. Kafka sent a letter to the

5  unemployment compensation division stating, "Hey, there's

6  conflicts in these documents and discrepancies, and please

7  clarify what's going on and what we should do."  He never

8  received a response from the agency.

9        Then in August 2011 Mr. Kafka noticed that Maitland

10  Furniture -- on the Maitland Furniture quarterly benefits paid

11  statement, that Mr. Berman was receiving unemployment benefits,

12  which prompted him to send the e-mail, the first allegedly

13  libelous statement to Jamie Bellflower of the agency stating

14  that he wanted to appeal any award.

15        In this first statement, the e-mail at issue,

16  Mr. Kafka believed that he had proven in the May hearing that

17  not only Chris Berman embezzled money, that Lareesa Berman took

18  part in that embezzlement and asked them not to lose sight that

19  he proved that Chris Berman and his wife embezzled money from

20  the company.  That's it.

21        Mr. Bellflower will tell you that he forwarded

22  Mr. Kafka's request to the office of appeals.  As a result of

23  this, additional orders were produced by the Unemployment

24  Appeals Commission.

25        Mr. Kafka also advised that Mr. Bellflower had

1   evidence -- he advised Mr. Bellflower that he had evidence that

2   Mr. Berman was working while receiving unemployment benefits.

3   As a result, Mr. Bellflower forwarded this concern to the

4   benefit payment control unit where Janice Connell worked.

5          Janice Connell will tell you that it was her job to

6   conduct investigations into whether or not someone was actually

7   receiving benefits while -- was working while receiving

8   benefits.

9          And here comes the second libel per se statement.  As

10  part of a packet of documents sent to Janice Connell, Mr. Kafka

11  sent a document which stated his position and that part of the

12  money was embezzled by Chris Berman's wife.

13         In both statements Mr. Kafka didn't even mention

14  Ms. Berman's name, just mentioned wife.  Mr. Kafka will tell

15  you once again that had her name not been on the back of the

16  business check that shouldn't have been there, her name -- a

17  reference to her would never have come up.

18         Ms. Connell used this information to conduct her

19  investigation, which concluded in October of 2011.  The

20  evidence will demonstrate that at no time did Mr. Kafka make

21  the two statements at issue with ill will, hostility, or have

22  any intent to harm Ms. Berman.

23         The reference to her assisting in embezzling was part

24  and parcel of the evidence presented, part and parcel with the

25  checks that were used in a hearing to prove Chris Berman

1    embezzled money, and her name was on the back.

2          You will not hear any evidence of damage to

3    Ms. Berman's reputation, that she experienced any shame, that

4    she experienced any humiliation.  There is no evidence to

5    support this.

6          The statements at issue were made only to the Agency

7    for Workforce Innovation, Mr. Bellflower and Ms. Connell.

8    That's it.  Nobody else.

9          The only way anyone could obtain this -- you'll hear

10   this.  Mr. Bellflower will testify that the only way someone

11   could obtain the document that he received, the e-mail, was to

12   make a public records request for Chris Berman's unemployment

13   file in the hopes that maybe Ms. Berman's reference to her

14   being his wife is mentioned in that.  That's it.

15         And Ms. Connell will get on the stand, and she will

16   tell you that the document she had, including the second libel

17   per se statement, are confidential.  Nobody can get them.

18         The evidence will show that Ms. Berman has not been

19   damaged in any way by this case.

20         At the conclusion of evidence, we're going to ask you

21   to return a verdict against Ms. Berman, and we're confident

22   you'll do that.

23         Thank you.

24         THE COURT:  Okay.  Ladies and gentlemen, you've now

25   heard the opening statements, and we're going to go ahead and

 1   take a lunch break at this point.

 2           Now, when do you come back to the courtroom, you'll

 3   always be entering and exiting through the jury room, so don't

 4   come actually back physically into the courtroom.  Just go

 5   outside, and Mr. Sowards will show you where to go.  We may be

 6   taking up other matters, you know, in the courtroom outside

 7   your presence.

 8           But for now, please remember the instructions I gave

 9   you previously in terms of not talking or researching anything

10   about the case.  And so you're now dismissed, and please be

11   back at 1:15.

12           Thank you.

13           COURT SECURITY OFFICER:  All rise for the jury.

14       (Jury out at 12:09 p.m.)

15           COURT SECURITY OFFICER:  Please be seated.

16           THE COURT:  All right.  Let's just talk about one

17   thing in terms of the witnesses.  So we'll be back at 1:15.  It

18   looks as if we'll be able to get a good bit of testimony in

19   today.

20           So, Ms. Berman, for planning purposes, who are

21   your -- who do you plan on calling first as a witness?

22           MS. BERMAN:  I think I will call first the defendant.

23           THE COURT:  Okay.  You're going to call Mr. Kafka?

24   All right.

25           And then what other witnesses do you have to present,

1    and who do you have here ready and available to testify?

2              MS. BERMAN:  Just my husband, and another witness

3    will be tomorrow.  I need to call her.

4              THE COURT:  All right.  We'll have -- that's

5    Ms. Cobb?

6              MS. BERMAN:  Yes.

7              THE COURT:  All right.  And we'll take up the matter

8    of whether that testimony will be allowed.

9              And then are you going to -- are you planning on

10   testifying, I assume?

11             MS. BERMAN:  After I have my witnesses.

12             THE COURT:  All right.  So you wanted to testify

13   after -- after your other witnesses.

14             MS. BERMAN:  Yes.

15             THE COURT:  Okay.  And that's the extent of your

16   witnesses?  That's all your witnesses?  In other words, it's

17   you, Mr. Kafka, your husband, and Ms. Cobb.  Those are the

18   witnesses.

19             MS. BERMAN:  Uh-huh.

20             THE COURT:  Okay.  All right.

21             And, Mr. Springer, what -- let's assume then

22   Ms. Berman, for one reason or another, is done today.  Are you

23   prepared to go -- to go forward and who with?

24             MR. SPRINGER:  Your Honor, it kind of depends.  I

25   know that she's going to call Mr. Kafka first.  In cross

1  generally we're not allowed to introduce evidence or documents,

2  and I do have documents I'd like to introduce.  So if that is

3  the Court's position, then I will have to recall him in our

4  case, and we can do that today.

5          Or the other thing is the only other two witnesses we

6  have will not be here till tonight because they're from out of

7  town.

8          THE COURT:  All right.  And that's Mr. Bellflower and

9  Ms. Connell?

10          MR. SPRINGER:  Yes, Your Honor.

11          COURT:  And what about Ms. Kafka?

12          MR. SPRINGER:  She is not going to be called.

13          THE COURT:  All right.  And --

14          MR. SPRINGER:  And there's Lora Katsavrias.  We're

15  not going to call her either.

16          THE COURT:  All right.  Ms. Berman, if you're going

17  to call Mr. Kafka, would you have a problem if the defendant

18  introduces some of their exhibits on their cross-examination,

19  or would you prefer that they wait and call him as a witness

20  themselves?

21          MS. BERMAN:  I think when they call him as a witness

22  themselves.

23          THE COURT:  All right.  Okay.  All right.  So we'll

24  come -- we'll be back, then, at 1:15, and you'll be putting on

25  Mr. Kafka as a witness.

1          And then so you're ready to call him and you're ready

2     to call Mr. Berman --

3          MS. BERMAN:  Yes.

4          THE COURT:  -- correct, right after lunch?

5          Okay.  Is there anything else that we need to take up

6     at this point?

7          MR. SPRINGER:  No, Your Honor.

8          THE COURT:  Obviously everybody needs to be back here

9     at 1:15.

10          Okay.  Anything, Ms. Berman, to take up at this

11     point?

12          MS. BERMAN:  No, Your Honor.

13          THE COURT:  Okay.  Court will be in recess.

14          COURT SECURITY OFFICER:  All rise.

15       (Recess from 12:13 p.m. until 1:23 p.m.; all parties

16     present.)

17       (Outside the presence of the jury:)

18          COURT SECURITY OFFICER:  All rise.  This Honorable

19     Court is now in session.

20          Please be seated.

21          THE COURT:  All right.  We're back on the record.

22     The jury's not in the courtroom yet.

23          Do the parties want to discuss something before the

24     jury comes back in?

25          MR. SPRINGER:  Your Honor, there are a few exhibits

1    that we've agreed upon that will be entered into evidence.

2    We'd like to do that now, if that's okay.

3              THE COURT:  All right.

4              MS. BERMAN:  First is Defendant's Exhibit No. 1, the

5    May 29th, 2009, order.

6              May I approach?

7              THE COURT:  Yes.

8              All right.  That will be admitted.  Now, is this

9    going to be as a defense exhibit still or joint exhibit or --

10             MR. SPRINGER:  It's marked defense exhibit.  It's

11   okay if it stays like that.  It doesn't matter.

12             THE COURT:  All right.  Ms. Berman, do you have any

13   preference?

14             MS. BERMAN:  I already agree with defendant.  We will

15   together agree on these exhibits.

16             THE COURT:  Okay.  I'll just inform the jury that

17   these exhibits have been admitted into evidence with no

18   objection.

19             MR. SPRINGER:  Okay.

20             THE COURT:  All right.  So that's Exhibit 1.

21        (Defendant's Exhibit 1 was received in evidence.)

22             MR. SPRINGER:  The next one is Defense Exhibit No. 2.

23   It's the order from October 2009.

24             THE COURT:  That will be admitted.

25        (Defendant's Exhibit 2 was received in evidence.)

1          MR. SPRINGER:  The next one is Defense Exhibit No. 4,

2   which is the dismissal without prejudice from March 9th, 2010.

3          The next exhibit is Defense Exhibit No. 7, which is

4   an Unemployment Appeals Commission order from September 16th,

5   2011.

6          The next one is Defense Exhibit No. 8, which is a

7   notice of order issued on September 16th, 2011.

8          The next one is a composite exhibit.  It's the annual

9   reports of Trifecta Gaming from 2005 to 2007, labeled as 10A,

10  10B, and 10C.

11         The next one is another composite exhibit, Exhibit

12  19, Exhibits A through L.  These are checks from the Trifecta

13  Gaming account written to Maitland Furniture.

14         The next one is Defense Exhibit 25, which is the

15  legally operative document in the case, the e-mail to Janice

16  Connell containing the alleged libelous statement.

17         And the last one is Defense Exhibit No. 28, which

18  contains the e-mails between Mr. Kafka and Mr. Bellflower in

19  August 2011.

20         Thank you.

21         THE COURT:  All right.  What I was going to do was

22  right before the openings, go ahead and advise the jury on the

23  admitted facts -- the stipulated facts.  I could also tell them

24  that there are a number of documents that have been admitted

25  also by agreement, and then I won't reference them again until

1    somebody references them.

2         (Defendant's Exhibits 7, 8, 10A-10C, 19A-19L, 25, and 28

3    were received in evidence.)

4              THE COURT:  All right.  Is there anything else?

5              MR. SPRINGER:  No, Your Honor.

6              THE COURT:  Okay.  Ms. Berman, anything?

7              MS. BERMAN:  No.

8              THE COURT:  All right.  Are you ready to call your

9    first -- hold on, Mr. Sowards.

10             So you're ready to call your first witness?

11             MS. BERMAN:  Yes, I am.

12             THE COURT:  Okay.  And also, are there any other

13   witnesses who need to be advised of the rule of sequestration?

14             MR. SPRINGER:  Not from the defense, Your Honor.

15             THE COURT:  Okay.  So you're responsible to your own

16   witnesses, telling them to remain outside the courtroom and to

17   not discuss the case, all right --

18             MS. BERMAN:  Okay.

19             THE COURT:  -- as to any witness who hasn't already

20   been instructed.

21             Do you understand that, Ms. Berman?

22             MS. BERMAN:  Yes, Your Honor.

23             THE COURT:  Okay.  And, Mr. Springer, you understand

24   that?

25             MR. SPRINGER:  Yes, sir.

1          THE COURT:  All right.  You can bring in the jury.

2          COURT SECURITY OFFICER:  All rise for the jury.

3      (Jury in at 1:30 p.m.)

4          COURT SECURITY OFFICER:  Please be seated.

5          THE COURT:  Okay, ladies and gentlemen of the jury.

6   Let the record reflect the jury is back in the courtroom.

7          So now we're going to start with the plaintiff's

8   case.  Before we do that, let me advise you of some

9   stipulations.

10         Sometimes the parties have agreed that certain facts

11  are true.  This agreement is called a stipulation.  You must

12  treat these facts as proved for this case.

13         So these are the following facts that the parties

14  have stipulated to.  In this case the parties have agreed that

15  the following facts are true:

16         First, Defendant Thomas A. Kafka, sent electronic

17  mail to James Bellflower between August 10th, 2011, and August

18  16th, 2011, which contained the alleged libel per se.

19         Second, Defendant Thomas Kafka sent a document to

20  Janice Connell or Connell, which contains the alleged libel per

21  se.

22         And third, the plaintiff was never employed by

23  Defendant Thomas A. Kafka's companies.  So those are the

24  stipulations.

25         And then I will also tell you that a number of

1    exhibits have already been stipulated into evidence, meaning

2    that neither party has an objection to you seeing those

3    exhibits.

4              You'll be hearing more about those exhibits as we

5    proceed.  I'm not going to go through all of them now, but

6    there are a number of exhibits that have been admitted.

7              All right.  So, Ms. Berman, if you can call your

8    first witness.

9              MS. BERMAN:  I'm calling to the witness stand Thomas

10   Kafka.

11             THE COURT:  Okay, Mr. Kafka.

12             COURTROOM DEPUTY:  Please raise your right hand.

13             Do you solemnly swear or affirm the answers you will

14   give during these proceedings will be the truth, the whole

15   truth, and nothing but the truth?

16             THE WITNESS:  Yes, I do.

17             COURTROOM DEPUTY:  And please state your name for the

18   record.

19             THE WITNESS:  Tom Kafka.

20             COURTROOM DEPUTY:  Okay.  Ms. Berman?

21            THOMAS A. KAFKA, PLAINTIFF'S WITNESS, SWORN

22                          DIRECT EXAMINATION

23   BY MS. BERMAN:

24   Q.   Do you know me?

25             Do you know me?

```
 1   A.    Yes, I do.

 2   Q.    How do you know me?

 3   A.    I've had the opportunity to meet you during discovery, and

 4   I've seen you a couple times at the factory in the car.

 5   Q.    But we never have before conversation or --

 6   A.    I don't believe I've ever had a conversation with you

 7   prior to a deposition.

 8   Q.    Yes.  At your deposition.  Okay.

 9         You agree that one of your affirmative defense is the

10   truth?  Do you agree?

11         MR. SPRINGER:  Objection, Judge.  That's a legal

12   issue.  He didn't come up with the affirmative defenses.

13         THE COURT:  I'll allow it.

14         MS. BERMAN:  But he's --

15         THE COURT:  I'll allow it.

16         Go ahead.  You can answer the question.

17   BY MS. BERMAN:

18   Q.    Do you agree with that?

19   A.    Can you repeat the question again?  I didn't hear you.

20   Q.    Do you agree that one of your affirmative defense is the

21   truth?

22   A.    Yes.

23   Q.    And do you agree with me if you claim the truth, that you

24   have to be a truthful person?

25   A.    Say that again, please?
```

1   Q.   Would you agree with me if your defense is truth, you have

2   to be a truthful person?

3   A.   If it's opinion, I would say yes, if you're asking my

4   opinion.

5   Q.   Okay.  Where do you reside?

6   A.   Pardon?

7   Q.   Where do you reside?

8   A.   I live in Janesville, Wisconsin.

9   Q.   Can I see your identification, ID?

10  A.   Pardon?

11  Q.   Can I see your driver's license, ID, to see if it says

12  Janesville, Wisconsin?

13           MR. SPRINGER:  Judge, I think we might need a sidebar

14  about what we're about to get into here.

15           THE COURT:  All right.

16      (At sidebar, out of the hearing of the jury:)

17           MR. SPRINGER:  Your Honor, I believe what

18  Ms. Berman's about to go into is things about where he resides,

19  whether it's Wisconsin or Daytona Beach, the homestead filings,

20  the whole -- things that have already been excluded in limine

21  purs- -- the registered agent.

22           MS. BERMAN:  I'm not -- Your Honor, I'm not talking

23  about registered agent.

24           THE COURT:  Are you going to -- can you --

25           MS. BERMAN:  I will not talk about registered agent.

1   A homestead exemption wasn't denied.  But I am talking this

2   case about -- in federal court so I want to see his driver's

3   license and if he's from Wisconsin.

4           THE COURT:  What's the relevance of that?

5           MS. BERMAN:  The relevance is my claim here in

6   federal because it's diversity, so I need to see his driver's

7   license.

8           THE COURT:  No, that's not going to be allowed.

9   Jurisdiction has been determined long ago.  You brought the

10  case here, so I don't -- I don't understand what you're getting

11  into.

12          But, no, I'm not going to have him show you his ID.

13  Move on to your next line of questioning.

14          MS. BERMAN:  But can I ask about this ID?

15          THE COURT:  No.

16          MS. BERMAN:  I would like to --

17          THE COURT:  What's the relevance?

18          MS. BERMAN:  Relevance is he make a sworn -- sworn

19  testimony in his introductory and show a driver's license.

20          THE COURT:  I --

21          MS. BERMAN:  It's relevant --

22          THE COURT:  No.

23          MS. BERMAN:  -- to this case.

24          THE COURT:  No.  That's not -- no, you can't get into

25  it.  Move on to your next line of questioning.

1          (End of discussion at sidebar.)

2     BY MS. BERMAN:

3     Q.    So you admit you are resident of Wisconsin?

4     A.    Yes, I am.

5     Q.    Yes?

6     A.    Yes.

7     Q.    Okay.  When you entered this courtroom, did you show your

8     ID to the security guard?

9     A.    Yes, I did.

10    Q.    And your ID is correct on your -- the driver's license?

11              MR. SPRINGER:  Objection, Judge, relevance.

12              MS. BERMAN:  Your Honor --

13              THE COURT:  I sustained --

14              MS. BERMAN:  -- he --

15              THE COURT:  I sustained the objection.  Go on to your

16    next line of questioning other than identification.

17              MS. BERMAN:  I would like to introduce my Exhibit

18    No. 1.

19              THE COURT:  Any objection?

20              MR. SPRINGER:  No, Your Honor.

21              THE COURT:  All right.  That exhibit will be admitted

22    as Plaintiff's Exhibit 1.

23         (Plaintiff's Exhibit 1 was received in evidence.)

24    BY MS. BERMAN:

25    Q.    Do you -- what date was -- do you recall that you give us

 1  what --

 2  A.   Mrs. Berman, I can't make that out.

 3            THE COURT:  You need to show the exhibit to the

 4  witness.

 5            Can you see that, Mr. Kafka?

 6            THE WITNESS:  Not yet.

 7  BY MS. BERMAN:

 8  Q.   Do you recall this sworn testimony?  It was from your

 9  first interrogatories in this case.

10  A.   It's hard for me to make it out from this angle.  Can I

11  just -- is there -- do you have a document I could look at?

12            THE COURT:  Do you have a copy you can give to the

13  witness?

14            MS. BERMAN:  Oh, okay.

15            THE WITNESS:  Thank you.

16            Can you tell me where this is from?

17  BY MS. BERMAN:

18  Q.   It's from your interrogatory.

19            Do you remember you -- okay.

20            MS. BERMAN:  I would like to explain that during

21  discovery we have questions, interrogatories --

22            THE COURT:  No.  No.  Ms. Berman, no.  This is not

23  how it proceeds.  You're here to ask questions.

24  BY MS. BERMAN:

25  Q.   It's from the interrogatory.

1              Do you recall that you signed as if you answer

2      question from your interrogatory from me?

3      A.    Okay.

4      Q.    Do you recall that?

5      A.    And this was on April -- I can't read the date on here,

6      but it looks like it was April something, 2014.

7      Q.    Yeah, April 10, 2014.

8      A.    Okay.

9      Q.    Do you think that everything is correct on this -- on

10     sworn testimony?

