```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                   JACKSONVILLE DIVISION

 3  LAREESA BERMAN,                Jacksonville, Florida

 4          Plaintiff,            Case No. 3:13-cv-1109-J-JBT

 5       -vs-                      Tuesday, March 10, 2015

 6  THOMAS KAFKA,                  8:59 a.m.

 7          Defendant.             Courtroom 5A
   _____

 8

 9                 TRANSCRIPT OF JURY TRIAL
                        (VOLUME II)
10           BEFORE THE HONORABLE JOEL B. TOOMEY
                UNITED STATES MAGISTRATE JUDGE
11

12

13

14

15

16

17

18

19

20

21  OFFICIAL COURT REPORTER:

22       Shelli Kozachenko, RPR, CRR
         221 N. Hogan Street, #185
23       Jacksonville, FL  32202
         Telephone:  (904) 301-6842
24

25                      (Proceedings reported by stenography;
                         transcript produced by computer.)
```

1                          **A P P E A R A N C E S**

2

    COUNSEL FOR PLAINTIFF:
3

            **Lareesa Berman, Pro Se**
4           303 Augusta Circle
            St. Augustine, FL  32086
5


6
    COUNSEL FOR DEFENDANT:
7

            **Paul Jones, Esquire**
8           Luks, Santaniello, Petrillo & Jones, LLC
            225 South Orange Avenue, Suite 750
9           Orlando, FL  32801

10          **Todd Springer, Esquire**
            Luks, Santaniello, Petrillo & Jones, LLC
11          301 West Bay Street, Suite 1050
            Jacksonville, FL  32202
12

13

14

15

16

17

18

19

20

21

22

23

24

25

# T A B L E   O F   C O N T E N T S

**PLAINTIFF'S WITNESSES:**                                    **Page No.**

  **THOMAS A. KAFKA**
    DIRECT EXAM (CONTINUED) BY MS. BERMAN.....      16
    CROSS-EXAMINATION BY MR. SPRINGER.........      52
    REDIRECT EXAMINATION BY MS. BERMAN........      58

  **SHERI COBB**
    DIRECT EXAMINATION BY MS. BERMAN..........      67

  **CHRISTOPHER BERMAN**
    DIRECT EXAMINATION BY MS. BERMAN..........      76
    CROSS-EXAMINATION BY MR. JONES............     154


**DEFENDANT'S WITNESS (OUT OF ORDER):**

  **JANICE CONNELL**
    DIRECT EXAMINATION BY MR. SPRINGER........     197
    CROSS-EXAMINATION BY MS. BERMAN...........     207
    REDIRECT EXAMINATION BY MR. SPRINGER......     215


**PLAINTIFF'S WITNESSES:**

  **CHRISTOPHER BERMAN**
    CROSS-EXAM (CONTINUED) BY MR. JONES.......     217
    REDIRECT EXAMINATION BY MS. BERMAN........     230

  **LAREESA BERMAN**
    DIRECT EXAMINATION BY MS. BERMAN..........     249
    CROSS-EXAMINATION BY MR. JONES............     275

1      <u>P L A I N T I F F   E X H I B I T S   R E C E I V E D</u>

2                                                    <u>Page No.</u>

3      PLAINTIFF'S EXHIBITS 11, 73, AND 73B ..........        5

4      PLAINTIFF'S EXHIBIT 73..........................       26

5      PLAINTIFF'S EXHIBIT 73B.........................       29

6      PLAINTIFF'S EXHIBITS 84 AND 84A ...............       125

7      PLAINTIFF'S EXHIBITS 85 AND 85A ...............        11

8

9

10

11      <u>D E F E N S E   E X H I B I T S   R E C E I V E D</u>

12                                                   <u>Page No.</u>

13     DEFENDANT'S EXHIBIT 3...........................       10

14     DEFENDANT'S EXHIBITS 11, 12, 13, AND 26........        9

15     DEFENDANT'S EXHIBITS 14A AND 14B...............       11

16     DEFENDANT'S EXHIBIT 15..........................       12

17     DEFENDANT'S EXHIBIT 16..........................       13

18     DEFENDANT'S EXHIBIT 17..........................       13

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2    Tuesday, March 10, 2015                        8:59 a.m.

3                         -   -   -

4        (Outside the presence of the jury:)

5            COURT SECURITY OFFICER:  All rise.  This Honorable

6    Court is now in session.

7            Please be seated.

8            THE COURT:  All right.  We're back on the record in

9    Berman versus Kafka.

10           I'm told that three more exhibits have been agreed

11   to, and I guess they may be duplicative of the defendant's

12   exhibits, but anyway it's Plaintiff's Exhibits 11, 73, and 73D.

13           Is that correct?

14           MS. BERMAN:  Your Honor, 11, 73, and 73B, yes, that's

15   correct.

16           THE COURT:  It was 73D, right?

17           COURTROOM DEPUTY:  B.

18           THE COURT:  B?

19           COURTROOM DEPUTY:  73 and 73B.

20           THE COURT:  Oh, okay.  73 and 73B.

21           Now, I don't have a copy of 11.

22           All right.  So those will be admitted, Plaintiff's

23   11, 73, and 73B.

24       (Plaintiff's Exhibits 11, 73, and 73B were received in

25   evidence.)

1        THE COURT:  Okay.  In terms of timing, Ms. Berman, as

2  I told you, you're going to have to finish up your case today.

3        How much longer were you planning on spending with

4  Mr. Kafka?

5        MS. BERMAN:  I want to get through these exhibits,

6  and I would like to see if they agree with --

7        THE COURT:  No, no.  I asked you a question.  Answer

8  my question.

9        MS. BERMAN:  Maybe couple hours.

10        THE COURT:  No.  You've got 45 minutes, and that's

11  all you've got.

12        We already went through your exhibits.

13        MS. BERMAN:  Your Honor --

14        THE COURT:  You proffered them yesterday --

15        MS. BERMAN:  Your Honor --

16        THE COURT:  -- told me which ones you wanted to

17  admit.  I let you admit the ones that -- we went through them

18  all, and you're done with the exhibits.

19        MS. BERMAN:  Your Honor, let me -- let me ask you.  I

20  admit Exhibit 38, and I didn't get through these exhibits and

21  others.  I would like to speak about because jury didn't hear

22  about my exhibits.

23        THE COURT:  All right.  You've got 45 minutes to get

24  through with Mr. Kafka, all right?

25        Anything else to take up?

1          MR. SPRINGER:  Yes, sir.  Good morning.

2          THE COURT:  Good morning.

3          MR. SPRINGER:  We have -- our witnesses from

4     Tallahassee are here.  They came in last night.  One of them is

5     Janice Connell, a pretty short witness, I would hope.

6          She informed me last night that -- I told her she may

7     not go today but be ready.  But she's a kidney transplant

8     patient, I believe, and she didn't bring enough medication for

9     tomorrow morning, so I need to get her on today at some point

10    if possible before 5 o'clock.

11         THE COURT:  Do you have a problem with her going out

12    of order?

13         MS. BERMAN:  If you allow me my witness on next day,

14    me and my husband.

15         THE COURT:  No.  No.

16         MS. BERMAN:  Your Honor, I have --

17         THE COURT:  Both you and your husband are not going

18    on tomorrow.

19         MS. BERMAN:  But -- but you said I have whole day,

20    Your Honor, today.

21         THE COURT:  You'll get as much time as he uses.  I'll

22    give you as much time as he uses with this witness, but that's

23    all, so you'd better start moving your case, Ms. Berman.  You'd

24    better start focusing on what's relevant, which you haven't

25    done.

```
 1          You're beating around the bush.  For some reason you
 2   don't want to get to the heart of your case.  I don't know what
 3   the problem is with the heart of your case, but you're doing
 4   everything but getting to the heart of your case.
 5          You're losing the jury.  They're completely bored,
 6   and so I don't know what you think you're accomplishing or
 7   who's told you to proceed this way, but it's not working, I can
 8   tell you that.
 9          MS. BERMAN:  Your Honor, we agree with defendant that
10   I substitute my Exhibit 38 with 38A.
11          THE COURT:  You're not even listening to me.  Did you
12   hear what I just said?  Forget about your exhibit for a minute.
13   This is a bigger issue.
14          MS. BERMAN:  I will go in a -- all the exhibit what
15   you -- what we agreed to admit, I will go through so quickly.
16   I try to go so quickly.
17          THE COURT:  Well, you've got -- like I said, you've
18   got 45 minutes.
19          I will try to accommodate that.
20          MR. SPRINGER:  Thank you, Your Honor.
21          One other matter that might speed things up for when
22   we get Mr. Kafka is that first of all we have agreed to a
23   couple additional defense exhibits, if I could admit those at
24   this time.
25          THE COURT:  All right.  What are those?
```

1           MR. SPRINGER:  Those are Defense Exhibit No. 11 --

2           THE COURT:  All right.

3           MR. SPRINGER:  -- and Defense Exhibit 12 and 13.

4           THE COURT:  No objection, Ms. Berman?

5           MS. BERMAN:  Is that what we agreed?

6           MR. SPRINGER:  It's what we talked about, yes.

7           MS. BERMAN:  Yes.

8           MR. SPRINGER:  And lastly, Defense Exhibit No. 26.

9           And, Your Honor, I'll leave it to your discretion,

10  whatever you prefer, but there are a few remaining exhibits

11  that we will enter through Tom Kafka, if necessary, or -- I

12  think they're pretty self-explanatory.  We can deal with that

13  right now to save some time later this afternoon.  It's up to

14  you.

15          MS. BERMAN:  Your Honor, I would like to know if you

16  allow them to use the checks which they --

17          THE COURT:  First of all, let me admit these exhibits

18  that he just named, 11, 12, 13, and 26, defense exhibits.

19      (Defendant's Exhibits 11, 12, 13, and 26 were received in

20  evidence.)

21          THE COURT:  All right.  And you want to admit some

22  other exhibits?

23          MR. SPRINGER:  I'd like to, Your Honor.  However,

24  they --

25          THE COURT:  And then you want to -- let me -- just to

1   clarify, so then you won't have to call Mr. Kafka back?

2           MR. SPRINGER:  I can -- I'm going to call him, but I

3   don't have to lay the predicate through him, take more time in

4   my questioning.

5           THE COURT:  All right.  Have you talked to Ms. Berman

6   about these exhibits?

7           MR. SPRINGER:  I have.  They've been objected to, but

8   I think they're pretty self-explanatory.

9           THE COURT:  All right.  What are those exhibits?

10          MR. SPRINGER:  Exhibits -- defense exhibits -- the

11  first one is No. 3.  It's a notice of continuance from the

12  agency.

13          THE COURT:  That -- what's your objection,

14  Ms. Berman?

15          MS. BERMAN:  Your Honor, that the order -- it's going

16  to be very confusing to the jury because the order said if he

17  wants to continue, he has until September 9, 2010.

18          THE COURT:  The objection's overruled.  That will be

19  admitted.

20      (Defendant's Exhibit 3 was received in evidence.)

21          MR. SPRINGER:  The next one, Your Honor, is Defense

22  Composite Exhibit 14A and 14B.  These are the checks at issue

23  in this case.

24          THE COURT:  How could you not -- how could you object

25  to this, Ms. Berman?

1        MS. BERMAN:  Because I'm not sure if they were used

2  or not, but if -- if defendant -- if you allow them to use

3  these checks, then let me introduce that I --

4        THE COURT:  I'm not listening to your other exhibits.

5        Defendant's Exhibits 14A and 14B will be admitted.

6     (Defendant's Exhibits 14A and 14B were received in

7  evidence.)

8        MS. BERMAN:  Okay.  It's my -- the same exhibits I

9  will introduce.

10        THE COURT:  Well, if they're in by one party, it

11  doesn't matter.  Then they just become duplicative.

12        MS. BERMAN:  No.  They don't have -- they don't have

13  85, I would like to introduce.

14        THE COURT:  Does it relate to the checks?

15        MS. BERMAN:  85 and --

16        THE COURT:  Does it relate to the checks?

17        MS. BERMAN:  85 and 85A.

18        MR. SPRINGER:  Judge, they're the same checks.

19        MS. BERMAN:  But it's really important.  I need to

20  show --

21        THE COURT:  She's going to argue something about

22  those checks.

23        I'll admit those, 85 and 85A.

24     (Plaintiff's Exhibits 85 and 85A were received in

25  evidence.)

```
 1           MS. BERMAN:  But I would like to admit for --

 2           THE COURT:  Wait a minute.  We're not -- we're still

 3  on the defendant.  I'll give you a chance.

 4           MS. BERMAN:  But --

 5           THE COURT:  Anything else from the defendant?

 6           MR. SPRINGER:  Yes, Your Honor.  Exhibit 15.  It's an

 7  application --

 8           THE COURT:  Hold on a second.  Let me get these.

 9           MR. SPRINGER:  Yes, Your Honor.

10           THE COURT:  All right.  So Plaintiff's 85 and 85A

11  will be admitted.

12           All right.  And what other exhibits have you got?

13           MR. SPRINGER:  Exhibit 15.  It's an application to

14  marry, certified copy from the clerk.  It's used for the

15  purpose of her signature is on this.

16           THE COURT:  What's your objection?

17           MS. BERMAN:  My objection, it wasn't used for

18  unemployment hearing.

19           THE COURT:  Overruled.

20           15, Defendant's 15, will be admitted.

21      (Defendant's Exhibit 15 was received in evidence.)

22           MR. SPRINGER:  Can I proceed, Your Honor?

23           THE COURT:  Yes.

24           MR. SPRINGER:  Exhibit No. 16 is the warranty deed

25  for Ms. Berman's home.  It has her signature on there as well
```

1    as the alternate spelling of her name.

2            THE COURT:  And what's your objection?

3            MS. BERMAN:  It wasn't introduced for unemployment.

4            THE COURT:  Objection overruled.

5            16 will be admitted.

6        (Defendant's Exhibit 16 was received in evidence.)

7            MR. SPRINGER:  Next exhibit is Exhibit No. 17.  It's

8    a certified copy of Ms. Berman's continuous marriage affidavit

9    which, again, has her signature on there.

10           THE COURT:  The same objection?

11           MS. BERMAN:  Yes.

12           THE COURT:  Overruled.

13           17 will be admitted.

14       (Defendant's Exhibit 17 was received in evidence.)

15           MR. SPRINGER:  And then lastly, Your Honor,

16   Composite -- Defense Composite Exhibit 18, which are payroll

17   checks from Mr. Kafka's company, Maitland Furniture, to Chris

18   Berman.  On the back of those checks, they are filled out the

19   exact same way as the checks at issue in this case.

20           THE COURT:  Same objection?

21           MS. BERMAN:  Can I see these?

22           MR. SPRINGER:  Sure.

23           MS. BERMAN:  Your Honor, this -- this copy is not

24   certified anywhere.  He just printed, and I cannot say if I

25   agree with them or not because they are not certified by bank,

 1   and it wasn't in initial disclosures.

 2           THE COURT:  Are you going to --

 3           MR. SPRINGER:  Your Honor, I can lay the predicate

 4   through Mr. Kafka, if necessary.  It's his company.

 5           THE COURT:  All right.  Why don't you have him lay a

 6   predicate.

 7           MR. SPRINGER:  Okay, sir.

 8           That's all we have.

 9           THE COURT:  All right.

10           MR. SPRINGER:  May we approach?

11           THE COURT:  Yes.  Do you have those exhibits?

12           MS. BERMAN:  Your Honor, may I say that Valley Bank

13   wasn't in initial disclosures either.

14           THE COURT:  It hasn't been admitted yet.

15           You need to repeat that for the court reporter.  She

16   didn't -- couldn't understand you.

17           MS. BERMAN:  That Valley Bank wasn't in -- on the

18   initial disclosures.

19           THE COURT:  Okay.

20           MR. SPRINGER:  I can -- I can pull it out if you'd

21   like me to, Your Honor.

22           THE COURT:  What's that?

23           MR. SPRINGER:  The initial disclosures dealing with

24   the checks, or we can do it later.

25           THE COURT:  I'm not worried about that.

1          MR. SPRINGER:  Thank you.

2          THE COURT:  All right.  Now, Ms. Berman, we've been

3    through your exhibits ad nauseam.  If you have one or two key

4    exhibits, I'll let you tell me what those are that haven't been

5    admitted, but other than that, we're not going back through

6    your stack of exhibits.

7          MS. BERMAN:  But I want to ask him on the exhibit.

8          THE COURT:  Well, you can ask him, but you've got 45

9    minutes to do so because you've already taken three hours with

10   him yesterday, and it was pretty much a waste of time.

11         All right.  Is there anything else to take up before

12   the jury comes back?

13         MR. SPRINGER:  No, Your Honor.

14         THE COURT:  Okay.  All right.  Can we bring in the

15   jury?

16         COURT SECURITY OFFICER:  Yes, sir.

17         THE COURT:  It's 9:15, Ms. Berman.  You've got until

18   10 o'clock.

19         COURT SECURITY OFFICER:  All rise for the jury.

20      (Jury in at 9:13 a.m.)

21         COURT SECURITY OFFICER:  Please be seated.

22         THE COURT:  All right.  Good morning, ladies and

23   gentlemen.

24         THE JURORS:  Good morning.

25         THE COURT:  Okay.  Ms. Berman?

1              Mr. Kafka, if you can retake the stand.

2              MS. BERMAN:  Good morning, Your Honor, ladies and

3    gentlemen.

4              THE JURORS:  Good morning.

5          THOMAS A. KAFKA, PLAINTIFF'S WITNESS, SWORN

6                  DIRECT EXAMINATION (CONTINUED)

7    BY MS. BERMAN:

8    Q.   Mr. Kafka, yesterday you said that my husband was not

9    employed by Trifecta Gaming.  Is correct?

10   A.   I said he was vice president of sales --

11   Q.   No.  No.  I --

12   A.   -- for Trifecta Gaming.

13             THE COURT:  Well, wait a minute.  Let him answer.

14             MS. BERMAN:  I just want to --

15             THE COURT:  Ms. Berman, you've got to let him answer

16   the question.

17             MS. BERMAN:  Okay.

18             THE WITNESS:  He was vice president of sales for

19   Trifecta Gaming, and he was being paid through Maitland

20   Furniture as a vehicle of payroll.

21   BY MS. BERMAN:

22   Q.   But was he employee of Trifecta Gaming?

23   A.   I don't know how else to answer this other than the fact

24   of saying that his title was vice president of sales for

25   Trifecta Gaming.  He was being paid through Maitland Furniture

1   as a vehicle of payroll.

2   Q.   And you said he -- you terminated him from Trifecta Gaming

3   in which year?

4   A.   I didn't understand your question.

5   Q.   Which year he stop working for Trifecta Gaming, he wasn't

6   an owner of Trifecta Gaming?

7   A.   He was on the corporate books in 2004 and on the books in

8   2005.  He was no longer on the corporate books in 2006.

9   Q.   What about 2007?

10  A.   He was not on the corporate books in 2007.

11  Q.   2008?

12  A.   He was not on the corporate books in 2008.

13  Q.   Okay.  Let me introduce Exhibit 35.

14          Is it your signature?

15  A.   Yes, it is.

16  Q.   Can you read it?

17  A.   Tom Kafka.

18  Q.   Okay.  Read what it says.

19  A.   The letter?

20  Q.   Can you read here where it says employee?

21  A.   Oh, yes.  It says Christopher Berman.

22  Q.   Employee Christopher Berman, Trifecta Gaming.

23          Can you see the date, January 8th?

24  A.   Yes.

25  Q.   And you said that he was not employee of Trifecta Gaming

1    2008, correct?

2    A.    I said that he was vice president of sales for Trifecta

3    Gaming.  That was his title.

4    Q.    But you terminated him as employee in 2008 and read this

5    letter what you said.

6    A.    "This letter will serve as notice that you are terminated

7    from all corporate office employment held to you by Trifecta

8    Gaming USA and effective immediately.  You are hereby directed

9    to immediately return to the company all sales information,

10   corporate records, financial records, computer files, cell

11   phones, and other corporate assets held in your position and

12   control."

13   Q.    So -- but you said he give away rights in 2005 for

14   Trifecta Gaming, but you terminate him in 2008.

15   A.    Because his title was vice president of sales for Trifecta

16   Gaming.

17   Q.    Where it says?

18   A.    I'm telling you that's what his title was.  That's what

19   was on his business card.

20   Q.    Well, let's look at your deposition.

21         Look at page 29.

22   A.    (Complies.)

23   Q.    Can you read from 11 to 13 loud?

24   A.    Pardon?

25   Q.    Can you read loud from 11 to 13, line 11 to 13?

1  A.   It says, "What I" -- how do they know what I'm talking

2  about?

3  Q.   Let's read what it says on page 29.

4       "It's my understanding that your husband sent a

5  letter" --

6  A.   Oh, hang on.  Hang on.  I have to be on the wrong page.

7       What page did you say?

8  Q.   Page 29.

9  A.   39.

10 Q.   29.

11      THE COURT:  29.

12      THE WITNESS:  Oh.  Sorry.

13 BY MS. BERMAN:

14 Q.   I have 45 minutes with you.

15 A.   I'm sorry.  I thought you said 39.

16 Q.   Okay.

17 A.   From what -- what?

18 Q.   11 to 13.

19 A.   11:  "It's my understanding that your husband was sent a

20 letter he was supposed to respond to and --"

21 A.   And I ask you, "Which letter?"

22      Is it this letter you're talking about?  Which letter

23 you sent to my husband.

24 A.   I sent a couple so I don't know which one you're talking

25 about.

1   Q.   That I ask.  That's what you ans- -- you saying and I

2   asked, "Which letter?"

3   A.   I said, "Which letter?"

4   Q.   No --

5   A.   Oh, then Mr. --

6   Q.   -- that's my question.

7   A.   Then my -- I read on what my attorney said?

8         MR. SPRINGER:  No.  Objection, Judge.  This is --

9   it's vague, ambiguous.

10        THE COURT:  I don't --

11  BY MS. BERMAN:

12  Q.   Okay.  Let's turn to page 62.

13  A.   62?

14  Q.   62.

15  A.   Yes.

16  Q.   Read line 18 to 19.

17        MR. SPRINGER:  Judge, objection.  This is improper

18  impeachment.  He hasn't been asked a question about it.

19        THE COURT:  Sustained.

20  BY MS. BERMAN:

21  Q.   Okay.  Did you inform my husband to cease and desist

22  Trifecta Gaming or not?

23  A.   (No response.)

24  Q.   Did you inform my husband to cease and desist Trifecta

25  Gaming in 2005?

1   A.    In 2005?

2   Q.    Yes.

3   A.    No.  I don't know what you're talking about.

4   Q.    I'm asking did you inform my husband to cease and desist

5   from the corporate -- from Trifecta Gaming?

6   A.    In 2005 I told him that we were going to dissolve the

7   company.  I . . .

8   Q.    Okay.  Read page No. 18 and -- 62, 18 to 19.

9   A.    "December 26th, 2005, when we informed him that we were

10  going to cease operations of Trifecta Gaming."

11  Q.    So did you cease operation of Trifecta Gaming?

12  A.    I said that we were going to cease operations of Trifecta

13  Gaming.  I was finished.  I was not going to do anything.  I

14  was done.

15  Q.    Okay.  But you continued to use Trifecta Gaming.

16  A.    Yes, because your husband said, "Take me off the books and

17  make me a salesperson.  I will work for $500 a week," is what

18  he said.

19         And then I called my accountant and discussed it with

20  him, and that's when we decided, after -- to make him vice

21  president of sales of Trifecta Gaming, paying him through

22  Maitland Furniture because we had no employees in Trifecta

23  Gaming.  All of our accounting was done through Maitland

24  Furniture.

25  Q.    Okay.  That is not what I asking you.

 1          You -- just a short -- just ask -- just answer

 2   question what I ask you.

 3          For example, who inform -- did you say that you

 4   inform him --

 5   A.   Yes.

 6   Q.   -- that you --

 7   A.   I told him that we were going to stop --

 8   Q.   Okay.

 9   A.   -- on December 26.

10   Q.   Just a short answer.

11          Yes?

12          MR. SPRINGER:  Objection, Judge.  She needs to let

13   him finish.

14          THE COURT:  Yeah, you've got to let him answer your

15   question.

16          MS. BERMAN:  I have 45 --

17          THE COURT:  He's not -- he's not going on and on.

18   You've got to let him answer your question.

19   BY MS. BERMAN:

20   Q.   So look at the page 62 because you said you informed him.

21   62, line 22, 25.

22   A.   Yes.  That's exactly what I said.

23   Q.   Can you read it?

24   A.   Where do I start?

25   Q.   22, 25.

1   A.   20:  "Do you have a letter?

2            "No.

3            "How did you --"

4   Q.   No, no, no.  62, page 62, 22, 25.

5   A.   "How did you inform him?

6            "He informed us."

7   Q.   My question is, "How did you inform him?"

8            And you answer, "He inform us."

9   A.   Yes.

10  Q.   I'm asking you, "He informed you?"

11           Your answer, "Yes."

12           Before, just before on page 62, you said you inform

13  him.  Now on page 62, you're saying that he inform us.

14  A.   Listen.  Hang on a second.  My very next words to try to

15  clarify said, "His exact words, as I recall, 'Take me off the

16  books.  Make me a salesperson.  I will work for $500 a week.'"

17           I mean, you have to take the whole thing.  You can't

18  just pick two little lines out.

19  Q.   Okay.  Then read -- on page 63 from your deposition, you

20  said, "His exact words, take me out of the books."

21           Please read 63, lines 3 to 10.

22  A.   "What did he inform you?

23           "His exact words were, as I recall, 'Take me off the

24  books.  Make me a salesperson.  I will work for $500 a week.'

25  Then we negotiated.  We called my accountant, and this is what

 1  happened, that he would, after that point, become vice

 2  president of sales for Trifecta Gaming USA, sell product to the

 3  casino industry while being paid by Maitland Furniture.

 4          "When exactly did this -- when exactly did happen

 5  this?

 6          "ANSWER:  I'm assuming that the transfer from when he

 7  went on to a seller position from being an owner took place on

 8  the 26th of December, 2005, and I believe he started going out

 9  as an employee of Maitland Furniture the following week, which

10  I believe would be January 1st, 2006."

11  BY MS. BERMAN:

12  Q.   No.  I ask you to, at 10, stop.

13          Okay.  Let's look at Exhibit 18.  We agreed to

14  substitute because it's easier to read.

15          MS. BERMAN:  You agree this is the --

16          MR. SPRINGER:  Yes.

17  BY MS. BERMAN:

18  Q.   Here.  Now read.  It's termination letter.  Look at this.

19  Employee, Chris Berman of Maitland Furniture, January 8, 2009.

20          You said he was working for Maitland Furniture, but

21  just before I show you exhibit, you terminated him in January

22  8, 2009, for Trifecta Gaming, and you terminated him in January

23  8, 2009, for Maitland Furniture as employee.

24          How is it can happen?

25  A.   All I'm saying is these letters were sent out in abundance

1   of caution, I do believe, because your husband held -- was

2   selling product as vice president of sales for Trifecta Gaming.

3   He was being paid by Maitland Furniture.  I believe my attorney

4   at that time, in abundance of caution, sent out both letters.

5   Q.   Are you reading the answers?  Because you are looking

6   at --

7   A.   I'm looking at whatever you gave me.

8   Q.   Okay.  But you said he give away rights in 2005, but you

9   terminate him from Trifecta Gaming in 2006.

10            Let's continue.

11            THE WITNESS:  I don't know what she just said.  I'm

12   sorry.

13            THE COURT:  She didn't ask you a question.

14            THE WITNESS:  Okay.

15   BY MS. BERMAN:

16   Q.   Did you say -- Mr. Kafka, did you say yesterday that you

17   close your company in Florida in 2006 because you have problems

18   and you move to Wisconsin?  Is it correct?

19   A.   I did not say we closed our factory.  I said we kept part

20   of it open.

21   Q.   But you said that you have problem with Trifecta Gaming --

22   with Maitland Furniture in 2006.

23   A.   No.  What I said was we produced everything out of my

24   uncle's plant in Wisconsin.  That's what we did since 1983.

25   Q.   Yes.  But you said -- do you recall you said that you

1   downsized Maitland Furniture because in 2006 you have a

2   problem?

3   A.   I didn't say --

4        MR. SPRINGER:  Asked and answered, Judge.

5        THE COURT:  Sorry?

6        MR. SPRINGER:  Asked and answered.

7        THE COURT:  I'll let him answer that.

8        THE WITNESS:  I believe what I said yesterday was

9   that business was slower so we downsized.  We kept part of it

10  so when business picked up again, we could open up again, and

11  that's exactly what we did.

12  BY MS. BERMAN:

13  Q.   In 2006, yes?

14  A.   In 2006, I believe, was when we downsized, yes.

15  Q.   Yes.  Okay.

16       MS. BERMAN:  Let me introduce this 73 exhibit.

17       THE COURT:  What number is this?

18       MS. BERMAN:  Exhibit 73.

19    (Plaintiff's Exhibit 73 was received in evidence.)

20  BY MS. BERMAN:

21  Q.   It's 2006.  You're transferring money from Trifecta --

22  from Trifecta Gaming to Maitland Furniture, is it correct, in

23  2006?

24  A.   That would be correct.

25  Q.   Yeah.  And you transferred $3,204 from Trifecta Gaming to

1    Maitland Furniture.

2    A.    That would be correct.

3    Q.    Let's look at another -- another page.

4          MS. BERMAN:  Can jury see this?  Can you see?

5          (Affirmative response.)

6    BY MS. BERMAN:

7    Q.    Look at this check.  It says 2006, yes?  Correct?

8    A.    That is correct.

9    Q.    From Trifecta Gaming.

10   A.    Yes.

11   Q.    To Maitland Furniture.

12   A.    Yes.

13   Q.    9,797.

14   A.    I think it says 92, but I can't -- it's very small.

15   Q.    Next, from 2006, from Trifecta Gaming account to Maitland

16   Furniture.  It's 9,905.

17   A.    Yes.

18   Q.    Next exhibit is from Trifecta Gaming -- from Trifecta

19   Gaming to Maitland Furniture, $55,877.  Is it correct?

20   A.    That is correct.

21   Q.    Next exhibit, from Trifecta Gaming to Maitland Furniture

22   in 2006, 3,093.

23   A.    That is correct.

24   Q.    Next exhibit from 2006, from Trifecta Gaming to Maitland

25   Furniture, 4,446.

1   A.    That is correct.

2   Q.    Next exhibit, from Trifecta Gaming to Maitland Furniture,

3   $50,000.

4   A.    You are correct.

5   Q.    Next exhibit, from Trifecta Gaming to Maitland Furniture,

6   29,165.66.

7   A.    Yes.

8   Q.    Next exhibit, from Trifecta -- from Trifecta Gaming to

9   Maitland Furniture, 15,000.

10  A.    Yes.

11  Q.    Next exhibit, from Trifecta Gaming to Maitland Furniture,

12  50,000, and it's signed by your wife.

13  A.    Yes.

14  Q.    Next exhibit, 2006, from Trifecta Gaming to Maitland

15  Furniture, 1,012 and 6,000 in 2006 --

16  A.    You would be correct.

17  Q.    -- from Trifecta to Maitland Furniture.

18  A.    Yes.

19  Q.    So you were saying that this is -- your company -- your

20  company wasn't doing very well.  That's why you were

21  transferring from when my husband was an owner shareholder from

22  Trifecta Gaming to Maitland Furniture.

23  A.    I had --

24             MR. SPRINGER:  Argumentative, Judge.

25             MS. BERMAN:  No.  It's --

1          THE COURT:  Hold on.  Hold on.

2          I'll let him answer.  He was about to answer.

3          THE WITNESS:  I have no idea what she's getting at,

4    Your Honor.

5          THE COURT:  All right.  Well, the objection will be

6    sustained.

7    BY MS. BERMAN:

8    Q.   In 2007 you again -- you just produced me two transfer.

9    You didn't produce all of the check.

10         MR. SPRINGER:  Objection, Your Honor.  It's a

11   discovery issue.

12         THE COURT:  Ms. Berman, you can't make statements,

13   okay?

14         MS. BERMAN:  Okay.

15         THE COURT:  You're here to ask questions right now.

16   BY MS. BERMAN:

17   Q.   Can you see, in 2007, from Trifecta Gaming to Maitland

18   Furniture, 2,676?

19         THE COURT:  What exhibit is this?

20         MS. BERMAN:  Exhibit 73B.

21      (Plaintiff's Exhibit 73B was received in evidence.)

22   BY MS. BERMAN:

23   Q.   From Trifecta Gaming to Maitland Furniture, 649.85, 2007.

24   Is that correct?

25   A.   Yes, that is correct.

1  Q.   So you transferring money?

2  A.   Yes.

3          THE WITNESS:  Your Honor, may I say something?

4          MS. BERMAN:  No.

5          THE WITNESS:  Okay.  Never mind.

6  BY MS. BERMAN:

7  Q.   I just want to ask a question.

8  A.   Yeah.

9  Q.   So Trifecta Gaming was very profitable company because you

10 were transferring a lot of money.

11         Did my husband knew about this, yes or no?

12 A.   Listen, I can't --

13 Q.   No.

14         THE COURT:  Hold on, Ms. Berman.  You asked the

15 question.

16         MS. BERMAN:  Okay.

17         THE COURT:  You've got to let him answer it.  And you

18 asked it in two parts, so let him answer it.

19         THE WITNESS:  I do want to go back and say I know I

20 may have said that we closed in 2006.  That was a long time

21 ago.  It may have been 2007 when we did that.  That's what I'm

22 not sure.

23         And I may have been mistaken yesterday when I said

24 that -- if I said 2006 that we downsized, that may have been

25 2007.  And I'm sorry.  I'm not real sure on that.

1        But other than that, I don't know what you are

2   getting at.  We were transferring checks.  The companies, both

3   companies, were used at that point for payroll.  I paid your

4   husband in 2006 $73,000.  That cost --

5   BY MS. BERMAN:

6   Q.   That's not true.  That's not true.

7   A.   That's my recollection -- that is my recollection.

8   Q.   That's not true.

9        MR. SPRINGER:  Judge, she's not asking a question.

10       THE COURT:  Ms. Berman, he's answering your question,

11  and when you testify, if you do testify, you can say what you

12  want to say.

13       THE WITNESS:  It's my recollection that I paid your

14  husband 73,000.  Now, it takes a company -- to pay somebody

15  $73,000, it costs the company close to a hundred grand to do

16  that.  I had 12 to 15 employees in 2006.  I have to pay them.

17  I have expenses.

18  BY MS. BERMAN:

19  Q.   My question is --

20  A.   That -- and there's not -- hold on.  There's nothing

21  illegal about transferring money from one company to another.

22  It's done all the time.

23  Q.   Okay.

24  A.   I've done it for 30 years.

25  Q.   Mr. Kafka, I have just 45 minutes with you.  I need to

1   question you, so please just answer my question.

2          You said you have 12 employees in 2006.

3          Do you recall yesterday you said in 2006 you have

4   just two, my husband and you?  Do you recall?

5   A.   And like I said, I believe I was wrong.  I think that we

6   downsized in 2007, not 2006.

7   Q.   Let's look about unemployment account, this exhibit.

8          Do you see the date, 2/18/09?

9          THE COURT:  What exhibit?

10         MS. BERMAN:  Exhibit No. 42.

11         THE WITNESS:  Yes.

12         THE COURT:  42?

13         MS. BERMAN:  42.

14  BY MS. BERMAN:

15  Q.   Can you read what it says, determination?

16  A.   It says, "Notice of determination.  The claimant was

17  discharged.  No information was provided by the employer which

18  substantiates misconduct.  The discharge was for reason other

19  than misconduct connected with work.  Any benefits received for

20  which were not entitled are overpayments and subject to

21  recovery."

22         Can I stop?

23  Q.   Can you -- can you read underline here, "The discharge

24  was . . ."

25  A.   "The discharge was for reason other than misconduct

1    connected with the work."

2            And I believe this was a phone call that they gave to

3    me.  I didn't sign anything.  I didn't say anything.  It was

4    under the advice of my attorney since I was doing an

5    investigation into the embezzlement of my company to say

6    nothing at this time until more information came in in regards

7    to the embezzlement that we were waiting for.

8    Q.   Did my husband file unemployment appeal under Maitland

9    Furniture?

10   A.   Yes, he did.

11   Q.   Not Trifecta Gaming.

12   A.   He was being paid by Maitland Furniture.

13   Q.   So somebody contacted you, and you said, "No misconduct."

14   Okay.

15   A.   No.  I didn't say anything.  I did not say anything.

16   Q.   This exhibit that my husband file trademark application is

17   from unemployment 24, 24B.

18           You agree?  Do you see it?

19           My husband's trademark application filed, can you see

20   it?

21   A.   Yes, I can.

22   Q.   Would be he file a trademark application if he wasn't an

23   owner and shareholder?  Yes or no?  Just yes or no.

24   A.   Ms. Berman, listen --

25           MR. SPRINGER:  Objection, speculation, Your Honor.

1          THE COURT:  Sustained.  He can't say why your husband

2    did something.

3    BY MS. BERMAN:

4    Q.   Okay.  Now, you -- after my husband file trademark

5    application, you decided to appeal.

6          Exhibit 47, unemployment appeal, can you see --

7    A.   Yes.

8    Q.   -- that my husband file unemployment appeal on 2/18/09 and

9    Mr. Kafka:  "I agree that you file unemployment appeal on the

10   date 3/9/09."

11   A.   I agreed that I filed the unemployment compensation appeal

12   on 3/9/09.  However, it had nothing to do with a -- I was

13   totally unaware that he even did it at that point.

14   Q.   And you file under Maitland Furniture.

15   A.   Yes, I did, because --

16   Q.   And -- --

17   A.   -- he was being paid by Maitland Furniture.

18   Q.   -- you gave address as in Janesville.

19   A.   Yes, I did --

20   Q.   Okay.

21   A.   -- as my contact because that's where I was at the time.

22   Q.   Then we agree it was unemployment hearing on May 27th --

23          THE COURT:  What number, 15?

24          MS. BERMAN:  It's 14.

25          THE COURT:  14?

 1    BY MS. BERMAN:

 2    Q.   On May 27 -- May 27, 2009.  Under employer, Maitland

 3    Furniture, c/o Eugene --

 4              MR. SPRINGER:  Objection, Judge.  It doesn't matter

 5    who's on the "care of" line for an employer.  That's just --

 6              MS. BERMAN:  Yeah, but it --

 7              THE COURT:  Okay.  I don't have this -- hold on.  I

 8    don't have this exhibit.

 9              Was this -- has this been admitted?

10              MS. BERMAN:  Mr. Springer said to me to add it

11    because I forgot about this yesterday, but going to

12    unemployment appeal.

13              THE COURT:  Is this one of your exhibits?

14              MS. BERMAN:  Yes.

15              THE COURT:  It's 14.

16              MR. SPRINGER:  It's one of Ms. Berman's exhibits,

17    Your Honor.

18              MS. BERMAN:  Yeah.  And today he agree with this.

19              THE COURT:  Well, it hasn't been admitted, so it

20    needs to be admitted.

21              Do you have an objection to it?

22              MR. SPRINGER:  I don't have an objection to the

23    admission, just the questioning on it.

24              THE COURT:  It's Exhibit 14?

25              MS. BERMAN:  14.

 1            THE COURT:  13?

 2            MS. BERMAN:  14.  I can . . .

 3            THE COURT:  All right.  What's the question?

 4            MS. BERMAN:  If Eugene Brunozzi is employee of

 5   Maitland Furniture or has anything to do -- is he in corporate

 6   records, Eugene Brunozzi?