11     A.    Well, if I'm looking at Florida driver's license -- is

12     that what you're getting at?

13     Q.    Yes.

14     A.    I would say at that time it was right.  Right now I have a

15     Wisconsin driver's license, though, so I don't know what you're

16     getting at.

17     Q.    Yes.  But --

18             MR. SPRINGER:  Judge, I object to the relevance of

19     where he lives, his identification.  It's the same line of

20     questioning.

21             THE COURT:  I'm going to sustain that objection,

22     Ms. Berman.

23             MS. BERMAN:  Your Honor, this case in federal court

24     and --

25             THE COURT:  Ms. Berman, we already had a sidebar

1   about it.  Move on to your next line of questioning.

2   BY MS. BERMAN:

3   Q.   Where did you reside in April 10th, 2014?

4   A.   April 10th, 2015?

5   Q.   '14.

6   A.   '14.

7   Q.   Uh-huh.

8   A.   In Janesville, Wisconsin.

9   Q.   But you show driver's license.  It's Florida license.

10  A.   That's because I had a Florida driver's license at that

11  time.

12  Q.   When did you move to Wisconsin?

13  A.   Officially, I would say approximately -- well, I think we

14  moved initially in the last part of 2007.

15  Q.   You lived in Janesville, and in 2014 you presented Florida

16  driver's license.

17          MR. SPRINGER:  Objection, Judge.  We're still on the

18  same line of questioning.

19          THE COURT:  Sustained.

20          MS. BERMAN:  I would like to show Exhibit 1A.  It's

21  from your second interrogatories.

22          THE COURT:  First you have to -- is there an

23  objection?

24          MR. SPRINGER:  Judge, there would be because my

25  anticipation is going to be for the same exact reason, where

1   things were signed and driver's licenses.

2           MS. BERMAN:  But this he signed in this case.  It's

3   not someplace.  He presented for me that he lives in Florida.

4           THE COURT:  All right.  I do not see the relevancy of

5   this.  The objection will be sustained, and you need to move

6   on.

7   BY MS. BERMAN:

8   Q.   Mr. Kafka, do you recall I sent you a certificate later to

9   retract your false statement and to apologize to me?  Do you

10  recall that?

11  A.   You sent me a letter.  Yes, I recall that.

12  Q.   Did I give you opportunity to apologize to me?

13          MR. SPRINGER:  Objection, relevance, Judge.

14          THE COURT:  Sustained.

15          MS. BERMAN:  I would like to enter my letter that I

16  sent before I filed a lawsuit, ask for --

17          MR. SPRINGER:  Judge, objection.

18          THE COURT:  Yeah.  First of all, don't put that --

19  don't show it until it's been admitted into evidence, okay?

20          MR. SPRINGER:  Defense would object to I believe it's

21  Exhibit No. 2A or 2 -- is that 2?

22          MS. BERMAN:  2.

23          MR. SPRINGER:  2.  It's a letter.  It's our position

24  it's hearsay.

25          MS. BERMAN:  No, I --

1            MR. SPRINGER:  And --

2            THE COURT:  Hold on.  Hold on.

3            MR. SPRINGER:  And that it's not relevant in the case

4   to any issues at stake here.

5            MS. BERMAN:  Your Honor, it's --

6            THE COURT:  Hold on.  Let me look at it.

7            MR. SPRINGER:  It's Ms. Berman's own letter.

8            THE COURT:  All right.  I'll overrule the objection

9   and allow this exhibit to be admitted, Exhibit No. 2.

10       (Plaintiff's Exhibit 2 was received in evidence.)

11  BY MS. BERMAN:

12  Q.   So do you recall this letter --

13  A.   Again, I can't.

14  Q.   -- to the best --

15  A.   I can't see what it says from this angle.

16           I remember this letter.

17  Q.   Defendant agrees that I sent him two letter before I -- I

18  did not want to --

19           THE COURT:  Ms. Berman, you can't make a statement.

20  You're here to ask questions right now.

21           MS. BERMAN:  And Exhibit 2, he already admitted that

22  he saw this letter that -- that he receive it.

23           THE COURT:  Well, you just admitted Exhibit 2.

24  BY MS. BERMAN:

25  Q.   Yes.  You received this letter.

 1          MR. SPRINGER:  No objection.

 2   BY MS. BERMAN:

 3   Q.   I would like to -- do you see on this --

 4   A.   I can actually see this one.

 5   Q.   You can see this one?

 6   A.   Yeah.

 7   Q.   When was this sent to you?

 8   A.   I can't see the date.

 9          THE COURT:  Is this Exhibit 2A you're referring to?

10          MS. BERMAN:  2A.

11          THE COURT:  All right.  This will be admitted.

12      (Plaintiff's Exhibit 2A was received in evidence.)

13          THE WITNESS:  8/21?  Is that what it says?

14          MS. BERMAN:  Uh-huh.

15   BY MS. BERMAN:

16   Q.   And you -- in my second request for admissions, defendant

17   state that he admits he received this letter.

18          On what date did you -- you said it was on August 8,

19   2013 [sic].

20   A.   I can't understand you.  I'm sorry.

21   Q.   You said that you received this letter --

22   A.   I think on 8/21?  Is that what it said?

23   Q.   Yes.

24   A.   Yes.

25   Q.   Do you --

1   A.   Now, I think that's when -- if it looks like my wife

2   signed for the letter, I may not have seen it at that time

3   because I may have been on a business trip, but that's when my

4   wife signed for the letter.

5   Q.   So -- but you decided not to apologize to me or take away

6   the statement?

7           MR. SPRINGER:  Objection, relevance, Judge.

8           THE COURT:  I'm going to let him answer the question.

9   BY MS. BERMAN:

10  Q.   Would you agree --

11          THE COURT:  Hold on.  I'm letting him answer the

12  question.

13          THE WITNESS:  I think the answer to the question

14  would be I felt if I answered that, that I would be lying.

15  That's why I did not answer the letter.

16  BY MS. BERMAN:

17  Q.   Would you agree you would have saved everybody a lot of

18  time and aggravation if you just sent me apology letter?

19  A.   If I didn't have to lie to do it, yes.

20  Q.   You never lie?

21  A.   Pardon?  I said -- in the letter you sent me, I felt that

22  if I sent you an apology letter that I would be lying.

23  Q.   We'll talk about this later.

24  A.   All right.

25  Q.   What did you do instead of apologizing to me?

1   A.   I think I turned it over to my attorney.

2   Q.   And who is your attorney at that time?

3        MR. SPRINGER:  Objection, relevance, as to who his

4   attorney was at the time.

5        THE COURT:  Sustain the objection.

6   BY MS. BERMAN:

7   Q.   And do you recall what day you contacted personal

8   attorney?

9   A.   I do not.

10  Q.   Okay.  Let me get --

11       THE COURT:  Ms. Berman, can you move that over to the

12  podium so you don't have to keep going back and forth?  Is

13  there room there?

14       MS. BERMAN:  Okay.  Can I introduce Exhibit 2C?

15       THE COURT:  What's the exhibit number?

16       MS. BERMAN:  2C.

17       MR. SPRINGER:  2C, Your Honor, the defense objects.

18  It's an affirmative defense pleading in the case.

19       THE COURT:  Yeah.  That will be sustained.

20       MS. BERMAN:  But this has --

21       THE COURT:  No.  It's sustained, Ms. Berman.

22       MS. BERMAN:  Okay.  Exhibit 3.

23  BY MS. BERMAN:

24  Q.   When you receive on August 21st, 2013 --

25  A.   Again, from this angle I cannot make that out.

1   Q.   You can see that you received on August 21st.

2          THE COURT:  Is there any objection to this exhibit?

3          MS. BERMAN:  He thinks the date --

4          THE COURT:  Hold on, Ms. Berman.

5          THE WITNESS:  It's three pages.

6          MR. SPRINGER:  No objection, Judge.

7          THE COURT:  All right.  Plaintiff's Exhibit 3 will be

8   admitted.

9       (Plaintiff's Exhibit 3 was received in evidence.)

10  BY MS. BERMAN:

11  Q.   On August 23, you sent this letter to your personal

12  attorney.  Do you agree with this?

13         MR. SPRINGER:  Objection.  We didn't object to the

14  evidence, but she's asking a question what he sent to his

15  attorneys now.

16         THE COURT:  That's sustained.

17         MS. BERMAN:  But you didn't object to this Exhibit 3.

18  Here is --

19         THE COURT:  Ms. Berman, direct your comments to the

20  Court, not to counsel.

21         MS. BERMAN:  Oh, okay.

22         Your Honor, he admit this exhibit, and it shows that

23  he sent this letter to his personal attorney on page 3.

24         THE COURT:  On page 3?

25         MS. BERMAN:  Yes.

1    THE COURT:  Well, the letter speaks for -- I admitted

2    the exhibit.  It speaks for itself.  I'm not going to allow you

3    to go into anything further about any communication between him

4    and his attorney.

5    BY MS. BERMAN:

6    Q.   I just want to say when you receive this letter, I give

7    you opportunity to apologize and didn't right away file my

8    suit.  I was --

9         THE COURT:  Ms. Berman, you need to ask a question.

10        MS. BERMAN:  Okay.

11        THE COURT:  You'll have an opportunity to get on the

12   stand as a witness if you'd like.

13   BY MS. BERMAN:

14   Q.   Did I ask you during your deposition that you -- that you

15   should apologize to me?  Did I give you a chance during your

16   deposition?

17        Do you recall your deposition on May 6th, 2014?

18   A.   Did you say the deposition?

19   Q.   Yes.

20   A.   Did you give me a chance to apologize?

21   Q.   Yes.

22   A.   I don't recall if you gave me --

23   Q.   You don't recall?

24   A.   No.

25   Q.   Okay.

```
 1   A.    What are you referring to?

 2              I'm sorry.  I guess I'm not supposed to ask

 3   questions.

 4   Q.    This is your deposition.

 5              Do you recall your deposition?

 6   A.    I certainly recall the deposition, yes.

 7   Q.    You recall this.

 8              Can you turn to page 138?

 9   A.    Pardon?

10   Q.    Page 138?

11   A.    60 or 50, did you --

12   Q.    138.

13   A.    Oh, 138.

14              THE COURT:  Do you have a copy of this deposition,

15   Ms. Berman?

16              MS. BERMAN:  I give him a copy, yes.

17              THE COURT:  All right.  Do you have a copy for the

18   Court?

19              MS. BERMAN:  I supply all the copy, but I have . . .

20              MR. SPRINGER:  I have one, Your Honor.

21              THE COURT:  All right.  Hand it to the clerk.

22              Thank you.

23   BY MS. BERMAN:

24   Q.    Look at page 138, line 18, 20.

25              Can you read it?
```

```
 1    A.    Line what, please?

 2    Q.    138 --

 3    A.    I have 138.

 4          What line?

 5    Q.    18 --

 6    A.    Okay.

 7    Q.    -- to 20.

 8    A.    I see it.

 9    Q.    Okay.  Can you read it?

10    A.    You want me to read it?

11    Q.    Yes.

12    A.    "QUESTION:  Mr. Kafka, honestly, tell me, do you think --

13    do you think you should apologize to me?"

14          Do I keep going?

15    BY MS. BERMAN:

16    Q.    Until 20.

17    A.    Until when?

18    Q.    20.  One more line.

19    A.    One more line.

20          "I think you should."  And --

21    Q.    Okay.

22    A.    -- then there's a break like I was interrupted --

23    Q.    Just 20.  That's all.

24    A.    20?

25    Q.    Yeah.
```

 1   A.    But I'm not finishing the line.

 2             THE COURT:  You can -- I'll allow him to read 21 and

 3   22.

 4             THE WITNESS:  Okay.

 5             "ANSWER:  I think you should.

 6             "QUESTION:  For embezzling money?

 7             "ANSWER:  I think you should apologize to me."

 8   BY MS. BERMAN:

 9   Q.    So that was your answer, you should apologize to me.

10   A.    No.  I said you should apologize to me.

11   Q.    You said.

12   A.    Yes.

13   Q.    So -- and you just before admitted the fact that I didn't

14   give you opportunity to apologize in deposition.

15   A.    No, no, no.  I said I did not recall that.  It was

16   three-and-a-half hours long.

17   Q.    Okay.  When did you move to Wisconsin?

18   A.    I think I answered that.

19   Q.    In 2007, yes?

20   A.    I believe it was in -- yes, in 2007.

21   Q.    Did you purchase a home there?

22   A.    Yes, we did.

23   Q.    Is the address in Spring Drive, Janesville, Wisconsin?

24   A.    In Spring Hill Drive, did you say?

25   Q.    Uh-huh.

1    A.    Yes, it is.

2    Q.    Is that the house where you're living in?

3    A.    Yes, it is.

4    Q.    What date -- do you recall what date did you purchase that

5    house?

6            MR. SPRINGER:  Objection, Judge, relevance.  We're

7    moving into other territories that aren't relevant.

8            MS. BERMAN:  No.  It's relevant.  I will show in my

9    next exhibits.

10           MR. SPRINGER:  Specifically --

11           THE COURT:  No.  We already talked about it at the

12   sidebar.  The objection's sustained.

13           MS. BERMAN:  Can I show my Exhibit 4?  Because it's

14   relevant.

15           THE COURT:  Let me see everybody at sidebar again.

16      (At sidebar, out of the hearing of the jury:)

17           THE COURT:  Ms. Berman, you're not sticking to the

18   facts of this case, and you're not paying any attention to my

19   rulings on your motions in limine.

20           Okay.  All of this is irrelevant.  We're here for

21   these statements and what -- the effect of these statements and

22   the circumstances of these statements, which you still have not

23   even asked him about.

24           We're not into -- we're not here to talk about

25   whether he may have lied on his homestead application or lied

1   about where he's a resident or lied about anything else.  We're

2   here about these statements.

3           Do you understand that?

4           MS. BERMAN:  Yes.  But this is about all the

5   discovery that I -- all of the stuff, and this house, it's part

6   of the company which is showing that I embezzle money, and I

7   will show my exhibits.  It show --

8           THE COURT:  Tell me right now, what is the relevancy

9   of this?

10          MS. BERMAN:  He's talking about that I embezzle

11  money, and he has a house which is -- according to his website,

12  is a business of that home.  He has the business in Wisconsin,

13  but he lives here.  And he tell me that I embezzle money during

14  that period which he purchase a million-dollar house.

15          THE COURT:  What does that have to do with anything?

16          MS. BERMAN:  I would -- I would prove --

17          THE COURT:  No.  I want you right now to tell me what

18  that's got to do --

19          MS. BERMAN:  He's saying defense of truth, defense of

20  truth.  I want to show how truthful he was.

21          THE COURT:  Is that all you have to tell me right now

22  about how this is relevant?

23          MS. BERMAN:  Yes.

24          THE COURT:  Okay.  Well, it's not.  It's not

25  relevant, and we're terminating this line of questioning, and

1    you better start asking relevant questions because we're not

2    going to be here all day on irrelevant matters.  Do you

3    understand that?

4           Get to the substance of this lawsuit.  You brought

5    the lawsuit about these statements.  Get to these statements.

6    You understand?

7           MS. BERMAN:  Yes, I understand.

8       (End of discussion at sidebar.)

9    BY MS. BERMAN:

10   Q.   Mr. Kafka, do you own Maitland Furniture?

11   A.   Yes, I do.

12   Q.   And what did Maitland Furniture do?

13   A.   I didn't understand you.

14   Q.   What did Maitland Furniture do?

15   A.   We make furniture.

16   Q.   And did you make a product?

17   A.   Pardon?

18   Q.   Just furniture, yes?

19   A.   Yes.  We manufacture furniture.  We -- did you say

20   granite?  Did you say granite?

21   Q.   What do you --

22   A.   I didn't understand you.  I'm sorry.  Never mind.

23   Q.   What is address for your company Maitland Furniture?

24   A.   I believe it's 1711 State Avenue, Holly Hill, Florida, and

25   I say I believe because I'm not sure where my accountant has

 1    the address.

 2    Q.    So is your company is located in Florida?

 3    A.    Yes, ma'am.

 4    Q.    Do you know Lora Katsavrias?

 5    A.    Pardon?

 6    Q.    Lora Katsavrias.

 7    A.    I don't understand you.

 8    Q.    Lora Katsavrias.

 9    A.    Oh, Lora Katsavrias, yes.

10    Q.    Yes.

11          Who is she?

12    A.    She is a former employee.

13    Q.    Why is she a former employee?

14    A.    Why is she what?

15    Q.    Why is she former employee?  Why did she -- did she quit

16    on her own?

17    A.    I don't believe she did, no.

18    Q.    So she's still working?

19    A.    No.  I said she was a former employee.

20    Q.    Did you terminated her?

21    A.    I did not terminate her.

22    Q.    So she quit on her own.

23    A.    I believe that Lora worked up until the very end in 2007.

24    Q.    Okay.

25          MS. BERMAN:  I would like to introduce my -- Lora

 1   Katsavrias, excerpt from her deposition.

 2            THE COURT:  I'm sorry?

 3            MS. BERMAN:  I would like to introduce Lora

 4   Katsavrias, excerpt from her deposition.

 5            Can I introduce?

 6            THE COURT:  Well, no.  You have a witness on the

 7   stand.

 8            MS. BERMAN:  They have her as a witness.

 9            THE COURT:  Well, you could -- well, we can get to

10   that later, but you can't introduce exhibits now.

11            MS. BERMAN:  But it's for the impeachment, Your

12   Honor.

13            THE COURT:  Well, you have to ask him if he made some

14   other inconsistent statement before you can impeach him.

15            MS. BERMAN:  But this was from her deposition,

16   completely different, what she said.

17            THE COURT:  Well, we'll get to that later if you want

18   to try to introduce excerpts of her deposition but not now.

19   BY MS. BERMAN:

20   Q.   What address did Maitland Furniture have after 2006?

21   A.   What -- in 2006 we -- I would say 1711 State Avenue, but I

22   don't know for account purposes.  My accountant could have used

23   his office.  He could have used our home.  I am not sure.  I'm

24   telling you right now that's a fairly long time ago, and I'm

25   not sure what address was used.

 1  Q.    Who opened Maitland Furniture?

 2  A.    Pardon?

 3  Q.    Who opened Maitland Furniture?

 4  A.    I don't --

 5            MS. BERMAN:  Can everybody hear me?

 6            THE WITNESS:  I believe I opened Maitland Furniture.

 7  BY MS. BERMAN:

 8  Q.    So you should know where is your company located.

 9  A.    Our company --

10            MR. SPRINGER:  Argumentative, Judge.

11            THE COURT:  I sustain it.

12  BY MS. BERMAN:

13  Q.    You said that you move in 2007 to Wisconsin.

14            Did you close Maitland Furniture in Florida?

15  A.    You have to repeat that.

16  Q.    You said that you move to Wisconsin in 2007.

17            Did you close Maitland Furniture here?

18  A.    We closed most of it, yes.

19  Q.    So Maitland Furniture wasn't exist in Florida.

20  A.    Well, that's not true.  I said we closed most of the shop.

21  Q.    What do you mean most of the shop?

22  A.    We kept part of the building.

23  Q.    Can you explain that?

24  A.    Well, business wasn't that good at that time.  We

25  originally had seven different buildings.  We went down to, I

1   think, three buildings, then we went to two buildings.  Then we

2   decided to do the production in Wisconsin, but we kept part of

3   the building open and kept the doors open in case things got

4   busy again.

5   Q.   What do you mean by seven different buildings?

6   A.   Our buildings have -- they're connected, and you can drive

7   into one, two, and three, and then we had three up here, that

8   type of thing.

9   Q.   So you're --

10  A.   And I think seven's wrong.  I think it was six.

11  Q.   So you're owner of six buildings?  You own all the six --

12  A.   I didn't own anything.  We rented.

13  Q.   You rented.

14  A.   Yes.

15  Q.   But Maitland Furniture was specifically in one building or

16  all of them, six or seven?