 7            MR. SPRINGER:  The objection is the "care of" line

 8   doesn't have anything to do with the relevance of this case.

 9            THE COURT:  I'll allow it.

10            THE WITNESS:  What was the question again?

11   BY MS. BERMAN:

12   Q.   Who is Eugene Brunozzi and what --

13   A.   Eugene Brunozzi is my accountant.

14   Q.   So why he's on your corporate records?  Is he employee or

15   owner or -- you said care of.

16   A.   He is my accountant.  All of our unemployment issues go to

17   my accountant.  I don't have time to handle all this.  This

18   goes to my accountant.  It's what he does.

19   Q.   Is your account was suspended license in 2008?

20            MR. SPRINGER:  Objection, Judge.

21            THE COURT:  I don't -- I'll overrule the objection.

22   I don't . . .

23            MR. SPRINGER:  Can we have a sidebar then, Your

24   Honor?

25            THE COURT:  All right.

1        (At sidebar, out of the hearing of the jury:)

2            THE COURT:  What was the question?  I don't remember.

3            MR. SPRINGER:  She started to say that wasn't it true

4    that Eugene Brunozzi, his accountant, had a suspended license

5    at some point.

6            THE COURT:  What does that have to do with this case?

7            MS. BERMAN:  He's saying that Eugene Brunozzi is in

8    his corporate records as an accountant, but his name on company

9    Maitland Furniture.  And he's saying his accountant handle

10   everything.  If accountant handle everything, why is it he was

11   unemployment appeal?  He was -- he was appealing, not Eugene

12   Brunozzi?

13           THE COURT:  The objection's sustained.

14       (End of discussion at sidebar.)

15   BY MS. BERMAN:

16   Q.   Let me see what you presented in -- for unemployment

17   appeal.  You present -- it will be Exhibit 45A.

18           You presented this exhibit telling that my husband,

19   in 2005, was embezzling money from Maitland Furniture, but he

20   was not employed by Maitland Furniture in 2005.

21           Is it correct?

22   A.   In 2005 he would have been a one-third owner of Trifecta

23   Gaming USA.

24   Q.   But unemployment appeal was for Maitland Furniture only,

25   yes?

1   A.    Say it again, please.

2   Q.    Unemployment appeal was for Maitland Furniture?

3   A.    It was for Maitland Furniture, yes.

4   Q.    And you presented checks for 2005 when he was not -- when

5   he was not working --

6   A.    Listen, in 2009 of -- January of 2009, we came across a

7   number of checks where money was embezzled.  When I went to the

8   unemployment hearing, I just grabbed a bunch of checks.  I

9   didn't necessarily -- you know, I just --

10  Q.    How he --

11  A.    -- gave checks that were embezzled.

12  Q.    How he --

13         THE COURT:  Hold on.  Let him finish his answer.

14         THE WITNESS:  So, yes, this money was -- there was

15  money embezzled from these checks, and it happened in 2005.

16         But I think when you have a hearing like that that

17  presenting checks that money was embezzled previously, I don't

18  believe -- I believe that helps present your case.  I don't see

19  anything wrong with doing that, the fact that he started

20  embezzling money in 2005.

21  BY MS. BERMAN:

22  Q.    Just fact that he never was employee in 2005.

23         Next what you presented --

24         MR. SPRINGER:  I move to strike that last statement,

25  Judge.

```
 1              THE COURT:  That will be granted.

 2              The jury will disregard that statement from

 3   Ms. Berman.

 4   BY MS. BERMAN:

 5   Q.   Next you presented for unemployment packet G.

 6              Please read what I underlined here.

 7              THE COURT:  What exhibit is this?

 8              MS. BERMAN:  It's Exhibit 50.

 9              THE COURT:  15?

10              MS. BERMAN:  50, 5-0.

11              THE COURT:  50?

12   BY MS. BERMAN:

13   Q.   Deposit ticket showing the deposit of 8,068 -- excuse me,

14   8,040.  Chris Berman deposited this as a payment for Yonkers

15   invoice above.  The actual amount of the deposit was 8,168.

16   There was an additional error on the deposit ticket.  This

17   deposit ticket shown on D4.  That's what you said.

18              So you're saying that my husband deposit 8,068 what

19   should be 8,040, and you're saying that it's considered

20   embezzlement?

21   A.   Listen, Ms. Berman, this packet had D1, D2, D3, D4, and

22   D5.  If all of that information was with me, everything it's

23   saying on D1, D2, D3, D4, and D5 would make sense.  To pick out

24   just D3 and underline something makes no sense.  I need to see

25   the whole packet.
```

1   Q.   Okay.  I just show you.

2        I would like to say what did you do with the extra

3   money what my husband deposit?

4   A.   I --

5   Q.   Did you return?

6   A.   I don't even know what you're talking --

7   Q.   You said it should be 8,040 --

8   A.   Ms. Berman, you have to show me D1, D2, D3, D4, and D5.

9   Q.   I show you.

10       Before I show you D1 and D2, you said invoice sent to

11  Yonkers by Chris Berman.  It says invoice, says D2 invoice.

12       Do you agree with that you said D1 and --

13  A.   Okay.

14  Q.   -- D2 is invoice?

15  A.   Can I have it back, please?

16  Q.   (Tenders document.)

17  A.   Thank you.

18       Invoice sent to Yonkers by --

19  Q.   Yes.

20  A.   -- Chris Berman for 24 units at a cost of 349.  He did not

21  give them a discount I instructed him to.  He also asked them

22  for a 50 percent discount -- or I think that was supposed to --

23  meant to be payment there.

24  Q.   Okay.  You just -- on D2, it says invoice --

25  A.   Yes.  I showed an --

1   Q.    -- yes?

2   A.    -- invoice in D1 that showed an invoice that he made out

3   to Yonkers for a higher price than the one he gave me.

4   Q.    Okay.  Let's put this on this packet.

5          So we're going through the package.  D1, you said

6   it's invoice, and let's read what it says here.  You said

7   before invoice and it says what?  Proposal.

8          Is invoice and proposal the same?

9   A.    I don't know -- I don't know what you're getting at.

10  Where do you see --

11  Q.    No.  My question, is invoice and proposal is the same or

12  not?

13  A.    The invoice and proposal would not be the same.

14  Q.    Of course.

15         You said in that early exhibit it was invoice D1, but

16  you submit proposal.  Proposal.

17         For example, if somebody --

18  A.    However -- listen, Ms. Berman.  He used this proposal for

19  the invoice.  That's how much the money -- that's how much the

20  check came in for, for 8,376.  He used this for the invoice.

21  Q.    Okay.  For example, if you're using this proposal --

22  sometimes you're going and buying a car and they give you

23  proposal, "Okay, we can buy you this car today," and -- just

24  proposal, and you -- insurance you're buying.  And they say

25  this insurance will be today.

 1           You go, like, a month later or -- but today -- in a

 2     month later, they don't give you what exactly will be on

 3     proposal.

 4           MR. SPRINGER:  Objection.

 5     BY MS. BERMAN:

 6     Q.   You understand?

 7           MR. SPRINGER:  Improper hypothetical.

 8           THE COURT:  Sustained.

 9     BY MS. BERMAN:

10     Q.   Mr. Kafka, the unemployment appeal started on -- I don't

11     have this.  I would like to ask you a question.

12           You said you find out about those alleged checks in

13     which year?

14     A.   Well, in January of 2009.

15     Q.   In January.

16           Do you recall exactly when?

17     A.   In January of 2009.

18     Q.   In January 2009.

19     A.   We had --

20     Q.   Okay.

21     A.   -- a number --

22     Q.   You said --

23     A.   -- of checks come in, yes.

24     Q.   You said if you -- in January 2009, if you found those

25     checks, and -- do you know me personally?

1   A.   I said yesterday I saw you in a car at the factory a

2   couple times.  I've never, ever talked to you.

3   Q.   How you can know that this is my signature if you saw the

4   checks?

5   A.   Are you -- you're referring to the checks that -- your two

6   checks now?

7   Q.   Yes.  I would like to know not how -- I would like to ask

8   a question.

9        For example, if you found out these checks and you

10  think it's my signature, would be a proper way to call to me

11  and verify in 2009 if it's my signature or not?

12  A.   I would say no.  If I'm feeling that people are embezzling

13  from my company, I have to do what I did.  I went into public

14  records.  I found your signature on a marriage proposal.  I

15  found your signature on some type of mortgage document.  I

16  compared them --

17  Q.   Did you tell that you --

18       THE COURT:  Hold on.  Hold on.  He's answering your

19  question.

20       THE WITNESS:  I compared them, and in my opinion you

21  have an extremely unique signature.

22       And after doing that, I was positive, in my opinion,

23  beyond a reasonable doubt, that yes, you -- the check was

24  signed, "Pay to the order of Larysa Berman."  You are Lareesa

25  Berman.  You're married to Chris Berman, and it had your

 1   signature on the back.

 2          So I was positive beyond a reasonable doubt that it

 3   was your signature, yes.

 4   BY MS. BERMAN:

 5   Q.   Mr. Kafka, isn't everybody's signature unique?  Is just --

 6   is just mine unique?

 7   A.   I would say that yours is much more unique than most

 8   people.

 9   Q.   Is the rest of them has the same signature, just my

10   unique?

11   A.   Pardon?

12   Q.   Just my unique, the rest of them has the same signature?

13          MR. SPRINGER:  Objection, Your Honor, argumentative.

14          THE COURT:  Sustained.

15   BY MS. BERMAN:

16   Q.   Okay.  You appeal --

17          MS. BERMAN:  I need to finish this appeal, Your

18   Honor, to show --

19   BY MS. BERMAN:

20   Q.   You appeal this decision, and this is -- so on May 27 was

21   a hearing.

22   A.   Yes.

23   Q.   2009, yes?

24   A.   Yes.

25   Q.   Did you say on that hearing that I embezzle money from

1    Maitland Furniture?

2    A.    In the hearing I presented evidence -- like I said

3    earlier, I presented some checks that were written to Chris

4    Berman of Trifecta Gaming that had his signature on the back

5    and that indicated to me that he received the money.

6          I presented some checks that had your signature on

7    the back that indicated to me that you received the money.

8    Then, when they ruled, they ruled that money was embezzled from

9    our company.

10   Q.    Okay.  You said they ruled.

11         What about this order, 53?

12         THE COURT:  What exhibit?

13         MS. BERMAN:  Exhibit 53.

14         THE COURT:  This one hasn't been admitted either.

15         MS. BERMAN:  No.  It was admitted.

16         THE COURT:  Do you show this as being admitted,

17   Mr. Springer?

18         MR. SPRINGER:  I know it was admitted through the

19   defense.

20         THE COURT:  All right.  What defense exhibit is it?

21         MR. SPRINGER:  That is No. 2.

22         THE COURT:  All right.

23   BY MS. BERMAN:

24   Q.    Let's read what it says here.  "The employer employed the

25   claimant as a sales representative from January 1, 2006,

1    through January 9, 2009.  Towards the end of the claimant's

2    employment, the employer became aware that the claimant had

3    been having customer write checks for purchase directly to the

4    claimant rather than to the business.

5         "The employer conducted an investigation and

6    discovered that the claimant also had sold products to

7    customers at higher rates than he had instructed the claimant

8    to charge and paid the difference to himself, giving the

9    employer one copy of an invoice and the customer another.  The

10   employer discharged the claimant for falsifying records and

11   misappropriation of funds."

12   A.   Well, listen.  If you look up embezzlement in the

13   dictionary, it probably says misappropriation of funds.  I'm

14   not sure, but to me that's just a -- I mean, if somebody said

15   to me, "Could you please define embezzlement?" I would say it

16   was a misappropriation of funds.

17   Q.   Look about October 21, 2009.

18        Do you recall you said they found in your favor?

19   Look at October 21, 2009.

20        What it says there?

21        THE COURT:  Is this a different exhibit?

22        MS. BERMAN:  No.  It's the same.

23        THE WITNESS:  "This is to certify that on October

24   21st, 2009, the above order was filed in the office of the

25   clerk of the Unemployment Appeals Commission."

 1  BY MS. BERMAN:

 2  Q.    No.  That's not what I'm saying.  Let's read all exhibit.

 3  A.    The other part that's yellowed?

 4  Q.    The whole.  "The record" --

 5  A.    The decision of the appeals referee is --

 6  Q.    No.  No.  The record.

 7        "The record reflects that, at what appeared to be

 8  near the end of the telephonic hearing conducted in this case,

 9  the claimant was disconnected.  Although the referee attempted

10  to reconnect with the claimant, she was unable to do so.

11  Notwithstanding that fact, the referee questioned the

12  employer's sole witness farther regarding the merits of the

13  case and thereafter rendered the decision now under review?

14        "The claimant's request for review asserts that a

15  storm in the area caused his disconnection from the hearing and

16  that he had further evidence to produce, but was prevented from

17  doing so by reason of the disconnection of this telephone line

18  during the storm.

19        "The claimant requests another hearing in order to

20  continue with the presentation of his case.  In light of the

21  allegations contained in the claimant's request for review and

22  in order to ensure the claimant's due process rights have not

23  been breached, this matter is being remanded for an additional

24  hearing to allow the claimant an opportunity to present

25  additional evidence as he may deem advisable."

1              Claimant is my husband.

2    A.    That is exactly what I said yesterday, yes.

3    Q.    Do you know in fact that, "During the hearing the parties

4    raised an issue not addressed by the referee in her decision;

5    namely, the question of whether the service performed by the

6    claimant for employer were performed as an independent

7    contractor or as an employee of the company.  Such an issue is

8    a" -- excuse me.

9    A.    I'll continue.

10             "Such an issue is a threshold one which must be

11   addressed to determine whether the claimant is even eligible

12   for unemployment compensation benefits aside from any issue

13   regarding his separation from the company.

14             "On remand, the referee is directed to question the

15   parties further regarding that issue and include, in a new

16   decision, her ruling in that regard."

17   Q.    "The decision of the appeal referee is vacated," and

18   vacated means for farther procedure.  Vacated means that that

19   decision was in error give in your favor.  They vacated.  It's

20   like never happen.

21   A.    But they remanded it for a new hearing --

22   Q.    Well, let's --

23   A.    -- to see if your husband had any more information.

24   Q.    Let's -- let's -- let's see this.

25             MS. BERMAN:  I'm sorry.  I'm in a hurry because of

1   time.

2   BY MS. BERMAN:

3   Q.    Okay.  Can you recognize it here that you -- you wrote to

4   unemployment appeal?

5           "I just received the notice on unemployment

6   compensation telephone hearing" --

7           MS. BERMAN:  Can everybody understand me?

8           THE COURT:  What exhibit?

9           MS. BERMAN:  "Due to a previous" --

10          THE COURT:  Ms. Berman, what exhibit are you

11   referring to?

12          MS. BERMAN:  It's -- I'm sorry.  It's Exhibit 55.

13   BY MS. BERMAN:

14   Q.   "Due to previous unscheduled business trip for the month

15   of December, the date of December 8, 2009, is one of the weeks

16   I will be out of town.  I have two other business trips

17   scheduled for December.

18          "These trips are on-site installation of product we

19   manufacture and are scheduled by client or their general

20   contractor.  Therefore, I would like to request a

21   postponement."

22          It's your letter to agency from November 24, 2009.

23          Do you agree about this?

24   A.    Yes.

25   Q.    You wrote this to them, that you -- that you decided --

1    they give a hearing on December 8, 2009, but you couldn't --

2    couldn't be in this hearing because you have a business trips.

3          You agree with that.  Is correct?

4    A.   I believe that's correct, yes.

5    Q.   Okay.  The next exhibit's 55A.  The date was -- I just

6    remind, the date of that letter was November 24, 2009.

7          And here is this order from unemployment hearing:

8    "Dismissal without prejudice.  The appeal indicate inability to

9    a hearing to prosecute the appeal.  The appeal, however, also

10   indicate a desire to procure the appeal.  Accordingly, the

11   appeal is dismissed without prejudice."

12         After you couldn't attend, they dismiss this on

13   November 25, 2009.

14         Do you agree with that?

15   A.   There was all sorts of confusion going on here.  I think I

16   wrote other letters to the Workforce Innovation to --

17   Q.   But this is not --

18         THE COURT:  Hold on.  He's still answering your

19   question.

20         THE WITNESS:  There is a whole chain of e-mails going

21   back and forth from me to them trying to ask for clarification.

22   But that is what this document says, yes.

23   BY MS. BERMAN:

24   Q.   They schedule and you said you cannot appear.

25   A.   Yes.

1   Q.    Okay.  Next.

2          THE COURT:  Let me see the parties at sidebar.

3      (At sidebar, out of the hearing of the jury:)

4          THE COURT:  Ms. Berman, it's 10 o'clock.  I'm

5   terminating your questioning.

6          Do you have cross?

7          MR. SPRINGER:  I do, Your Honor.  To save time, if

8   I'm permitted to introduce exhibits during cross, I can finish

9   and not have to call Mr. Kafka again.

10         THE COURT:  All right.  Do you have an objection to

11  that?

12         MS. BERMAN:  I didn't --

13         THE COURT:  Do you have an objection to what he just

14  said?

15         MS. BERMAN:  Exhibits?  What exhibits are you --

16         MR. SPRINGER:  Just the checks.

17         MS. BERMAN:  No.  Again, I have other witnesses.  I

18  can't.  I can't right now because I have witness from SunTrust

19  and my husband.  If he will take the time, I can't right now.

20         THE COURT:  I don't understand.  He wants to -- he

21  doesn't want to have to recall Mr. Kafka, and we could just

22  introduce some of these exhibits right now rather than have to

23  recall him.

24         MS. BERMAN:  Okay.  I want to present what -- that

25  there was no judicial proceeding because of the order.  In

1   order, that there was no judicial proceeding.

2           THE COURT:  What does that have to do with what he

3   was talking about?

4           MS. BERMAN:  About he's claiming a judicial

5   proceeding, and I need to show the jury that --

6           THE COURT:  You'll just have to -- you'll just have

7   to recall him.

8           All right.  Your questioning is done.

9           You can start your cross-exam.

10          MR. SPRINGER:  Thank you, Your Honor.

11      (End of discussion at sidebar.)

12          THE COURT:  Okay.  Mr. Springer, you may

13  cross-examine Mr. Kafka.

14          MR. SPRINGER:  Thank you.

15          Can I have Exhibit 50, please, Plaintiff's Exhibit

16  50?

17          COURTROOM DEPUTY:  Plaintiff's?

18          MR. SPRINGER:  Yes, ma'am.

19                          CROSS-EXAMINATION

20  BY MR. SPRINGER:

21  Q.   Good morning, Mr. Kafka.  How are you?

22  A.   Okay.

23  Q.   Good.  I have a few questions for you now and more later.

24          But let's start with a few things that were brought

25  up during your direct examination by Ms. Berman, the first of

1   which, dates in which Maitland Furniture shut down most of its

2   operations in Florida.

3            Are you positive whether it's 2006 versus 2007?

4   A.    I am not positive, but I am leaning definitely to the fact

5   that it was 2007.

6   Q.    Given that it's what, eight, nine years ago now?

7   A.    Yes.

8   Q.    And even though your factory may have been mostly shut

9   down in Florida for Maitland Furniture during the '06/'07 time

10  frame --

11  A.    Yeah, and --

12  Q.    -- you were still producing furniture in Wisconsin,

13  correct?

14  A.    Yes.

15  Q.    So sales could be made in Florida by Mr. Berman, and those

16  products were produced elsewhere.

17  A.    That is correct.

18  Q.    Doesn't mean you shut down your entire operation.

19  A.    Correct.

20  Q.    Doesn't mean that you didn't make money during those

21  years.

22  A.    Oh, no, not at all.  I mean, we worked since 1983 running

23  out of that factory.

24  Q.    I want to show you what's been marked as Plaintiff's

25  Exhibit 35.

1          MR. SPRINGER:  If I may approach, Your Honor?

2          THE COURT:  Yes.

3    BY MR. SPRINGER:

4    Q.   That's the January of 2009 letter shown to you by

5    Ms. Berman terminating Mr. Berman from employment with Trifecta

6    Gaming.

7          Do you see that?

8    A.   Yes.

9          MS. BERMAN:  Your Honor, may I see it?

10         MR. SPRINGER:  It's your Exhibit 35.

11   BY MR. SPRINGER:

12   Q.   Now, that letter doesn't say that Mr. Berman was owner of

13   Trifecta Gaming, does it?

14   A.   It does not.

15   Q.   It says his employment, correct?

16   A.   Yes.

17   Q.   Because he sold products for Trifecta Gaming.

18   A.   Right, as vice president of sales.

19   Q.   As a paid employee of Maitland Furniture --

20   A.   Correct.

21   Q.   -- however.

22   A.   Correct.

23   Q.   And was that letter sent out in an abundance of caution to

24   cover all your bases because you were letting him go in that

25   time frame?

1    A.    That is correct.

2    Q.    Let's look at Exhibit 24B, which was shown to you by --

3    Plaintiff's Exhibit 24B, shown to you by Ms. Berman.

4    A.    Yes.

5    Q.    It's a trademark service application.  The date of this is

6    January 20th, 2009.

7          Do you see that highlighted up there?  Can you read

8    that?

9          I'll tell you it's January 20th, 2009.

10   A.    Okay.

11   Q.    When Mr. Berman applied for a trademark, for whatever

12   reason, for Trifecta Gaming, was January 20th, 2009, after he

13   was fired?

14   A.    Yes, it was.

15   Q.    Let's talk about Plaintiff's Exhibit No. 50, packet D.

16         Do you recall this line of questioning regarding

17   invoices and proposals?

18   A.    Yes, I do.

19   Q.    And specifically what was it that you presented to the

20   unemployment compensation referee regarding embezzlement by

21   Chris Berman as referenced in packet D?  What did your evidence

22   consist of?

23   A.    Yeah.  I mean, I can't see the --

24   Q.    Right.  From what you recall.

25   A.    From what I recall, it would have been a package -- five

1    different packets showing one invoice going to the account at a

2    higher price, one invoice coming to me at a lower price or the

3    price it should have been.

4            And then I believe that when it came time for the

5    deposit, apparently Mr. Berman had cashed the check, and then

6    he substituted one check from Yonkers, I believe, but I can't

7    read it.  I mean --

8    Q.   Right.

9    A.   Okay.  But that was the pattern, yes.

10   Q.   In essence, what was he doing?  Was he billing clients at

11   a higher rate --

12   A.   Yes.

13   Q.   -- and then --

14   A.   Keeping the difference.

15   Q.   -- keeping the money that was over the rate that they

16   should have been billed for?

17   A.   Yes.  And then he was also substituting checks and keeping

18   the money as well.

19   Q.   And the evidence you presented as part of the May 26,

20   2009, appeals hearing at the unemployment -- with the

21   unemployment referee, did that include the checks that had the

22   name of Lareesa Berman on the back?

23   A.   Yes, they did.

24   Q.   Two checks?

25   A.   Two checks.

1    Q.   The evidence presented at this May 26, 2009, hearing

2    appealing the award of benefits to Mr. Berman, those checks

3    were made out to Chris Berman, care of Trifecta Gaming,

4    correct?

5    A.   That is correct.

6    Q.   Now, they weren't made out to Maitland Furniture, correct?

7    A.   Correct.

8    Q.   And that was because Chris Berman's position was vice

9    president of sales for Trifecta Gaming, correct?

10   A.   Correct.

11   Q.   As an employee of Maitland Furniture?

12   A.   That's correct.

13   Q.   So there wouldn't be any checks that were made out to

14   Maitland Furniture per se, or most of them would be made out to

15   Trifecta Gaming --

16   A.   Yeah.

17   Q.   -- because that's what he did.

18   A.   And the fact -- yeah.  Anything that he sold, for the most

19   part, would be coming in under Trifecta Gaming.  And like I

20   said, periodically a larger account would want to still make

21   the check under Maitland Furniture because Maitland Furniture

22   was -- had been very well established.

23            MR. SPRINGER:  Thank you.  That's all I have for now.

24   Thanks so much for your time.

25            THE COURT:  Ms. Berman?

1                        REDIRECT EXAMINATION

2    BY MS. BERMAN:

3    Q.   Yesterday you say it was a difficult situation and you --

4    in 2006.  Today you're saying 2007.

5              Your employee, when I question on deposition, she

6    said that you close your Maitland Furniture in 2006.

7    A.   Yeah.  I am -- I'm really not sure on it.  Just -- I'm

8    just not sure which year it was.  I'm leaning towards 2007

9    right now, but I --

10   Q.   I --

11   A.   -- I would have to check.

12   Q.   I presented --

13   A.   I'm sorry.

14   Q.   I presented you two exhibits where it says Maitland

15   Furniture, January 8, 2009, and Trifecta, January 8th, 2009, as

16   employee of both of this company.

17             If you claim that he give away his rights in 2005,

18   how he can be employee by Trifecta Gaming and Maitland

19   Furniture?

20   A.   I think I answered that.  I mean, the answer would be in

21   an abundance of caution, my attorneys drew up letters for --

22             THE COURT:  Let me see the attorneys and Ms. Berman

23   again at sidebar.

24        (At sidebar, out of the hearing of the jury:)

25             THE COURT:  All right.  You've got ten minutes to do

1  your rebuttal examination of him.  It's ten after 10:00.

2  You've got till 10:20.

3          His cross was ten minutes.  You're limited to just

4  what he went into.  You're not supposed to go back again.

5  You're not supposed to keep repeating things over and over.

6          So if you have some new ground to cover, cover it

7  now.  You've got ten minutes.

8      (End of discussion at sidebar.)

9  BY MS. BERMAN:

10 Q.   Your attorney said to cover up both company, but you said

11 earlier that my husband was not employee of Trifecta Gaming --

12 A.   Your husband was --

13 Q.   -- correct?

14 A.   -- vice president of sales for Trifecta Gaming.

15 Q.   But he was not an employee.

16 A.   He was being paid by Maitland Furniture.

17 Q.   But he was employee of Maitland Furniture --

18          MR. SPRINGER:  Objection, asked and answered.

19 BY MS. BERMAN:

20 Q.   -- not Trifecta Gaming, yes or no?

21          MR. SPRINGER:  Asked and answered, Judge.

22 BY MS. BERMAN:

23 Q.   Just yes or no.

24          THE COURT:  I'll let him answer it.

25          Go ahead.

1   BY MS. BERMAN:

2   Q.   Just Maitland Furniture he was employed, yes or no?

3   A.   He was being paid by Maitland Furniture as a vehicle for

4   payroll.  His title was vice president of sales for Trifecta

5   Gaming.

6   Q.   That's not what I ask.  I ask --

7   A.   I don't know how --

8   Q.   -- was he --

9   A.   I have not --

10           THE COURT:  Hold on.  Hold on.  Hold on.  The

11  objection is sustained at this point.

12           MS. BERMAN:  Okay.  I don't have anything --

13           THE COURT:  All right.  Thank you.

14           You can step down, Mr. Kafka.

15           MS. BERMAN:  I reserve my rights to cross-examine

16  this witness.

17           THE COURT:  All right.

18           THE WITNESS:  Ms. Berman, I think -- is this yours?

19           THE COURT:  All right.  Ms. Berman, call your next

20  witness.

21           MS. BERMAN:  I will call Sheri Cobb.

22           THE COURT:  Do we need to take this outside of the

23  jury's presence?

24           MR. SPRINGER:  We probably do, Your Honor.

25           THE COURT:  Okay.  Ladies and gentlemen of the jury,

```
 1   you're free to take a -- let's say a 15-minute break.

 2            COURT SECURITY OFFICER:  All rise for the jury.

 3        (Jury out at 10:11 a.m.)

 4            COURT SECURITY OFFICER:  Please be seated.

 5            THE COURT:  What's your objection, Mr. Springer --

 6            MR. SPRINGER:  My objection is --

 7            THE COURT:  -- to this witness?

 8            MR. SPRINGER:  -- the Court ruled in limine to

 9   prevent any testimony from Ms. Cobb regarding allegedly

10   fraudulently opening the SunTrust Bank account and that the

11   dates on the signature card versus the articles of

12   incorporation are different.  And I'm afraid that's the only

13   questioning that she's going to be asked.

14            THE COURT:  All right.  Is that -- what questioning

15   are you going to ask of Ms. Cobb?

16            MS. BERMAN:  Your Honor, I would like to ask how --

17   not about how bank fraudulently or not.  What -- how -- I will

18   not ask about --

19            THE COURT:  No.  I'm not asking you what you're not

20   going to ask.  I'm asking you what you are going to ask and

21   what this witness is going to testify about.

22            MS. BERMAN:  If she knows anything about

23   investigation by -- by what defendant's saying about my

24   husband.

25            MR. SPRINGER:  I can help, Judge.  I think Ms. Berman
```

1    intends to try and introduce a Rule 26 disclosure where she was

2    listed as a potential witness, and that's what she's going to

3    ask her about.

4         THE COURT:  Is that what you're going to ask her?

5         MS. BERMAN:  Yes.

6         THE COURT:  All right.  Well, I'm not going to allow

7    that.  It's got nothing to do with -- Ms. Berman, on Rule 26

8    disclosures, that's just -- you'd be complaining if they don't

9    disclose something.  Now you're complaining that they do

10   disclose something.

11        That's just -- what did you list her as having

12   knowledge of, Mr. Springer?

13        MR. SPRINGER:  It was more of a general listing of

14   the bank account at issue, Trifecta Gaming, and any

15   investigation into Chris Berman's embezzlement.  I believe she

16   may have been contacted by Tom at some point back in '09.

17        But to the extent of her involvement, I don't know

18   that she recalls.  She was asked in deposition, and she said

19   she didn't recall.

20        THE COURT:  So why are you going to call her if she

21   doesn't recall anything about this?

22        MS. BERMAN:  Your Honor, I'm going to -- can I

23   sidebar?  I don't want defendant witness to hear what we are

24   discussing.  I would like it private so the witness will not

25   hear what we discussing and what I will be asking.

```
 1            THE COURT:  What?

 2            MS. BERMAN:  The witness will not hear --

 3            THE COURT:  The witness is not here.

 4            MS. BERMAN:  The defendant.

 5            THE COURT:  Well, the defendant's a party.  He's got

 6    a right to be here.

 7            MS. BERMAN:  He said --

 8            THE COURT:  He's going to be here anyway when she

 9    testifies.

10            MS. BERMAN:  Your Honor, she said that he went to the

11    bank -- to the bank, SunTrust Bank, and check if there is a

12    problem something.  He check into SunTrust Bank and see that

13    some kind of embezzlement, he saw, in bank.

14            So I would like to ask if she knows about that or

15    not.

16            THE COURT:  He went to check on whether there was

17    some type of embezzlement?

18            MS. BERMAN:  Yes.  That's what he said.

19            THE COURT:  And that's relating to your husband's

20    embezzlement?

21            MS. BERMAN:  Uh-huh, yes.  He's alleging these checks

22    and he says that he went to the bank to check it, and he didn't

23    know if she knows about this or not.

24            THE COURT:  Well, what did she say in her deposition?

25            MS. BERMAN:  She didn't know anything.
```

1          THE COURT:  So that's what you're going to put her up

2    there for?

3          MS. BERMAN:  Because he saying that I and my husband

4    embezzle money, and he went to the check -- to the bank and

5    check what's wrong with this.  I need the jury to hear that --

6    that his testimony is not correct.

7          THE COURT:  What's --

8          MR. SPRINGER:  I think she's trying to prove that

9    just because a witness doesn't recall something that -- that

10   there was no embezzlement, I suppose.

11         Additionally, these checks that are at issue with her

12   name on them aren't from SunTrust or deposited in SunTrust.  So

13   the checks she'd be inquiring about, if anybody knew anything

14   about it, it wouldn't have anything to do with this case.

15         THE COURT:  Well, you know, in an abundance of

16   caution, I'll let you put her on.  I'm going to limit you to 15

17   minutes.  Based on what you're telling me, it shouldn't take

18   longer than that.

19         MS. BERMAN:  Okay.

20         THE COURT:  So I'll allow the jury to take a break

21   until 10:15 -- until 10:25 so both sides should be back at

22   10:25.

23         Is there anything else that we need to take up?

24         MR. SPRINGER:  No, Your Honor.

25         THE COURT:  Okay.  Court will be in recess.

1           COURT SECURITY OFFICER:  All rise.

2      (Recess from 10:16 a.m. until 10:29 a.m.; all parties

3 present.)

4      (Outside the presence of the jury:)

5           COURT SECURITY OFFICER:  All rise.  This Honorable

6 Court is now in session.

7           Please be seated.

8           THE COURT:  Mr. Springer, what was the name of the

9 witness that you wanted to call out of turn?

10           MR. SPRINGER:  Janice Connell.

11           THE COURT:  Janice Connell?

12           And you said -- what was, again, her issue today?

13           MR. SPRINGER:  My understanding is that she is a

14 kidney transplant recipient, I believe, and she takes

15 medication, and she has to take it every morning.  And she

16 brought enough for today but didn't bring it for tomorrow

17 morning.  And if she doesn't take it, something with her immune

18 system goes whacky.

19           THE COURT:  All right.  Well, I am going to let her

20 testify out of turn, and I would suggest that maybe the best

21 time to do it would be after this witness, Ms. Cobb.

22           Or how much time do you think you need with

23 Ms. Connell?

24           MR. SPRINGER:  I asked her to come here after our

25 lunch break.

```
 1            THE COURT:  Oh, she won't be here till lunch.
 2            MR. SPRINGER:  Till lunch.
 3            THE COURT:  Oh, okay.
 4            MR. SPRINGER:  And then we can call her right after
 5  lunch if you'd like to.
 6            THE COURT:  All right.  Well, we'll see where we are.
 7            Who is your next witness after Ms. Cobb?
 8            MS. BERMAN:  My husband.
 9            THE COURT:  All right.  And so once Ms. Cobb leaves
10  the stand, I'm going to ask you to call your husband.
11            I'm going to put a -- how long do you think you're
12  going to be with your husband?
13            MS. BERMAN:  I have to go through the exhibits.  I
14  don't know.
15            THE COURT:  All right.  Well, I'm going to give you
16  two hours to examine your husband, which I believe is more than
17  enough time.
18            You know, you don't have to always ask a witness a
19  question about an exhibit.  Do you realize that?  The jury is
20  going to have these exhibits, and when you give your closing
21  argument, you can refer to the exhibits.  So I don't know why
22  you're wasting so much time with these exhibits.
23            All right.  Bring the jury in.
24            COURT SECURITY OFFICER:  Yes, sir.
25            All rise for the jury.
```

1        (Jury in at 10:31 a.m.)

2            COURT SECURITY OFFICER:  Please be seated.

3            THE COURT:  All right, Ms. Berman.  Call your next

4    witness.

5            MS. BERMAN:  I call Ms. Cobb.

6            THE COURT:  Okay.  Mr. Sowards, would you mind?

7            COURT SECURITY OFFICER:  Yes, sir.

8            COURTROOM DEPUTY:  Please raise your right hand.

9            Do you solemnly swear or affirm the answers you will

10   give during these proceedings will be the truth, the whole

11   truth, and nothing but the truth?

12           THE WITNESS:  I do.

13           COURTROOM DEPUTY:  And please state your name for the

14   record.

15           THE WITNESS:  Sheri Cobb.

16              SHERI COBB, PLAINTIFF'S WITNESS, SWORN

17                        DIRECT EXAMINATION

18   BY MS. BERMAN:

19   Q.   Good morning, Ms. Cobb.  Thank you for being here.

20           Do you recall I took deposition in -- for you in your

21   bank.  Do you recall that?

22   A.   I do.

23   Q.   And can you introduce yourself, who you are and how do you

24   know Defendant Kafka?

25   A.   My name is Sheri Cobb.  I work for SunTrust Bank, and

 1   Mr. Kafka comes into the bank.

 2          THE COURT:  Ms. Cobb, I'm sorry, but can you move up

 3   your seat a little bit --

 4          THE WITNESS:  Yes, sir.

 5          THE COURT:  -- get a little bit closer to the

 6   microphone and speak a little louder?

 7          THE WITNESS:  Is that better?

 8          THE COURT:  Yes.  Thank you.

 9          THE WITNESS:  Okay.

10   BY MS. BERMAN:

11   Q.   I would like to ask you, for example, if you are a vice

12   president of the bank.

13   A.   Yes, I am.

14   Q.   And now you reside -- transferred to different bank.

15   A.   I am in a different location, yes.

16   Q.   Can I ask you what the reason you transferred from that

17   bank to different location?

18   A.   I was asked to move by management.

19   Q.   Now, how long you were working in that location?

20   A.   I don't understand the question.

21   Q.   How long you were working in SunTrust in Holly Hill

22   location?

23   A.   I was branch manager.

24   Q.   How long?  How long you were working in SunTrust?

25   A.   How long?

1  Q.    Uh-huh.

2  A.    In that office or with the company?

3  Q.    In that office.

4  A.    September of '04.

5  Q.    2004.  Okay.

6          I would like to ask you, how do you know -- for

7  example, if somebody came to your bank and they open a business

8  bank account and they put their name, like, president and vice

9  president, how do you know that those people are usually

10 president or vice president?  Do you check this or not?

11 A.    I do check that.

12 Q.    And where do you check?

13 A.    I use the State of Florida website called sunbiz.

14 Q.    Sunbiz.

15         And so on Exhibit 26, Mr. Kafka opened a bank account

16 for Trifecta Gaming and it says here Tom Kafka and Julie Kafka,

17 and he opened bank account on 5/19/04, correct?

18 A.    Yes.

19 Q.    And you said you checking with the business -- with the

20 sunbiz, but we establish already --

21         MR. SPRINGER:  Objection, Judge.  We're getting into

22 the motion in limine.

23         MS. BERMAN:  No, I --

24         THE COURT:  Ms. Berman, we just -- this is not what

25 you said you were going to ask this witness, so go on to the

1   subject that you told me you were going to ask this witness.

2          MS. BERMAN:  Okay.  I have another question.

3   BY MS. BERMAN:

4   Q.   Can somebody deposit a check which -- for Trifecta Gaming

5   check, the business account Trifecta Gaming, and can somebody

6   deposit on Trifecta Gaming under different name?

7   A.   Can I ask to clarify the question?  You're asking me can

8   someone put --

9   Q.   No.  Can somebody put a check, for example, if it was for

10  different company, Maitland Trifecta, but can they put this

11  check to Trifecta Gaming?

12  A.   They should not deposit a check into an account that

13  doesn't match that same titling.

14         MS. BERMAN:  I would like to see Exhibit 70.

15         THE COURT:  70?

16         MS. BERMAN:  70, yes.

17  BY MS. BERMAN:

18  Q.   As you can see, this was deposit to Trifecta Gaming

19  account in 2007, Maitland Trifecta, when company Maitland

20  Trifecta in 2007 was not existed.

21         How is it possible this is a check deposit in that

22  account?

23  A.   Do you mind if I read this a second?

24  Q.   Yes.  Yes.

25  A.   Thank you.

1           It is endorsed Maitland Trifecta, the way it is

2    payable, and there's an account number on the back.  And I

3    cannot tell you how this is possible other than if it was in a

4    group of checks or if it was an individual check, the teller

5    may not have caught the titling change.

6    Q.   But they not supposed to be deposit check in company which

7    does not exist, correct?