17  A.   Maitland Furniture just -- whenever we had -- when we

18  needed more space, we would go to the landlord and say, "Can we

19  rent a building for a month?" and he would say yes.

20  Q.   So tell me, did you close Maitland Furniture or you --

21  when you --

22  A.   I answered that question.  I said we downsized but we kept

23  part of it open.

24  Q.   Okay.  Who was the manager in that location when you

25  relocate to Wisconsin?

1  A.   When we just kept part of it open, I would have to say at

2  that point I would be the manager.

3  Q.   But you live in Wisconsin.

4  A.   Yes.

5  Q.   How you can --

6  A.   And I paid the bills --

7  Q.   Would you drive or fly --

8  A.   I paid the bills --

9       THE COURT:  Hold on.  Hold on.  Don't talk over each

10 other.

11      THE WITNESS:  Oh, I'm sorry.

12 BY MS. BERMAN:

13 Q.   So did you go to Florida every day?

14 A.   I --

15 Q.   How did you manage your company?

16 A.   I simply paid the bills and paid the rent and paid the --

17 whatever you have to do to keep a company open, and then when

18 things got busy, we opened up again.

19 Q.   Did you have employees?

20 A.   There were no employees at that time except for me and

21 your husband.

22 Q.   In 2007 there were no employees?

23 A.   I told you, in the second half of the year, we closed

24 down.  Actually, I think it was 2000 -- yeah, in 2007, I think

25 we . . .

1   Q.   Do you agree that Maitland Furniture and Trifecta Gaming

2   two different companies?

3   A.   Do I believe that Maitland Furniture and Trifecta Gaming

4   are --

5   Q.   Yes.

6   A.   -- two different companies.

7   Q.   Right.

8   A.   I would say yes.

9   Q.   So can you tell me, how did you meet my husband?

10  A.   How did I meet your husband?  I believe he came to our

11  shop.

12  Q.   When?

13  A.   I would say in 2004.

14  Q.   Why did he came to your shop?

15  A.   I believe he was looking for someone to help produce

16  product for -- that he wanted to make for the casino industry.

17  Q.   Okay.  Do you recall a month?

18  A.   I wouldn't want to guess, but I would say it was probably

19  in March or April, somewhere in there.

20  Q.   March or April.  Okay.

21  A.   And he did not speak to me initially.  I think he spoke to

22  the manager at the time.

23  Q.   Did you tell my husband that you owned and ran a second

24  production facility in Wisconsin called northern plant?

25  A.   Say it again, please.

1    Q.    Did you tell my husband that you own and ran a second

2    production facility in Wisconsin called northern plant?

3    A.    I don't believe I did, no.

4            MS. BERMAN:   Let me introduce Lora Katsavrias'

5    deposition, Your Honor.

6            THE COURT:   Well, this is not the time to do it.

7    BY MS. BERMAN:

8    Q.    You know a Jeff Krall?

9    A.    Yes, I do.

10   Q.    Who is Jeff Krall?

11   A.    Pardon?

12   Q.    Who is Jeff Krall?

13   A.    Jeff Krall is a former employee.

14   Q.    He was employed by Maitland Furniture?

15   A.    Yes, he was.

16   Q.    And where did he work?

17   A.    He worked at Maitland Furniture.

18   Q.    And which location?

19   A.    Actually, when he worked for Maitland Furniture, he worked

20   at 1711 State Avenue in Holly Hill, Florida.

21   Q.    From which year?

22   A.    Pardon?

23   Q.    Which year?

24   A.    I would have a hard time recalling that.

25   Q.    You don't recall when he was employed?

1   A.   I can -- I can estimate, but I don't want to say for sure

2   because I'm not sure.

3   Q.   Can you tell me?

4   A.   Can I estimate?

5   Q.   Estimate, yes.

6   A.   I would estimate that it would be probably 2009/'10,

7   somewhere in there, '9, '10, '11.

8   Q.   And '11?

9   A.   I'm estimating.  I'm don't know for sure.

10  Q.   Does he work now for you?

11  A.   He does not.

12  Q.   Okay.  Before 2004 Maitland Furniture was doing just

13  furniture production, yes?

14  A.   In --

15  Q.   Before you met my husband.

16  A.   In -- no, that would not be true.  Before 2004 we

17  manufactured furniture, which would include TV stands, bunk

18  beds, chest of drawers, but we also imported telescopes and

19  binoculars and things in that order and distributed them as

20  well.

21  Q.   What else did you sell for Maitland Furniture?

22  A.   At the moment, that's all I can recall.

23  Q.   After 2004?

24  A.   Oh, what else did we sell?  We sold a lot -- at the time

25  we sold a huge amount of telemarketing booths for

1    telemarketers.

2    Q.    In 2004?

3    A.    In 2004, yes.  Before 2004 I thought you said.

4    Q.    What about after 2004 -- in 2004?

5    A.    We still sold a fair amount of the telemarketing booths

6    and the TV stands.

7    Q.    2005?

8    A.    Same.

9    Q.    2006?

10   A.    I would say in 2006 the telemarketing booth industry sort

11   of died because of government regulations, where they couldn't

12   call.

13   Q.    So in 2006 what were you selling, Maitland Furniture?

14   A.    I think at that time we were selling TV stands.

15   Q.    Just TV stands.

16   A.    For Maitland Furniture.

17   Q.    You mean --

18   A.    I mean, listen -- listen, at times we would sell other

19   things because in -- we also started Trifecta Gaming at that

20   time.  And there were times when an account would not order

21   product through Trifecta Gaming because the company was new,

22   and they insisted that we write the orders through Maitland

23   Furniture because they were in business for a long time.

24   Q.    Who insisted?

25   A.    Who insisted?

1   Q.    Yes.

2   A.    The accounts.

3   Q.    Which accounts?

4   A.    I am not sure at this point.  I mean, I --

5   Q.    But it just --

6   A.    There were several of -- Ms. Berman, there were several

7   accounts --

8   Q.    Do you have evidence of accounts insisted to work with

9   you?

10  A.    I'm telling you that they would say to me, "We are not

11  going to make the contract under Trifecta Gaming.  We want to

12  make the contract under Maitland Furniture" --

13  Q.    Can you --

14  A.    -- "because Maitland Furniture is established."

15  Q.    Can you name an account name?

16  A.    Name an account?  I believe that Gulfstream Park fell into

17  that category.  I think Harris fell into that category, but I

18  am not sure, and I don't want to sit here and say for sure that

19  that was the case.

20  Q.    So you said you started to produce in 2006 products for

21  Trifecta Gaming?

22  A.    I'm sorry.  I didn't hear you.

23  Q.    You stated in 2006 your TV stands stopped -- not making

24  any money, yes?

25  A.    No, that's not the case.  I -- I just -- listen, I am not

1   positive when we shut -- what year we shut the factory down.

2   I'm just not positive right now.  But when we shut -- or closed

3   down most of the factory, we still made TV stands in Wisconsin.

4   Q.   And you register your -- Maitland Furniture in Wisconsin?

5   A.   We did not, because Maitland Furniture wasn't in

6   Wisconsin.

7   Q.   But you moved to Wisconsin.  You making --

8        MR. SPRINGER:  Objection, Judge.  We're going back to

9   that area again where people reside.

10       THE COURT:  Sustained.

11       MS. BERMAN:  All right.  I would like to . . .

12  BY MS. BERMAN:

13  Q.   You said that your company Maitland Furniture is located

14  on 1711 --

15  A.   Maitland Furniture?

16  Q.   Yes.

17  A.   1711 State Avenue, yes.

18  Q.   Okay.

19  A.   But I also said I wasn't sure.  I'm not sure where my

20  accountant had it established, but go ahead.

21  Q.   But didn't you just say that you opened the company, not

22  your account?

23  A.   I can't understand you.

24  Q.   Did you open the company, not your account?  You just

25  say --

1    A.   Well, when I say open the company, you ask for help from

2    an accountant because I am not an accountant.

3    Q.   Yes, but account nothing has to do with opening your

4    company.  I know.

5    A.   I have --

6    Q.   I run a small business and not my -- my account doesn't do

7    anything.  I --

8    A.   I --

9    Q.   -- have to open it --

10   A.   And --

11   Q.   -- and I have to know where the company's located.

12   A.   I'm telling you I am not sure where the company's located

13   because I didn't handle that.  It was incorporated in the State

14   of Florida.  I know that.

15   Q.   Okay.  I can --

16            MS. BERMAN:  I would like to introduce Exhibit 6.

17            MR. SPRINGER:  Judge, defense has an objection to

18   these exhibits.  I can explain it here if you'd like.

19            MS. BERMAN:  No.  It's relevant.  It's relevant.

20            THE COURT:  Well, hold on a second.

21            Is there a series, a number of exhibits?

22            MR. SPRINGER:  What number is that?

23            MS. BERMAN:  6.  6.

24            MR. SPRINGER:  It's more of in the way they're going

25   to be used than the exhibits themselves, Your Honor,

1   specifically as to addresses, locations of people, and

2   registered agents.

3            THE COURT:  All right.  Well, let's just take it one

4   at a time.

5            Do you have an objection to the exhibit itself?

6            MR. SPRINGER:  The exhibit itself, I do not.

7            THE COURT:  Okay.  All right.  Plaintiff's Exhibit 6

8   will be introduced in evidence.

9        (Plaintiff's Exhibit 6 was received in evidence.)

10  BY MS. BERMAN:

11  Q.   Please read what is this.  2006, what is that?  Read this

12  exhibit.

13  A.   What do you want me to read on this form?

14  Q.   What it says.  It's 2006 for-profit corporation annual

15  report --

16  A.   Do you want the address?

17  Q.   -- for Maitland Furniture.

18  A.   It says on here 6 Shadow Creek Way, Ormond Beach, Florida

19  32174.

20  Q.   And what it says before, principal place of business, is

21  that correct?

22  A.   That is correct.

23  Q.   But you just said that you in 1711.

24  A.   Yeah, but this is 2006.

25  Q.   Well, where you were in --

1    A.    I said I thought maybe we closed down in 2006, so I wasn't

2    even there.

3    Q.    No.  Let --

4    A.    I was getting mail at 6 Shadow Creek Way, Ormond Beach.

5    Q.    But you said you left part of your shop open in 2006.

6    Didn't you say just now?

7    A.    Yes.  Yes, I did.

8    Q.    So -- but why is that -- it's not 1711?

9    A.    Because we weren't producing anything at the shop.  We

10   only kept part of it open in case we got busy and we could move

11   back.

12   Q.    But you did --

13   A.    I wanted to get mail, and I knew I would get the mail at 6

14   Shadow --

15   Q.    No, no.  That's not -- you see it.  Current mail is 6

16   Shadow Creek, blah, blah, blah, but current principal place of

17   business, it's 6 Shadow Creek.

18   A.    Ms. Berman, listen.  I was traveling back and forth.  I

19   didn't want to not have mail come to me, so --

20   Q.    You're --

21            THE COURT:  Hold on.  Don't interrupt the witness.

22   Let him finish.

23            THE WITNESS:  So I believe that that was done so that

24   we could make sure we got the mail so we could keep everything

25   current.

 1 | BY MS. BERMAN:
 2 | Q.   Do you see this exhibit?  It says current principal place
 3 | of business.  I'm not talking about your -- and there is a --
 4 | below current mailing address.  You can put different mailing
 5 | address, but current principal place of business, that's where
 6 | your business is.
 7 |         Is it correct?  You agree with that?
 8 |         MR. SPRINGER:  Objection, argumentative.  Asked and
 9 | answered.
10 |         THE COURT:  I'll just -- I'll let him answer that one
11 | question and then we're moving on.
12 |         THE WITNESS:  Okay.  So repeat the question, please?
13 | BY MS. BERMAN:
14 | Q.   It says current place of -- principal place of business, 6
15 | Shadow Creek Way, Ormond Beach, Florida.
16 | A.   Yes.
17 | Q.   You agree.
18 | A.   Yes.
19 | Q.   So does it mean that you producing furniture in that
20 | place?
21 | A.   Well, I apparently had a dilemma because we weren't
22 | producing any furniture at that time.
23 | Q.   You just said --
24 | A.   So, I mean, they -- listen, we used the address.
25 | Q.   And what's at address building?

1  A.   Pardon me?

2  Q.   Is that your home address?

3  A.   This is where we lived, yes.

4  Q.   In 2006.

5  A.   Yes.  I believe we still lived there in 2006, yes.

6  Q.   But why did you put your principal place of business

7  address as your home address?

8           MR. SPRINGER:  Objection.

9           THE COURT:  Sustained.  It's been asked and answered.

10  Ask your next question.

11           MS. BERMAN:  I'd like to introduce Exhibit 5A.

12           MR. SPRINGER:  We object to the exhibit, Your Honor,

13  based upon relevance.

14           MS. BERMAN:  Your Honor, it's relevant --

15           THE COURT:  Hold on.  Hold on.  Do not -- do not

16  argue.

17           The objection will be sustained.  Move on to your

18  next question or exhibit.

19           What number is this?

20           MS. BERMAN:  It's No. 6A.

21  BY MS. BERMAN:

22  Q.   Do you see you file in Florida Department of

23  Corporation -- it's called sunbiz.  In 2007 you again put in

24  place of business Shadow Creek Way.

25           Do you agree with that?

1    A.    Yes.  Yes, I do.

2    Q.    Why did you file this as your place of business?

3    A.    The same answer as the last one.

4    Q.    You said that your business is located in 1711 Holly Hill.

5    A.    Yes.

6    Q.    Why are you putting that you -- that your production is

7    from your home?

8    A.    We were not producing anything in the factory.

9    Q.    Okay.

10   A.    I didn't want to have to run -- I mean, I --

11   Q.    So can you tell me, did you produce anything in 2006

12   or '7?

13   A.    In the factory?

14   Q.    Yes.

15   A.    In 2006 we did, yes.  I don't think we produced anything

16   in that location in 2007.

17   Q.    So in 2007 Maitland Furniture didn't produce anything.

18   A.    Pardon?

19   Q.    In 2007 Maitland Furniture didn't produce anything,

20   correct?

21   A.    Well, we still had product made.  We had it made at the

22   plant that my uncle runs in Wisconsin.  It's just we didn't

23   necessarily want to keep two plants open if the business didn't

24   justify it.

25   Q.    So are you telling that in Florida you didn't produce

1   anything in 2007.

2   A.   In 2007 I do not believe we produced any product in

3   Florida.  That is correct.

4   Q.   And in 2006 you didn't produce any product in Florida.

5           MR. SPRINGER:  Objection, asked and answered.

6           THE COURT:  I'll just let him answer that again.

7           THE WITNESS:  I can answer?

8           THE COURT:  In 2006, yes.

9           THE WITNESS:  In 2006 we produced product in Florida.

10  BY MS. BERMAN:

11  Q.   In Florida.

12  A.   Yes.

13  Q.   In your home address.

14          MR. SPRINGER:  Objection.  It's argumentative.

15          THE COURT:  Sustained.

16          MS. BERMAN:  I would like to introduce Exhibit 7.

17          MR. SPRINGER:  Object to relevance on that exhibit,

18  Your Honor.

19          THE COURT:  Hold on.  I don't see 7.

20          MR. SPRINGER:  And because it's a pleading, Your

21  Honor.

22          THE COURT:  Let me see 7.  I don't have a copy of it

23  here.

24          Don't put it on -- no, no, no.  Don't put it on

25  the . . .

1          That objection is sustained.  That will not be

2     admitted.

3          THE WITNESS:  Your Honor?

4     BY MS. BERMAN:

5     Q.   What did you --

6          THE COURT:  Hold on a second.

7          THE WITNESS:  Can I get my glass of water, please?

8          THE COURT:  Sure.

9          THE WITNESS:  Thank you.

10    BY MS. BERMAN:

11    Q.   What about 2008?  Did Maitland Furniture produce anything

12    in 2008, and if yes, where?

13         MR. SPRINGER:  Judge, object to relevancy.  The time

14    frame in this case stops in 2007 for the most part related to

15    employment practices, so --

16         MS. BERMAN:  But my husband was employed in

17    2006, '7, '8, and '9.  I would like to know what he produced.

18         THE COURT:  All right.  I'll allow it.

19         THE WITNESS:  Okay.  Repeat the question, please.

20    BY MS. BERMAN:

21    Q.   What did Maitland Furniture produce in 2008?

22    A.   In 2008 --

23    Q.   Yes.

24    A.   -- I would say we produced TV stands, office furniture,

25    teller counters, casino furniture -- well, actually, we -- and

1    when I say that, in the '80s I went into business with my

2    uncle, and he made the product, and we purchased it as Maitland

3    Furniture and we distributed it.

4           So we went back to that, where my uncle made the

5    product and then we distributed it.

6    Q.   So actually Maitland furniture didn't produce anything?

7    A.   You're asking about the year 2008?

8    Q.   Yes.

9    A.   I do not believe that Maitland Furniture produced

10   anything.  I believe everything was made at the northern plant

11   owned by my uncle in 2008.

12   Q.   Who is your uncle?  What's the name of your uncle?

13   A.   My uncle's name is Gerald Krall.

14   Q.   Jared Krall?

15   A.   Gerald, as in --

16   Q.   Gerald Krall?

17   A.   -- G-e-r-a-l-d.

18   Q.   Your uncle?

19          And where did he live?

20   A.   Pardon?

21   Q.   Where Gerald Krall live?

22          MR. SPRINGER:  Objection, relevance, Your Honor.

23   We're getting a little astray here.

24          THE COURT:  I'll let him answer that question.

25          THE WITNESS:  I think he lived at 1407 Central Avenue

1   in Marshville, Wisconsin, but I'm not sure on the address.

2   BY MS. BERMAN:

3   Q.    So everything in 2008 was produced in Wisconsin.

4   A.    Yes.  It is my belief.

5   Q.    Not in Florida.

6   A.    Pardon?

7   Q.    Not in Florida, yes?

8   A.    I don't think in 2008.

9   Q.    What about 2009?

10  A.    I believe in 2009 we started producing in Florida again,

11  but, again, I am not sure.

12  Q.    Are you an owner of Maitland Furniture?

13  A.    Yes, I am.

14  Q.    But you said you're not sure.  What do you mean by you're

15  not sure?

16  A.    Well, I mean it's 2015 right now, and I am not sure if we

17  opened up in 2009 or 2010.  I am just not real sure.

18  Q.    Okay.  You said you met my husband in 2004.

19  A.    You are correct, yes.

20  Q.    Okay.  And he approach you to -- for what kind of purpose

21  he approach you?

22  A.    He approached me and said he needed someone to make some

23  orders for some furniture he was selling to the casino

24  industry.

25  Q.    Okay.  And did you convince him to create a corporation,

```
 1   Trifecta Gaming USA, Inc.?

 2   A.    I believe it was a mutual thing.  I don't think I

 3   convinced him.  He -- I don't -- I wouldn't say convinced, no.

 4   It was a mutual thing.

 5   Q.    And when did you incorporate Trifecta Gaming?

 6   A.    I believe I incorporated in July of 2004.

 7   Q.    July 2004.

 8         And you agreed to be divided 50/50?

 9   A.    Pardon?

10   Q.    My husband supposed to be an owner Trifecta Gaming,

11   correct?

12   A.    Huh?

13   Q.    Is my husband an owner of Trifecta Gaming?

14   A.    Yeah.  We incorporated in July of 2014 and --

15   Q.    He was --

16   A.    -- your husband --

17         THE COURT:  Hold on.  Don't interrupt.

18         MS. BERMAN:  Okay.

19         THE WITNESS:  We incorporated in July of 2014, and as

20   I recall, I was a 34 percent owner, my wife was a 33 percent

21   owner, and your husband was a 33 percent owner.

22   BY MS. BERMAN:

23   Q.    Did you say in July of 2014?

24   A.    Pardon?

25   Q.    You just said in July 2014 you incorporated Trifecta
```

1    Gaming?

2    A.    I'm sorry.  I'm not understanding.

3             THE COURT:  What was the date?  Was it 2004?  I

4    believe you said 2014.