8           MR. SPRINGER:  Objection, relevance, Your Honor.

9           THE COURT:  I'll sustain the objection.

10          Ms. Berman, if you can get to the area of questioning

11   that you told me you were going to ask.

12   BY MS. BERMAN:

13   Q.   Defendant -- Defendant Kafka says that he went to your

14   bank and found out that some kind of problem with checks or

15   something not and up, and he was investigated of Trifecta

16   Gaming embezzling by my husband.

17          Do you recall that he was investigating in your bank?

18   He put you as a witness.

19          MR. SPRINGER:  Objection, foundation.  I'm not sure

20   there's any evidence in this case that Mr. Kafka went to

21   SunTrust and made such an investigation.

22          THE COURT:  All right.  I'll sustain the objection.

23   BY MS. BERMAN:

24   Q.   But do you know me?

25   A.   Do I --

1   Q.    Do you know me or my husband?

2   A.    I only met you this summer.

3   Q.    On -- when I was taking deposition for you, yes?

4   A.    Correct.

5   Q.    And do you know Chris Berman, my husband?

6   A.    I do not.

7   Q.    Okay.  And did the defendant ever said that I -- that my

8   husband or I embezzle money from Trifecta Gaming or Maitland

9   Furniture?

10  A.    I don't know anything about that.

11  Q.    He never told you about this.

12  A.    Who?

13  Q.    Defendant Kafka, did he ever told you that I or my husband

14  embezzle money from Trifecta Gaming or Maitland Furniture?

15         MR. SPRINGER:  Objection, relevance, Your Honor.

16         THE COURT:  I'll allow her to answer it.

17         You can answer, ma'am, if you --

18         THE WITNESS:  I do not know anything about an

19  allegation such as that.  I'm sorry.

20  BY MS. BERMAN:

21  Q.    So it means he never told you about anything like checking

22  if it was investigation about embezzling money.

23  A.    No.

24  Q.    You wasn't aware about this, no?

25  A.    No.

1    Q.   I would like to show you Exhibit 11.

2            THE COURT:  Has this exhibit been admitted?

3            MS. BERMAN:  Yes, it was admitted.

4            THE COURT:  Okay.  Do you have a copy?

5            COURTROOM DEPUTY:  Yes.

6    BY MS. BERMAN:

7    Q.   It says that your name Sheri Cobb.  It's contact

8    information for a credit.

9            Have you -- do you know about this, that he put you

10   on as a business loan credit?  Did he talk about this?

11   A.   No.  We never discussed this.  Not -- not to my

12   recollection.  I'm sorry.

13   Q.   So you never --

14   A.   It's the first time I've ever seen this document.

15   Q.   Did he told you that, "Can I, like, ask a question?  Can I

16   put you as a contact information for the -- for my company

17   Trifecta Gaming or Maitland Furniture?"

18   A.   I, in the past, have been a credit -- the bank has been a

19   credit reference, and as the point of contact for the bank,

20   those probably would have come through me, yes.

21   Q.   But you agree with me as a bank manager, would you know if

22   some kind of investigation was going about embezzlement?  Would

23   you already know about this?

24   A.   I would not.

25           MR. SPRINGER:  Objection, relevance, Your Honor, and

1  vague.  I don't know what she's referring to.

2          THE COURT:  I'll let the witness answer.  She was --

3          THE WITNESS:  I would not have known unless the

4  client told me or the bank was notified of such.

5  BY MS. BERMAN:

6  Q.   So bank was not notify about investigation?

7  A.   Not to my knowledge.

8  Q.   By my -- by defendant.  He investigated my husband

9  embezzle money.

10 A.   Not to my knowledge.  I'd never heard that before.

11 Q.   Okay.  And you never heard that the defendant was saying

12 that I embezzle money, was investigation about me have --

13 defendant claims that he went to your bank and check and

14 something wrong was with the -- with his account, and he found

15 out that my husband embezzling money.

16          But did you know about this information or not?

17          MR. SPRINGER:  Objection, predicate, foundation.

18          THE COURT:  Sustained.

19 BY MS. BERMAN:

20 Q.   This exhibit was written as your contact information in

21 7/16/08.

22          Defendant claims that he transferred his company to

23 Wisconsin in 2006 or 2007.  He doesn't remember.  But on this

24 exhibit it says Trifecta Gaming, 6 Shadow Creek Way in 2008,

25 but he said he transferred company to Wisconsin.

1          Were you aware that company -- you have a loan with

2    the company.  Were you aware that company was transferred to a

3    different state?

4          MR. SPRINGER:  Objection, Judge.  It's --

5          THE COURT:  Sustained.

6    BY MS. BERMAN:

7    Q.   Okay.  Another question.  As a bank manager, do you give,

8    like -- if you have a credit with defendant, yes, is he

9    supposed to tell you that he move company to different state

10   when he took a credit, yes or no?

11         MR. SPRINGER:  Objection, Your Honor --

12         THE COURT:  Sustained.

13         MS. BERMAN:  Okay.

14         THE COURT:  All right.  You can cross-examine

15   Ms. Cobb.

16         MR. SPRINGER:  No questions, Your Honor.

17         THE COURT:  All right.  Thank you, Ms. Cobb.  Thank

18   you for your testimony today.

19         MS. BERMAN:  Thank you.

20         THE COURT:  You may step down.

21         MS. BERMAN:  Thank you.

22         THE COURT:  Okay.  Ms. Berman, call your next

23   witness.

24         MS. BERMAN:  Oh, my next witness is my husband, Chris

25   Berman.

```
 1              THE COURT:  All right.

 2              COURTROOM DEPUTY:  Please raise your right hand.

 3              Do you solemnly swear or affirm the answers you will

 4   give during these proceedings will be the truth, the whole

 5   truth, and nothing but the truth?

 6              THE WITNESS:  Yes, I do.

 7              COURTROOM DEPUTY:  And please state your name for the

 8   record.

 9              THE WITNESS:  Oh, Chris Berman.

10              COURTROOM DEPUTY:  Thank you.

11         CHRISTOPHER BERMAN, PLAINTIFF'S WITNESS, SWORN

12                      DIRECT EXAMINATION

13   BY MS. BERMAN:

14   Q.   Can you introduce yourself and how you know me?

15   A.   Sure.  My name's Chris Berman, and I am fortunate enough

16   to be my wife's husband.

17   Q.   I understand that you have a car accident and you speaking

18   a little bit difficult.  We have just two minutes -- two hours,

19   so try to as much answer my question as you can because --

20   A.   I will.

21   Q.   -- of time here.

22   A.   I will.

23   Q.   Do you ever embezzle money?

24   A.   No.  What I will say is that, you know, I know -- I've

25   seen those allegations.  There was -- there's -- there's no
```

1  finding of that in the unemployment appeals proceeding.  There

2  was no finding of fraud.  There was no charges filed against

3  me.  There was no legal action against me for that --

4          MR. JONES:  Objection, Your Honor.

5          THE WITNESS:  -- so absolutely not.

6          MR. JONES:  I'm sorry, Mr. Berman.  I need to get an

7  objection on the record.

8          Objection.  It's nonresponsive, it's narrative, and

9  other matters beyond the scope of the question.

10          THE COURT:  All right.  I'll sustain the objection.

11  BY MS. BERMAN:

12  Q.  Can you tell me about me?  Have I ever embezzle money or

13  not?

14  A.  The only thing you stole was my heart.  You are the most

15  honest person I --

16          MR. JONES:  Objection, Your Honor.

17          THE COURT:  Mr. Berman, you need to answer the

18  question, all right?

19          THE WITNESS:  No.  You've never -- you've never taken

20  anything.

21  BY MS. BERMAN:

22  Q.  Okay.  I would like to ask you questions.

23          Were you employee of Trifecta Gaming?

24  A.  No.  I was an owner, and according to the S corporation,

25  I'm still an owner.

1   Q.   Were you employee in Maitland Furniture?

2   A.   Yes.

3   Q.   Since when?

4   A.   Since 2006.

5   Q.   You weren't employee in 2005?

6   A.   No.

7   Q.   The unemployment appeal for which company was?

8   A.   Maitland Furniture.

9   Q.   Not Trifecta Gaming?

10  A.   No.

11  Q.   Did you ever give away your rights, as if you decided not

12  to work for Trifecta Gaming?

13  A.   Could you repeat the question?

14  Q.   Did you ever give away your rights that you decided not to

15  work for Trifecta Gaming but work for Maitland Furniture?

16  A.   Did I -- did I surrender my ownership or my --

17  Q.   Yes.

18  A.   -- stockholder --

19  Q.   Yes.

20  A.   No.

21  Q.   How did you -- how did you meet Defendant Kafka?

22  A.   I was -- had worked up some designs for the products that

23  I had developed.  I had been in this industry, worked in this

24  industry, since 1995.  I'd had products built in Canada before.

25  I had an association with another manufacturer for a while.

1          And I had a project coming up.  I was looking for a

2   production shop that met certain requirements, that used

3   certain types of materials, and that could manufacture the

4   products using mostly automated equipment because that's how

5   you would keep the costs down and make it profitable.

6          And that was in -- that was in late April or early

7   May of 2004.

8   Q.   I already show the SunTrust Bank account.

9          Can you see from here?

10  A.   Yeah, I see that.

11  Q.   Um --

12  A.   I see that, yes, and I saw that.

13  Q.   Did you know about Defendant Kafka open a business account

14  in May 2004?

15  A.   Absolutely not.  In May of 2004 we were still just in the

16  discussion stages.  At that point I was considering Mr. Kafka's

17  company as a subcontractor.  There was no Trifecta Gaming in

18  2004 -- USA.

19          MR. JONES:  Objection.  It's getting to an in limine

20  matter.

21          THE COURT:  And what's the --

22          MR. JONES:  It's starting to touch onto a prior

23  ruling.

24          MS. BERMAN:  What's --

25          THE COURT:  What exhibit are we on?

 1          MS. BERMAN:  26.

 2          THE COURT:  Is that the one you just showed him?

 3  BY MS. BERMAN:

 4  Q.   So you were not aware the business bank account was

 5  opened?

 6  A.   Absolutely not.

 7  Q.   Let's talk about your termination letter.  You was working

 8  for Maitland Furniture but was an owner for Trifecta Gaming; is

 9  that correct?

10  A.   That is correct.

11  Q.   You never give up rights?

12  A.   No.

13  Q.   Tell me, what were you doing for Maitland Furniture?

14  A.   For Maitland Furniture -- it was primarily to satisfy the

15  requirements of insurance.  It was for doing some production

16  work.

17          But mostly it was for being on-site at construction

18  sites, on-site at development sites where a certificate of

19  insurance would have to be presented that who's ever there has

20  liability insurance, Workers' Compensation, etc., etc.

21          It also involved working in subcontractors' shops,

22  helping to produce product to get them out and to get them to

23  the sites.

24          MR. JONES:  (Standing.)

25  BY MS. BERMAN:

 1   Q.    Did you work --

 2              THE COURT:  Hold on, Ms. Berman.

 3              MR. JONES:  I'm sorry.  May we approach the bench

 4   just very quickly?

 5              THE COURT:  All right.

 6        (At sidebar, out of the hearing of the jury:)

 7              MR. JONES:  Sorry, Judge.  I didn't see this coming.

 8              This man is mentioning liability insurance on behalf

 9   of Tom Kafka, which is absolutely prejudicial to my client.

10   It's not -- it's not a very far leap for them to conclude that

11   he's got insurance in this case that's covering him for this

12   lawsuit.

13              Liability insurance is the death knell to a case,

14   Judge, when it's --

15              THE COURT:  No.  I agree.  I didn't -- you're not to

16   get into any matters that he's got insurance for this case.

17              Do you understand that?

18              MS. BERMAN:  We not talking about insurance.

19              THE COURT:  He's talking about insurance.

20              MS. BERMAN:  No, no, no.

21              MR. JONES:  He just said that the reason why he

22   worked for Maitland Furniture was because he was required to

23   show certificates of insurance to third parties --

24              MS. BERMAN:  That's what it was.

25              MR. JONES:  -- which would show that he was carrying

 1  liability insurance that covered him on behalf of Maitland

 2  Furniture.

 3          THE COURT:  Well, I mean, I think it's a little bit

 4  of a stretch at this point, but do not get into any matters of

 5  insurance -- that has anything to do with insurance.  It's got

 6  nothing to do with this case, okay?

 7          MS. BERMAN:  I'm not talking about insurance.

 8          THE COURT:  Well, don't ask him anything about it.

 9          MR. JONES:  You know, while we're up here, Judge,

10  there's a series of in limine rulings.  I'm just hoping that

11  this witness has been advised of those.

12          THE COURT:  Have you advised your witness of the in

13  limine rulings?

14          MS. BERMAN:  I was preparing and didn't want to say

15  anything you're not supposed to, but I didn't even prepare my

16  husband or speak about this because --

17          THE COURT:  No.  Before the trial did you tell your

18  husband about the rulings?  Did he read the order that I wrote

19  on the evidence rulings?

20          MS. BERMAN:  I -- I -- I can't remember.  I hope so.

21  Maybe he knows.  I don't remember.

22          THE COURT:  Well, let's get Mr. -- come up here for a

23  second.

24      (Mr. Berman approached the bench.)

25          THE WITNESS:  Yes, Your Honor.

 1          THE COURT:  Keep your voice down, okay?  The jury's
 2  not supposed to hear this.
 3          Are you aware of the rulings I made on evidence in
 4  this case and what can come into evidence and what cannot?
 5          THE WITNESS:  No, I'm not.
 6          THE COURT:  You haven't talked to your wife about
 7  that?  She hasn't advised you --
 8          THE WITNESS:  No.
 9          THE COURT:  -- of that?
10          THE WITNESS:  Uh-uh.  She's been --
11          THE COURT:  Well, I told her --
12          THE WITNESS:  She didn't --
13          THE COURT:  Okay.  No.  She's supposed to tell you
14  that.
15          THE WITNESS:  Okay.
16          THE COURT:  Okay.  They're supposed to tell you
17  about -- lawyers and pro se parties are supposed to inform
18  their witnesses about rulings on evidence.
19          THE WITNESS:  Okay.
20          THE COURT:  Okay.  One thing you're not to discuss at
21  all is insurance --
22          THE WITNESS:  Right.
23          THE COURT:  -- okay?  Don't say anything else about
24  insurance.
25          THE WITNESS:  Okay.  Well, I mean, it was Workers'

1   Compensation.  Without having a Workers' Compensation policy,

2   you're not going to be allowed onto a construction site.

3           THE COURT:  That's irrelevant, okay?  That's

4   irrelevant to this.

5           THE WITNESS:  Well, it was the reason why my company,

6   Trifecta Gaming -- because owners don't carry Workers'

7   Compensation, so you can't go onto a site without a certificate

8   of insurance.  They'll throw you off the job site.

9           THE COURT:  Okay.  There's no reason to mention

10  that --

11          THE WITNESS:  Okay.

12          THE COURT:  -- all right, so don't mention that.

13          Just answer the question directly.  If I get the

14  feeling that improper evidence is coming in, I'm going to stop

15  the testimony, and I'll decide what to do then, including

16  possibly having to call a mistrial.

17          MR. JONES:  I have the order, Your Honor, if he wants

18  to read it.

19          THE COURT:  Well, I'm not going to do that at this

20  point.

21          You're aware of the order, the motion in limine.  If

22  improper evidence starts coming in, you risk a mistrial, and

23  that's sad.  That's all I can tell you.

24          So if you happen to get a verdict in this case, I

25  could still grant a mistrial after the trial and wipe

1   everything out, so you're warned.

2           Do you understand that, Mr. Berman?

3           THE WITNESS:  Yes.

4           THE COURT:  Do you understand, Ms. Berman?

5           MS. BERMAN:  Yes.

6           THE COURT:  All right.

7       (End of discussion at sidebar.)

8   BY MS. BERMAN:

9   Q.   Let's talk about just before the termination letter.

10          Do you recall what was -- I would like to show you

11  Exhibit 37.

12  A.   Yes.  Yes, I do.

13  Q.   Here.

14  A.   Uh-huh.  Sure.  I was in the middle --

15  Q.   Can you --

16  A.   Sure.  I was in the middle --

17          THE COURT:  No.  No.  You didn't -- there's no

18  question pending.

19          THE WITNESS:  Okay.

20          THE COURT:  She asked if you recognize the exhibit.

21  You said --

22          THE WITNESS:  Yes --

23          THE COURT:  -- yes.

24          THE WITNESS:  Yes, I do.  I --

25          THE COURT:  Okay.  Well, then, wait for a question --

1          THE WITNESS:  Okay.  Sure.

2          THE COURT:  -- okay, Mr. Berman?

3    BY MS. BERMAN:

4    Q.   And what date it was here in once --

5    A.   This is -- I can see it says January 8th, 2009.

6    Q.   Okay.  What it says?

7    A.   I was -- let's see.  It was an e-mail from Mr. Kafka.  It

8    says, "I did not hear from The Meadows.  Do you want me to give

9    them a call?  Let me know."

10          And I responded to him, "Yeah, I think that would

11   be" -- I think that would be in order to do.

12   Q.   And do you see a date 1/7/2009?

13   A.   Yes, I do.  I see the date on 1/7/2009.  That's when this

14   e-mail was sent to me.

15   Q.   That was just before the day of your termination; is it

16   correct?

17   A.   Yes.  Yes, that is correct.

18   Q.   Do you recall this e-mail, Exhibit 36?

19   A.   Yes.

20   Q.   Can you tell me, what is that e-mail all about?

21   A.   This is an e-mail from Mr. Kafka, who asked me for all the

22   updates on all of my accounts.  I consider this looting.

23   Q.   So you give him all accounts information, is it correct,

24   in this e-mail?

25   A.   Basically -- basically I turned over probably 8-,

1   $900,000 to the Kafkas.

2   Q.   Is Trifecta Gaming a very profitable company?

3   A.   Oh, it was very profitable.  If I built a -- if a product

4   was built for $200, it was sold for $400 or $425.

5   Q.   Do you recall being -- working with Paul Thompson in

6   St. Augustine?

7   A.   Sure.  I certainly do recall working with Paul Thompson.

8   Q.   Do you recall which year was it?

9   A.   Yeah.  I started working with Paul Thompson in late

10  November of 2005.

11  Q.   And Defendant Kafka was working the --

12  A.   He came up to the shop too.

13  Q.   So you were working as a worker, yes?

14  A.   Yes.  Yes.

15  Q.   But making products for Trifecta Gaming.

16  A.   Well, it was making prod- -- it was making -- yes, it was

17  making --

18  Q.   From Maitland Furniture, I mean.

19  A.   Yes.  Maitland Furniture would manufacture the product.

20  Trifecta Gaming would --

21  Q.   How much --

22  A.   -- sell it.

23  Q.   -- money Trifecta Gaming receive?

24  A.   On that project?

25  Q.   Yes.

 1   A.    It was 700 -- roughly between 700- and $800,000.

 2   Q.    How much profit, though, did --

 3               MR. JONES:  Predicate, Judge.

 4               THE WITNESS:  How much profit --

 5               MR. JONES:  He doesn't know anything about the

 6   accounting.

 7               THE WITNESS:  Pardon me.  I --

 8               THE COURT:  Hold on.  Hold on.

 9               I'll allow him to answer it.

10   BY MS. BERMAN:

11   Q.    How much profit would be from that account?

12   A.    It would -- out of a $700,000 account, approximately

13   anywheres from 220- to $250,000 would have been the profit on

14   the project.

15   Q.    And you share it with Mr. Kafka, yes?

16   A.    It was supposed to be 50/50.

17   Q.    Yes.  And did you receive this money?

18   A.    I did not.

19   Q.    What happened to that money?

20   A.    I was told it was -- most of it was used --

21               MR. JONES:  Relevance --

22               THE COURT:  I'll allow it.

23               MR. JONES:  -- and hearsay.

24               THE COURT:  I'll allow it.

25               THE WITNESS:  It was -- hold on a second.

1          I had -- I had priced it.  I had calculated.  I had

2     calculated the profit, so I knew exactly what the profit was.

3     I knew the labor costs.  I knew the material costs.  It was my

4     company.  I should know that, okay?

5          I was told that most of it was used up in cost

6     overruns.

7     BY MS. BERMAN:

8     Q.   Told by whom?

9     A.   I was told by Mr. Kafka that most of that was used up

10    by -- in cost overruns, and it seemed particularly difficult to

11    believe at the time that that much profit was used up in cost

12    overruns.  I could see maybe $15,000 could have been lost in

13    cost overruns but not that much.

14    Q.   But you believe him and still was working with him; is

15    correct?

16    A.   Well, actually, at the end of 2005 I had decided I was

17    going to cut my ties and establish a working relationship with

18    another production shop, people that I had actually met down on

19    that particular job site that -- on that project.

20    Q.   Why you didn't go?

21    A.   I had gone down.  I had met with the individuals.  I

22    believe you came down with me that day.

23    Q.   Do you recall which year was it?

24    A.   Yes.  It was sometime in late 2005 or early 2006.  It was

25    in Boca Raton, Florida.

1    Q.    What happened after?

2    A.    I had gotten a call from -- I was kind of on the fence

3    about it, and I was also talking to another entity that was in

4    Longwood, Florida, about cutting ties with Mr. Kafka and

5    setting that up.

6            And I believe it was sometime around January 6th --

7    January 6th I got a call from Mr. Kafka who said, "Come down to

8    the shop.  I have a proposal for you."  He said, "I know that

9    you've been -- you know, you've been unhappy about this.  I

10   have a proposal.  I think we can make this right."

11   Q.    Did you receive any money for 2004 and 2005, profits from

12   the company when -- for the ownership of your company?

13           Did you have a lot of -- how many projects you did

14   for 2004 and '5?

15   A.    Well, 2004 was probably maybe half a dozen projects.

16   2005, I would say eight to ten, but most of 2005, the income

17   from 2005, was from the one big project in South Florida.

18   Q.    How much money did company make in 2005?

19   A.    Well, if you added in that project, I would have to say it

20   would be close to $900,000.

21   Q.    It's the profit, yes?

22   A.    Pardon me?

23   Q.    900, it's the profit?

24   A.    Yes.  Yes -- no.  No.  900,000 would have been general

25   sales.  Profits should have been 400- to 425,000.

1  Q.   So in 2005, how much you have to receive?

2  A.   I should have received something --

3           MR. JONES:  Your Honor, objection.

4           THE COURT:  Yeah.  I'm going to -- does this have

5  anything to do with these two checks that were written on

6  November 24, 2006, and May 10, 2007?  Yes or no?

7           MS. BERMAN:  Because --

8           THE COURT:  No.  Yes or no?

9           MS. BERMAN:  Yes.

10          THE COURT:  All right.  Let me see you at sidebar.

11     (At sidebar, out of the hearing of the jury:)

12          THE COURT:  What does this have to do with those two

13 checks?

14          MS. BERMAN:  With how much money he receive actually

15 and how -- how profitable, why that company was transferring.

16          THE COURT:  And what does that have to do with these

17 two checks that were supposedly embezzled?  That's why we're

18 here.

19          MS. BERMAN:  Okay.

20          THE COURT:  So don't tell me it has something to do

21 with it when it doesn't.

22          MS. BERMAN:  Okay.

23     (End of discussion at sidebar.)

24          THE COURT:  The objection's sustained.

25 BY MS. BERMAN:

1  Q.   Let's proceed.

2       You file an unemployment appeal for Maitland

3  Furniture.  Is it correct?

4  A.   That is correct, yes.

5  Q.   And it was in 2009?

6  A.   Yes.  It was around -- sometime -- January 17th, I

7  believe, 2009.

8  Q.   And what happened next?

9  A.   What happened next?  I -- I had gotten a call from an

10 individual named Benjamin at the unemployment division because

11 at that time I was -- it was like I was all of a sudden out of

12 anything.  So I said, you know, "Gee, I better get some

13 unemployment money and then see if I can reorganize and get" --

14 you know, it was a real shock.

15      So, yes, I got a call from an individual named

16 Benjamin at the UAC, and he just called me to confirm

17 something.  He said --

18          MR. JONES:  Objection, hearsay.

19          THE COURT:  Well, I'm going to allow -- if it's

20 proceedings involving Workers' Comp -- or, I'm sorry,

21 unemployment proceedings.

22          THE WITNESS:  Okay.  Benjamin had said that -- he

23 said, "Well, I have an unusual reason for termination from

24 Mr. Kafka.  He said he terminated you for writing a book."

25          And I said, "That is unusual."

1          He says, "But, you know, don't worry.  There's" -- he
2     just wanted to ask me about it.
3          And I said, "Well, that was something I did in my --
4     in my off hours at night, particularly after my injury.  At
5     that time I had to sit up a lot at night."
6     BY MS. BERMAN:
7     Q.   Okay.  Next you receive a termination letter from
8     Mr. Kafka on January 9th.
9          Do you recall this?
10    A.   Yes, that's correct, January 9th.
11    Q.   You recall this?  You remember that, yeah?
12    A.   Yes.  Yes, I do.
13    Q.   From Maitland Furniture.
14    A.   Yes.
15    Q.   And also -- January 8th.  It's not 9th.
16    A.   Yes.  They -- it arrived on the 9th.  It was sent on the
17    8th.
18    Q.   And also for Trifecta Gaming from January 8th.
19    A.   Yes.
20    Q.   And he claiming that you are employee of Trifecta Gaming
21    in January 8th and --
22    A.   And that's a --
23    Q.   -- Maitland Furniture?
24    A.   Maitland Furniture I was an employee.  I was never an
25    employee of Trifecta Gaming.  I was an owner and shareholder.

1   Q.   Okay.  What happened on -- where to go next?

2           I show you exhibits.  Just -- I just want to show you

3   and you know anything about -- if you can see --

4   A.   Yeah.

5   Q.   -- the transfer.

6           THE COURT:  What number is this?

7           MS. BERMAN:  It's Exhibit 73.

8   BY MS. BERMAN:

9   Q.   This exhibit I will show you.

10          Have you seen -- known about this transfer?

11  A.   I found out about those transfers through your case.  I

12  had never seen them before.

13  Q.   Let's talk about, how did you -- your company Trifecta

14  Gaming -- you met Mr. Kafka in -- you said in March --

15  A.   No, May.

16  Q.   In May 2004, yeah?

17  A.   Correct.

18  Q.   Why -- how did you find out about him and how -- what you

19  decide?  Can you explain about this?

20  A.   Well, yeah.  As I said before, I had done an Internet

21  search for somebody with a production shop that used that type

22  of machines and material.  And I simply said, "Hey, I've got

23  some designs.  I would like you to see what it would cost to

24  build these."

25  Q.   Did you agree in May to be a partner with Mr. Kafka?

1  A.   No.

2  Q.   When did you agree?

3  A.   It was sometime in -- sometime around early to mid July.

4  Q.   Did you know that he open a bank account without your

5  knowledge?

6  A.   No, I did not.

7  Q.   Did you have an article incorporation with Mr. Kafka?

8  A.   I did, yes.

9  Q.   You sign in when?

10 A.   I signed it sometime -- obviously sometime before the 15th

11 of July.

12 Q.   You don't recall the date?

13 A.   I do not.  I just recall it was extremely hot that day.

14 Q.   Do you recall that it was signed on July 12th?

15 A.   No.  It couldn't have been signed on July 12th.

16 Q.   Why not?

17      MR. JONES:  Objection, Your Honor.  This is directly

18 getting into a prior ruling.

19      THE COURT:  Sustained.

20 BY MS. BERMAN:

21 Q.   Do you have a copy of the article incorporation?

22 A.   No, I did not.

23 Q.   Why not?

24 A.   Mr. Kafka told me his copier printer was not working that

25 day.

1  Q.    And then what happened?

2  A.    He said he would send the paperwork up to his accountant

3  in Pennsylvania.

4  Q.    And you trusted him about that?

5  A.    Yeah.   I didn't see any reason not to trust him.

6  Q.    Okay.   Let's talk about -- do you recall the hearing on

7  May 27, 2009, unemployment hearing?

8  A.    Yes, it -- yes, I do.

9  Q.    Where that hearing was; do you recall?

10 A.    It was a telephone hearing.   I was rather surprised about

11 the whole thing because initially I had gotten a letter that

12 said there was no misconduct, no reason not to receive

13 benefits.

14 Q.    What -- was I present on that hearing?

15 A.    You were not.

16 Q.    Can you recall if he ever said that I embezzle money in

17 that hearing?

18 A.    I don't recall ever hearing him say that.

19 Q.    Did he introduce any checks with my signature in that

20 hearing?

21 A.    Not that I can recall.

22 Q.    He didn't introduce any checks?

23 A.    I don't believe so, no.

24 Q.    Okay.   In 2005 -- so do you recall what he introduce you

25 package A --

1   A.    May I see --

2   Q.    -- 2005?

3   A.    Yeah, can I see that?

4         Yep, I see that.

5   Q.    Why is that for 2005?

6   A.    Well, I wouldn't know why somebody -- if you haven't been

7   an employee of a company until 2006, why you would introduce

8   checks that had to do with my own personal company and my own

9   personal business in 2005.

10  Q.    Can you clarify me on Exhibit 58D, because defendant says

11  it was invoice but it's actually a proposal.

12        Can you explain to me what proposal is?

13  A.    Sure.  A proposal is something that you make before you

14  sell a -- sell a project.  You propose a price, etc.  A

15  proposal is not an invoice.

16  Q.    So it means if you propose, can be price higher than later

17  or not?

18  A.    Oh, absolutely.  If you make your initial proposal, say,

19  in June and there is a price increase in materials or labor or

20  shipping that happens before, say, August, well, you're not

21  going to be able to sell them the product at the same price you

22  proposed them in June now in August.  You have to say, "Well,

23  it's gone up a little bit, so the price is higher."

24  Q.    Have ever Mr. Kafka said to you that price changing?

25  A.    Oh, all the time.  There's -- laminate suppliers have to

 1  be changed.  Certain materials are not in stock.  Something

 2  needs to be shipped in and they're charging additional money

 3  for it.

 4  Q.    Okay.  So about this unemployment hearing --

 5  A.    Yes.

 6  Q.    -- do you recall that it was -- your phone was

 7  disconnected, you said, yes?

 8  A.    The phone was disconnected.  There was a lightning strike,

 9  and it took out the phone lines.

10  Q.    And unemployment hearing was in -- what date was it?

11  A.    Hmm?

12  Q.    On May 27th, 2009?

13  A.    Yes, May 27th, 2009.

14  Q.    And decision was in his favor on what date; do you recall?

15  A.    The initial decision, yes, it was in his favor, but the

16  reason it happened was because the telephone had been cut off.

17  I found out later, by listening to a transcript, that Mr. Kafka

18  kept going on with all sorts of allegations without my being

19  able to do a summation or rebuttal or present my evidence, that

20  what he was talking about was Trifecta Gaming, not Maitland

21  Furniture.

22        Trifecta Gaming was my company, and I never -- never

23  did anything with Maitland Furniture that would have caused any

24  issues to have arisen.

25  Q.    Do you recall next when they vacated the decision?  Do you

1   recall this?

2   A.    Yes.  They vacated the decision --

3   Q.    I already showed that one.

4   A.    Yes.  They vacated the decision in October of 2009.  That

5   is correct.

6   Q.    Okay.  And then it was dismissed without prejudice, and

7   Mr. Kafka wasn't able to attend, yes?

8   A.    Yes.

9   Q.    Let's talk about the next decision.

10          THE COURT:  What number, Ms. Berman?

11          MS. BERMAN:  It's 56.

12  BY MS. BERMAN:

13  Q.    Can you read in yellow what it says?

14  A.    Yes.  It says here, "Appeal is dismissed without

15  prejudice.  The appellant may request that the appeal be

16  reopened and another hearing scheduled after resolution of the

17  trademark case when ready to proceed with this hearing provided

18  the request is submitted in writing to the appeals referee by

19  September 9th, 2010.  No further action will be taken unless

20  the request for reopening is submitted."

21          And this was dated March 9th, 2010.

22  Q.    Did they reopen -- did Defendant Kafka reopen the

23  decision?

24  A.    No, he never did.

25  Q.    I know defendant wants to introduce exhibit that some kind

1  of trademark was in question about trademark, and that's why

2  there's some kind of order they want to introduce.  I don't

3  know how is it working, but can you look at our 56A, please?

4  A.    (Complies.)

5  Q.    Can you --

6  A.    Okay.  This is -- this -- I know what this is about.  This

7  happened that -- it was actually I who inadvertently -- there

8  was some confusion.

9          They thought I was requesting the hearing to be

10 reopened.  I never requested the hearing to be opened --

11 reopened, so they -- they -- they basically went back to the

12 original decision of March, which said that the -- everything

13 was vacated.

14         And then this is dated August 20th, 2010, and, again,

15 it gave -- it gave Mr. Kafka the opportunity to ask for a

16 second hearing or open another appeal or whatever.

17 Q.    Can you read what it says here?

18 A.    Okay.  "The decision of the appeals referee dated March

19 9th, 2010, is reinstated.  The appeal and determination dated

20 February 18th, 2009, is dismissed without prejudice until

21 September 9th, 2010."

22 Q.    Can you read important rights?

23 A.    Important rights.  The decision will become final unless a

24 request for review or opening is filed within 20 calendar days

25 after the mailing date shown.  If the 20th day is Saturday,

1   Sunday, or a holiday defined by the FAC, 60 BD 6-0 -- 6.004

2   filing may be made the next day.  I can't really read that in

3   there, Saturday or Sunday or a holiday.

4         If the decision disqualifies and/or holds claimant

5   ineligible  --

6   Q.   That's enough.

7   A.   Okay.

8   Q.   Just --

9   A.   Right.

10  Q.   It says 20 days.

11  A.   20 days, correct.

12  Q.   Okay.  Okay.  Let's talk now about this libel, libel

13  letter what Mr. Kafka sended.

14  A.   Okay.

15  Q.   This letter, did you receive benefits from unemployment?

16  A.   Yes.  I received all back -- I received all the benefits,

17  back-benefits, etc., once the decision was final.

18  Q.   I don't have extra copy.  I will show here August 10th,

19  and read it.

20         THE COURT:  What exhibit?

21         MS. BERMAN:  It's Exhibit 58.

22         "We were shocked to find out that Chris Berman

23  received unemployment payment when we receive our quarterly --

24  quarterly notice of benefits paid statement.  We would like to

25  appeal this ruling and prove that Chris Berman does not deserve

1  unemployment because he embezzle money and also present new

2  evidence to prove he was working at the time.

3        "We kindly ask this case be renewed and the request

4  for appeal be granted."

5  BY MS. BERMAN:

6  Q.   Do you see Thomas Kafka, president, Maitland Furniture?

7  A.   Yes.  Yes, I do.

8  Q.   And do you see he send it to his attorney Vukelja and

9  Jarett de Paula?

10  A.   Yes.  Yes, I do.

11  Q.   Was attorney in unemployment present?

12  A.   Not that I know of.

13  Q.   Okay.  Now I would like to show this letter, 59.  That's

14  where he libel me and you.

15  A.   Yes.  I see that.  Actually, I've seen it a few times

16  because I received it.

17  Q.   It says, "I ask kindly not to lose sight of the fact that

18  you initially ruled in our favor and that we proved that Chris

19  Berman and his wife embezzle money from our company."

20        Do you see how he signed Tom Kafka, President,

21  Maitland Furniture?

22  A.   Yes.  Yes, I do.

23  Q.   Not Trifecta Gaming.

24  A.   No.

25  Q.   And do you see that he said "not to lose sight of the fact

1    that you initially ruled in our favor."  He said "fact that you

2    initially ruled in our favor."  "We proved."

3    A.    Uh-huh.

4    Q.    Did he prove that I embezzle money?

5    A.    Absolutely not.  If there was any proof of that --

6             MR. JONES:  Objection.

7    A.    -- they would have --

8             THE COURT:  Hold on.

9    A.    -- found in his favor.

10            THE COURT:  Hold on, Mr. Berman.

11            THE WITNESS:  Oh, sorry.

12            MR. JONES:  It's calling for an ultimate conclusion

13   at law.

14            MS. BERMAN:  But --

15            THE COURT:  What are you answering based on?

16            THE WITNESS:  I was --

17            THE COURT:  Have you reviewed the transcript of this

18   hearing?

19            THE WITNESS:  I had received that letter, and I know

20   that the unemployment appeal was -- the original unemployment

21   appeal he's talking about in there was vacated, and the case

22   was closed --

23            THE COURT:  Well, wait a minute.

24            THE WITNESS:  -- a year earlier.

25            THE COURT:  Mr. Berman, wait a minute.

 1              She's asking about at that original hearing.  You're

 2    saying you were cut off on the telephone, correct?

 3              THE WITNESS:  That is correct.

 4              THE COURT:  Okay.  So did you get a copy of the rest

 5    of the transcript?

 6              THE WITNESS:  Yes, I did.

 7              THE COURT:  And you read the transcript?

 8              THE WITNESS:  I did.

 9              THE COURT:  And then --

10              MS. BERMAN:  And --

11              THE COURT:  Wait a minute.

12              And so are your basing your answer on your reading of

13    the transcript?

14              THE WITNESS:  No.  I'm basing my answer on the

15    decision of the Unemployment Appeals Commission that they

16    vacated the hearing.  They voided the decision in favor of

17    Mr. Kafka, which he apparently never bothers to mention in

18    here, that the decision was vacated and voided, and it --

19    he's -- when --

20              THE COURT:  All right.  All right.  You've answered

21    the question.

22              Go ahead.  Proceed.

23              MS. BERMAN:  No.  I want to clarify.

24    BY MS. BERMAN:

25    Q.   Your Honor ask you about did you receive a transcript.

1              What did you receive?

2   A.    I received a CD.

3   Q.    But not an actual transcript.

4   A.    Not a physical transcript.  I received a CD.

5   Q.    Okay.  And you can see that that was -- if I -- if you

6   look carefully, it was on -- what day it was, 8/16/2011?

7   A.    8/16/2011, that is correct.

8   Q.    So it was on 8/16/2011, then there was an unemployment

9   appeal on August 22nd, 2011, then it was sent to somebody here.

10             THE COURT:  What exhibit are you looking at?

11             MS. BERMAN:  It's so many --

12             THE COURT:  Ms. Berman, what number?

13             MS. BERMAN:  No. 59 of this letter.

14             THE COURT:  Okay.

15  BY MS. BERMAN:

16  Q.    Then it was faxed to somebody here, then faxed here.  It's

17  like so many faxes on this e-mail.

18             Do you see it?

19  A.    Yes.  It -- it would appear it went to a lot of different

20  individuals.

21  Q.    Now, Exhibit -- Exhibit 59B, this is the same letter to

22  Bellflower but in different month already.

23  A.    Yes.

24  Q.    And it says, "I ask kindly not to lose sight of the fact

25  that you initially rule in our favor and that we proved that

1   Chris Berman and his wife embezzle money from our company."

2   A.   I see that.

3   Q.   And, "Thank you, Tom Kafka, president of Maitland

4   Furniture."

5   A.   Yes.  I see that.

6   Q.   Okay.  Now another exhibit, 59C.

7   A.   Uh-huh.  I see that.

8   Q.   It -- you can see it doesn't have any -- it's -- what I

9   found out, it's from my complaint when I -- when you receive

10  this.

11  A.   Yes, I have received that.

12  Q.   There is no -- and to whom he sent, it doesn't say

13  anything.  There is no saying it's from Maitland Furniture.