5             THE WITNESS:  Oh.  2004.  I'm sorry.

6             THE COURT:  All right.

7    BY MS. BERMAN:

8    Q.    So my husband was making for -- products for casino, you

9    said.  It's correct?

10   A.    I'm very sorry.  I did not understand you.

11   Q.    My husband was making products for casino; is it correct?

12   A.    He was not making products, no.  He was selling products.

13   Q.    Selling products --

14   A.    Yes.

15   Q.    -- to casino, yes?

16   A.    Yes.

17   Q.    Did you send -- why you decided to incorporate Trifecta

18   Gaming?

19   A.    Because if you go into a casino and say, "Hi, we're

20   Maitland Furniture," they're less apt to see you versus if you

21   have a name that sounds like -- Trifecta Gaming sounds like

22   you're selling to the casino industry.

23   Q.    Did my husband met your wife in 2004?

24   A.    Yes, he did.

25   Q.    When?

1    A.    I imagine several times because she worked at the factory.

2    Q.    In 2004.

3    A.    Yes.

4    Q.    What did you do with article incorporation?

5    A.    Pardon?

6    Q.    How you incorporate?  Did you make article of

7    incorporation in 2004 with my husband?

8    A.    I don't -- I can't understand you.

9    Q.    How did you incorporate Trifecta Gaming?

10   A.    We incorporated with the State of Florida.

11   Q.    Okay.  And did you have some kind of agreement in writing?

12   A.    Yes.  We have an articles of incorporation.

13   Q.    Okay.  And what it says?  What kind of share it's supposed

14   to be?

15   A.    Whatever it says on the shares.  I think I just said that,

16   34 percent for me, 33 percent for your husband, and 33 percent

17   for my wife.

18   Q.    Do you know what is an I-94?

19   A.    Pardon?

20   Q.    I-94, do you know?

21   A.    I do not.

22   Q.    So you don't know what does it mean.

23   A.    No.

24              MS. BERMAN:  Can I introduce Exhibit 8?

25              MR. SPRINGER:  Object to the relevance of this

 1  document, Your Honor.

 2              THE COURT:  Yeah, sustained.

 3              MS. BERMAN:  Your Honor, it's relevant because --

 4              THE COURT:  No.  I've already sustained the

 5  objection.

 6              What exhibit is this?

 7              MS. BERMAN:  Exhibit 10.

 8  BY MS. BERMAN:

 9  Q.    Do you recall this?

10  A.    The errata sheet?

11  Q.    Yes.

12  A.    I recall it.

13              Is there another part to it?

14  Q.    Is it your signature?

15  A.    Oh, is it my signature?

16  Q.    Yes.

17  A.    Yes, it is.

18  Q.    Do you recall why did you sign this document?

19  A.    I believe because I thought during the deposition there

20  were parts of the deposition that I felt the recorder may have

21  taken down improperly.

22  Q.    Okay.  So you recall you took deposition in May 6, 2014,

23  and I was deposing you.

24  A.    Yes.

25  Q.    Do you recall where it was taken?

```
 1  A.    Where it was what?

 2  Q.    Where deposition was taken?

 3  A.    It was --

 4  Q.    Do you recall?

 5          MR. SPRINGER:  Your Honor, I'd ask that he be given a

 6  copy of the transcript if she's going to start referring to the

 7  transcript.

 8          THE WITNESS:  I have --

 9          MS. BERMAN:  I give it to him.

10          MR. SPRINGER:  You have it?

11          THE WITNESS:  Is this it right here?

12          MS. BERMAN:  Uh-huh.

13          THE WITNESS:  Okay.  Was it in Palm Coast?

14  BY MS. BERMAN:

15  Q.    Do you recall where --

16  A.    I'm not sure.  I'm not sure.  I think we met at a hotel

17  somewhere, and I thought it was in Palm Coast, but I may be

18  wrong.

19  Q.    Yes, because you didn't want to meet in location where I

20  live, so we -- do you recall who was present at that

21  deposition?

22          MR. SPRINGER:  Objection, Your Honor.  She's going to

23  get into who was present at the deposition.  It's irrelevant

24  concerning what attorneys may have been present or not have

25  been present.
```

1           THE COURT:  Yeah, sustained.

2           THE WITNESS:  Ms. Berman --

3           THE COURT:  Hold on.  Hold on.

4           THE WITNESS:  -- do you want your copy back?

5   BY MS. BERMAN:

6   Q.   Do you recall there was a day that you were -- I was

7   questioning you, and --

8           MS. BERMAN:  I would like to give Exhibit 10A.

9           MR. SPRINGER:  It's okay for identification but not

10  for -- we object to it being entered into evidence, Your Honor.

11          THE COURT:  Which exhibit is this?

12          MR. SPRINGER:  10A, 10 alpha.

13          THE COURT:  Yeah.  I don't see the purpose of just

14  introducing this one.  This is an errata sheet attachment, and

15  so the objection's sustained.

16  BY MS. BERMAN:

17  Q.   I would like to ask you where -- do you recall that you

18  signed this exhibit previously, Exhibit 10, and you read all

19  deposition, and everything what you said in the deposition is

20  true?

21          You agree with that?

22  A.   Are you -- if you're talking about your deposition --

23  Q.   On May 6, 2014.

24  A.   Yes.

25  Q.   Yes.

 1  A.    Okay.

 2  Q.    Everything what --

 3  A.    Listen, it is very, very long, and I'm not going to make a

 4  carte blanche statement that when I went through the whole

 5  thing -- that I may have missed something.  But the stuff I did

 6  find, I did put on the sheet you just gave me.

 7  Q.    So -- but you have a chance to review and --

 8  A.    Yes, I did.  Yes, I did.

 9  Q.    -- and you did it.

10        Okay.  That exhibit was shown to you.

11        And do you recall among the correction you were

12  correcting my question which you were not supposed to correct?

13  A.    I have no idea what you are talking about, because on the

14  form that you gave me, you didn't show me what I -- what I

15  wanted to correct.  You only showed me -- I didn't see what

16  was --

17  Q.    He objected to this.  This Exhibit 10A, you were corrected

18  my question, and you supposed to correct just your answer, not

19  my questions.

20        MR. SPRINGER:  Objection, relevance, Your Honor.

21        THE COURT:  Sustained.

22  BY MS. BERMAN:

23  Q.    Where did you do your corrections --

24        MR. SPRINGER:  Objection, relevance.

25  Q.    -- in Florida or Wisconsin?

1           MR. SPRINGER:  Relevance.

2           THE COURT:  Sustained.

3  BY MS. BERMAN:

4  Q.    Did anybody prepare your deposition?

5  A.    I --

6           MR. SPRINGER:  Same objection, Your Honor.

7           THE COURT:  Other than asking about attorney

8  communications, you could say what you did to prepare for the

9  deposition if you --

10          THE WITNESS:  I just -- I think I just -- I'm not

11 sure what I did.  I just tried to prepare with the materials

12 that were available to me.

13 BY MS. BERMAN:

14 Q.    So -- but nobody help you to prepare for deposition, just

15 you?

16 A.    I would say basically that is correct, yes.

17 Q.    Can you look at page 81, line 4, 5?

18 A.    Okay.  Line what?  I'm on 81.

19 Q.    Line 4 through 5, can you read it?

20 A.    I don't know -- can I go back if I know who's talking?  I

21 don't know who's talking.  Can I go back?

22          MS. BERMAN:  It's Mr. Springer speaking to me.

23          MR. SPRINGER:  Objection, Judge.  That's my -- what I

24 say in deposition is not testimony.

25          THE COURT:  Sustained.

```
 1            MS. BERMAN:  Okay.
 2   BY MS. BERMAN:
 3   Q.    Do you recall that during -- before we begin your
 4   testimony on deposition, you were sworn to testimony.  Do you
 5   recall?
 6   A.    Yes, I do.
 7   Q.    Just for the record, can you read from line 6 -- from page
 8   6, line 13, 20?
 9   A.    On what page?
10   Q.    Page 6.
11   A.    On page 6?
12   Q.    Uh-huh.
13            THE COURT:  What lines?
14            MS. BERMAN:  13, 20.
15            THE COURT:  He already just testified he was sworn in
16   and he swore to tell the truth.
17            MS. BERMAN:  Okay.
18            THE COURT:  He doesn't need to do that.
19            Ms. Berman, are you getting at anything particular in
20   this deposition?  If you are, could you please do so?
21            MS. BERMAN:  What?
22            THE COURT:  Are you getting at anything in
23   particular --
24            MS. BERMAN:  Yes.
25            THE COURT:  -- in this deposition?
```

1              MS. BERMAN:  Yes.

2    BY MS. BERMAN:

3    Q.   I would like to refer to page 35 in your deposition.

4    A.   I am on page 35.

5    Q.   Line 12, 17.

6    A.   12?

7              MR. SPRINGER:  Your Honor, defense objects.  This is

8    getting into in limine motions that were already ruled upon.

9              THE COURT:  Sustained.

10             MS. BERMAN:  But --

11             THE COURT:  Sustained, Ms. Berman.  Move on.

12             MS. BERMAN:  Okay.  I do need address one of the

13   question on -- I would like to ask defendant question from

14   deposition, page 41, 7 to 9.

15             THE WITNESS:  Would you repeat the page, please?

16             MS. BERMAN:  Page 41, 7 to 9.

17             THE WITNESS:  41?

18             MS. BERMAN:  It's --

19             THE WITNESS:  41?

20             MS. BERMAN:  41.

21             THE COURT:  That's an objection by Mr. Springer, so

22   that's improper, so move on to the next question.

23             MS. BERMAN:  No, because he stated that he libel me

24   in 2007.

25             THE COURT:  This is an objection in the deposition by

 1   Mr. Springer.  It's not even testimony, Ms. Berman.

 2   BY MS. BERMAN:

 3   Q.   Let's read from your deposition, page 50, 8 to 12.

 4         THE COURT:  Ms. Berman, why don't you just ask him

 5   questions.  Why don't you just ask him questions instead of

 6   keeping referring to pages in a deposition that the jury

 7   doesn't know what you're referring to.

 8         Why don't you just ask him questions right now.  If

 9   he makes an inconsistent statement, you can ask him did he say

10   something different in the deposition.

11         MS. BERMAN:  Okay.

12         THE COURT:  So ask him a question now.

13   BY MS. BERMAN:

14   Q.   Do you recall that in your deposition you said you're not

15   sure of where your company is located?  Do you recall that?

16   A.   It's probably very similar to the questions you asked me

17   now where I said I don't recall where things are located

18   because we moved around and because my accountant put different

19   locations at different times.

20         THE COURT:  All right.  That's -- I'm going to

21   terminate the questioning about location.  That's all the

22   testimony there's going to be about the location of his

23   companies or him, so move on to an entirely different subject.

24         MR. SPRINGER:  This is --

25         MS. BERMAN:  Exhibit 11.

 1            MR. SPRINGER.  -- Plaintiff's Exhibit 11?

 2            MS. BERMAN:  Yes.

 3            MR. SPRINGER:  The defense objects to the exhibit,

 4  Your Honor.

 5            THE COURT:  Hold on.  Hold on.

 6            I sustain the objection.

 7            MS. BERMAN:  Your Honor, this is exhibit the

 8  defendant produced --

 9            THE COURT:  It doesn't matter.

10            MS. BERMAN:  -- and it shows ownership of my

11  husband's company.  I'd like to address it.

12            THE COURT:  It's what?

13            MS. BERMAN:  It's about ownership of my husband

14  Trifecta Gaming.

15            THE COURT:  All right.  I'll allow it.  Plaintiff's

16  Exhibit 11 will be introduced into evidence.

17      (Plaintiff's Exhibit 11 was received in evidence.)

18  BY MS. BERMAN:

19  Q.   Do you recall this?

20  A.   Pardon?

21  Q.   Do you recall this exhibit?

22  A.   It looks like a supplier registration form that some of

23  the accounts request, and in this particular case it was filled

24  out Trifecta Gaming USA/Maitland Furniture, Inc., and I signed

25  it.  And we had some of the accounts on -- for references, to

     1    show that we're a business in good standing.

     2    Q.    Okay.  Where Trifecta Gaming was located?

     3    A.    Pardon?

     4    Q.    Where Trifecta Gaming was located in 2008?

     5    A.    That -- hang on a second.  I want to see what year this

     6    is.

     7    Q.    It's 2008.

     8    A.    Where are you seeing the date?  I am not seeing a date.

     9    Q.    Look on the page No. 3.

    10    A.    There's only two pages here.

    11    Q.    Yes, there is two pages.

    12    A.    How can there be three --

    13    Q.    It says page 3 here.

    14    A.    Oh, okay.  I thought it was missing a page.

    15          Did you miss page two?

    16    Q.    That's what I want to ask.  Your attorney produced me just

    17    page 1 and 3.

    18          What -- why you didn't produce No. 2?  Is it

    19    something important that you didn't producing?

    20          MR. SPRINGER:  Objection, Judge.  I need to go to

    21    sidebar on this.

    22          THE COURT:  All right.

    23       (At sidebar, out of the hearing of the jury:)

    24          MR. SPRINGER:  Your Honor, she's implying that we

    25    destroyed evidence somehow.

 1          MS. BERMAN:  This --

 2          MR. SPRINGER:  That's just not the case.

 3          MS. BERMAN:  It's a list -- this registration form,

 4  it says my husband vice president and I want to introduce

 5  article incorporation to show what it says.

 6          THE COURT:  All right.  You're the one who introduced

 7  the incomplete exhibit just now.

 8          MS. BERMAN:  That's what they sended to me.

 9          THE COURT:  Well, that's to be taken up before,

10  beforehand, not in front of the jury if you think they produced

11  something incomplete, so that's irrelevant.

12          Are you ever going to get to the substance of this

13  case?

14          MS. BERMAN:  Yes, I am.

15          THE COURT:  Okay.  Because I'm about to force you to

16  get to it, okay --

17          MS. BERMAN:  Okay.

18          THE COURT:  -- right now, all right?  And then I'll

19  see if anything else is relevant.

20          MS. BERMAN:  Okay.

21          THE COURT:  Okay.  But I have the right to order the

22  presentation of evidence.  I haven't heard anything relevant

23  thus far.  We've been at it for an hour and a half.

24          Have you looked at the jury?

25          MS. BERMAN:  No.

1          THE COURT:  Okay.  Well, you're losing completely the

2   jury.

3          MS. BERMAN:  Okay.

4          THE COURT:  So I don't know what you think you're

5   accomplishing by this, but if anything, you're hurting your

6   case --

7          MS. BERMAN:  Okay.

8          THE COURT:  -- okay, because the jury completely is

9   lost.  They don't know what's going on, and you haven't gotten

10  to anything relevant.

11         MS. BERMAN:  Okay.

12         THE COURT:  So you're going to ask him about the

13  statements that are at issue, okay, and then after that, you'll

14  proffer to me what else you want to ask him.

15         MS. BERMAN:  I'll -- when I can read from his

16  deposition?  Can I read mine from his deposition?

17         THE COURT:  You can -- do you have an objection to

18  having the deposition be admitted?

19         MR. JONES:  Yes, Your Honor, only because --

20         THE COURT:  There are a lot of irrelevant matters?

21  All right.

22         MR. JONES:  Yes.

23         THE COURT:  If you're going to ask him questions

24  about the deposition, it needs to be relevant to these two

25  statements that are at issue in this lawsuit --

 1           MS. BERMAN:  Okay.

 2           THE COURT:  -- all right?  And then once you're --

 3   how much longer do you think you're going to be with him?

 4           MS. BERMAN:  I don't know.  I will look at my --

 5           THE COURT:  Well, give me an estimate right now.

 6           MS. BERMAN:  I can't estimate.  I have to look over

 7   the exhibits.  I will check all the -- I will go to the table,

 8   check which now, and make sure.

 9           THE COURT:  Okay.  Ms. Berman, I've got to tell you

10   that this is -- it's turning into -- oppressive to the jury and

11   to everyone else, okay.

12           MS. BERMAN:  Okay.

13           THE COURT:  Okay?  So like I said, you're not

14   accomplishing anything.  I don't know what you're doing other

15   than possibly harassing this witness --

16           MS. BERMAN:  No, I'm not --

17           THE COURT:  -- and just wasting everybody's time.

18           MS. BERMAN:  Okay.

19           MR. SPRINGER:  Can I ask for a curative, just that

20   the jury disregard the comment about missing pages of the

21   document?

22           THE COURT:  Yeah.  I can do that.

23           MR. SPRINGER:  Thank you.

24           THE COURT:  All right.

25       (End of discussion at sidebar.)

1          THE COURT:  All right.  Ladies and gentlemen of the

2   jury, please disregard any comments about missing pages or

3   incomplete documents being produced.  Please disregard any

4   comments or statements that you heard about that.

5          THE WITNESS:  Ms. Berman?

6          MS. BERMAN:  Yes.

7          THE WITNESS:  Do you want this back?

8          MS. BERMAN:  No.

9   BY MS. BERMAN:

10  Q.   I have a question here on page 3, actually.

11          You said that you (unintelligible)?

12          THE COURT:  Hold on, Ms. Berman.  We can't hear you.

13  BY MS. BERMAN:

14  Q.   On page 3 you said you contact information on Sheri Cobb.

15  Is it true?

16  A.   I am trying to find something on page 3.

17          What do you say is on page 3?  Can you show me?

18  Q.   Right here.

19  A.   Oh.  Well, this is just a form for -- registration form

20  for an account, and when they -- when you have a registration

21  form, that account wants to know if you're a business in good

22  standing, that you've been around for a while and that you have

23  financial ability to back up the order that they may be giving

24  you.

25          And we were dealing with SunTrust.  And yes, I have

1   Sheri Cobb's number down as the contact name.

2   Q.   Did Sheri Cobb knew about that you give her contact

3   information?

4   A.   I didn't understand you.  I'm sorry.

5   Q.   Did she know that you give contact information about her

6   to the company?

7   A.   Did she know I did this?  Probably not, because she was my

8   contact.  I was just filling out a form.

9   Q.   Okay.  So you agree that my husband was owner of Trifecta

10  Gaming in 2004, '5, '6, '7, '8, and '9?

11  A.   I agree that your husband was a minority stockholder in

12  Trifecta Gaming in 2004 and 2005.

13  Q.   Do you have any documents that he was minority?

14  A.   Yes, the articles of incorporation.

15  Q.   Okay.  We will get to this.

16       Let's talk about when my husband become employee of

17  Maitland Furniture.

18  A.   I would say on December 26th of 2005 he came and talked to

19  me, and at that time I was unhappy with his job performance,

20  and I was going to dissolve Trifecta Gaming.  At that time he

21  asked me to take him off the books and make him a salesperson

22  and that he would work for $500 a week, were his exact words.

23       I believe the official transfer -- we started

24  receiving checks or a W-2 -- I think the official transfer took

25  place on January 1st of 2006, which would be the very next

1   week.

2   Q.   Do you have a company Maitland Imports?

3   A.   In 1983 I started a company in Pittsburgh, Pennsylvania,

4   called Maitland Imports.

5   Q.   And what did you do with that company?

6   A.   We started in 1983.

7   Q.   Yes.  And you transferred to Florida or you close that

8   company?

9   A.   That is sort of interesting.  What we did in, I believe,

10  1998, we moved the company from Pittsburgh to Florida, and we

11  incorporated in Florida under Maitland Furniture.  And I'm --

12  and, again, it could be 1996; it could be 1998, but it was in

13  that area somewhere where we incorporated in the state of

14  Florida as Maitland Furniture.

15  Q.   But is this company still active?

16  A.   Say it again, please?

17  Q.   Is this company still active?

18  A.   That's sort of funny.  I was unaware that the company was

19  active until you came with your deposition because I didn't do

20  anything with the company in 20 years --

21  Q.   So --

22  A.   -- but apparently I --

23  Q.   Did you close that company?

24  A.   Pardon?

25  Q.   Did you close that company?

1   A.    I didn't understand you.

2   Q.    Did you close that company?

3   A.    We've done no business for 20 years.  In the state of

4   Florida, if you don't register properly, in a very short period

5   of time, it becomes inactive.