14  It's from where, I don't know.  It's Tom Kafka.

15          And let's read from here, what did he say.

16  A.   We -- he was --

17  Q.   Oh, I'm sorry.  No.  No.  I give you.

18  A.   Okay.

19  Q.   Here.

20  A.   Okay.  It says here:  "He was terminated on 1/9/09," which

21  was actually 1/8/09, "for embezzling money.  Part of the money

22  was embezzled by his wife."

23          And at that point, if -- if he was close I would have

24  done him real physical damage.

25          MR. JONES:  Objection.  This is improper testimony.

1           THE COURT:  That -- I agree.

2           MR. JONES:  It's beyond the scope of the question.

3           THE COURT:  The jury will be instructed to disregard

4   that comment.

5   BY MS. BERMAN:

6   Q.   Can you see people contacted -- contact Edmund Zaho and

7   contacted Patel?

8   A.   Yes, I see that.

9   Q.   Do you know those people?

10  A.   Yes, I do.

11  Q.   What do you know about them?

12  A.   Well, I was trying to set up work.  I was trying to set up

13  some projects to work with Mr. Zaho and Xpress Yourself

14  Publishing, Jessica Tilles.

15          She was my publisher for the book that Mr. Kafka

16  accused me of writing, which apparently was a true statement

17  because I wrote it and got it published.

18  Q.   What about contact Edmund Zaho?  Were you work for Edmund

19  Zaho?

20  A.   I was not employed by Edmund Zaho, no.

21  Q.   But, I mean, was you planning to be employed with --

22  A.   I was planning on working on a number of projects with

23  him.

24  Q.   But what happened?

25  A.   Something happened, and I believe that something must have

1    been the interference of Mr. Kafka.

2    Q.    What about your publisher, Xpress Yourself Publishing?

3    A.    Yeah.  Apparently -- apparently sometime right after the

4    time this was sent, she canceled my publishing contract.

5              MR. JONES:  Relevance, Your Honor.

6              THE COURT:  Sustained.

7    BY MS. BERMAN:

8    Q.    Okay.  And he's saying here -- he was -- I would like you

9    read this exhibit completely.

10   A.    Sure.

11   Q.    Whole.  All this letter.

12   A.    Okay.  This whole exhibit.

13   Q.    Yes.

14   A.    Okay.  "In September or October of 2008, Chris Berman

15   received $100,000 from a personal injury lawsuit."

16             Well, it was actually not $100,000 --

17             THE COURT:  Well, Mr. Berman, read the letter.

18             THE WITNESS:  Okay.

19             "We paid Chris Berman for a year and a half for doing

20   almost nothing," which wasn't true.

21             "We" --

22             THE COURT:  Mr. Berman --

23             THE WITNESS:  Yes.  Yes, Your Honor.  I'm sorry.

24             THE COURT:  Well, wait a minute.  Look at me.

25             MS. BERMAN:  Will you just read --

1          THE COURT:  Hold on.

2          Can you just read this letter?

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  Do you understand this instruction?

5          THE WITNESS:  Yes.  Okay.

6          "We paid Chris Berman for a year and a half of doing

7   almost nothing.  We were waiting for him to get better.  We

8   found out later he was writing novels during this time.

9          "After Chris Berman received the $100,000 settlement,

10  he claimed the accident was work related and claimed I told him

11  not to report it to Workers' Comp.  In March of 2009 Chris

12  Berman received $24,000 in a Workers' Compensation settlement

13  for the same injury.

14         "We paid Chris Berman $52,000 in 2008 and another

15  $2,000 two weeks later in 2009.  He was terminated on 1/9/09

16  for embezzling money.  Part of the money was embezzled by his

17  wife.

18         "Chris Berman worked for Maitland Furniture of

19  Orlan-" -- sorry, "Advanced Millwork of Orlando from sometime

20  from February of 2009 till sometime November of 2009.  He

21  received money from Xpress Yourself Publishing in 2009, '10,

22  and '11.  In addition, he received unemployment.

23         "Chris Berman also has several companies.  Chris

24  Berman shows -- if Chris Berman shows for his deposition, we'll

25  get more information.  We will send it to you.

1              August 10 of -- "In August of 2010 Chris Berman

2    filled out indigent forms for pro se -- pro se lawsuits against

3    us."

4    BY MS. BERMAN:

5    Q.   Can you explaining what is -- what kind of pro se was a

6    lawsuit against us he's talking about in this letter?

7    A.    Yeah.

8              MR. JONES:  Objection.

9              THE COURT:  Sustained.

10             THE WITNESS:  I sued him for fraud.

11             THE COURT:  Sustained.

12             MR. JONES:  Objection.  Your Honor --

13             MS. BERMAN:  Your Honor, it's in this letter.  The

14   jury have right to hear --

15             THE COURT:  This case is about you, Ms. Berman.  It's

16   not about your husband.  The objection's been sustained.

17             If you want to ask him the part of the letter that

18   has to do with you, you can.

19             MS. BERMAN:  Did you --

20             MR. JONES:  I'm sorry, Judge.

21             THE COURT:  Hold on.

22             What's your --

23             MR. JONES:  Because of this -- blurting out this

24   answer from this witness after the objection was sustained,

25   I've got to ask for a cure.

1          THE COURT:  All right.  The jury will disregard that

2    last statement from Mr. Berman, all right?  You're not to

3    consider it.

4    BY MS. BERMAN:

5    Q.   Let's talk about this.

6          Did you receive $2,000 in 2009?

7    A.   No, I did not.

8          THE COURT:  Let me just stop you for a minute.

9          And, Mr. Berman, I already instructed you that you're

10   to answer the question, and you're not to blurt out things that

11   you want to say.

12         THE WITNESS:  Yes, Your Honor.

13   BY MS. BERMAN:

14   Q.   Did you receive $2,000 in 2009?

15   A.   No.

16   Q.   Did you receive money he claim from Xpress Yourself

17   Publishing in 2009?

18   A.   No.

19   Q.   Were you published -- when did she turn over your rights

20   from publishing company?

21   A.   2010.

22   Q.   And 2011 you weren't with Xpress Yourself Publishing.

23   A.   I was not.

24   Q.   But he claims that you already have money in 2011 --

25   A.   Yes.

1   Q.   -- on this.

2   A.   That's simply not true.

3   Q.   Okay.  Next exhibit, he claim that you receive money in

4   2009 from Xpress Yourself Publishing.

5   A.   That is true.

6   Q.   This is from your publisher.

7   A.   It is.

8             THE COURT:  What exhibit?

9             Ms. Berman, it would go quicker if you tell me what

10  exhibits.  I don't have to keep asking you.

11            MS. BERMAN:  It's 61.  It's 61.

12  BY MS. BERMAN:

13  Q.   For April 24, 2009.  You can read.

14  A.   Yes.  It says, "Please accept this letter as confirmation

15  of the following regarding your publishing agreement with

16  Xpress Yourself" --

17            THE COURT:  Hold on.  This exhibit has not been

18  admitted into evidence from what I can tell.

19            MS. BERMAN:  No.  It was.

20            THE COURT:  Was it, 61?

21            MS. BERMAN:  Yes, it was.

22            THE COURT:  I'm asking --

23            COURTROOM DEPUTY:  Yes.

24            THE COURT:  It was?  All right.

25            Go ahead.  Go ahead.  You can continue to read.

1          THE WITNESS:  Okay.  "Author did not receive

2   financial advance for *The Hive*.  Author received industry

3   standard royalty percentage based on net sales.  Author has not

4   received royalty payments.

5          "Please let me know if you have any questions or you

6   require additional information.  Warm regards, Jessica Tilles,

7   publisher."

8   BY MS. BERMAN:

9   Q.   That's 2009 when he claims that you received benefits.

10  A.   Yes.

11  Q.   Do you consider if that letter states so many incorrection

12  that it's a truthful letter?

13  A.   No.

14  Q.   Now another one.  It's another letter.  He admitted in

15  deposition that he retyped this letter, Exhibit 59A.

16         Again, the same letter to -- I ask for -- it's the

17  same letter.  Again, I asked -- he -- let's --

18  A.   Yes.  I see.

19  Q.   Let's careful look in this letter.

20  A.   Okay.

21  Q.   It is from?  Can you see it?

22  A.   Yes.  It says from Maitland Kafka to Maitland Kafka,

23  August 23, 2013.

24  Q.   Okay.  And read it.

25  A.   Dear -- from dear Mr. Kafka?

1   Q.    Yeah.

2   A.    "Dear Mr. Kafka, good morning.  I wanted to acknowledge

3   the receipt of your e-mail.  I have also notified our benefit

4   control department/unit concerning your fraud claim.

5           "Please let me know if -- please let me know of any

6   questions and I will anticipate your transmission of

7   information to me."

8   Q.    And written James -- Jamie Bellflower?

9   A.    Jamie Bellflower, yes.

10  Q.    How is it possible from Maitland Kafka to Maitland Kafka

11  and say there Mr. Kafka?

12  A.    Right.

13  Q.    How is it possible to write down this?

14          MR. JONES:  Predicate, Judge.

15          THE COURT:  Sustained.

16  BY MS. BERMAN:

17  Q.    If you turn -- if you turn on second page, you can see

18  that James Bellflower, when he send the letter to Mr. Kafka, he

19  usually puts it here James Bellflower and all of this stuff,

20  but he does not put Jamie Bellflower --

21          MR. JONES:  Same objection.

22  Q.    -- from unemployment.

23          THE WITNESS:  I see that.

24          THE COURT:  There's no question.  I don't know what

25  the question is.

1  BY MS. BERMAN:

2  Q.   Exhibit 46A.

3  A.   I see this too, yes.

4  Q.   It's sent to Ms. Connell, I think.  It says, "I am writing

5  to give update.  Our attorney decided to have Chris Berman" --

6  can you read it?

7  A.   Yes.  Yes.  Sure.  "I'm writing to give you an update.

8  Our attorney decided to have Chris Berman come to a deposition

9  instead of subpoenaing information from his publisher and

10 former employer.

11      "The deposition was scheduled to take place on August

12 26, 2011.  Mr. Berman did not show up.  The Court has now

13 compelled Chris Berman to attend the next deposition which will

14 be scheduled in the near future.

15      "We would like very much to send you the information

16 we have gathered so far.  If Chris Berman attends the

17 deposition, we will send you that information."

18 Q.   But unemployment appeal was resolved and the attorney --

19 it says our attorney.

20 A.   Uh-huh.

21 Q.   What does it mean, our attorney?

22      MR. JONES:  Calls for speculation.

23      THE COURT:  Sustained.

24 BY MS. BERMAN:

25 Q.   Now, this next one.  "We are currently asking for an

1    affidavit from one of Chris Berman's former employers, and our

2    attorney is subpoenaing information from publisher of his first

3    two novels."

4           THE COURT:  Wait a minute.  Is this exhibit in

5    evidence?

6           MS. BERMAN:  Yes.

7           THE COURT:  This is 46A?

8           MS. BERMAN:  Yes.  This is one --

9           THE COURT:  Hold on.  Hold on.  Hold on, Ms. Berman.

10   I'm waiting for the defendant to look.

11          Do you have an objection to this exhibit?

12          MR. SPRINGER:  We had an objection to it, Your Honor.

13   I don't have that it was admitted into evidence.

14          COURTROOM DEPUTY:  It was not.

15          THE COURT:  All right.  This exhibit has not been

16   admitted into evidence.

17          MS. BERMAN:  We agree on this exhibit.

18          THE COURT:  It has not been, Ms. Berman, so do not

19   show it to the jury.

20          And the jury should disregard anything pertaining to

21   that exhibit.

22          MS. BERMAN:  Okay.  Exhibit 46 was permitted,

23   correct?  It's the same, the same letter.

24          THE WITNESS:  Okay.

25   BY MS. BERMAN:

1  Q.  Read it.

2  A.  Well, it's the same that I read --

3  Q.  "We are currently asking" --

4  A.  Yeah.  "We are currently asking for an affidavit from one

5  of Chris Berman's former employers, and our attorney is

6  subpoenaing information from the publisher of his first two

7  novels.  We will also be sending you information on businesses

8  owned by Chris Berman and/or his wife."

9  Q.  And it says, "Tom Kafka, Maitland Furniture."

10  A.  Yeah, that's correct.

11  Q.  Were you -- were I employed by one of the many companies

12  of defendant?

13  A.  From his -- from his Maitland Furniture, yes.

14  Q.  Or Trifecta Gaming or wherever is that?

15  A.  Not from Trifecta Gaming.  I'm a --

16  Q.  Then why he was asking information about me in the --

17  A.  I have no idea why he was --

18        MR. JONES:  Objection.

19        THE COURT:  Sustained.

20  BY MS. BERMAN:

21  Q.  Another Exhibit 25B.  It was on 10/17/11.

22  A.  Yes.

23  Q.  It says, "The claimant is unemployed."

24  A.  Uh-huh.

25  Q.  It was an investigation, and they didn't find that you

1    were employed.

2    A.   That's correct.

3    Q.   So this letter was sent to your former employer.

4         Were you working for anybody else after defendant?

5    A.   No.

6    Q.   And they didn't find that you were working.  It was -- he

7    was claiming for benefits fraud.  Is it correct?

8    A.   Yes.  He had put in a claim for benefits fraud.  They did

9    an investigation.  They found that the claim was groundless.

10   Q.   So can you read -- can you read here?  10/17/11 --

11   A.   Can I have a copy?

12   Q.   (Tenders document.)

13   A.   Yeah.  "10/17/11.  This determination will be final unless

14   an appeal is filed within 20 calendar days after the mailing

15   date shown above."

16   Q.   Yes.  And it says Maitland?

17   A.   Yes.  It says -- well, actually at this point it says

18   Maitland Trifecta.

19   Q.   Were you working for Maitland Trifecta?

20   A.   No.

21   Q.   Were you working just for Maitland Furniture?

22   A.   Yes, that's correct.

23   Q.   And Mr. Kafka rename from Maitland Furniture to Maitland

24   Trifecta after you were working?

25   A.   That is correct.

 1   Q.   So he change from Maitland Furniture already to Maitland

 2   Trifecta, but you never worked for Maitland Trifecta.

 3   A.   I did not.

 4   Q.   And address was both names and sent to an address

 5   Pittsburgh.

 6   A.   If that's what's on here, yeah.

 7   Q.   Is it mean that he's claiming that he never receive any

 8   letters because address was to his accountant?

 9           MR. JONES:  Objection, Your Honor, calls for

10   speculation.

11           THE COURT:  Sustained.

12   BY MS. BERMAN:

13   Q.   Then Exhibit 64A --

14   A.   Uh-huh.

15   Q.   -- can you see?

16   A.   Yes, I see that.

17           MS. BERMAN:  The jury can see?

18       (Affirmative response.)

19           THE WITNESS:  I see that as well, yes.

20   BY MS. BERMAN:

21   Q.   Can you read what it says in this -- from unemployment

22   appeal and which date was it?

23   A.   Let's see.  This is dated September 16th, 2011.  "The

24   decision of the appeals referee was not unfavorable to the

25   employer.  Consequently there's no basis for the employer to

1    invoke the jurisdiction of the commission.  It appears this

2    case was docketed through error, and therefore it is dismissed.

3          "It appears the employer was attempting to request a

4    reopening of the March 9, 2010, dismissal without prejudice,

5    the decision issued in the referee docket number 2009-170950U.

6    The request has not been ruled on by the appeals referee."

7    Q.    What does it end with?

8    A.    "The employer's appeal has been forwarded to the Office of

9    Appeals for a hearing before the appeals referee."

10   Q.    Okay.  And it was dated September 16th, 2011.

11   A.    That's correct.

12   Q.    And libelous letter was in August 16th, 2011.

13   A.    Correct.

14   Q.    And the second one, we don't even know the date.  It

15   didn't say.

16   A.    No.

17   Q.    Let's read this, September 16, 2011.

18              THE COURT:  What exhibit number?

19              MS. BERMAN:  It's Exhibit 64.

20              THE WITNESS:  May I have a copy?

21              MS. BERMAN:  Yes.  Yes.

22              Can jury see this?

23        (Affirmative response.)

24              THE WITNESS:  Thank you.  Okay.

25              Would you like me to read that or --

 1   BY MS. BERMAN:

 2   Q.   Yeah.  It says, "Enclosed is a copy" --

 3   A.   Yeah.  Sure.  "Enclosed is a copy of the order of the

 4   Unemployment Appeals Commission.  This order will become final

 5   unless appealed to a district court of appeal within 30

 6   calendar days of the order is filed.

 7             "Judicial review is an appellate review process

 8   similar to that conducted by the commission and does not

 9   involve another hearing, trial, or taking of evidence.

10   Judicial review is commenced by filing one copy of notice of

11   appeal with the clerk of the commission at the above address

12   and a second copy, with filing fees prescribed by law, with the

13   appropriate district court of appeal.

14             "A notice of appeal should be submitted by mail,

15   courier service, or by hand delivery.  Court rules do not

16   authorize the filing of a judicial appeal by fax, through the

17   AWI, or the commission's Internet filing system or by e-mail.

18             "A notice of appeal is filed on the date" -- let's

19   see.  "A notice of appeal is filed on the date received by the

20   commission or the Court.  You should reference the UAC order

21   number, not Social Security number, on the notice of appeal

22   filed.

23             "The time to appeal this order to the court is not

24   tolled or extended by any determination, the decision, or the

25   order."

1          It was sent to Maitland Furniture, attention Tom

2   Kafka, Pittsburgh, Pennsylvania, mailed on September 16th,

3   2011.

4   Q.   That means that defendant didn't have any quasi-judicial

5   or judicial proceeding because it says that they don't have --

6   this order will become final unless appeal to district court --

7   appeal within 30 days.

8          Did defendant appeal after September 16, 2011?

9          MR. JONES:  Objection, Your Honor.

10         THE WITNESS:  I never got any --

11         THE COURT:  Hold on.  Hold on, Mr. Berman.

12         THE WITNESS:  All right.

13         MR. JONES:  I think she's asking for an

14  interpretation of this administrative document by this lay

15  witness.

16         THE COURT:  Well, she's just asking if, to his

17  knowledge, he appealed so I'll let him answer that.

18         THE WITNESS:  Well, if Mr. Kafka appealed, according

19  to this document, I would have received a copy of it.

20  BY MS. BERMAN:

21  Q.   So he didn't appeal?

22  A.   I never received a copy of it.

23  Q.   And you received full benefits?

24  A.   I received my full benefits, yes.

25  Q.   Does unemployment appeal give benefits when they found

 1   some kind of misconduct or not?

 2   A.   They do not.  They will not give benefits if they --

 3   Q.   And does unemployment appeal give you benefits for -- if

 4   you are not employed on a company?

 5   A.   No.  You can only file for unemployment if you're employed

 6   by a company.

 7   Q.   But if you are not employee, you cannot file unemployment

 8   appeal.  Is it correct?

 9   A.   That is correct.

10        THE COURT:  I'm going to -- let's take a break at

11   this point.  Let's see.  It's ten till 12:00.  I'm going to ask

12   the jury to come back at 1 o'clock.

13        MS. BERMAN:  And I still --

14        THE COURT:  I'll let you continue.

15        Okay.  You may be excused.

16        COURT SECURITY OFFICER:  All rise.

17     (Jury out at 11:48 a.m.)

18        COURT SECURITY OFFICER:  Please be seated.

19        THE COURT:  All right.  Mr. Berman, you need to come

20   back at 1 o'clock as well.  You're still under the rule -- hold

21   on a second -- meaning you're not to discuss the case with

22   anyone.

23        MR. JONES:  Including -- including Ms. Berman.

24        THE COURT:  Including Ms. Berman --

25        THE WITNESS:  Yes, Your Honor.

1          THE COURT:  -- okay, because you're under examination

2     right now.

3          All right.  You can be dismissed.  I need to speak

4     with the attorneys and your wife.

5       (The witness left the courtroom.)

6          THE COURT:  All right.  So, Ms. Berman, you've used

7     an hour with your husband, actually a little bit over.  I'll

8     give you another hour.  I don't know why you'd need that much

9     time, but anyway, that's the amount of time I'll give you to

10    conclude your examination of your husband.

11         MS. BERMAN:  But I would like to introduce those

12    checks if I can examine them.  Can I -- those checks the

13    defendant have, I need to ask questions on those checks.

14         THE COURT:  Well, we've already been through your

15    exhibits, and we've already been -- you already proffered all

16    your exhibits yesterday, so no, I'm not going to go back over

17    your exhibits again.

18         MS. BERMAN:  But how I will ask him if -- I need to

19    ask him about whose writing or whose signature.

20         MR. SPRINGER:  I believe she's speaking of the checks

21    at issue that are actually in evidence, Your Honor.

22         THE COURT:  Okay.  So these are already in evidence.

23         MR. SPRINGER:  Right.

24         MR. JONES:  Defendant's 14.

25         MS. BERMAN:  But -- but I -- isn't my checks in

 1  evidence too?

 2          THE COURT:  What number?

 3          MS. BERMAN:  84.  I would like ask this about

 4  Mr. Berman, 84 and 84A, those checks.

 5          COURTROOM DEPUTY:  They weren't admitted yet.

 6          THE COURT:  Do you have objections to those?  Are

 7  they just duplicative?

 8          MR. SPRINGER:  It's the same as our 14A and B.

 9          THE COURT:  All right.  I'll -- I don't know what the

10  reason is to admit it from both sides, but I'll let you admit

11  it as well.

12          So 84A and B?

13          MR. JONES:  May I see the original, Your Honor?

14          MS. BERMAN:  84?

15          MR. JONES:  Yes.

16          THE COURT:  All right.  So what are the exhibit

17  numbers?

18          MS. BERMAN:  84 and 84A.

19          THE COURT:  84 and 84A.  All right.  Those will be

20  admitted.

21      (Plaintiff's Exhibits 84 and 84A were received in

22  evidence.)

23          THE COURT:  Have the parties had an opportunity to

24  look at the jury instructions?

25          MR. JONES:  Yes --

1          MR. SPRINGER:  Yes, Your Honor.

2          MR. JONES:  -- we have.

3          THE COURT:  And do you have any objection to them?

4   Let me ask the defendant first.

5          MR. SPRINGER:  I only noted one issue, Your Honor,

6   that -- let me find the page for you here -- regarding the

7   defense of opinion.

8          THE COURT:  Which -- hold on a second.  What page or

9   what instruction?

10          MR. SPRINGER:  It is page 11, instruction 9.

11          THE COURT:  All right.  Which part of that?

12          MR. SPRINGER:  Paragraph 2 which starts, "If the

13   preponderance of the evidence supports the defense that the

14   statements were either substantially true" --

15          COURT REPORTER:  Sorry.  I can't hear you.

16          MR. SPRINGER:  Sorry.

17          THE COURT:  You can stay seated if you'd like.

18          MR. SPRINGER:  ". . . statements of fact or were

19   statements of opinion based upon true facts adequately

20   disclosed in the publication at issue or assumed to exist by a

21   party exposed to the communication."

22          My issue would be with "or assumed to exist by a

23   party exposed to the communication."  I agree with that.

24   However, I believe that -- and I have some cases here -- case

25   law shows that it's also if the reader has access to the

1   information, the facts outside the document itself, if that

2   makes sense.

3           THE COURT:  All right.  What case -- do you have

4   copies of those cases?

5           MR. SPRINGER:  I do, Your Honor.

6           May I approach?

7           THE COURT:  Yes.

8           For the record, what cases are those?

9           MR. SPRINGER:  It's case 907 So. --

10          THE COURT:  Just the case name.

11          MR. SPRINGER:  Okay.  *Scott versus Busch*, B-u-s-c-h.

12          THE COURT:  All right.  Is that all?

13          MR. SPRINGER:  It's the only one I brought, yes, sir.

14          THE COURT:  All right.  And what part of the -- this

15  opinion are you looking at?  Is there a quote or something in

16  here?

17          MR. SPRINGER:  There is.  I'm sorry, Your Honor.  I

18  was planning on doing this for the judgment as a matter of law

19  portion.

20          THE COURT:  All right.  Well, we can look at -- we'll

21  take a look at that.  I just want to get a sense of if there's

22  any problems with the jury instructions at this point, so we'll

23  take a look at that.

24          That was the only issue you had?

25          MR. SPRINGER:  That's all I saw, yes, sir.

1          THE COURT:  All right.  Ms. Berman, did you have any

2    issues with the jury instructions?

3          MS. BERMAN:  Your Honor, I didn't have a chance to

4    look through, didn't have time.

5          THE COURT:  All right.  Well, at some point I'm going

6    to do them, and you should have done it last night.  That was

7    the purpose of giving you those instructions.

8          So we're not ready to do it yet, but I'm going to

9    tell you right now, when the Court's ready to do it, I'm not

10   going to have as an excuse that you didn't have time to look at

11   them.  So you need to figure out when you're going to look at

12   them.

13         All right.  So I told the jury to be back at 1:00, so

14   the parties need to be back at 1:00 also.

15         Is there anything -- so once she's done and you're

16   done with your cross-examination of Mr. Berman, then I'll allow

17   you to put Ms. Connell on the stand.

18         So is there anything further to take up right now?

19         MR. SPRINGER:  No, Your Honor.

20         THE COURT:  Ms. Berman?

21         MS. BERMAN:  Can I introduce from -- where it says

22   2006, I don't have this check.

23         THE COURT:  I don't know what you're talking about.

24   Are you trying to introduce another exhibit?

25         MS. BERMAN:  That one what Mr. Springer introduce

1    from Valley Hudson Bank, which they said they don't have any

2    records for 2006 check.

3           MR. SPRINGER:  Your Honor, the issue isn't relevant

4    anyways.  What happened was we subpoenaed the records from the

5    bank.  They sent us one of the checks from '07.  The '06 check

6    they didn't have.

7           The letter said the retention policy, they didn't --

8    in other words, it was destroyed already.  That's what she

9    wants to introduce, the letter that the check was destroyed by

10   the bank because it was past the year limitation they retain

11   those documents.

12          MS. BERMAN:  But, Your Honor, it's not identified

13   properly.  How do you know if it's from bank or what is that?

14   It's not original or copy from the bank.

15          THE COURT:  All right.  I'm going to -- if there is

16   an objection, I'm going to sustain the objection.

17          Is there anything further?

18          MS. BERMAN:  No.

19          THE COURT:  All right.  Court will be in recess.

20          COURT SECURITY OFFICER:  All rise.

21      (Recess from 11:57 a.m. until 1:05 p.m.; all parties

22   present.)

23      (Outside the presence of the jury:)

24          COURT SECURITY OFFICER:  All rise.  This Honorable

25   Court is now in session.

 1             Please be seated.

 2             THE COURT:  All right.  You want to call back

 3    Mr. Berman?

 4        (The witness entered the courtroom.)

 5             THE COURT:  All right.  Mr. Sowards, you can bring

 6    the jury in.

 7             COURT SECURITY OFFICER:  Okay.

 8             Mr. Berman, you can have a seat.  You're still under

 9    oath.  We're going to bring the jury in.

10             COURT SECURITY OFFICER:  All rise for the jury.

11        (Jury in at 1:07 p.m.)

12             COURT SECURITY OFFICER:  Please be seated.

13             THE COURT:  Ms. Berman, you may proceed with your

14    questioning.

15    BY MS. BERMAN:

16    Q.   I would like to come back to Exhibit 59C.  I already show

17    the jury, but it says that you receive Workers' Compensation.

18    Is it correct?

19    A.   That is correct, yes.

20    Q.   For which company?

21    A.   Maitland Furniture.

22    Q.   Why did you receive Workers' Compensation?

23    A.   I was -- I was injured.  I was struck by a car picking up

24    samples for -- to deliver to a project.

25    Q.   And that was work related.

1           But is it 100,000, you receive?  Is it -- yes or no?

2    A.   Oh, no.

3    Q.   In packet D, it says there that you deposit more than need

4    in the company.

5           Is it considered embezzlement?

6    A.   Well, no.  Typically I think embezzlement is taking money

7    out, not putting more in.

8    Q.   Can you explain to me what does it mean proposal and

9    invoice?

10   A.   Sure.  I went over that a little while ago, but a proposal

11   is just a proposal.  It's your price to do a project.  Whether

12   a customer says yes or no to that is up to the customer.

13          Once they say yes and the project's completed, well,

14   then you send an invoice.

15   Q.   So the price can be changed, yes or no?

16   A.   Yes.

17   Q.   For Trifecta Gaming, did you receive checks or the

18   defendant was receiving checks?

19   A.   I believe all checks came through me.

20   Q.   Why?

21   A.   Well, because that was the -- that was the address of the

22   location.  It was on all the purchase agreements, and with

23   purchasing people at various sites, they sent the checks to me.

24   I deposited them.

25   Q.   You deposit where?

1   A.   I would deposit them in SunTrust Bank.

2   Q.   But you don't recall what the number of the account, no?

3   A.   I do not, and I do not recall the number of checks.  There

4   were, you know, over a hundred.

5   Q.   But were you aware that defendant opened business checking

6   account in May?

7   A.   No.  No, I wasn't.

8   Q.   When did you start to put check -- checks in business

9   account?

10       Did you -- I'm sorry.  Did you -- when you receiving

11   check, you always put in business for Trifecta Gaming.  It's

12   correct?

13   A.   Yeah, that's right.

14   Q.   Have you ever, like -- when you receiving check, maybe one

15   or two times have you ever give to defendant?

16   A.   Yeah, on occasion.  If I had something that came in and he

17   would say, oh -- you know, we -- we were going to meet about

18   something, I would say, "I will just drive them down to you."

19   Q.   So he deposit.

20   A.   Yes, he would deposit them.

21   Q.   Have you ever receive checks for Maitland Furniture

22   customers?

23   A.   I -- I have never received a check made out to Maitland

24   Furniture, no.

25   Q.   No.

1           But on Exhibit 70 it says in 2007 Maitland Trifecta,

2    Inc.

3    A.    Yeah.  I see that.

4    Q.    This corporation existed in 2007, Maitland Trifecta, Inc.?

5    A.    No.  There was no such company.

6    Q.    Did you receive this check?

7    A.    Yes.

8    Q.    You recall this?

9    A.    I do, yes.  I recall this because it was so odd.

10   Q.    Why?

11   A.    Well, I mean, there was no company called Maitland

12   Trifecta.

13   Q.    What did you do?

14   A.    Well, I called Mr. Kafka and I said, "You know, I got this

15   oddball check that says Maitland Trifecta.  What am I supposed

16   to do with it?"

17   Q.    And --

18   A.    He said --

19   Q.    -- what --

20   A.    He said to me, "If you have any problem depositing it,

21   just contact Sheri Cobb or call me."

22   Q.    Did you deposit this check?

23   A.    Looks like I did.  This is the -- this would be the

24   account on it, so --

25   Q.    Looks like?

1              Do you see a signature on this check?

2    A.    No.  No.  It hasn't been signed.

3    Q.    Did you deposit or not?

4    A.    As far as I -- as far as I know, either I deposited it or

5    maybe Mr. Kafka deposited it.  I'm not entirely sure, but there

6    was an issue because, I mean, this is not the -- this is not

7    the name of the company on the bank account.

8    Q.    So how you handle this issue?

9    A.    I don't exactly recall, but I do remember if -- you know,

10   Mr. Kafka said if there was an issue that came up, you know,

11   just contact him.  He would take care of it with his -- his --

12   with his banker contact.

13   Q.    So they accept this check, yes?

14   A.    Yeah.  I would assume so.  I mean, usually with something

15   like this, you would have to ask the company to write a new

16   check.

17   Q.    Why did you apply for a trademark application?

18   A.    Why did I apply for trademark?

19   Q.    Yes.

20              MR. JONES:  Objection, Your Honor, relevance.

21              THE COURT:  Well, the one exhibit's in.  I'll let it

22   go a little bit.

23              THE WITNESS:  I applied for the -- may I answer, Your

24   Honor?

25              THE COURT:  Yes.

1           THE WITNESS:  Okay.  I applied for trademark

2    protection because Trifecta Gaming was my company.  I began the

3    company in April of 2001.  I came up with the name.  I came up

4    with the catch phrase that went with it.  I came up with the

5    logo, and I was not going to let Mr. Kafka steal my company.

6    BY MS. BERMAN:

7    Q.    What your company before was called?

8    A.    It was called Trifecta Gaming Products.

9    Q.    Why did you change to Trifecta Gaming USA?

10   A.    Mr. Kafka, when we were talking initially about

11   incorporating, he said -- he said, "Well, let's give it" --

12   let's call it Trifecta Gaming USA.  Let's give it, like, a USA

13   sort of plug because, you know, we're making our products in

14   the United States."

15           A lot of the stuff I had done before was made in

16   Canada.

17   Q.    So that was his idea about Trifecta Gaming USA, yes?

18   A.    Excuse me?

19   Q.    Was it Defendant Kafka idea about Trifecta Gaming USA?

20   A.    About using the USA, yes, that is correct.

21   Q.    So do you recall if company in -- Maitland Furniture in

22   2006 or '7 have a problem?

23   A.    I believe Mr. Kafka said that they were running into

24   issues.  I think in 2006 they were losing their TV stand

25   business.

1  Q.   When exactly?  Before you were employee or after?

2  A.   No, it was after.

3  Q.   After.

4  A.   After.

5  Q.   And what you decided to do?

6  A.   Well, I mean, the idea was that, you know, one door opens,

7  another -- one door closes, another opens.  We -- he was the --

8  Maitland Furniture was the subcontractor -- was, rather, the

9  production shop for the products that I was designing for

10 Trifecta Gaming.

11 Q.   So did he move to Wisconsin?

12 A.   Yes, he did.

13 Q.   Why?  What did he tell you about that?

14 A.   Well, he said that he owned another company in Wisconsin

15 that he called the northern plant --

16 Q.   So --

17 A.   -- and --

18 Q.   -- when you were working on Maitland Furniture, you

19 thought that he has a company.

20 A.   Yeah, a company that he called the northern plant, yes.

21 Q.   When do --

22 A.   Actually, that kind of impressed me because, wow, he's got

23 two locations.

24 Q.   And when did you find out that this company did not belong

25 to him?

1   A.    I believe sometime in 2008.

2   Q.    When exactly, beginning, middle, or the end?

3   A.    I can't recall exactly, but I finally found out it was

4   actually a company owned by his uncle or cousin or something.

5   Q.    So do you recall when you were injured on the job?

6   A.    I do, yes.  It was --

7   Q.    Which year?

8   A.    It was in late 2006.  Maybe it was in November.

9   Q.    So every -- after that when you were injured, did you work

10  for him or --

11  A.    For Mr. Kafka?

12  Q.    Yes, for --

13  A.    Yeah.

14  Q.    -- Maitland Furniture.

15  A.    Yeah.  I still continued to work even though I had two

16  fractured vertebrae.

17  Q.    How about your Trifecta Gaming?

18  A.    Yeah, I worked with my Trifecta Gaming.  I kept designing

19  products and soliciting new accounts.

20  Q.    Can you explain when you were working, how you would work?

21  Trifecta Gaming is not -- can you explain difference in

22  Trifecta Gaming and Maitland Furniture?

23  A.    Sure.  They're two separate companies.  Trifecta Gaming

24  was involved with design and -- design of product and sale of

25  product.  Maitland Furniture is involved with production of

1  those designs, production of products.

2          At one point prior to that, I worked with a company

3  out of Canada called Group La Cass.  I would design the

4  product.  I would solicit the people to sell it to, and then I

5  would send those designs up to Canada, and Group La Cass would

6  manufacture those.  And it's essentially the same thing.

7  Q.   Did you give away rights in December 26, 2005, rights of

8  ownership for your company?

9  A.   I did not.

10  Q.   But why you decided to become employee of Maitland

11  Furniture?

12  A.   Well, as I had said before, it was to facilitate certain

13  requirements about going on-site.  It was to take care of

14  certain requirements for -- well, I -- basically going on-site

15  and doing production work, etc., etc.

16  Q.   Mr. Kafka said that in industry that people didn't want to

17  work for -- work with Trifecta Gaming because it's a new

18  company but just with Maitland Furniture.

19          Can you explain if it's true or not?

20  A.   Sure.  Maitland Furniture had no reputation and no

21  credibility within the industry I worked in.  Trifecta Gaming,

22  I'd been working closely with myself and Mr. Lou Faraone since

23  2- -- April of 2001.

24          And prior to that when I was working with -- working

25  with having the products built out of Canada, I actually had

1  been working in that industry or that field since 1995.

2          So everybody knew me, and everybody knew the company,

3  etc.  Nobody knew, you know, Mr. Kafka or his company.

4  Q.   You said Lou Faraone.

5          Can you explain who is Lou Faraone?

6  A.   Lou Faraone -- Lou Faraone used to be -- actually used to

7  be one of my customers.  Lou Faraone was the manager of a small

8  casino and racetrack up in Delaware.

9          And then Lou went -- when he retired from that, he

10  became president of Seats, Etc.  They were a seating company

11  that, you know, sold seats.  And Lou and I would work together.

12  We would share accounts, and we would share information, and a

13  couple of times we actually worked jointly on projects

14  together.

15         And he was quite knowledge- -- he had a lot of

16  contacts in the industry too because he'd been in it for, I

17  guess, like, 25, 30 years.

18  Q.   And was Lou Faraone working or owner or employee of either

19  company Trifecta Gaming or Maitland Furniture?

20  A.   Oh, no.  No.

21         MS. BERMAN:  I would like to introduce Exhibit 27.

22         THE WITNESS:  Uh-huh.

23  BY MS. BERMAN:

24  Q.   Can you see the name Lou Faraone on Trifecta Gaming?

25  A.   Yes, I do.

1   Q.   And what it says?

2   A.   It says vice president, seating division.

3   Q.   Look at Julie Kafka, which supposed to be vice president.

4   What is she here?

5   A.   It says secretary/treasurer.

6   Q.   And there is two of them.

7        And Julie Kafka another one?

8   A.   And she's also a warranty division.

9   Q.   Is it -- it's two different people or is just one?

10  A.   Well, I would have to assume it's just one.

11  Q.   And it was in -- this from website 2/4/2009, yes?

12  A.   That is correct.

13  Q.   Can you explain how Lou Faraone -- why is it after you

14  were fired why he's vice president on this?  Can you explain?

15        MR. JONES:  Calls for speculation.

16        THE WITNESS:  Well, actually it doesn't.

17        THE COURT:  Hold on.

18        THE WITNESS:  It's personal knowledge.

19        THE COURT:  Hold on.  Hold on.

20        I'll allow the witness to answer.

21        THE WITNESS:  Okay.  Lou Faraone had no idea he had

22  been put on as vice president of seating.  He was quite upset

23  about it and he said so, and --

24        MR. JONES:  It's hearsay, Your Honor.

25        MS. BERMAN:  Your Honor, I have an exhibit which they

1    deny, a letter, certified letter, from Lou Faraone, and it was

2    admitting to unemployment when he was saying about that

3    Trifecta Gaming belongs to my husband, and he was saying he was

4    upset when he found out that he was --

5            MR. JONES:  Your Honor, she's discussing an exhibit

6    that's not in evidence.

7            MS. BERMAN:  But --

8            THE COURT:  Well, what exhibit are you trying to --

9            MS. BERMAN:  That exhibit was --

10           THE COURT:  Hold on.  Let's just take a sidebar.

11       (At sidebar, out of the hearing of the jury:)

12           THE COURT:  So what's -- what's the relevancy of

13   this?

14           MS. BERMAN:  He said that Trifecta Gaming, his wife

15   is vice president, but it's completely different person on this

16   website.

17           Lou Faraone never was working for -- as a vice

18   president.  And that letter from unemployment, he explained

19   that real owner of Trifecta Gaming is my husband, and that

20   letter was certified, and it was in unemployment appeal.