6         So I imagine, since apparently the State of

7   Pennsylvania requires you to do nothing, that we are still

8   active.  But I was unaware that the State of Pennsylvania

9   apparently does not make you do anything to keep a company

10  current.

11  Q.    Okay.  Let's look at the article incorporation.  You've

12  said --

13        THE COURT:  Hold on a second.

14        I'm going to go ahead and have a break at this point,

15  and I am going to ask the attorneys and Ms. Berman to stay, and

16  we'll discuss some matters.

17        And so I would ask the jury if you could please be

18  back at 3:15.

19        COURT SECURITY OFFICER:  All rise for the jury.

20     (Jury out at 2:55 p.m.)

21        COURT SECURITY OFFICER:  Please be seated.

22        THE COURT:  All right.  Ms. Berman, so far I haven't

23  heard anything that I even understand the relevancy of.  You've

24  spent an hour and 45 minutes on questioning that appears to be

25  completely irrelevant, and I'm not going to let it continue.

1          So what I'm going to do is I'm going to have you

2     proffer to me right now what you intend to ask --

3          MS. BERMAN:  Yes.

4          THE COURT:  -- this witness --

5          MS. BERMAN:  I --

6          THE COURT:  Hold on -- and I will tell you right now

7     what I'm not going to allow, okay?  And then so I expect you to

8     not ask those questions and go right to the questions and --

9     right to the questions that I allow and the exhibits that I

10    allow.

11         So tell me what areas of questioning you plan on

12    asking this witness.

13         MS. BERMAN:  About unemployment appeal now I will be

14    asking.

15         THE COURT:  About what?

16         MS. BERMAN:  Unemployment appeal and also ownership

17    of my husband.

18         THE COURT:  Ownership of your husband.

19         MS. BERMAN:  Yes, of Trifecta Gaming.

20         THE COURT:  What do you mean?

21         MS. BERMAN:  My husband is still owner and

22    shareholder --

23         THE COURT:  Okay.  We're not -- your husband filed an

24    unemployment compensation claim.

25         MS. BERMAN:  For Maitland Furniture.

1           THE COURT:  Okay.  So --

2           MS. BERMAN:  So I want to establish that Maitland

3   Furniture and Trifecta Gaming two different companies.

4           THE COURT:  Okay.  And so what does your husband's

5   ownership of Trifecta Gaming have to do with anything?

6           MS. BERMAN:  Because all the evidence what he

7   produce, it was all about Trifecta Gaming.

8           THE COURT:  What's your response?

9           MR. SPRINGER:  Your Honor, I think where she's going

10  is the checks that are at issue in this case were made

11  payable -- the checks at issue in the case were made payable to

12  Trifecta Gaming, and therefore I think the case is that how

13  could she embezzle money from a company that her husband owned.

14          THE COURT:  All right.  I'll allow you to inquire

15  into the ownership.

16          And when were these checks dated?

17          MR. SPRINGER:  They were dated 2006 and 2007.

18          Your Honor, may I say one more thing?

19          THE COURT:  Yes.

20          MR. SPRINGER:  And as to the time period, the only

21  relevant time period, we would submit, of the ownership of

22  Mr. Berman in Trifecta Gaming would be in that time period of

23  2006/2007, nothing beyond that time frame because that's going

24  to get us into the lawsuits, prior lawsuits.

25          THE COURT:  All right.  I think the ownership, as I

1    did -- as I stated, I believe, in an order on a motion in

2    limine, I'll let you ask Mr. Kafka about ownership of Trifecta

3    Gaming in 2006 and 2007 in terms of your husband, whether or

4    not he was an owner, all right?  I'll limit it to that.

5              Do you understand that, Ms. Berman?

6              MS. BERMAN:  Yes.

7              THE COURT:  All right.  What else are you planning on

8    asking?

9              MS. BERMAN:  I have also unemployment appeal and

10   those libel statements.

11             THE COURT:  All right.  So all you're going to ask

12   about is the ownership of Trifecta Gaming, the libelous

13   statements, and the unemployment appeal?

14             MS. BERMAN:  Yes.

15             THE COURT:  All right.  That's it.  That's all you're

16   going to be asking because I'm not going to let you ask

17   anything else.

18             Is that right?

19             MS. BERMAN:  Yes.  I will just go through my exhibits

20   so I can introduce just what -- for unemployment appeal and

21   ownership of my husband.

22             THE COURT:  I'm sorry.  Say that again?

23             MS. BERMAN:  I will just go through my exhibits and

24   will introduce everything for unemployment appeal and the

25   ownership of my husband for Trifecta Gaming.

1            THE COURT:  All right.  Can we speed this up?

2         Have you looked at these exhibits?  Can she introduce

3    the ones that have to do with the ownership and the --

4            MR. SPRINGER:  Yes.  Your Honor, there was about 85

5    listed, but I can go through the ones she intends to put in

6    right now while the jury's out, and we can get that -- a lot of

7    that out of the way.

8            THE COURT:  All right.  Show him all of the exhibits

9    that you intend to introduce right now --

10           MS. BERMAN:  Okay.

11           THE COURT:  -- and then the two of you need to work

12   that out.

13           All right.  Court will be in recess, then, until

14   3:15.

15           COURT SECURITY OFFICER:  All rise.

16      (Recess from 3:01 p.m. until 3:32 p.m.; all parties

17   present.)

18      (Outside the presence of the jury:)

19           COURT SECURITY OFFICER:  All rise.  This Honorable

20   Court is now in session.

21           Please be seated.

22           THE COURT:  All right.  Have the parties discussed

23   the exhibits?

24           MR. SPRINGER:  Yes, Your Honor, we did.  We didn't

25   agree on all of them, but we did agree on some of them.

 1              THE COURT:  All right.  Which are the ones that are

 2      agreed on?  Let's go ahead and put those in evidence.

 3              And let me say this before we get into the exhibits.

 4      We told the jury that this would be a three- to four-day trial,

 5      and I plan on staying with that.

 6              Mr. Springer, how long do you think your case is

 7      going to be?

 8              MR. SPRINGER:  I don't -- I won't be more than, I

 9      want to say, 45 minutes with Mr. Kafka, maybe an hour --

10      probably an hour.  And then our remaining two witnesses are no

11      more than 30 minutes each.

12              THE COURT:  All right.  Ms. Berman, I'm going to put

13      a time limit on your case.  In other words, you're going to

14      have to be done with your entire case, all your witnesses,

15      including yourself, all your evidence, by tomorrow when we

16      break, which will be at 5 o'clock or close to 5 o'clock.

17              I would think you could get done really sooner than

18      that, by -- I would love to see you get done by lunchtime, but

19      I'm putting an absolute limit on your case by 5 o'clock

20      tomorrow -- not 5:00 -- well, whenever we break.  It may be at

21      5:00; it may be a little sooner than that.

22              We're going to take normal breaks during the day.

23      We're going to take a lunch break.  We're going to do just

24      basically what we did today.

25              So if Mr. Kafka is still on the stand -- I mean, I'm

1  hoping obviously that he won't be -- then your case will be

2  done, okay?  You won't get a chance to testify.  Nobody else

3  will get a chance to testify.  Your case will be over with,

4  okay?

5         I think that's a fair limit in this case based on the

6  number of witnesses that you have, which is you, your husband,

7  Mr. Kafka, maybe Ms. Cobb.

8         I believe that you should be able to get through all

9  those witnesses in that amount of time, because I'm not going

10 to sit here, as we just did for two hours, and let you waste

11 the Court's time, let you waste everybody else's time with

12 irrelevant matters that -- I don't know if anybody in this

13 courtroom has any idea what you're trying to get at by what you

14 just did for the last hour and a half.

15        But it's a waste of time, and I'm not going to keep

16 having to move this case along.  I understand the defendants

17 are not objecting to all of it.  They probably think it's

18 benefiting them to just let you basically lose the jury.

19        So it's going to be on you to move your case along,

20 to keep it going.  And if you don't, if you don't finish by

21 tomorrow, if you don't get a chance to testify, if you don't

22 get a chance to put on some of your evidence, it's just going

23 to be tough.

24        Do you understand that?

25        MS. BERMAN:  Yes.

1          THE COURT:  All right.  So what are the exhibits

2    that -- and I don't anticipate having to put a limit on the

3    defendant's case, let me say, based on what you just said, but

4    I will put a limit on the defendant's case too, if need be.

5          And I would give you as much time as I gave the

6    plaintiff, but I wouldn't think you're going to need anywhere

7    near that time to get through with this.

8          So what are the exhibits that are agreed to?

9          MR. SPRINGER:  The first one is Plaintiff's Exhibit

10   22C, articles of incorporation.

11         Madam Clerk, do you have a copy of her exhibits,

12   Ms. Berman's?

13         COURTROOM DEPUTY:  I --

14         THE COURT:  I do have a copy of her exhibits.

15         And, Ms. Berman, you know, all of these exhibits that

16   you're admitting are the court's exhibits once you admit them.

17   You're supposed to keep your own copies for yourself if you

18   want them.

19         So they need to be with the deputy clerk, and you're

20   not to take them back.  Once they're admitted into evidence,

21   they're evidence for the court.

22         You understand that?

23         MS. BERMAN:  Yes, Your Honor.

24         THE COURT:  All right.  22A, that will be admitted.

25         Okay.  What else?

1          MR. SPRINGER:  I think it was actually 22C, Your

2    Honor.

3          THE COURT:  22C?  Okay.  22C will be admitted.

4    That's the articles of incorporation of Trifecta Gaming USA.

5        (Plaintiff's Exhibit 22C was received in evidence.)

6          THE COURT:  Okay.  What else?

7          MR. SPRINGER:  25B, bravo, notice of determination,

8    October 17, 2011.

9          THE COURT:  All right.  That will be admitted, 25B.

10       (Plaintiff's Exhibit 25B was received in evidence.)

11         MR. SPRINGER:  Exhibit 26.  It's the signature card

12   for SunTrust Bank.  And these are plaintiff's exhibits, Your

13   Honor, labeled as plaintiff's exhibits.

14         THE COURT:  All right.  That will be admitted.

15         26, you said?

16         MR. SPRINGER:  Yes, sir.

17       (Plaintiff's Exhibit 26 was received in evidence.)

18         MR. SPRINGER:  Plaintiff's Exhibit 34B, as in bravo,

19   is an annual report filed with the Florida Department of

20   Corporations for 2006.

21         THE COURT:  34B?

22         MR. SPRINGER:  Yes, sir.

23         THE COURT:  All right.  34B will be admitted.

24       (Plaintiff's Exhibit 34B was received in evidence.)

25         MR. SPRINGER:  Exhibit 42 is a notice of

1   determination from the Agency for Workforce Innovation, and I

2   think there's a 42A as well that is going to be admitted, that

3   composite exhibit.

4            THE COURT:  42 and 42A?

5            MR. SPRINGER:  Yes, sir.

6            THE COURT:  All right.  Those will be admitted.

7        (Plaintiff's Exhibits 42 and 42A were received in

8   evidence.)

9            MR. SPRINGER:  Exhibit 46, e-mails from Thomas Kafka

10  to Janice Connell.

11           THE COURT:  All right.  That will be admitted.

12       (Plaintiff's Exhibit 46 was received in evidence.)

13           MR. SPRINGER:  Exhibit 47.

14           THE COURT:  All right.

15           MR. SPRINGER:  And, Your Honor, on Exhibit 46, there

16  was a 46A as well.  I object to 46A, just for the record.

17           THE COURT:  All right.  So just 46 and 47.

18       (Plaintiff's Exhibit 47 was received in evidence.)

19           MR. SPRINGER:  Exhibit 50.

20           THE COURT:  All right.  That will be admitted.

21       (Plaintiff's Exhibit 50 was received in evidence.)

22           MR. SPRINGER:  Exhibit 50A, as in alpha.

23           THE COURT:  Okay.  That will be admitted.

24       (Plaintiff's Exhibit 50A was received in evidence.)

25           MR. SPRINGER:  Exhibit 50B, bravo.

1          THE COURT:  By the way, on 50A, I have a copy where

2    there's a sticky note that's covering up part of that.

3          Is that what you have?

4          MR. SPRINGER:  I think it's the only one there is,

5    Your Honor.

6          THE COURT:  All right.

7          What was the next one?

8          MR. SPRINGER:  50 bravo, 50B.

9          THE COURT:  All right.  That will be admitted.

10      (Plaintiff's Exhibit 50B was received in evidence.)

11          MR. SPRINGER:  Exhibit 51.

12          THE COURT:  All right.  That will be admitted.

13      (Plaintiff's Exhibit 51 was received in evidence.)

14          MR. SPRINGER:  Exhibit 55.

15          THE COURT:  All right.  That will be admitted.

16      (Plaintiff's Exhibit 55 was received in evidence.)

17          MR. SPRINGER:  Exhibit 55A, alpha.

18          THE COURT:  All right.  That will be admitted.

19      (Plaintiff's Exhibit 55A was received in evidence.)

20          MR. SPRINGER:  Exhibit -- and we object to 55 bravo,

21    just for the record.

22          THE COURT:  Okay.

23          MR. SPRINGER:  Exhibit 56 and 56A.

24          THE COURT:  All right.  Those will be admitted.

25      (Plaintiff's Exhibits 56 and 56A were received in

1    evidence.)

2              MR. SPRINGER:  Exhibit 58.

3              THE COURT:  All right.

4         (Plaintiff's Exhibit 58 was received in evidence.)

5              MR. SPRINGER:  Exhibit 59.

6              THE COURT:  All right.

7         (Plaintiff's Exhibit 59 was received in evidence.)

8              MR. SPRINGER:  59A.

9              THE COURT:  All right.

10        (Plaintiff's Exhibit 59A was received in evidence.)

11             MR. SPRINGER:  59B.

12             THE COURT:  All right.

13        (Plaintiff's Exhibit 59B was received in evidence.)

14             MR. SPRINGER:  59C.

15             THE COURT:  All right.

16        (Plaintiff's Exhibit 59C was received in evidence.)

17             MR. SPRINGER:  Exhibit 64.

18             THE COURT:  All right.

19        (Plaintiff's Exhibit 64 was received in evidence.)

20             MR. SPRINGER:  Exhibit 64A.

21             THE COURT:  All right.

22        (Plaintiff's Exhibit 64A was received in evidence.)

23             MR. SPRINGER:  Exhibit 70.

24             THE COURT:  All right.

25        (Plaintiff's Exhibit 70 was received in evidence.)

1          MR. SPRINGER:  Exhibit 84A, as in alpha.

2          THE COURT:  All right.

3          MR. SPRINGER:  84B, bravo.

4          THE COURT:  All right.

5          MS. BERMAN:  Your Honor, may I say something?  Those

6   Exhibits 84, 84A, and B, I will -- I do not -- I object to the

7   evidence, but I will just go over those exhibits, but I object

8   to the evidence, those exhibits.

9          THE COURT:  I thought you -- these were --

10         MS. BERMAN:  84.  I do not waive my right for

11  objection from 84, 84A, 84B, 84C.

12         THE COURT:  All right.  So you don't want to admit

13  these exhibits.

14         MS. BERMAN:  I -- how to say?  I will comment on it,

15  but I do not -- I don't waive my right for objection.

16         THE COURT:  Well, once the jury hears them, they're

17  into evidence, so -- then we won't admit them then.

18         This is supposed to be if the parties stipulate,

19  so then I won't admit 84 --

20         MS. BERMAN:  I object --

21         THE COURT:  What?

22         MS. BERMAN:  I object to those exhibits.

23         THE COURT:  All right.  Then I won't admit them at

24  this time, 84A and 84B.  They're your exhibits.

25         MR. SPRINGER:  That was all, Your Honor.

1            MS. BERMAN:  This actually defendant's exhibits,

2    so -- and 84A -- 84, 84A, 84B, 84C --

3            THE COURT:  They're not coming in at this point.

4            All right.  Ms. Berman, are you going to try to

5    introduce any of these other exhibits?

6            MS. BERMAN:  Yeah.  I'd like to discuss with you.

7            THE COURT:  All right.  We're not going to discuss

8    them one by one.  I want you to tell me the category -- tell me

9    about what the relevancy is and the categories of these

10   exhibits.

11           And remember, you're -- at this point you're using

12   your time, so . . .

13           MS. BERMAN:  Okay.  I would like to introduce Exhibit

14   24.  It's an application for trademark.

15           THE COURT:  All right.  That will be denied.

16           MS. BERMAN:  But this is ownership of my husband.

17           THE COURT:  This is what?

18           MS. BERMAN:  Ownership of my husband for Trifecta

19   Gaming, and it was an ongoing appeal.

20           THE COURT:  And what's your objection to this?

21           MR. SPRINGER:  Your Honor, our position is -- and

22   this goes back to what I brought up before the jury selection

23   today.  There was a trademark lawsuit involving the parties in

24   this case --

25           THE COURT:  Does it say anything here about the

 1   ownership of the company?

 2          MR. SPRINGER:  Not to my knowledge.  In fact, our

 3   position is applying for a trademark doesn't mean you own the

 4   company.

 5          THE COURT:  All right.  That will be -- I'm going to

 6   sustain the objection.

 7          What's the next exhibit you want to introduce?

 8          MS. BERMAN:  On 24 --

 9          THE COURT:  Ms. Berman, that's my ruling, okay?

10          MS. BERMAN:  Okay.  24A when he show unemployment

11   that he is a trademark -- it's from unemployment appeal, 24A,

12   application for trademark.

13          THE COURT:  This is part of the unemployment appeal?

14          MS. BERMAN:  Yes.

15          MR. SPRINGER:  I can clarify, Your Honor, if you'd

16   like.

17          There's a mention -- reference of a trademark case in

18   the unemployment documents, and that is in, like, an order

19   issued -- or it's a continuing issue by the appeals commission.

20          However, the applications for a trademark -- maybe

21   it's in their file somewhere, but, again, it's not relevant to

22   this case other than the fact that a hearing was continued

23   because of that trademark case.

24          Again, the specifics of it I don't think are relevant

25   for purposes of this trial.

1          MS. BERMAN:  Your Honor, may I comment on that?

2          THE COURT:  What's the date of this document?

3          MS. BERMAN:  It says up here May 26th, '09.  It's

4   faxed to unemployment appeal.

5          THE COURT:  That's just the date of the fax.  What's

6   the date of the document?

7          MS. BERMAN:  It just was introduced in unemployment

8   appeal because there was decision if my husband is owner of

9   Trifecta Gaming or not because you cannot claim benefits when

10  you are an owner of a company.  It was just for Maitland

11  Furniture.

12          So my husband has to produce a trademark --

13          THE COURT:  Well, what's the harm in allowing this

14  document?  Is there really prejudice to it?

15          MR. SPRINGER:  Well, it's going to probably go to

16  where they say her husband owned the company merely because he

17  filed a lawsuit regarding the trademark.

18          MS. BERMAN:  Your Honor, my husband did not file a

19  lawsuit regarding trademark.

20          THE COURT:  What's the relevance of -- that he tried

21  to register a trademark?

22          MS. BERMAN:  Because it was his company, and

23  defendant took away from him his company illegally.