21           THE COURT:  Has that been --

22           MR. SPRINGER:  I can help with this, Your Honor.

23   There was a letter that she tried to introduce from this Lou

24   Faraone that was excluded because of hearsay.  It was making

25   all kinds of accusations in the letter, and it's not even in

 1   evidence.

 2            MS. BERMAN:  It was certified on the --

 3            THE COURT:  All right.  But the letter's been

 4   excluded from evidence, so, no, you're not to get into this.  I

 5   already ruled the letter was not in evidence.

 6            MS. BERMAN:  Okay.

 7       (End of discussion at sidebar.)

 8   BY MS. BERMAN:

 9   Q.   Do you know how many employee was at Maitland Furniture in

10   2006?

11   A.   How many people were employed?

12   Q.   Yes.

13   A.   I don't have an exact count.  I know that Lora Katsavrias

14   was one of them and a fellow named Jason.

15   Q.   What about 2007?

16   A.   I wouldn't know in 2007 because that's when Mr. Kafka went

17   to Wisconsin.

18   Q.   So it was closed completely or just part?

19   A.   No.  The whole thing was closed.

20   Q.   Not part of Maitland Furniture.

21            But you thought that he relocated in Wisconsin, and

22   so what were you doing for Maitland Furniture when he relocated

23   in Wisconsin?

24   A.   Well, I was --

25   Q.   Were you working still like --

1  A.    I was still --

2  Q.    -- as a worker?

3  A.    Yeah.  I was still going to job sites.  You know, I had to

4  do a safety check and put on a hard hat and walk around and

5  say, "No, no, that goes there, and electrical goes here and

6  those" --

7  Q.    Were you working as a worker on the projects?

8  A.    Yes.  Sometimes I would have to assemble --

9  Q.    Assemble?

10  A.    Assemble the product, yes, on site.

11  Q.    Okay.  And so were you owner of Trifecta Gaming?

12  A.    Yes.

13  Q.    And you never give away your rights.

14  A.    Absolutely not.

15  Q.    I would like to show Exhibit 73, which jury already saw

16  with how much money he was transferred.

17          Did you know about this?

18  A.    I did not know about this until you started your action

19  against Mr. Kafka, and this was produced I believe by

20  Mr. Kafka's attorney as part of your discovery request.

21  Q.    I calculated it's about 257,000.

22          Were you aware that he was transferring from Trifecta

23  Gaming to Maitland Furniture?

24  A.    What, a quarter of a million dollars?  No, I was not.

25  Q.    So he transferred without your knowledge.

1    A.    Yes, he did.  I have -- I have no idea what this money was

2    used for.

3    Q.    Okay.  Let's talk about ownership of your company.

4          You said you met Mr. Kafka in -- when did you say?

5    A.    It was in sometime late April, early May of 2004.

6    Q.    And did you wanted to become right away --

7    A.    Incorporated?

8    Q.    -- have a corporation?

9    A.    No, not immediately.

10   Q.    When did you decide it?

11   A.    I believe it was sometime in the latter part of June,

12   early part of July.

13   Q.    And why you decided to incorporate?

14   A.    Well, it seemed like a good match at the time.  I had the

15   product designs.  He had knocked off several of them and, you

16   know, built -- built several of them.  The quality was quite

17   acceptable, and the price on it was -- it was in the right

18   price point, so it looked very workable.

19   Q.    Can you tell me, did he build when you incorporated or

20   before?  How it happen?

21   A.    I believe he did one project for me before we incorporated

22   and had constructed a couple of prototypes.

23   Q.    And then when you incorporated, you said -- how you

24   decided to divide shares?

25   A.    The division, when we had discussed it, was supposed to be

1    a 50/50 division of shares and profits.

2    Q.    Did you -- when you incorporated, was Julie Kafka on --

3    in -- when you were incorporating, was she present?

4    A.    No.

5    Q.    When did you meet -- first time meet Julie Kafka?

6    A.    The first time I met Julie Kafka was in August of 2005.

7    Q.    Why do you remember the date?

8    A.    Well, it was very important.  There was -- we were -- the

9    big project I was telling you about, the $700,000 project,

10   their project manager was coming to Mr. Kafka's location to

11   inspect it to see if we were, you know, the right kind of

12   company to be granted this order.

13          And the first time I met Julie Kafka, she was

14   sweeping the floors, and I didn't know who she was.  But either

15   somebody introduced her -- me to her or she introduced herself

16   to me, but that was the first time I had met her.

17          And it really sticks out in my mind because if we

18   didn't -- if we didn't pass that hurdle with this individual --

19   his name was Jeff, but I can't -- I can't remember his last

20   name.  It began with a G.  It was like Goodrich or something

21   like that.

22          But if we didn't pass that inspection, we weren't

23   going to get the project, so, you know, I was really keyed up

24   about it.

25   Q.    So just to show Exhibit -- Exhibit 82.

 1   A.    Uh-huh.

 2   Q.    Can you see from here or --

 3   A.    I can see.

 4   Q.    You can see?  Okay.

 5         Is it your signature?  Did you sign article

 6   incorporation?

 7   A.    Yes, I did.

 8   Q.    Thomas Kafka sign?

 9   A.    Yes.

10   Q.    What about --

11         MR. JONES:  Objection, Your Honor.  This goes to an

12   in limine matter.

13         THE COURT:  I don't believe this exhibit's in

14   evidence.

15         MS. BERMAN:  It is in evidence, Your Honor.

16         THE COURT:  It is in evidence?

17         MR. JONES:  But the question that was about to

18   follow or the comment made on it is --

19         THE COURT:  Let me see you at sidebar.

20      (At sidebar, out of the hearing of the jury:)

21         MR. SPRINGER:  Exhibit 22.

22         THE COURT:  Let me see it.

23         MS. BERMAN:  This article incorporation.

24         MR. SPRINGER:  I have this as in, Judge.

25         MR. JONES:  Yeah, but they're going to try and make

1   some argument that --

2           THE COURT:  You need to talk up a little bit so she

3   can hear you.

4           MR. JONES:  She's going to try to make an argument,

5   Your Honor, that there is some fraud with regard to how this

6   document was conducted --

7           MS. BERMAN:  Your Honor --

8           MR. JONES:  -- like, for example, that her name was

9   somehow inserted after the fact, that he never knew that she

10  was -- was going to be on this document.  Somehow he

11  Photoshopped -- I'm not kidding.  He's going to say he -- he

12  must have Photoshopped her name and her signature, and that's

13  how she wound up on these corporate documents.  He had no idea.

14          MS. BERMAN:  That's not what I'm trying to say.

15          THE COURT:  What's the relevancy?

16          MS. BERMAN:  Your Honor, it's relevancy of ownership

17  of my husband.  This is article incorporation.  She --

18          THE COURT:  She is on here.

19          MS. BERMAN:  But he never, never met Julie Kafka in

20  2004, and she was not there.  They want to present my check,

21  it's my signature, based on guesses, and defendant said he

22  wasn't sure if my signature or not.

23          THE COURT:  Well, this isn't about her signature;

24  it's about your signature.

25          MS. BERMAN:  This isn't my signature.  It's my

 1  husband.

 2          THE COURT:  I understand.

 3          MS. BERMAN:  I would like to introduce jury that

 4  Julie Kafka was never --

 5          THE COURT:  No.  We're not going to get into her

 6  signature.

 7          Let me ask you a question.  Are you going to ask him

 8  about these checks at issue?

 9          MS. BERMAN:  Yes, I am.  Yes.

10          THE COURT:  Okay.  Well, you'd better start, okay,

11  because you're running out of time, and you might as well just

12  go ahead and ask him if he signed these checks, what the deal

13  is with these checks, because that's what this case is about.

14          So if you run out of time, I'm giving you fair

15  warning.

16          MS. BERMAN:  Your Honor, it's about punitive damages.

17  I would like to prove --

18          THE COURT:  Punitive damages for this, for these

19  statements, not for things that he did ten years ago with your

20  husband or some other dispute they have.  Punitive damages

21  relating to these statements about you, okay?

22          If you're going to ask him about these checks, if

23  you're going to ask him about these statements, you'd better go

24  ahead because you're running out of time.  So I'm just giving

25  you warning.  You're spending lots of time on irrelevant

1  matters.

2        And the objection's sustained.

3     (End of discussion at sidebar.)

4  BY MS. BERMAN:

5  Q.   Unfortunately, I can't comment on how it was --

6        THE COURT:  Move on to your next question,

7  Ms. Berman.

8        MS. BERMAN:  Okay.

9  BY MS. BERMAN:

10 Q.   Do you recall, during unemployment hearing, that there was

11 two checks with my signature, as defendant claim, on those two

12 checks for Trifecta Gaming?

13 A.   I do not.

14 Q.   You didn't see those checks in unemployment appeal?

15 A.   No.  No, I did not.

16       MS. BERMAN:  Can you produce the checks with the

17 stamp of unemployment to know where the checks came from?

18       MR. JONES:  I think she's trying to make a discovery

19 request.

20       MS. BERMAN:  No.

21       THE COURT:  Are you saying there's an item in

22 evidence?

23       MS. BERMAN:  Evidence doesn't show that it's --

24       THE COURT:  No.

25       MS. BERMAN:  -- certified with unemployment appeal.

1           THE COURT:  What are you asking him?

2           MS. BERMAN:  From where those checks come, but --

3           THE COURT:  Well, you can't ask a lawyer question

4    during your examination.

5           MS. BERMAN:  Okay.  Let me look at those checks,

6    please.

7    BY MS. BERMAN:

8    Q.   It's Exhibit 84.  First, I want to see the date when

9    defendant claim he receive on January 9, 2009.

10          Do you see it?

11   A.   Yes.

12   Q.   In deposition the defendant said that he received those

13   checks in January 9, 2009.

14   A.   Yes.  Well --

15   Q.   When did he terminated you?

16   A.   January 8th, 2009.

17   Q.   So how is those checks relevant to your termination for

18   Maitland Furniture?

19          MR. JONES:  Objection.

20          THE COURT:  The objection is sustained.

21   BY MS. BERMAN:

22   Q.   Okay.  Then let's talk about those checks.

23          Is it your signature?

24   A.   Well, can you flip it the other way around?

25   Q.   I'm sorry.

 1   A.    Okay.

 2   Q.    (Tenders document.)

 3   A.    Thanks.

 4         All right.  That looks like my signature, but I

 5   couldn't -- I could not say for certain whether it is or not.

 6   Q.    Does it look like my signature?

 7   A.    Your signature?  No, it doesn't.

 8   Q.    Why is it it's not -- but it's -- do you think it's maybe

 9   a little bit close like my signature, yes?

10   A.    Well, I mean, yeah, it's kind of like your signature.  I

11   mean, it kind of goes up like that, but it's not as compact,

12   and it's not as, you know, graceful.

13         MS. BERMAN:  Your Honor, I forgot to say I object to

14   these checks.  Without waiving any objection, I introduced them

15   because I don't have anything to hide.

16   BY MS. BERMAN:

17   Q.    Now, please tell me, is it your writing?

18   A.    On --

19   Q.    On the checks.

20   A.    You mean on the spelling, the writing of your name?

21   Q.    Yes.  Where it says, "Pay to Larysa Berman," did you write

22   that?

23   A.    No.  I would not have written that.

24   Q.    Is it -- does it look like my writing?

25   A.    No, it's not your writing either.  You have very neat

1    handwriting.

2    Q.    Okay.  And this check is -- it says 12/4/2006, correct?

3    A.    Right, December 4th, 2006.

4    Q.    And so from bank when -- Hudson Valley Bank, they said

5    they don't have from 2006 any checks.

6          Let's look at the Exhibit -- Exhibit -- before I --

7    we look at this, I would like you look at this one.

8          What it says on this check?

9    A.    What does it say?  It says Chris Berman, care of Trifecta

10   Gaming USA, 303 Augusta Circle, St. Augustine.

11   Q.    Do you recall this check?

12   A.    Not in particular, no.

13   Q.    It was -- it was 12/4/2006.

14         And when were you injured?

15   A.    I was injured in November 2006.

16   Q.    So you could not recall particular check this one?

17   A.    Well, I couldn't recall much after that.

18   Q.    But you're certain it's not your writing on this check?

19   A.    Well, I certainly wouldn't have -- would not have spelled

20   your name that way.

21   Q.    And not your writing, yes?

22   A.    No.

23   Q.    Why -- why would you not spell my name that way?

24   A.    Because you changed the spelling of your name in order --

25   when you got your citizenship.

 1          MS. BERMAN:  I would like to say to the Court I

 2   didn't change my name, I just changed spelling of name.

 3          THE COURT:  You'll have a chance, Ms. Berman, to

 4   testify.

 5          MS. BERMAN:  Okay.

 6   BY MS. BERMAN:

 7   Q.   So let's look at the other check.  It's -- this check is

 8   5/16/2007.  It's Exhibit 84A.

 9   A.   Okay.  Have you got a copy for me?

10   Q.   (Tenders document.)

11   A.   Thank you.

12          Okay.  This is the same thing, basically.

13   Q.   And does it look like your signature?

14   A.   Like I said before, it looks like my signature, but I

15   couldn't -- I couldn't say for sure whether it was or not.

16   Q.   Did you write the, "Pay to Larysa Berman"?

17   A.   Well, no.  This looks like it was paid to Larysh Berman or

18   Laryush Berman.

19   Q.   Okay.  And let's look at the date of this check,

20   5/16/2007.  Yes?

21   A.   Right.  That's May 16th, 2007.

22   Q.   So you will not write, "Pay to Larysa Berman."

23   A.   Excuse me?

24   Q.   You will not write this, "Pay to Larysa Berman."

25   A.   Well, not like --

1   Q.    Is that right?

2   A.    Not like that, no.

3   Q.    And it's not your writing.

4   A.    It doesn't look like mine, no.

5   Q.    That's what I'm asking.

6            MS. BERMAN:  Are you going to introduce this check

7   now or . . .

8            I reserve my rights to the witness now.

9            THE COURT:  You're done with the witness?

10           All right.  You may cross-examine.

11           MR. JONES:  Thank you, Judge.

12           May I approach the clerk, get a few exhibits?

13           THE COURT:  Yes.

14                       CROSS-EXAMINATION

15  BY MR. JONES:

16  Q.    Good afternoon, Mr. Berman.

17  A.    Yes.  Good afternoon.

18  Q.    I want to --

19           MS. BERMAN:  Oh, that's yours.  Sorry.

20  BY MR. JONES:

21  Q.    I want to start by asking you some questions --

22  A.    Sure.

23  Q.    -- about the two companies, Maitland Furniture and

24  Trifecta Gaming USA, Inc.

25  A.    Uh-huh.

1   Q.   Now, you would agree with me, would you not, Mr. Berman,

2   that Tom Kafka owned Maitland Furniture long before he met you,

3   correct?

4   A.   Oh, yes.

5   Q.   And, in fact, Mr. Kafka owned Maitland Furniture for

6   always, right?

7   A.   Well, as far as I know, since 1998.

8   Q.   Okay.  Fair enough.

9        So you've never had an ownership interest in Maitland

10  Furniture, have you?

11  A.   I did not.

12  Q.   Okay.  So if you would just indulge me, I want to just see

13  if I can't conceptualize the companies and their relationship.

14       So your testimony, your understanding, is Mr. Kafka

15  was the sole owner of Maitland Furniture; is that right?

16  A.   I would assume so.

17  Q.   Okay.  And you would also agree with me, I think, that

18  Trifecta Gaming USA, Inc., was formed with the purpose to sell

19  gaming and casino furniture made by Maitland Furniture,

20  correct?

21  A.   Well, Maitland Furniture was a subcontractor.

22  Q.   No, sir.

23       My question is, you would agree with me that Trifecta

24  Gaming was formed for the purpose of selling gaming and casino

25  furniture made by Maitland Furniture, correct?

1    A.    Products manufactured by Maitland, yes.

2    Q.    Okay.  So, I mean, I feel like you're struggling with my

3    question.  I'm just wanting to make sure I understand.

4    A.    Well, I mean, it's no different than the way I worked with

5    the Canadians.  I would do the design; somebody else would make

6    it.

7    Q.    All right.  Let me show you, if I can, a transcript from

8    your unemployment compensation case.

9          Do you remember giving testimony in that case?

10   A.    No, not particularly.

11   Q.    Okay.  Well, let me hand you a copy of your transcript.

12         MR. JONES:  Does the Court need a copy as well, Your

13   Honor?

14         THE COURT:  If you have one, I would appreciate it.

15         MR. JONES:  (Tendered document.)

16         THE COURT:  Thank you.

17         MR. JONES:  May I approach the witness, Your Honor?

18         THE COURT:  Yes.

19   BY MR. JONES:

20   Q.    I'd ask you to turn to page 25 of this transcript, if you

21   will.

22         Before you do, this deposition has your first name --

23   or has your full name on the first page?

24         MS. BERMAN:  Let me ask you, what is that from?

25         MR. JONES:  This is from his unemployment case.

1          MS. BERMAN:  Your Honor, I would like to object

2    because I have a CD for unemployment case, and we check the CD

3    for the transcript, and it's not correctly transcribed.

4          MR. JONES:  I'm sorry.  This is Workers'

5    Compensation.

6          MS. BERMAN:  Yes, for Workers' Compensation.  I check

7    it and --

8          THE COURT:  Well, then you can address that in your

9    case, but this is -- he's allowed to ask him.

10   BY MR. JONES:

11   Q.   All right.  Mr. Berman --

12   A.   Okay.  On page --

13   Q.   -- on the front page of that --

14   A.   Yes.

15   Q.   -- do you see your name, deposition of Christopher Berman?

16   A.   I do, yes.

17   Q.   And do you see the date as January 6th, 2009?

18   A.   I see that, yes.

19   Q.   And that would have been about two days before you were

20   fired?

21   A.   2000 -- you said January 6th.  Yes.

22   Q.   Okay.

23   A.   Correct.

24   Q.   All right.  And --

25   A.   Think there's a connection there?

1   Q.   Well, I'm going to ask you some questions, sir --

2   A.   All right.

3   Q.   -- and I think you'll see the connection.

4        There was a court reporter at that deposition, just

5   like there is here today, correct?

6   A.   I would think so.

7   Q.   And you were sworn in to tell the --

8        MS. BERMAN:  Excuse me.  Objection.  I don't

9   understand which transcript is --

10       THE COURT:  Overruled.  The objection's overruled.

11       MS. BERMAN:  From what is that --

12       THE COURT:  The objection is overruled.  He's already

13  told you.

14       MR. JONES:  I have an extra copy if she would like.

15       THE COURT:  Okay.

16       MS. BERMAN:  But that deposition was not from

17  unemployment appeal, Your Honor.  It's not.

18       THE COURT:  I know that.

19       MS. BERMAN:  It doesn't -- he's asking him about a

20  prior inconsistent statement.  He's allowed to do that.

21       MS. BERMAN:  But you objected about lawsuit.  That

22  was a lawsuit my husband sue defendant for fraud in U.S.

23  District Court.  It's nothing to do with unemployment appeal.

24       THE COURT:  No.  This is a Workers' Compensation

25  case.

 1          MS. BERMAN:  That's not what --

 2          THE COURT:  Your objection's overruled, Ms. Berman.

 3  Sit down.

 4          THE WITNESS:  Okay.

 5  BY MR. JONES:

 6  Q.   You were under oath, were you not?

 7  A.   Yes.

 8  Q.   Okay.  If you'd turn to page 25.

 9  A.   I'm looking at it.

10  Q.   All right.  Very good.

11          And at line 6 you were asked a question:  "So why is

12  Trifecta Gaming doing business as Maitland Furniture?  How did

13  that -- what is Trifecta Gaming?

14          "ANSWER:  Well, that's simply the company that was

15  formed to sell to this market, to the gaming and casino."

16          Did I read that correctly?

17  A.   Yes.

18  Q.   Okay.

19  A.   And I don't understand.  You just -- you just asked me.  I

20  explained to you, Trifecta Gaming sells the product, designs

21  the product.  Maitland Furniture makes the product.

22  Q.   But that doesn't say -- that says a little bit more,

23  doesn't it, Mr. Berman?  I'm going to read it one more time.

24  A.   Sure.

25  Q.   Your answer was:  "Well, that's simply the company that

1  was formed to sell to the gaming market and casino," correct?

2  A.   Yes.  And if you wanted to sell plastic widgets, you would

3  form a company to sell plastic widgets, and then you would find

4  a plastics manufacturer to make them for you.

5  Q.   So this is Trifecta Gaming and that's USA --

6  A.   Correct.

7  Q.   -- Inc.

8        All right.  Now -- and you also agree with me, would

9  you not, that Trifecta Gaming USA, Inc. -- you were not

10 necessarily Trifecta Gaming USA, Inc., yourself, before you got

11 with Tom Kafka, correct?

12 A.   I was Trifecta Gaming Products.

13 Q.   Right.

14       So you were not Trifecta Gaming USA, Inc., before you

15 got with Tom Kafka, correct?

16 A.   No.  I had my own company as Trifecta Gaming Products, and

17 I would use other manufacturers to build my products.

18 Q.   And you understand, sir, that when you're -- if you're --

19 to use your term, if you're creating a company to make widgets,

20 you can create one company called Widgets, Inc., another

21 company called Widget, Inc.  They're two separate companies,

22 aren't they?  Aren't they, sir?

23 A.   I don't follow you.

24 Q.   Okay.  Let me ask you if you've seen this exhibit.  It's

25 in evidence.  Let me hand it to you.  It is Exhibit 10A.

1  A.    Uh-huh.

2           MR. JONES:  May I approach, Your Honor?

3           THE COURT:  Yes.

4           Is this a plaintiff's exhibit or defense exhibit?

5           MR. JONES:  It's Defense Exhibit 10A, Your Honor.

6           THE WITNESS:  Yes.

7  BY MR. JONES:

8  Q.    Okay.  And that was formed in 2004; is that right?

9  A.    That is correct.

10 Q.    All right.  And so prior to 2004 you would agree with me

11 Trifecta Gaming USA, Inc., did not exist, right?

12 A.    Yes.  But I have a problem with this annual report.

13 Q.    I'm not asking you about the problem yet.

14 A.    Well --

15 Q.    I'm asking you about whether, in fact, it was formed in

16 2004.  Right?

17 A.    That is correct, yes.

18 Q.    Okay.

19 A.    I've never denied that.

20 Q.    All right.  And as a matter of fact, you would agree with

21 me that the company Trifecta Gaming, Inc. -- or USA, Inc., was

22 actually considered a doing business as Maitland Furniture,

23 correct?

24 A.    That's absolutely not correct.

25 Q.    All right.  Turn to page 27 of that transcript, please.

1   A.    Uh-huh.

2   Q.    I'm sorry.  24.

3   A.    24?

4   Q.    Yes.

5   A.    Okay.

6   Q.    You know what?  I'm going to have you back up because the

7   question really begins on 23.

8   A.    Excuse me?

9   Q.    I'm sorry.  I'm going to ask you to back up one page

10  because the question really begins on page 23.

11  A.    Okay.

12  Q.    All right.  On page 23 you were asked, down on line 23 --

13  A.    Uh-huh.

14  Q.    -- "And when was Trifecta Gaming formed?"

15        And your answer is, "Trifecta Gaming was actually

16  incorporated, I want to say, in May of 2004.

17        "QUESTION:  Okay."

18        And then your answer, "But it's actually

19  considered -- it's actually like Maitland Furniture d/b/a

20  Trifecta Gaming, doing business as Trifecta Gaming."  And then

21  you say, "Does that help you?"

22        Did I read that correctly?

23  A.    Well, you may have read -- you may have read that

24  correctly, but --

25  Q.    And that's your sworn testimony, isn't it, sir?

1  A.   Well, I would say it was sworn testimony under -- under

2  the fact that I was loaded up with pain medication.  I mean, I

3  was still recovering from two fractured vertebrae.

4  Q.   Are you telling this jury that when you provided sworn

5  testimony in your --

6  A.   No.  I'm --

7  Q.   -- Workers' Compensation case that you were so drugged up

8  that you could not answer questions truthfully?  Is that what

9  you're telling this jury?

10  A.   I'm not -- I'm not -- I'm not telling that at all.  Why

11  are you arguing when me?

12  Q.   I'm not.

13       You just told me or just told this jury, did you

14  not -- when I asked you simply whether I read that correctly,

15  that Maitland Furniture is doing business as Trifecta Gaming,

16  you looked at this jury and said that you were drugged up.

17  A.   Let me -- let me see if I can explain this better.

18       Yeah, I was -- I was taking pain medications, but if

19  I can explain this better, the individuals that were there were

20  having as much trouble understanding the relationship between

21  the two companies as you are, and that's what I was trying to

22  explain to them.

23       But, of course, they're not -- they're two separate

24  companies.  They're two separate corporations.

25  Q.   Sir, I'm not having trouble.  I'm just reading your

1   deposition testimony.

2   A.    I understand.

3   Q.    And it's -- and you said -- back on January the 6th, two

4   days before you were fired, you said -- admitted under oath

5   Trifecta Gaming was really a doing business as -- or Maitland

6   Furniture was really doing business as Trifecta Gaming,

7   correct?

8   A.    Well, I was --

9   Q.    That's your testimony.

10  A.    I was trying to explain to the person who was there the

11  relationship.  They weren't -- they weren't getting it.  They

12  didn't understand it.  And I was trying to explain that, "Look,

13  we sell -- I design and sell the product.  They manufacture the

14  product."

15  Q.    Now, you also would agree with me that there are many

16  checks that say Maitland Furniture on them as well, correct?

17  A.    Checks that say Maitland Furniture?

18  Q.    Yes.

19  A.    Not that I've seen.

20  Q.    Okay.  Now, on that exhibit that I showed you, there's

21  three names, is there not?  The exhibit I showed you is the

22  2004 annual report for Trifecta Gaming USA, Inc.

23          Do you see --

24  A.    Well, no.  It says 2005.

25  Q.    Okay.  2005.

1           There's three names on that annual report, is there

2    not?

3    A.    One of them is on there fraudulently.

4    Q.    Sir --

5           MR. JONES:  Your Honor, I move to strike that.

6           THE COURT:  Well, I'll ask the jury to -- or instruct

7    the jury to disregard that statement.

8           And, Mr. Berman, I'm going to ask you again to answer

9    the questions.

10          THE WITNESS:  Yes, Your Honor.

11   BY MR. JONES:

12   Q.    There's three names on that annual report for Trifecta

13   Gaming USA, isn't there?

14   A.    It would appear there are three names on that report.

15   Q.    Okay.  Give me one name.

16   A.    My name, Christopher Berman.

17   Q.    Okay.  Give me another name.

18   A.    Thomas Kafka.

19   Q.    And give me the next name.

20   A.    Well, I mean, it says Julie Kafka.

21   Q.    Thank you.

22          THE COURT:  What exhibit is this?

23          MR. JONES:  Exhibit 10A, Your Honor, defense.

24          THE COURT:  Your exhibit?

25          MR. JONES:  Yes, Your Honor.

1   BY MR. JONES:

2   Q.   Okay.  You would agree with me, I'm sure, Mr. Berman, that

3   Ms. Julie Kafka was a part owner of Trifecta Gaming --

4   A.   I would not agree with you.

5   Q.   -- would you not?

6            Okay.  Turn to page 31, please.

7            THE COURT:  31 of that same transcript?

8            MR. JONES:  Yes, Your Honor.

9   BY MR. JONES:

10  Q.   And this kind of spills over from 31 to 32.

11  A.   Uh-huh.

12  Q.   It's broken up by an objection that we'll skip.

13           On page 9 -- I'm sorry, on page 31, line 9:

14           "QUESTION:  Now, you were the principals of Trifecta

15  Gaming.

16           "ANSWER:  Well, Tom and myself.

17           "QUESTION:  And that was formed as a separate

18  corporation but no tax ID number?

19           "ANSWER:  That's correct.

20  A.   Uh-huh.

21  Q.   And there's an objection.  Skip down.

22           Line 24 you're asked a question:  "I'm just trying to

23  figure out who was in what."

24           Next, line 6 you answer:  "Well, when we originally

25  formed the corporation --

1            "QUESTION:  2004?

2            "ANSWER:  Right.  I'm shown on the corporate

3    registry, but I'm no longer on the corporate registry.

4            "QUESTION:  So it was Chris and Tom in 2004?"

5            Answer, line 14, what does it say?

6    A.   Uh-huh.

7    Q.   Read it.

8    A.   It says, "Yeah, and his wife."

9    Q.   Question, line 15:  "And his wife.

10           "Now, was one of you president, one of you vice

11   president, or all just owners or --"

12           And your answer on line 18 says, "Yeah.  Tom said,

13   you know, 'I'll be president.'  He says, 'You can be vice

14   president.  My wife will be treasurer.'"

15           Question on page -- line 21.

16   A.   Uh-huh.

17   Q.   "QUESTION:  But you were all owners 50/50 or --"

18           Your answer, what does it say?

19   A.   It says, "33, 33, 33."

20   Q.   Well, first it says what?

21   A.   "30, 30, 30."

22   Q.   30 --

23   A.   Okay.

24   Q.   -- 30, 30.

25   A.   Okay.

1    Q.   Then you correct yourself, sir, and you say, "Or 33, 33,

2    33."

3         Does that -- did I read that correctly?

4    A.   That would be -- that would be correct at the time of

5    January 6th.  It wasn't until in February when I actually got

6    ahold of the actual articles of incorporation and everything

7    else that went with it --

8    Q.   So --

9    A.   -- and --

10        THE COURT:  I'm going to let him explain.

11        THE WITNESS:  Okay.  It actually was not until I had

12   gone to my trademark attorney.

13        I was shown these documents at a deposition for

14   Workers' Compensation, and I looked at them, and I could not

15   recall anything on them.  I couldn't recall if they were

16   correct or not.

17        It was through meeting with the trademark attorney

18   who had said to me -- he said to me, "Well, can you tell me

19   about this -- this other person, this Julie Kafka on here?"

20        And I said, "I don't recall ever signing any

21   documents with Julie Kafka's name on them."

22        I was sitting down.  It was a very long deposition.

23   It was very uncomfortable for me.  I was shown a bunch of

24   paperwork, and I looked at them, and I said, "Yeah, whatever,

25   on here."

1    BY MR. JONES:

2    Q.    Are you done?

3    A.    Pretty much.

4    Q.    Okay.  So if I am to just take your sworn testimony at

5    face value, you were asked who were the owners, and you

6    identified yourself, Tom Kafka, Julie Kafka, and you divided it

7    up by 33, 33, and 33.

8           Isn't that what's in this transcript?  Correct?

9    A.    That would be what they showed -- they showed me the paper

10   and asked me if that was correct, yes.

11   Q.    Sir, that's your testimony, isn't it?  You answered the

12   question, "33, 33, and 33," didn't you?

13   A.    Well --

14   Q.    Those words came out of your mouth.

15   A.    Yeah, it certainly would appear that way, but I'm sitting

16   there getting shown all these papers and documents of stuff

17   that -- it wasn't until -- it wasn't until February that I

18   really started digging into this stuff, and it wasn't until

19   much later that all of this came to light, the fact that she

20   wasn't really supposed to be on the articles of incorporation.

21   Q.    And, in fact, Mr. Berman, you went from being on the

22   corporate registry for Trifecta to being a W-2 employee of

23   Maitland Furniture; is that right?

24   A.    No.  I became a W-2 employee of Maitland Furniture, but as

25   far as I knew, I had never been taken off the corporate

 1 | registry.
 2 | Q.   Okay.  Let's read the next line then.  Same page 32, line
 3 | 23:  "If I wanted to say to you" -- this is you speaking.  This
 4 | says answer, right?
 5 | A.   At page 30 --
 6 | Q.   32.
 7 | A.   32.
 8 |         Uh-huh.
 9 | Q.   You see that, page 32, down at line 23.  This is still
10 | your answer --
11 | A.   Correct.
12 | Q.   -- right?
13 |         Okay.  These are your words, sworn testimony,
14 | correct?
15 | A.   Yes.
16 | Q.   Okay.  It says, "But I wanted to say to you though was in
17 | 2006 when I went from being a -- you know, on the corporate
18 | registry to being, like, a W-2 employee."  And then you say,
19 | "Does that help you?"
20 |         Did I read that correctly?
21 | A.   You did.
22 | Q.   Okay.
23 | A.   But did I say I was ever -- had ever taken myself off the
24 | corporate registry?
25 | Q.   Do you see Exhibit -- let me show you Exhibit 10B.

```
 1   A.   Sure.
 2           MR. JONES:  May I approach the witness, Your Honor?
 3           THE COURT:  Sure.
 4           THE WITNESS:  Yeah, I see that.
 5   BY MR. JONES:
 6   Q.   All right.  Thank you.
 7           MS. BERMAN:  Your Honor, I object because they pick
 8   up just words that -- they don't do all deposition, and I'm not
 9   aware of this.  I didn't read it.  I need to see what exactly
10   he's saying.
11           THE COURT:  Is there a part of that dep- --
12           MS. BERMAN:  They didn't show me --
13           THE COURT:  Well, this is for impeachment so they
14   didn't have to show it to you.
15           MS. BERMAN:  But they didn't tell me.  I would like
16   to read it.
17   BY MR. JONES:
18   Q.   All right.  I want to show you what's been -- it's in
19   evidence.  This is 2006 annual report.
20   A.   Uh-huh.
21   Q.   Do you see that?
22   A.   I see that.
23   Q.   For Trifecta Gaming USA, Inc., right?
24   A.   Yes, I see that.
25   Q.   Okay.  And there are three names down here --
```

1   A.   Uh-huh.

2   Q.   -- that we saw on the first exhibit, right?

3   A.   Yes.

4   Q.   Do you still have A with you, Exhibit 10A?

5   A.   10A?

6   Q.   Yeah.

7   A.   No.  I think you took it back.

8   Q.   What's in your right -- left hand?  What is this?

9   A.   This?

10  Q.   That's 10A.

11  A.   Ah, okay.  Got it.

12  Q.   Can I have it, please?

13  A.   Can you have it back?

14  Q.   Yeah.

15  A.   Sure.

16  Q.   I just want to show the jury.

17  A.   Sure.

18  Q.   So this is 2005 --

19  A.   Uh-huh.

20  Q.   -- for Trifecta Gaming, Inc., right?

21  A.   Yes.

22  Q.   There are the three names that we were talking about a

23  moment ago, correct?

24  A.   Correct.

25  Q.   Now, we see in 2006 -- 2006 --

 1  A.    Right.

 2  Q.    -- Trifecta Gaming, there are three names.  And on the

 3  last name, Christopher Berman, there's a box that's checked

 4  delete.

 5            Do you see that?

 6  A.    I see that, but --

 7  Q.    Okay.

 8  A.    -- the first time I saw that --

 9  Q.    I didn't ask you when you saw it, sir.

10  A.    Well, can I answer?

11            THE COURT:  Let --

12            THE WITNESS:  The first time I saw that document --

13            THE COURT:  I'm going to let him explain.

14            Go ahead.

15            THE WITNESS:  Okay.  The first time I saw that

16  document, that my name had been removed, was when I was in the

17  office of Mark Young, a trademark attorney, when we were

18  setting up the trademark.  And he said to me, "Did you know you

19  were taken off the corporate registry?"

20            I said, "I had no idea about that."

21            I had no idea about a lot of stuff, but that --

22  sometime in the latter part of January, beginning of February,

23  that was the first time that I had known about it.

24            I didn't even know that the corporation was actually

25  incorporated in Florida.  Mr. Kafka said he was having it sent

1   up to his accountant in Pennsylvania.

2   BY MR. JONES:

3   Q.   Now -- but what you did know, at least in January of 2009

4   when you gave this deposition, was that Julie Kafka owned 33

5   percent of the company, correct?

6   A.   Well, I --

7   Q.   That's what you said.

8   A.   I looked at the document, and I said -- you know, it was

9   on the document, but I didn't recall her being on the document.

10  Q.   Sir, you're telling this jury that with -- in your mind,

11  being a 50 percent owner --

12  A.   Yes.

13  Q.   -- that you're shown a document and you say, "Well, I

14  guess Julie Kafka's 33 percent."

15          That's what you're telling them?

16  A.   This was a long, drawn-out process.  I had been recovering

17  from -- I'd been recovering from an accident, and I had a lot

18  of people just handing me a lot of paperwork and looking at it.

19          I mean, it's not that difficult to be confused on

20  that.

21  Q.   That someone you had no clue had any ownership interest in

22  your company now suddenly owns 33 percent.

23  A.   To be honest with you, I -- I don't recall ever seeing her

24  on the corporate documents before, and, you know, they -- that

25  was the first time I had actually seen the corporate documents,

1    when they pulled them out at this -- this hearing.  And I was

2    not -- I was not very sure of what -- what I was looking at.

3    Q.    Let me show you Exhibit 10C.

4               Oh, I've got to ask you a question about that.

5               So when you are -- if you turn to -- back to page

6    32 --

7    A.    Uh-huh.

8    Q.    -- on line 21 where you're asked, "But you were all owners

9    50/50" -- that you were asked whether you were 50/50.

10   A.    Yes.

11   Q.    And where in here does it say, "Wait a minute.  Stop.  I'm

12   confused.  I don't understand these documents"?

13              Where does it say that?

14   A.    Hey, my fault.

15   Q.    Oh.

16   A.    My fault.

17   Q.    Okay.

18              Let's look at 10C, please.

19   A.    (Complies.)

20   Q.    This is the 2007 corporate annual report for Trifecta

21   Gaming.

22   A.    Uh-huh.

23   Q.    Do you see that?

24   A.    I do.

25   Q.    Is your name on there?

1    A.   It is not.  And, again --

2    Q.   That's consistent with --

3    A.   Again, the first time I saw that was in late January,

4    early February of 2009.

5    Q.   I understand you want this jury to believe that you were

6    clueless.

7    A.   Oh, yes.  Absolutely.

8    Q.   I understand that.  Yeah, I get that.

9    A.   I was --

10   Q.   But my question --

11   A.   I was --

12            THE COURT:  Hold on.  Let him ask you a question.

13   BY MR. JONES:

14   Q.   But my question to you, sir, is just very simple.

15   A.   What?

16   Q.   You're not on there, are you?  You're not on there.

17   A.   And Mr. Kafka and his wife shouldn't be on there either.

18   Q.   Sir --

19   A.   They weren't living in Ormond Beach in 2007.

20   Q.   I'm asking you whether Chris Berman's name shows up on

21   this document.

22   A.   Look, my name was removed from the corporate registry

23   without my knowledge or permission.

24   Q.   That's a no, right?  That's a no?

25   A.   A no what?

1   Q.   No, your name doesn't show up there?

2   A.   Well, obviously if somebody removed my name, it wouldn't

3   be there, would it?  Where are my -- where are my division of

4   shares, K-1s, stock certificates?

5   Q.   So let me ask you this, sir.  The decision to move you --

6   you went from being on the corporate registry to being a W-2

7   employee for Maitland Furniture.

8           That was your testimony, right?

9   A.   Yes, but I never said that I gave up my corporate

10  ownership of the company.

11  Q.   Well, I'm just curious because you used the word, "I went

12  from being on the corporate registry," and then you use the

13  word "to being a W-2 employee."

14  A.   Well, if that were --

15  Q.   That's -- wait a minute.  I haven't asked the question

16  yet.

17  A.   Okay.

18  Q.   If I'm going from being one thing to being another, I'm no

19  longer the thing I went from, am I?