24          THE COURT:  All right.  I'll allow the exhibit.

25  24A --

```
 1              MS. BERMAN:  Thank you, Your Honor.

 2              THE COURT:  -- will be admitted.

 3          (Plaintiff's Exhibit 24A was received in evidence.)

 4              THE COURT:  What else?

 5              MS. BERMAN:  This is exactly -- 24B, it shows a

 6    trademark application.  It's in unemployment.

 7              THE COURT:  All right.  I'll allow that.

 8          (Plaintiff's Exhibit 24B was received in evidence.)

 9              MS. BERMAN:  Then it's from IRS about trademark --

10    not trademark.  From IRS is tax return because my husband is an

11    owner and shareholder, so they -- he cannot obtain tax return,

12    so it shows that he's an owner there.

13              THE COURT:  And what's the objection?

14              MR. SPRINGER:  Well, No. 1, these aren't certified

15    documents that were obtained so they're hearsay.

16              No. 2, the way that Mr. Kafka's accountant advised

17    him to conduct his business for tax reasons, it can't be proven

18    that it was done wrongly, and it's not relevant in the case

19    here.

20              MS. BERMAN:  Your Honor, defendant claims that I

21    somehow embezzled money from 2006 and '7.  It will show that

22    Trifecta Gaming didn't have any money, zero money.  How you can

23    embezzle from zero?

24              THE COURT:  I'll sustain the objection.

25              MS. BERMAN:  It's also --
```

1            THE COURT:  That's not going to be admitted.  Move

2    on, Ms. Berman.

3            MS. BERMAN:  Can I show Exhibit 27?  It's where it

4    show which position do people have in Trifecta Gaming.

5            THE COURT:  And what's the objection?

6            MR. SPRINGER:  I think the date on that picture, if

7    I'm not mistaken, is 2009, which is after the relevant time

8    frame of the case.

9            MS. BERMAN:  That's exactly when my husband has file

10   unemployment appeal, 2009.

11           MR. SPRINGER:  The checks at issue were 2006, 2007,

12   whether or not he was an owner at that time.

13           MS. BERMAN:  Your Honor, unemployment appeal was in

14   2009, not 2006 and '7.  The defendant --

15           THE COURT:  All right.  I'll allow this exhibit.

16           MS. BERMAN:  Thank you, Your Honor.

17      (Plaintiff's Exhibit 27 was received in evidence.)

18           MS. BERMAN:  I would like to produce Exhibit 28.

19   That was in unemployment appeal.  It's explanation of ownership

20   of my husband.

21           THE COURT:  Mr. Springer?

22           MR. SPRINGER:  Your Honor, the letter she's referring

23   to is hearsay, No. 1.  That -- the person that wrote the letter

24   is not here to testify about the letter.

25           No. 2, we wholly question the authenticity of that

1   letter, and it just goes spouting about different accusations

2   in the letter that are unfounded.

3           THE COURT:  All right.  I'm going to sustain --

4           MS. BERMAN:  Your Honor --

5           THE COURT:  I'm going to sustain the objection.

6           What's the next exhibit?

7           MS. BERMAN:  Next Exhibit 28A, where --

8           THE COURT:  Ms. Berman, are we going to go through

9   all these exhibits, because we might as well let the jury go

10  for the day.

11          MS. BERMAN:  No, not all of them, but some of them I

12  would like to admit.

13          28A, it's how many people that are working on

14  Trifecta Gaming.

15          THE COURT:  We already have one of these.  27 looks

16  like the same thing.

17          MS. BERMAN:  It's -- it's different date.  It's

18  changed name -- it changed people already.

19          THE COURT:  And what's the objection?

20          MR. SPRINGER:  Your Honor, the -- Mr. -- the conflict

21  in this case is whether Mr. Berman was an owner in 2006 and '7.

22  That's it.  Any time period afterward, including 2009, from

23  this website is not relevant.

24          MS. BERMAN:  But unemployment appeal was in 2009.

25  It's not just 2006 and '7.  He file in 2009 for unemployment

 1   appeal.

 2           THE COURT:  But Mr. Berman is not listed as an owner

 3   here, right?

 4           MS. BERMAN:  That's what I was told, that when he

 5   filed, there is other people that maybe libel me, and he have

 6   different -- different --

 7           THE COURT:  Other people who might have libeled you?

 8   That's the relevancy of this?

 9           MS. BERMAN:  He has description who is vice

10   president, president, etc.

11           THE COURT:  And how is that relevant?

12           MS. BERMAN:  To show that Mr. Kafka -- this exhibit

13   show that -- what -- article incorporation is not correct with

14   what his website saying.

15           THE COURT:  All right.  That will be -- the objection

16   will be sustained.

17           MS. BERMAN:  I would like 28B.  It's a letter from

18   the woman who was on his website and asking to remove her

19   because she is not an employee of the company.

20           THE COURT:  And what's the relevancy of this?

21           MS. BERMAN:  That when I ask for employee, he didn't

22   produce me, but he has all different employee.

23           THE COURT:  The objection's sustained on that.

24           MS. BERMAN:  It's my husband letter to Mr. Kafka

25   after he --

1          THE COURT:  What exhibit?

2          MS. BERMAN:  It's Exhibit 32, when he terminate him.

3  It was in unemployment appeal.

4          THE COURT:  What's the relevancy of this?

5          MS. BERMAN:  This explain about his ownership, that

6  he -- it's about termination from unemployment -- from --

7          THE COURT:  This is just a hearsay letter by your

8  husband.

9          What's the objection?

10         MR. SPRINGER:  That was one of our objections, Judge.

11  It's a hearsay letter.  He's sitting in the hallway.  He's

12  going to testify in this case.  And it's unsupported

13  allegations.

14         MS. BERMAN:  But it's -- all the defendant's is

15  hearsay too.  I need to show that it's not like he is right

16  now, come up with different ideas or answers.  It was in 2009.

17  That what he work.  It's not like he differently.  It's what he

18  work.

19         THE COURT:  Let me say this.  Even if Mr. Berman was

20  a part owner of, I guess, Trifecta Gaming --

21         MS. BERMAN:  Uh-huh.

22         THE COURT:  -- that doesn't mean that checks can

23  still just be written to him and he just gets to keep the

24  checks.  I assume they still have to go through the corporation

25  and still be dealt with accordingly.

1          So this is a -- this is an e-mail written in 2009,

2    which is way beyond the dates of the checks, and I don't think

3    this lawsuit is about a dispute about the ownership of the

4    company, okay?

5          I'm going to allow a little bit of evidence as to

6    that, but we're not going to get sidetracked on this dispute

7    that apparently your husband has and maybe still has over some

8    ownership of this company.

9          A check made out to a corporation can't be cashed by

10   an owner, as far as I know anyway, so --

11         MS. BERMAN:  Your Honor, it's -- I don't know if --

12   who would cash check because my husband cannot recall this

13   check.

14         THE COURT:  Well, then I don't even know why we're

15   getting into all of this.

16         MS. BERMAN:  That's what -- I am not sure if this

17   check actually was in unemployment hearing.  I would like them

18   produce me the checks that were produced at the unemployment

19   hearing because I --

20         THE COURT:  All right.  Well, I'm going to keep out

21   32.  The objection to that will be sustained.

22         What's your next exhibit?

23         MS. BERMAN:  So 32 you --

24         THE COURT:  I'm keeping -- is not admitted.

25         MS. BERMAN:  Not included.  Okay.

1          I would like to include Exhibit 33.  It's from

2    Trifecta's trademark attorney who explain in here that my

3    husband is still in ownership and what he's supposed to do to

4    remove my husband from being in ownership.  He's still in

5    ownership legally.

6          THE COURT:  All right.  This is in 2009.  Again,

7    we're not going to get into all these other lawsuits and

8    letters going back and forth --

9          MS. BERMAN:  No, it's --

10          THE COURT:  Hold on, Ms. Berman.

11          We're not going to get into letters going back and

12    forth between attorneys and accusations.  We're talking about

13    two checks that were written in 2006 and in 2007, and so I'm

14    going to sustain the objection to 33.

15          MS. BERMAN:  Okay.  I would like Exhibit 34A.  It's

16    explanation what you have to do to remove an officer from a

17    corporation, when you owner what you have to do.  It is -- it

18    was improperly removed.

19          THE COURT:  The objection's sustained.

20          MS. BERMAN:  Okay.  34B, it show in 2006 my husband

21    is still owner of Trifecta Gaming.

22          MR. SPRINGER:  I think we agreed to that one, Your

23    Honor.

24          THE COURT:  All right.  That one's already in.

25          MS. BERMAN:  So 34B is --

1          THE COURT:  That's been admitted.

2          MS. BERMAN:  Okay.  35 is a letter -- termination

3   letter from defendant.  He terminated him from Trifecta Gaming.

4          THE COURT:  What's the objection?

5          MR. SPRINGER:  It's hearsay, Your Honor.  The witness

6   is right here.  She can ask him questions that she has about

7   that area, but there's no need to introduce this document.

8          MS. BERMAN:  Your Honor --

9          THE COURT:  All right.  I'm going to overrule that

10  objection and admit Plaintiff's 35.

11         MS. BERMAN:  Thank you, Your Honor.

12      (Plaintiff's Exhibit 35 was received in evidence.)

13         MS. BERMAN:  Thank you, Your Honor.

14         I would like 36 when my husband -- giving him all the

15  accounts.  It was in unemployment.  It was just around --

16  before he terminated him, they, like, working very good.  He's

17  asking him for account information.  It's 36.

18         THE COURT:  And what's the objection?

19         MR. SPRINGER:  The response from Chris Berman would

20  be hearsay.  We don't think it's relevant, what's in any of

21  those e-mails.

22         MS. BERMAN:  But he's supplying all of the account

23  information.  It still looks like he's working with him on --

24         THE COURT:  All right.  I'll allow -- I'll allow this

25  exhibit.

1            MS. BERMAN:  Thank you, Your Honor.

2            THE COURT:  36 will be admitted.

3       (Plaintiff's Exhibit 36 was received in evidence.)

4            MS. BERMAN:  And this -- this 36A when he ask him --

5   defendant asking my husband to submit all of this account

6   information, it's just before he terminated him.  That's when

7   my husband submit all of the --

8            THE COURT:  And what's the objection?

9            MR. SPRINGER:  He was still employed then.  That is

10  not disputed.  I don't see the relevance in the e-mail.

11           THE COURT:  I'll allow 36A.

12           MS. BERMAN:  Thank you.

13      (Plaintiff's Exhibit 36A was received in evidence.)

14           MS. BERMAN:  I would like this Exhibit 37.  This was

15  just on the same day when defendant -- just before he

16  terminated him.  And my husband, on the same day, was writing

17  to him.  He said nothing about termination.  They are still

18  working very good.

19           It's the day -- it's the same day when my husband was

20  terminated.  It's correspondence with him.

21           THE COURT:  And what's the objection?

22           MR. SPRINGER:  Relevance.

23           THE COURT:  I'll allow it.  37 will be admitted.

24           MS. BERMAN:  37.  Thank you, Your Honor.

25      (Plaintiff's Exhibit 37 was received in evidence.)

1            MS. BERMAN:  I think this is -- 38 is termination

2    from Maitland Furniture from defendant.  He terminate him.

3            THE COURT:  And what's the objection?

4            MR. SPRINGER:  We'll withdraw the objection.

5            THE COURT:  All right.  38 will be admitted.

6        (Plaintiff's Exhibit 38 was received in evidence.)

7            MS. BERMAN:  38A is the same so I don't need.

8            Exhibit 39, my husband's response to his terminations

9    letters, when he receive.

10           THE COURT:  And what's the objection?

11           MR. SPRINGER:  Bolstering, Your Honor, hearsay.

12           MS. BERMAN:  It's response from my husband.  He

13   wasn't aware that he terminate him.

14           THE COURT:  But this is in 2009.

15           MS. BERMAN:  Yeah.  He terminate him in one -- in

16   2009, and that's when he found out, and he respond to him on

17   the termination letter.

18           THE COURT:  All right.  I'm going to keep this

19   exhibit out.  I sustain the objection.

20           MS. BERMAN:  Exhibit 41 when -- in the -- just before

21   he terminated him, he was asking to speak with him.  They were

22   talking on the same day that he was terminated, my husband.

23           THE COURT:  And what's the relevancy of that?

24           MS. BERMAN:  That when they were talking, he never

25   said anything about termination.  He was -- it's like --

 1          THE COURT:  And what's the relevancy of that?  Who

 2   cares?

 3          MS. BERMAN:  He didn't say to him anything, "Did you

 4   embezzle money?" and terminated.  He received termination

 5   letter on the 9th, and he was talking with him on the 4th

 6   giving him more account information.

 7          THE COURT:  I'm going to sustain the objection on

 8   that.

 9          Ms. Berman, all along you've been saying this lawsuit

10   is about you, and all I see here are documents that relate to a

11   dispute between you and your husband.

12          MS. BERMAN:  Okay.  Can I admit 44, a name change of

13   Maitland Furniture to Trifecta Gaming?

14          THE COURT:  What's the relevancy of a name change in

15   2009 from Maitland Furniture to Maitland Trifecta, Inc.?

16          MS. BERMAN:  Your Honor, because it was Maitland

17   Furniture.  My husband company was Trifecta Gaming.  He decided

18   to change to Maitland Trifecta because trademark application,

19   so he changed to Maitland Trifecta.

20          THE COURT:  And what does that have to do with

21   accusing you of embezzling money from the company in 2006 and

22   2007?

23          MS. BERMAN:  It's his truth, defendant's truth,

24   affirmative defense and good motive.  He has affirmative

25   defense of good motive and truth.

1              THE COURT:  I'll sustain the objection.

2              MS. BERMAN:  I would like 45A.  It's for unemployment

3   appeal.  The defendant's exhibit show embezzlement of my

4   husband and for year when he wasn't employee.  It's very

5   important because he's claiming he was employee but he show

6   exhibits for a year that my husband never was employed.

7              THE COURT:  What question is relevant?  There's an 8,

8   9.

9              MS. BERMAN:  45A.

10             THE COURT:  I know.  45A -- oh, 45A.

11             MS. BERMAN:  45 -- I can admit?

12             THE COURT:  No.  I haven't -- 45A you're trying to

13  get in?

14             MS. BERMAN:  Yes, 45A.

15             THE COURT:  What is this?  This is some kind of

16  timeline.

17             MS. BERMAN:  No.  This is exactly what he was talking

18  about embezzlement.  He submit for unemployment this exhibit

19  about embezzlement.  I want to show there is no my name here.

20  He's claiming --

21             THE COURT:  So this was admitted -- this was admitted

22  in the unemployment compensation?

23             MS. BERMAN:  Yes.

24             THE COURT:  Is this some type of exhibit list --

25             MS. BERMAN:  Yes.

1           THE COURT:  -- Mr. Springer?

2           MR. SPRINGER:  It was a timeline created by

3    Mr. Kafka, I think, regarding some other checks that were

4    embezzled by Chris Berman, but they don't have the name of

5    Lareesa Berman on the back.

6           THE COURT:  So these are different checks?

7           MR. SPRINGER:  Different checks, correct.

8           THE COURT:  All right.  I'll allow it, 45A.

9           MS. BERMAN:  Excuse me?  You allow?

10          THE COURT:  Yes.  I'll admit that.

11          MS. BERMAN:  Thank you.

12      (Plaintiff's Exhibit 45A was received in evidence.)

13          MS. BERMAN:  I would like Exhibit 46.  It's

14   correspondence for unemployment appeal between defendant and

15   unemployment appeal.

16          MR. SPRINGER:  We agreed to that one, Your Honor.

17          THE COURT:  Okay.  That's been admitted.

18          MS. BERMAN:  Okay.  Excuse me.

19          You said Exhibit 50 you agree, yes?

20          MR. SPRINGER:  (Nods head up and down.)

21          THE COURT:  Okay.  Let me just say something,

22   Ms. Berman.  It's ten after 4:00.  I'm going to let the jury go

23   at probably around ten till 5:00 so we can discuss the jury

24   instructions briefly, so I just want you to know that.

25          If you're not finished soon, we might as well --

1           MS. BERMAN:  I just want to go through so that I will

2    not put exhibits which you do not allow.  Just -- I just want

3    to go through exhibits which I will introduce.

4           THE COURT:  All right.  Well, there's no point

5    keeping the jury here if you're going to spend another 50

6    minutes going through these exhibits.

7           MS. BERMAN:  Okay.

8           THE COURT:  Are you going to spend another 50 minutes

9    going through these exhibits?

10           MS. BERMAN:  Judge, I hope I won't, no.  I try --

11           THE COURT:  Well, I hope you won't either, and I hope

12    you have a little consideration for this jury, okay?

13           MS. BERMAN:  Yes, Your Honor.

14           THE COURT:  All right.  Go ahead.

15           MS. BERMAN:  Okay.  55, a letter of defendant asking

16    for --

17           THE COURT:  I think that's been admitted.

18           Has that been admitted?

19           MR. SPRINGER:  No, Your Honor.

20           THE COURT:  It has not?

21           MS. BERMAN:  Yes.  55 --

22           MR. SPRINGER:  Oh, 55B is what she's talking about.

23           THE COURT:  55B?

24           MS. BERMAN:  Yeah.

25           THE COURT:  I'm not going to allow anything else --

1    no, I'm not -- I sustain the objection on that.

2            MS. BERMAN:  61 exhibit.  It's -- he claims that my

3    husband was working while he was receiving benefits, and he

4    libel me and one other person.  This Exhibit 61 has the name of

5    the person whom he libel.

6            THE COURT:  This is another person that he libeled?

7            MS. BERMAN:  Yes.

8            THE COURT:  That will be sustained, the objection.

9            MS. BERMAN:  The objection?

10           THE COURT:  The objection's sustained so the

11   document's not coming in.

12           MS. BERMAN:  But this person, he libel me.

13           THE COURT:  What do you mean this person libeled you?

14           MS. BERMAN:  Mr. Kafka libel me to that person.  It

15   was in letter that he make libel statement, and the name of

16   this person was in that letter.

17           THE COURT:  I don't see -- this is a letter dated

18   April 24th, 2009, from some --

19           MS. BERMAN:  Yes.

20           THE COURT:  -- type of publisher --

21           MS. BERMAN:  Yes, but the name is --

22           THE COURT:  Well, wait a minute.  Xpress Yourself

23   Publishing to Chris Berman, to your husband, "Please accept

24   this letter of confirmation of the following."

25           I don't see -- I don't see any relevancy to this.

1          MS. BERMAN:  In the exhibit when he libel me to

2    Ms. Connell, it's -- and he's saying it's confidential, this

3    was not confidential because this name of this person, Jessica

4    Tilles, was in that letter.

5          THE COURT:  Was in what letter?

6          MS. BERMAN:  When he libel me that I embezzle money

7    was this name of this person.

8          THE COURT:  Well, what's the objection?

9          MR. SPRINGER:  Relevancy.

10         MS. BERMAN:  It's relevant because it was in the --

11   in the libel statement made.

12         THE COURT:  What do you mean?  Jennifer Tilles' name

13   was in the statement?

14         MS. BERMAN:  Yes.  Yes.  Yes.

15         THE COURT:  Where?

16         MS. BERMAN:  When he libel me, he said contact those

17   people.

18         THE COURT:  He said what?

19         MS. BERMAN:  To contact those people, contact and

20   information to those people.

21         THE COURT:  Okay.

22         MS. BERMAN:  They know something about my

23   embezzlement.

24         MR. SPRINGER:  Your Honor, I can help with this.

25         THE COURT:  All right.

1          MR. SPRINGER:  There is -- the second libel per se

2   statement was in a document sent to Janice Connell regarding

3   Mr. Berman working while receiving benefits.

4          At the end of that document, there are two employers

5   listed.  One is Xpress Yourself Publishing.  That's all it was

6   was an address and the name of someone at Xpress Yourself

7   Publishing, for Ms. Connell to contact them to see if he was

8   working.  That was it.

9          The libel per se in this case was about embezzling

10  money, not somebody working while receiving benefits.

11         THE COURT:  Wait.  Hold on.  So did they get a copy

12  of this --

13         MR. SPRINGER:  No.  The only --

14         MS. BERMAN:  Your Honor --

15         THE COURT:  Hold on, Ms. Berman.

16         MR. SPRINGER:  The only people that received a copy

17  of the document that contained the libel per se was the agency.

18  That's it.

19         MS. BERMAN:  Your Honor, there is an exhibit, a

20  letter from Defendant Kafka on August 10th, when he's saying

21  they asking information to people like publisher and the other

22  people that are on this to -- about embezzling of me in that

23  letter.  They were asking.