20  A.   Well, don't you think you're being a little abusive?

21          THE COURT:  Mr. Berman --

22          THE WITNESS:  All right.  I will say this.  Yes, if I

23  went from -- no, I did not -- I went -- I did not give up my

24  corporate ownership of the company.

25          If I had surrendered my corporate ownership of the

1  company, there would be specific documentation that I did that,

2  including an amendment to the articles of incorporation.  There

3  would have been a disbursal of shares.  There would have been a

4  notarized document from me.

5  BY MR. JONES:

6  Q.   Can we just agree on one thing?  You went from being on

7  the corporate registry to being a W-2 employee of --

8  A.   The only thing I'll agree --

9  Q.   I'm sorry, sir.  Can you agree with that, since it was

10 your testimony?

11 A.   I'll agree that Mr. Kafka removed me without my knowledge.

12 Q.   Do you agree that's your testimony, sir, that I read that

13 correctly?

14 A.   Yes.  That's --

15 Q.   That's your sworn testimony back on January 6, 2009,

16 correct?

17 A.   Yes, but you're --

18 Q.   Thank you.

19 A.   -- you're taking that out of context.

20 Q.   Sir, I'm just reading what you said.

21 Q.   Why would --

22 A.   You were under oath.  I didn't answer this.

23 A.   I may have said that, but --

24 Q.   Okay.

25 A.   I may have said that, but if you -- did I say that I --

1  did I say that I gave up my shares, that I transferred out,

2  that I -- that I surrendered my ownership of the corporation?

3  I did not.

4  Q.   No.  You just said --

5        THE COURT:  Let me see the attorneys and Ms. Berman

6  at sidebar for a moment.

7     (At sidebar, out of the hearing of the jury:)

8        THE COURT:  Mr. Jones, I have to tell you I think

9  you're kind of beating a dead horse here --

10       MR. JONES:  I'm sorry, Your Honor.  I --

11       THE COURT:  -- and you're spending a lot of time on

12  pretty much the same subject, and you're going back over and

13  over.  And I've imposed time limits on Ms. Berman.  I'm going

14  to impose time limits on the defense as well --

15       MR. JONES:  Okay.  Understood.

16       THE COURT:  -- so you need to get to what's relevant

17  in this case, so a point's been made and let's move on.

18       MR. JONES:  I will.

19     (End of discussion at sidebar.)

20  BY MR. JONES:

21  Q.   You also know, sir, that -- I think you told this jury

22  earlier you had no idea that money was being moved from

23  Trifecta Gaming to Maitland Furniture; is that correct?

24  A.   Yes, that is correct.

25  Q.   All right.  Would you please turn to page 57 of that same

1  transcript?

2  A.   No.  I should correct that.  I had no idea that a quarter

3  of a million dollars had been moved from Trifecta Gaming to

4  Maitland Furniture.

5  Q.   All right.  Let me just read this quickly.

6  A.   Uh-huh.

7  Q.   The question starts on -- really the question you answered

8  starts on page 57, line 10.  You're asked:  "Your whole check

9  came out of Maitland, but you don't know how the money was

10 written to Trifecta" -- I'm sorry.  "You don't know how the

11 money that was written to Trifecta got over to Maitland."

12 A.   Right.

13 Q.   Your answer is:  "Well, I would -- he probably went over

14 to the bank and transferred it from one account to the other.

15 I mean, that would be logical, but I wasn't involved with it so

16 I don't know.

17      "QUESTION:  But you always got paid from Maitland for

18 everything you did, whether it was Trifecta or Maitland, the

19 bank accounts?

20      "ANSWER:  That's correct."

21      Did I read that correctly?

22 A.   Yes.  You're reading that correctly.

23 Q.   Okay.  And, in fact, in terms of bonuses, whenever there

24 was bonuses, Mr. Kafka had the decision-making on how those

25 bonuses were split up, correct?

1  A.    Well, they were supposed to be split up as a 50/50 split.

2  Q.    Okay.  Let me ask you this.  When you went to being a W-2

3  employee, that decision was made by Mr. Kafka alone, correct?

4  A.    What was that?

5  Q.    When you went from being -- when you switched over to

6  being an employee of Maitland Furniture, that was Mr. Kafka's

7  decision alone, correct?

8  A.    No, it was not.

9  Q.    All right.  Turn to page 34, please --

10 A.    Uh-huh.

11 Q.    -- line 20.

12 A.    Yes.

13 Q.    "Who made the decision that -- to make you an employee of

14 Maitland rather than an employee of Trifecta?

15         "ANSWER:  Tom did."

16         Did I read that correctly?

17 A.    Yes.

18 Q.    Okay.  Now, back to page 60.

19 A.    Do you want to read the rest of it?  It says, "So as an

20 owner for Trifecta, did you have any type of worker

21 compensation or anything like that for Trifecta?

22         "Under 1099, I would not have.

23         "Okay.  So under 1099 Trifecta, you didn't have a tax

24 ID number, anything like that."

25         At that time I did not know that there was a separate

1  tax ID number for Trifecta.

2  Q.   I --

3  A.   But that was the entire point of becoming an employee of

4  Maitland Furniture was to be covered by their coverages when

5  I'm on-site on a commercial installation.

6  Q.   All right.  Mr. Berman, I'm just wanting to establish the

7  point --

8  A.   Sure.

9  Q.   -- that the decision that was made to make you an

10  employee, a W-2 employee, that was Tom Kafka's decision,

11  correct?

12  A.   Well, it was a decision that I agreed on with him at the

13  time.

14  Q.   Okay.  And let me ask you about these bonuses.  You

15  disagreed with me just a moment ago about the bonus decision

16  being Mr. Kafka's decision to make.

17           Turn to page 60, please.

18  A.   (Complies.)

19  Q.   I'm about to move on to a different area --

20  A.   Sure.

21  Q.   -- but I want to ask you this one question here, and I'll

22  wrap it up --

23  A.   Sure.  Go ahead.

24  Q.   -- on this subject.

25           It says here on page 60, line 10:  "And then there

 1  were bonuses."

 2              Your answer:  "Yes."

 3              Question on line 12:  "And how did those work?

 4              "ANSWER:  Those worked however Tom felt they worked."

 5              Did I read that correctly?

 6  A.    Yeah.

 7  Q.    Okay.  And then further down, you would agree with me that

 8  the bonuses were not necessarily a certain percentage of

 9  profits, correct?

10  A.    Well, they were supposed to be.

11  Q.    Well, down here on line -- same page, line 60 -- I mean,

12  on page 60, line 23 --

13  A.    Uh-huh.  "Based on what?"

14              "Profit of sales."

15  Q.    "Profit of sales."

16              So question, line 25:  "So was it a certain

17  percentage of profit of sales for that month?"

18              "ANSWER:  No, not necessarily."

19  A.    Yeah.  Not necessarily for that month.

20  Q.    All right.  So here's what I'm getting that.  The fact

21  that there's evidence that you were removed from the

22  registry --

23  A.    Without my knowledge.

24              THE COURT:  Hold on.  Don't interrupt him.  Let him

25  ask the question.

1           THE WITNESS:  Okay.

2    BY MR. JONES:

3    Q.   The fact that you were made a -- went from being on the

4    registry of Trifecta to being a W-2 employee, the fact the

5    decision was made by Tom, the fact that Tom was the one who

6    decided on bonuses, you would agree with me that would be

7    consistent with someone who was the majority shareholder of

8    Trifecta Gaming --

9    A.   No.

10   Q.   -- correct?

11   A.   That would be -- that would be someone who would be the

12   owner of Maitland Furniture.  It had nothing to do with

13   Trifecta Gaming.

14   Q.   Both, wouldn't it?

15   A.   No.  That would not be the case.  How would that be --

16   Q.   Moving on.

17   A.   -- the case?

18   Q.   Let me move on to another area.

19           You said, I believe, that you were not working in --

20   that you were not working in 2009, correct?

21   A.   That is correct.

22   Q.   Okay.  Let me -- do you remember attending a hearing in

23   the unemployment compensation appeals hearing?  Do you remember

24   that one on May 27th, 2009?

25   A.   Yes, I do.

 1  Q.   All right.

 2           MS. BERMAN:  Your Honor, I object to that hearing.

 3  That was vacated and what's happen has been -- judgment

 4  vacated.  It's like never happened.

 5           THE COURT:  The objection's overruled.

 6           MR. JONES:  Okay.  May I approach the witness, Your

 7  Honor?

 8           THE COURT:  Yes.

 9           MS. BERMAN:  And I was confused because --

10           THE COURT:  Ms. Berman, I overruled your objection.

11           THE WITNESS:  Okay.  Go ahead.

12  BY MR. JONES:

13  Q.   All right.

14  A.   What's your question?

15  Q.   Let me ask you, do you see where the questions are

16  numbered off to the side?  They don't have page numbers on

17  these things.  Well, some of them do.

18  A.   Uh-huh.

19  Q.   But Question 107.

20  A.   Yes.  Okay.

21  Q.   Question 107, and I think that's going to be on page 19,

22  if yours has a page number.

23  A.   Uh-huh.

24  Q.   And you know what?  Let me back up for context because it

25  only has --

 1          MS. BERMAN:  Your Honor, do they have a copy?

 2          THE COURT:  Do you have a copy for her?

 3          MR. JONES:  Do I have an extra copy?  We gave her a

 4   notebook earlier.

 5          THE COURT:  That has it in it?

 6          MR. JONES:  That had it in it.

 7          THE COURT:  Look in the notebook he gave you,

 8   Ms. Berman.

 9          MS. BERMAN:  Which notebook?

10          MR. JONES:  No.  We had given Ms. Berman earlier a

11   notebook that --

12          THE COURT:  Oh, okay.

13          MR. JONES:  Several weeks ago.

14          MS. BERMAN:  No.  It wasn't in that notebook.

15          THE COURT:  Well, it's all right.

16          MS. BERMAN:  And I received it.  It was not there.

17          THE COURT:  Do you have it?

18          MR. JONES:  We may have one, Judge.

19          THE COURT:  Okay.  Thank you.

20          MR. JONES:  Thank you.

21   BY MR. JONES:

22   Q.   Mr. Berman, this was a hearing that was conducted on May

23   27, 2009?

24   A.   That is correct, yes.

25   Q.   Okay.  And if you turn to page 6, which is Question 21,

1   you were placed under oath, were you not?

2   A.    Yes, I was.

3   Q.    And the reason why I'm bringing that up here, because your

4   answer, it says -- it addresses you, Mr. Berman, and the

5   answer's yes, but it says A2 by the answer?

6   A.    Uh-huh.

7   Q.    Do you see that?

8   A.    Yes.

9   Q.    Mr. Kafka is also in this transcript, but his answer is

10  designated with just an A.

11        Do you see that?

12  A.    Uh-huh.

13  Q.    Okay.

14  A.    Yes.

15  Q.    So anywhere there's an A2, that's your response.  Do you

16  understand?

17  A.    Uh-huh.

18  Q.    All right.

19        THE COURT:  And, Mr. Berman, if you could answer yes

20  or no.  It's difficult for the court reporter to take down --

21        THE WITNESS:  Sorry.  Yes.

22        THE COURT:  -- uh-huhs or uh-uhs.

23        THE WITNESS:  Yes.

24  BY MR. JONES:

25  Q.    All right.  And just going back now to page 19 where we

1   left off --

2   A.    Uh-huh.

3   Q.    -- Question 107:  "And have you had other employment after

4   that?"

5           Your answer:  "After January 2009?"

6           "QUESTION: Yes.

7           "ANSWER:  Yes.  Well, I had only put in with you for

8   three weeks of unemployment.

9           "QUESTION:  Okay.  The reason I ask you is if you are

10  disqualified, it isn't until you earn a certain amount of

11  money.

12          "ANSWER:  I put in with you for three weeks of

13  unemployment.  I was reemployed last Monday in February.  I

14  believe that it's February 23rd or -- 24th or 23rd."

15          Did I read that correctly?

16  A.    Yeah --

17  Q.    Thank you.

18  A.    -- but it never happened.

19          Well, excuse me.  I'd like to clarify that.

20          The unemployment benefits fraud investigation went

21  through all of the records and found that I was not employed at

22  that time.

23  Q.    Sir, you're telling --

24          THE COURT:  Mr. Berman, the question is whether you

25  made this statement or not.

1          THE WITNESS:  Yes, I made the statement, but from

2    circumstances that I believe were the result of Mr. Kafka, that

3    job never came to fruition.

4    BY MR. JONES:

5    Q.   Well, let me ask you this, because the date of this is May

6    27, 2009, this hearing --

7    A.   I understand that.

8    Q.   -- correct?

9    A.   Yes.

10   Q.   Okay.  But you're telling them that you were reemployed as

11   of February the 23rd.

12          Isn't that what that says?

13   A.   Yes.

14   Q.   So you're telling them that you've been employed for going

15   on three months, correct?

16   A.   Yes, but I -- but I hadn't been.  Listen --

17   Q.   But that's your testimony here.

18   A.   I had -- I was going to get set up with a -- with a

19   position towards the end of February, and it kept getting

20   delayed, delayed, delayed.  And then it was -- then it never

21   happened, and I believe it had something to do with Mr. Kafka's

22   interference.

23          But at this point, you know, I just wanted to get

24   this hearing over and be done with.  I didn't want any more

25   trouble from the defendant because he was causing me lots and

1    lots of trouble.  I was hoping he'd just go away.

2    Q.   Were you on medications, too, here?

3    A.   I don't believe so, no --

4    Q.   Okay.

5    A.   -- but I just wanted to -- I wanted to get this thing over

6    and get done with it.

7    Q.   You also told, I believe, this jury when you were

8    testifying earlier that --

9    A.   Yeah.

10   Q.   -- those checks that had your wife's signature on them

11   that were made out to Trifecta -- to you in care of Trifecta

12   Gaming --

13   A.   Yes.

14   Q.   -- were never submitted in this hearing, correct?

15   A.   Were never submitted in the unemployment hearing?

16   Q.   Correct.  That was your testimony.

17   A.   Yeah.

18   Q.   Okay.  Well, turn again in that same document to question

19   82, please.

20   A.   To question what?

21   Q.   82, Q82.

22   A.   Would that be back the other way?

23   Q.   That's going to be on page 15.

24   A.   Okay.  I see that.

25   Q.   Do you see the A there?  That's Mr. Kafka speaking?

1   A.   Uh-huh.

2   Q.   Section C -- I'm reading from Mr. Kafka's testimony.

3   "Section C, is it -- is just because it is a little different,"

4   he says.  "In this particular case, we had the check come in

5   from Yonkers Raceway, and this was in 2006."

6   A.   Right.

7   Q.   "And in this particular case, he signed the check over to

8   Lareesa Berman.

9              "And who is that?

10             "ANSWER:  That would be his wife."

11  A.   Uh-huh.

12  Q.   Did I read that correctly?

13  A.   Yes.

14  Q.   All right.  Let me show you Exhibit 14.

15             MR. JONES:  These are in evidence, Defendant's 14A.

16             THE WITNESS:  Yeah.

17  BY MR. JONES:

18  Q.   Okay.  And I think you've admitted that this could be

19  your -- your signature, right?  You're not saying it's not.

20  A.   I'm not saying it's not my signature, but I never would

21  have filled out my wife's name like that.

22  Q.   Okay.

23  A.   Uh-uh.

24  Q.   So it says Larysa Berman.

25             Are you telling this jury that that is not her

1  signature and that's not her name?

2  A.    No, it's not.  It's not.

3  Q.    All right.

4  A.    I mean, you could see it on the -- on her complaint, it's

5  not.

6         And I'd like to -- I'd like to make sure that you're

7  clear on something here as well.

8         MR. JONES:  No question is pending, Your Honor.

9         THE COURT:  Yeah, Mr. Berman.  There's no question.

10        THE WITNESS:  Okay.

11        THE COURT:  Mr. Jones, if you're going to move on to

12  another subject, I'd like --

13        MS. BERMAN:  I have --

14        THE COURT:  -- to go ahead and take a break at this

15  point.

16        MS. BERMAN:  -- redirect examination, Your Honor.

17        THE WITNESS:  Yeah.

18        MR. JONES:  I am moving on --

19        THE WITNESS:  This was --

20        MR. JONES:  -- to another subject.

21        THE WITNESS:  This was a telephone --

22        THE COURT:  No.  Hold on, Mr. Berman.  Hold on.

23        THE WITNESS:  Okay.

24        THE COURT:  All right.  I'm going to have the jury

25  take a break at this point, so you can take a 15-minute break

1  and be back at 2:45, please.

2          COURT SECURITY OFFICER:  All rise for the jury.

3      (Jury out at 2:28 p.m.)

4          COURT SECURITY OFFICER:  Please be seated.

5          THE COURT:  Mr. Berman, if you can step outside the

6  courtroom.

7          THE WITNESS:  Sure.

8      (The witness left the courtroom.)

9          THE COURT:  All right.  Let's talk about timing for a

10  minute.  So we're going to be back at 2:45.

11          Mr. Jones, how much more cross-examination do you

12  have?

13          MR. JONES:  I think I can get it done in 10, 20

14  minutes.

15          THE COURT:  All right.  I'm going to give you till

16  3:15, all right --

17          MR. JONES:  Okay.

18          THE COURT:  -- to get it done.

19          MR. JONES:  All right.

20          THE COURT:  And then, Ms. Berman, I'm going to give

21  you 15 minutes of rebuttal questioning, and then -- that's

22  going to probably put us till 3:30 or later.

23          How long is your witness that you need to call?

24          MR. SPRINGER:  She shouldn't be more, on our end,

25  than 20, 25 minutes.

1          THE COURT:  All right.  And do you have any idea

2   how -- if you're going to cross-examine this witness or --

3          MS. BERMAN:  Yes.

4          THE COURT:  All right.  And how long do you think you

5   will cross-examine this witness?

6          MS. BERMAN:  I don't know.  It depends what the

7   question is.

8          THE COURT:  All right.  Well, we may run into a

9   problem because we can't go past 5 o'clock, so keep that in

10  mind as you're going through this.

11         But if the witness has to come back, I guess the

12  witness will have to come back.  I don't know what else to tell

13  you, unless you have any better suggestion.

14         MR. JONES:  Would the Court entertain just taking a

15  hiatus on Mr. Berman and putting on Ms. Connell next, I mean,

16  when they come back from break?

17         MR. SPRINGER:  Well, if you're done at 3:15 and she's

18  done by 3:45, that's our next witness.

19         THE COURT:  Well, right.  And so if you're only going

20  to take, you said, 20, 25 minutes, that will put us about 4:05,

21  4:10.  I'm not getting an estimate here and --

22         MR. SPRINGER:  It's very limited direct.  It's not

23  extensive in many subject areas at all.

24         THE COURT:  All right.  Would you want to try to put

25  on this witness first?  That would --

```
 1              MR. SPRINGER:  I could.

 2              THE COURT:  I wouldn't do that without Ms. --

 3              MR. SPRINGER:  Yes, sir, we could do that.

 4              THE COURT:  Ms. Berman, do you have an objection to

 5    them putting on this witness in the middle of cross-examination

 6    of your husband?

 7              MS. BERMAN:  But I would like to cross-examine

 8    before -- I have questions.  I would like to --

 9              THE COURT:  I'm going to let you -- I mean, we're

10    just going to pick up right where we left off.  The only thing

11    we're going to do different is we're going to put this witness

12    in there.

13              Whatever time is used with this witness doesn't count

14    towards your time that I gave you till the end of the day.  So

15    if they take an hour with this witness, you'll get an hour

16    tomorrow --

17              MS. BERMAN:  Okay.

18              THE COURT:  -- all right?

19              MS. BERMAN:  Okay.

20              THE COURT:  All right.  So why don't we do that.  You

21    can go ahead and put this witness on at 2:45 when we come back,

22    all right?

23              Anything further?

24              MR. JONES:  No, Your Honor.

25              THE COURT:  All right.  Court will be in recess.
```

 1          COURT SECURITY OFFICER:  All rise.

 2      (Recess from 2:32 p.m. until 2:48 p.m.; all parties

 3  present.)

 4      (Outside the presence of the jury:)

 5          COURT SECURITY OFFICER:  All rise.  This Honorable

 6  Court is now in session.

 7          Please be seated.

 8          THE COURT:  All right.  So what I'll do is I'll just

 9  tell the jury that we're taking a witness out of turn and that

10  it should not affect their consideration of the evidence at

11  all.  It's just a matter of order of presentation, all right?

12          Okay.  If you want to bring the jury back.

13          COURT SECURITY OFFICER:  All rise for the jury.

14      (Jury in at 2:49 p.m.)

15          COURT SECURITY OFFICER:  Please be seated.

16          THE COURT:  Ladies and gentlemen, I'm going to allow

17  the defendant at this point to call a witness.  This is just to

18  facilitate the presentation of the evidence.  It has nothing to

19  do with anything substantive.  Mr. Berman will be back on the

20  stand at a later point, but I just wanted you to know that.

21          So, okay, Mr. Springer.  If you can call your

22  witness.

23          MR. SPRINGER:  Defense calls Janice Connell.

24          THE COURT:  All right.

25          COURTROOM DEPUTY:  Can you please raise your right

 1   hand?

 2         Do you solemnly swear or affirm that the answers you

 3   will give during these proceedings will be the truth, the whole

 4   truth, and nothing but the truth?

 5         THE WITNESS:  I do.

 6         COURTROOM DEPUTY:  And please state your name for the

 7   record.

 8         THE WITNESS:  Janice Connell.

 9         MR. SPRINGER:  May I proceed?

10         THE COURT:  Yes.

11         Ms. Connell, you might just want to slide your seat

12   forward a little bit just so you can talk into the mike.

13         THE WITNESS:  (Complies.)

14         THE COURT:  Thank you.

15            JANICE CONNELL, DEFENDANT'S WITNESS, SWORN

16                        DIRECT EXAMINATION

17   BY MR. SPRINGER:

18   Q.   Good afternoon, Ms. Connell.

19   A.   Hello.

20   Q.   How are you?

21   A.   Good.  How are you?

22   Q.   Good.  Thank you.

23         Where do you live?

24   A.   In Tallahassee.

25   Q.   Are you currently employed?

1  A.    Yes, I am.

2  Q.    And where are you employed?

3  A.    I'm employed with Fannel (phonetic), which is a contractor

4  with the State of Florida.

5  Q.    And what agency do you work for?

6  A.    Department of Economic Opportunity, DEO.

7  Q.    Is the name Agency for Unemployment Workers' Compensation

8  the same as that?

9  A.    Yes.

10 Q.    Or Workforce Innovation?

11 A.    Yes.

12 Q.    So if I say the agency or the department, you'll know what

13 I'm referring to?

14 A.    Yes.

15 Q.    How long have you been with the Department of Economic

16 Opportunity?

17 A.    I was with the department for a little over 40 years.

18 Q.    40?

19 A.    Uh-huh.

20 Q.    And have you worked in various departments since you began

21 your employment with the department 40 years ago?

22 A.    Yes.

23 Q.    And which departments have you worked in?

24 A.    I worked in initial claims.  I worked in adjudication.  I

25 also did the federal part, reviews and reports to submit to the

1    feds, and my last assignment is in benefit payment and control.

2    Q.   And did the Department of Economic Opportunity or Agency

3    for Workforce Innovation, is that the agency responsible in the

4    state of Florida for administering the unemployment

5    compensation process?

6    A.   Yes, it is.

7    Q.   What unit are you currently in?  You said the benefit

8    payment and control unit?

9    A.   Yes.

10   Q.   Can you explain to the jury what exactly you do?

11   A.   Benefit payment and control is responsible for

12   overpayments of unemployment compensation wages, and we set up

13   those overpayments and do an investigation to determine if an

14   individual is overpaid or not.

15   Q.   Okay.  And when you say overpaid, do you mean whether or

16   not an individual is working while they receive unemployment

17   benefits?

18   A.   Yes.

19   Q.   And how long have you been in that department?

20   A.   Five years.

21   Q.   Do the decisions that the agency makes during the

22   unemployment compensation process affect the rights of

23   individuals?

24   A.   Yes.

25   Q.   And those individuals being the persons that receive

1    unemployment benefits?

2    A.    Yes.

3    Q.    Do you consider the agency to be a quasi-judicial entity?

4    A.    Yes.

5    Q.    So does your investigation in the benefit payment and

6    control unit into whether or not someone is receiving --

7    working while receiving benefits play a role in the overall

8    unemployment compensation process?

9    A.    Yes, it does.

10   Q.    What is a notice of determination?

11   A.    A notice of determination is a decision that's made.  It

12   could be from the adjudication section or from the benefit

13   payment and control section.  And it's just a notice that goes

14   out to the claimant or individual that's applying for

15   unemployment benefits and to any potential employers.

16   Q.    Is the notice of determination something that is issued

17   potentially as a result of the investigations you perform?

18   A.    Yes.

19   Q.    Okay.  And does the notice of determination determine

20   whether someone receiving unemployment benefits continues to

21   receive them or is disqualified from receiving them?

22   A.    Yes.

23   Q.    All right.  And can you conduct an investigation at any

24   time that someone is receiving unemployment benefits?

25   A.    Yes.

1    Q.   Can your investigation into whether or not someone is

2    working while receiving benefits even take place after the

3    receipt of those benefits stops?  Did that make sense?

4         After -- can you conduct an investigation into

5    whether or not someone is working or had worked while receiving

6    benefits --

7    A.   Yes.

8    Q.   -- after the payments stopped?

9    A.   Yes.

10   Q.   Okay.  What happens if you find fraud and someone was

11   actually working while receiving benefits?

12   A.   If we find fraud, a determination of overpayment is mailed

13   out to the claimant.  It advises them of the overpayment and

14   their rights to file an appeal if they wish to do so.

15        We can set up payment arrangements for individuals to

16   repay that money back, and if they refuse to make payments,

17   then it goes to the State Attorney's Office to be prosecuted

18   for fraud.

19   Q.   Okay.  I'm going to show you what's been marked and

20   already entered into evidence as Defendant's Exhibit No. 25.

21        MR. SPRINGER:  May I approach the witness?

22        THE COURT:  Yes.

23   BY MR. SPRINGER:

24   Q.   Go ahead and take a look at that document, if you would,

25   Ms. Connell.  I'm just going to have a couple of questions for

1   you on it.

2   A.   (Complies.)

3   Q.   This is one of the -- this is a document with one of the

4   statements that is in this case that have been alleged as libel

5   per se.

6            Now, do you recognize this document?

7   A.   Yes, I do.

8   Q.   Was this a document that you received from Mr. Kafka?

9   A.   Yes.

10  Q.   And do you know in and about when you may have received

11  this document?  Would it have been in 2011?

12  A.   It would have been 2011.

13  Q.   Was this document used in part of your investigation?

14  A.   It was.

15  Q.   And was that investigation to determine whether or not

16  Mr. Chris Berman was receiving unemployment benefits while

17  working?

18  A.   Yes.

19  Q.   Now, do you see on the document where it states, "Part of

20  the money was embezzled by his wife"?

21  A.   Yes.

22  Q.   And when you received this document, did you have any idea

23  who Chris Berman's wife was?

24  A.   No, I did not.

25  Q.   Prior to your deposition being taken in this case, did you

1   have any idea who Chris Berman's wife was?

2   A.   No.

3   Q.   Prior to your deposition being taken in this case, did you

4   know who Lareesa Berman was?

5   A.   No.

6   Q.   Now, did you -- as part of your investigation, did you

7   contact anyone to determine whether or not Mr. Berman was

8   working while receiving benefits?

9   A.   Yes.

10  Q.   Okay.  And the persons you contacted, no matter who it may

11  have been, did you ever mention to them the name Lareesa

12  Berman?

13  A.   No.

14  Q.   Did you ever mention to them Chris Berman's wife?

15  A.   No.

16  Q.   Did you ever mention to them what is stated in this

17  document, "Part of the money was embezzled by his wife"?

18  A.   No.

19  Q.   When you received this document, Exhibit 25 that we're

20  looking at, if you wanted to, did you have the ability to pull

21  Chris Berman's unemployment file and look and see what

22  documents were in there?  Could you have done that if you

23  wanted to?

24  A.   To Mr. Berman's --

25  Q.   Yes.

1   A.   -- yes, uh-huh.

2   Q.   Is that a yes?

3   A.   Yes.

4   Q.   Okay.  I didn't hear you.  Thank you.

5        Now, is this document public record?

6   A.   Not at this time.  It's confidential.

7   Q.   So even if it was subpoenaed, you're not going to turn it

8   over.

9   A.   No.

10  Q.   All right.  The investigation that you conduct as part of

11  your position with the benefit payment and control unit, does

12  that investigation consist of phone calls?

13  A.   Yes.

14  Q.   Are you a field investigator?

15  A.   No, I'm not a field investigator.

16  Q.   In other words, do you leave your office and go out and

17  knock on doors to conduct part of your investigation?

18  A.   No.

19  Q.   I imagine the agency -- and correct me if I'm wrong -- has

20  those types of investigators.

21  A.   Yes, they do.

22  Q.   Was that type of investigator used to investigate

23  Mr. Berman's -- the claim of whether he was working while

24  receiving benefits?

25  A.   No.

1   Q.   So the investigation was merely a phone call or two?

2   A.   Phone calls and correspondence.

3          MR. SPRINGER:  May I approach the witness, Your

4   Honor?

5          THE COURT:  Yes.

6   BY MR. SPRINGER:

7   Q.   I'm going to show you what's been marked as Plaintiff's

8   Exhibit 25B.

9          Just go ahead and take a look at that document.

10  A.   (Complies.)

11  Q.   And while you're looking at that, let me ask you this.  So

12  have you -- other than as you've been involved in this

13  proceeding today or your deposition, have you spoken to anybody

14  about Lareesa Berman?

15  A.   No.

16  Q.   Now, Exhibit 25B says notice of determination, and we

17  talked about that a few minutes ago.

18          Do you remember that?

19  A.   Yes.

20  Q.   These are one of the documents that are issued as a result

21  of your investigation, correct?

22  A.   Yes, it is.

23  Q.   And this notice of determination says that the

24  determination was made Mr. Berman was not working while

25  receiving benefits.

1          Now, does that ultimately always mean that he really

2   wasn't working?

3   A.    Not necessarily.  It means the evidence I obtained, I felt

4   like he wasn't working during that period of time.

5   Q.    Right, through your phone calls.

6   A.    Yes.

7   Q.    All right.  And the date on this document is October 17th,

8   2011.

9          Do you see that?

10  A.    Yes.

11  Q.    And as of that date, was the unemployment compensation

12  process continuing for Mr. Berman and his benefits?

13  A.    I can't recall whether he was still receiving benefits or

14  not, but this did not deny his benefits.

15  Q.    Right.

16         But your issuance of the notice of determination was

17  part of the unemployment compensation process.

18  A.    Yes.

19  Q.    Okay.  Was Mr. Kafka entitled to appeal this finding in

20  this notice of determination if he so chose to?

21  A.    Yes, he could.

22         MS. BERMAN:  Your Honor, I'm going to object

23  because --

24         THE COURT:  There's no question pending.  There's

25  nothing to object to.

 1  BY MR. SPRINGER:

 2  Q.   My last question would be overall, and referring back to

 3  Exhibit 25 and that particular statement that's at issue, "Part

 4  of the money was embezzled by his wife," did you use that

 5  statement for any reason whatsoever in your investigation that

 6  you conducted on behalf of the agency?

 7  A.   No.  The person I was investigating was Mr. Berman, so any

 8  allegation as to Ms. Berman in here was not relevant to my

 9  investigation.

10          MR. SPRINGER:  Thank you.  Those are all the

11  questions I have.

12          THE COURT:  All right.  Ms. Berman?

13          MS. BERMAN:  I would like --

14          MR. SPRINGER:  Yeah, I'll get them for you.

15                          CROSS-EXAMINATION

16  BY MS. BERMAN:

17  Q.   Good morning.

18  A.   Hi.

19  Q.   Good afternoon.

20          Ms. Connell, when you see this letter, do you think

21  that a person who is on this letter, that person will be

22  contacted?

23  A.   I was contacted by Mr. Kaufman.

24  Q.   Mr. Kaufman?

25  A.   Uh-huh.

1  Q.    Who is that?

2  A.    From Maitland Furniture.

3  Q.    Oh, Mr. Kafka, you mean.

4  A.    Uh-huh.

5  Q.    But you think if Mr. Kafka receive those -- if Mr. Kafka

6  put those people on the -- in this letter, would you agree

7  that -- I remember in your deposition you told that you would

8  agree that those people been contacted.

9          MR. SPRINGER:  Objection, vague.  Who contacted who?

10         THE COURT:  Yeah.  I'm going to sustain the

11  objection.

12  BY MS. BERMAN:

13  Q.   Ms. Connell, I would like to ask you a question.

14         This letter doesn't have anything.  It doesn't have

15  Maitland Furniture, or it doesn't say it's for unemployment or

16  not.  It's just written Tom Kafka.

17         Could you tell me, is it -- what else in that letter?

18  It just -- just simple letter?

19  A.   This -- this letter was part of a packet of information

20  that was provided to me.

21  Q.   But where's the rest of them?  Can you tell me?

22  A.   I'm sorry?

23  Q.   Where's the rest of the package?

24  A.   It's in our files.

25  Q.   In the files.

1          But would you agree if -- you said this letter is

2   confidential.  Would you agree that if it's confidential, it

3   will not have a stamp?

4   A.   This document has a -- any documents that pertain to my

5   investigation are considered confidential information.

6   Q.   Yes, I know.  I know, but they produce me from bureau and

7   it says in that letter every document is -- which you receive

8   is a public record and it was -- it was -- I'm sorry -- was --

9   I forgot the word.  Like an X, and that's why they were able to

10  take this letter.

11         Is it correct?

12         MR. SPRINGER:  Objection, predicate, foundation.  I

13  don't know -- vague.  I don't know what she's talking about.

14         THE COURT:  I'm going to sustain the objection.

15  BY MS. BERMAN:

16  Q.   So on this letter, 10/17/11, you investigated.

17         Did you find any fraud?

18  A.   No, I didn't find any fraud.

19  Q.   Did you -- would you be contacting those people who are on

20  the letter?

21  A.   I could have contacted those people as part of the

22  investigation, yes.

23  Q.   Yes.  Okay.

24         This notice of determination, it says -- did you

25  believe everything what this letter said, is that my husband --

 1   my husband on unemployment, and he -- you are -- investigated

 2   just fraud investigation.  Is it correct?

 3   A.    I'm sorry.  I don't understand.

 4   Q.    You investigated just fraud investigation; is it correct?

 5   A.    I'm --

 6   Q.    You are not, like, part of the unemployment appeal.  You

 7   are not about -- you just about benefits fraud; is it correct?

 8   A.    That's correct.  I am not involved in the appeal process.

 9   Q.    You weren't involved in appeal process.

10         Can you tell, when did you start your investigation?

11   A.    What was my reference to that?

12   Q.    When did you started investigation for --

13   A.    It was during, like, August and September of 2011 was when

14   the investigation occurred.  It was finished in -- I think that

15   determination was made in October of 2011.

16   Q.    So it was -- was it judicial proceeding or not?

17         MR. SPRINGER:  Objection.  It's speculation.  It asks

18   for an opinion out of her --

19         MS. BERMAN:  But you ask --

20         THE COURT:  I'll allow it.

21   BY MS. BERMAN:

22   Q.    Was it a judicial proceeding or not?

23   A.    A -- I'm sorry?

24   Q.    A quasi-judicial proceeding.

25   A.    A judicial proceeding?  After we issue a determination,

1   there are appeal rights on the bottom of the determination.  It

2   goes to both the claimant and the employer.  Either one of

3   those have appeal rights to our Office of Appeals.

4   Q.   You mean in this notice when it says that my husband

5   wasn't working, and it says there is 20 calendar days after

6   this date, 10/17/11, that he can appeal.

7   A.   Yes.

8   Q.   Did defendant appeal your conduct of investigation?

9   A.   There was no appeal.

10  Q.   No appeal.

11        To appeal -- what do you need to do to appeal

12  investigation?

13  A.   You would appeal in writing.

14  Q.   You --

15  A.   At the particular time that this happened, your appeal had

16  to be in writing.

17  Q.   In writing.

18  A.   Uh-huh.

19  Q.   Within the 20 calendar days.

20  A.   I'm sorry?

21  Q.   Within the 20 calendar days.

22  A.   Within 20 days of the date of the determination, yes.

23  Q.   So can you tell me if -- you were working, you said, 40

24  years, yes?

25  A.   Uh-huh.

```
 1    Q.    Congratulations.

 2          Can you tell me if you -- if you file for

 3    unemployment appeal, you have to be just employee.  You cannot

 4    file if you are not employee of the company.

 5    A.    Either one can file an appeal --

 6    Q.    No, no, no.

 7    A.    -- not just the employer.

 8    Q.    Maybe you misunderstand my question.  For example, if my

 9    husband filed for unemployment -- not appeal, for unemployment.

10          Does he need to be employee of a company to file for

11    unemployment?

12    A.    I'm not following.

13    Q.    For example, if I am not employee and, for example, never

14    was employed, can I go and file for unemployment?

15    A.    Anybody's entitled to file for unemployment, yes.

16    Q.    No.  That's not what I want to ask.

17          I want to ask, for example, if my husband is not

18    employed by -- he has own corporation, an incorporation, can he

19    go and file for unemployment when he has a corporation, when he

20    is an owner of corporation?

21    A.    When he's self-employed?

22    Q.    No.  If -- for example, if he's owner, any -- not my

23    husband, anyone who is an owner, can he go and for

24    unemployment -- file for unemployment?

25    A.    The owner of the company?
```

1  Q.   Yes.

2  A.   Normally not.  Usually what happens is they're not

3  registered with the State as an employer.  They don't pay

4  unemployment taxes.  Some of them don't; some of them do.

5        Like I said, anybody is entitled to file for

6  unemployment, but that doesn't mean they're going to receive

7  unemployment.

8  Q.   Okay.  So if it's -- a person is not -- not employee, he

9  cannot receive benefits.

10       MR. SPRINGER:  Objection, Judge.  It's outside the

11  scope of direct.  She did an investigation for whether he was

12  working at the time, not the appeals process for the

13  unemployment claim itself.

14       THE COURT:  I'm going to -- I'll sustain the

15  objection.

16       MS. BERMAN:  Okay.

17  BY MS. BERMAN:

18  Q.   And you did not find any fraud benefits.

19       I have a question.  For example, this letter where he

20  said that my husband embezzle money and part of embezzled by

21  my -- by me, does it have any relationship with your fraud

22  investigation --

23  A.   No.

24  Q.   -- my name?

25  A.   No.

 1  Q.    No.
 2        So it means no judicial proceeding when there is no
 3  relationship.
 4  A.    Right.  There's no relationship.
 5  Q.    So no any quasi-judicial proceeding --
 6              MR. SPRINGER:  Object, speculation.
 7  Q.    -- correct?
 8              THE COURT:  I'll let her answer it.
 9              I'll let you answer it if you understood the
10  question.
11              THE WITNESS:  What was the question?
12  BY MS. BERMAN:
13  Q.    If -- I'm sorry.
14  A.    I think what you're trying to ask is the fact that the
15  information in there relates to you and your husband
16  committing -- embezzling money, that had nothing -- that was
17  not relevant to my issue.  That would be a civil issue between
18  the owner of the company and the individual that did it.
19  Q.    So is -- if I am not -- my husband have benefits and I'm
20  not receive unemployment benefits, do I have any relationship
21  to what you investigating?
22              So you said that I don't have any relationship --
23  A.    No.
24  Q.    -- as I wasn't employed by Defendant Kafka; is it correct?
25  A.    You were not -- you were not the person that had filed for

1   the benefits.