24         And they will prove --

25         THE COURT:  All right.  I'll allow the exhibit.

1              MS. BERMAN:  Thank you.

2              THE COURT:  So 61 will be admitted.

3         (Plaintiff's Exhibit 61 was received in evidence.)

4              MS. BERMAN:  62 is W-2 for my husband and payment

5    check which he claimed that he give $2,000, but he didn't.

6    That -- but my husband have to go to IRS and explain that we

7    did not receive this money, what the defendant claims.

8              THE COURT:  You talking about 62?

9              MS. BERMAN:  Yes.

10             THE COURT:  Again, the checks were in '06 and '07.

11   This is a W-2 from 2009.

12             MS. BERMAN:  Yes.  That's when unemployment was --

13   when he terminated my husband.

14             THE COURT:  All right.

15             MS. BERMAN:  He terminated my husband in 2009, not '6

16   or '7.

17             THE COURT:  Yeah.  I understand that.

18             So what's the relevancy of this?

19             MS. BERMAN:  That he claim that he pay my husband

20   2,000, but it was investigation, and IRS see that he didn't pay

21   2,000.  He just --

22             THE COURT:  You talking about 2009?

23             MS. BERMAN:  He gave them wrong information, yeah.

24             THE COURT:  In 2009 you're talking about?

25             MS. BERMAN:  Yes, in 2009.

1          THE COURT:  All right.  And what's the objection?

2          MR. SPRINGER:  There's no relevance to whether or not

3     he was shorted or a stop payment was put on a check to any

4     issues in this case.

5          THE COURT:  I'll sustain the objection.

6          MS. BERMAN:  What about -- so I cannot use 62A?

7          THE COURT:  Not if it relates to 62, no.

8          MS. BERMAN:  Okay.  Your Honor, defendant saying that

9     my husband embezzle money and that some of the issue was

10    settled between my husband and this, but this Exhibit 63 is --

11    they already breached a contract between my husband and

12    defendant.  It shows that he pay --

13         THE COURT:  Wait a minute.  63 is a check from --

14         MS. BERMAN:  Yes.

15         THE COURT:  Made out to your husband for $12,500 --

16         MS. BERMAN:  Yes.  They breached the contract.  It

17    supposed to be confidential.

18         THE COURT:  And this is --

19         MS. BERMAN:  And they pay my husband --

20         THE COURT:  And this was in 2014?

21         MS. BERMAN:  No.  63.

22         THE COURT:  Exhibit 63, right.

23         MS. BERMAN:  Yes.

24         THE COURT:  It's dated December 3rd, 2014 --

25         MS. BERMAN:  Yes.

1          THE COURT:  -- which is a couple months ago.

2          MS. BERMAN:  Because he claiming my husband embezzled

3    money, but he pay here.  It shows that he never embezzle money.

4          THE COURT:  He claimed -- well, I don't see how it

5    shows that.  This is from another case.  This is a separate

6    settlement, and --

7          MS. BERMAN:  But --

8          THE COURT:  -- I'm going to sustain the objection on

9    that.

10          MS. BERMAN:  Exhibit 65 --

11          THE COURT:  Ms. Berman, if you were going to plan on

12    really introducing all this evidence and going into all of

13    this, why didn't you tell the Court that the trial was going to

14    take four weeks?  Because that's what you should have told the

15    Court, because if we were going to get into all these issues,

16    all these collateral issues between your husband and Mr. Kafka

17    that have been going on for ten years, we would need a

18    four-week trial over two defamatory statements, allegedly.

19          So you should have told the Court this case was going

20    to take four weeks.

21          MS. BERMAN:  I didn't know they will produce all the

22    evidence they produced.  Only all --

23          THE COURT:  Well, I asked you at the pretrial

24    conference.

25          MS. BERMAN:  I said that I wasn't sure what --

1          THE COURT:  You said you weren't sure.

2          Well, you knew you had all of this, and you knew that

3   you're trying to get into a history of ten years' worth of

4   dealings between your husband and this defendant, when all

5   along you've maintained that this case is about you.  And now

6   we get here and every single exhibit relates to your husband.

7          MS. BERMAN:  Okay.  I want --

8          THE COURT:  What's the next one?

9          MS. BERMAN:  I want to introduce Exhibit 67.  It's my

10  payroll in my -- from -- I am putting money in my bank when I

11  was working, so this will show that -- when I changed my name.

12         He claims that I embezzle -- during that period I

13  embezzle money and spell my name.  It's impossible for me to

14  spell that name because it's completely different name I am

15  using.

16         THE COURT:  What's -- what's the objection to this?

17  Is there any harm to this?

18         MR. SPRINGER:  No objection.  We'll withdraw the

19  objection, Your Honor.

20         THE COURT:  All right.  I'll allow 67.

21     (Plaintiff's Exhibit 67 was received in evidence.)

22         MS. BERMAN:  And it's the same, 67 and 67A.

23         THE COURT:  Any objection to 67A?

24         MS. BERMAN:  It's -- continues.

25         THE COURT:  Any objection, Mr. Springer?

 1          MR. SPRINGER:  To the --

 2          THE COURT:  67A?

 3          MR. SPRINGER:  No, Your Honor.

 4          THE COURT:  All right.  67A will be admitted.

 5      (Plaintiff's Exhibit and 67A was received in evidence.)

 6          MS. BERMAN:  Your Honor, I would like to admit

 7  defendant's exhibits what they produce me with Lora Katsavrias'

 8  signature.  It's very important.

 9          THE COURT:  What exhibit are you talking about?

10          MS. BERMAN:  68.  68, 68A, B, and C.

11          THE COURT:  And what's the relevancy of this?

12          MS. BERMAN:  Relevancy is Lora Katsavrias is

13  employee, and she admit that she have -- she signed different

14  every time.  And they talking about some kind of signature on

15  the check, so I don't know whose signature was on the check.

16          THE COURT:  That she signed differently --

17          MS. BERMAN:  Yes.

18          THE COURT:  -- on the back of checks?

19          MS. BERMAN:  Yes.  In the deposition she says that

20  she has different -- was different with signature, signing.

21          THE COURT:  Are you going to deny that you signed

22  those checks?

23          MS. BERMAN:  Yes, Your Honor.  I didn't sign those

24  checks.  I couldn't possibly have signed them.

25          THE COURT:  And so what are you going to say, that

1    this Lora person signed those checks?

2          MS. BERMAN:  I don't know who signed these checks,

3    but it's --

4          THE COURT:  So --

5          MS. BERMAN:  I don't know how my signature went to --

6    she claims that this is my signature.  I don't know.

7          THE COURT:  All right.  And what's the objection?

8          MR. SPRINGER:  Judge, it's not -- it's not relevant.

9          If I understand the argument correctly, it's maybe

10   twofold.  One is she's saying that somebody's signature can

11   change maybe, but it's not even -- the signature at issue is

12   her own, not Lora Katsavrias', who's not even going to be

13   called as a witness in this case.

14         And the second thing is it is completely baseless to

15   say now for the first time ever that maybe Lora Katsavrias

16   signed these checks at issue in this case and signed her name

17   from Chris Berman, so we object to the relevance.

18         MS. BERMAN:  Your Honor, he's claiming that it was my

19   signature --

20         THE COURT:  I'm going to sustain the objection.

21         MS. BERMAN:  I would like to introduce Exhibit 72.

22   It's from IRS that shows zero -- the year he claim I embezzle

23   money, it shows zero amount of profit or loss.

24         And if he's claiming I embezzle money in 2006 and '7,

25   this IRS shows there was no any money in the account.  I

1    couldn't possibly embezzle.

2            There is no loss; there is no profit; nothing.  And

3    my husband was an owner of his.  That's why he is -- obtains

4    this and was in shock when he saw zeros.

5            THE COURT:  All right.  And what's the objection?

6            MR. SPRINGER:  The objection is -- well, I think the

7    Court ruled a few minutes ago that anything regarding the IRS

8    is not coming in.

9            But these are uncertified documents.  There's no

10   testimony being presented as to whether it's improper -- if you

11   own two companies, how you distribute the income on your taxes.

12   It's irrelevant, and it will confuse the jury.

13           MS. BERMAN:  Your Honor, if he claim that I embezzle

14   money, he needs to show documents of where is the -- how is it

15   you can embezzle money from zero.

16           THE COURT:  Are you just claiming that she

17   embezzled -- or, I guess, she embezzled those two checks?

18           MR. SPRINGER:  That's it, just the two checks.

19           MS. BERMAN:  Yes.  Yes.  He's saying --

20           THE COURT:  All right.  Well, then, that's all we're

21   going to -- that's all we're going to get into are those two

22   checks.

23           MS. BERMAN:  But this from 2006 and '7.  That's what

24   he claiming.

25           THE COURT:  No.  The objection's sustained.

 1          MS. BERMAN:  Could I show that Trifecta Gaming is a C

 2   corporation, Exhibit 75?

 3          THE COURT:  I don't see what relevancy that has, what

 4   type of corporation they are.

 5          MS. BERMAN:  Because it's C corporation, and with

 6   Florida you put S corporation.  When you are claiming C

 7   corporation, it's supposed to be when he was transferring

 8   money.

 9          THE COURT:  Objection's sustained.

10          What exhibit was that?

11          MS. BERMAN:  75.

12          I would like to produce Exhibit 76.  It's enlargement

13   of article incorporation, the signatures.

14          THE COURT:  77?

15          MS. BERMAN:  76.

16          THE COURT:  Well, what's the relevancy of --

17          MS. BERMAN:  Defendant claims that there is three

18   shareholders, but if -- I can prove that his wife never was on

19   the signature.

20          THE COURT:  Is this already admitted?  It's just an

21   enlargement?

22          MR. SPRINGER:  I think the articles of incorporation

23   has been admitted.  Your Honor, our objection was it's focusing

24   on one page instead of the complete document itself.

25          THE COURT:  Is it a question of whether Mr. Berman

1   signed the check?

2         MR. SPRINGER:  I think the -- they're going to raise

3   an issue of whether or not Julie Kafka's name was on there when

4   the articles of incorporation were signed.  They're going to

5   get into allegations of fraud, and they're unsupported.

6         MS. BERMAN:  It's not an allegation of fraud.

7         THE COURT:  I'm going to sustain the objection.  The

8   document's already in evidence.

9         MS. BERMAN:  Exhibit 78 about not -- when my

10  husband -- defendant claims that my husband was -- went to

11  notary and three people was there, defendant and Julie Kafka

12  and my husband.  And when he found out he file a complaint

13  because he never -- he never went to the notary.  Notary said

14  that she cannot remember that my husband was present.

15        THE COURT:  What does that have to do with this case?

16        MS. BERMAN:  Ownership of the company, who was

17  partner.  It's 50/50, that Julie Kafka never was.

18        THE COURT:  I'm going to sustain --

19        MS. BERMAN:  It's about unclean hands.

20        THE COURT:  I'm going to sustain the objection.

21        MS. BERMAN:  Your Honor, Exhibit 80.  Mr. Kafka

22  claims about embezzling by my husband from Trifecta Gaming and

23  order says that --

24        THE COURT:  This is sustained.

25        MS. BERMAN:  Your Honor --

1          THE COURT:  You're not putting in a complaint from

2     another case.

3          MS. BERMAN:  No.  I just -- just one page where it

4     says that there is no embezzlement when he sue him.  It doesn't

5     say anything that he embezzle.  He's suing as Trifecta

6     Gaming --

7          THE COURT:  No.

8          MS. BERMAN:  -- and it show here completely different

9     what he said.  He said from -- he was employee from 2006.  Here

10    he said employee from 2004.  It's two different statement he

11    saying, and it's legal document.

12         It needs to show the jury that embezzlement never

13    happened.  He already went to unemployment 2009 telling them

14    that he embezzled money.  He file complaint in 2010 and didn't

15    even mention that money embezzlement.

16         THE COURT:  Well, this complaint's about something

17    else.

18         MS. BERMAN:  Yes, but not -- that's what's my point,

19    he -- that my husband never embezzle money.  They trying to

20    tell them that he embezzle money.  He file a complaint from --

21    not from himself, from Trifecta Gaming, my husband ownership

22    what he has, Trifecta Gaming versus Christopher Berman, and

23    didn't say anything that he embezzle money.

24         THE COURT:  Okay.  The objection's sustained.

25         MS. BERMAN:  81 is from unemployment, letter

1    explaining unemployment proceedings that my husband -- my

2    husband was -- order was dismissed, and he was going out and

3    telling customers that he was employed by Trifecta Gaming when

4    he never was employee of Trifecta Gaming.  He was employee of

5    Maitland Furniture.

6         That, Your Honor, is so confusing.  That's why I need

7    to show that my husband never was employee and he'd never give

8    away rights.

9         THE COURT:  What's the objection?

10        MR. SPRINGER:  The objection, if I recall correctly,

11   I think it's double hearsay.  There's an attorney who's not

12   going to testify here today writing a letter about what he was

13   told by Chris Berman regarding allegations that we believe are

14   wholly inaccurate.

15        THE COURT:  I'm going to sustain the objection.

16        Anything else, Ms. Berman?

17        MS. BERMAN:  Your Honor, I --

18        THE COURT:  Any other exhibits?

19        MS. BERMAN:  No.  I just want to say if they will

20   introduce those checks, I would like to introduce Trifecta

21   Gaming versus Christopher Berman and the other check that they

22   pay for him and any others that he never --

23        THE COURT:  Well, I don't know what they're going to

24   introduce yet, so we'll cross that bridge when we come to it.

25        You've got about 15 minutes to continue your

1    examination of Mr. Kafka and then I'm going to let the jury go.

2          So if you can bring in the jury.

3          Now, all these exhibits that are admitted, you don't

4    need to be walking back and forth and wasting time with them.

5    They're admitted.  All the ones that have been kept out,

6    they're out.  Don't refer to them.

7          So all the ones that have been admitted, if you're

8    going to ask him about them, just put them in front of him and

9    let's try to move this along.

10         COURT SECURITY OFFICER:  All rise for the jury.

11      (Jury in at 4:30 p.m.)

12         COURT SECURITY OFFICER:  Please be seated.

13         THE COURT:  All right.  Let me apologize for that

14   long delay.  I think in the long run that's going to save some

15   time though.  There were some matters that we had to take up

16   outside of your presence.

17         I'm still going to let you go in about 20 minutes or

18   so, so -- I know it's been a long day.

19         So, Ms. Berman, if you could proceed.

20         MS. BERMAN:  Okay.  I would like to introduce --

21         THE COURT:  They've already been introduced.

22         MS. BERMAN:  So I don't need to show them?

23         THE COURT:  No, not if we've already introduced them,

24   if they're one of the ones they've agreed to.  Just show it to

25   the witness or whatever you're trying to do with it.

1   BY MS. BERMAN:

2   Q.   And you agree that you incorporated -- incorporated

3   Trifecta Gaming with my husband in July 2004?

4           THE COURT:  What exhibit is this?

5           MS. BERMAN:  It's Exhibit 22C.

6           THE COURT:  22C?

7           MS. BERMAN:  Uh-huh.

8           THE WITNESS:  Yes.

9   BY MS. BERMAN:

10  Q.   Okay.  Then I would like to ask you, on Exhibit 26 --

11  before I ask you, when you incorporated, you said it's -- do

12  you have the designation who was president, who was vice

13  president in Trifecta Gaming?

14  A.   That would be in the whole document, I think.  I don't

15  think this is the whole document.  Isn't there, like, 30 pages?

16  Q.   No.  You look at this.  There is the names there and find

17  out where it says president, vice president.

18  A.   I'm not seeing that anywhere.  In the whole document there

19  is, but I don't think this is the whole document.

20  Q.   Do you see -- okay.  Read Article 10.

21  A.   Page 10?

22  Q.   No.  Article 10, please.

23  A.   Yes.

24  Q.   It says -- read it, what it says there.

25  A.   There's a line through -- through mine.  I can't read the

1    second word.  It says "the" and then there's a word and then it

2    says "of said corporation shall be president, vice president,

3    and a secretary/treasurer."  Then there's another line through

4    that I can't read, "such other officers/agents," I can't read

5    the next word, "may be deemed necessary."

6    Q.   Okay.  So you agree there is no -- my husband's name where

7    it says he's president or vice president.

8    A.   In this document there isn't, but in the whole document --

9    I don't think this is the whole document, but I'm not --

10   Q.   This is whole.

11   A.   -- sure.  I'm not sure.

12   Q.   It is whole document.

13   A.   This is the full document?

14   Q.   Let me give you this one.

15        MS. BERMAN:  It's the same, Your Honor, 22.

16        THE COURT:  Well, this is 22C.

17        MS. BERMAN:  Because it was from unemployment appeal

18   so it's in 22 --

19        THE COURT:  Well, if it's been admitted, it's been

20   admitted.  If not, then it's not.

21        MS. BERMAN:  It's the same document, just saying that

22   there is --

23   BY MS. BERMAN:

24   Q.   You said on article incorporation, it says who was

25   president and vice president, but it doesn't say anything who's

1   president, vice president.

2           Can you see on --

3   A.   If -- if this is the --

4           THE COURT:  Hold on.  Hold on.

5           THE WITNESS:  Okay.

6           THE COURT:  Let me say this.  The document speaks for

7   itself.  I don't understand the relevancy of it, but it speaks

8   for itself.  The jury can look at it and so proceed on.

9           MS. BERMAN:  Okay.

10  BY MS. BERMAN:

11  Q.   Then look at Exhibit 26.

12  A.   Thank you.

13  Q.   Do you see?

14  A.   This --

15  Q.   So --

16  A.   This looks like the signature card --

17  Q.   Yes.

18  A.   -- or the signatures for the checking account for Trifecta

19  Gaming USA --

20  Q.   Yes.

21  A.   -- that show Tom Kafka and Julie Kafka as the people who

22  are allowed to sign the back of the checks.

23  Q.   Okay.

24  A.   Is that correct?

25  Q.   Now look at the date when it was signed.

1    A.   It was signed --

2         MR. SPRINGER:  Objection, Your Honor.  This is going

3    into an in limine regarding the opening of the SunTrust

4    account.

5         MS. BERMAN:  No, no, no.  That's not -- it is not

6    about that.  I will show that --

7         THE COURT:  Hold on.

8         MS. BERMAN:  -- he put my --

9         THE COURT:  Well -- hold on a second.  Let me say the

10   exhibit's been admitted and so I'm going to go ahead and let

11   Ms. Berman proceed.

12   BY MS. BERMAN:

13   Q.   Look at the date when the exhibit was admitted.

14   A.   The date on this exhibit --

15   Q.   Yes.

16   A.   -- is May 19th, 2004.

17   Q.   So -- and do you see up there Trifecta Gaming USA, Inc.,

18   and it says type, corporation?

19   A.   Say that again, please?

20   Q.   It says type of corporation.  It was corporation.  Can you

21   see it?

22   A.   Type of -- yes, it's a corporation.

23   Q.   Corporation.

24   A.   Type of organization.  It was a corporation.

25   Q.   But articles, just now I show you, of incorporation was in

1    July 2004.

2    A.    Yeah.

3    Q.    Yes.

4          But you opened an account in May.

5          MR. SPRINGER:  Objection, Your Honor.  We need a

6    sidebar, I think.  It's violating a motion in limine.

7          MS. BERMAN:  No, he's --

8          THE COURT:  All right.  Hold on.  Hold on.  Let's go

9    to sidebar.

10        (At sidebar, out of the hearing of the jury:)

11         MR. SPRINGER:  Your Honor, you ruled -- for the

12   motion in limine, there was an argument that the account was

13   opened fraudulently and that the date the account was opened

14   was before the articles of incorporation, and that's exactly

15   where she's going with her questioning right now.

16         MS. BERMAN:  I'm not talking about a fraud.  I'm

17   talking about he presented for me that his wife is the vice

18   president way before my husband even incorporate with him.

19         THE COURT:  So what does that have to do with

20   anything?

21         MS. BERMAN:  How he can open an account in name

22   Trifecta Gaming when my husband, he just met him?

23         THE COURT:  Okay.  So what has that got to do with

24   your case here?