2   Q.   Yeah.  So it means that I am -- during that -- there is no

3   any quasi-judicial proceeding because I was not employed.  Is

4   it correct?

5   A.   Right.

6   Q.   You just said that, right?

7   A.   Yes.  You were not -- you weren't the person with the

8   claim, so you weren't investigated.

9   Q.   So the quasi-judicial or judicial proceeding does not

10  affect me.  Is it correct?

11  A.   That's correct.

12            MS. BERMAN:  Thank you.  Thank you very much.

13            THE COURT:  All right.  Any redirect?

14            MR. SPRINGER:  Just real brief, Your Honor.

15                        REDIRECT EXAMINATION

16  BY MR. SPRINGER:

17  Q.   Ms. Connell, just to be clear, you don't know why

18  Mr. Kafka did not appeal the notice of determination, correct?

19  A.   No, I don't.

20  Q.   And your investigation was solely into whether or not

21  Mr. Berman was working while receiving benefits; is that right?

22  A.   That's correct.

23  Q.   And the letter, document 25, Exhibit 25, this letter

24  provided context for you, didn't it, in your investigation of

25  background to set up what had transpired, what was going on?

1    A.    Yes.

2            MR. SPRINGER:  That's all I have.  Thank you.

3            THE COURT:  All right.  Thank you, Ms. Connell.  You

4    can step down.

5            Let me see counsel and Ms. Berman at sidebar for a

6    moment.

7        (At sidebar, out of the hearing of the jury:)

8            THE COURT:  All right.  So just in terms of the

9    timing, that took 20 minutes, so I'll allow you to go 20

10   minutes more tomorrow if for some reason you can't finish up

11   today.  That's with your case, including your testimony.

12           And so I'm going to allow you -- I think I said I'll

13   allow you a half hour to finish up your cross, and I'll allow

14   you 15 minutes of redirect of your husband, okay, and then he's

15   done.  And then you'll start your testimony.

16           MS. BERMAN:  Okay.

17       (End of discussion at sidebar.)

18           THE COURT:  All right.  If you can have Mr. Berman

19   come back in.

20           MR. JONES:  May I retrieve some exhibits?

21           THE COURT:  Yes.

22       (Brief pause.)

23           THE COURT:  Take a seat back on the stand,

24   Mr. Berman.

25           THE WITNESS:  Sure.

1          Can I ask a question?

2          THE COURT:  No.

3          THE WITNESS:  Oh, okay.

4          MR. JONES:  May it please the Court?

5          THE COURT:  Yes.

6          CHRISTOPHER BERMAN, PLAINTIFF'S WITNESS, SWORN

7              CROSS-EXAMINATION (CONTINUED)

8    BY MR. JONES:

9    Q.   So, Mr. Berman, we left off beginning to discuss this

10   document.  It's a check.

11   A.   Right.

12   Q.   And right before we broke, you told the jury that is not

13   your wife's name or signature.  Am I correct?

14   A.   Well, it doesn't really look like her signature, and that

15   wouldn't be the spelling of her name at that particular time.

16   It had already been changed so that people could pronounce my

17   wife's first name phonetically instead of people would call her

18   Larysa or -- you know, they would have problems with it.

19   Q.   Okay.

20   A.   She didn't like -- she didn't like people to have problems

21   with her name.

22   Q.   And you said at that time.  You're speaking of -- it's

23   obliterated but it's November 2006, correct?

24   A.   That is correct, yes.

25   Q.   Okay.  Let me show you what has been entered into evidence

1    as Defendant's Exhibit 16.

2    A.    Uh-huh.

3    Q.    This is a warranty deed.

4          Do you see that?

5    A.    Uh-huh.

6    Q.    And that is with -- is that your name on this warranty

7    deed?

8    A.    Yes, it is.

9    Q.    Christopher Berman?

10   A.    Uh-huh.

11   Q.    Yeah.

12         And then is that your wife's name?

13   A.    Yes.

14   Q.    And you didn't purchase a house with Larysha (phonetic),

15   did you?

16   A.    I did not.

17   Q.    And it's spelled L-a-r-y-s-a.

18   A.    Correct.

19   Q.    All right.  And that is your wife, correct?

20   A.    Yes.  I would hope so.

21   Q.    And she signed -- she signed this warranty deed, and she

22   spelled it L-a-r-y-s-a, correct?

23   A.    No.  Actually, that's -- that's not what she signed at

24   all.

25   Q.    That's not her signature?

1   A.   That's her signature, but that's not -- but that's not

2   what it says.

3   Q.   Well, I'm just reading the name underneath the signature

4   line.  It says L-a-r-y-s-a.

5        Am I right?

6   A.   Under the signature line?  Well, that's the --

7   Q.   See that right there?

8   A.   You mean the typed name.

9   Q.   The typed name --

10  A.   Yes.

11  Q.   -- is L-a-r-y-s-a.

12  A.   Uh-huh.

13  Q.   Correct?

14       And that's her signature.  Am I right?

15  A.   But that's -- but that signature doesn't say L-a-r-y-s-a.

16  Q.   Well, I don't believe -- well, it's just a signature,

17  isn't it, Mr. Berman?

18  A.   I don't know.  Can you read Ukrainian?

19  Q.   Well, let's see while comparing these two.

20       And the spelling on your wife's warranty deed is the

21  same as the spelling on the check, is it not?

22  A.   Oh, you're digging yourself a very deep hole.

23  Q.   Sir --

24            THE COURT:  Mr. Berman, just answer the question.

25            THE WITNESS:  Okay.

1          THE COURT:  You're not supposed to be an advocate

2  here.  You're a witness.

3          THE WITNESS:  I'm sorry.

4          Okay.  Yes.  That is the spelling on that warranty

5  deed, that is correct.

6  BY MR. JONES:

7  Q.  Okay.  And it's the same as on this check, is it not, the

8  same spelling?

9  A.  Yes.  I can see that.

10 Q.  Okay.  And this warranty deed was made in August 2007,

11 correct?

12 A.  That appears to be correct, yes.

13 Q.  And this check was made out, I think we already

14 established, November 2006, correct?

15 A.  Yes.  But you're missing -- you're missing the point.

16         THE COURT:  Just answer the question.  Mr. Berman,

17 just answer the question.

18         THE WITNESS:  Okay.  Yes.

19 BY MR. JONES:

20 Q.  Let me show you another exhibit that's marked into

21 evidence as a defense -- it's in evidence as Defense Exhibit

22 15.

23         That's a marriage record.  It's an application to

24 marry.

25 A.  Yes.

1   Q.   Do you see that?

2   A.   Uh-huh.

3   Q.   All right.  And for the date, the date that would have

4   been issued in this -- slide down here -- August 14, 2000,

5   right?

6   A.   That is correct.

7   Q.   And the bride's name is Larysa --

8   A.   No.  You're pronouncing it wrong.

9   Q.   Larysa?

10  A.   Correct.

11  Q.   L-a-r-y-s-a, correct?

12  A.   Well, that's one translation of the spelling.  It could be

13  translated two different ways.

14  Q.   Okay.  But on this document, when she applied to marry

15  you, she translated it L-a-r-y-s-a, correct?

16  A.   No.  She didn't translate it that way.  That was the

17  official translation from the INS.

18  Q.   On this record, sir, that's filed with the State of

19  Florida, your marriage application simply has her as

20  L-a-r-y-s-a, correct?

21  A.   Well, yes, that is correct.

22  Q.   All right.  And she signed it right there where it says

23  signature of the bride?

24  A.   Uh-huh.

25  Q.   That's her signature?  Okay.

 1  A.    I don't know.  They don't look --

 2  Q.    That's --

 3  A.    They don't look the same to me.

 4          THE COURT:  Wait till there's a question, Mr. Berman.

 5          THE WITNESS:  Okay.

 6  BY MR. JONES:

 7  Q.    This is your wife's signature --

 8  A.    Yes.

 9  Q.    -- on this application to marry.

10  A.    Uh-huh.

11  Q.    And that's the signature under the same spelling,

12  L-a-r-y-s-a, on this check in 2006, correct?

13  A.    Yeah.

14  Q.    Okay.  And you were present -- you witnessed your wife

15  sign the marriage application, right?

16  A.    Yes.

17  Q.    Okay.  Let me move on to another subject matter, sir.

18          I think you've testified that when the -- you

19  received a check in the course of your business with -- for

20  Trifecta Gaming --

21  A.    Uh-huh.

22  Q.    -- you would deposit those into the Trifecta Gaming

23  account, correct?

24  A.    Yes, that is correct.

25  Q.    All right.  And, in fact, this was a check not made out to

1   Trifecta Gaming but in care of Trifecta Gaming -- or you in

2   care of Trifecta Gaming, correct?

3   A.   I see that, yes.

4   Q.   All right.  But it's got Trifecta Gaming USA, Inc., on

5   this check.  Am I right?

6   A.   Well, yes, it does.

7   Q.   All right.  However, this check was not deposited, was it?

8   A.   I wouldn't know.

9   Q.   It says cash check, doesn't it?

10  A.   That's what it -- that's what it says there, yes.

11  Q.   All right.  Now, I want to show you what's been marked for

12  identification Defendant's Exhibit 18.

13          Now --

14          MS. BERMAN:  Your Honor, I objected for that because

15  it was not from SunTrust, and it was not with a stamp.  That

16  can be anyone to --

17          THE COURT:  Is this --

18          MR. JONES:  I'm not --

19          MS. BERMAN:  We --

20          THE COURT:  Hold on.  Hold on, Ms. Berman.

21          MR. JONES:  It hasn't been entered yet.  The

22  predicate is going to be laid later.  I'm not going to admit

23  it -- or offer it into evidence or show the jury at this time.

24          THE COURT:  All right.

25          MS. BERMAN:  Your Honor, it wasn't in initial

 1  disclosure.  We already objected.  It's not in the --

 2          THE COURT:  Okay.  Objection overruled.

 3  BY MR. JONES:

 4  Q.   Before I do that, sir --

 5          THE COURT:  You're not -- you said you weren't going

 6  to show it to the jury.

 7          MR. JONES:  No, no, no.  This is a different one.

 8          THE COURT:  Okay.

 9          MR. JONES:  This is Exhibit 14A that's in evidence.

10  I forgot to ask you this one question.

11          THE WITNESS:  Sure.

12  BY MR. JONES:

13  Q.   You've never seen that account number before, correct?

14  That's your testimony?

15  A.   That account number?

16  Q.   Correct.

17  A.   I'm not familiar with it, no.

18  Q.   Never seen it before, correct?

19  A.   Well, I'm not familiar -- it's not my account number.

20  Q.   Okay.  Lastly, let me show you --

21          MR. JONES:  Your Honor, may I have two seconds to

22  consult with my client?

23          THE COURT:  Yes.

24  BY MR. JONES:

25  Q.   Okay.  Let me show you what's been marked as

1    Defendant's -- it's in evidence as Defendant's Exhibit 1.

2    We've seen this earlier.

3    A.   Uh-huh.

4    Q.   Let me finish up with this question here.

5    A.   Sure.

6    Q.   This is the decision of the appeals referee.  This was --

7    this decision was made in May 29, 2009.

8    A.   Uh-huh.

9    Q.   Do you see that?

10        And that was following that hearing we just spoke of

11   before we broke?

12   A.   You mean the vacated hearing?

13   Q.   The hearing you testified to under oath.  Do you remember

14   that one?

15   A.   Well, the hearing was vacated.

16        THE COURT:  Mr. Berman --

17        THE WITNESS:  Yes.

18        THE COURT:  -- would you answer the question?

19        THE WITNESS:  Yes.  I -- yes.

20   BY MR. JONES:

21   Q.   Okay.

22   A.   Okay.

23   Q.   So I want to ask you here, there's a short paragraph here

24   about findings of fact --

25   A.   Uh-huh.

 1  Q.    -- and the unemployment appeals referee finds -- and when

 2  it mentions the name claimant in here, you understand that's

 3  you, right?

 4  A.    Yes.

 5  Q.    All right.  And it says in here that the -- "Toward the

 6  end of the claimant's employment, the employer became aware the

 7  claimant had been having customers write checks for purchase

 8  directly to the claimant rather than the business."

 9          Do you see that?

10  A.    But that's not the business.  The business is Maitland

11  Furniture.

12          THE COURT:  He asked you a question --

13          THE WITNESS:  Yes.  I see that.

14          THE COURT:  -- Mr. Berman.

15  BY MR. JONES:

16  Q.    And it says in here, "The employer conducted an

17  investigation and discovered that the claimant also had sold

18  products to customers at a higher rate than he had instructed

19  the claimant to charge and had paid the difference to himself,

20  giving the employer one copy of an invoice and the customer

21  another."

22          Do you see that?

23  A.    I see that, yes.

24  Q.    "Lastly, the employer discharged the claimant for

25  falsifying records and misappropriation of funds."

1          Did I -- is there anything in there where it says

2    that you were fired because you wrote a book?

3    A.   That's what the -- that's what the original determination

4    was in February 18th of 2009.

5    Q.   Sir, is there anything in this referee's findings of fact

6    that said you were discharged because you wrote a book?

7    A.   I don't see that, but I also don't see my wife's name in

8    there.

9    Q.   It was in the hearing, wasn't it?

10   A.   No, it was not.  You --

11   Q.   The checks were referenced in the hearing, weren't they?

12   A.   By Mr. Kafka, not by me.

13   Q.   Exactly.

14   A.   And I --

15   Q.   They were entered into evidence.

16   A.   How could I -- how could I know that they were entered

17   into evidence?  It was a telephone hearing.

18   Q.   You got a copy, sir.

19   A.   Excuse me?

20   Q.   You were provided copies.

21   A.   I didn't have copies of those checks.  Show me -- please

22   show me on here where I answered that I saw those checks.

23   Q.   You -- were you given an opportunity, Mr. Berman --

24   A.   Opportunity for --

25   Q.   -- to offer evidence in that hearing?

1   A.    I was not.

2   Q.    Okay.  Last question.

3   A.    That's why the -- one of the reasons the hearing was

4   vacated, because I was cut off.

5         Look, if they found any --

6         THE COURT:  Mr. Berman, that's it.

7         THE WITNESS:  Okay.

8   BY MR. JONES:

9   Q.    Let me ask you this.

10  A.    Sure.

11  Q.    Were you offered an opportunity to object to any of the

12  documents that Mr. Kafka had entered?

13  A.    No, I was not.

14  Q.    Okay.  Let me show you --

15        MR. JONES:  May I approach the witness, Your Honor?

16        THE COURT:  Yes.

17  BY MR. JONES:

18  Q.    Referring back to the hearing transcript --

19  A.    Yes.

20  Q.    -- question -- do you have a copy of it still up here?

21  A.    This, yes.  Is this it?

22  Q.    Yeah, that's it.

23  A.    Yes.

24  Q.    Q95, that's on page 17.

25  A.    Yes.

1    Q.   You're asked a question:  "Do you have any objection to

2    the documents being entered as exhibits, Mr. Berman?

3             "ANSWER:  No, I don't."

4    A.   It wasn't part of the exhibit, and I was waiting until the

5    end of the hearing for my rebuttal that I might take that time

6    to address each one of those issues.

7             Mr. Kafka refused to let the articles of

8    incorporation be entered.

9    Q.   Did I read that correctly?

10   A.   Did you read what correctly?

11   Q.   What -- your sworn testimony.

12   A.   Yes, you did, but those -- but those checks that you're

13   talking about were not in the -- were not part of what I was

14   sent.

15   Q.   Let's turn to -- I'm going to try to finish up here --

16   page 15.

17   A.   Uh-huh.

18   Q.   This is Mr. Kafka speaking.  That's just an A, not A2 in

19   there, and it says in here, "Section C.  That's because it's a

20   little different.  In this particular" --

21             THE COURT:  She can't hear you, Mr. Jones.

22   BY MR. JONES:

23   Q.   "In this particular case, he had the check come in from

24   Yonkers Raceway," showing you Exhibit 14A for a second.

25   A.   Uh-huh.

 1   Q.   The person writing that check is Yonkers Racing Corp.,

 2   correct?

 3   A.   That's -- yes.

 4   Q.   Okay.  "Had the check come in from Yonkers Raceway."  And

 5   this was in 2006.

 6   A.   Uh-huh.

 7   Q.   That check was in 2006.

 8   A.   Yes.  I'm sorry.  Yes.

 9   Q.   "And this -- in this particular case, he signed the check

10   over to Lareesa Berman."

11          Q83:  "And who" -- "QUESTION:  "And who was that?

12          "That would be his wife."

13   A.   And that was answered by Mr. Kafka not by me.

14   Q.   And entered in by Mr. Kafka, correct?

15   A.   Entered in by Mr. Kafka, correct.

16          MR. JONES:  No further questions, Your Honor.

17          THE COURT:  All right.  Redirect?

18                      REDIRECT EXAMINATION

19   BY MS. BERMAN:

20   Q.   Was it a telephone hearing?

21   A.   Yes, it was a telephone hearing.

22   Q.   Do you recall the weather?

23   A.   Yeah.  There was a thunderstorm, a bad one, that was --

24   Q.   Did you hear --

25   A.   -- picking up right in the middle of the hearing.

1    Q.   Did you hear very well what they talking about?

2    A.   No.  The phone was cutting out intermittently.

3    Q.   Can you tell me, did you hear he ever said about me during

4    this telephone hearing?

5    A.   I never heard it.

6    Q.   You never heard.

7    A.   I didn't hear it, no.

8    Q.   But this was what they talking about, a check.  It's

9    Mr. Kafka's speech and the referee, correct?

10   A.   Yeah, that's right.

11   Q.   Then I want to say those transcripts, it's -- what was

12   from unemployment hearing, did you receive this transcript or

13   you receive in other form?

14   A.   No.  I received it as a CD after -- after I had asked for

15   it.

16   Q.   You asked for that.

17   A.   I asked for it because -- because I wanted -- because I

18   lost the telephone connection, and I wanted to see what was

19   being said after the telephone went dead.

20   Q.   But let's read it in the end.

21   A.   Sure.

22        Where did you want me to start to read from?

23   Q.   Page 34, and 181.

24   A.   Page 34 and what?

25   Q.   Uh-huh.

1    A.    Page 34 where?

2    Q.    Q181.

3    A.    Oh, 181.  Okay.

4            THE COURT:  Hold on.  Hold on.

5            MR. JONES:  Yeah.  No objection, Your Honor.

6            THE COURT:  All right.

7            THE WITNESS:  "Hold on a moment.  I'm seeing if he's

8    still on the line.  Just a moment.

9            "Are you still on the line, Mr. Berman?

10           "I think he got cut off.  Let me see if I can get him

11   back on the line."

12           And it says, "At the tone, please read your -- yeah.

13   Mr. Berman, this is Debra McEachim trying to reconnect.  Please

14   hang up and I will call you back.

15           "Still there, Mr. Kafka?

16           "Yes, I am.

17           "Give me one more try, one more minute.

18           "Ringing.  No sounds, sounds like it rang but

19   disconnected again.

20           "Okay.  Well, did -- are you filing any charges

21   against Mr. Berman?

22           "We have retained an attorney" --

23           MR. JONES:  Objection, Your Honor.

24           THE COURT:  You're going to need to tell him when to

25   stop or --

1              MS. BERMAN:  No.  I would like to.

2              THE COURT:  How much are you going to have him --

3              MS. BERMAN:  I would like to read --

4              THE COURT:  How far do you -- to go where?

5              MS. BERMAN:  To the next page.

6              THE WITNESS:  I can skip that --

7              THE COURT:  Hold on a second.

8              THE WITNESS:  -- part.

9              MS. BERMAN:  I would like -- it's --

10             THE COURT:  This is Mr. Kafka's testimony?

11             MR. JONES:  Yes, Your Honor.

12             THE COURT:  Do you have an objection to this?

13             MR. JONES:  No.

14             THE COURT:  All right.  Go ahead.

15    BY MS. BERMAN:

16    Q.   Can you continue with the -- continue --

17    A.   Okay.

18    Q.   -- when he said, "Are you filing charges?"

19    A.   Yeah.  "Right now we're taking care of other things,

20    mainly the trademark at the moment.  We will have time other.

21    Also how the trademark name Maitland Furniture do business

22    under other company.

23             "Yes.  Well, everything we did.  Maitland has been in

24    business for 25 years, and so on May 2004 Chris came to me and

25    we started Trifecta Gaming USA.  He's correct.  He was a

1    minority shareholder -- stockholder at the time and owned 33

2    percent of the company, I believe, and my wife owned 67

3    percent.

4          "And then it went that way until December 31st,

5    2006 -- 2005 at the time due -- and he's saying due to -- and

6    he's -- due to complete incompetence on his part, I was going

7    to part ways.  I was completely done at the time to justify

8    what he said.

9          "He begged and begged to stay and suggested I put him

10   on as a salesperson and give him a 1099.  Despite what he says,

11   that's what happened.  And so what we did, we did that ever

12   since.  So he's on a 1099 ever since.

13         "No, he's been on a 1099 for 2004, 2005 only, and the

14   invoices that went to customers didn't have Trifecta name on it

15   or Maitland.  I think where Chris is totally mistaken, he's

16   saying we don't have a federal tax ID number, but sometimes

17   where Trifecta Gaming is new, an account did not" --

18         MR. JONES:  I'm sorry.  He skipped --

19         THE COURT:  Hold on.  Yeah.

20         THE WITNESS:  Oh, I'm sorry.

21         THE COURT:  First of all, Ms. Berman -- where are you

22   going to have him stop?  Why is he reading all this?

23         THE WITNESS:  Well --

24         THE COURT:  I asked Ms. Berman that.

25         THE WITNESS:  Okay.

 1          MS. BERMAN:  Okay.  This was when cut off.

 2  Unemployment proceeding is -- when a person off, they have to

 3  stop and not testify from one side.

 4          THE COURT:  All right.  So that's your point?

 5          MS. BERMAN:  And here he --

 6          THE COURT:  All right.  So you don't need to read any

 7  more.

 8          Okay.  Go on to your next question.

 9          MS. BERMAN:  But he -- on the -- when my husband

10  wasn't here, he mention my name here that I embezzle money

11  in -- just to the person but not to how they apply in -- during

12  the hearing.

13          THE COURT:  All right.  Go ahead and read to the end

14  of this transcript.

15          THE WITNESS:  Okay.  "I will do so" --

16          THE COURT:  But read -- Mr. Berman, stop skipping

17  lines --

18          THE WITNESS:  Sure.

19          THE COURT:  -- and paraphrasing.  Read it word for

20  word.

21          THE WITNESS:  Okay.  Okay.  "The invoices" -- okay.

22  I think -- "I think where Chris is totally mistaken, he's

23  saying we don't have a federal tax ID number.  We both have

24  copies of the federal tax ID number.

25          "But sometimes where Trifecta Gaming was new, an

1    account did not want to do business with Trifecta because they

2    were new, and they would ask to be written through Maitland

3    Furniture because we had been around for 25 years, and we would

4    do that as well.

5              "Do you have any other information to provide?

6              "I don't know.  I get a little weary when it comes to

7    all this crazy stuff, and, you know, he's out there

8    broadcasting it every day.

9              "Do you have a closing statement as far as the

10   unemployment, whether he qualifies for unemployment benefits or

11   not?

12             "I would say the man has embezzled a relatively large

13   sum of money, and the fact that he embezzled money from people

14   in the industry is the fact that I have to deal with, and the

15   fact that he misappropriated funds and signed a check over to

16   his wife.  I think there's no way on earth this man should be

17   collecting unemployment.

18             "I'm going to close this hearing and issue a written

19   decision and mail -- mail to both parties within a few days.

20             "All right.  Thank you for your time.  Good-bye.

21             "Good-bye.

22             "Good-bye.

23             "End of transcript."

24   BY MS. BERMAN:

25   Q.   That's why unemployment appeal was in his favor, because

 1  he was talking --

 2          THE COURT:  Are you asking a question, Ms. Berman?

 3  BY MS. BERMAN:

 4  Q.   Is it because he was talking without your knowledge?

 5  A.   Yes.  I was --

 6          MR. JONES:  Objection.

 7          THE COURT:  That objection is sustained as to why

 8  somebody else made a decision.

 9  BY MS. BERMAN:

10  Q.   But you don't recall about -- that he said the checks

11  turned over to Lareesa Berman.

12  A.   No.  I don't -- I don't recall hearing that because I was

13  having an intermittent on-and-off connection.

14  Q.   They talking about some kind of Section C.

15          Have you received a Section C?

16  A.   Section C?

17  Q.   Yes.  I don't know what it is.  "Section C is just because

18  it's different."

19  A.   I don't know what Section C is.

20  Q.   You see that he provided package A and D, and nobody

21  provided me Section C with my name --

22          THE COURT:  Ms. Berman, you can't testify right now.

23          MS. BERMAN:  Okay.

24          THE COURT:  You can testify later.

25          Do you have any more questions for your husband?

```
 1              MS. BERMAN:  Yes, I do.  I do.
 2              THE COURT:  Okay.  Well, you don't have a lot of
 3    time, so --
 4    BY MS. BERMAN:
 5    Q.   Do you recall that they were talking about this deposition
 6    testimony that you took in January 6, 2009?
 7    A.   Yes.  Yes, I do.
 8    Q.   So do you recall that you had a right to go, like
 9    Mr. Kafka, and check if everything correct or not?
10    A.   Yes, but I -- I didn't do that.
11    Q.   I don't see your signature here.
12    A.   No, I didn't --
13    Q.   You didn't.
14              But did you -- you didn't sign.  I mean, you didn't
15    sign this --
16    A.   Deposition, no.
17    Q.   -- deposition.
18    A.   No.
19    Q.   But do you recall you go through and correct it?  Do you
20    recall that?
21    A.   No.  I was never given it to correct.
22    Q.   So you didn't read it.
23    A.   No.
24              MR. JONES:  Objection, Your Honor.  It's -- it's
25    sworn testimony.
```

1              MS. BERMAN:  But it's --

2              THE COURT:  Hold on.  Hold on.

3              MS. BERMAN:  Your Honor, there is no his signature.

4              THE COURT:  All right.  He doesn't have to sign a

5      deposition, Ms. Berman.

6              MS. BERMAN:  But he reserve the rights.  On page 4

7      it says that he reserve the right to read everything correct.

8              THE COURT:  Page 4?

9              MS. BERMAN:  Yes.  It was related that he would be

10     reading and sign.

11             THE COURT:  All right.  He's allowed to say that he

12     didn't read it and didn't sign it.  It is sworn testimony, all

13     right?

14             MS. BERMAN:  Yeah, but he didn't read it.  Maybe he

15     would correct it.  I don't know.

16             THE COURT:  Well, you can ask him.  Don't argue with

17     me.

18             THE WITNESS:  Yes, I would have corrected that if I

19     had it -- if I had read it.

20             Actually, this is the first time I've seen it, in

21     this -- in this -- in this courtroom.  I hadn't seen it before.

22     BY MS. BERMAN:

23     Q.  Okay.  And about this interview, do you recall you

24     receive -- you said you receive already CD.

25             You remember that?

1  A.   Yes.  I asked for the CD because I wanted to know what was

2  on the last -- the last minutes that were --

3  Q.   But we didn't hear everything.  We just check in the end,

4  correct?

5  A.   Yes.  We checked in the end.

6  Q.   Does this CD transcribe correctly what it says in this

7  transcript?

8  A.   No, it does not.  The wording's different.

9        MS. BERMAN:  We have CD and its wording is not

10  correct.  I have CD from unemployment.

11        THE COURT:  Well, that's -- okay.  So --

12        MS. BERMAN:  So this is --

13        THE COURT:  So ask a question.

14        MS. BERMAN:  Okay.  Next.

15        MR. JONES:  Your Honor, I'm sorry.  In terms of --

16  for the sake of completeness, there is a last page on that same

17  deposition --

18        THE COURT:  You're talking now about the deposition?

19        MR. JONES:  -- that he's saying he never got an

20  opportunity to read and sign.

21        THE COURT:  Right.  Go ahead and read -- where is

22  that?

23        MR. JONES:  Page 85.

24        THE COURT:  85?

25        MR. JONES:  It's the second one.  The first one was

 1  continued.  It did not conclude, so there was no last page

 2  where they asked if he would read and sign.

 3          THE COURT:  Okay.  Do I have -- do I have a copy of

 4  that one?  Mine only goes up to 79.

 5          MR. JONES:  They started repaging after -- on the

 6  second.  It picks up in the afternoon.

 7          Go ahead.  You can read that part of it.

 8          MS. BERMAN:  There is no signature of --

 9          THE COURT:  He can read what he wants to read.

10          Go ahead.

11          MR. JONES:  It says -- it's his attorney saying --

12          THE COURT:  You might want to get a little closer to

13  the microphone.

14          MR. JONES:  Okay.  It says, "Since this was so long

15  and would like reading, we'll read."  So he's speaking through

16  his attorney that they would read.

17          THE WITNESS:  But I never read --

18          MS. BERMAN:  There is no signature.

19          THE WITNESS:  I never read it.

20          MR. JONES:  Your Honor, he was -- for the sake of

21  completeness, he was given the opportunity through his attorney

22  to read.  You know, we don't know to what extent he did or

23  didn't.  It's sworn testimony, and according to the rules of

24  procedure, he was given the opportunity to --

25          THE COURT:  All right.  Well, you were allowed to

1    impeach him with that deposition.  He's now saying he didn't --

2    he never did read it.  The jury can attribute whatever weight

3    they want to that, if any.

4           MR. JONES:  Thank you.

5    BY MS. BERMAN:

6    Q.   Is opportunity, to give opportunity, and usually give to

7    you and read it, is it the same?

8    A.   Well, giving you an opportunity --

9    Q.   That's not the same --

10   A.   Giving you an opportunity to do so and then actually doing

11   it are two different things, yes.

12   Q.   But nobody give you this to read.

13   A.   I don't recall ever -- I recall that we were in there for,

14   gosh, it was not one day; it was two days.

15   Q.   Can you explain to jury that -- how difficult to explain

16   between -- difference between Maitland and Trifecta?  It took

17   you, like, two days to --

18   A.   It took the entire first day to try to explain to them how

19   they're two separate companies and how they interact, and that

20   was -- I think I sat there for must have been six, seven hours.

21          I can recall that -- you know, try sitting someplace

22   for six or seven hours when you're still -- you have two

23   fractured vertebrae that are still healing.

24   Q.   So -- and you said you took medications that you --

25   A.   I -- yeah.  Well, I was on constant medication since the

1   accident.

2   Q.   And is it impair your speech when you're taking?  You

3   usually don't even know --

4   A.   I don't -- usually not.  I usually don't -- you know, I

5   remember specifically at that time it was really quite

6   difficult.  I had been given some different types of pain

7   relievers, and a couple of those were codeine based.

8   Q.   Can you clarify to jury that -- you said 33, 33, 33 on

9   this.

10         Can you -- do they show you during this deposition?

11  A.   Yeah.  Somebody stuck a -- stuck the sheet in front of me

12  and said, you know, "Well, what is this?"

13         And I looked at it, "Oh, looks like 33, 33, 33," and

14  it's like -- you know, I know it was stupid not to really look

15  at it and concentrate on it, but, I mean, I'd been sitting

16  there for hours with, you know, something that felt like an ice

17  pick jammed in the back of my neck.

18         MS. BERMAN:  I would like to introduce -- I know what

19  you mean.  It's like they show you, and you could not believe.

20  They're saying that somehow you're guilty too.

21         MR. JONES:  Your Honor --

22         THE COURT:  Ms. Berman, that's --

23         MS. BERMAN:  No.

24         THE COURT:  -- not a question.

25         And let me see -- let me see everyone at sidebar.

1          (At sidebar, out of the hearing of the jury:)

2          THE COURT:  Okay.  You're almost out of time.  I'm

3    going to allow you three more questions and then that's it.

4          We're going to take a quick break for ten minutes,

5    come back at 4 o'clock.  You've got an hour to testify yourself

6    today, and then you've got 20 minutes tomorrow, so --

7          MS. BERMAN:  Okay.

8          THE COURT:  -- that's three more questions.

9       (End of discussion at sidebar.)

10   BY MS. BERMAN:

11   Q.   You think that I could not possibly put in -- this check

12   in my bank account and/or cash, yes?

13   A.   No, not at that time.

14         MS. BERMAN:  I would like to show my exhibits.  Can I

15   show my exhibits?

16         THE COURT:  What exhibit?

17         MS. BERMAN:  Exhibit 67.

18         THE COURT:  Is it in evidence?

19         MS. BERMAN:  Yes.

20         THE COURT:  You can show it.

21   BY MS. BERMAN:

22   Q.   That was introducing my -- that was introducing when we

23   bought house or --

24   A.   We refinanced the house.

25   Q.   Yeah.

1        But I didn't change at the time to the house, but did

2   I change my bank account?

3   A.    No, you did not.

4   Q.    No.  My bank account, did I change my name, not --

5   A.    In August?  You changed the -- you changed the name on

6   your bank account but it wasn't --

7   Q.    But not on the house, correct?

8   A.    That is correct.

9   Q.    Okay.  Let me show this, and you can see.

10        Do you recall this date of those alleged checks?

11        MR. SPRINGER:  November 24th, 2006.

12        MS. BERMAN:  November.  Okay.  November 24, 2006.

13   BY MS. BERMAN:

14   Q.    Look at my payroll check.

15        MS. BERMAN:  I would like to say that this was my

16   first job in America.  I was so proud that I still keep my

17   checks.

18        MR. JONES:  Your Honor, objection.

19        THE COURT:  Okay.  I'm going to sustain the

20   objection.

21        I'm going to tell the jury that we're going to take a

22   short break, and you can take a break till 4 o'clock, and

23   please be back at 4 o'clock.  And then we'll go till about

24   5:00.

25        Thank you.

```
 1            COURT SECURITY OFFICER:  All rise for the jury.

 2       (Jury out at 3:49 p.m.)

 3            COURT SECURITY OFFICER:  Please be seated.

 4            THE COURT:  Okay.  Mr. Berman, you can exit the

 5  courtroom.

 6            THE WITNESS:  Okay.

 7       (Mr. Berman left the courtroom.)

 8            THE COURT:  All right.  As I just stated, we're done

 9  with Mr. Berman's testimony.

10            Ms. Berman, we're going to take a ten-minute break.

11  You're going to present your testimony, correct?

12            MS. BERMAN:  Yes, I will.

13            THE COURT:  All right.  So you have about an hour

14  today -- we'll go almost till 5:00 -- then you've got 20

15  minutes tomorrow.

16            Are you just planning on giving a narrative?  Are you

17  just going to get up and tell the jury what your story is?

18            MS. BERMAN:  Yes.

19            THE COURT:  All right.  How long do you think it's

20  going to take you?

21            MS. BERMAN:  I don't know.  If an hour will be fine

22  today.

23            THE COURT:  All right.  All right.  So court will be

24  in recess until 4 o'clock.

25            COURT SECURITY OFFICER:  All rise.
```

1       (Recess from 3:50 p.m. until 4:04 p.m.; all parties

2  present.)

3       (Outside the presence of the jury:)

4           COURT SECURITY OFFICER:  All rise.  This Honorable

5  Court is now in session.

6           Please be seated.

7           THE COURT:  All right.  Bring the jury back.

8           MR. SPRINGER:  Your Honor, can I bring one thing up

9  real quick?

10          THE COURT:  Yeah.

11          MR. SPRINGER:  We have Jamie Bellflower outside.

12 He's been here most of the day, but we're not going to get to

13 him till tomorrow.

14          Can I excuse him today until tomorrow morning?

15          THE COURT:  Is there any chance you're going to take

16 just a short period of time, Ms. Berman, like a half hour?

17          MS. BERMAN:  And it will be added for tomorrow if

18 I --

19          THE COURT:  No.  How long -- well, you can let him go

20 because we can talk about -- I don't anticipate we'll get to

21 it, but -- if she's done with her case, if she rests, then if

22 you have any motions, and then we can talk about the jury

23 instructions.

24          So, yes, you can --

25          MR. SPRINGER:  Okay.  I just need one second to run

1    out here.

2          THE COURT:  Okay.  And tell him -- what I plan to do

3    tomorrow is have -- if things go according to schedule, have

4    the attorneys and Ms. Berman here at 8:30 to go over any jury

5    instruction issues and the verdict forms and any motions, and

6    then start the testimony at 9:00.

7          MR. SPRINGER:  Yes, sir.

8       (Brief pause.)

9          THE COURT:  All right.  Bring the jury in.

10         COURT SECURITY OFFICER:  All rise for the jury.

11      (Jury in at 4:07 p.m.)

12         COURT SECURITY OFFICER:  Please be seated.

13         THE COURT:  Ms. Berman, are you going to testify?

14         MS. BERMAN:  Yes.

15         THE COURT:  All right.  Do you want to take the

16   witness stand?

17         Madam Clerk, can you swear Ms. Berman?

18         COURTROOM DEPUTY:  Please raise your right hand.

19         Do you solemnly swear or affirm the answers you will

20   give during these proceedings will be the truth, the whole

21   truth, and nothing but the truth?

22         THE WITNESS:  I do.

23         COURTROOM DEPUTY:  And please state your name for the

24   record.

25         THE WITNESS:  My name is Lareesa Berman.

```
 1              LAREESA BERMAN, PLAINTIFF'S WITNESS, SWORN

 2                        DIRECT EXAMINATION

 3   BY MS. BERMAN:

 4   Q.   Thank you that you are through all of this process and you

 5   hear testimony.

 6              What I would like to say, that Defendant Kafka, he

 7   already stated that he never met me, just maybe couple times

 8   in -- in the car.  We didn't speak with him.  He doesn't know

 9   me.  He is not sure about my signature.

10              I went from the different country.  During the

11   deposition I ask Mr. Kafka if he know from which country I am.

12   He said that he's not sure but he can guess from Russia, and it

13   wasn't true because if he as claim had a marriage certificate,

14   he will see that I am from Ukraine, from completely different

15   country.

16              It's -- when I came to this country, they do a

17   complete background check.  I never stole anything in my life.

18   I never did anything in my life.  Then I came here, and I was

19   working in a community college.  It was my first job.  I was so

20   proud that I still kept my check, real check.

21              MS. BERMAN:  If I can show?

22              THE COURT:  Are you introducing an exhibit?

23              MS. BERMAN:  Yeah.  I introduce this.

24              THE COURT:  Well, what are you trying to introduce?

25              MS. BERMAN:  My -- a copy of my check statement.
```

 1              THE COURT:  Your check -- your checks?

 2              MS. BERMAN:  Yes.

 3              THE COURT:  The checks that are at issue in this

 4    lawsuit?

 5              MS. BERMAN:  No, no, no.

 6    BY MS. BERMAN:

 7    Q.   I would like to say that -- defendant saying that I some

 8    kind of cash or embezzle money, so -- I never -- during the

 9    testimony -- it's very hard for me to talk.

10              Always they introduce to me that Exhibit A and D.  I

11    never heard about Exhibit C.  I didn't know if my name was in

12    that unemployment hearing.  I have no relation to this.  He

13    never knew about me anything.

14              And when a lawsuit starts, I -- somehow he introduce

15    those two checks, and I was in shock.  Looks like mine, but --

16    but looks it does not mean that I sign this check.  I couldn't

17    believe -- and it was from 2006 and '7.  Bank already doesn't

18    keep records.