25         MS. BERMAN:  With that, he's telling that Julie

1  Kafka -- and Julie Kafka appears fraudulently on article

2  incorporation.

3          THE COURT:  I'm going to sustain the objection.

4  These documents are in evidence, but move to your next line of

5  questioning.

6      (End of discussion at sidebar.)

7  BY MS. BERMAN:

8  Q.   When did you say you met my husband?

9  A.   I believe I said earlier I thought I met him in March or

10  April of 2004.

11  Q.   Yes.

12          And you decide to incorporate in July, correct?

13  A.   I said we incorporated in July.  I didn't know when we

14  decided to incorporate.

15  Q.   You incorporate -- yes, that's why my husband sign in July

16  12th --

17  A.   Yes.

18  Q.   -- but incorporated in July 15th.

19  A.   No, no.

20  Q.   My husband wasn't aware about --

21  A.   No.

22  Q.   -- signing in -- opening your bank -- opening Trifecta

23  Gaming in May.  He just met you.

24  A.   Your husband's not on here.

25          Ms. Berman --

1  Q.   He --

2  A.   Ms. Berman, look --

3  Q.   He --

4           THE COURT:  Hold on.  Let the witness finish.

5           Go ahead.

6           THE WITNESS:  Ms. Berman, this was signed on 5/19/04.

7  We opened up an account by the name of Trifecta Gaming USA.  My

8  wife and I went into the bank.  They said we need to have an

9  SS-4 form, which we had, to open up an account.

10          And in that account we deposited checks that your

11 husband gave to us.  The very first check we wrote out of that

12 account was to your husband.  So I don't know where you're

13 going with these questions.  I'm sorry.

14 BY MS. BERMAN:

15 Q.   My point is my husband incorporate with you in July 12,

16 and the real incorporation of the company was in July 15.

17          How -- how is it you opened bank account without my

18 husband knowledge in May when he wasn't incorporate --

19 A.   We didn't open it without your account, Mrs. -- without

20 your husband's knowledge, Mrs. -- I mean, he cashed the checks

21 we sent to him.  Certainly he knew we opened up an account.  He

22 cashed the checks.

23 Q.   You told him that you open an account later, not in May.

24          MR. SPRINGER:  Objection, hearsay.

25          THE COURT:  I'll allow it.

1              Go ahead.

2    BY MS. BERMAN:

3    Q.   Did you tell my husband that in 2004 when you were started

4    working with him that -- that you -- your accountant will open

5    bank account?  You know somebody, and -- did you tell him that?

6    A.   I did not -- I don't know what you're talking about.

7    Q.   Why -- my question is, if my husband an owner and

8    shareholder, why there is no my husband's name when you open

9    bank account?

10   A.   Because he wasn't on the -- this was just the signature

11   card.  He wasn't --

12   Q.   But it's a --

13   A.   He wasn't allowed --

14   Q.   -- corporation account.

15   A.   Pardon?

16   Q.   Why he wasn't allowed?

17   A.   Well, it never came up, for one thing.  My wife and I had

18   all the money in the account.

19   Q.   Okay.  You told previously that Maitland Furniture has

20   problems and they cannot make furniture already in 2006.  You

21   move to Wisconsin, etc.

22           And now, because you told this in 2006 and '7 and

23   when you met my husband, you saw that this corporation -- this

24   what he's designing furniture and have all his customers, that

25   it's profitable.

1           Did you find the Trifecta Gaming profitable?

2  A.    I don't understand your question.

3  Q.    Was Trifecta Gaming make a profit?

4  A.    Did Trifecta Gaming make a profit?

5  Q.    Yes.

6  A.    I would have to look at tax returns.  Some years they did;

7  some years they didn't.  I don't know.  You're talking about

8  2000 -- when are you talking?

9  Q.    Okay.  In 2006 did Trifecta Gaming make profit?

10  A.    I would have to look at tax returns.

11  Q.    Would you --

12  A.    I don't have them with me.

13          MS. BERMAN:  Your Honor, I need to show tax return.

14          THE COURT:  What's the relevancy?

15          MS. BERMAN:  Because he's claiming that my husband

16  somehow embezzle from Trifecta Gaming, and tax return will show

17  what exactly.  There is no embezzlement there.

18          THE COURT:  No.  We've already discussed this.  I'm

19  going to sustain the objection.

20  BY MS. BERMAN:

21  Q.    Did -- okay.  You were working with him on Trifecta

22  Gaming.

23  A.    When you say him --

24  Q.    With my husband in 2004, '5, '6, '7, '8.  My husband was

25  an owner and shareholder, correct?

1   A.    Your husband was a shareholder of Trifecta Gaming in 2004

2   and 2005.  He was a one-third owner.

3           In 2000 -- the end of 2005, as I said earlier, he

4   traded in his shares for a -- I guess you'd have to say a

5   salaried position with Maitland Furniture, and then he

6   continued on as the vice president of sales for Trifecta

7   Gaming, and Maitland Furniture was a vehicle for payroll.

8   Q.    That he -- that you're saying.

9           Your work that he train -- can you produce me any

10  documents when my husband actually train for Maitland

11  Furniture?

12          MR. SPRINGER:  Objection, improper question.

13          THE COURT:  Sustained.

14  BY MS. BERMAN:

15  Q.    Let's talk about this termination.  It's very difficult.

16  It's -- I have nothing to do with this, but it's been difficult

17  for my family.

18          Did unemployment appeal --

19          MR. SPRINGER:  Objection.  Move to strike that last

20  comment.

21          THE COURT:  I'll sustain that objection.

22          Ms. Berman, you're supposed to be asking questions,

23  not making statements like that.

24          MS. BERMAN:  Okay.

25          THE COURT:  The jury will please disregard that last

1    statement.

2    BY MS. BERMAN:

3    Q.   You terminate him in -- do you recall when did you

4    terminate from Maitland Furniture?

5    A.   I didn't get it.

6    Q.   Did you recall when did you terminate my husband from

7    Maitland Furniture?

8    A.   I believe on January 9th of 2009.

9    Q.   You certain about that?

10   A.   No, I'm not, but that's very close.

11   Q.   Okay.  I would like to show that was termination in

12   January 8th, 2009.

13   A.   Okay.

14   Q.   After that my husband apply for unemployment.

15        Did my husband apply for unemployment for Maitland

16   Furniture?

17   A.   Yes, he did.

18   Q.   You lie about me for -- on the Maitland Furniture.

19   A.   Pardon?

20   Q.   Did -- your libel statement was on the Maitland Furniture?

21   A.   I don't believe I libelled you.

22   Q.   You just admitted those --

23   A.   No.  I said I made the statement.  I do not believe I

24   libelled you.

25   Q.   So you think that I embezzle money?

1    A.    Yes.

2    Q.    You -- you stand here and looking at me and think I

3    embezzle money?

4              MR. SPRINGER:  Objection, argumentative, Judge.

5              THE COURT:  I'll allow it.

6              Go ahead.  You can answer.

7    BY MS. BERMAN:

8    Q.    What kind of proof --

9              THE COURT:  Hold on.  Hold on.  You asked a question.

10   Let the witness answer it.

11             MS. BERMAN:  Okay.

12             THE WITNESS:  Listen.  I presented checks to

13   Workforce Innovation.  Some of the checks that were embezzled

14   from the company were made out to your husband and to the

15   company, and your husband cashed them and in -- that says to me

16   he received the money.

17             Some of the checks that I presented to unemployment,

18   Workforce Innovation, during the hearing had your signature on

19   the back, implying to me that you received the money.  This

20   money never came back into the account.

21             So do I feel you embezzled money, yes, I do.

22             MS. BERMAN:  I would like to see from unemployment --

23   BY MS. BERMAN:

24   Q.    When unemployment hearing was; do you recall?

25   A.    I believe that it was in May of 2009.

1  Q.    May 27.

2  A.    That sounds approximately correct.

3  Q.    What exactly you present to unemployment appeal?

4  A.    I just got done saying I presented checks from both --

5  both --

6  Q.    From which company did you present?

7  A.    What company?  I presented -- I mean, I presented a lot of

8  checks, so I am not sure.

9  Q.    Which company did you present checks?

10 A.    In regards to you?  In regards to you?

11 Q.    To me or my husband.

12 A.    Well, if -- your husband had checks that the contract was

13 made out to Maitland Furniture doing business as Trifecta

14 Gaming.  The checks that you signed were made out to Trifecta

15 Gaming.

16 Q.    No.  My question is, did you present checks from Maitland

17 Furniture where I -- my signature is there or my husband's

18 signature?

19 A.    I just said -- yes, I believe your -- well, I don't know

20 how the -- I don't know how -- I would have to look at all the

21 evidence.

22 Q.    Which --

23 A.    I can't say.  I know the contract was made out to Maitland

24 Furniture doing business as Trifecta Gaming for some of the

25 checks that your husband embezzled, but I cannot say exactly

 1    how the checks were written, not without looking at all the

 2    evidence that was presented at the unemployment hearing in May

 3    of 2009.

 4    Q.   One of your admissions, you admit that no checks was

 5    presented by Maitland Furniture, only Trifecta Gaming.  Is it

 6    correct?

 7    A.   I do not know that.

 8    Q.   You -- in sworn testimony you said --

 9    A.   I would have to -- I would have to look at the

10    admittances.  I don't know that.  Just sitting here, I don't

11    know.

12    Q.   But they don't allow me to show.

13         You admit that you present -- there is no Maitland

14    Furniture checks, only Trifecta Gaming.

15         MR. SPRINGER:  Judge, objection.  She's commenting on

16    what's been ruled by the Court --

17         MS. BERMAN:  Okay.

18         MR. SPRINGER:  -- what's being allowed to be shown

19    and what's not being allowed because it's not an exhibit.

20         THE COURT:  All right.  I'll sustain the objection.

21    BY MS. BERMAN:

22    Q.   Was my husband employee of Trifecta Gaming, yes or no?

23    A.   He was --

24         MR. SPRINGER:  Object.  What time frame are we

25    referring to?

1           THE WITNESS:  Yeah, what time frame?

2   BY MS. BERMAN:

3   Q.   2009.

4   A.   In 2009 for the first two weeks he was employed at

5   Maitland Furniture.

6   Q.   But he wasn't employee of Trifecta Gaming?

7   A.   He was not.  He was vice president of sales of Trifecta

8   Gaming -- Ms. Berman, Trifecta Gaming USA was the account that

9   your husband used.  That's the name that he used to go in and

10  sell to the casinos.  It's what he did.  He was vice president

11  of sales for Trifecta Gaming.

12          Maitland Furniture was a vehicle for payroll.  He was

13  paid through Maitland Furniture for what he did.

14  Q.   Is it legal?

15  A.   Pardon?

16  Q.   Is it legal?

17          MR. SPRINGER:  Objection, improper question.

18          THE COURT:  I'll sustain the objection.

19  BY MS. BERMAN:

20  Q.   I don't understand.

21          How was it he was paid by Maitland Furniture and

22  worked for Trifecta Gaming?  How?  Can you explain for me?  I

23  don't understand.

24  A.   After -- after 2006, revenue from both companies were used

25  to pay employees and keep the operation moving, going along.

1   Q.   But he was an employee of Trifecta Gaming.

2   A.   He was vice president of sales for Trifecta Gaming being

3   paid by Maitland Furniture.

4   Q.   Is unemployment appeal was for Maitland Furniture?

5   A.   Pardon?

6   Q.   Is unemployment appeal was for Maitland Furniture?

7   A.   That is correct, because he was being paid by Maitland

8   Furniture as vice president of sales --

9   Q.   Now, tell me --

10  A.   -- for Trifecta Gaming.

11  Q.   -- did unemployment appeal find embezzlement against my

12  husband?

13  A.   The -- if I recall correctly, the unemployment hearing

14  ruled that your husband sent out invoices to the accounts at

15  one price, sent invoices to me at another price, and kept the

16  difference or kept the money for himself.

17       They also ruled that he was having checks written to

18  himself instead of to the company.  I'm not sure what else was

19  in that document, but that's basically the gist of the ruling

20  where they said that he was guilty of embezzlement.

21  Q.   Did they vacate that ruling?

22  A.   Pardon?

23  Q.   Did they vacate that ruling?

24  A.   Repeat that, please?

25  Q.   Did they -- that ruling was vacated, isn't it?

 1  A.   Well, the ruling was vacated and remanded for another

 2  hearing because during the initial hearing, after they made the

 3  ruling, there was some type of alleged phone call disconnection

 4  involving your husband where I believe he said allegedly the

 5  phone was disconnected.

 6         So they remanded the hearing to have another hearing

 7  to take place to just -- to rehear the information in case your

 8  husband had more information to give.  And they also wanted us

 9  to discuss was your husband working while he was collecting

10  unemployment.  Those were the two items that they wanted the

11  new hearing to discuss.

12  Q.   Did they give you opportunity to file again?

13  A.   Pardon?

14  Q.   Okay.  You said that they found in my -- in your favor,

15  then do you recall the order was vacated?

16  A.   It was vacated but it was remanded, if I'm using the

17  correct term, for another hearing.

18  Q.   Yes.

19  A.   It wasn't -- it wasn't -- it was just for another hearing.

20  Another hearing was supposed to take place.

21  Q.   But didn't you -- let's look at this exhibit.

22         THE COURT:  Okay.  Let's -- I'm going to stop the

23  examination at this point because we're getting close to

24  5 o'clock, and you'll be able to pick up tomorrow.

25         I'm going to thank the jury for their service today.

1    Again, I know it's been a long day.  If you can please be back

2    here at 8:45 tomorrow.

3           And, again, please remember the instruction I gave

4    you about not discussing the case or trying to do any research

5    or find anything out about the case.  But thank you again,

6    ladies and gentlemen.

7           COURT SECURITY OFFICER:  All rise for the jury.

8        (Jury out at 4:52 p.m.)

9           COURT SECURITY OFFICER:  Please be seated.

10          THE COURT:  All right.  One thing I want to take up

11   is the jury instructions briefly.

12          I know we're not at the end of the evidence yet, but

13   we've looked at the jury instructions that both sides have

14   provided.

15          And I'm going to give you copies right now.  My law

16   clerk will give you copies of the instructions that at this

17   point we plan to instruct the jury on so you'll have a chance

18   to look at them tonight, and then -- they're not -- they're not

19   final, but at least at this point they're what I propose that

20   the jury be instructed on.

21          They're pretty close to the standard Florida -- the

22   introductory ones are pretty much the standard Eleventh Circuit

23   instructions.  The substantive defamation ones are pretty close

24   to the Florida jury instructions, the standard Florida jury

25   instructions.  They're not exact of those instructions.  We did

1    have to make some changes to it.  I'm not going to -- I'm not

2    going to go through it in detail at this point.

3            I will note, Mr. Springer, Mr. Jones, in terms of the

4    absolute privilege, I was not planning on -- litigation, the

5    absolute litigation privilege, I was not planning on

6    instructing the jury on that because I believe that's a

7    question for the Court.

8            And so what I'll most likely do is allow the case to

9    go to the jury, reserve ruling on that for after trial,

10   depending on how the jury finds.  It may -- assuming you're

11   presenting that as an issue.  It may -- of course, depending on

12   how the jury rules, it may not be necessary to ever get to that

13   privilege.

14           You'll see we made an instruction that gives the jury

15   the factors that are to be considered in terms of a qualified

16   privilege.  I understand that that could be determined as a

17   matter of law, but I would plan on at least initially letting

18   the jury determine that.  I believe there's a qualified

19   privilege if they get -- if they get that far on the verdict

20   form.

21           I mean, we haven't given you the verdict form yet,

22   but anyway -- so look them over.

23           Now, if you object to a particular jury instruction

24   or you want a particular jury instruction that's not in there,

25   you'll need to bring a copy of the cases or case that you have

1   as authority that says that you're entitled to that jury

2   instruction or not entitled or that I should not give one of

3   these instructions.  So don't refer me to some lengthy

4   memorandum of law.  And have copies for the other side as well.

5          And so I believe that this -- that this accurately

6   reflects the law of defamation.  It could change based on the

7   evidence still, but we might as well get a start on this right

8   now.

9          So, Ms. Berman, I'll remind you that you have

10  tomorrow -- you have tomorrow to present all your evidence,

11  finish your case.  I suggest that you seriously evaluate what

12  you're trying to prove here and what's relevant.

13         I think finally, as we got to about 4:30, you seemed

14  to get into matters that were relevant.  Other than that, if

15  you keep proceeding as you proceeded today, you're going to run

16  out of time, okay?  So you need to pick up the pace, and you

17  need to get to the relevant matters if you want to be able to

18  present all your evidence.  You can't go as it went today.

19         Now, all your exhibits have been ruled on, so you

20  don't need to be worrying about those anymore.  And you need to

21  make an extra copy of these exhibits for yourself so that you

22  can give the copy to the court that needs to go into evidence.

23         So is there anything further to take up?

24         MR. JONES:  Yes, Your Honor, briefly.  I'm unsure

25  whether Ms. Berman has extra copies, but because there's been a

1  couple -- two or three different renditions of her exhibit

2  lists and such, if I could get copies of what she has extra of

3  what's been actually submitted into evidence, that would be

4  very helpful.

5         MS. BERMAN:  I will send it to you.

6         MR. SPRINGER:  We had a couple different exhibit

7  exchanges, and Ms. Berman continues to tell us that in response

8  to our request for production, she provided the documents.  We

9  have some documents, but there seem to be additional that have

10 been added so we're kind of at a loss here, so --

11        MS. BERMAN:  I didn't add anything.  You have all my

12 exhibits, Mr. Springer.

13        THE COURT:  Well, let me say, we went through all the

14 exhibits that are -- that are -- have been admitted.

15        MS. BERMAN:  Most of the exhibits they produced for

16 me.  It's not my exhibits.  Most of them --

17        THE COURT:  Are you saying that when you went through

18 them, you didn't have a copy?  You just looked at her copy?

19        MR. SPRINGER:  Correct.

20        THE COURT:  All right.  Well, you should be giving

21 them a copy, Ms. Berman --

22        MS. BERMAN:  I gave them all.

23        THE COURT:  -- of your exhibits.

24        MS. BERMAN:  They have.  I give him all of my copies,

25 but if they want, I will -- I will give him another copy.

```
 1            THE COURT:  All right.  Give him a copy of the

 2    exhibits --

 3            MS. BERMAN:  And I want to say --

 4            THE COURT:  Hold on a second -- that have been

 5    introduced into evidence.

 6            All right.  Was there anything else from the

 7    defendant?

 8            MR. SPRINGER:  No, Your Honor.

 9            THE COURT:  Okay.  What, Ms. Berman?

10            MS. BERMAN:  I give all my copies to the Court

11    already.

12            THE COURT:  All right.  Those are -- these are

13    courtesy copies.  These are for me.

14            MS. BERMAN:  Okay.

15            THE COURT:  These are just my copies.

16            MS. BERMAN:  Okay.

17            THE COURT:  You need an extra copy to actually be

18    admitted into evidence --

19            MS. BERMAN:  Okay.

20            THE COURT:  -- all right?

21            All right.  Is there anything further?

22            MS. BERMAN:  No, Your Honor.

23            THE COURT:  All right.  Court will be in recess.

24            And so if you can be back -- I told the jury to be

25    here at 8:45.  Why don't you plan on being back -- being here
```

1    at 8:45 as well.

2            Court will be in recess.

3            COURT SECURITY OFFICER:  All rise.

4        (The proceedings were adjourned at 5:00 p.m., to be

5    continued on March 10, 2015.)

6                            -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4   UNITED STATES DISTRICT COURT )

5   MIDDLE DISTRICT OF FLORIDA    )

6

7          I hereby certify that the foregoing transcript is a

8   true and correct computer-aided transcription of my stenotype

9   notes taken at the time and place indicated therein.

10

11         DATED this 9th day of August, 2015.

12

13                              s/Shelli Kozachenko
                                _____
                                Shelli Kozachenko, RPR, CRR
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25