19              So I -- I was -- I was in shock.  But I kept my -- my

20    checks for unemployment.  That's when I change my signature.  I

21    didn't change my name.  I changed my spelling of my name.

22    That how I get used to the people, my parents and my friends,

23    calling me in Ukraine.

24              So -- just can I show this?

25              THE COURT:  I don't know what you're trying to show.

1   What --

2           MS. BERMAN:  I want to say those checks what he

3   allegedly saying, it was in 2006.  My -- in my -- I change in

4   my -- changed my bank, my spelling through L-a-r-y-s-a.  It --

5   I was -- when you see my checks, it was from 8/20/06 and

6   9/19/06.

7           The next year is my exhibit.  Can I show this to --

8           THE COURT:  Do you know what she's referring to?

9   Show it to the defense, and see if they have any questions.

10          MR. JONES:  I think I do.

11          MS. BERMAN:  That's when I change in my bank my name

12  spelling, my name.  It's already into evidence.

13          MR. JONES:  This one is?

14          MS. BERMAN:  Yes.  Yes.

15          THE COURT:  These are already in evidence?

16          MS. BERMAN:  Yes.

17          THE COURT:  What exhibit numbers are they?

18          MS. BERMAN:  It's Exhibit 67 and 67A.

19          THE COURT:  All right.  If you need to show the jury

20  exhibits and you want to testify from the podium, you can do

21  so.

22          MS. BERMAN:  Okay.  I'll show the exhibits.

23          Alleged checks was in -- when did you say?

24          MR. SPRINGER:  2006.

25          MS. BERMAN:  November 2006.

1          MR. JONES:  And 2007.

2   BY MS. BERMAN:

3   Q.   It show my spelling, Berman, L-a-r-y-s-a.  Pay period,

4   8/26, 9/19/06.

5          Can you see it?  9/19/06.  That's how I spell in that

6   period.

7          The next check is -- okay.

8          Do you see my spelling?  It's L-a-r-e-e -- since I

9   have long last name, it didn't get to my letter A.  That's how

10  my spelling is, and you can see period, 9/20/06, 10/19/06.

11         My bank do not allow to put cash or -- I don't know,

12  or put in the bank if my name was different.

13         That wasn't my writing, nor was my husband's writing.

14  It's those alleged checks which he talking about 2006 and 2007.

15  It's -- it -- nobody would write in my bank through a Y.  The

16  person only who does not know that will change this, and I

17  don't know who did it, but it wasn't me.

18         That's my copy of the stub, the real checks I would

19  like to show.  They are -- this.

20         MR. JONES:  Are those in evidence?

21         MS. BERMAN:  Yeah, because it's -- that was a copy.

22  This is real check.

23         MR. JONES:  Which number?

24         MS. BERMAN:  It's 67A and 67.

25         MR. JONES:  Thank you.

1  BY MS. BERMAN:

2  Q.   I still -- I was so proud, I still was -- you can see that

3  by that time, I could not cash in the bank the check because my

4  spelling -- notice my spelling.  I used my maiden name.  So I

5  possibly cannot put this Larysa through Y Berman if I already

6  was using a Polyakova Berman.

7          When -- during this one period -- I'm going to sit.

8  It's easier for me.

9          Here I was looking at the check, and I could not

10 understand how is that my signature appears on the check.  I

11 couldn't.  It looks like -- looks like mine, but did I sign it?

12         They produce from Valley Bank 2006, but Valley Bank,

13 what he claim, said they don't have those checks from 2006.

14 But -- I'm not an attorney.  It's very hard to speak for me in

15 English, and I try to think each word.  And they are very high

16 qualified.  They can twist your word --

17         MR. JONES:  Objection, Your Honor.

18         THE COURT:  It's getting argumentative.  Just testify

19 to facts, Ms. Berman.  You'll be given an opportunity to give a

20 closing --

21         MS. BERMAN:  I would like to --

22         THE COURT:  Ms. Berman, you'll be given an

23 opportunity to give a closing argument, at which time you'll be

24 able to argue.

25 BY MS. BERMAN:

1   Q.   I have nothing to do with defendant.  During his

2   deposition I was ask him, "How did you prove that it was my

3   signature?"

4           What he said --

5           MS. BERMAN:  Can I read what he said from his

6   deposition?

7           THE COURT:  The deposition is not in evidence, and

8   no, he's not being impeached with it, so no.

9   BY MS. BERMAN:

10  Q.   He said that he look online and see my signature.

11          And I said, "Where online my signature?"

12          First he said, "I saw your signature on your company

13  in 2009," on my company.  My company wasn't open until in the

14  end of 2010, and I don't sign anything on my company.

15          Then he decided to produce a marriage certificate and

16  house purchase or whatever is that.  Those wasn't produced in

17  unemployment hearing.  He never produced this.  I'm not sure

18  what exactly he produce during unemployment.  I wasn't present.

19  I don't know what he was talking about.

20          I -- all he produce me is packet A and D, A where my

21  husband never were employee Maitland Furniture, D where my

22  husband --

23          THE COURT:  Hold on.  Hold on.

24          MR. JONES:  Judge, we're getting into discovery

25  issues and claims of missing documents.  It's --

1          THE COURT:  Hold on.  Yeah.  We're way past

2   discovery, Ms. Berman, so you can just stick with what -- the

3   evidence that's been entered.

4          MS. BERMAN:  Okay.  Then I -- can I produce some

5   evidence or can I produce those evidence when I will be

6   questioning Mr. Kafka?

7          THE COURT:  What evidence do you want to -- do you

8   want to produce evidence as part of your testimony now?

9          MS. BERMAN:  Or can I ask him later because if I

10  produce right now --

11         THE COURT:  No, I'm not going to let you recall

12  Mr. Kafka.

13         MS. BERMAN:  Okay.  Then I produce.

14  BY MS. BERMAN:

15  Q.   He produce not only this alleged check which I do not

16  recall.  I never would sign anything that does not belong to

17  me.  He produce -- to me he produce the other checks which he

18  does not want to show you, but it's in my --

19         MR. JONES:  Objection, Your Honor.

20         THE COURT:  Hold on.  What --

21         MS. BERMAN:  No.  That in evidence.

22         THE COURT:  Is this in evidence?

23         MS. BERMAN:  It's 85.

24         THE COURT:  Don't -- you're not showing it to the --

25  is it in evidence?

1          MS. BERMAN:  Yes.  Yes, Your Honor, it is.  It's 85

2     and 85A.

3          MR. JONES:  The objection was to the comment that we

4     don't want to show something that's already in evidence.

5          THE COURT:  All right.  The jury will disregard that

6     comment.

7     BY MS. BERMAN:

8     Q.   Okay.  I would like to say about this, that would he

9     produce, my Exhibit 85.

10         It's the same check he produce what he claim I

11    embezzle money, 84.  And when we compare them, it says Chris

12    Berman, Trifecta Gaming, for November 24, 2006.

13         And I look at this and couldn't understand why is

14    that this one doesn't have any signature, just here two

15    signature from this check.  Here -- here is just one line, and

16    it says card game.  Nothing else.

17         Then, you know, when you receive a check, you usually

18    have, like, tab from the check.  Then there is this tab from

19    the check, and you see it's not connected.  It's somebody tear

20    apart.  It's 2006.

21         2007 when he claim, it's the same check for 2007.

22    2007.  It says Chris Berman, Trifecta Gaming, copy, but it's

23    different copy.  There's no signature.  It says paid May 10th,

24    2007, by, and don't know who paid and by whom.

25         For 2006, they didn't even say it's paid.  If you

```
 1   look at the evidence, it does not look that somebody pay or not
 2   pay.
 3           When I receive a check -- when I receive a check --
 4   that's my check -- you usually --
 5           MR. JONES:  Is that in evidence?
 6           MS. BERMAN:  Yes.  That's my -- that's a copy of my
 7   real check.  This copy, this is real check.
 8   BY MS. BERMAN:
 9   Q.   I try to show -- come close.  When you receive a check,
10   you see that you have part of this.  You tear apart.  You go to
11   bank, and put in money.
12           THE COURT:  Ms. Berman, I don't think anyone can hear
13   you back here.
14           MS. BERMAN:  Oh.
15           THE COURT:  You need to show them at the --
16           MS. BERMAN:  I just want to explain.
17           THE COURT:  Well, it's a lot easier if you show them
18   using that document --
19   BY MS. BERMAN:
20   Q.   You tear apart and you put this money in the account.
21   This check what he produce, it's already somebody tear apart.
22           MR. JONES:  Objection, Your Honor.  These were
23   produced by the bank, not us.
24           THE COURT:  All right.
25           MS. BERMAN:  Yeah, but they will not keep tear --
```

1   they sent you real check, not tear apart and send you from the

2   bank.  I know so many things.  The bank can't send you --

3           MR. JONES:  Objection, Your Honor, speculation.

4           THE COURT:  Hold on.

5           Let me see the parties at sidebar.

6       (At sidebar, out of the hearing of the jury:)

7           THE COURT:  I'm confused here.  I imagine the jury is

8   too.  But what -- what are you trying to show them?  Is it in

9   evidence what you're showing them?

10          MS. BERMAN:  Yes.  This is evidence.

11          THE COURT:  Let me see what you just put back in

12  there that you were just --

13          MS. BERMAN:  That's my check what I received.  I'm

14  show this.  When I receive this, the part you tear apart and go

15  to bank and you keeping this part.

16          THE COURT:  You want to put this in evidence.

17          MS. BERMAN:  That's what my evidence here.

18          THE COURT:  No.  You want to put the original in

19  evidence and you can have it returned afterwards?  We'll make a

20  copy of it.

21          MS. BERMAN:  But you will give me back?  Because I

22  would like to keep it.

23          THE COURT:  Tracee.

24          COURTROOM DEPUTY:  I'm sorry.

25          THE COURT:  Can we have her put an original in

1    evidence and then we return it to her?  Can we not mark it or

2    anything?

3           COURTROOM DEPUTY:  I can just run a copy of it.

4           THE COURT:  But she wants the original back.

5           COURTROOM DEPUTY:  Well, I mean, but I'll make a copy

6    of it.

7           THE COURT:  Well, we already have a copy.

8           Is there any reason you keep referring to this

9    original?  Why can't you just refer to what's in evidence?

10          MS. BERMAN:  Okay.  So just --  I want --

11          THE COURT:  Okay.  So put the originals away and just

12   show the jury what's in evidence.

13          MS. BERMAN:  Okay.

14          THE COURT:  Do you have a problem with that?

15          MR. JONES:  No, Your Honor, no.  But what she's doing

16   is she's trying to say that there is this -- it's like -- I

17   don't want to say a conspiracy theory, but because there's a

18   space in between the check and the attached receipt, that

19   somehow this didn't originate from the bank, or something

20   unseemly is going on here.

21          And these records came from the bank.  I mean, we

22   didn't pull them from our own records.  These were subpoenaed.

23          MS. BERMAN:  And I am not --

24          THE COURT:  This is not even the check.  This is not

25   even the check.  This is her --

```
 1          MS. BERMAN:  That's my -- I show that during that

 2   period what they claim I embezzle money, I already changed my

 3   name, and he didn't know.

 4          THE COURT:  Okay.  We've been through that already.

 5          MR. JONES:  Your Honor, she --

 6          THE COURT:  That's what she's got in front of her.

 7          MR. JONES:  But the original, the reason why she's

 8   holding up the original, is this whole notion that the receipt

 9   is attached and very close to the check.

10          THE COURT:  Let me see this.

11          What receipt?

12          MS. BERMAN:  No.  No.

13          THE COURT:  This is a totally different -- this

14   isn't --

15          MS. BERMAN:  No, no.  I'm --

16          THE COURT:  -- even a check.

17          MS. BERMAN:  I am talking when somebody receiving a

18   check, this my check, this part is attached, and you rip it off

19   and putting on -- in bank, and you keeping this part for

20   yourself.

21          THE COURT:  I'll let her make -- I'll let her make

22   this argument to the jury.

23      (End of discussion at sidebar.)

24   BY MS. BERMAN:

25   Q.   If you understand it, I try to explain how it's work.
```

1   When you receive a check, you receive a check.  You tear apart.

2   You go into bank and put in this piece of check, and you keep

3   this.

4          And defendant produce this check.  It means he has

5   this all along and telling me he forged my signature and

6   telling me --

7          MR. JONES:  Objection, Your Honor.

8          THE COURT:  I'll allow you -- I'm going to let her

9   go.

10  BY MS. BERMAN:

11  Q.   Telling me that I embezzle money when he had all along.

12         I am doing this by myself, and it's so hard.  I try

13  to find a word in English and sometimes incorrectly say

14  something.  It's very hard for me.

15         And this -- he has two attorneys can afford.  I can't

16  afford --

17         MR. JONES:  Objection, Your Honor.

18         THE COURT:  All right.  This is improper argument.

19         MS. BERMAN:  Okay.

20         THE COURT:  Testify to facts, and don't forget,

21  Ms. Berman, you're limited in your time --

22         MS. BERMAN:  Okay.

23         THE COURT:  -- so if you want to talk about that

24  letter -- those letters and how it affected you, you might want

25  to get to that.

```
 1   BY MS. BERMAN:
 2   Q.   The letter is very affect me.  When I by accident my
 3   husband -- I'm sorry.
 4          He was telling that my husband embezzle money and
 5   included me in the -- this testimony.  It didn't say anywhere
 6   on this unemployment hearing that he said I embezzle money.  He
 7   said check turn over to Lareesa Berman.
 8          He produced a forged document and telling that he
 9   prove I embezzle money, not as a -- like, I believe, I think.
10   I proved, in past tense, that I embezzle money.
11          When my husband receive this check -- not receive a
12   check.  When I, during this trial -- and it's long trial.  It's
13   over a year.  And I'm not an attorney.  I was studying the law
14   on -- by my own.  I had to write motions.  I had to -- to know
15   how correctly --
16          MR. JONES:  Objection, Your Honor.  This is --
17   relevancy.
18          THE COURT:  I'm going to sustain the objection.
19          Ms. Berman, we're not here to hear how difficult this
20   lawsuit that you brought has been for you.  We're here for you
21   to testify to facts and testify about these checks and these
22   statements, these allegedly defamatory statements, and that's
23   what you're here to testify about and how they affected you.
24          You said that's what you were going to talk about.
25   BY MS. BERMAN:
```

1   Q.   During discovery when he told that I embezzle and he

2   produce those checks, I was in shock.  I couldn't -- you

3   know -- you know that you didn't do anything but looks like

4   your signature.  And how is it looks like -- and you know

5   you're not guilty.

6           I couldn't sleep.  I couldn't eat.  I -- I was in

7   shock.  I always am thinking about who else he contacted, who

8   else.  He has employee I was asking about to -- who is this

9   employee, and it's one of his employee, Lora Katsavrias.

10          When I depose her, she was very rude to me.  She call

11  me evil --

12          MR. JONES:  Objection, Your Honor.

13          THE COURT:  All right.  We're not here to hear about

14  the course of this litigation, Ms. Berman, so stop testifying

15  about the course of this litigation.

16          MS. BERMAN:  Okay.  What I am allowed to say?

17          THE COURT:  Well, you brought a lawsuit over these

18  two statements, so you can talk about how these two statements

19  affected you --

20  BY MS. BERMAN:

21  Q.   It's very much --

22          THE COURT:  -- but not the lawsuit.  It's not about

23  how the lawsuit's affected you; it's about how these statements

24  affected you.  You brought the lawsuit.

25  BY MS. BERMAN:

1  Q.   I have a small business, and I trying to run and want to

2  run my company.  And every time in my mind, if he told anybody

3  else.

4       I have website and see his IP address when he's

5  constantly stalking, stalking my company, and telling my -- I

6  don't know what he -- I have a publishing company.  I don't

7  understand.

8       I took it as a publishing company because my -- my

9  husband was an author, and he ruin relationship with the other

10 publisher, and I decided to open and just run my publishing

11 company.

12      And I have authors.  I have editors.  And I do recall

13 one editor I was working with.  I was so happy about this, and

14 all the sudden, she stop working.  She didn't say anything, and

15 I don't know what's going on.  So I don't know how many people.

16 And he every time go into my website and checking what author I

17 have, what else.

18      He stated that I opened -- that he found my -- my

19 signature on the company, which I op- -- didn't open a year

20 later.

21      I couldn't eat.  I couldn't sleep.  So I didn't want

22 to bring this suit.  It's difficult.  I never -- I never sue

23 anybody in my life.  I don't want to sue.

24      And after this, definitely I don't want to do

25 anything with this.  I would -- right now I'm sitting there.

 1  What I don't want to be is an attorney.  I don't want to see

 2  any law, any -- what defendant did is -- I have two children,

 3  and I need to feed them.  He --

 4              MR. JONES:  Objection, Your Honor.  This is getting

 5  into 403 and 401.

 6              THE COURT:  Well, I don't know where --

 7  BY MS. BERMAN:

 8  Q.   He asking you to --

 9              THE COURT:  Keep it related to these statements,

10  Ms. Berman.

11  BY MS. BERMAN:

12  Q.   I want to say that I did not embezzle any money.  I never

13  took anything from anybody.  I can't do this.  I -- I work

14  hard.  I work honest.  I want -- I will be working day and

15  night but definitely not will take some money from somebody.

16  That's how I was raised.

17          He was thinking that I am from Russia, so he thought,

18  "Okay.  She's from Russia.  People will be thinking because

19  it's they."  But I am from Ukraine, and we do not take

20  anything.  We just -- it's hard for me.

21          And I am calling to my parents, and it's very hard

22  for me to speak.  I don't want my mother or my father will be

23  worried.  I try to call.  They will know no matter.  I am

24  calling.  I am trying to pretend to be happy, but I'm not very

25  good actress when I'm not happy.

1          And my mother, "What's going on?  What's wrong?

2  What's going on?"

3          I said, "Everything is fine.  Everything" -- I don't

4  want . . .

5          And she's like every time I'm calling, "What's wrong?

6  What's wrong?"  And I couldn't -- I don't want she thinks

7  something.

8          I said, "Mom, this -- it's very hard for me."

9          My mom was in shock.  She said, "But you live in

10  America."

11         THE COURT:  Don't testify to what your mother said.

12  Just stick with what you said.

13  BY MS. BERMAN:

14  Q.  I'm not related to him, don't know if you -- if he said

15  he -- if he just said, "I think you embezzle."  I ask him

16  during deposition because I saw how he was answering, "Do you

17  think you should apologize?"

18         If he in the deposition said, "Yes, I apologize,"

19  that --

20         MR. JONES:  Objection, Your Honor.

21         THE COURT:  Ms. Berman, we're past that point, okay?

22  We're here.  We're in trial today.  We're not going to go into

23  settlement -- anything relating to possible settlement --

24         MS. BERMAN:  I'm not --

25         THE COURT:  -- before suit so --

1              MS. BERMAN:  Only for deposition.

2              THE COURT:  Well, no, but you're going into other

3    matters.  You've already been into --

4              MS. BERMAN:  No, I don't.

5              THE COURT:  -- apology.

6              Do you have anything else to say about how these --

7    how these allegedly defamatory statements affected you?

8              MS. BERMAN:  Very.  I'm --

9              THE COURT:  Well, now's the time --

10             MS. BERMAN:  My health --

11             THE COURT:  -- to tell the jury.

12   BY MS. BERMAN:

13   Q.   I couldn't sleep.  It's -- my health is declining.  I

14   can't say anything else.

15             THE COURT:  All right.

16   BY MS. BERMAN:

17   Q.   It's very hard.  I'm going to bed, and I can't fall

18   asleep.  Always thinking whom else he telling this.  Who else?

19             Those statements are public records.  It's like if I

20   want to get a job, they really check you.  They check, and they

21   can -- I know that they'll say this --

22             MR. JONES:  Speculation, Judge.  Projecting what will

23   happen.

24             THE COURT:  I'll let her --

25             MS. BERMAN:  And I would like to show that -- you

1    were agree with my -- I try to show jury.  You agree that I

2    show my timeline that you will understand, and excuse me that I

3    cannot talk normally.

4            THE COURT:  Is this a demonstrative?

5            MS. BERMAN:  I --

6            THE COURT:  Hold on a second.

7            Have you seen this?

8            MR. JONES:  These are demonstrative aids.  We don't

9    have any objection, Judge.

10           THE COURT:  All right.

11           MS. BERMAN:  I can mark --

12           MR. JONES:  Not going into evidence, but to use to

13   show the --

14           THE COURT:  You can show the jury as demonstrative

15   aids.  They won't be admitted into evidence, but you're allowed

16   to show --

17           MS. BERMAN:  But I allowed to show?

18           THE COURT:  Yes, you can show them.

19           MS. BERMAN:  Thank you.

20   BY MS. BERMAN:

21   Q.  Okay.  I created timeline during the night.  Excuse me,

22   with all -- I made mistake on that one.  It's hard to

23   concentrate.  I even cannot talk normally.  That's what

24   happens.

25           January 8th, 2009, he terminated my husband from both

1   company, which he said he give away rights.  He terminated from

2   Maitland Furniture and Trifecta Gaming when my husband never

3   was employee of Trifecta Gaming and never give away rights, in

4   January 8th.

5          Those checks which he saying allegedly he receive on

6   January 9th, so he terminate January 8th, but he claiming that

7   he receive checks on January 9th, Mr. Kafka.

8          My husband file for unemployment compensation in

9   January 17th, 2009.  Then he file on trademark because he had

10  took away his company, and he file on January 20, 2009.

11         Mr. Kafka didn't know that my husband file this on

12  January, so when the unemployment contacted him, he said, "No

13  misconduct."

14         When he found out he'd filed on trademark to take his

15  company back, he right away said that he embezzle money, on

16  March 3, 2009.

17         Then on May 19 defendant opposed to my husband

18  trademark filing.

19         May 27th was unemployment hearing, which was a

20  decision by error on May 29th because my husband wasn't present

21  that -- not allowed to talk about unemployment hearing.  And

22  they reverse.  It says vacated.

23         Once that -- that decision is vacated, you're not

24  allowed to --

25         MR. JONES:  Objection, Your Honor.  She's commenting

 1   on the law.

 2            MS. BERMAN:  I read the law.  I --

 3            THE COURT:  No.  You can't -- you can't discuss --

 4   the jury's been told about -- that it's been vacated.  They

 5   also have received it into evidence, so it will be up to them.

 6   BY MS. BERMAN:

 7   Q.   October 21, decision.  May -- I simply make mistake here.

 8   May 21, 2009, decision was reversed.

 9            On November 24, Mr. Kafka say that he cannot -- they

10   give him another opportunity to attend the hearing.  He cannot

11   because he is so busy.

12            Next, March 9th, after -- after this, there is an

13   order.  They give him a time to appeal again.

14            August 20, 2010, notice -- they give him 20 days to

15   appeal.

16            September 9, 2010, no appeal was filed by Mr. Kafka.

17   When no appeal filed, there is no any judicial proceeding.

18   Chris Berman receives all benefits.

19            Here he -- he sent a letter on August 10th to James

20   Bellflower asking to reopen appeal.  While he was asking to

21   reopen appeal, he, on August 16, 2011, alleged to

22   Mr. Bellflower that he already prove that not just Mr. Berman,

23   I embezzle money with a forged check.

24            On September 22, 2011, to Investigator Janice Connell

25   states, "Our attorney will depose Chris Berman on September 22,

1  2011."  He pretended like he has attorney and plan to depose

2  him on unemployment hearing.

3         MR. JONES:  Sorry to interrupt, Your Honor.

4         THE COURT:  Just state the facts, Ms. Berman.  You'll

5  be able to argue later.

6         MS. BERMAN:  No.  That was in his -- I show in

7  evidence that letter.

8  BY MS. BERMAN:

9  Q.   Benefits fraud investigation on September 22, no judicial

10 appeal and found Chris Berman, my husband, receive full

11 benefits.

12        And what else I want to say -- I already forgot what

13 I want to say.  That's how it's a fact.  I remember here, and

14 it disappear in my memory, and I had before very good memory.

15        Embezzlement, it's when you are employee or you

16 somehow relate.  I have no -- nothing to do with him.  And law,

17 law said it's definitely -- I've read it.

18        THE COURT:  No, Ms. Berman.  You can't talk about the

19 law.

20        MS. BERMAN:  Okay.

21 BY MS. BERMAN:

22 Q.   It's so hard.  I can't even put normal speech.  It's --

23 you see how I am badly speaking.  I -- it's hard for me, this

24 whole process.  I just have a thought and it disappear.

25        He -- he's claiming that my husband embezzle money,

 1  and I have nothing to do with unemployment, and behind my back,

 2  telling that I embezzle money from his company.  I wasn't

 3  aware.  If I didn't -- by accident didn't receive those

 4  letters, I will not know.  I wouldn't even know why people do

 5  not speak with me?

 6          And they saying it's not affected.  It's affected.

 7  Every time there's something -- I see okay, she was planning to

 8  work with me, and all of a sudden, oh, you know, some kind of

 9  story which I -- doesn't make any sense to me.  In my mind,

10  Mr. Kafka's letter.

11          MR. JONES:  Speculation, Your Honor.

12          THE COURT:  Let me -- I'm going to instruct the jury

13  to disregard that -- that statement.

14          If it's just in your mind and you've got no proof,

15  then you could --

16  BY MS. BERMAN:

17  Q.   But I would like to say that libel per se was said, that

18  when somebody libel you, you don't need to prove malice.

19          Mr. Kafka, when I depose him, I said, "Are you sure

20  it's my signature?"

21          He said, "I don't care whose signature it is.  I

22  do -- I see it says 'to Larysa Berman,' and you are a wife of

23  Chris Berman, so I assume -- you are wife of Chris Berman, and

24  I assume" --

25          MR. JONES:  Your Honor.

1          MS. BERMAN:  -- "you embezzle money."

2          THE COURT:  Yeah.  I'm not going to allow you to

3     testify to what is in his deposition.  This is your testimony

4     now.  This is for you to testify about your own personal

5     knowledge of what you know.

6          And if you're done, Ms. Berman, you can stop.  You

7     don't have to keep going.  They're going to ask you questions

8     on cross-examination.

9     BY MS. BERMAN:

10    Q.   It just I want to excuse myself, and I am trying to talk,

11    and maybe my words is not in -- I can't even put complete

12    sentence.  That's how it affect me.  And I came to this

13    country, and I did graduated here.  I receive -- I receive

14    bachelor's degree, and I'm so proud.

15         I was the highest -- I receive -- not valedictorian,

16    I was summa cum laude.  The highest degree I receive.  I

17    receive an education, and I can write, I can speak, but right

18    now I feel like I can't speak, and my writing become declining.

19    I -- sometimes I'm forgetting how to write or spell a word.

20    That's how it's affect me.

21         Sometimes I am -- I had very good memory, and

22    sometimes I want to say something, and right away it disappear.

23    It's like what -- what I was planning to say and I forgot about

24    that?

25         I have two children, and I have to feed them, and

1  they see that I can't be happy, or when I am unhappy, upset, it

2  does not show my happiness.  And it's -- it's very difficult on

3  me.

4           He's saying that I embezzle money, but he purchase a

5  million-dollar house and --

6           MR. JONES:  Objection.

7           THE COURT:  That's -- sustained.  That's irrelevant.

8  The jury will disregard that.

9           Ms. Berman, it's getting repetitive.  If you're not

10 going to go on to something new, then I'm going to start

11 sustaining any objections to anything that's -- you've made

12 your points, and so if you have any new points to make, make

13 them, but it's getting repetitive at this point.

14 BY MS. BERMAN:

15 Q.   I just want to say that my husband never embezzled money

16 either.

17          If I can say that was -- I do remember he bought pair

18 of pants and couple other stuff, and when he came home it

19 wasn't -- something wasn't charged.  He remember what I told

20 him about my father.  He took this -- he take an example of me

21 and went back and say, "That wasn't charged."

22          I will not allow -- I wouldn't be living with

23 somebody who's taking money from somebody else.  It's --

24          MR. JONES:  Bolstering.

25          THE COURT:  I'll allow it.

```
 1    BY MS. BERMAN:
 2    Q.   It's very hard.  It affected me.  That's what I want to
 3    say.
 4              THE COURT:  All right.
 5              MS. BERMAN:  I'm sorry.
 6              THE COURT:  Okay.  You can take back the -- go back
 7    to the witness stand.
 8              And go ahead and start your cross-examination.
 9              MR. JONES:  Yes, Judge.
10                         CROSS-EXAMINATION
11    BY MR. JONES:
12    Q.   Ms. Berman, good afternoon.
13              You were -- I want to ask you some questions about
14    what you just told the jury about your business losses.
15              And isn't it true that you do not have any documented
16    damages that your business suffered from any statements made by
17    Mr. Kafka?  Isn't that true?
18    A.   My lawsuit of libel per se, I don't need to show any
19    damages --
20    Q.   And --
21    A.   -- and jury have to know that.
22    Q.   I just heard you tell this jury that your business
23    associates or people that you do business with are not doing
24    business with you anymore.
25              I'm asking you, isn't it true that you do not have
```

 1  any documented damages that your business has suffered from any

 2  statement made by Mr. Kafka?  Isn't that true?

 3  A.   I don't have documents, no.  How I will know why a person

 4  doesn't want to work with me?

 5  Q.   And as a matter of fact, you testified in this case that

 6  this case is not about your company.

 7  A.   Yes.  It's not.

 8  Q.   Isn't that correct?

 9  A.   Yes.

10  Q.   It's not about your company.

11  A.   No, it's not about my company.

12  Q.   It's about you, you said.

13  A.   Yes, it's about me.

14  Q.   All right.  And he didn't libel your company, correct?

15  A.   No, he didn't.

16  Q.   As a matter of fact, isn't it true that you don't know if

17  anyone has ridiculed you because of any of the statements made

18  by Mr. Kafka?  Isn't that true?

19  A.   You know, usually people don't come to you and say, "Oh,

20  you know, you are" -- if they don't want to talk to you, they

21  will not explain.  How do I know?

22  Q.   Well, I'm just --

23  A.   I know that Lora Katsavrias, when I took deposition, she

24  called me evil, and I don't even know her.

25  Q.   All right.  Ms. Berman, you're wanting this jury to

1   believe that all these -- these people are treating you

2   different because of these two letters that were sent to the

3   unemployment agency in the State of Florida, one of which is

4   confidential.

5   A.    Um --

6   Q.    I'm asking you this.  In your conversations with anyone,

7   no one has ridiculed you or told you, "I am not going to be

8   your friend or not do business with you because of the

9   statements that Tom Kafka made to the State," correct?  Isn't

10  that true?

11  A.    If somebody came to me and say --

12          THE COURT:  Ms. Berman, answer the question.

13          THE WITNESS:  No.  Nobody will come to me and say

14  that I don't want --

15  BY MR. JONES:

16  Q.    All right.  And, in fact, you can show no monetary loss

17  because of the statements made by Mr. Kafka to the State of

18  Florida unemployment agency, correct?

19  A.    Libel per se, you do not need --

20          THE COURT:  Ms. Berman, that's a matter of law, okay?

21  So just answer the question.

22  BY MR. JONES:

23  Q.    Ms. Berman --

24  A.    How I can -- he doesn't -- he won't even acknowledge to

25  how many people he -- it's monetary lo- -- mon- -- those two

1   people on that second libel statement, there is Zaho and his

2   publisher.

3         They -- yes, my husband actually was planning to

4   work.  He almost was working, and all of the sudden, that's

5   all.  And publisher contract returned to him, and it's hard to

6   actually -- publisher contract is returned so easily.

7   Q.   Ms. Berman, your husband's not a party to this lawsuit.

8   You just said this case was about you, correct?

9   A.   Okay.  Okay.  I just --

10  Q.   Well, didn't you say this case is about you?

11  A.   I make an example, but nobody told him that -- okay.

12  Q.   All right.  Let me ask you this.  And no one told your

13  husband that they're not going to publish his book because of

14  something Tom Kafka said to the state unemployment agency.

15  A.   No, they just stopped, stopped working.

16  Q.   Isn't that correct?

17  A.   Yes.  Yes.

18  Q.   And as a matter of fact, you told this jury a minute ago

19  you have children to feed.  Remember that?

20  A.   Yes.

21  Q.   But isn't it true you testified under oath that you can

22  show no monetary loss because of the statements made by

23  Mr. Kafka?

24  A.   I don't need to show because the law --

25              THE COURT:  Ms. Berman, did you not hear me?  That's

1  a matter of law, and so you're not to testify about that, and

2  answer the question.

3          THE WITNESS:  I can't show because nobody came and

4  will say that they don't want to have a deal with you.

5          And it's not my country.  People in my country

6  know -- know me very well, so they will not believe.  But here,

7  it's -- it's not like they -- I raised with them and they know

8  me.

9  BY MR. JONES:

10  Q.    All right.  Ms. Berman, you brought this lawsuit.  You

11  sued Mr. Kafka here.

12  A.    Yes.

13  Q.    I imagine you're going to ask this jury at the end of the

14  case for a lot of money.

15          My question to you is, as you sit here today, you

16  have no monetary loss because of these statements.  Isn't that

17  correct?

18  A.    It's not just simple statements.  He accuse me of

19  something what I didn't do.  He forge my signature.

20  Q.    But you -- there is no evidence of that, Ms. Berman, is

21  there?  There's none.

22  A.    I change -- I change -- he said he prove.  I changed my

23  spelling.  I cannot cash or deposit in my bank.

24  Q.    Let me ask you one more time.

25          You have no monetary loss, Ms. Berman, isn't that

1  true, from the statements that Mr. Kafka has made to the state

2  unemployment agency?  Isn't that correct?

3  A.   I don't know.  How do I know?

4  Q.   Okay.  So you don't know.  You don't have any.

5  A.   I cannot say how I lost from somebody.  How do I know what

6  people think about me?

7  Q.   You have no idea how the State -- Mr. Kafka's statements

8  to the State of Florida's unemployment agency have injured your

9  reputation.  You have no idea, correct?

10 A.   Mr. Bellflower said it's public record.  Anybody can pull

11 this.  And right now it's everywhere on Internet because of the

12 lawsuit here.

13 Q.   You have no idea, Ms. Berman, how Mr. Kafka's statements

14 have injured your reputation.  You don't know, correct?

15 A.   I already answer.  How I would know?

16 Q.   Well, you brought the lawsuit, and you're alleging that

17 your reputation has been damaged, and the question I'm asking

18 you is, you have no idea how this has -- these statements have

19 affected your reputation.  Isn't that true?

20 A.   I don't know how the statements will be affect my

21 reputation now or tomorrow.  He e-mail, fax, and it's not safe.

22 It can be somebody hack and the people see it.  And how I can

23 prove that I am innocent?

24 Q.   Ms. Berman, I'm not talking about --

25              THE COURT:  Wait a minute.

```
 1              Mr. Jones, it's getting real close to 5:00.  I'm

 2     going to -- now's a good time to break, or if you want to

 3     ask -- can we break now?

 4              MR. JONES:  Yes, Your Honor.

 5              THE COURT:  Okay.

 6              Okay, ladies and gentlemen of the jury.  Thank you

 7     for your attention today.  If you can please be back here

 8     tomorrow at 9 clock, I'd appreciate it.

 9              Thank you.

10              COURT SECURITY OFFICER:  All rise for the jury.

11         (Jury out at 4:57 p.m.)

12              COURT SECURITY OFFICER:  Please be seated.

13              THE COURT:  All right.  You can go back to the table.

14              All right.  So we'll pick up tomorrow with --

15              MS. BERMAN:  I just don't -- don't remember what I

16     did with my checks.

17              Oh, I'm sorry.  I --

18              THE COURT:   We'll proceed tomorrow with Ms. Berman's

19     cross-examination.

20              And then you've got -- Mr. Springer, Mr. Jones,

21     you've got just one witness and --

22              MR. JONES:  Two.

23              MR. SPRINGER:  We have Mr. Kafka and Jamie

24     Bellflower.

25              THE COURT:  Okay.  So you're going to recall --
```

1   you're going to call Mr. Kafka?

2         MR. SPRINGER:  Yes, sir.

3         THE COURT:  All right.  All right.  So I'm going to

4   ask, Ms. Berman, you and the attorneys to be back here at 8:30

5   in the morning.  We're going to go over the jury instructions

6   at that time, so you need to be ready to discuss the jury

7   instructions.

8         And also we have a proposed verdict form.  I'm going

9   to ask Mr. Mitchell to provide you with that.

10        And so that's the proposed verdict form.  We'll

11  discuss that as well tomorrow at 8:30 before the jury gets in,

12  with the idea that we're going to finalize the jury

13  instructions and the verdict form at 8:30 tomorrow morning.

14        I don't know if you have any matters, Mr. Springer,

15  in terms of motions, that can be heard before we finish up with

16  Ms. Berman's testimony.  I'll leave that up to you, but it

17  would be good if we can do anything that you don't think would

18  be affected by her testimony or that would affect her

19  testimony.

20        MR. SPRINGER:  I would make the Rule 50 motion.  One

21  specifically which I guess we can discuss, if Your Honor would

22  like to, is regarding the actual damages.

23        THE COURT:  All right.  Well --

24        MR. SPRINGER:  Should we wait till tomorrow on that?

25        THE COURT:  Yeah.  Let's -- I do want to end at 5:00.

```
 1            All right.  Is there anything further to take up
 2  right now?
 3            MR. SPRINGER:  No, Your Honor.
 4            THE COURT:  All right.  Ms. Berman?
 5            MS. BERMAN:  About Mr. Springer -- I'm sorry.
 6            THE COURT:  All right.  We'll take it up at 8:30.
 7            Is there any reason we need to take it up now instead
 8  of 8:30?
 9            MS. BERMAN:  He -- about the verdict form, he
10  presented some kind of law.  I would like to present some law
11  from my trial brief.
12            THE COURT:  Well, I told you, if you have any
13  objection to the jury instructions or the verdict form, you
14  need to give me a copy of the case tomorrow morning.
15            And I'll look at the case, and I'll decide whether it
16  needs to be incorporated into the jury instructions or whether
17  one of those jury instructions need to be admitted.
18            MS. BERMAN:  Copy --
19            THE COURT:  Okay.  That's how the law plays into
20  this.  It's the jury instructions and the verdict form.
21            MS. BERMAN:  Copy of the case which I was talking
22  about.  I have in trial brief a --
23            THE COURT:  Well, no.  We're not going to fish
24  through your trial brief.
25            MS. BERMAN:  Just a copy of the case.
```

```
 1              THE COURT:  You need to give me a photocopy.

 2              MS. BERMAN:  Okay.

 3              THE COURT:  If you have an Eleventh Circuit case or a

 4    Florida case or some authority --

 5              MS. BERMAN:  Okay.

 6              THE COURT:  -- you give us a copy of the case and

 7    we'll look at it, all right?

 8              MS. BERMAN:  Okay.  I will write down.

 9              THE COURT:  All right.  Court will be in recess.

10              COURT SECURITY OFFICER:  All rise.

11         (The proceedings were adjourned at 5:01 p.m., to be

12    continued on March 11, 2015.)

13                             -   -   -

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4    UNITED STATES DISTRICT COURT )

5    MIDDLE DISTRICT OF FLORIDA    )

6

7            I hereby certify that the foregoing transcript is a

8    true and correct computer-aided transcription of my stenotype

9    notes taken at the time and place indicated therein.

10

11           DATED this 9th day of August, 2015.

12

13                              s/Shelli Kozachenko
                                Shelli Kozachenko, RPR, CRR
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25