```
 1                    IN THE UNITED STATES DISTRICT COURT
                          MIDDLE DISTRICT OF FLORIDA
 2                          JACKSONVILLE DIVISION

 3   LAREESA BERMAN,                     Jacksonville, Florida

 4          Plaintiff,                   Case No. 3:13-cv-1109-J-JBT

 5       -vs-                            Wednesday, March 11, 2015

 6   THOMAS KAFKA,                       9:03 a.m.

 7          Defendant.                   Courtroom 5A
     _____
 8

 9                       TRANSCRIPT OF JURY TRIAL
                              (VOLUME III)
10                BEFORE THE HONORABLE JOEL B. TOOMEY
                     UNITED STATES MAGISTRATE JUDGE
11

12

13

14

15

16

17

18

19

20

21   OFFICIAL COURT REPORTER:

22        Shelli Kozachenko, RPR, CRR
          221 N. Hogan Street, #185
23        Jacksonville, FL  32202
          Telephone:  (904) 301-6842
24

25                      (Proceedings reported by stenography;
                          transcript produced by computer.)
```

1                          <u>A P P E A R A N C E S</u>

2

COUNSEL FOR PLAINTIFF:

3

**Lareesa Berman, Pro Se**
4           303 Augusta Circle
            St. Augustine, FL  32086
5

6

COUNSEL FOR DEFENDANT:

7

**Paul Jones, Esquire**
8           Luks, Santaniello, Petrillo & Jones, LLC
            225 South Orange Avenue, Suite 750
9           Orlando, FL  32801

10          **Todd Springer, Esquire**
            Luks, Santaniello, Petrillo & Jones, LLC
11          301 West Bay Street, Suite 1050
            Jacksonville, FL  32202

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# T A B L E   O F   C O N T E N T S

**PROCEEDINGS:**                                                    **Page No.**

PLAINTIFF RESTS................................       17
RULE 50 MOTIONS...............................       18
DEFENSE RESTS.................................      122
JURY CHARGE CONFERENCE........................      126
PLAINTIFF RESTS IN REBUTTAL...................      153
RULE 50 MOTIONS RENEWED.......................      153
CLOSING ARGUMENT BY MS. BERMAN................      158
CLOSING ARGUMENT BY MR. JONES.................      173
REBUTTAL CLOSE BY MS. BERMAN..................      193
INSTRUCTIONS OF THE COURT.....................      201
VERDICT OF THE JURY...........................      218
POLLING OF THE JURY...........................      218

**PLAINTIFF'S WITNESS:**                                            **Page No.**

  **LAREESA BERMAN**
      CROSS-EXAM (CONTINUED) BY MR. JONES.......        6
      REDIRECT EXAMINATION BY MS. BERMAN........       12

**DEFENDANT'S WITNESSES:**

  **JAMES WILLIAM BELLFLOWER, JR.**
      DIRECT EXAMINATION BY MR. SPRINGER........       23
      CROSS-EXAMINATION BY MS. BERMAN...........       34
      REDIRECT EXAMINATION BY MR. SPRINGER......       44

  **THOMAS KAFKA**
      DIRECT EXAMINATION BY MR. SPRINGER........       46
      CROSS-EXAMINATION BY MS. BERMAN...........       90
      REDIRECT EXAMINATION BY MR. SPRINGER......      120

**PLAINTIFF'S REBUTTAL WITNESS:**

  LAREESA BERMAN
      DIRECT EXAMINATION BY MS. BERMAN..........      145
      CROSS-EXAMINATION BY MR. SPRINGER.........      150

1      <u>P L A I N T I F F   E X H I B I T S   R E C E I V E D</u>

2                                                      <u>Page No.</u>

3   PLAINTIFF'S EXHIBIT 46A ......................      107

4

5

6

7          <u>D E F E N S E   E X H I B I T S   R E C E I V E D</u>

8                                                      <u>Page No.</u>

9   DEFENDANT'S EXHIBIT 5.........................       72

10  DEFENDANT'S EXHIBIT 9.........................      122

11  DEFENDANT'S EXHIBITS 18A THROUGH F.............      82

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

Wednesday, March 11, 2015                    9:03 a.m.

- - -

(Outside the presence of the jury:)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is now in session.

Please be seated.

THE COURT:  All right.  We're back on the record in Berman versus Kafka.

I understand there were traffic issues this morning, so we'll just have to deal with the jury instructions later. We're not going to have time, obviously, to do it this morning.

So I think where we left off was Ms. Berman was on the stand.  I think I had told you that you could have a half hour to cross-examine her.  I think you've used about ten minutes, so you've got another 20 minutes.

And then, Ms. Berman, I'll give you about five minutes to say anything in rebuttal that you want to say to his cross-examination --

MS. BERMAN:  Okay.

THE COURT:  -- all right?

And then you'll be done with your case, correct?

MS. BERMAN:  I didn't understand what you --

THE COURT:  Then you'll be done with your evidence, correct?

 1              MS. BERMAN:  Yes.

 2              THE COURT:  Okay.  All right.  You can bring in the

 3   jury.

 4              Ms. Berman, you can go ahead and take the stand

 5   again.

 6              COURT SECURITY OFFICER:  All rise for the jury.

 7        (Jury in at 9:05 a.m.)

 8              COURT SECURITY OFFICER:  Please be seated.

 9              THE COURT:  All right.  Good morning, ladies and

10   gentlemen.

11              THE JURORS:  Good morning.

12              THE COURT:  We're going to go ahead and pick up where

13   we left off yesterday in the testimony.

14              So Mr. Jones?

15            LAREESA BERMAN, PLAINTIFF'S WITNESS, SWORN

16                 CROSS-EXAMINATION (CONTINUED)

17   BY MR. JONES:

18   Q.   Good morning, Ms. Berman.

19   A.   Good morning.

20   Q.   Let me show you what's in evidence as Defendant's Exhibit

21   14A.

22              We've seen this before.  This is the -- first off --

23   well, this is a check, business check, made payable to your

24   husband, correct?

25   A.   It looks like, yes.

1    Q.    Okay.  And that's your -- that's your husband's name,

2    Chris Berman there --

3    A.    Yes.

4    Q.    -- on that check?

5    A.    Yes.

6    Q.    And on the back of this check, that looks like your

7    husband's signature, right?

8    A.    It looks like, yes.

9    Q.    And then it has the words "pay to" and then there's a name

10   there.  It says "Larysa Berman."

11             Do you see that?

12   A.    Yes, I do.

13   Q.    And the date of this check is November 2006.

14             Do you see that?

15   A.    Yes, I do.

16   Q.    Okay.  Now, November 2006 you were spelling your name in

17   that manner, were you not?

18   A.    No.  No.

19   Q.    November 2006 --

20   A.    Not in the bank, no.  I show yesterday that I changed my

21   spelling in the bank.

22   Q.    So in November 2006 are you telling this jury that you did

23   not spell your name --

24   A.    Not in the --

25   Q.    -- L-a-r-y-s-a?

1    A.    No.

2    Q.    You did not.

3    A.    Not in my bank.  I change my bank.

4    Q.    Let me show you what's in evidence as Exhibit 15.  This is

5    the -- your application to marry Mr. Berman.

6              Do you see that?

7    A.    Yes, I do.

8    Q.    Okay.  So just to be clear, originally you did spell your

9    name L-a-r-y-s-a, correct?

10   A.    Originally, yes.

11   Q.    All right.  Show you what's in evidence as Exhibit 16.

12   It's a warranty deed.

13             Do you see that?

14   A.    Yes, I do.

15   Q.    Okay.  And, in fact, it says on here that the warranty

16   deed is in your name and spells it L-a-r-y-s-a, correct?

17   A.    Yes.

18   Q.    Now -- and you sign it -- the signature line down there

19   has your name spelled L-a-r-y-s-a; is that right?

20   A.    Yes, I sign, but that warranty deed, when I sign them, I

21   have to change the name.  You don't show the next one because I

22   signed them -- it's -- you see August 2007.

23   Q.    Right.

24   A.    I sign Larysa, y-s-a, and they want to change.  You don't

25   show this Larysa Polyakova Berman.  That I am changing from

1    y-s-a to L-a-r-e-e-s-a.

2    Q.   I understand, Ms. Berman, but my point is this.  You're

3    making this change in August of 2007, correct?  Isn't that what

4    that document says?

5    A.   Yes --

6    Q.   Okay.

7    A.   -- for mortgage, but not for bank.  As I was working, I

8    couldn't cash check -- I presented to my -- I was working

9    through my company, and they -- when they changed my name, I

10   right away went and change bank.  The rest of the documents I

11   may change later.

12   Q.   So you just decided when you want to use L-a-r-y-s-a or --

13   A.   No --

14   Q.   -- L-a-r-e-e-s-a?

15   A.   -- I didn't decide when I was use.

16   Q.   Then --

17   A.   I was working.  I have small child.  I couldn't right away

18   go and all documents to change.  My name is the same.  I just

19   change spelling.

20   Q.   Understood.

21        And in -- you would agree with me, would you not,

22   November of 2006 is before May -- or August of 2007.

23        Do you agree with that?

24   A.   On the deed but not in my bank account.  I don't -- I

25   don't put money on my warranty deed.

1   Q.   And let me ask you this, Ms. Berman.

2   A.   The spelling, "Pay to Larysa Berman," not my writing.  Not

3   my husband either.

4   Q.   Are you --

5   A.   And this number of the bank, it's not my writing too.  I

6   don't know who did it.

7   Q.   Are you telling this jury --

8   A.   That's not -- those numbers --

9        THE COURT:  Hold on, Ms. Berman.  Let him finish his

10  questions.

11  BY MR. JONES:

12  Q.   Are you telling this jury that the signature on this check

13  is not your signature?

14  A.   Signature looks like mine, but I did not sign it.

15  Q.   How can you sit here and say you did not sign that check?

16  A.   I yesterday explain you that I could not sign the check

17  because I change in my bank account my name.  "Pay to Larysa

18  Berman," it's not my writing.

19  Q.   Okay.

20  A.   It's not my husband writing, and number of the bank

21  account, neither mine or my husband.

22  Q.   Let me ask this -- okay.  I'm glad you brought that up.

23       Do you see that account there ending in 61638?  Do

24  you see that?

25  A.   Yes.

1   Q.   Okay.  Is it your testimony you have no idea what that

2   account is, correct?

3   A.   I don't rec- -- I don't know what the -- when I have bank

4   account, I don't remember numbers or -- in my bank account.

5   Q.   You have no idea what account number that is.

6   A.   I have no idea who wrote down the bank account.  It's not

7   my numbers.  I don't write like this.

8   Q.   Hang on.  Wait.  I thought you just said you don't know

9   what your numbers are.  Now you're saying it's not your

10  numbers?

11  A.   No.  What I was just saying, that I did not write those

12  numbers.  That's not my handwriting.  That's what --

13  Q.   Is this your bank account number?

14  A.   I don't know.

15  Q.   It could be.

16       It could be, couldn't it?

17  A.   If you -- if you -- you have to prove.  You should show

18  me.  I don't know.

19       MR. JONES:  Thank you.

20       No further questions, Your Honor.

21       THE WITNESS:  You didn't show it as evidence.

22       MR. JONES:  No further questions, Your Honor.

23       THE COURT:  Okay.

24       MS. BERMAN:  Can I rebuttal?

25       THE COURT:  Well, do you have anything you want to

1   say on rebuttal?

2          MS. BERMAN:  Yes, I would like to say.

3          THE COURT:  Now, keep in mind that rebuttal is

4   limited to rebutting what he did on cross-examination.

5          MS. BERMAN:  I just want to show -- I hope I -- can I

6   have Exhibit 84A?

7                      REDIRECT EXAMINATION

8   BY MS. BERMAN:

9   Q.   They want to presented my --

10         MS. BERMAN:  I'm sorry.  And 67A too.  67A.

11         Thank you.

12  BY MS. BERMAN:

13  Q.   This is my check when I was working in the college.  They

14  give me a check.  And please look carefully.  Sorry, that isn't

15  the one.  It's Exhibit 67A.

16         Here my name, Larysa A. Berman, and look carefully at

17  the date, 8/20/06, 9/19/06.  That's how I was spelling my name

18  in my bank.

19         Now, next check after this -- you see it's 9/19/06.

20  Next one 9/20, 9/20/06.  9/20/06, I changed my spelling.  It

21  says Polyakova Berman, Lareesa, so you see the A did not --

22  they couldn't put A.  You see, it's 9 /20/06.

23         In my bank I couldn't put Larysa Berman.  Larysa

24  Berman is not my writing.  It's not my -- number account, it's

25  not my writing too.  I don't know whose writing is this.

 1  That's 9/20/06.

 2          They present and claim that I cash this check on --

 3          MS. BERMAN:  What date did you say?

 4          MR. JONES:  November 24, 2006.

 5  BY MS. BERMAN:

 6  Q.   November 24.  If you see it was September 20, '06, I

 7  already changed to Polyakova Berman.

 8          November 24 this check show, November 24, 2006.  You

 9  see?  I didn't -- I not signing Larysa Berman because my bank

10  account been changed to Polyakova Berman on -- already on

11  September, not November.

12          I'm sorry.  Can you see it?

13          On September, 9/20, I changed my bank account.  They

14  claim that this check, the check he sent from bank on November

15  24, 2006, that bank sent.  If you carefully look, what bank

16  account put check and give you portion which you supposed to be

17  keep?  The only person who -- who have this piece of the

18  check -- when you go to bank account, you tear off this check,

19  you keep for yourself, and this check is put in bank account.

20          You do not put in bank account check and portion with

21  this.  And specifically bank will not cut -- when they sent to

22  you, they together, not cutting.  Not cutting.  Somebody cut

23  it.  He had it before.

24          MR. JONES:  Objection, speculation.

25          MS. BERMAN:  That's not speculation.

1          THE COURT:  Ms. Berman, this is argument at this

2   point.  Like I told you, you'll be able to argue the evidence

3   later --

4          MS. BERMAN:  I just show --

5          THE COURT:  -- but right now, you're getting into

6   argument.

7   BY MS. BERMAN:

8   Q.   He's saying that this check from the bank.  Bank cannot

9   send a portion how much money will be.  Bank cannot have cut

10  down.  When somebody receiving a check --

11         THE COURT:  Well, you don't have personal knowledge

12  of this, so --

13         MS. BERMAN:  Your Honor, I --

14         THE COURT:  You can argue it, but this is not the

15  time for argument, okay, so go on to something factual that you

16  know of your own personal knowledge.

17  BY MS. BERMAN:

18  Q.   My personal knowledge, when I was working in my -- at my

19  work in college, I changed my -- legally changed my spelling of

20  my name that my sound be exactly the same as they call me in my

21  country, because through Y it is not correct.  It pronounced

22  like Larysa.

23         But my name is Lareesa, so I spell legally Lareesa

24  through e-e.  I spell it, and I present it when I change to my

25  college.  And I couldn't change anything else until my college

1   I presented to this document.  They change.

2         And when they changed my name in college, if you --

3   you can see it's document show 9/20/06, 10/19/06.  This is

4   already changed to Polyakova Berman from 9/20.

5         THE COURT:  Ms. Berman, I think this is getting --

6         MS. BERMAN:  September --

7         THE COURT:  Hold on.  Hold on.  This is getting

8   repetitive at this point.

9         Do you have any other points to make?  Because you're

10  almost out of time.

11        MS. BERMAN:  My point is --

12        THE COURT:  As a witness, not as an argument.

13  BY MS. BERMAN:

14  Q.  I did not cash this check because that cannot -- I don't.

15  I don't know who did it.  If he present from the bank portion

16  of bank, they'll not keep a portion of the check.

17        I hope I correctly understand -- if you understand me

18  what I want to mean.  That's -- I did not sign.  I did not sign

19  the check because I change my bank account -- bank -- my

20  spelling of my bank I change before defendant --

21        THE COURT:  Okay.  I think that's the same point that

22  you made.

23        Do you have any other point right now to make in

24  rebuttal?  You'll be able to argue later.

25  BY MS. BERMAN:

1   Q.   My point is not my --

2           THE COURT:  Okay.  We understand that.

3   Q.   Not my writing, not my bank account writing.  I didn't

4   write it.  I have no idea who did it.  I did not do anything

5   wrong.

6           THE COURT:  Okay.  Thank you.

7           All right.  Does the plaintiff rest with the evidence

8   in her case?

9           MS. BERMAN:  If I can rebuttal of Mr. Kafka.  My

10  evidence is --

11          THE COURT:  No.  No.  He's -- they're going to put

12  him back on the stand.

13          MS. BERMAN:  Okay.  I would like to say --

14          THE COURT:  No, no, no.  You're done with your

15  rebuttal testimony.

16          Let me ask you, do you have any other witnesses or

17  evidence?

18          MS. BERMAN:  Witnesses?  It's me, my husband, and --

19          THE COURT:  No.  Anybody -- do you have anybody to

20  call right now?

21          MS. BERMAN:  No.  I'm not calling.

22          THE COURT:  Okay.

23          MS. BERMAN:  But I would add little bit about this

24  check.

25  BY MS. BERMAN:

1   Q.   I changed this in my bank account, but when I redid my

2   mortgage --

3          MS. BERMAN:  Can I see that mortgage document again?

4   BY MS. BERMAN:

5   Q.   Warranty deed.  I change little bit later.  I change

6   through bank account.  Warranty deed on August 27, 2007.  I

7   change from -- it says, Larysa Berman, it says here, but that's

8   what I was changing, Larysa Berman to Lareesa Polyakova Berman.

9          But, No. 1, it not like I change -- I have a lot of

10  documents.  Because I have a small child in that time, in 2007,

11  small child, I change the bank account, then I change mortgage

12  little later.

13         That's why when he found online my mortgage, and he

14  saw that I still spelling my name through Y, so he decided to

15  forge a document but --

16         MR. JONES:  Objection --

17         THE COURT:  All right.  I'm going to ask the jury to

18  disregard -- instruct the jury to disregard it.  And that will

19  be the end of the --

20         MS. BERMAN:  I would like to say to jury --

21         THE COURT:  No, no.  Ms. Berman, you've used up your

22  time.  I've given you more than five minutes.

23         All right.  Ladies and gentlemen of the jury, I know

24  it's early for a break but we have something that has to be

25  taken outside your presence, so if you can take a 15-minute

```
 1   break and be back at 9:40, I would appreciate it.

 2         Thank you.

 3         COURT SECURITY OFFICER:  All rise for the jury.

 4      (Jury out at 9:23 a.m.)

 5         COURT SECURITY OFFICER:  Please be seated.

 6         THE COURT:  All right.  We're at the close of the

 7   plaintiff's case, so are there any motions?

 8         MR. SPRINGER:  Yes, Your Honor.  The defense has

 9   several Rule 50 motions.

10         THE COURT:  All right.  Tell me what you -- what

11   motions and what your argument is.

12         MR. SPRINGER:  First -- is it okay if I stand --

13         THE COURT:  Sure.  You can stand there.

14         MR. SPRINGER:  The first will be based upon the

15   qualified privilege defense.  There are several elements, as

16   the Court's aware, of qualified privilege, including good

17   faith -- the first of which is good faith.

18         And based upon the May 29th, 2009, ruling where it

19   was found that Mr. Berman had misappropriated funds or

20   embezzled money -- that's actually stated in that order from

21   May 2009 -- Mr. Kafka had good faith to make the statements at

22   issue in the letters -- in the e-mails that money was embezzled

23   by Mr. Berman and assisted by Ms. Berman.

24         The order stated that --

25         THE COURT:  Well, wait a minute.  Are you arguing --
```

1    you're arguing qualified privilege?

2            MR. SPRINGER:  I am, just in good -- that the

3    statement was made in good faith based upon a prior ruling

4    that --

5            THE COURT:  So you're asking for a ruling that he did

6    not -- that the privilege applies as a matter of law and that

7    as a matter of law he did not abuse privilege?

8            Which one --

9            MR. SPRINGER:  That's --

10           THE COURT:  -- or both?

11           MR. SPRINGER:  That's what I'm arguing, the qualified

12   privilege that he made the statements satisfies the four

13   elements that are necessary, good faith, proper occasion,

14   published in a proper manner, had an interest to be upheld,

15   which was the unemployment -- paying unemployment benefits to

16   Christopher Berman, and that as a result, the burden now shifts

17   to Ms. Berman to overcome good faith, which she would have to

18   show that, in fact, the statements were made with ill will,

19   hostility, to overcome that qualified privilege.

20           THE COURT:  All right.  I --

21           MS. BERMAN:  Your Honor --

22           THE COURT:  I'm going to -- hold on.  You don't need

23   to argue.

24           I'm going to deny that motion at this point.  I think

25   factual issues were presented on both of those points.

1          MR. SPRINGER:  The second one is the absolute

2    immunity litigation privilege.  Briefly, based upon, again, the

3    May 2009 order which states that Chris Berman embezzled money,

4    we believe that that was a true -- I'm sorry, the substantially

5    true defense.  In other words --

6          THE COURT:  That's a factual issue for sure.

7          MR. SPRINGER:  Okay.  The last one is pure opinion.

8    We'd move for pure opinion as well.

9          THE COURT:  That's -- I don't think it's a pure

10   opinion.

11         MR. SPRINGER:  And lastly the litigation privilege.

12         THE COURT:  I don't think I could determine at this

13   point that the litigation privilege applies.

14         MS. BERMAN:  Your Honor, I can show --

15         THE COURT:  Well, Ms. Berman, you don't need to

16   argue.  I'm ruling in your favor --

17         MS. BERMAN:  I'm sorry.

18         THE COURT:  -- okay?  So there's no reason for you to

19   argue when I rule in your favor.

20         Every -- that's one thing a lawyer learns, the first

21   thing a lawyer learns:  You don't want to start arguing if a

22   judge is ruling in your favor --

23         MS. BERMAN:  I understand.

24         THE COURT:  -- because then the judge may change

25   their mind.

```
 1            You understand?
 2            MS. BERMAN:  Yes, Your Honor.
 3            THE COURT:  All right.
 4            MS. BERMAN:  May I ask --
 5            THE COURT:  Do you have another point?
 6            MS. BERMAN:  No, I --
 7            THE COURT:  We're done with the motions.
 8            MS. BERMAN:  No, I'm -- not about motions.
 9  Yesterday --
10            THE COURT:  Hold on.  Let me just -- Mr. Springer,
11  are you done?
12            MR. SPRINGER:  There was one other one, Your Honor.
13  We'd move for a Rule 50 on actual damages.  There is no
14  evidence of any actual damages and we'd --
15            THE COURT:  She's testified that she's got mental
16  anguish, so that will be denied.
17            MS. BERMAN:  Thank you, Your Honor.
18            Yesterday you said that I can present -- because
19  Mr. Springer present to you for jury verdict case law, and I
20  was working all night, and it's very hard for me all night.
21            Can I present for you?
22            THE COURT:  We're not going to do that yet.  We were
23  going to do that at 8:30, but since you were late -- I
24  understand there were traffic issues, but since you were late,
25  we don't have time to do it now.  We'll do it later.  Now's not
```

```
 1    the time to do that.
 2             MS. BERMAN:  Okay.
 3             THE COURT:  Okay.
 4             All right.  Is there anything else to take up right
 5    now while the -- well, let me ask you before we break.
 6             So, now, who is your next witness, Mr. Springer?
 7             MR. SPRINGER:  Our next witness will be Jamie
 8    Bellflower.
 9             THE COURT:  All right.
10             MR. SPRINGER:  He will not be a very long witness, I
11    don't anticipate, and then we'll recall Mr. Kafka, and then
12    we'll rest.
13             THE COURT:  All right.  All right.  Well, I told the
14    jury to be back at 9:40.
15             Is there anything else to take up before they come
16    back?
17             MR. SPRINGER:  No, Your Honor.
18             THE COURT:  Ms. Berman, anything else right now?
19             MS. BERMAN:  No.  Thank you.
20             THE COURT:  All right.  Court will be in recess.
21             COURT SECURITY OFFICER:  All rise.
22        (Recess from 9:28 a.m. until 9:45 a.m.; all parties
23    present.)
24        (Outside the presence of the jury:)
25             COURT SECURITY OFFICER:  All rise.  This Honorable
```

1    Court is now in session.

2              Please be seated.

3              THE COURT:  All right.  If you could bring the jury

4    back in, Mr. Sowards.

5              Thank you.

6              COURT SECURITY OFFICER:  All rise for the jury.

7         (Jury in at 9:46 a.m.)

8              COURT SECURITY OFFICER:  Please be seated.

9              THE COURT:  All right.  Mr. Springer, if you can call

10   your first witness.

11             MR. SPRINGER:  Defense would call Jamie Bellflower.

12             COURTROOM DEPUTY:  Please raise your right hand.

13             Do you solemnly swear or affirm the answers you will

14   give during these proceedings will be the truth, the whole

15   truth, and nothing but the truth?

16             THE WITNESS:  I do.

17             COURTROOM DEPUTY:  And please state your name for the

18   record.

19             THE WITNESS:  James William Bellflower, Jr.

20             COURTROOM DEPUTY:  Thank you.

21             MR. SPRINGER:  May it please the Court?

22             THE COURT:  Yes.

23      JAMES WILLIAM BELLFLOWER, JR., DEFENDANT'S WITNESS, SWORN

24                       DIRECT EXAMINATION

25   BY MR. SPRINGER:

1    Q.    Good morning, Mr. Bellflower.

2    A.    Good morning.

3    Q.    How are you?

4    A.    Good.

5    Q.    Good.

6          I'm going to be asking you some questions today, and

7    if at any time you don't understand my question or just don't

8    hear me, just ask me to rephrase, and I'll do it for you, okay?

9    A.    Yes.

10   Q.    Does that sound fair?

11   A.    Yes.

12   Q.    Great.  Where do you live?

13   A.    Tallahassee, Florida.

14   Q.    And where are you employed?

15   A.    I am employed with Camping World.

16   Q.    How long have you been there?

17   A.    Since Labor Day.

18   Q.    And where were you employed prior to Camping World?

19   A.    With the State of Florida Department of Economic

20   Opportunity.

21   Q.    Now, if I say the term Agency for Workforce Innovation, do

22   you understand what I'm talking about?

23   A.    Yes.

24   Q.    Is that almost the same as the Department of Economic

25   Opportunity?

1  A.    Yes.

2  Q.    And do both of those agencies administer unemployment

3  compensation in the state of Florida?

4  A.    Yes.

5  Q.    How long were you employed there?

6  A.    I was about five years, since June of 2009.

7  Q.    And when you started in June of 2009, what department did

8  you work in?

9  A.    Unemployment compensation.

10  Q.    And what was your position there?

11  A.    Employment securities representative.

12  Q.    And just tell the jury generally what your duties were as

13  a securities representative.

14  A.    Assisting constituents with the unemployment compensation

15  program.

16  Q.    Did that include someone applying for claims at the

17  beginning?

18  A.    Correct.  Yes.

19  Q.    And working through the process of unemployment?

20  A.    Yes.

21  Q.    And how long were you an unemployment securities

22  representative?

23  A.    For about a year.

24  Q.    And what position did you hold after that?

25  A.    After that I got signed on as administrative assistant 2

1    with the Office of the General Counsel with the same state

2    agency.

3    Q.   And generally if you could just describe for the jury what

4    your duties were in that position.

5    A.   In that position I processed public records requests.

6    Q.   And what was your last position there?

7    A.   Agency clerk.

8    Q.   Okay.  And as an agency clerk, what were your duties in

9    that position?

10   A.   Oversaw all facets of the department and assisted with

11   final orders, public notices, docketing our orders, etc.

12   Q.   And through your various positions with the agency, did

13   you gain an understanding as to the whole unemployment

14   compensation process, how it takes place from beginning to

15   whether -- to the point where a final determination's made or

16   benefits are exhausted?

17   A.   Yes.

18   Q.   And in your various positions with the agency, did you

19   deal with requests to appeal?

20   A.   Yes.

21   Q.   And it seems obvious, but during your positions with the

22   agency, did you deal with persons who were making claims to

23   receive unemployment benefits?

24   A.   Yes.

25   Q.   And the decisions that were made or are made by the agency

1    throughout the unemployment claim process, do those decisions

2    affect individuals' rights?

3    A.    Yes.

4    Q.    And that being the individual actually making the

5    application for the benefits?

6    A.    Yes.

7         MS. BERMAN:  Your Honor, I object because it's

8    unemployment between my husband and the defendant.  It's

9    nothing to do with --

10        THE COURT:  The objection's overruled.

11   BY MR. SPRINGER:

12   Q.    Mr. Bellflower, during the time someone is receiving

13   unemployment compensation benefits, can an investigation be

14   conducted into whether or not someone is working while

15   receiving those benefits?

16   A.    Yes.

17   Q.    And the investigation that's conducted into whether one is

18   receiving -- or working while receiving benefits, is that part

19   of the unemployment compensation process?

20   A.    Yes.

21   Q.    And can an award of unemployment compensation be appealed?

22   A.    Yes.

23   Q.    And can an appeal be dismissed and then reopened later?

24   A.    Yes.

25   Q.    And during your employment with the agency, did you

1    receive requests from persons requesting to appeal a decision?

2    A.    Yes.

3    Q.    And is a request to appeal a decision part of the overall

4    unemployment compensation process?

5    A.    Yes.

6    Q.    All right.  I want to show you what's marked as

7    Defendant's Exhibit No. 28.  We'll talk about that document for

8    a couple of minutes.

9              I need to zoom that here.

10             On August 10th, 2011, towards the bottom of that page

11   that you're looking at, did you receive an e-mail from

12   Mr. Kafka?

13   A.    Yes.

14   Q.    And in that e-mail did Mr. Kafka -- did Mr. Kafka indicate

15   how he determined that Mr. Berman was actually receiving

16   unemployment -- unemployment benefits?

17   A.    Could you rephrase the question?

18   Q.    Yeah, sure.

19             In this e-mail in the second paragraph it states,

20   "When we received our quarterly notice of benefits paid

21   statement, we were shocked to find out that Chris Berman was

22   receiving unemployment benefits."

23   A.    Yes.

24   Q.    Was that your understanding as to how he found out that,

25   in fact, Chris Berman was receiving benefits?

1    A.    Yes.

2    Q.    And it states, "We kindly ask this case be reviewed and

3    our request for an appeal be granted."

4               Is it your understanding that Mr. Kafka wanted to, in

5    fact, appeal the award of benefits to Chris Berman at that

6    time?

7    A.    Yes.

8    Q.    And then on August 12th, 2011, you responded to Mr. Kafka;

9    is that right?

10   A.    Yes.

11   Q.    And your e-mail states -- and you wrote this e-mail,

12   correct?

13   A.    Yes.

14   Q.    "Good day.  I would like to acknowledge your request, and

15   I have directed this e-mail to the Office of Appeals to address

16   your issue."

17              Is that what you stated?

18   A.    Yes.

19   Q.    So you sent his request to appeal to the Office of Appeals

20   within the agency.

21   A.    Yes.

22   Q.    Now, on August 16th, 2011, about four days later, did you

23   receive another e-mail from Mr. Kafka?

24   A.    Yes.

25   Q.    And in that e-mail it states, "You initially ruled" -- you

1   being the agency -- "initially ruled in our favor in that we

2   proved that Chris Berman and his wife embezzled money from our

3   company."

4           When you received this e-mail, did you have any idea

5   who Chris Berman's wife was?

6   A.   No.

7   Q.   And Mr. Kafka never relayed to you what her name was.

8   Isn't that right?

9   A.   No.

10  Q.   And as an employee of the agency dealing with unemployment

11  compensation claims, did you often receive correspondence

12  regarding the award of unemployment compensation benefits?

13  A.   Yes.

14  Q.   All right.  And would that include orders issued as a

15  result of an appeal?

16  A.   Yes.

17  Q.   Notices of determination?

18  A.   Yes.

19  Q.   So it wasn't unusual for you to receive requests regarding

20  appeals.

21  A.   Yes.

22  Q.   Or it was unusual.

23  A.   No, it was not unusual.

24  Q.   As an -- given that, did you have an interest, as an

25  employee of the agency, in correspondence, orders, notices, any

1  other paperwork during the unemployment compensation claims

2  process?

3          You had an interest --

4  A.   Yes.

5  Q.   -- in that.  That was your job, right?

6  A.   Yes.

7  Q.   And when you received this e-mail from Tom Kafka on August

8  16, 2011, could you, if you'd wanted to, gone back and accessed

9  Chris Berman's unemployment file and looked through it?

10 A.   Yes.

11 Q.   Now, was it your understanding that Mr. Kafka also was

12 claiming that Mr. Berman was working while receiving benefits?

13 A.   Yes.

14 Q.   And did you ultimately send Mr. Kafka's request also to

15 the benefit payment and control unit?

16 A.   Yes.

17 Q.   And the benefit payment and control unit, is that where

18 investigation is conducted to determine whether or not someone

19 is working while receiving benefits?

20 A.   Yes.

21 Q.   Did you send this e-mail that contains the statement, "You

22 initially ruled in our favor, and we proved that Chris Berman

23 and his wife embezzled money from our company," to anyone

24 outside the agency ever?

25 A.   No.

1    Q.    Now, this document here, is this a public record?

2    A.    Yes.

3    Q.    All right.  And to obtain this document, how would that --

4    how would one have to go through that process?

5    A.    Simply requesting the records from the agency.

6    Q.    And Chris Berman's unemployment compensation file, was

7    that kept in his name?

8    A.    Yes.

9    Q.    It wouldn't be kept in his wife's name, right?

10   A.    No.

11   Q.    Wouldn't be kept in Lareesa Berman's name, correct?

12   A.    No.

13   Q.    And so for someone to get hold of Chris Berman's file,

14   they would have to do a -- what, a Freedom of Information Act

15   request?

16   A.    Uh-huh.  Yes.

17   Q.    Okay.  And to do that, they'd have to do it in the name of

18   Chris Berman, right?

19   A.    Correct.

20   Q.    In the hopes that maybe something was in there addressed

21   to his wife, correct?

22   A.    Yes.

23   Q.    And without his wife being named.

24   A.    Yes.

25   Q.    All right.  I want to show you what's been marked as

1    Defense Exhibit No. 7.

2              MR. SPRINGER:  May I approach, Your Honor?

3              THE COURT:  Yes.

4    BY MR. SPRINGER:

5    Q.   Now, Exhibit 7, it says it's an order of Unemployment

6    Appeals Commission.

7              Do you see that?

8    A.   Yes.

9    Q.   And was this an order issued by the appeals commission in

10   response to Mr. Kafka's request to appeal?

11   A.   Yes.

12   Q.   And it says, "The employer's appeal has been forwarded to

13   the Office of Appeals for a hearing before the appeals

14   referee."

15             Do you see that?

16   A.   Yes.

17   Q.   Okay.  And does this order indicate that the unemployment

18   compensation process was continuing?

19   A.   Yes.

20   Q.   I'm going to show you what's previously been marked as

21   Defense Exhibit 8.

22             MR. SPRINGER:  May I approach, Your Honor?

23             THE COURT:  Yes.

24             Feel free to approach the witness.  You don't need

25   to --

```
 1            MR. SPRINGER:  Okay.

 2            THE COURT:  -- keep asking.

 3            MR. SPRINGER:  Thank you.

 4   BY MR. SPRINGER:

 5   Q.   And Defense Exhibit No. 8, is that a notice?

 6   A.   Notice of order.

 7   Q.   Okay.  And does that -- let me put it up on the screen

 8   there.

 9   A.   (Tenders document.)

10   Q.   Thanks.

11            And this notice of order, was that simply enclosing

12   the order we just looked at?

13   A.   Yes.

14            MR. SPRINGER:  And those are all the questions I

15   have.  I thank you for your time.

16            THE COURT:  Okay.  Ms. Berman?

17                      CROSS-EXAMINATION

18   BY MS. BERMAN:

19   Q.   Good morning, Mr. Bellflower.

20   A.   Good morning.

21   Q.   Have we ever met?

22   A.   (Indicating he didn't hear.)

23   Q.   Have we ever met?

24   A.   No.

25   Q.   No.
```

1          But you have a deposition in this case with me, and I

2    was present on telephone hearing --

3    A.   Yes.

4    Q.   -- is correct?

5          And do you recall when I ask you if you're familiar

6    with a case between -- unemployment case between my husband and

7    defendant?

8          Do you recall what you said?

9    A.   I --

10   Q.   Do you recall -- when I ask you if you familiar with the

11   claim between my husband and unemployment appeal, do you recall

12   what you said?

13   A.   I don't recall the exact words, but I do recall.

14   Q.   What did you say to me?

15         Are you familiar with a claim between my husband --

16   A.   Yes.

17   Q.   But I would like --

18         MS. BERMAN:  Do you have Mr. Bellflower deposition?

19         MR. SPRINGER:  Yeah, I'm sure I do.

20         THE COURT:  Mr. Springer, do you have a copy as

21   well --

22         MR. SPRINGER:  I do, yes, sir.

23         THE COURT:  -- for the Court?

24   BY MS. BERMAN:

25   Q.   If you -- if you look at page 42, lines 9, 14.

1          MR. SPRINGER:  What page was that, Ms. Berman?  I'm

2    sorry.

3          MS. BERMAN:  42, line 9, 14.

4          THE WITNESS:  Line 13?

5    BY MS. BERMAN:

6    Q.    42, line 9 through 14.

7    A.    Line 9 through 14.

8    Q.    Yes.

9    A.    Okay.  Yes.

10   Q.    I was asking:  "Are you familiar with a case concerning my

11   husband and Maitland Furniture?"

12          You answer, "I'm sorry.  Could you repeat the

13   question?"

14          My question:  "Are you familiar with this case?"

15          And you answer:  "I'm familiar with this record

16   request.  I have no personal knowledge of the claim."

17          Is it correct?

18   A.    Correct.

19   Q.    So when Mr. Kafka sent you that on August 16, 2011, and

20   asking for -- to appeal benefits, you weren't aware that a

21   hearing of -- was vacated in his favor.

22          Were you aware about that?

23   A.    I was aware of the request, which I forwarded over to the

24   Office of Appeals.

25   Q.    But did you know that they vacated that hearing?

1   A.    I wasn't aware of any of the outcome.

2   Q.    And when I was asking you legal question, do you recall

3   that you were sitting with your attorney?  Do you recall that?

4   A.    Correct.  Yes.

5   Q.    And when I was asking -- can you look at page 57 --

6   A.    (Complies.)

7   Q.    -- 3 to 10.

8         MR. SPRINGER:  Objection, Judge.  She's referring to

9   a portion of the transcript --

10        MS. BERMAN:  No.  I --

11        THE COURT:  Hold on.  Let him finish.

12        MR. SPRINGER:  -- a portion of the transcript where

13  an attorney for the agency was present, and this is him

14  speaking.

15        MS. BERMAN:  Your Honor, I was asking about --

16        THE COURT:  But no.  The lines you've said are not

17  this witness's testimony.  It's an attorney.

18        MS. BERMAN:  But I --

19        THE COURT:  You can't impeach him with a statement

20  made by --

21        MS. BERMAN:  Okay.

22        THE COURT:  -- his attorney.

23  BY MS. BERMAN:

24  Q.    Do you recall I was asking if this e-mail when he libel me

25  on August 16, 2011, was public record?  Do you recall this, if

1   that e-mail what -- that Mr. Kafka lie about me was public

2   record, you said yes.

3          You recall this?

4   A.   Correct.  Yes.

5   Q.   So e-mails, you said, public records.  They don't need to

6   go to -- that's what you answered.  Is correct?

7   A.   It is a public record.

8   Q.   Yes.

9          And you -- can you look at page 58, line 9, 13 and --

10  lines 9, 13, and I was asking:  "And the appeal was in 2009

11  which Mr. Kafka did, correct?"

12         And you answer:  "That may be the case.  I don't

13  happen to have any personal knowledge regarding his immediate

14  appeals with the agency."

15         Is it correct?

16  A.   Correct.

17  Q.   So you didn't know that order was vacated.

18  A.   No.  I'm not -- I wasn't an appeals referee.

19  Q.   But Defendant Kafka didn't say the order was vacated.  He

20  just was saying that -- in his favor, but just have the truth

21  and didn't say that they vacated order.

22         Is it correct?  And you weren't aware about that,

23  yes?

24  A.   I'm sorry.  Could you rephrase the question?

25  Q.   From that e-mail you didn't understand that order was

1   vacated when defendant sent you that e-mail.  Is it correct?

2            MR. SPRINGER:  Objection, relevance, Your Honor.

3            THE COURT:  Overruled.

4            You can answer the question if you understood it.

5            THE WITNESS:  Okay.

6            Rephrase it one more time, please.

7   BY MS. BERMAN:

8   Q.   That libel statement that Mr. Kafka sent on August 16, he

9   told you that, "The unemployment appeal found in our favor,"

10  correct?

11           But he didn't tell you that it was vacated; is it

12  correct?

13  A.   Yeah.

14  Q.   You wasn't aware about that.

15  A.   No.  I don't -- I don't recall.

16  Q.   But you weren't aware that it was vacated.

17  A.   No, uh-uh.  I wouldn't have had any real personal

18  knowledge of the case.

19  Q.   Okay.  If I am not employee -- if I didn't file for

20  unemployment because I wasn't a party to this case, does it

21  have any relevance to -- between me and this unemployment

22  appeal?

23           MR. SPRINGER:  Objection, speculation.

24           THE COURT:  Overruled.

25           You can answer the question if you'd like.

1            THE WITNESS:  I didn't understand it.

2    BY MS. BERMAN:

3    Q.   I was not -- I didn't file for unemployment appeal.

4            Does it has any relevance that he telling me -- that

5    he telling you that I embezzle money?  Does this have any

6    relevance between Mr. Kafka and my husband?

7            MR. SPRINGER:  Same objection.  Relevance, Your

8    Honor, speculation.

9            THE COURT:  Overruled.

10           THE WITNESS:  No.

11   BY MS. BERMAN:

12   Q.   So what he was saying, it's not relevant.

13   A.   No.

14   Q.   That's what you say.

15           Also I was asking you do you recall if Mr. Kafka

16   volunteer this statement to you.

17           Do you recall this?

18   A.   I don't recall specifically.  It was some time ago that we

19   had the deposition.

20   Q.   Okay.  If you turn to page 49, line 15, 17, and I ask you.

21   Page 49, 15, 17.

22   A.   All right.  I see it.

23   Q.   Yeah.  And I ask you:  "Did Mr. Kafka volunteer that

24   statement without your request?"

25           And you answered, "Yes."

1  A.   Correct.

2  Q.   So you -- you didn't request anything.  He volunteer this

3  statement.

4        That's correct, yes?

5  A.   Yes.

6  Q.   Yeah.  And in your deposition when I was asking did you

7  know if it's -- that was --

8        MS. BERMAN:  I would like to explain to the jury that

9  I was --

10        MR. SPRINGER:  Objection, Judge.

11        THE COURT:  You can't explain, Ms. Berman.

12        MS. BERMAN:  No.  It was -- I was on the phone, and

13  Mr. Bellflower was difficult to hear because it was through the

14  phone.

15  BY MS. BERMAN:

16  Q.   If you look on page 48, lines 3 to 7, and court reporter

17  couldn't -- little bit incorrectly transcribe.

18        I was asking, "Did you know" --

19        MR. SPRINGER:  Objection, Judge.  This is improper.

20        THE COURT:  Yeah.  You can't add all this.

21        If you're -- why don't you just ask him a question as

22  opposed to going from the deposition?

23        But if you're going to go from the deposition, all

24  you can do is go from that deposition.

25        MS. BERMAN:  Okay.

1          THE, COURT:  You can't elaborate.

2          MS. BERMAN:  Okay.  I just go from deposition.

3   BY MS. BERMAN:

4   Q.   I asked you, "Did you know that the hearing was vacated on

5   May 27th?"

6          And your answer was --

7          MR. SPRINGER:  Objection.  She's not reading

8   accurately from the deposition transcript.

9          THE COURT:  Yeah.  You can't --

10          MS. BERMAN:  No.  I am -- okay.  I want to -- okay.

11  I read from deposition.

12  BY MS. BERMAN:

13  Q.   "Did you know that the hearing -- unemployment for hearing

14  on May 27, 2009, was repeated due" -- it says repeated but I

15  meant to say rescinded -- "due to the referee misconduct in

16  continue the conversation with Kafka without my husband being

17  present?"

18          And you said, "No.  I -- I am not aware."

19          Is it correct?

20  A.   That's correct.

21  Q.   So -- and is it correct that unemployment appeal has

22  nothing to do with me, between my husband and my -- and

23  defendant.

24          It's correct, yeah?

25  A.   Can you rephrase that?

1   Q.   That unemployment appeal nothing to do -- have to do with

2   me because I wasn't part, and I wasn't for any proceeding.

3          Is it correct?

4          MR. SPRINGER:  Objection, speculation.  He's already

5   testified he wasn't aware of what took place in the appeals

6   hearing.

7          THE COURT:  Overruled.

8          THE WITNESS:  Correct.

9   BY MS. BERMAN:

10  Q.   And -- but you're aware that my husband receive all

11  benefits.  My husband receive all benefits.  You aware about

12  that.

13         MR. SPRINGER:  Objection, foundation, Judge.

14         THE COURT:  Overruled.

15         Go ahead.  You can answer if you know.

16         THE WITNESS:  I'm not aware of what, if any, benefits

17  were paid to him.

18  BY MS. BERMAN:

19  Q.   Yesterday Ms. Connell said that my husband received all

20  benefits.

21         Would you say if my husband did something improperly,

22  embezzle money, would unemployment appeal give him benefits?

23         MR. SPRINGER:  Objection.

24         THE COURT:  I'll sustain that objection.  It's

25  speculative.

1              MS. BERMAN:  Okay.  I have no further questions.

2              THE COURT:  Okay.  Any redirect?

3              MR. SPRINGER:  Real briefly, Your Honor.

4                      REDIRECT EXAMINATION

5    BY MR. SPRINGER:

6    Q.   Mr. Bellflower, you didn't take -- you didn't take part in

7    any prior hearings, correct?

8    A.   Correct.

9    Q.   Okay.  But what you did receive was -- were the e-mails

10   from Mr. Kafka, correct?

11   A.   Correct.

12   Q.   And you testified as an employee of the agency, and while

13   you may not have been a part of the actual hearings that took

14   place, you had access to that material had you so wanted to get

15   access.

16   A.   Yes.

17   Q.   And as far as these e-mails are concerned, you didn't send

18   these e-mails regarding Chris Berman's wife to anyone outside

19   the agency.

20            Isn't that right?

21   A.   That's correct.

22   Q.   And you had an overall understanding of the documents and

23   the procedures for the unemployment process, correct?

24   A.   That's correct.

25   Q.   Okay.  Whether it be for Chris Berman or anyone else.

```
 1   A.    That's correct.
 2   Q.    All right.
 3             MR. SPRINGER:  That's all I have.  Thank you.
 4             THE COURT:  Okay.  Thank you, Mr. Bellflower.
 5             THE WITNESS:  Thank you.
 6             THE COURT:  You may step down.
 7             And can this witness be excused?
 8             MR. SPRINGER:  Yes, sir.
 9             THE COURT:  Okay.  All right.  Thank you.
10             THE WITNESS:  All right.
11             THE COURT:  You may be excused.
12        (Witness excused.)
13             THE COURT:  All right, Mr. Springer.  You can call
14   your next witness.
15             MR. SPRINGER:  Defense calls Tom Kafka back to the
16   stand.  We just need about one minute to get set up, Your
17   Honor, if that's okay.
18             THE COURT:  All right.
19             Now, Mr. Kafka, you've already been sworn in in this
20   case, so let me just remind you that you're still under oath.
21             You understand that?
22             THE WITNESS:  Yes.
23             MR. SPRINGER:  May I proceed, Your Honor?
24             THE COURT:  Yes.
25                THOMAS KAFKA, DEFENDANT'S WITNESS, SWORN
```

```
 1                      DIRECT EXAMINATION
 2   BY MR. SPRINGER:
 3   Q.   Mr. Kafka, so I'm not walking back and forth the entire
 4   time, I'm going to give you the exhibits I'll be referring to.
 5           All right, Mr. Kafka.  How are you doing?
 6   A.   I'm all right.
 7   Q.   You've been sitting here through the whole trial, correct?
 8   A.   Yes.
 9   Q.   Okay.  Look, if you don't understand my question or you
10   don't hear me, let me know, okay?
11   A.   Yes.
12   Q.   All right.  So tell the jury a little bit about yourself.
13           Are you married?
14   A.   Yes, I am.
15   Q.   Do you have any children?
16   A.   I have two children.
17   Q.   Okay.  And where do you live?
18   A.   I live in Janesville, Wisconsin.
19   Q.   Do you work part of the time in Florida?
20   A.   Yes, I do.
21   Q.   And are you employed?
22   A.   I have my own business, so I'm --
23   Q.   What's the name of that business currently?
24   A.   Maitland Trifecta.
25   Q.   And is that company related to Maitland Furniture?
```

1  A.    It is basically Maitland Furniture.  We just had a name

2  change in -- in the past, so . . .

3  Q.    Okay.  And when was that name change about?

4  A.    I believe February 2009.

5  Q.    How long -- and I'll refer to it if it's okay -- instead

6  of saying Maitland Trifecta, which is the current name, I'll

7  call it Maitland Furniture, which is what we're talking about

8  in this case.

9          Is that okay?

10  A.    Yes, it is.

11  Q.    Okay.  So what type of -- how long have you owned Maitland

12  Furniture?

13  A.    We actually started a company, I think Maitland Imports,

14  in Pittsburgh in 1983, and then we reincorporated in Florida, I

15  think, in 1998, so it's been a long time.

16  Q.    And just tell the jury, what type of business is Maitland

17  Furniture?

18  A.    We make furniture.  We do a lot of restaurants.  When you

19  go to a restaurant and you see the tables and the counters, we

20  do a lot of that.  We could make something very similar to what

21  you see here in the courtroom.  So -- and generally we make

22  casino furniture, which are basically small desks and things on

23  that order.

24          Our shop is in Daytona Beach so we do a lot of hotel

25  work and a lot of work for local restaurants and hotels and

1   shops for displaying merchandise and things on that order.

2   Q.    And do you personally take part in producing these

3   products?

4   A.    Yes, I do.

5   Q.    Do you actually sand products?

6   A.    Yes, I do.  If we have a double shift, I work both shifts,

7   yes.

8   Q.    Okay.  You're in there, and are you -- are you programming

9   machines to make sure the products are cut correctly?

10  A.    Yes.  And I do a lot of the sawing.

11  Q.    And at the end of the day, are you dirty?  Do you go home

12  dirty?

13  A.    Yeah.

14  Q.    Do you sometimes get the -- I mean, literally the sawdust

15  on your clothes and your hair?

16  A.    Yeah.  It's not a fun job at all times.

17  Q.    Have you always been the owner of Maitland Furniture?

18  A.    Yes, I have.

19  Q.    Now, the jury's heard evidence of a company called

20  Trifecta -- well, some evidence of Trifecta Gaming Products.

21        Have you heard of that company before?

22  A.    Yes.  That was a company -- I believe it was formed in

23  2001, and it was dissolved in 2003 in Florida.

24  Q.    Was Chris Berman involved in that company?

25  A.    Chris Berman was a minority stockholder in that company

1   with a gentleman called, I believe, Doug Etman.

2   Q.    Okay.  Now, turning to a company called Trifecta Gaming

3   USA, which we've talked about a lot in this trial, do you know

4   that company?

5   A.    Yes, I do.

6   Q.    And when was that company formed --

7   A.    In --

8   Q.    -- about what year?

9   A.    -- 2004.

10  Q.    And when that company was formed in 2004, who were the

11  owners of Trifecta Gaming USA?

12  A.    When the company was formed, the owners were myself, my

13  wife, and Chris Berman, and the breakdown was I owned 34

14  percent, my wife owned 33, and Chris Berman owned 33.

15  Q.    And at that time when it was formed in 2004, was Chris

16  Berman a minority shareholder?

17  A.    Yes, he was.

18  Q.    And was Trifecta Gaming the vehicle used to sell the

19  products manufactured by Maitland Furniture?

20  A.    Yes, it was.

21  Q.    And if you'd just explain to the jury, what type of

22  products were actually sold by Trifecta Gaming?

23  A.    Trifecta Gaming sold products -- if any of the members

24  have ever gone into a racetrack or an OTP, they have little,

25  small desks.  And you sit at the desk and there will be a TV on

1    the desk, and you can place bets on horses or dog tracks, and

2    we made the furniture for that product.

3            And then there would be teller counters that we would

4    make where you'd go out to place your bets.

5    Q.   I'm going to show you what's been marked as Defendant's

6    Exhibit 10A, and you should have a copy of it there yourself.

7    Let's look at that just for a moment.

8            This is a 2005 for-profit corporation annual report

9    for the company we were just speaking of, Trifecta Gaming USA.

10           Do you see that?

11   A.   Yes.

12   Q.   Okay.  And on this document it shows the owners of the

13   company in 2005 as being yourself, Thomas Kafka, correct?

14   A.   Yes.

15   Q.   Julie Kafka.

16   A.   Yes.

17   Q.   Is that your wife?

18   A.   Yes, it is.

19   Q.   And Christopher Berman, correct?

20   A.   Yes.

21   Q.   Okay.  And in 2005 was Christopher Berman paid under a

22   1099?

23   A.   Yes, he was.

24   Q.   All right.  And that's Exhibit 11, Defense Exhibit 11,

25   I'll show you for a moment here.

1           And this is for Trifecta Gaming USA, correct?

2    A.    Yes.

3    Q.    In 2005.

4           This is a 1099 for Chris Berman; is that right?

5    A.    Yes.

6    Q.    Okay.  Now, did the ownership of Trifecta Gaming change at

7    some point following the filing of the 2005 --

8           MS. BERMAN:  Your Honor, I object.  It's about --

9    this case about me.  Nothing has to do with my husband.

10          THE COURT:  Well, you -- I allowed you to go into

11   this --

12          MS. BERMAN:  Okay.

13          THE COURT:  -- very much, so I'm going to allow him.

14   BY MR. SPRINGER:

15   Q.    Did the ownership of Trifecta Gaming change at some point

16   after 2005?

17   A.    Yes, it did.

18   Q.    And when did it change?

19   A.    On December 26th of 2005.

20   Q.    Why do you remember that date?

21   A.    Well, one reason is I know I worked Christmas Day, and I

22   know the following day I had to be at an account, and the order

23   had to be done.  And --

24   Q.    What happened on that date?

25   A.    On that particular date my wife and I discussed that we

1   were going to just dissolve the corporation and be done.

2   Q.   Why was that?

3   A.   We were unhappy with Chris Berman's job performance.

4   Q.   Okay.  And as of that date was Chris Berman any longer a

5   minority shareholder in Trifecta Gaming USA?

6   A.   At -- what we decided at that point was he wanted to stay

7   on and keep the company going, and he said, "Take me off the

8   books.  Make me a salesperson.  I'll work for $500 a week."

9          And even though we increased his salary later, that's

10  exactly what we did, yes.

11  Q.   Okay.  So -- and I'm going to show you what's been marked

12  as Defense Exhibit 10B, and this is a 2000 -- we're in 2006

13  now annual report for Trifecta Gaming USA.

14         And this was filed with the Secretary of State,

15  correct?

16  A.   That is correct.

17  Q.   All right.  And as of 2006, now, do you see where it says

18  Christopher Berman, there's an X marked delete; is that right?

19  A.   That is correct.

20  Q.   Indicating he was no longer a minority shareholder in

21  Trifecta Gaming.

22  A.   That is correct.

23  Q.   So following December 26, 2005, what was Mr. Berman's

24  position?

25  A.   He was vice president of sales for Trifecta Gaming, and

1    he -- he would go out and sell to the casino industry under --

2    as vice president of sales for Trifecta Gaming.

3    Q.   Okay.  And I think we heard this before.  Was it the -- is

4    that -- was that title given to him because it was easier to

5    sell casino products through Trifecta Gaming versus Maitland

6    Furniture?

7    A.   Exactly.

8    Q.   Now, who was the employer or who paid Mr. Berman's salary

9    as of 2006 forward, what company?

10   A.   Maitland Furniture paid the salary for all the employees

11   starting January 1st, 2006.

12   Q.   And whether he was vice president of sales for Trifecta

13   Gaming or called senior vice president or associate, it's just

14   a title; is that right?  Whatever he was given was just a

15   title.

16   A.   That is correct.

17   Q.   All right.  But as of 2006 he was no longer a minority

18   shareholder of Trifecta Gaming.

19   A.   That is correct.

20   Q.   All right.  I'm going to show you what's been marked as

21   Defense Exhibit 12.  It's a W-2 for Christopher Berman as of

22   2006.

23        Do you see that?

24   A.   Yes.

25   Q.   Okay.  And who's the employer listed on there?

1   A.    Maitland Furniture, Inc.

2   Q.    Now -- and while we're on the subject, we've heard some

3   testimony from -- the jury heard testimony from Mr. Berman

4   yesterday on the stand that he was involved in an automobile

5   accident, and as a result of the accident, he took a lot of

6   medications in a 2009 deposition.

7          Do you recall that testimony?

8   A.    Yes, I do.

9   Q.    Do you know anything about that car accident?  When did it

10  take place?

11  A.    I'm not sure of the date.  It was in 2006, and I -- I

12  believe it was toward the end of the year, but I'm really not

13  sure.  If I had to guess --

14          MS. BERMAN:  Objection --

15  A.    -- I would say October.

16          MS. BERMAN:  -- Your Honor.  The defendant wasn't on

17  the deposition.

18          THE COURT:  Overruled.

19  BY MR. SPRINGER:

20  Q.    But you're aware that Mr. Berman was in a car accident; is

21  that right?

22  A.    Yes.  I --

23  Q.    And you know the year was 2006?

24  A.    Yes.

25  Q.    Okay.  And did Mr. Berman work the day after the car

1  accident?

2  A.   I believe he may have come down to the factory the day of

3  the car accident because I remember him having a hole in the

4  knee, in his knee of his pants.

5          And then he picked up a carrel, because -- a carrel

6  is one of the little desks I was talking about.  We made a new

7  product, and he put the product into a van that he rented and,

8  I believe, left the next day for Philadelphia for approximately

9  a week for --

10  Q.   Okay.

11  A.   -- a trade show.

12  Q.   All right.  Let me show you what is marked as Defense

13  Exhibit No. 13.  This is a 2007, now, W-2 for Chris Berman.

14          Do you have it there in front of you?

15  A.   Yes.

16  Q.   Okay.  And who's listed as the employer for Chris Berman

17  in 2007?

18  A.   Wait a minute.  I got the wrong one.

19          I got the 2007 here.  Maitland Furniture, Inc.

20  Q.   Okay.  In the position of vice president of sales for

21  Trifecta Gaming, would checks -- would clients send checks to

22  Mr. Berman in 2006 and 2007?

23  A.   Yeah.  In the year 2006 and 2007, part of Chris Berman's

24  job was to invoice accounts and deposit them into the bank.

25  Q.   Was -- were any of the clients ever to make checks payable

1   to Chris Berman personally?

2   A.   Absolutely not.

3   Q.   Were the clients ever to have made checks payable to Chris

4   Berman care of Trifecta Gaming?

5   A.   No.

6            MS. BERMAN:  Your Honor, it's hearsay.

7            THE COURT:  Overruled.

8   BY MR. SPRINGER:

9   Q.   Was Chris Berman to cash any of the checks he received

10  from clients?

11  A.   Absolutely not.

12  Q.   What was he to do with the checks?

13  A.   He was to deposit them into the Trifecta Gaming account,

14  and if any of the accounts were written to Maitland Furniture,

15  like I said earlier, he was to deposit those checks into the

16  Maitland Furniture account.

17  Q.   Okay.  Let me show you what's been marked as Plaintiff's

18  Exhibit 26.  It's the signature card for SunTrust Bank.

19           Let me know when you have that in front of you.

20  A.   I have it.

21  Q.   Okay.  Now, SunTrust Bank, is that the bank where Trifecta

22  Gaming had a business account?

23  A.   Yes, it is.

24  Q.   And was that account active in 2004, '5, '6, and '7?

25  A.   Yes.  Yes, it was.

1    Q.   All right.  And was Chris Berman an authorized signer on

2    this account?

3    A.   He was not.

4    Q.   So was Chris Berman to be signing any checks -- was his

5    signature to appear on any checks anywhere that he received

6    from clients?

7    A.   It was not.

8    Q.   From January 2006 through 2007, was the money used -- was

9    the money brought in by sales of Trifecta Gaming used to pay

10   expenses for both -- or for Maitland Furniture --

11   A.   Yes --

12   Q.   -- and for both --

13   A.   -- because at that time most of the money coming in was

14   coming in through that arm.

15   Q.   And what are some examples of what money brought in

16   through Trifecta Gaming was used to pay for?

17   A.    I think, like I said yesterday, in 2006 I paid Chris

18   Berman $73,000, and if you own a company, it costs roughly

19   $100,000 to pay somebody 73,000.  I had 12 to 15 other

20   employees in 2006.

21        I -- you have raw materials to buy.  You have

22   expenses, etc.

23   Q.   Okay.  And so all employees in this time frame, 2006 and

24   2007, were paid by Maitland Furniture, correct?

25   A.   That is correct.

1    Q.    Including Mr. Berman.

2    A.    That is correct.

3    Q.    All right.  And, in fact, in 2007, as we just showed you,

4    the W-2 for Chris Berman shows he made $55,000, right?

5    A.    Well --

6    Q.    Well, it's -- from 2007 it says 55,000.

7    A.    Okay.  Yes.

8    Q.    So that money had to have been paid from Maitland

9    Furniture as he was an employee; is that right?

10   A.    That is correct.

11   Q.    So moneys that were brought in through Trifecta Gaming,

12   they would have been transferred over to Maitland Furniture.

13   A.    That is correct.

14   Q.    Because that was one of the expenses.

15   A.    Yes.

16   Q.    All right.  So what I'm going to show you next are some

17   checks that have already been entered into evidence as Defense

18   Exhibit 19, and there are several checks here.  And these are

19   checks that are made payable, as we just discussed, from -- and

20   I know it's hard to see -- from the Trifecta Gaming business

21   account to Maitland Furniture; is that right?

22   A.    That is correct.

23   Q.    Okay.  And there are several checks -- let's flip through

24   here.

25          These are the checks that were transferring money to

1   pay the expenses you spoke of?

2   A.   Yes.

3   Q.   All right.  Here's a check, 19H, in the amount of $29,000

4   in 2006.

5             Do you know what that check was for?

6   A.   I believe that check was for -- to pay the state tax of

7   Florida for jobs that we did in the state of Florida.

8   Q.   Okay.  And during this time frame, 2006 to 2007, was

9   Mr. Berman any longer a shareholder or minority shareholder in

10  Trifecta Gaming?

11  A.   He was not.

12  Q.   Now, when did Chris Berman's employment with Trifecta

13  Gaming -- Maitland Furniture end?

14  A.   I thought -- I thought it was on January 9th of 2009, but

15  it could have been --

16  Q.   Regardless --

17  A.   Yeah.  It's either the 8th or the 9th.

18  Q.   Was it in January?

19  A.   Yes.

20  Q.   2009?

21  A.   Yes.

22  Q.   All right.  Was --

23            MS. BERMAN:  January 8th, Your Honor.

24  BY MR. SPRINGER:

25  Q.   Was he fired?

1  A.    Yes, he was.

2  Q.    All right.  Did you fire him?

3  A.    Yes, I did.

4  Q.    Why?

5  A.    Because he was -- we found out that he was embezzling

6  money from the company.

7  Q.    Was there anything else that you determined he was doing

8  with funds from clients or billing of the clients?

9  A.    Well, we discovered that he was writing invoices for a

10 higher price than what the product was supposed to be and

11 sending that invoice directly to the account, and then I would

12 receive another invoice to me which had the correct amount on

13 it.

14 Q.    Okay.  At some point after you fired Mr. Berman, did you

15 find out that he had applied for unemployment compensation

16 benefits?

17 A.    Yes, I did.

18 Q.    Did you initially respond to the notification or the

19 phone -- was it a phone call from the agency?

20 A.    It was a phone call, yeah.

21 Q.    Did you say anything about misappropriation of funds

22 during that telephone conference?

23 A.    I didn't because we were -- we sent out mailings to

24 accounts, and we were waiting for more information to come in.

25 And under the advice of my attorney, he suggested that I say

1    nothing at that point until more information came in.

2    Q.   Now, did you ultimately end up appealing the award of

3    benefits to Mr. Berman?

4    A.   Yes, I did.

5    Q.   All right.  Was a hearing held?

6    A.   Yes.  A hearing was held in May of 2009.

7    Q.   And during that hearing did you present evidence of what

8    you considered to be embezzlement by Chris Berman?

9    A.   I -- yes, I did, a fair amount.

10   Q.   And did that evidence include the two checks we've talked

11   about in this trial which are from November 2006 and May 2007?

12   A.   Yes, it did.

13   Q.   I'm going to show you what's been marked as Defense

14   Exhibit 14A, and this is the check from November of 2006.

15   Sorry.

16        All right.  This check is in the amount of -- oh, do

17   you have it?

18   A.   I -- (indicating).

19   Q.   Okay.  This check is in the amount of $1,137.

20        And who is Yonkers Racing?

21   A.   Yonkers Racing is a harness track in Yonkers, New York,

22   which is a suburb of New York.

23   Q.   And this check is pay to the order of Chris Berman, care

24   of Trifecta Gaming; is that right?

25   A.   That is correct.

1    Q.    At this time of this check in November of 2006, was Chris

2    Berman an employee of Maitland Furniture?

3    A.    Yes, he was.

4    Q.    And was he any longer a minority shareholder or any kind

5    of owner at all in Trifecta Gaming?

6    A.    He was not.

7    Q.    Was it proper for him to have business checks made payable

8    to himself while an employee of Maitland Furniture?

9    A.    It was not.

10   Q.    All right.  Now, on the back of the check at the top,

11   there's a signature, and whose signature is that?

12   A.    Chris Berman's.

13   Q.    Are you familiar with his signature?

14   A.    Yes, I am.

15   Q.    Had you seen documents signed by him on prior occasions?

16   A.    I have probably seen, I would say, 50 to a hundred

17   documents of Chris Berman's signature and was very familiar

18   with it.

19   Q.    And beneath that it says, "Pay to Larysa Berman."

20         Do you see that?

21   A.    Yes, I do.

22   Q.    And is that Chris Berman's wife?

23   A.    Yes, it is.

24   Q.    Show you what's been marked as Defense Exhibit 14B, and

25   this check is from May 2007.

1           Again, Yonkers Racing is on this check; is that

2    right?

3    A.    Yeah.   I mean, I'm very familiar with the checks, so I'm

4    going to say yes.

5    Q.    And was this check also paid to the order of Chris Berman,

6    care of Trifecta Gaming?

7    A.    Yes, it was.

8    Q.    Was it proper in 2007, at the time of this check, for

9    Chris Berman to have checks made payable to him care of

10   Trifecta Gaming?

11   A.    I'm going to say absolutely not.

12   Q.    And in 2007 he was still an employee of Maitland

13   Furniture; is that right?

14   A.    Yes, he was.

15   Q.    Not an owner of Trifecta Gaming in 2007?

16   A.    He was not.

17   Q.    On the back of the check, it has the signature on the top.

18          And by the way, these checks are stamped on the back,

19   do you see that, the different stamps from different banks?

20   A.    Yes.

21   Q.    It has a signature on the top.

22          Is that Chris Berman's signature?

23   A.    Yes.

24   Q.    All right.   And beneath it it says, "Pay to Larysa

25   Berman."

1              Is that Chris Berman's wife?

2    A.   Yes, it is.

3    Q.   Now, at any time during these time periods, whether it be

4    2006 or 2007, did Lareesa Berman ever work for Maitland

5    Furniture?

6    A.   She did not.

7    Q.   Was she ever an owner of either Trifecta Gaming or

8    Maitland Furniture?

9    A.   She was not.

10   Q.   Was she an employee of Trifecta Gaming?

11   A.   She was not.

12   Q.   Was it proper for her to have her name on the back of a

13   business check for Trifecta Gaming in 2007?

14   A.   Absolutely not.

15   Q.   Was it proper for her to have her name on the back of a

16   check to Trifecta Gaming in 2006?

17   A.   Absolutely not.

18   Q.   And are these -- these are the two checks that we just

19   referred to, 14A and 14B, that you used in the May 2009

20   hearing, correct?

21   A.   Yes, it is.

22   Q.   Was her name on the back of these checks part and parcel

23   of the evidence you presented against Chris Berman in that

24   hearing?

25   A.   Yes, it was.

1   Q.   Were either of these checks, November 2006 or May 2007,

2   deposited into the SunTrust Bank account for Trifecta Gaming?

3   A.   They were not deposited.

4   Q.   Should they have been?

5   A.   Yes, they should have been.

6   Q.   All right.  I'm going to refer to Defense Exhibit No. 1,

7   which is the May 2009 decision of the appeals referee.

8          Do you have it?

9   A.   I have it.

10  Q.   And I'm going to refer to the second page.  The second

11  page next to the decision states:  "The determination dated

12  February 18th, 2009, qualifying the claimant" -- and the

13  claimant being Chris Berman; is that right?

14  A.   That's correct.

15  Q.   ". . . full receipt of benefits and charging the

16  employer's account is reversed.  The claimant is disqualified

17  from receiving benefits for the week ending January 10th, 2009,

18  and the employer's account is relieved of charges for any

19  benefits paid in connection with this claim."

20          Was that your understanding of what the result was of

21  that hearing?

22  A.   Yes, it was.

23  Q.   So as far as you were concerned, did you think you'd won

24  the appeal at that point?

25  A.   Absolutely I thought we won the appeal.

1   Q.   And based upon -- based upon what I just read, is that why

2   you thought you won the appeal?

3   A.   Yes.  I mean --

4   Q.   Okay.

5   A.   Yes.

6   Q.   And referring to the first page, the bottom paragraph, it

7   states:  "The record reflects that the employer discharged the

8   claimant for falsifying employer records and misappropriation

9   of funds."

10           Was that your understanding as well?

11  A.   Yes, it is.

12  Q.   All right.  And was there ultimately an appeal taken of

13  this May 2009 order?

14  A.   Yes.

15  Q.   By who?

16  A.   There was an appeal made by Christopher Berman, and he

17  claimed that at the end of the -- or at the end of the hearing

18  his phone was allegedly disconnected and he did not get a

19  chance to offer more information.

20           So they decided to have another hearing, and then

21  some of the stuff that was discussed at the hearing, they also

22  wanted to find out in the second hearing if Chris Berman was

23  working while he was collecting unemployment.

24  Q.   Okay.  Let's look at that order from October 2009, which

25  is following that first hearing, obviously, Defense Exhibit

 1    No. 2.

 2              And this order states:  "Procedural error requires

 3    this case to be remanded for further proceedings."

 4    A.    That is correct.

 5    Q.    That was your understanding, right?

 6    A.    Yes, it was.

 7    Q.    And on the back, as it just says -- it says, "Cause is

 8    remanded for further proceedings," right?

 9    A.    Yes.

10    Q.    Now, anywhere in this order does it state that Chris

11    Berman did not embezzle or misappropriate funds?

12    A.    It does not.  It simply says that -- I believe it says it

13    was revoked -- it was vacated and remanded for a second

14    hearing.  I would have presented the exact same evidence.

15    Q.    And following the October 2009 ruling, the one we just

16    spoke of, was the hearing that was supposed to take place when

17    it was sent back down for another hearing -- did that hearing

18    ever take place?

19    A.    That hearing never took place.

20    Q.    And eventually there was a hearing set for February 9th --

21    19th, 2010, correct?  That's on Defense Exhibit No. 3.

22    A.    Correct.

23    Q.    All right.  And that -- it says at the top:  "The hearing

24    for this case which was to be held on February 19th has been

25    postponed at the request of claimant."

1              And the claimant is Chris Berman, right?

2   A.    That is correct.

3   Q.    And did that hearing that was set for February 19th ever

4   go forward?

5   A.    That hearing never went forward.

6   Q.    It also states:  "This hearing will not be set for a

7   hearing until this officer sees written notification that the

8   trademark case has been resolved."

9              Do you see that?

10  A.    Yes, I do.

11             MS. BERMAN:  Your Honor, was this in evidence?  I

12  don't recall that -- what kind of exhibit is that?  I don't

13  recall this.

14             MR. SPRINGER:  The Court ruled on it yesterday,

15  admitted it into evidence.

16             MS. BERMAN:  Which one is this?

17             MR. SPRINGER:  No. 3.

18             MS. BERMAN:  I didn't see it.

19             THE COURT:  Well, it's part of the unemployment

20  proceeding, so --

21             MR. SPRINGER:  Yeah.

22             THE COURT:  -- it will be admitted if it's not

23  already.

24             MS. BERMAN:  But --

25             COURTROOM DEPUTY:  It was admitted.

1              THE COURT:   We show that it was admitted, Ms. Berman.

2    BY MR. SPRINGER:

3    Q.   All right.   Moving forward, I want to show you Exhibit

4    No. 4, which is a -- this is dated March now.   Now we're at

5    March 9th, 2010, and this is a dismissal without prejudice.

6              And was this the next document you received from the

7    agency?

8    A.   Yes, it was.

9    Q.   It says at the top, "Subsequent to filing appeal, the

10   appellant indicated" -- appellant being you -- "an inability to

11   attend a hearing."

12             Did you ever state that?

13   A.   No.   That's -- this -- this whole thing got totally mixed

14   up.   We were totally ready for the hearing, and they -- it was

15   the claimant that could not make it, and then somehow, when

16   they did this, they got mixed up and said that we couldn't make

17   it.

18   Q.   Okay.   Referring to the second paragraph, it states:   "The

19   appellant may request that the appeal be reopened and another

20   hearing scheduled after resolution of the trademark case and

21   when ready to proceed with this hearing, provide the request

22   submitted in writing by September 9th, 2010."

23             Right?   Is that your understanding as well?

24   A.   That's what it said, yes.

25   Q.   Now, this order in March has a deadline for you to

1    reopen -- to continue --

2    A.    Yeah.

3    Q.    -- your appeal, correct?

4    A.    Yeah.  It made no sense.

5    Q.    And the one from February we just showed you says it was

6    going to be continued until the trademark case is resolved,

7    right --

8    A.    Yes.

9    Q.    -- without a deadline?

10   A.    Yes.

11   Q.    And what was your reaction to that?

12   A.    Well, my reaction was one of the notices had a hearing

13   with no deadline, and then the newer notice had the same

14   reason, they're waiting for the trademark case to be resolved,

15   but they put an absolute deadline of September 9th, 2010.

16          It was my opinion that the trademark issue might take

17   years, so I wrote a letter asking for clarification.

18   Q.    Okay.  And in March 2010, following that February order,

19   did you write a letter to the agency --

20   A.    Yes, I did.

21   Q.    -- regarding the conflict?

22   A.    Yes.

23          MR. SPRINGER:  Judge, this is not in evidence yet.

24   I'm just going to lay the predicate for it so I won't show it

25   to the jury until we establish that.

1            THE COURT:  All right.  Do you have a copy --

2            MR. SPRINGER:  I do.

3            THE COURT:  -- or did you already give us one?

4            What exhibit number is it?

5            MR. SPRINGER:  It's No. 5.  It should be in there,

6    Your Honor.

7            THE COURT:  Okay.

8    BY MR. SPRINGER:

9    Q.    All right.  Did you write this letter, Mr. Kafka?

10   A.    Yes, I did.

11   Q.    And is that your signature -- I mean, is that your name at

12   the bottom of the letter?

13   A.    Yes, it is.

14   Q.    Was this letter created when the matters were more fresh

15   in your mind?

16   A.    Yes, it was.

17   Q.    Is this letter accurate as to what it states?

18   A.    Yes, it was -- yes, it is.

19   Q.    Do you currently lack the specific knowledge to testify as

20   to the matters contained therein, in other words, the

21   specificness of that letter?  Is your memory not as good now as

22   it was back then?

23   A.    It would have been better back then, yes, because it would

24   have been more fresh in my mind than it is now.

25            MR. SPRINGER:  Judge, the defense would tender the

```
 1  exhibit as a recorded recollection.
 2          THE COURT:  Any objection, Ms. Berman?
 3          MS. BERMAN:  I object to this.  It wasn't in
 4  evidence.
 5          THE COURT:  Overruled.  The document will be admitted
 6  as Defendant's Exhibit 5.
 7      (Defendant's Exhibit 5 was received in evidence.)
 8  BY MR. SPRINGER:
 9  Q.  All right.  So let's take a look at this letter from March
10  26th.
11          Now, in this letter in the last paragraph, it states:
12  "Maitland Furniture respectfully requests written clarification
13  of these two conflicting documents."
14          Did you write that?
15  A.  Yes, I did.
16  Q.  And that was based upon the two rulings we just looked at
17  where you didn't understand what was going on.
18  A.  Yes.
19  Q.  And you stated:  "The importance is that the notice of
20  continuance was issued without a dismissal and any deadline for
21  reopening the case."
22          And as we discussed, in February there was an order
23  without a deadline to reopen it, right?
24  A.  Correct.
25          MS. BERMAN:  Your Honor, I object because it's not
```

1  certified by Department of --

2       THE COURT:  I already overruled your objection,

3  Ms. Berman.

4       MS. BERMAN:  I'm sorry.

5       THE COURT:  The document is in evidence.

6  BY MR. SPRINGER:

7  Q.  "Understanding that a date could not be determined if

8  this -- at this time when the trademark case will be resolved."

9  You go on to state:  "Irrespective of the stated reason for the

10  dismissal without prejudice dated March 9th, 2010, there's an

11  absolute deadline contained in there of September 9th."

12       Well, what was the problem with that in your mind?

13  A.  Well, the problem with that in my mind is that the process

14  of law apparently is very long, and I really didn't expect the

15  trademark issue to be settled for years.

16  Q.  And for clarification, there's evidence of it in the case.

17  I think something -- it has been admitted about this trademark

18  issue.

19       Was that simply over a slogan?

20  A.  It was over the slogan "Quality you can bet on."

21  Q.  And was that trademark -- patent for a trademark filed

22  after Mr. Berman was fired?

23  A.  It was filed, yes, after he was terminated.

24  Q.  And at the end you, in this letter, are stating, "Request

25  that this matter be clarified."  Is that right?

1  A.   That is correct.

2  Q.   So you were looking -- were you looking for direction from

3  the agency as to what to do at this point?

4  A.   Yeah.  I -- I had no idea what to do.  Yes, I was.

5  Q.   Did you ever receive that clarification from the agency?

6  A.   We never received anything back from the agency.

7  Q.   All right.  At some point in 2011 did you determine that

8  Mr. Berman was receiving unemployment benefits?

9  A.   He -- yeah.  We get our quarterly statement of benefits

10  paid usually the first part of August -- of every quarter, so

11  it would have been approximately around the first part of

12  August that we would have received information that he had

13  collected unemployment.

14  Q.   And as a result of that, what did you do?  Did you send an

15  e-mail to Mr. Bellflower?

16  A.   Yes, I did.

17  Q.   All right.  I'd refer to you to Defense Exhibit 28,

18  referring to the third page of the letter, the e-mail, and let

19  me know when you're there.

20  A.   Let me find that.

21  Q.   It's 28.

22  A.   Yeah.  I'll look in this stack.

23  Q.   All right.  Here you go.  All right.  Looking at the third

24  page.

25  A.   (Complies.)

1   Q.   And this is a -- this third page really is a carry-over

2   from the bottom --

3   A.   Yes.

4   Q.   -- of the second page but as you can see, it says from

5   Maitland Kafka to -- Maitland Kafka is your e-mail address?

6   A.   That is correct.

7   Q.   To James Bellflower, correct?

8   A.   Yes.

9   Q.   All right.  And then this -- after you found out from your

10  quarterly benefits statement that Mr. Berman was continuing to

11  receive unemployment benefits which you didn't -- did you know

12  about before this?

13  A.   I did not.

14  Q.   All right.  And in the last paragraph it states, "We were

15  shocked to find out that Chris Berman received unemployment

16  payments when we received our quarterly notice of benefits paid

17  statement."

18       That's what you just told us, right?

19  A.   Yes.  Yes.

20  Q.   And you go on to state, "We would like to appeal this

21  ruling and prove that Chris Berman does not deserve

22  unemployment benefits because he embezzled money and also

23  present new evidence that he was working at the time."

24       So you wanted two things, you wanted to appeal,

25  right?

1   A.    Yes.

2   Q.    And then you wanted to prove that he was working while

3   receiving benefits.

4   A.    Yes.

5   Q.    All right.  And then on August 12th Mr. Bellflower sends

6   you an e-mail acknowledging your request and directing your

7   e-mail to the Office of Appeals.

8            Is that your understanding?

9   A.    That is correct, yes.

10  Q.    August 16th, now we turn to the -- one of the subject

11  statements of the case here.

12           You write back to Mr. Bellflower thanking him for his

13  assistance, right?

14  A.    Yes.

15  Q.    And it looks like you go through -- in that first

16  paragraph that you explain to him about the conflicting

17  documents you received, and you don't understand what's going

18  on.

19  A.    Correct.

20  Q.    All right.  Now, let's look at that statement that's at

21  issue in the case:  "I asked Connie not to lose sight of the

22  fact that you initially ruled in our favor."

23           What were you referring to there, the May 2009 order?

24  A.    Yes, I was.  Yes.

25  Q.    "And that we proved that Chris Berman and his wife

1  embezzled money from our company."

2  A.   Yes.

3  Q.   Well, let me ask you this, when you made that statement,

4  was it your opinion that you had proven Chris Berman embezzled

5  money from Maitland Furniture?

6  A.   Yes.

7  Q.   And was it your opinion that Lareesa Berman took part in

8  that embezzlement from Maitland Furniture?

9  A.   Yes, it was.

10  Q.   And was that based upon the two checks, the November 24th,

11  2006, check and the May 2007 check?

12  A.   Yes, it was.

13  Q.   Did you believe your statement that is contained in this

14  e-mail from August 16th to Jamie Bellflower was true?

15  A.   Yes, I did.

16  Q.   All right.  So let's look at the 14A and 14B defense

17  exhibits again.  The first one is the 2006 check.

18  A.   Okay.

19  Q.   All right.  So on the back of this check -- and we talked

20  about it a little bit, but I want to ask you something else

21  about it.

22        It says in print, "Pay to Larysa Berman," right?

23  A.   Yes.

24  Q.   And do you see there's a Y there spelled with her name?

25  A.   Yes.

1    Q.   All right.  And under that is Lareesa Berman's signature,

2    right?

3    A.   Yes.

4    Q.   Before you wrote the e-mail to Jamie Bellflower in August

5    2011, had you seen Ms. Berman's signature on the back of

6    Maitland Furniture payroll checks?

7    A.   Yes, I had.

8    Q.   Before you wrote the e-mail to Jamie Bellflower on August

9    16th, 2011, did you research what Ms. Berman's signature looked

10   like?

11   A.   I actually researched what Lareesa Berman's signature

12   looked like before the hearing in May of 2009.

13   Q.   And what did you do?

14   A.   I went online at the public records and found documents

15   with her signature on.

16   Q.   What documents; do you recall?

17   A.   One was some type of mortgage document, and the other --

18   and the other one was her marriage license, I believe.

19   Q.   Okay.  Now, I'll show you Defense Exhibit 15.  This is an

20   application to marry, and on there, on the top left,

21   Ms. Berman's name is spelled L-a-r-y-s-a.

22           Do you see that?

23   A.   Yes, I do.

24   Q.   All right.  And this document is from 2000.

25   A.   Yes.

1   Q.   Okay.  Does the signature -- and did you look at a

2   marriage application in your research online before the

3   hearing?

4   A.   Yes, I did.

5   Q.   Okay.  And does the signature on this document look like

6   the same signature that appears on the back of the two checks?

7   A.   It certainly looked that way to me, yes.

8   Q.   I'll show you Defense Exhibit No. 16.  This is a warranty

9   deed.

10          Is this the document you believe you looked at

11  online?

12  A.   I believe that is it, yes.

13  Q.   And in this document, again, Ms. Berman spells her name

14  with a Y --

15  A.   Yes.

16  Q.   -- correct?

17          And down at the bottom her name is with a Y, correct?

18  A.   Yes.

19  Q.   And that signature, does that look like the same signature

20  on the back of the two checks at issue in this case?

21  A.   It did to me, yes.

22  Q.   And you believed it was.

23  A.   Yes, I did.

24  Q.   Okay.  The next exhibit is Defense Exhibit 18.

25          MR. SPRINGER:  It's not in evidence yet, Your Honor,

 1  but I'm going to lay the predicate with Mr. Berman [sic].

 2          THE COURT:  All right.  It's 18 as opposed to 18A?

 3          MR. SPRINGER:  18A is a composite, yes, sir.

 4          THE COURT:  Okay.

 5  BY MR. SPRINGER:

 6  Q.   Do you have those in front of you, Mr. Kafka?

 7  A.   Which ones are the numbers again?

 8  Q.   18.

 9          MR. SPRINGER:  Just one second, Your Honor.  Sorry.

10  BY MR. SPRINGER:

11  Q.   Here.  Let's look over here, Mr. Kafka.

12          Did you find it?

13  A.   I did not.

14  Q.   We'll share.

15          THE COURT:  I don't think I have a copy.

16          MS. BERMAN:  Your Honor, that wasn't in initial

17  disclosures, what they present right now.

18          THE COURT:  Well, let me see the document.

19          MR. SPRINGER:  I can give you this one, Your Honor.

20          THE COURT:  All right.  Thank you.

21          THE WITNESS:  Is this it here?

22          THE COURT:  I have 18A.

23          MS. BERMAN:  This is 18A.

24          MR. SPRINGER:  The exhibit is stapled, so --

25          THE COURT:  Oh, so you mean all of it, 18A through F.

1           MR. SPRINGER:  Correct.  Yes, sir.

2           THE COURT:  Okay.  We have it here.

3   BY MR. SPRINGER:

4   Q.   So here.  Take a look at these -- what's been marked as

5   Composite Exhibit 18A through H [sic], I believe.

6           All right.  So what are those?  Are those checks that

7   you have in front of you?

8   A.   Yes, they are.

9   Q.   And who is the check from, what account?  What's the name

10  of the --

11  A.   Maitland Furniture, Inc.

12  Q.   And that was your company?

13  A.   Yes, it was.

14  Q.   All right.

15  A.   Is.

16  Q.   And does your signature appear on some of those checks?

17  A.   My signature appears on some, and my wife's signature

18  appears on some.

19  Q.   Are you familiar with your wife's signature?

20  A.   Very familiar.

21  Q.   Have you seen her sign documents before?

22  A.   Yes, I have.

23  Q.   Had you seen her sign documents back in the time frame of

24  2006/2007?

25  A.   Yes, I have.

1   Q.   And those are checks that you or your wife wrote?

2   A.   Yes.

3   Q.   As part of payroll checks for your company?

4   A.   That is correct.

5          MR. SPRINGER:  Judge, the defense would like to move

6   18A through F into evidence.

7          THE COURT:  Any objection?

8          MS. BERMAN:  I object.  It wasn't in initial

9   disclosure, and it wasn't from that -- it just he -- I can't

10  verify --

11         THE COURT:  It's overruled.  The document will be

12  admitted.

13     (Defendant's Exhibits 18A through F were received in

14  evidence.)

15  BY MR. SPRINGER:

16  Q.   You can keep those.

17  A.   Okay.

18  Q.   Now, again, Mr. Berman was employed by Maitland Furniture

19  in 2006/2007 when you issued these payroll checks, correct?

20  A.   That is correct.

21  Q.   And these checks were actually made payable to Chris

22  Berman; is that right?

23  A.   That is correct.

24  Q.   This particular check is from October 2006, right?

25  A.   Yes.

1   Q.   And on the back of this check from October 2006, there's a

2   signature on top, and whose signature is that up top?

3   A.   That would be a messy version of Chris Berman's.

4   Q.   Okay.  "Pay to Larysa Berman."

5   A.   Correct.

6   Q.   With a signature underneath?

7   A.   Yes.

8   Q.   Now, do you see that account number there, 0054942261638?

9   A.   Yes.

10  Q.   I'm sorry.  Well, it ends in 61638, correct?

11  A.   Correct.

12  Q.   And we heard testimony from Ms. Berman a little while back

13  that she didn't know what that account number was.

14  A.   That is correct.

15  Q.   Here is the check from May -- November 2006 in this case,

16  and the account number is 61638.

17         Is that the same account number that was on the

18  payroll check that you wrote to Chris Berman, her husband?

19  A.   Yes.

20  Q.   Let's look at another one, 18B.  This is a payroll --

21  again, a payroll check to Chris Berman, correct?

22  A.   Correct.

23  Q.   And this one is actually from -- and the tag's in the

24  way -- but May 2007.

25         Do you see that?

1   A.   Yes.

2   Q.   And on the back of the check is whose signature at the

3   top?

4   A.   Chris Berman's.

5   Q.   Pay to?

6   A.   Larysa Berman.

7   Q.   With a Y?

8   A.   Yes.

9   Q.   And the account number ends in 616- --

10  A.   I'm not sure on this one.

11  Q.   Yeah.  It's a little messy, I guess.

12            All right.  Let's look at 18C.

13  A.   (Complies.)

14  Q.   This is another payroll check to Chris Berman, right?

15  A.   Yes.

16  Q.   And what's the date on that check?

17  A.   8/11/06.

18  Q.   And on the back, Chris -- whose signature is at the top?

19  A.   Chris Berman's.

20  Q.   And does the back of this payroll check -- I don't know if

21  I can fit them both on here or not.  The one on the right is

22  the payroll check, and the one on the left is the check at

23  issue from November 2006.

24            Is it filled out the same way?

25  A.   Yes, it is.

1    Q.    Does the signature look the same?

2    A.    Yes.  It does to me.

3    Q.    The account number, 6138?

4    A.    It is the same.

5    Q.    So Mr. Berman was receiving payroll checks from you,

6    signing them over to his wife, Larysa Berman, in 2006, correct?

7    A.    Correct.

8    Q.    And the one from before was 2007; is that right?

9    A.    That's correct.

10   Q.    And signing them over to his wife.

11   A.    Correct.

12   Q.    The same way as the checks at issue in this case.

13   A.    That is correct.

14   Q.    And the same account number.

15   A.    With the same account number.

16   Q.    And just to be clear, here's the check at issue in this

17   case from May 2007, and on the back of that check is Chris

18   Berman at the top and filled out the same way as the payroll

19   checks.

20   A.    That is correct, "Pay to the order of Larysa Berman."

21   Q.    With the same account number?

22   A.    I don't think it has an account number on this.

23   Q.    Oh, you're right.

24         Filled out the same way.

25   A.    Yes.

1   Q.   All right.  Let me show you what's been marked as Exhibit

2   No. 25, which is the second statement at issue in this case.

3           Do you have it, Mr. Kafka?

4   A.   Yes, I do.

5   Q.   All right.  Is this a document you sent?

6   A.   Yes, it is.

7   Q.   Is that your signature on the document?

8   A.   Yes, it is.

9   Q.   Okay.  Who did you send this to?

10  A.   I believe this I would have sent to Janice Connell.

11  Q.   Okay.  With the agency?

12  A.   Yes.

13  Q.   And about when was this sent?

14  A.   I'm guessing September of 2011, somewhere in there.

15  Q.   Okay.  And the letter states, "He was terminated on

16  January 9th, 2009, for embezzling money (part of the money was

17  embezzled by his wife)."

18  A.   Yes.

19  Q.   Is that what you wrote?

20  A.   Yes, I did.

21  Q.   And why did you write that, "Part of the money was

22  embezzled by his wife"?

23  A.   Because I thought part of the money was embezzled by his

24  wife.

25  Q.   Based upon what, the two checks at issue?

1    A.   Well, right.  I mean, like I said earlier, some of the

2    checks had his signature on the back, and as the owner of a

3    company, when I see somebody's signature on the back, I'm

4    assuming they cashed the check; they got the money.

5         When I saw her signature on the back, I'm assuming

6    she cashed the check and she received the money.

7    Q.   All right.  And did you receive any of the money, or did

8    your company receive the money that it should have from those

9    checks?

10   A.   We received no money from these checks.

11   Q.   Now, on the -- on this letter there are, it looks like,

12   two companies mentioned, Advanced Millwork -- do you see that?

13   A.   Yes.

14   Q.   And Advanced Millwork, did you send this letter to them?

15   A.   I did not.

16   Q.   Did this only go to Janice Connell?

17   A.   That is correct.

18   Q.   What about Xpress Yourself Publishing?  Did you send this

19   letter to them?

20   A.   I did not.

21   Q.   Let's talk about -- talk about this letter.

22        Did you send any e-mails -- did you e-mail anyone

23   else -- anyone other than Jamie Bellflower and your attorneys

24   as part of this case -- the August 16, 2011, e-mail which says,

25   "Part of the money was embezzled by his wife"?

1    A.    I did not.

2    Q.    Okay.  Did you send it to anyone who knew Ms. Berman?

3    A.    I did not.

4    Q.    Have you ever posted either document, the one we just

5    looked at or the e-mail to Jamie Bellflower, on social media of

6    any type?

7    A.    I have not.

8    Q.    How many times had you met Ms. Berman prior to your

9    first -- the first date of this case, August 2011?  How many

10   times had you met her?

11   A.    I never -- I don't believe I officially ever met her, but

12   I do remember seeing her in a car at the factory when her

13   husband was at the factory.

14   Q.    Had you ever spoken to Ms. Berman prior to August 2011

15   when you wrote the e-mail to the agency or sent the document to

16   Ms. Connell, ever spoken to her?

17   A.    I don't believe I ever spoke to Ms. Berman.

18   Q.    Had you ever had any arguments with Ms. Berman?

19   A.    I had never spoke to her.

20   Q.    Did you not like Ms. Berman?

21   A.    I have no opinion of Ms. Berman.  I did not know her.

22   Q.    Did you ever use her name, did you ever use Lareesa

23   Berman, in any of those documents?

24   A.    I did not.

25   Q.    Did you mention wife in those documents to ridicule her or

1    shame her in any way?

2    A.    I did not.  If her name was not on the back of the checks,

3    there would have been no reason for her to ever be mentioned.

4          MR. SPRINGER:  I don't have any further questions.

5    Thank you.

6          THE COURT:  All right.  We've been going for a while.

7    Why don't we take about a ten-minute break.  If you can be back

8    at 11:20.

9          COURT SECURITY OFFICER:  All rise for the jury.

10       (Jury out at 11:09 a.m.)

11         COURT SECURITY OFFICER:  Please be seated.

12         THE COURT:  All right.  Court's in recess until

13   11:20.

14         COURT SECURITY OFFICER:  All rise.

15       (Recess from 11:09 a.m. until 11:23 a.m.; all parties

16   present.)

17       (Outside the presence of the jury:)

18         COURT SECURITY OFFICER:  All rise.  This Honorable

19   Court is now in session.

20         Please be seated.

21         THE COURT:  All right.  Before we bring back the

22   jury, let's talk about timing here.

23         Ms. Berman, how much time do you anticipate you're

24   going to be spending cross-examining Mr. Kafka, keeping in mind

25   that you already had him up on the stand for I don't know how

1   many hours but it was a lot?

2          MS. BERMAN:  I want cross-examine from his

3   deposition.  It's maybe an hour, I think.

4          THE COURT:  Well, I'm not going to give you that much

5   time.  The direct examination was only an hour.  I'll give you

6   40 minutes, and then I'll give the plaintiff [sic] ten minutes

7   for redirect.

8          So I'll tell the jury that if it's okay with them,

9   we'll go past -- it's 11:25, according to that clock.  I'll

10  tell them that we may go as late as 12:30 and not break at

11  12:00 so we can hopefully conclude Mr. Kafka's testimony.

12         All right.  Bring in the jury.

13         COURT SECURITY OFFICER:  All rise for the jury.

14     (Jury in at 11:25 a.m.)

15         COURT SECURITY OFFICER:  Please be seated.

16         THE COURT:  Ladies and gentlemen, because we took a

17  little bit later break, we may go a little past noon today.  It

18  wouldn't be later than 12:30 at the latest.

19         Does that present a problem for anyone?

20     (Negative response.)

21         THE COURT:  Okay.  Great.

22         Okay.  Mr. Kafka, if you can retake the stand.

23                      CROSS-EXAMINATION

24  BY MS. BERMAN:

25  Q.   Mr. Kafka, do you recall your deposition was taken on May

```
 1   6, 2014?

 2            Do you recall that?

 3   A.    Yes.

 4   Q.    And you answer everything truthfully, yes?

 5   A.    To the best of my knowledge, yes.

 6   Q.    Okay.  Do you recall I ask you if that's the only time you

 7   saw my signature.

 8            Do you recall this?

 9   A.    About the only time I saw your signature?

10   Q.    Yes.

11   A.    I mean, I recall us discussing it, but I don't recall

12   exactly what you're referring to.

13   Q.    Okay.  Can you turn, please, on page 99 and look at line

14   3, 19.  I am asking questions.

15   A.    99?

16   Q.    3, 19.

17            THE COURT:  When you say 3, 19, do you mean 3

18   through --

19            MS. BERMAN:  Page 99, line 3, 19.

20            THE COURT:  When you say line 3, 19, what do you

21   mean?

22            MS. BERMAN:  Line --

23            THE COURT:  Are you saying 3 through 19?

24            MS. BERMAN:  Through.  Through.  I will read it.

25            THE COURT:  Okay.  3 through 19.
```

1           MR. SPRINGER:  Judge, I'm going to object.  This

2    doesn't impeach him.  He doesn't say he never --

3           MS. BERMAN:  No.  I --

4           THE COURT:  Hold on.  Hold on.  Let me read it.  Let

5    me look at it.  3 through 19?

6           I'll allow it.  If there are other parts of the

7    deposition you want presented, you can have her do so now or

8    during your redirect.

9           MR. SPRINGER:  Okay, sir.

10   BY MS. BERMAN:

11   Q.   "Is it the only time you saw my signature before on those

12   two documents?"

13          Your answer:  "I'm not sure.

14          "But you said from my company and from marriage

15   license.

16          "Yeah.  And I'm not sure I have some more documents.

17   I'm not sure.

18          "Okay.  Are you an expert for writing signature?

19          "I'm just saying you have a very --

20          "Are you expert?

21          "I'm just saying you have a very unique signature,

22   and it looks exactly like it.

23          "Then you make a conclusion without any verification

24   that it was my signature?

25          "I guess that as the president of the company, I see

1    a check made out to Chris Berman of Trifecta Gaming," and

2    then --

3             THE COURT:  Keep reading.  Go down to line 25 and

4    read that part.

5             MS. BERMAN:  Until 25?  Okay.

6             My question:  "When you --" and then it's

7    Mr. Springer speaking.

8             THE COURT:  Just go to line 25 where the witness

9    picks up, where he says, "I have to assume . . ."

10            MS. BERMAN:  Okay.

11            THE COURT:  Do you want that read, Mr. Springer?

12            MR. SPRINGER:  Yes.  Yes, sir.

13            MS. BERMAN:  Okay.

14            "I have to assume that if a check is written over to

15   Lareesa Berman from Chris Berman -- from a check that was

16   written to Chris Berman of Trifecta Gaming USA and it says on

17   the back of the check 'payable to Larysa Berman' and then there

18   is a signature that looks like your signature, that -- I have

19   to assume that -- that you are married to Chris Berman and you

20   are Lareesa Berman and you have signed the check, I think."

21   BY MS. BERMAN:

22   Q.   Then --

23            THE COURT:  Do you have a question, Ms. Berman, after

24   all that?

25   BY MS. BERMAN:

1    Q.    So you -- you presented some check you said that I sign

2    from -- from payment from your company.

3           Would you agree with me if you saw this, you right

4    away will say, "Oh, I saw you on your husband payment," not on

5    the marriage certificate and my company, which wasn't existed?

6    Would you agree?

7    A.    I think what I said in the deposition is that I went and

8    looked for a couple documents online, and I wasn't sure what

9    documents those were and that one of them I remembered for sure

10   was your marriage certificate, and the other one I wasn't sure

11   at the time which certificate it was.

12   Q.    But you didn't say these --

13   A.    After -- after the deposition, though, I went and checked

14   to see which one it was, and it was a mortgage -- it was a

15   mortgage certificate of some sort.

16   Q.    Let's look on page 17.

17   A.    17 or 70, 1 --

18   Q.    1-7.

19   A.    Thank you.

20   Q.    2 to 9.

21          I was asking you:  "For what purpose did you discover

22   my --" and you interrupt me.

23          "A.   No.  The question" -- your answer:  "No.  The

24   question that you asked first was what is my defense.  My

25   defense is your name was on the back of the company checks that

1    weren't written to my company.  They are written to Chris
2    Berman of Trifecta Gaming.  They are written to Chris Berman
3    and your name is on the back.  That is my defense.  Your name
4    was on the back of the company checks.  What I supposed to
5    think?"
6              THE COURT:  It says, "What am I supposed to think?"
7    just to clarify that.
8    BY MS. BERMAN:
9    Q.   Then on page 20 --
10             THE COURT:  Well, do you have a question to him about
11   that statement?
12   BY MS. BERMAN:
13   Q.   When did you discover those checks, first time?
14   A.   I believe the first time I saw those checks, we sent away
15   and I believe they came in to me on January 9th of 2009, is
16   when I believe I received them from Yonkers Raceway from Rosa.
17   Q.   Okay.  And after -- well, you received January 9th, but
18   you terminated my husband on January 8th.
19   A.   Yes, and that was part of the information we were waiting
20   back on when --
21   Q.   How you can present check --
22             THE COURT:  Hold on.  He did not finish.
23             Go ahead.
24             THE WITNESS:  I said that was part of the information
25   that we were waiting for why, when the unemployment agency

1   called me, I decided to say nothing, because we were still

2   waiting for information to come in.

3   BY MS. BERMAN:

4   Q.   So when you saw this check, I was asking you how --

5   how you found out about those checks?

6             Do you recall?

7   A.   I -- I don't -- how did I find out about the checks?

8   Q.   Yes.

9   A.   They were sent to us from Yonkers Raceway.  That's how we

10  found out.

11  Q.   Okay.  Look at page 20, 13 to 22.

12            I -- your answer was:  "I think I look at the

13  deposit, and the deposit" --

14  A.   Ma'am, I'm not there yet.  Please, just wait.

15            Okay.  13 what, now?

16  Q.   20.

17  A.   20?

18  Q.   Page 20, line 13 to 22.

19  A.   Okay.

20  Q.   "I think I look at the deposit, and the deposit" --

21  A.   Time out.  Time out.  I'm on the wrong page.  What page?

22  Q.   Page 20.

23            THE COURT:  It's page 20.

24            THE WITNESS:  Pardon me?

25            THE COURT:  It's page 20 of the deposition.

1          THE WITNESS:  Oh.  I'm on 30.

2          THE COURT:  Line 13.

3    BY MS. BERMAN:

4    Q.   "I think I look at the deposit and deposit -- or I had

5    invoices that I saw didn't add up.  There was something that

6    looks a little suspicious.  So I went to the bank and I asked

7    for the deposit slip.  Wait a minute.  That might have been --

8    I did a lot of different things.

9          "This -- I'm not sure.  If it came from the bank --

10   it came on January 9th, 2009, if it came from the bank.  If it

11   came from -- this actually says Yonkers, so I probably got this

12   from Yonkers.  Okay.  I got some stuff from the bank, and I got

13   some stuff from Yonkers."

14         Which bank you talking about?  You said, "I went to

15   the bank."  Which bank?

16   A.   Listen, you're asking me something at a deposition.  I

17   have no idea what you're going to ask me about, and what I'm

18   saying is I had a lot of checks come in from the bank, and I

19   had checks come in from accounts.

20         And the particular checks that you were talking

21   about -- initially you did not show me the check, I don't

22   believe, and then on the check it said 2009.

23         I was trying to determine at that time if the check

24   came from the bank or from Yonkers, and while I was talking, I

25   was able to determine that it indeed had come from Yonkers.

1   Q.   Mr. Kafka, you presented this check, not I presented.  You

2   have in your possession this check, not me.

3           Do you recall that I said about what position --

4   A.   I just want to say that I did not have the check in front

5   of me.

6   Q.   Do you recall I said, "What position my husband has?"

7           Do you recall this?  What was your answer?

8   A.   I'm not sure what you're asking.

9   Q.   I'm asking you where it says that my husband was on --

10  vice president of Trifecta Gaming?  Where it says?

11  A.   He was -- well, it was on his business card.  It was on

12  the website.  It was on his e-mails.

13  Q.   But yesterday you said it was on article incorporation.

14  A.   No.

15  Q.   That what you said yesterday.

16  A.   Yes.  Yes, it is.  In 2004 and 2005, he was vice president

17  of Trifecta Gaming.

18  Q.   But when I was asking, you didn't say this.

19          Let's look at page --

20          THE COURT:  Ms. Berman, you need to ask questions,

21  okay?  You can't make statements and then go on to another

22  subject.

23          MS. BERMAN:  Okay.  Okay.  Sorry.

24          THE COURT:  So just ask your questions.

25  BY MS. BERMAN:

1   Q.   Page 31.

2   A.   3-1?

3   Q.   3-1, 14 to 22.

4           Your answer --

5           MR. SPRINGER:  Judge, objection.

6   BY MS. BERMAN:

7   Q.   -- "Because like I said earlier" --

8           THE COURT:  Hold on.  Hold on.  There's an objection.

9           MR. SPRINGER:  I object because there's no question

10  pending, and she's reading a deposition.

11          MS. BERMAN:  Okay.  I read it, and I will have a

12  question for him because I need to read this.

13          THE COURT:  All right.

14  BY MS. BERMAN:

15  Q.   "Because like I said earlier, his position was vice

16  president of sales of Trifecta Gaming."

17  A.   Can I just --

18  Q.   And I ask you, "Where it says" --

19  A.   Ma'am --

20          THE COURT:  Hold on.  Hold on.

21          THE WITNESS:  Where are you reading from?

22  BY MS. BERMAN:

23  Q.   31.

24  A.   I'm on 31.

25  Q.   3-1.  Line 13 -- 14 through 22.

1  A.    Okay.

2  Q.    Your answer:  "Because like I said earlier, his position

3  was vice president of sales of Trifecta Gaming."

4          And I'm asking you:  "Where it says?"

5          You said, "His business card said vice president of

6  sales of Trifecta Gaming."

7          I'm asking, "Can you show me?  Can you show me

8  business cards?"

9          You said, "I'm sure I can.  I just don't have it with

10 me today."

11         Your deposition was in 2014 and you still have my

12 husband's business card.

13         What the purpose was you keeping his business card?

14         MR. SPRINGER:  Objection, relevance, Your Honor.

15         THE COURT:  Sustained.

16 BY MS. BERMAN:

17 Q.    When I ask you, "Can you show me how it was -- is it

18 supposed to be written to Trifecta Gaming or to Maitland

19 Furniture?  Do you have contract or how it's supposed to be

20 written?" do you recall what you answered?

21         MR. SPRINGER:  Objection, vague.  I don't know what

22 she's referring to.

23         THE COURT:  Ms. Berman, why don't you just ask him a

24 question now today and see how he answers.  If it's

25 inconsistent with the deposition, you can --

 1  BY MS. BERMAN:

 2  Q.    How --

 3          THE COURT:  Wait.  Wait.  I'm talking.

 4          MS. BERMAN:  Okay.  I'm sorry.  I'm sorry.

 5          THE COURT:  Okay.  You need to slow down, okay?

 6          MS. BERMAN:  Okay.

 7          THE COURT:  Why don't you ask him a question right

 8  now while he's on the stand.  If he has an inconsistent answer,

 9  then you can refer to the deposition, but there's no point in

10  just going through the deposition like you're doing.

11          MS. BERMAN:  Okay.

12          THE COURT:  Why don't you ask him a question.

13  BY MS. BERMAN:

14  Q.    When I ask you on deposition did you -- "How did you prove

15  that it was my signature?" your proof was only based on

16  assumptions.

17  A.    I think I went -- did more than I have to as an owner of a

18  company to make sure that it was your signature.

19  Q.    Okay.  Look at page 99.

20  A.    (Complies.)

21  Q.    I'm sorry.  Page 26.

22  A.    2-6?

23  Q.    Page 2-6.

24  A.    (Complies.)

25  Q.    Line 14, 18 -- line 14 -- I'm sorry, 14 to 25.

1              I asked you:  "You were sure that this was written by

2    me, Lareesa Berman."

3              Page 26, 2-6.  Did you find?

4    A.    2-6.

5    Q.    2-6, line 14 --

6    A.    Yes.

7    Q.    -- to 25.

8              "You were sure that this was written by me, Lareesa

9    Berman."

10             Your answer:  "I'm not sure that it was written to

11   you.  It says, 'Pay to Larysa Berman.'

12             "Yeah.  Do you think this is mine?"

13             Your answer:  "I don't care who that is.  I'm looking

14   at, 'Pay to Larysa Berman,' and your signature.

15             "Okay.  I'm asking, were you sure that I signed this

16   Larysa Berman?  Is it my spelling right?  Did I spell this

17   name?

18             "I don't know that."

19             Do you think this is proof that I embezzle money when

20   you say --

21   A.   Mrs. Berman, listen to me, when you did -- you were

22   pointing at -- as I recall, you were pointing at "Pay to Larysa

23   Berman" and saying, "Did I write that?"

24             And I said that I didn't care who wrote that.  Your

25   signature's on the back.  That's what that was referring to.

1    Q.   So you don't care who wrote it.  You just blaming me --

2    A.   No.  What I'm saying is what's more important than, "Pay

3    to the order of Larysa Berman," is the signature, and the

4    signature, in my opinion, is yours.

5    Q.   Do you think -- if I really embezzle money should you call

6    somebody and really find out if the person wrote -- if it's

7    their signature or not?

8    A.   I don't believe that is correct, no.

9    Q.   So you just can accuse behind a person back?  That's

10   correct, yes?

11          MR. SPRINGER:  Objection, argumentative.

12          THE COURT:  I didn't even under- -- I didn't

13   understand that question.

14          Rephrase your question.

15   BY MS. BERMAN:

16   Q.   You said that -- is it correct to accuse somebody without

17   a person knowledge?  Is it correct?

18   A.    In this particular case, is it correct for me to

19   accumulate evidence and then take it to a hearing?  Yes, I

20   think it's correct.  If somebody was embezzling from your

21   company, I believe you would have the right to accumulate

22   evidence and take it to a hearing.

23   Q.   On page 121 --

24   A.   1-3-1?

25   Q.   1-2-1.  24 --

1          THE COURT:  Hold on.  What line?

2    BY MS. BERMAN:

3    Q.    Page 24.

4    A.    24?

5    Q.    Uh-huh.

6          THE COURT:  Line 24, you mean?

7    BY MS. BERMAN:

8    Q.    I'm sorry.  Page 121 and line 24, 25, and then we continue

9    on next page.

10          I asking you:  "No.  When you saw the check, you

11   right away knew it was my signature.  Yes or no?"

12          Continue on page 124, you answer me --

13   A.    124?

14   Q.    122, I'm sorry.

15          "When I saw the check, well, I assume it was your

16   signature because you are Lareesa Berman.  When I saw the check

17   later, I went and looked at your marriage certificate and

18   looked at how --"

19          And I am asking you, "Okay.  Did you know my name

20   before?"

21          Your answer:  "Did I know your name before?"

22          And I say, "Uh-huh."

23          Next, line 10:  "Before the check appears."

24          Next line:  "Well, yeah, because every time Chris

25   Berman sent an e-mail or fax to me, it says Lareesa and Chris

1   Berman."

2          And I'm asking:  "Okay.  And how was the spelling

3   this Lareesa?"

4          15:  "I would have to look at one of the -- one of

5   the e-mails."

6          17:  "Was it spelling through Y?"

7          18:  "I said I don't know.  I have to look at one of

8   the e-mails to see how it was spelled."

9          20:  "In my case it's definitely not spelled with Y."

10         21:  "Pardon?"

11         22:  "My name is not spelled with Y --"

12         THE COURT:  This is -- wait.  It's becoming unclear

13  as to who's doing the questioning and who's doing the

14  answering.

15         MS. BERMAN:  Okay.  I'm sorry.  I'm questioning.

16  BY MS. BERMAN:

17  Q.   "My name is not spelled with Y."

18         23 --

19         THE COURT:  Okay.  Don't do the line number.  Just

20  say answer.

21  BY MS. BERMAN:

22  Q.   "ANSWER:  Not spelled with what?

23         "QUESTION:  Spelled with Y."

24         That next is Mr. Springer.

25         On page 123, line 2, I'm questioning:  "Like

1    L-a-r-y-s-a?  The check was -- it wasn't spell my name like

2    that so I don't understand."

3           Your answer:  "I just knew your name was Lareesa."

4           MR. SPRINGER:  Judge, can I ask when this is going to

5    end?  She's been reading for three pages now.

6           THE COURT:  Ms. Berman, you have a limited amount of

7    time, and --

8           MS. BERMAN:  Okay.

9           THE COURT:  -- I don't know why you're reading from

10   this deposition.  It's --

11          MS. BERMAN:  I want to say that on deposition --

12          THE COURT:  Well, you don't have anything to say.

13   You need to be asking questions at this point.

14   BY MS. BERMAN:

15   Q.   Mr. Kafka, when you appealed this -- my husband appeal,

16   did somebody help you to appeal?  Did you have attorney for

17   unemployment appeal?

18          MR. SPRINGER:  Objection, relevancy as to whether he

19   had an attorney.

20          THE COURT:  I'll overrule it.

21          THE WITNESS:  I had no attorney to -- at the hearing.

22   It was just myself at home in my house in Wisconsin.

23          MS. BERMAN:  So I would like to introduce Exhibit

24   46A.

25          THE COURT:  Is that already in evidence?

1          MS. BERMAN:  Yeah.  It's on -- in evidence.

2          THE COURT:  All right.  So it's already in evidence;

3     is that right?

4          MR. SPRINGER:  I have it as not being in evidence.

5          THE COURT:  Wait a minute.  We don't --

6          MS. BERMAN:  No.  It is.

7          THE COURT:  No.  We don't show it as being in

8     evidence.  Let me see it.

9          MS. BERMAN:  It is.

10         MR. SPRINGER:  Take it off the screen.

11         THE COURT:  Ms. Berman, we don't show it as being in

12    evidence, okay?

13         MS. BERMAN:  I'm sorry.

14         THE COURT:  Do you have an objection to it?

15         MR. SPRINGER:  I did originally.  I'd have to look at

16    it again to see what it is.

17         I do object to it, Your Honor, because of the content

18    of it.

19         MS. BERMAN:  It is relevant.

20         THE COURT:  It's overruled.  The objection's

21    overruled.  It will be admitted, Defendant's 46A -- I mean,

22    Plaintiff's 46A.

23      (Plaintiff's Exhibit 46A was received in evidence.)

24    BY MS. BERMAN:

25    Q.   You said that your wife was vice president of the company.

1   A.    Yeah.

2   Q.    She was president and still president.

3   A.    I don't know what you're saying.

4   Q.    I'm saying you said that your wife was vice president of

5   Trifecta Gaming.

6          Is she still president?

7   A.    I still don't know what you're saying.

8          THE COURT:  Are you asking him right now if she's

9   president as of today?

10  BY MS. BERMAN:

11  Q.    Is your wife still president as a vice president -- if --

12  I'm asking is your wife still vice president of Trifecta

13  Gaming.

14  A.    I don't believe my wife was ever vice president of

15  Trifecta Gaming.  I think -- hang on.  I think what you might

16  be referring to is when we opened up the SunTrust account, we

17  might have put -- or we did put my wife as vice president for

18  the signature cards because the company wasn't formed yet.

19         Then apparently after that we decided to make your

20  husband vice president and my wife secretary/treasurer and I

21  was president.  She was never president.

22  Q.    If she was never, why did you put on business bank account

23  her name as a vice president?

24  A.    Did we have her -- say it again.

25  Q.    Why did you put your wife as a vice president when you

1   opened business bank account for Trifecta Gaming?

2   A.   It was in 2004.  I have no idea.  They -- it's probably --

3   we had to get an SS form.  Maybe on the SS-4 form her name was

4   on that.  I don't know.

5            MS. BERMAN:  This check 85 -- Exhibit 85A.  This

6   admitted.

7            THE WITNESS:  Do you have a copy for me, please?

8   BY MS. BERMAN:

9   Q.   I would like to know -- you said the check -- this check

10  came from a bank.

11           Where did you get this version, this one?

12  A.   This might -- and, again, because I'm only looking at

13  Exhibit C, when I presented the evidence with the checks that

14  were embezzled, Exhibit C was attached to the packet where I

15  included the checks with your name on the back.  That was

16  Exhibit C in the --

17  Q.   Would you agree with me --

18  A.   And --

19  Q.   Okay.

20  A.   And this form that --

21           THE COURT:  Hold on.

22  A.   -- we have right here, these checks I received back in

23  2009.  And when they sent the check, they sent the check and

24  they also sent the form that they must use for their

25  bookkeeping.

1          And my guess is it's a copy of the check before it's

2    signed that they can use for their bookkeeping purposes.  And

3    when we got the checks from Yonkers Raceway, they included the

4    check with your signature on the back and then attached to the

5    check with your signature on the back, in front of it was this

6    copy.

7    Q.   Would you agree with me the person who usually put in bank

8    account a check would have this -- this tab with -- how to

9    explain this.

10   A.   Hey, listen --

11   Q.   The only person will have this stub is the person who --

12   A.   Hey, Ms. Berman, I don't have the same copy you do.  I

13   don't have --

14   Q.   But you present it.  You said it came with the check.

15   A.   Yeah.  Mine says -- mine says -- I can't see yours all,

16   but mine doesn't look like the same copy.

17   Q.   This one.

18   A.   I can't see --

19   Q.   This one.  Would you agree with me that you would have --

20          THE COURT:  Hold on.  Wait a minute.  Don't ask from

21   there.

22          THE WITNESS:  But you see this says May 2007.  This

23   one doesn't have that.

24   BY MS. BERMAN:

25   Q.   Sorry.

1            Do you see?

2    A.    Yes.

3    Q.    May 10.  It says paid.

4            Do you know by whom it's paid?

5    A.    Well, I'm assuming if it came from Yonkers Raceway, it was

6    paid by Yonkers Raceway.

7    Q.    And they put a check.  It's for 2007, which you claim that

8    I embezzle money, yes?

9            MR. SPRINGER:  Can I ask her to repeat the question,

10   please?

11           THE COURT:  Ms. Berman, you really have to keep your

12   voice up or go back because --

13           MS. BERMAN:  Okay.

14   BY MS. BERMAN:

15   Q.    It's --

16   A.    Yes.  It says May 10th, 2007, and I'm assuming if they

17   issued the check on May 10th, 2007, that for their record

18   purposes, they would have stamped it then.

19   Q.    Yeah.  But look now on Exhibit 85.  It's in 2006.  And

20   compare those two checks.  85 doesn't have any stamp, and when

21   you see those checks copied, only on first portion of this says

22   copy.  There is no any word copy here, and they divided.  They

23   not together.

24           Can you see that?

25   A.    Yes, I can.

1    Q.    This division only when somebody tear apart this check and

2    put in a bank and person keep this part, like I am keeping my

3    check from unemployment.  I don't put in the bank --

4            THE COURT:  Are you asking him a question, or are you

5    testifying?

6    BY MS. BERMAN:

7    Q.    Would you agree with me?

8    A.    I don't even know what you're talking about.

9    Q.    Would you agree with me if you receive a check and there

10   is a written portion with explanation what is it for, you tear

11   this check, go to bank, present, and you keep that stub?  Would

12   you agree with me?

13   A.    I don't agree with you, no.  I don't -- I don't even know

14   what you're getting at.

15   Q.    So you will take -- when you receive a check, you will

16   take this with the stub?

17   A.    I mean, Ms. Berman, there has to be a hundred different

18   checking accounts and checking ledgers with a hundred different

19   ways of keeping records.  I have absolutely no idea what you

20   are referring to.

21   Q.    Does your company keeping records?

22   A.    Yes, we keep records.

23   Q.    And who's keeping records?

24   A.    It's a collective thing.  We --

25   Q.    Who's keeping the records?

```
 1   A.    I guess the vast majority of the records I would keep.

 2   Q.    Okay.  Why did you put your accountant on unemployment

 3   appeal?  You said --

 4   A.    Listen --

 5   Q.    -- that you --

 6   A.    -- because when I keep my records, I send them to my

 7   accountant.  It's what he does.

 8   Q.    You're saying for unemployment appeal that people

 9   didn't -- that unemployment appeal didn't respond to your

10   letter, but what -- what address did you send to unemployment

11   address -- unemployment appeal?

12   A.    My accountant handled the unemployment appeal.  It was his

13   address.  He took care of paying for the unemployment for

14   employees.

15   Q.    Okay --

16   A.    Listen, Ms. Berman, I don't have time to handle

17   everything.  When you run a business, you have an accountant to

18   help you handle the business.  I send the information to my

19   accountant, and he takes care of it.  And this was one of his

20   duties was to handle.

21          So yes, the stuff -- the information that came for

22   Workforce Innovation would have gone to my accountant.

23   Q.    In this vacated unemployment hearing, did you say that --

24   to referee that I embezzle money or you just mention my name?

25   A.    I would have to look at the transcript.
```

1          MS. BERMAN:  Can I show him your transcript for

2    vacated unemployment hearing?

3    BY MS. BERMAN:

4    Q.   Is anywhere here you look at this where it says that I

5    embezzle money?

6          THE COURT:  You can't ask him to read an entire

7    transcript, Ms. Berman, at this point.  If you have something

8    specific you want to refer him to, you can do that.  It's

9    not -- that's an improper question.

10         MS. BERMAN:  He said he need to look in transcript.

11         THE COURT:  I'm not going to have him read the

12   transcript now.

13   BY MS. BERMAN:

14   Q.   Do you recall that -- did you say to unemployment appeal,

15   to referee, that I embezzle money or you just mention my name?

16         MR. SPRINGER:  Objection, asked and answered.

17         THE COURT:  Asked and answered.  It's sustained.

18   BY MS. BERMAN:

19   Q.   Do you think when you mention somebody's name, it's proof

20   that -- you can say after that that you prove that I embezzle

21   money when you just mention somebody name?

22   A.   Ms. Berman, I sent evidence to Workforce Innovation.  I

23   sent the evidence with -- checks with your name on the back and

24   with your husband's name on the back.  Workforce Innovation

25   ruled that money was embezzled.

1          When I was referring to that, I was referring to the

2    ruling, and when I presented evidence and they ruled in our

3    favor, in my opinion that means that we proved that money was

4    embezzled and that Chris Berman's wife embezzled money.  We

5    proved it.

6    Q.    But you didn't mention to Mr. Bellflower that that

7    decision was vacated, and the decision is vacated --

8    A.    Mr. Bellflower has nothing to do with that.

9    Q.    Then why he is your witness?

10          MR. SPRINGER:  Objection, improper question.

11          THE COURT:  Sustained.

12   BY MS. BERMAN:

13   Q.    What proof -- right now -- during deposition you -- during

14   all the discovery process what you show me, it was package A

15   and package D.  On package A was everything from 2005 when my

16   husband was not employed by your company.

17          Do you recall that?

18   A.    I --

19   Q.    Early I was showing you.  Do you recall that?

20   A.    Well, in this --

21   Q.    Yes.  You submit --

22   A.    Are you talking about something you showed me yesterday or

23   something Mr. Springer showed me?

24   Q.    Something what I -- I already admitted to evidence and

25   show package where you -- everything was for 2005.

1           Then you show package D when my husband put more

2    money into your account, and this is considered embezzlement,

3    when somebody put more money in your account?

4           MR. SPRINGER:  Objection, vague, ambiguous, and not

5    sure --

6           THE COURT:  Sustained.

7           MS. BERMAN:  What exhibits you show him?

8           MR. SPRINGER:  Which one?  They're all out of order.

9           MS. BERMAN:  Where it says Trifecta Gaming 2006.

10          MR. SPRINGER:  You're free to look through them.

11   BY MS. BERMAN:

12   Q.   Did you testify earlier that your company, Maitland

13   Furniture, had the trouble in 2006 and 2007?

14   A.   I don't -- in 2000 -- no.  I think what we said -- what I

15   said was we consolidated and moved in 2007 -- in the middle of

16   2007, I think we downsized and moved to the northern plant.

17          But that would also mean that the northern plant was

18   now bustling because they had to take care of, you know, stuff

19   that the southern plant was supposed to be doing.  It's just a

20   business decision.

21   Q.   But you -- earlier -- I remember earlier you told me in

22   2006 you downsized your company, Maitland Furniture and --

23   A.   Well, I know I did say that, but I said it by mistake.

24   2006 was actually a pretty good year.  It was 2007 when we

25   consolidated.

1    Q.    How many employees did you have in 2007?

2    A.    Well, in the first half of the year, I'm not sure.

3    Probably -- I'm going to guess and say seven or eight, maybe

4    ten.

5    Q.    How many employees did you have in 2006?

6    A.    I'm guessing between 12 and 15.

7    Q.    But when first time during your testimony I ask you in

8    2006 how many employee you had, you said, "Just two, me and

9    Chris Berman."

10            Do you recall that?

11   A.    Not in 2006.

12   Q.    That's what you said.

13   A.    But then it was a mistake, and I think I clarified

14   afterwards that in the second half of 2007, it would have been

15   Chris Berman and myself as the only employees under Maitland

16   Furniture, and then it stayed that way until either 2008 or

17   2009 when we opened up again.

18   Q.    I ask you during discovery to produce list of employee.

19            Did you tell your employee anything about me, that I

20   embezzle money, to any of your employee?

21   A.    Repeat the question, please.

22   Q.    Did you tell to any of your employee that I embezzle money

23   from your company?

24   A.    We had a meeting with our attorney, and he was very strict

25   to me to have a meeting with my employees and to say that I am

1   involved in litigation and I cannot talk about it.

2   Q.    So you didn't mention anything to anybody about me?

3   A.    We had a meeting, and I was told to tell our employees

4   that I am -- only tell them that I am in litigation and I

5   cannot talk about it.  We had a special meeting for that

6   purpose.

7   Q.    When did you have a meeting?

8   A.    We had that meeting -- I don't know.

9   Q.    Which year?

10  A.    I do not know.

11  Q.    You can't recall when you have meeting?

12  A.    I don't want to guess for sure, but it would have -- it

13  certainly was after the litigation started --

14  Q.    So you --

15  A.    -- on advice from an attorney.

16  Q.    -- can't recall, but you remember -- you recall -- you

17  said that my husband said exact words.

18       You can recall exact words of my husband, what he

19  said in 2005, but right now you can't recall?

20  A.    I'm telling you that we had a meeting after litigation

21  started.

22       THE COURT:  When you say -- just to clarify, when you

23  say litigation, you mean this case?

24       THE WITNESS:  Yes.

25       THE COURT:  Okay.

1   BY MS. BERMAN:

2   Q.   Do you recall -- I want to know who is your employee if

3   you said something about me to your employee, and during the

4   day of the discovery, I would like to know your employee

5   because I would like witnesses.

6   A.   Yes.

7   Q.   And do you recall you were -- somebody were videotaping

8   me?

9        Who was videotaping me --

10       MR. SPRINGER:  Objection.

11  Q.   -- and for what purpose?

12       MR. SPRINGER:  Objection, Your Honor.  These are

13  discovery matters.

14       THE COURT:  Objection sustained.

15       MS. BERMAN:  Your Honor, he --

16  BY MS. BERMAN:

17  Q.   Do you recall that Lou Faraone was on website as the vice

18  president?

19       Did you ask him if he agreed to be vice president for

20  Trifecta Gaming?

21  A.   Lou Faraone and I talked, and I put -- we came up with the

22  position of vice president of sales, and he wanted chair god,

23  and I said he couldn't have it.

24  Q.   You said he --

25  A.   He -- he asked if he could be the chair god, and I said

1    no.  We had to come up with something different.

2              MS. BERMAN:  Your Honor, if it wasn't in evidence,

3    but I would like to --

4              THE COURT:  Let me see everybody at sidebar.

5         (At sidebar, out of the hearing of the jury:)

6              THE COURT:  All right.  Well, Ms. Berman, you're

7    getting into irrelevant matters.  You're out of time.  You had

8    40 minutes.  You spent a lot of it with irrelevant matters, so

9    that's your fault.

10             All right.  As I said -- I believe I said ten

11   minutes?

12             MR. SPRINGER:  I have three questions.

13             THE COURT:  Okay.  All right.

14             Did you get that?

15             COURT REPORTER:  Yes.

16        (End of discussion at sidebar.)

17             THE COURT:  Okay.  Mr. Springer?

18             MR. SPRINGER:  Yes, Your Honor.  Brief redirect.

19                      REDIRECT EXAMINATION

20   BY MR. SPRINGER:

21   Q.   Mr. Kafka, just a few questions.

22             So back when you fired Chris Berman in January -- on

23   January 8th, 2009, you already had some documents establishing

24   embezzlement by him; is that right?

25   A.   Yes.  Yes, we did.  I think the first documents came in on

1   January 5th.

2   Q.   And January 9th when the checks at issue in this case --

3   when you received those checks with Larysa Berman's name on the

4   back, made payable to Chris Berman, that was just additional

5   evidence at that point.

6   A.   That is correct.

7   Q.   All right.  And to be clear, because I'm not sure that it

8   is -- to be clear, prior to or before this litigation starting,

9   did you tell anyone outside the agency of your statement of the

10  wife -- Chris Berman's wife embezzled money or part of the

11  money was embezzled by his wife?

12  A.   I did not.

13  Q.   All right.

14          MR. SPRINGER:  Thank you.  That's all I have.

15          THE COURT:  All right.  Thank you.

16          You can step down, Mr. Kafka.

17          Does the defense rest?

18          MR. SPRINGER:  Yes, Your Honor -- oh, wait, Your

19  Honor.  There is one -- I have a document I would like to

20  introduce.

21          THE COURT:  All right.  What is that?

22          MR. SPRINGER:  It's Defense Exhibit No. 9.  It has

23  been objected to by Ms. Berman.  It's a copy of the check from

24  May 2007.  This is the one we received from the bank, directly

25  from the bank, not from Yonkers, and I just want to make sure

```
 1   this is in evidence.
 2            THE COURT:  Do you have an objection, Ms. Berman?
 3            MS. BERMAN:  Let me see.
 4            THE COURT:  It's not in evidence yet.
 5            MS. BERMAN:  It's not in evidence.
 6            THE COURT:  Do you have an objection?
 7            MS. BERMAN:  Yes.
 8            THE COURT:  What's your objection?
 9            MS. BERMAN:  It wasn't in evidence before.
10            THE COURT:  The objection's overruled.
11            MR. SPRINGER:  May I approach?
12            THE COURT:  Yes.
13            All right.  Defense Exhibit No. 9 will be admitted
14   into evidence.
15       (Defendant's Exhibit 9 was received in evidence.)
16            MR. SPRINGER:  At this time, Your Honor, the defense
17   rests.
18            THE COURT:  All right.
19            All right, ladies and gentlemen.  So we -- it's ten
20   after 12:00 now.  If you could be back at 1:20, that would be
21   great.
22            And I've been a little bit negligent in not
23   instructing you all the time to not talk about the case, not to
24   do any investigation, but I probably made a big enough deal out
25   of it on Monday so let me just remind you of that again.
```

1          Thank you.

2          COURT SECURITY OFFICER:  All rise for the jury.

3      (Jury out at 12:07 p.m.)

4          COURT SECURITY OFFICER:  Please be seated.

5          THE COURT:  All right.  Ms. Berman, do you have any

6  motions at this point?

7          MS. BERMAN:  I have just those -- what you said, law

8  cases.

9          THE COURT:  Okay.  Well, go ahead and give those to

10  us and we'll look at them.

11          Do you have copies for us to look at?

12          MS. BERMAN:  Yes.

13          THE COURT:  Do you have copies for Mr. Springer?

14          MS. BERMAN:  Yes, I do.

15          THE COURT:  All right.  Now, does this relate to the

16  jury instructions?

17          MS. BERMAN:  Yes.

18          THE COURT:  All right.  And -- all right.  Before we

19  get to any jury instruction issues, do you have any motions?

20          MS. BERMAN:  I -- I didn't get -- didn't get a chance

21  to write a motion here because --

22          THE COURT:  All right.  Well, now's the time to make

23  any motions.

24          So all right.  We're going to go on to your rebuttal.

25  Do you plan on putting on any rebuttal evidence to what -- this

```
 1   is just to what was -- to Mr. Kafka's recent testimony here --
 2             MS. BERMAN:  Yes --
 3             THE COURT:  -- and to Mr. Bellflower.
 4             MS. BERMAN:  I do.
 5             THE COURT:  What -- tell me what evidence you want to
 6   put on in rebuttal.
 7             First of all, who do you want to put on as a witness?
 8             MS. BERMAN:  I would like all of the evidence what
 9   Mr. Springer was given, all of his evidence.
10             THE COURT:  Well, you're going to have to be more
11   specific than that.
12             MS. BERMAN:  Can you show me what you --
13             THE COURT:  Tell me this.  What -- are you planning
14   on putting on any witnesses?
15             MS. BERMAN:  Just Mr. -- Defendant Kafka.
16             THE COURT:  You want to put him back on the stand?
17             MS. BERMAN:  I want rebuttal, yes, or I can rebuttal
18   myself, can put myself.
19             THE COURT:  All right.  Do you want to -- you want to
20   put yourself as a witness to rebut some of the things he said?
21             MS. BERMAN:  Yes.
22             THE COURT:  All right.  And how much time do you
23   think you need to do that?
24             MS. BERMAN:  Whatever you give it to me.
25             THE COURT:  Do you need more than 15 minutes?
```

```
 1              MS. BERMAN:  Maybe a little bit more.

 2              THE COURT:  I'm sorry.  I can't hear you.

 3              MS. BERMAN:  Maybe a little more.

 4              THE COURT:  All right.  I'll give you 25 minutes, all

 5    right --

 6              MS. BERMAN:  Thank you.

 7              THE COURT:  -- for rebuttal.

 8              MS. BERMAN:  Thank you, Your Honor.

 9              THE COURT:  And then after that -- so that should

10    take us till about 2 o'clock.

11              If we could go ahead and get the jury instructions

12    and the verdict form out of the way now, then we can go ahead

13    and work on those.

14              And then at the close of the evidence, you can renew

15    any motions if you'd like, Mr. Springer, and then we'll go

16    right into the closings and we'll get as far as we can.

17              I think I'm going to put a 45-minute time limit on

18    each side for closing arguments.

19              Is that -- any objection?

20              MR. JONES:  More than enough.

21              THE COURT:  All right.  Ms. Berman?

22              MS. BERMAN:  Yes.  Okay.

23              THE COURT:  All right.  And that doesn't obviously

24    mean you have to take all of that.  That's the maximum.  You

25    know, the jury can only sit there so long and hear so much,
```

1   especially when it's repetitive.

2         All right.  And then we'll see what time that all is,

3   whether I should go ahead and instruct them now -- go ahead and

4   give the case to them or whether it would be better to do that

5   tomorrow morning.

6         So in terms of -- Mr. Springer, in terms of the jury

7   instructions and the verdict forms -- all right.  Now, you had

8   raised an issue on the opinion defense.

9         MR. SPRINGER:  Yes, sir.

10        THE COURT:  And you had given us that case.

11        MR. SPRINGER:  I do have an additional case that has

12  the language in it if you'd like to see it.

13        THE COURT:  Well, let me tell you what we were going

14  to do is --

15        MR. SPRINGER:  Okay.

16        THE COURT:  -- at least based on that case, we were

17  going to add in to the instruction -- and this is on page 11 of

18  the instructions that I gave you the other day --

19        MR. SPRINGER:  Yes, sir.  Got them.

20        THE COURT:  Okay.  We were going to add in the phrase

21  "or known to the" -- and this is in paragraph 2.

22        MS. BERMAN:  I'm sorry, Your Honor.  I don't have

23  instructions.

24        THE COURT:  Well, I'm sorry.  I gave you a copy the

25  other day, Ms. Berman.

1        MS. BERMAN:  Okay.  I don't want to waste your time.

2   I will just listen.

3        THE COURT:  All right.  We're going to add in the

4   phrase "or known to the audience to whom the publication was

5   made."

6        So in other words, it would read:  "If the

7   preponderance of the evidence supports Defendant Thomas Kafka's

8   defense that his statements were either substantially true

9   statements of fact or were statements of opinion based upon

10  true facts adequately disclosed in the publication at issue,

11  assumed to exist by a party exposed to the communication, or

12  known to the audience to whom the publication was made" -- and

13  I think that's a quote from that case -- "then your verdict

14  shall be for Defendant Thomas Kafka."

15       MR. SPRINGER:  My comment is this, Your Honor.

16  There's a case out of the Middle District of Florida, 484

17  F.Supp.2d 1242.  I have a copy for Your Honor if you'd like it.

18  In there it says that the opinion or facts which are set forth

19  in the article or which are otherwise known or available.

20       And the language "available," I think, is important

21  here because Mr. Bellflower and Ms. Connell had available to

22  them access to Mr. Berman's unemployment file should they need

23  it, so that's why I think the word "available" should be in

24  there as well.

25       THE COURT:  All right.  Do you have a copy of that

1    case?

2           MR. SPRINGER:  I do, yes, sir.  It's -- I can tell

3    you the page.

4           THE COURT:  And the name of the case, for the record,

5    is *Johnson v. Clark*.

6           MR. SPRINGER:  It's --

7           THE COURT:  Is that right?

8           MR. SPRINGER:  Yes, sir, and it's on page 6, pin note

9    4 and 5 towards the top of that paragraph, top middle.

10          THE COURT:  I'm not seeing page numbers here.

11          MR. SPRINGER:  It's on the bottom right-hand corner.

12          THE COURT:  All right.  Page 6, where now?

13          MR. SPRINGER:  Under headnote 4, 5.  It's about three

14   or four sentences down from the start of that paragraph.  It

15   starts with pure opinion.

16          THE COURT:  Now, we're not talking about pure opinion

17   though.  We're only talking about -- I don't believe we have a

18   pure opinion.  We have a mixed opinion; at most I think a mixed

19   opinion.

20          So if your comment -- if this "available" part

21   relates to the pure opinion, then I'm not going to give it.  If

22   it relates to the mixed opinion, then I'll consider it.

23          MR. SPRINGER:  Yeah.  I think that is pure opinion.

24          THE COURT:  All right.  I don't believe we have pure

25   opinion here, so --

1          MR. SPRINGER:  Okay.

2          THE COURT:  -- I'm going to deny that -- deny that

3   request.  But I will add in the language "or known to the

4   audience to whom the publication was made," and I will make

5   that change in the verdict form as well, in paragraph 3 of the

6   verdict form.  Then so we'll -- we'll get you additional

7   copies.

8          I will give the jury a copy of the jury instructions

9   as well as the verdict form.

10         And did you have any other issues with the jury

11  instructions or verdict form?

12         MR. JONES:  Your Honor, the verdict form --

13         THE COURT:  Oh, let me tell you.  We made one other

14  change on the verdict form.

15         In paragraph 7, which is the damages part, I think it

16  had a subparagraph (a) in there.  That's what your copy should

17  show.

18         Since there are Bs and Cs but they don't apply so we

19  were just going to take that out and combine it so that it

20  says -- if the jury finds damages, it says, "Plaintiff is

21  entitled to recover compensatory damages for injury to

22  reputation or health, shame, humiliation, mental anguish and/or

23  hurt feelings experienced in the past or to be experienced in

24  the future in the amount of," then they're to write the amount.

25         So we made that change, so --

1          MS. BERMAN:  Your Honor --

2          THE COURT:  Hold on a second.  I'm dealing with them

3   first.

4          So did you have any other objections or comments on

5   the --

6          MR. JONES:  A comment on the verdict form, Your

7   Honor, would be as to -- I think we might should delete

8   Question 1 altogether, and that's because the comment that's at

9   issue here is a comment of a crime.  And I don't know.  They

10  could come back and say no to that.

11         THE COURT:  All right.

12         MR. JONES:  And the case centers around, you know,

13  questions really 2, 3 -- you know, the rest of the verdict

14  form.

15         THE COURT:  All right.  All right.  Well, how do you

16  suggest -- do you suggest -- and I agree with that.  I was a

17  little concerned that if they came back with a no on that, that

18  it might be inconsistent --

19         MR. JONES:  Me too.

20         THE COURT:  -- with the evidence, so I agree.

21         And are you suggesting that we just delete it

22  entirely and just start from paragraph 2, or shall we tell them

23  that --

24         MR. JONES:  I would rec- -- yeah, my recommendation

25  with the verdict form would just be that we delete No. 1

```
 1   altogether and just start with No. 2, which would be the new
 2   Question 1.
 3            THE COURT:  All right.  And do you have any comment
 4   on that, Ms. Berman?
 5            MS. BERMAN:  Your Honor, I don't have verdict form.
 6            THE COURT:  Well, I gave you a copy of the verdict
 7   form --
 8            MS. BERMAN:  I'm sorry.  I --
 9            THE COURT:  -- as well.
10            Do you have a --
11            LAW CLERK:  I don't have an extra.
12            THE COURT:  Here's an extra copy of what I gave you.
13   It's got a little writing on it.
14            MS. BERMAN:  I appreciate it very much.  Thank you so
15   much.
16            Thank you.
17            THE COURT:  All right.  So, Ms. Berman, what he's
18   suggesting is from the one I gave you yesterday, the one that
19   you have in front of you, we're just going to entirely
20   eliminate question No. 1, which asks -- basically asks the jury
21   did Mr. Kafka make defamatory statements about you --
22            MS. BERMAN:  Okay.
23            THE COURT:  -- because that has been -- it's been
24   proven.  It's basically been stipulated to.
25            Is that correct, Mr. Jones?
```

1              MR. JONES:  I believe the evidence -- yes, Your

2     Honor.

3              THE COURT:  So --

4              MR. JONES:  The evidence shows --

5              THE COURT:  -- in other words, you don't even have to

6     prove that.  We're really getting on to the defenses in the

7     case.

8              So, now, I don't know -- so that probably means a

9     change would need to be made to the jury instruction as well.

10             I think I would -- to have it make sense, it would

11    seem like I would have to say -- and this is on jury

12    instruction No. 9 on page 10 -- that the parties have

13    stipulated that Mr. Kafka made the statements and that the

14    statements charged that Ms. Berman committed a crime and then

15    eliminate -- and then go on to the first defense of truth and

16    good motives.

17             MR. JONES:  Would it help to clarify -- get a little

18    bit more specific, instead of crime, participated in

19    embezzlement?  I mean, because there's been allegations of

20    other stuff been thrown out in this case, and I just want to

21    make sure the jury is drawn in that we're -- it's just those

22    two statements in Exhibit 25 and 28 where Mr. Kafka is saying

23    to the agency, you know, the wife participated in embezzlement.

24             MS. BERMAN:  Which paragraph?

25             MR. JONES:  It's on page 10 in the jury instructions.

1          MS. BERMAN:  Thank you.

2          THE COURT:  All right.  So that -- instruct them that

3    Thomas Kafka made the statements and that they charged that

4    Ms. Berman committed embezzlement.

5          MR. JONES:  Yes.

6          THE COURT:  Do you have a problem with that,

7    Ms. Berman?

8          MS. BERMAN:  I'm sorry, Your Honor.  I have a problem

9    with -- sometimes my -- my mind, like, blanking off, and I

10   can't hear.  I'm sorry.

11         Can you repeat this?

12         THE COURT:  What they're saying is that we're going

13   to tell -- we're basically going to tell the jury that they

14   admit that they made the statements, those two statements --

15   that Mr. Kafka made those statements and that they -- the

16   statements charged you with committing embezzlement.

17         And then so you don't have to prove -- basically you

18   don't have to prove that those statements were defamatory.

19         MS. BERMAN:  Okay.

20         THE COURT:  Then they're going to go on to the

21   defenses in the case.

22         MS. BERMAN:  Okay.

23         THE COURT:  And then they'll go in -- from there, go

24   into the defenses.

25         MS. BERMAN:  Okay.

1          THE COURT:  So you understand that?

2          MS. BERMAN:  Yes.

3          THE COURT:  All right.  All right.  Were there any

4     other issues?

5          MR. SPRINGER:  Your Honor, the only other issue that

6     I saw potentially with -- on page 11 of the jury instructions,

7     and I think it's on the verdict form as well, has to do with

8     the opinion we were speaking of earlier.

9          It's -- part of the instruction states that "or were

10    statements of opinion based upon true facts."  I don't know

11    that the facts necessarily have to be true if you're relying on

12    facts from other documents.  It's just someone's opinion based

13    on what's written elsewhere.

14         MR. JONES:  I think what Mr. Springer's getting at

15    is, you know, facts are inherently true, and to put true facts

16    in there would seem to heighten the level of

17    information-gathering that this person's having to rely on.

18         I just -- we don't want to run into an idea where

19    they're back there in there hair-splitting on scrutinizing, you

20    know, well, whether this is her signature, whether it was a

21    true fact.  I mean, they're going to -- they're going to decide

22    that in the -- in the affirmative defense, of course.

23         THE COURT:  All right.  We have a case here.  It's --

24    well, it might be the same case you gave me.  Is it *Johnson*?

25    Is that what you gave me?

1          MR. SPRINGER:  I think -- yeah, it's *Clark versus*

2  *Johnson*?

3          THE COURT:  Yeah, it's that same case on page 10.  I

4  mean, again, we're still talking about mixed, and that could be

5  the distinction again, but we're talking about mixed opinion.

6          It says in that second column -- did you give -- you

7  can have -- Ms. Berman, you can have this copy of this *Johnson*

8  case since we have it.

9          MR. SPRINGER:  I gave you a copy, Ms. Berman.

10         THE COURT:  Oh, okay.

11         MS. BERMAN:  Okay.

12         MR. SPRINGER:  You have it there.

13         MS. BERMAN:  Yes, I have it.

14         THE COURT:  It says in that second column at the

15  bottom of the first paragraph, "Moreover" --

16         MS. BERMAN:  Excuse me.  What page is it?

17         THE COURT:  It's page 10.

18         It says, "Moreover, a jury may find mixed opinion to

19  be actionable where the facts set forth to support the opinion

20  are themselves found to be untrue."  So I think we need to

21  include that.

22         MS. BERMAN:  Which paragraph is it?

23         THE COURT:  I'm ruling in your favor here,

24  Ms. Berman --

25         MS. BERMAN:  Oh, okay.

```
 1            THE COURT:  -- but it's the first paragraph of --
 2   it's in the second column there, the bottom -- the last line in
 3   the first paragraph.
 4            MS. BERMAN:  Okay.
 5            THE COURT:  I think I am.  I'm waiting to hear from
 6   them.
 7            So if it can be actionable that it's not true, then I
 8   think we need to keep that true in there.
 9            MR. JONES:  Okay.  All right.
10            THE COURT:  All right.  Any other issues with the
11   jury instructions or the verdict form?
12            MR. JONES:  No, Your Honor.
13            THE COURT:  All right.  Ms. Berman, did you have any
14   issues with the jury instruction -- any objections or issues
15   with the jury instruction or verdict forms that I gave you
16   as -- plus the changes that we just went through?
17            MS. BERMAN:  I'm sorry.  I don't have the jury
18   instructions.  I will check the verdict form.
19            Your Honor, I have a question.  Will the jury
20   understand what is a privilege on verdict form, paragraph 4?
21            THE COURT:  Of the verdict form?
22            MS. BERMAN:  Yes.
23            THE COURT:  Well, they're going to be given an
24   instruction -- they're going to be given an instruction on
25   that --
```

1          MR. JONES:  Page 11.

2          THE COURT:  -- which is on page 11 in the middle of

3     the -- middle of the page.

4          It says, "On the defense of privilege, I instruct you

5     that provided one does not speak with improper motives, which I

6     shall explain in a moment, a person such as the defendant is

7     privileged to make a statement to someone such as James

8     Bellflower or Janice Connell with the Department of Economic

9     Opportunity about another, such as the plaintiff, even if the

10    statement is untrue under the following circumstances:

11          "The defendant made the statement in good faith;

12          "He had an interest in the subject of the statement

13    or the statement concerned the subject in which defendant had a

14    duty to speak;

15          "The listener or reader of the statement had a

16    corresponding interest or duty regarding the subject of the

17    statement;

18          "Defendant published the statement on a proper

19    occasion, and defendant published the statement in a proper

20    manner."

21          Then it says on the next page:  "If the preponderance

22    of the evidence does not show that these circumstances existed,

23    then you must find that the defendant had no privilege to make

24    such a statement, even with proper motives.

25          "However, if the preponderance of the evidence does

1    show that the defendant spoke under circumstances creating a

2    privilege, then you should decide whether, as plaintiff claims,

3    defendant made the statement with improper motives, abusing

4    that privilege."

5            So all of that will be read to them, so I think that

6    sufficiently explains the privilege and then how that can be

7    abused.

8            MS. BERMAN:  Can we actually say that I am not a

9    party to unemployment appeal, so that they understand --

10           THE COURT:  Well, that's a factual matter.  I'm not

11   going to instruct them.  I think it's been well stated that

12   you're not a party to that unemployment --

13           MS. BERMAN:  Okay.

14           THE COURT:  -- appeal.

15           MS. BERMAN:  Okay.

16           THE COURT:  All right.  Do you have any other

17   comments on the verdict form or the jury instructions,

18   Ms. Berman?

19           MS. BERMAN:  Your Honor, I have a comment on Question

20   6.  It says, "Did plaintiff sustain any damages?"

21           My case, it's libel per se, and if it's on the face

22   of the -- I don't need to -- I don't --

23           THE COURT:  Well, let me say you don't need to, but I

24   would think you might want to.  The question is, "Did plaintiff

25   sustain any damages as a result of the defamatory statements?"

1          Now, it says if they answer yes, then they're going

2 to answer Question 7, which is going to give you an amount for

3 the -- what you testified about the other day, which is that

4 you can't eat, you can't sleep, things like that.

5          If they answer no to that question, they're still

6 going to go on to Question 8, which is, "Plaintiff is entitled

7 to recover nominal damages in the amount of X."

8          So they're still going to consider awarding you

9 nominal damages, then they're also going to go on to Question

10 9, which is, "Under the circumstances of this case, state

11 whether you find by a preponderance of the evidence that

12 Mr. Kafka's primary purpose in making the statements was to

13 indulge ill will," etc.  I'm not going to read all this.

14          MS. BERMAN:  Uh-huh.

15          THE COURT:  If they answer yes to that, then they'll

16 go to Question 10, which is, "What amount of punitive damages

17 should be assessed against the defendant?"

18          So I believe this is correct.  It preserves your

19 right to nominal damages.  It preserves your right to possible

20 punitive damages, all right?

21          MS. BERMAN:  (Nods head up and down.)

22          THE COURT:  You need to say something.

23          MS. BERMAN:  Yes.  I'm sorry.

24          THE COURT:  Okay.  Now, did you have any other

25 issues?

3-140

```
 1          MS. BERMAN:  On the form, I guess not, but I don't
 2    have verdict with me so I can't say.
 3          THE COURT:  Well, I just gave you the verdict form.
 4    You have both of them now, so -- and you had them last night,
 5    and I told you we were going to discuss it at 8:30 this
 6    morning, and we couldn't do it then.
 7          So -- but let me ask you this.  Why are you giving me
 8    this case which, for the record, is Longwood versus Sedow
 9    (phonetic).
10          MS. BERMAN:  It's about punitive damages, how much in
11    Florida they awarded.
12          THE COURT:  Okay.  Well, that's interesting, but what
13    does it have to do with this case?
14          MS. BERMAN:  For libel.
15          THE COURT:  Well, they may award punitive damages in
16    this case, and they may not.  They don't have to.
17          MS. BERMAN:  But, I mean -- but I am asking for
18    punitive damages.
19          THE COURT:  Well, I just read the part of the verdict
20    form that allows that to go to the jury even if they don't find
21    any compensatory damages and if they find that Mr. Kafka acted
22    with what I just read, the requisite ill will, etc.
23          So -- now, there is -- there is an instruction on
24    punitive damages as well which basically essentially mirrors
25    what the verdict form just says, so -- it's on page 13.
```

1          It says, "If you find for plaintiff and against

2     defendant, you should" -- this is at the bottom of the page --

3     "you should consider whether, in addition to compensatory and

4     nominal damages, punitive damages are warranted in the

5     circumstances of this case as punishment and as a deterrent to

6     others.

7          "Punitive damages are warranted if you find by a

8     preponderance of the evidence that defendant's primary purpose

9     in making the statement was to indulge ill will, hostility, or

10    an intent to harm plaintiff."

11         MS. BERMAN:  Okay.

12         THE COURT:  All right?

13         All right.  So I believe I told the jury to -- did I

14    tell them 11:20 or 11 -- I mean 1:00 --

15         COURTROOM DEPUTY:  I think you told them 1:20.

16         THE COURT:  1:20.  Okay.

17         I told the jury to be back at 1:20, and so we'll

18    finalize the instructions and the verdict form.  And it sounds

19    like we should be able to get to closings and possibly instruct

20    the jury and let them start deliberating.

21         I'm not going to sequester them or anything like

22    that.  We can only go to 5 o'clock, so -- I'll check into the

23    possibility of going later.  But if we can, it probably isn't

24    going to be much later.  And if they haven't reached a verdict

25    by then, we'll just have them come back tomorrow.

1          MR. JONES:  Couple housekeeping things.  The 45

2    minutes, Your Honor, that would include rebuttal time?

3          THE COURT:  Yes.

4          Ms. Berman, on your closing argument, you'll have 45

5    minutes.  You can reserve some of that time for rebuttal.  In

6    other words, you're going to get to get up there twice.  You'll

7    give your closing argument, then they'll go, and then if you

8    want to reserve some time for rebuttal, you can come back,

9    okay?

10          So do you want to reserve any of that --

11          MS. BERMAN:  Yes.  I would like.

12          THE COURT:  How much?

13          MS. BERMAN:  Excuse me.  How much time?

14          THE COURT:  How much time would you like to reserve

15    for rebuttal?

16          MS. BERMAN:  You say altogether it's 25 minutes or 45

17    minutes?

18          THE COURT:  45 minutes altogether.

19          MS. BERMAN:  45 minutes?  Maybe 25.

20          THE COURT:  All right.  Now, keep in mind, in your

21    rebuttal, you can only go back.  You can't bring up new things,

22    okay?

23          MS. BERMAN:  Maybe 15.

24          THE COURT:  All right.  So she'll reserve 15 for

25    rebuttal and 30, all right?

```
 1          MR. JONES:  There's one thing you just said, Your

 2  Honor.  Maybe this could just be argument, but, you know, the

 3  law as I understand it is a plaintiff can't recover for

 4  anguish, mental anguish, incurred because of the litigation.

 5          And I think the testimony that Ms. Berman gave,

 6  something about not eating, not sleeping, I think, was tied to

 7  her, you know, being so stressed over the litigation.

 8          So I can say at closing that she can't recover

 9  anything stress related to litigation or -- I don't know how

10  else to handle that than --

11          MS. BERMAN:  That's not --

12          MR. JONES:  -- in instructions to the jury, the jury

13  instructions.

14          MS. BERMAN:  This is not --

15          THE COURT:  Well, I know she did get into litigation,

16  but I think I -- I think I addressed that at the time, and --

17          MR. JONES:  You did.

18          THE COURT:  -- I think the part about not eating, not

19  sleeping, I think, was at least arguably related to the

20  statements themselves.

21          I mean, it's going to be up to the jury, I think,

22  but --

23          MR. JONES:  I'll handle it in the closing.

24          THE COURT:  All right.  Anything further?

25          MR. JONES:  No, Your Honor.
```

1          THE COURT:  Anything further right now?

2          MS. BERMAN:  No.  Thank you.

3          THE COURT:  Okay.  If you can be back, then, at 1:20.

4   Thank you.

5          Court will be in recess.

6          COURT SECURITY OFFICER:  All rise.

7      (Recess from 12:38 p.m. until 1:22 p.m.; all parties

8   present.)

9      (Outside the presence of the jury:)

10          COURT SECURITY OFFICER:  All rise.  This Honorable

11   Court is now in session.

12          Please be seated.

13          THE COURT:  All right.  So just to recap, I think I

14   gave -- I said I would give Ms. Berman 25 minutes to do her

15   rebuttal and then -- and then after that, that will be the end

16   of all the evidence, and we'll take up whatever motions there

17   are.

18          I've been asked a question that my courtroom deputy

19   has as to whether Mr. Berman can come in for closings.

20          Do you have any objection to that?

21          MR. JONES:  No objection, Your Honor.

22          THE COURT:  Okay.  So you can --

23          MS. BERMAN:  Excuse me.  Can you repeat this?

24          THE COURT:  I guess your husband wanted to know if he

25   could come into the courtroom for closing arguments, and we're

1   going to tell him he can.

2           MS. BERMAN:  Thank you.

3           THE COURT:  Okay.

4           MS. BERMAN:  Thank you, Your Honor.

5           THE COURT:  All right.  And -- all right.  I believe

6   we're ready to bring the jury in.

7           COURT SECURITY OFFICER:  All rise for the jury.

8       (Jury in at 1:24 p.m.)

9           COURT SECURITY OFFICER:  Please be seated.

10          THE COURT:  All right, Ms. Berman.  Do you want to

11  take the stand again in rebuttal?

12          MS. BERMAN:  Yes, Your Honor.

13          THE COURT:  Okay.  You can -- let me remind you that

14  you've been sworn in, and so you're still sworn to tell the

15  truth.

16          You can go to the witness chair, or if you have

17  documents to show, you can stand at the podium.

18       LAREESA BERMAN, PLAINTIFF'S REBUTTAL WITNESS, SWORN

19                      DIRECT EXAMINATION

20  BY MS. BERMAN:

21  Q.   I just want to pointed out on the checks which defendant

22  present that claim that I embezzle money, Exhibit 85 and 85A.

23          Exhibit 85, if you see, it says copy.  But there is

24  no signature on this check.

25          MR. SPRINGER:  Objection, Judge.  I would object to

1  two things.  One, it's speculation as to what may have been

2  done or not done with this check --

3          MS. BERMAN:  That's what you presented --

4          MR. SPRINGER:  -- and secondly, I didn't ask him

5  about this exhibit in the examination of Mr. Kafka.  This is

6  rebuttal to his examination.

7          MS. BERMAN:  But what --

8          THE COURT:  I'll allow it.  I'll allow it.

9  BY MS. BERMAN:

10  Q.   If you see the other check when he say I embezzle money

11  from the company which belongs to my husband, they have two

12  lines on this check.  It's the same date, but two lines with a

13  signature.  This -- this what he presented have just one line

14  and no signature on this check.

15          Copy just on the top one.  Didn't say copy.  This

16  one, one line, no signature.  Copy, says paid.  You don't know

17  by whom it paid and who cashed the check.

18          As I -- please, I would like to explain very well.

19  This is a -- when I was working in America.  I still keeping

20  my -- I was very proud -- my check from my job.  And bank

21  account, which I -- this was portion of the check I put in bank

22  account, cash.  It show when exactly I change my spelling.

23          And you see the check until 9/19/06 --

24          MS. BERMAN:  May I have 67A?

25          COURTROOM DEPUTY:  Which one?

1        MS. BERMAN:  67A.

2   BY MS. BERMAN:

3   Q.   If you see, he claims that I cash the check on May 10,

4   2007, one, and the other November 24th, 2006.  I change my bank

5   here.  You see that I change to Polyakova Berman 9/20, 9/20.  I

6   didn't spell in bank as -- I didn't spell that way in my bank.

7        Signature looks like mine but spelling or writing,

8   it's not mine, not my husband.  There is some kind of bank

9   account; it's not my number.  How to explain it?  It's not my

10  writing either.  I don't know who wrote this, but not me.

11       They -- they tried to convince you that somehow,

12  because he found on the -- online my marriage license, on my

13  marriage license I was -- was spell it through Y.  And then he

14  found my -- from my house refinancing through Y.

15       But I don't put check to my house refinance.  I put

16  check into my bank, and my bank already -- already change.

17  Defendant didn't know when I changed my spelling and my name on

18  that bank.  He didn't know.  He found online, and he thought

19  that I change in 2007.  So he created this false checks --

20       MR. SPRINGER:  Argumentative, Judge.  Argumentative.

21  No evidence supports the allegations.

22       MS. BERMAN:  Evidence --

23       THE COURT:  Yes.  Again -- wait, Ms. Berman.  Keep in

24  mind, you'll be allowed to argue later, so just stick with the

25  facts.

1    BY MS. BERMAN:

2    Q.   This is the evidence, and I show that I have not just a

3    copy.  I have real check, and I show you.  But -- and they

4    saying that evidence -- I don't know how to say.

5          Bank account, I change on 9/20/06 and this one, 2006

6    November 24, not my writing, not my writing on the number

7    account.  And they want to convince you that somehow, which

8    check belongs to my husband, somehow I wrote down and put in my

9    bank, and I didn't do that.  I never do anything like that.

10         Evidence show that I changed my spelling before those

11   alleged checks appears.  And what they present, he said, sent

12   from bank or whatever is that, they don't have signature.  I

13   don't know how he -- he got this.  It says copy here.  There is

14   no nothing.  I don't know what is this.

15         Then he saying that this --

16         THE COURT:  Ms. Berman, I'm sorry, but this is

17   argument, okay?

18         MS. BERMAN:  Okay.

19         THE COURT:  You're going to have -- you've had plenty

20   of opportunity here, and so --

21         MS. BERMAN:  Okay.

22         THE COURT:  -- you need to stop saying what the

23   defendant said and just testify to what you want to testify.

24   If you've already said it, you don't need to say it any more,

25   and you need to move on to another subject --

1          MS. BERMAN:  I would like --

2          THE COURT:  -- or you don't -- you can stop.

3          MS. BERMAN:  I would like Exhibit 46A that defendant

4  saying he didn't tell anybody else.

5  BY MS. BERMAN:

6  Q.   If you see August 21, 2011, he saying, "We are currently

7  asking for affidavit from one of Chris Berman's former

8  employees, and our attorney is subpoena information for

9  publisher of his first two novels."  It's already they were

10 asking those two people.  Zaho and publisher was contacted.

11 They already knew about that.

12         "And we also will send new information of businesses

13 owned by Chris Berman and owned his wife."

14         I don't have anything to do with unemployment appeal.

15 Why he put my name when he doesn't even know me, that he's

16 looking on the businesses by -- unemployment appeal already

17 found in favor of my husband, and he still continue to claim

18 that my husband embezzle and trying to put all the documents

19 about my husband.

20         His ownership, it means that he has to give him a

21 share.  It's by law.  Not by unemployment -- not for salary

22 position.  You have to give him a share because in S

23 corporation --

24         MR. SPRINGER:  Objection.

25         THE COURT:  Sustained.

 1              This is complete argument, Ms. Berman.  This is not

 2    the time for closing argument.

 3              MS. BERMAN:  Okay.

 4              THE COURT:  All right.  Do you have anything else to

 5    say?

 6              MS. BERMAN:  Okay.

 7              THE COURT:  All right.

 8              All right.

 9              MR. SPRINGER:  Do I get a really brief cross of her

10    rebuttal?

11              THE COURT:  Oh, yes.  I'm sorry.  I'm sorry.  Yes,

12    you do.

13              MR. SPRINGER:  Thank you.

14              THE COURT:  Ms. Berman, if you can take the stand.

15              MR. SPRINGER:  I'd like to use one of the exhibits

16    you were using.

17                            CROSS-EXAMINATION

18    BY MR. SPRINGER:

19    Q.   All right, Ms. Berman.  I just have a couple questions for

20    you.

21              So it's your testimony that because of this first

22    paycheck you ever earned, as of September 2006, you spelled

23    your name L-a-r-e-e-s-a.  Therefore, the spelling on the back

24    of the checks in this case is wrong because they have a Y,

25    correct?

```
 1   A.    That's how I spell in --

 2   Q.    Okay.

 3   A.    -- September, but check was in November cashed.

 4   Q.    Right.  So any check after September 2006, your name --

 5   A.    Yes.

 6   Q.    -- had been changed to Es, correct?

 7   A.    Yes.

 8   Q.    No Ys.

 9   A.    No.

10   Q.    Show you Defense Exhibit 18B.  This is a check from May 1,

11   2007.  It's a payroll check to your husband, Chris Berman.

12         Do you see that?

13   A.    Yes, I do see it.

14   Q.    On the back it says, "Pay to Larysa," L-a-r-y-s-a.

15         May 2007 is after September 2006, correct?

16   A.    Correct.  I would like to comment on this.

17   Q.    Is it -- just is May 1st, 2007, after September 2006?

18   A.    The writing, it's not mine.  I don't know who wrote this.

19   Q.    Oh, okay.  So you didn't sign your husband's payroll

20   checks.  Another Larysa Berman signed it?

21   A.    Mr. Springer, I would like to address on this.  I would

22   like to address the checks what you show.  It's not just from

23   SunTrust.  I don't know how he did it.

24   Q.    Okay.

25   A.    It wasn't stamped from SunTrust.  You can just print and
```

1    manipulate with this whatever you want.

2    Q.    Okay.  So here's Exhibit 18F, Defense Exhibit 18F.  This

3    is a check from October 20th, 2006, which is one month after

4    you claim you changed your name to spelling it with an E based

5    on your payroll check, and on the back of this check, which is

6    one month later, pay to L-a-r-y-s-a --

7    A.    It's not --

8    Q.    -- Larysa Berman.

9    A.    It's not my number.  I never -- I never write like -- it's

10   not mine.

11   Q.    So you didn't sign --

12   A.    The check --

13   Q.    So who -- so what Larysa Berman signed the back --

14   A.    If you --

15   Q.    -- of your husband's payroll check?

16   A.    -- present with this -- you have to subpoena bank and

17   present from the bank, not what he on paper wrote down.  How do

18   you know what he change?

19          MR. SPRINGER:  That's all I have.  Thank you.

20          THE COURT:  All right.  You can have a seat,

21   Ms. Berman.

22          Okay, ladies and gentlemen.  I know you just sat

23   down, but I'm going to ask you to stand back up.  We just have

24   a few matters to take up outside your presence.  If you can be

25   back in, let's say, 15 minutes, so let's say ten till 2:00 on

1    that clock.

2          COURT SECURITY OFFICER:  All rise for the jury.

3       (Jury out at 1:37 p.m.)

4          COURT SECURITY OFFICER:  Please be seated.

5          THE COURT:  All right.  So all the evidence now in

6    the case is in.

7          Are there any motions from the defendant?

8          MR. SPRINGER:  Yes, Your Honor.  The defense -- we

9    renew our Rule 50 motions based upon the defenses of

10   substantial truth, mixed opinion, qualified privilege, as well

11   as the absolute litigation privilege based upon the evidence

12   that additionally has been placed into evidence since the

13   resting of the plaintiff's case.

14         THE COURT:  I'm going to deny these motions at this

15   time, let these issues go to the jury.

16         MR. SPRINGER:  The last one I'd like to renew is the

17   Rule 50 motion on actual damages.  We don't feel there's any

18   evidence of actual damages, business, any kind of monetary

19   damages, even to her reputation.  It's all speculation.

20         There's no evidence anybody else heard these

21   statements outside persons from the agency.  So with that said,

22   we'd suggest that she only be allowed -- the jury only be

23   allowed to deliberate as to nominal damages.

24         THE COURT:  I will deny that as well.  I think there

25   was --

1          MS. BERMAN:  There was --

2          THE COURT:  I'm ruling in your favor again.

3          MS. BERMAN:  Thank you, Judge.

4          THE COURT:  Okay.  I think there's been testimony

5    about -- at least about mental anguish, so I'm going to deny

6    that.

7          MS. BERMAN:  Thank you.

8          THE COURT:  Did you have any motions, Ms. Berman?

9          MS. BERMAN:  Not at this time.

10         THE COURT:  Okay.  All right.  So on the closings, we

11   still need -- I'm not going to give you the revised jury

12   instruction and verdict form just yet because I haven't had a

13   chance to look at the revisions, so I'll do that when we take a

14   break right now.

15         On the closings, I'm just going to say to the jury

16   that these will be -- the parties now are going to present

17   their final arguments.  These final arguments are not to be

18   considered by you as evidence or as the instructions on the

19   law.  Nevertheless, these arguments are intended to help you to

20   understand the contentions of each side and you should give

21   them your close attention.

22         Is that sufficient?

23         MR. JONES:  That's fine, Your Honor.

24         Will we get a copy of the jury instruction and

25   verdict form before closings?

1        THE COURT:  Well, we're about to do closings.  I

2  think we should be able to, so I'll try to do that.

3        MR. JONES:  All right.

4        THE COURT:  But you still can't show them to them or

5  anything.

6        MR. JONES:  Can I show them the verdict form?

7        THE COURT:  Yes.

8        MR. JONES:  Okay.

9        THE COURT:  Yes.  You can go through the verdict form

10  with them.

11        MS. BERMAN:  Can I make an oral motion?

12        THE COURT:  Yes.

13        MS. BERMAN:  I would like to motion the Court to

14  exclude those from SunTrust because they weren't authenticated.

15  He can put --

16        THE COURT:  No.  That will be denied.  The evidence

17  is in, Ms. Berman.  The evidence -- whatever's in evidence is

18  in evidence.

19        All right.  So in terms of the closing argument

20  instruction, no objection was noted on that.

21        And then if there's nothing further, we'll go ahead

22  and work on the revisions to the verdict form and the jury

23  instructions, and then I'll come back out, all right?

24        Court will be in recess.

25        COURT SECURITY OFFICER:  All rise.

1      (Recess from 1:40 p.m. until 2:01 p.m.; all parties

2    present.)

3        (Outside the presence of the jury:)

4            COURT SECURITY OFFICER:  All rise.  This Honorable

5    Court is now in session.

6            Please be seated.

7            THE COURT:  All right.  So I've given the parties the

8    revised verdict form and jury instructions based on our

9    conference earlier, and I understand there's no issue with

10   them.

11           Is that correct, Mr. Jones?

12           MR. JONES:  Yes, Your Honor.

13           THE COURT:  And Ms. Berman?

14           MS. BERMAN:  Yes.

15           THE COURT:  All right.  Let me revise something I

16   said, Mr. Jones.  I think you're correct that you can show the

17   instructions to the jury if you like.

18           MR. JONES:  Okay.  Thank you.

19           THE COURT:  So both parties can do that.  They can

20   show the jury instructions and the verdict forms to the

21   parties.  I'm -- to the jury while they're doing their closing

22   arguments, all right?

23           So if you can bring the jury in.

24           MR. SPRINGER:  Your Honor, real quickly.

25           THE COURT:  Hold on.  Hold on a sec.

1          MR. SPRINGER:  I know that we're going to have --

2    Mr. Berman's in the courtroom.  I don't know if this is going

3    to happen, but I'd ask the Court to instruct him not to make

4    any noises or anything while the closing arguments are going

5    on.

6          THE COURT:  All right.

7          COURT SECURITY OFFICER:  I think he stepped out.

8          THE COURT:  Yeah, I see.

9      (Mr. Berman entered the courtroom.)

10          THE COURT:  Mr. Berman, we've allowed you to be in

11    the courtroom for closing.  A request has been made that you be

12    certain not to make any noises or show any emotion or anything

13    demonstrative during the closing arguments or at any other time

14    while you're in the courtroom.

15          Do you understand that?

16          MR. BERMAN:  Yes.

17          THE COURT:  And will you abide by that?

18          MR. BERMAN:  Yes.

19          THE COURT:  All right.  Okay.

20          COURT SECURITY OFFICER:  All rise for the jury.

21      (Jury in at 2:03 p.m.)

22          COURT SECURITY OFFICER:  Please be seated.

23          THE COURT:  Okay.  Ladies and gentlemen of the jury,

24    we've now reached the time in the trial for the final

25    arguments.

1          Let me tell you that these final arguments are not to

2    be considered by you as evidence or as the instructions on the

3    law.  Nevertheless, these arguments are intended to help you to

4    understand the contentions of each side, and you should give

5    them your close attention, okay?

6          Ms. Berman, you may give your closing argument.

7          MS. BERMAN:  Good afternoon, ladies and gentlemen.

8          I'm stand in front of you because I believe what is

9    truth.  I am represented myself, and if I did something wrong

10   and I knew that I did something wrong, I will never be in this

11   court against two qualified attorneys.

12         You hear -- you saw all the evidence, and it's

13   difficult for me.  I would like to explain you clearly, but

14   it's not my language, and sometimes I'm forgetting words when

15   I'm nervous.

16         Defendant's side want to show you that looks like the

17   defense, it's all about my husband, but this case not about my

18   husband.  It about me.  Unemployment appeal was between my

19   husband and defendant.  I have nothing to do with that.

20         Unemployment appeal show that my husband receive full

21   benefits, and he didn't embezzle anything, and they give him --

22   Department of Economic Opportunity will not award benefits if

23   he did something wrong.

24         MR. JONES:  Objection, Your Honor.  That's not the

25   evidence.

1          THE COURT:  I'll allow it.  It's argument.

2          MS. BERMAN:  You saw that he claim two checks.  You

3     saw I presented my payment stubs, and I change my name.  He

4     never met me, he admit.  He didn't know me.  But he decided to

5     put dirt on my name and saying in his libel statement that, "We

6     proved that Chris Berman and his wife embezzle money," as a

7     fact.

8          Can somebody will be proved in this country when the

9     person doesn't know that he being accused?  The person has

10    rights.  If you want to prove something, you have to contact

11    that person and ask, "Listen, I wanted to prove.  You can

12    rebuttal."  He was proving behind my back.  I wasn't aware

13    about any proof, and he put this as a fact that he already

14    prove.

15         If he really prove and he has two attorneys and I am

16    plaintiff here, he would have -- if he had proof, he would

17    countersue me.  He didn't.

18         MR. JONES:  Objection, Your Honor.  That's improper

19    argument based on --

20         THE COURT:  That is improper argument.

21         The jury will disregard that.

22         MS. BERMAN:  It's so difficult if you know that you

23    didn't do anything wrong and they still saying that you did

24    something wrong.  The check -- the unemployment appeal was

25    between Maitland Furniture and defendant.  He presented all of

1    this check for Trifecta Gaming.

2          When you saw this evidence, all that he present for

3    unemployment appeal is package A, if you recall, where 2005 my

4    husband never was employee, and package D, where it says that

5    he actually made mistake and put more money in account than

6    need.  But you didn't see anything where he present evidence

7    where actually my name there.  You didn't.

8          He present those checks and trying to convince you

9    that somehow I change -- he admit evidence which is what he

10   show you from -- for unemployment appeal -- not for

11   unemployment, like employee that it's my signature and somebody

12   else.  I didn't write this.  I didn't have anything in writing.

13   He's saying that it was in 2007, but that check wasn't verified

14   with SunTrust.

15         You can create on computer whatever you want.  It's

16   supposed to be -- that not admissible.  It supposed to be with

17   stamp, what he present.  And now he -- he still continue to

18   saying -- when I read you deposition I said, "How you prove?

19         "I assume when I see your signature that you are

20   married to Chris Berman.  I assume, as the president of

21   Maitland Furniture, that you embezzle money."

22         When you heard about what the transcript for

23   unemployment did, it -- now, my name, he never said anything

24   about that I embezzle.  He just said Chris Berman turn over to

25   Lareesa Berman.  Is it proof if it's Chris Berman turn over or

1   not?

2          Then he's saying in his testimony, sworn testimony,

3   in deposition that "I don't care whose signature is it.  I

4   don't care."

5          MR. JONES:  Your Honor, that wasn't the testimony.

6          MS. BERMAN:  Yes, it was --

7          THE COURT:  I'll allow it as argument.

8          MS. BERMAN:  It was.  I can find it and read it.  It

9   was.  It's malice.  It's in bad faith.  He knew I didn't do

10  anything.  He knew it.  Excuse me.

11         But he specifically forge check.  Is it a good faith?

12  He forge my signature and telling that behind my back, because

13  if he contacted me, I will -- I don't -- he didn't want to

14  contact me and prove without me that I embezzle money.  Then he

15  put other people, publisher and claiming that I am -- I'm

16  sorry.

17         Somehow he wants to convince you, and maybe it

18  doesn't come up very well for me.  They are trained very well,

19  and I'm not very -- I'm not public speaker.

20         MR. JONES:  Your Honor, this is improper comment when

21  she's speaking about her being pro se versus attorneys.

22         MS. BERMAN:  I didn't even write my --

23         THE COURT:  Ms. Berman, I've already told the jury

24  they're not to consider either an advantage or disadvantage for

25  you or not, or the other side, whether they have attorneys or

1    not, so --

2              MS. BERMAN:  Okay.

3              THE COURT:  -- proceed.

4              MS. BERMAN:  If he prove, he doesn't need to show you

5    and ask you to prove that that was my signature, if he had

6    proof.  All that he need to show, just proof, not asking you to

7    compare a signature.

8              They argue that somehow, because he found out that I

9    change spelling in 2007, that's why he did.  It's malice

10   when -- when you know that it's not true and you forge this

11   document and telling that somebody embezzle and then you

12   telling that you prove and this person has no idea that this

13   proof is what's being made.

14             THE COURT:  Hold on a second, Ms. Berman.

15             MR. JONES:  Objection, Your Honor.  None of this is

16   in evidence.  None of this has been proven, Your Honor.

17   There's not even a shred of evidence related --

18             THE COURT:  All right.  I'm going to allow it.  I'm

19   giving both sides a lot of leeway to argue based on what they

20   think the evidence is.

21             MS. BERMAN:  If I did something wrong, I wouldn't

22   stand here and convincing you.  No.  No.  I never.

23             The law in Florida very strict on libel per se, and

24   they say it's not when it's accused.  Not on the time when it's

25   accused if it's your signature.  No.  No.  It's what happen

1  after.  He doesn't know what happen after.  Not when the

2  signature there, the law said what happened after.

3       He doesn't know was it cash?  Was it this?  He has --

4  he produce and claiming that Exhibit, if you remember, 85A and

5  85, that it came from bank with the check which doesn't have

6  any signature and tab, like I don't know how is this.  How the

7  bank can have this without signature and some copy and -- from

8  that bank he said some kind of investigation.

9       You heard the testimony of Sheri Cobb from his bank

10  account, business bank account, and she said she never heard

11  about that he went to the bank and investigate.

12       If he really thought that was embezzling, she will

13  know because he know her, and she will check all amount of this

14  check and really investigate it.  And I will not be staying

15  here.  If it was proved, I would be already in prison when it

16  was proved.

17       I'm just -- I really want you -- privilege, no

18  privilege because case was closed on September 9, 2010, and he

19  knew that my husband receive benefits.  They didn't find any

20  fraud.  They didn't find any embezzlement, and they didn't find

21  he was working.

22       MR. JONES:  Objection.  There wasn't a second

23  hearing.  There was no finding on it.

24       THE COURT:  Objection's overruled.

25       MS. BERMAN:  The final order allowed still him to --

1  if he wants to appeal on September 16th, 2011, in district

2  court.  They specifically said 30 days, "30 days you have.

3  After this you cannot."  And appeal not supposed to be

4  considered by e-mail.  He send e-mail.  It's in this e-mail

5  which Mr. Bellflower was testifying that it's public record.

6  Anybody can -- can see it.

7          And in his testimony, he said he copied and pasted

8  this.  How would I know what -- even after this that he still

9  will be sending to people that I still embezzle money?  He

10 still continue even unemployment appeal -- I'm sorry.  Excuse

11 me.

12         Unemployment appeal found in favor of my husband.  He

13 still continue that he embezzle money and still doesn't want to

14 admit that it's not true.

15         Check was forged.  No -- no privilege.  It wasn't

16 opinion.  It was not true.  It's not opinion.  He said we

17 prove, proved, past tense, in -- as a fact.

18         They have tried to convince you that I didn't suffer

19 any damage.  When you said that somebody commit a crime, you

20 don't need to prove any damage.  That's what the law said.

21         I'm asking for punitive damages, and I'm asking for

22 four-and-a-half million.  And punitive damages, it's when he

23 did wrong.  He knew that I didn't do anything.  He forged the

24 document and telling that that's what I did.  That's not good

25 motive.  What kind of good motive -- his motive was to harm me,

 1   really harm me.

 2          It's stressful.  When I read -- when I saw this and

 3   read, I couldn't believe.  I couldn't believe.  Specifically

 4   when it said it's proved.  If something in writing said proved,

 5   how I even here stand and show my evidence, and it's hard to

 6   say that you didn't do anything.

 7          When I show that I changed my bank account before

 8   those alleged checks appears, he still continued to -- he show

 9   some kind of check which wasn't even stamped from this.

10   Defendant had -- defendant have -- during the discovery, he put

11   a higher and ask -- a witness ask.  He didn't, because it won't

12   be proved.

13          It's -- it's very hard to speak with me.  Sometimes I

14   am blanking myself with even person walking or speaking to me,

15   and I cannot hear.  Or even I look to you, I don't see you.

16   I -- when I walk, I sometimes know somebody.  I came through

17   and didn't see.  It looks like rude, but it's not.  It's

18   like -- it's very hard.

19          There is no evidence that he prove anything.  He put

20   in these two libel statement and trying to convince you that it

21   didn't harm me and trying to convince that -- he doesn't want

22   to -- his employee, former employee, Lora Katsavrias, which was

23   his business and she did not come.  She testify in deposition

24   that she stopped working 2006, and he found --

25          MR. JONES:  Objection.

```
 1          THE COURT:  Objection sustained.  This is not in
 2   evidence.
 3          MS. BERMAN:  But she already was --
 4          THE COURT:  This is -- this deposition was not put
 5   into evidence, so you have to stick with what the evidence is
 6   here.
 7          MS. BERMAN:  He still doesn't want to admit that he
 8   did wrong, doesn't, because he know that I cannot prepare
 9   proper speech or correctly said that I will -- that you will
10   understand.  He knows that attorney can do this, but I can't
11   correctly say.
12          If you look at these checks, it's -- you don't
13   compare when I -- my house change name.  You supposed to change
14   your bank account, not right away your house.  At that time I
15   have a small child, and I change my -- my bank account, and
16   little later I change my house.
17          Defendant didn't know that.  That's why those checks
18   were in -- after I change my -- I don't have any connection in
19   my bank -- in my bank that they can actually put something
20   which it's not in my name.
21          The writing wasn't mine.  The bank -- they want to
22   convince you somehow it's my bank account.  If it was
23   written -- my numbers was written, I would say, "Oh, yeah, it's
24   my bank account because I wrote it."  No.  I don't know who
25   wrote those numbers.  I don't know.
```

1        Some kind of check they present which is in evidence

2   after this which I didn't see it, and it was so many written.

3   It's not my writing either.  I don't know who.  I usually put a

4   check and my signature, not writing anything on the check.

5        I'm standing here and asking you look at the evidence

6   and you will see that when I change my -- I could not after

7   that to put -- he saying that some kind of bank sent to him,

8   but bank from which he receive the 2006 check says they don't

9   have any -- any evidence of this because they didn't have

10  recordkeeping.  And -- but he produce and it says Hudson Valley

11  Bank, and Hudson Valley Bank is not my bank, and I don't know

12  whose bank is that.

13       And he claimed -- when I ask him that, "How did you

14  find out?" he said in 2009 he look.  Something invoices does

15  not work correctly or improperly in 2009 for check 2006 and

16  2007.  I think if you checking your invoices, you checking in

17  this year, not three years later.

18       They trying to convince you that my husband somehow

19  give away ownership.  He didn't.  You see the two -- the check

20  where he said first time you saw the check on January 9th,

21  2009, but then you saw that when he terminated letter, it was

22  January 8th, 2009.  And there was two terminate letter, from

23  Maitland Furniture as employee and from Trifecta Gaming as

24  employee.

25       What his testimony saying, that, "Your husband give

1    away rights for Trifecta Gaming to Maitland Furniture in 2005."

2          "Then why you terminate him in 2008 and tell him

3    employee?  Trifecta Gaming did not have any employees."

4          I am grateful that you came here and so hard for you

5    to sit here and so confusing, I understand, so many evidence

6    because they put on me so many evidence, and I try to explain

7    each of them.

8          And they want to convince you, like, somehow that

9    this case about my husband, but as a pro se, I cannot be an

10   attorney for my husband and saying it's in his defense.  I

11   am -- I'm bringing this lawsuit as a -- on myself, and I can

12   speak just for myself.

13         That was -- statement was libels with malice, no

14   truth to it, no opinion, no any privilege, no any privilege

15   because it's close in September 9, 2010, and he wrote a letter.

16   And notice of the order said they don't have jurisdiction.  It

17   means they cannot hear you.  If you want, you go to appeals

18   court in 30 days.

19         He's trying to confuse you, said it's supposed to be

20   second hearing, but you saw e-mail from him that he was very

21   busy for -- to appear for second hearing.

22         He's trying to show evidence that -- somehow he's

23   still trying to show that vacated -- vacated order which said

24   that my husband embezzle money, and he still ignore that there

25   is another order where it's vacated.  And if you want to hear

1   again, you have to apply by the law and write in writing to

2   hear this.

3           No.  He trying to convince that that order is

4   correct.  Law said when this is vacated, it's never happen.

5   It's like never happen when it is vacated.

6           I'm stand here, and you see what I am.  I'm just very

7   grateful that you're here, really grateful.  And I hope I

8   didn't confuse you.

9           I'm asking also not just for the damages but for the

10  punitive damages.  When defendant make a statement with malice,

11  that's a punishment.  Punitive damage is punishment.  He knew

12  that I didn't -- I didn't cash or whatever this check.  He knew

13  this.  He created it, and behind my back was saying.

14          If I ask, "Did you contact me?"

15          "No."

16          If you actually think, really think, that my husband

17  embezzling money, which he said in 2006 or '7 his company had a

18  problem, so he saw that my husband have a good company which he

19  can make money and telling you that somehow he has 76,000.

20  That's not true.

21          The proof that -- my husband wasn't aware that it was

22  transfer a quarter million from Trifecta Gaming to Maitland

23  Furniture.  And sometimes I'm saying -- it looks like you

24  working for casino or horse track and people say, "Oh, you

25  making the big money."  No.  I said, "At least don't tell

1    people," because every project he made was huge numbers.

2    Defendant claiming that something wrong, something override,

3    something this, and he never receive those.

4            Why he decided to make him employee?  Because my

5    husband didn't like how it's handled.  He was looking for

6    somebody else.  He found out about this and say, "Listen, you

7    will be -- because you were working on this, I will be repaying

8    you, but it's still your company, and I -- and you will be --

9    for that you working the product, I will pay, and still the

10   company, I will little later give you this money."

11           He knew that article incorporation he did

12   fraudulently.  He knew the law.  The law said four years.  If

13   four years pass, it's statute of limitation.  You cannot sue

14   him that it's improperly made.  You cannot.  My husband found

15   out about that it was fraud after four years and you cannot --

16           MR. JONES:  Objection, Your Honor.

17           THE COURT:  I'll sustain that objection.

18           MS. BERMAN:  I don't have anything to do with

19   defendant.  At least you should give me -- as a person, if you

20   think really, call me.  Call me and -- say, "Is it your

21   signature?  Did you sign that?"

22           That way I will look at this, and we will go to bank

23   and we'll see this.  Not after how long, seven years or eight

24   years you coming and say, "I prove already," and I never heard

25   any proof.

1          Defense doesn't have any truth, no opinion, no

2     privilege, no good motive.  His motive was just to harm me.  He

3     was acting in bad faith.  No litigation privilege.  No

4     statutory privilege.

5          Statutory privilege is when -- is between employee

6     and employer when I'm not employee.  There's no statutory.

7     That's between my husband and him.  That's statutory privilege.

8     As I am not employee, it does not apply to me, statutory

9     privilege.

10          I'm sorry.

11          I'm stand here because I know I didn't do anything

12     wrong.  I didn't sign.  That's what I want to say.

13          I'm sorry if I am just stop like this sometimes.

14     I . . .

15          I ask him before I file this lawsuit, just all that I

16     want --

17          MR. JONES:  Objection.

18          THE COURT:  Objection will be sustained.

19          Ms. Berman, you've got about four minutes left, and

20     then you're going to have your rebuttal for 15 minutes as well.

21          MS. BERMAN:  When you see when he present some kind

22     of Trifecta Gaming annual report for 2006 and you see three

23     names and it's my husband name and it's X, when you file on

24     annual report, it's improper.  You cannot put an X.  The owner

25     of the company has to file paperwork and sign -- he didn't sign

1   this -- to properly remove, not an X.

2          And he said he give away his rights on December 25 --

3   26, 2009, but if you see annual report, it was, I think, April

4   of 2006, and he still was there.  He file report on April of

5   2006.  If he give away rights, he won't be already -- my

6   husband will not be on that annual report.

7          But I want you to consider it's about me, nothing

8   about my husband.  I have nothing to do with this.  It just

9   happens that I'm his wife.

10         I didn't do anything with his companies, any of his

11  companies.  I just -- I didn't involve what they did, what

12  they -- I never was any -- and embezzlement was said.  It's

13  supposed to be -- you have to be employee or fiduciary is held.

14  And I'm neither employee nor any fiduciary I held, and not when

15  it occurs, he's asking you to prove.  After.  He has to prove

16  what happens with money after.  He doesn't say anything what

17  happens.

18         It's so hard when you living by truth, by truthfully

19  honest person, and you think that you don't do anything wrong.

20  And then by accident you see on this that it says, "We proved."

21  When I saw this, I almost receive heart attack.  It's not just,

22  "I think she embezzle," or what -- whatever.  It's, "No.  We

23  proved."

24         And in that unemployment hearing, he never mention

25  that Lareesa Berman embezzle money.  No.  He said Chris Berman

1   turned over to Lareesa Berman.  Is it turn over check to

2   Lareesa Berman proof?

3           THE COURT:  Hold on.

4           MR. JONES:  That's an inaccurate statement of the

5   testimony.

6           THE COURT:  All right.  Your time's up, Ms. Berman.

7           MS. BERMAN:  Thank you so much --

8           THE COURT:  You'll still have 15 minutes left.

9           MS. BERMAN:  -- for letting me . . .

10          THE COURT:  Okay.  Mr. Jones?

11          MR. JONES:  Can I get a five-minute warning?

12          THE COURT:  What's that?

13          MR. JONES:  Can I get a five-minute warning?

14          THE COURT:  Sure.

15          MR. JONES:  Exhibit 18, please.  I think it's A

16  through F.

17          Good afternoon.  I'd like to start off by thanking

18  all of you on behalf of myself and Ms. Berman.  Thank you.  You

19  took your valuable time away from your jobs and your family to

20  come perform your duty, civic duty, and we appreciate that.

21  You guys were very attentive.  You listened, and, again, thank

22  you.

23          You will be instructed on the law here by the judge

24  in a moment.  One of the instructions that you will be given

25  is -- we call it just a sympathy or prejudice instruction.  It

1   says that you're not to -- your decision must be based only on

2   the evidence presented here.  You must not be influenced in any

3   way by either sympathy for or prejudice against anyone.

4          Sometimes that's a tough job; sometimes it's not.

5   You know, I don't know what's going on in your heads, but I

6   bring this up only to say this.

7          You know, Ms. Berman stood up here and told you that

8   she was representing herself, that she didn't have a lawyer,

9   and then she pointed over here and said that Mr. Kafka's got

10  two lawyers.  That's sympathy and prejudice.

11         Mr. Kafka's entitled to have a lawyer here.  He's

12  being sued.  I think any reasonable person would want a lawyer

13  if they're being sued in federal court.

14         On the other hand, Ms. Berman, she could have a

15  lawyer.  Throw a dart at a phone book.  She chose to come in

16  here and represent herself.  But none of that is to be taken by

17  either side by you guys when you're looking.  It's just -- your

18  duty is to just look at the evidence and decide this case

19  simply based on that.

20         And having said that, when I look back -- I'm looking

21  through this -- at the evidence and listening to the testimony,

22  you know what this case is about?  I'll tell you, one word.

23  It's revenge.  It's revenge.

24         Ms. Berman is mad that her husband was fired.  That's

25  what this case is about.  Why else are we listening to Trifecta

1   Gaming, Inc., Trifecta this, who owned this, who owned that?

2   "He's an owner."

3          "No."

4          "You took him off the books fraudulent."

5          All this.  Why are we listening to that?  She's mad.

6   She even said it.

7          She said, "When he was fired, it was hard on us."

8          Ah.  Wait a minute.  What?  That's what this -- now

9   you -- that's the button right there.  That's what we're here

10  for.  Her husband was caught embezzling money, and he was

11  fired, and now she's seeking revenge.

12         This case is very simple.  I can show it to you in

13  three documents, three.  You have -- well, three-and-a-half.

14  You have this statement here.  This is the document you guys

15  have seen.  You guys have seen all this stuff plenty of times,

16  okay?  But here's -- here's the document, one of the documents.

17  The other documents say -- it's pretty much the same thing.

18         So this is Mr. Kafka telling the agency, "not to lose

19  sight of the fact that you initially ruled in our favor."

20  Anything untruthful about that?  ". . . and that we proved that

21  Chris Berman and his wife embezzled money from our company."

22         Well, let's see what -- what the initial decision

23  was.  Here's document No. 2.  Right there.  Okay.  Here's the

24  findings of fact, truthful fact.  This isn't what Mr. Kafka is

25  here telling you.  This is what the State of Florida referee

1    found:

2          "The employer employed Chris Berman" -- he's the

3    claimant -- "as a sales representative from '06 to '09.

4    Towards the end of the claimant's employment, the employer

5    became aware that the claimant had been having customers write

6    checks for purchase directly to Chris Berman rather than the

7    business."

8          Tom Kafka produced documents to that effect.

9          "The employer conducted an investigation" -- you

10   heard about the investigation.  He compiled the checks, the

11   invoices, checked his books -- "and discovered that the

12   claimant had also sold product to customers at a higher rate

13   than he had instructed the claimant to charge and paid the

14   difference to himself, giving the employer one copy and the

15   customer another."

16         I'm sure we've heard that before.

17         Then the employer discharged Chris Berman for what?

18   Falsifying records and misappropriation of funds.  By

19   definition, that is embezzlement, misappropriation of funds,

20   embezzlement.

21         Now, Mr. Kafka turned over a packet.  That's document

22   two.  Here comes the third one, three-and-a-half.  Mr. Kafka

23   turned over a packet of documents to the State.  That's how

24   they made their decision.  Included in them were these two

25   checks.  And he discussed these checks with -- and I read you

1    on the stand -- from the stand -- when Chris Berman was on the

2    stand, he tried to tell you, "Oh, my wife's name never came

3    up."  Remember that?

4           And then I had to read from the transcript where

5    Mr. Kafka said, talking about these checks, and he explained to

6    the State, "Lareesa Berman is on there."

7           They asked him, "Lareesa Berman?"

8           He says, "Yes, his wife," okay?

9           And here's the other one.

10          That's what this case is about, these three

11   documents.  We don't need to get into articles of

12   incorporation.  We don't need to get into where Kafka's address

13   was.  It's these three documents, very simple.

14          Now -- so when Mr. Kafka said, "Don't lose sight of

15   that" -- remember, this was this appeals process.  And I'm not

16   going to go over it because you just heard from Mr. Kafka, and

17   you saw some records where this hearing was ultimately vacated

18   because Chris Berman claimed that his phone cut out.  It cut

19   out toward the end of the hearing.  You were read the rest of

20   the transcript.  It was just a closing statement.  All the

21   evidence had been entered.

22          Now -- so they said, "Okay, well, we'll have to do it

23   again."  Does that suddenly make this magically disappear?  Or

24   did, in fact, they initially rule in the employer's favor?

25   Yes.  The findings of fact are the findings of fact.  They

1   didn't change.

2          You know, there's a -- there's a theory,

3   problem-solving theory, and it's called Ockham's razor.  You've

4   all heard of it, maybe not by that name.  But if you have

5   something and there's competing explanations for it, more than

6   one explanation for it, it's usually the easiest explanation

7   that's the truth.  That's the theory.

8          It's like Elvis Presley.  You know, people say, "Oh,

9   well, I think he faked his death and, you know, he's -- and the

10  whole funeral was a fake, and there was a fake body and he's

11  somewhere up . . ."

12         Or maybe Mr. Presley's resting peacefully in

13  Graceland, Tennessee, since 1977.  That's the easy answer,

14  probably the truthful one.

15         And here Ms. Berman is coming in here and she is

16  trying to tell you that in 2006, when this check was written,

17  2006, and signed -- it's not coming into focus here.  Okay.

18  That that was forged.

19         Follow me on this.  She's claiming that that was

20  forged somehow by Mr. Kafka back in 2006, okay, despite the

21  fact that it has all these stamps -- this is an actual check.

22  It's got all these stamps from the banks from that same time.

23         So this had to have happened in 2006.  Mr. Kafka

24  said, "Aha, I'm going to forge this check, even though Chris --

25  it was made out to Chris Berman and it has his signature on

1    it."  Somehow he got it from Chris Berman and Mr. Kafka said,

2    "Hang on a minute here, Chris.  I've got to forge your wife's

3    signature here.  Okay.  Go ahead."

4         Did the same thing in 2007, same thing, even though

5    they're still doing business together.  Then -- where's 18? --

6    he did the same thing on these payroll checks that she claims

7    that she didn't sign either.

8         There it is.  There's a payroll check for Maitland

9    Furniture, '06.  He forged that one too back in '06 after he

10   paid her -- paid Chris Berman.  He forged that one too.

11        And then in May of 2007 he pays Chris Berman again,

12   Tom Kafka does.  Chris Berman gets the check, signs it.

13   There's the signature.  He takes the check from Chris Berman

14   and endorses it -- I mean, forges his wife's -- Ms. Berman's

15   signature.

16        Does it again right there.  This is a check from

17   August of 2006.  This is the third one you've seen.

18        Here's a fourth one that he did again, a payroll

19   check.

20        Here's a fifth one he did again.  Forgery.

21        Here's a sixth one he did.  Forgery.

22        He did all of this in 2006 and 2007, okay, all so

23   that in -- sometime in 2009 when he decides to fire him that he

24   won't have to pay unemployment benefits to Chris Berman.

25   That's the theory.

1          Or she signed them.  Or she signed them.  What's the

2    easier explanation?  What's the most likely explanation?  She

3    signed them.

4          Think about this.  When these checks are being signed

5    over -- let's use this one here.

6          Now, Chris Berman doesn't deny that this check is

7    made out to him, okay?  He's very proud of the fact that he

8    would get checks from these other companies, because of course

9    he was trying to tell you it was his company.  We'll talk about

10   that in a second briefly.  Very proud of that fact.  "Oh, I got

11   this check.  Yeah, I got it.  Yeah."

12         And didn't deny that was his signature at the top,

13   right?  So, now, if he's handing this over to his wife, Lareesa

14   Berman, and she's signing it, it's the most plausible

15   explanation.  And when you compare all the signatures -- feel

16   free to compare them.  It's her signature, a fairly unique

17   signature.

18         Is she trying to say that, "Well, I didn't know," or,

19   "I didn't" -- "I would never deposit it"?  Well, she didn't

20   deposit it.  It says cash.

21         Let's think about this for just a second.  It's

22   stamped on there "cash" right there.  So don't be misled by,

23   "Oh, I never deposited this in my banking account.  My banking

24   account -- they should have pulled banking account numbers."

25         No.  Her banking account wouldn't have shown

1  anything.  She didn't deposit them.  She cashed them, every

2  single one of them.

3        Now, if someone is endorsing a check, they get a

4  check signed over to them, don't you think that they would

5  figure out -- since they're going to cash it, they've got to

6  know how much it's going to be, right?

7        I'm going to give it to the bank teller.  They're

8  going to flip it over, right?  And that person's going to see,

9  "Okay, well, it's over a thousand dollars.  Oh, and it's from

10  Yonkers Racing Corp.  Oh, and it's to care of Trifecta Gaming,

11  Inc."  It was a business check.

12        She knew that it was a business check.  She knew her

13  husband gave it to her to cash.  She knew it was a business

14  check.  She signed it, she cashed it, and the money never got

15  its way to where it was supposed to go.  Now, what do you call

16  that?

17        Now, if I thought for a moment that all this evidence

18  about Chris Berman owning Trifecta Gaming, that they were going

19  to come in here and say, "Yeah, that was my company, and yes, I

20  cashed that, and yes, she signed it, and yes, that's my money.

21  So what?  So what?"  Did they tell you that?  No.  They denied

22  it.

23        "Well -- well, that's not my signature," and, "No, I

24  don't remember cashing that," and the wife said the same thing.

25  Well, why?  If he thinks he owns this company and it's his

1  company and that's his money, why didn't he just come out and

2  say it?  "Yeah, I cashed it.  It was my money."  He knows and

3  she knows that it wasn't their money.

4      That money, like Chris Berman testified to -- of

5  course, he had to be impeached.  I had to read his testimony.

6  That money was sent to Maitland Furniture, who paid Chris

7  Berman a salary.  It would also pay bonuses.  But that was Tom

8  Kafka's decision.  He knew it.  So did she.

9      If you think for a moment that Lareesa Berman is one

10  of these housewives that just is in the dark, no.  She knows

11  every detail.

12      The investigation that was done, did Mr. Kafka just

13  willy-nilly say, "You know what?  Yeah, I'm going to just --

14  I'm just going to assume this is his wife's signature.  We'll

15  just go with that.  Yeah, all I need is these checks.  I'm good

16  with that"?  No.

17      He went the extra step of researching how she spells

18  her name.  He pulls up this warranty deed.  There is her name

19  and her signature spelled with a Y just like on the check.

20  There's the signature just like on these checks.  He did his

21  research.

22      And this is -- this is August of 2007.  Of course,

23  this is supposed to be long after she said she changed her name

24  and never went by Larysa with a Y.  Well, that's for you to be

25  the judge of.

1      But he didn't stop there.  You can pull these up

2  online and he did.  There it is again, Larysa with a Y.  Sure

3  enough, married to Chris Berman, so we're talking about the

4  right Larysa.  Signature of the bride, there it is.  Move it

5  over here.  Take a look at how it compares there.  Same

6  signature.  He did his homework.

7      Amazingly, amazingly, Mr. Berman did the same thing.

8  He got up there and he told you, "I have no idea what account

9  number that is on there ending 61638.  No idea."  Well, it

10  happens to be -- there it is.  It happens to be the same number

11  that's written on one of the checks.

12      Now, we've got more than just a name that

13  corroborates with what's in the public records.  We've got more

14  than just a signature that looks identical.  Now we've got an

15  account number that is matching up.

16      And where do these account numbers match up?  Where?

17  That's the subject check that was supposed to be given to

18  Mr. Kafka, the one on the left.  The one on the right, guess

19  what?  That's a payroll check to Chris Berman.  That's a

20  payroll check to Chris Berman.

21      And it shows up there, and it shows up there, and all

22  these payroll checks -- I'll spare you.  All these payroll

23  checks, it's the same account number.  I mean, really.

24      Mr. Kafka did his research.  He submitted the

25  evidence to the unemployment agency, State of Florida, and they

1    made a finding of fact.

2              Let me get moving on.  I want to discuss very briefly

3    with you plaintiff's star witness, Chris Berman.  You'll see

4    another jury instruction that talks about believability of

5    witnesses.

6              Did the witness -- these are questions, rhetorically

7    for now, that you can ask yourself:  Did the witness impress

8    you as one who was telling the truth?

9              Did the witness have a particular reason not to tell

10   the truth?  Like being married to the plaintiff.

11             Did the witness have a personal interest in the

12   outcome of the case?  Like hoping you would give his wife

13   money.

14             And did the witness seem to have a good memory?  And

15   there's others.

16             They put Mr. Berman on the stand, and he sat in that

17   chair right there, and he told you that at no time did Tom

18   Kafka mention or bring up those two checks to the State of

19   Florida.  That's what he did.  He said that.

20             I had to get the transcript and read it to him.  He

21   said, "Oh, well, my phone was cutting in and out."  I thought

22   it dropped at the end, but now it's cutting in and out.

23             He told you he did not work in 2009.  Remember that?

24   "I didn't work at all in 2009."  I had to show him the

25   transcript where he tells the referee he started work in

1  February 23 of 2009.

2          I confronted him with that.  You know what he said?

3  "Oh, well, you know, kind of a crazy thing.  I didn't get the

4  job."

5          "Well, wait a minute.  This was May.  You're telling

6  the referee in May that you've got a job and you started on the

7  23rd.  That's three months."  That's -- no.  I don't know what

8  that explanation was, but . . .

9          He tells you he was fired because he was writing a

10 book.  Remember that?  "I was writing a book.  I'm a novelist.

11 I'm writing a book."  Well, did you see anything in there in

12 the findings of fact he was -- about writing a book?  He was

13 fired for cooking the books but not writing the books.

14         Then we had this whole discussion about ownership.

15 Again, I don't know where they're going with that because they

16 never came out and said, "Yeah, I cashed that check because I

17 owned the company."  So I don't know why they were going there.

18         We had this whole discussion about how this was his

19 company, and it was fraud.  And so I had to read his own

20 testimony from a deposition he gave in 2009.

21         Who was the owners of the company?  Who were the

22 shareholders?  What did he say?  Tom Kafka, Julie Kafka, and

23 him, a third, a third, a third.

24         He sat in here and tried to tell you, "It was my

25 company.  It's 50 percent."  I confronted him with that.  What

1    did he say?  "I was in a drug-induced stupor.  I didn't know

2    what I was talking about," something like that.  It was

3    something to do with drugs over an accident that he had.

4            This is 2009 testimony.  The accident he had --

5    that's why we had to ask, "Well, wait a minute.  Wait.  When

6    did that accident happen?"

7            2006, and right afterwards he went back into work,

8    picked up a unit, put it in a van, and drove to Philadelphia.

9    But he's in a drug-induced stupor three years later giving

10   testimony.  That's why he had no idea what he was saying.  Is

11   anything that comes out of this man's mouth believable?

12           It might be uncomfortable.  I understand.  I

13   understand.  It's your -- it's your job as jurors.  You are the

14   judges of the facts, and because you're the judges of the

15   facts, it's your job to judge credibility.  I'm sorry.  It just

16   is.  And that's why there's that instruction.

17           So when you think about what was said from this

18   witness stand, think about that, how believable these people

19   are, or unbelievable.

20           I find it interesting that one of the things that

21   Ms. Berman stood up here and told you, "Well, I can't embezzle

22   money because I wasn't an employee, and if you're, you know,

23   embezzling, you have to be an employee."  What?  So it -- is it

24   now a technicality that you didn't embezzle?  I'm not

25   following.

1          Let me show you what the verdict form looks like.

2    When you guys go in the back room, you're going to be given a

3    verdict form, and this is it.  It's going to look just like

4    that.

5          And the very first question on the verdict form asks

6    you, "Do you find, from a preponderance of the evidence" -- and

7    you'll be told what a preponderance of the evidence is.  It's

8    not state court -- I mean, it's not -- well, it's not state

9    court, but it's not criminal court.  It's not the greater

10   weight of the evidence, okay?

11         Preponderance of the evidence is if you have the

12   scale, and it just barely tips in that favor, it's 51

13   percent -- or actually it's 50.1 percent, that's preponderance

14   of the evidence.  "Do you find from a preponderance of the

15   evidence that the statements were substantially true and made

16   with good motives?"

17         The answer to that question is yes, they were

18   substantially true.

19         MS. BERMAN:  Objection, Your Honor.

20         THE COURT:  Overruled.

21         MR. JONES:  You have the evidence in front of you.

22   He said, "Don't lose sight that the initial -- that you found

23   initially that there was embezzlement."  He had the documents

24   to back it up.  Was it substantially true?  Yes.  If you find

25   yes, then the instruction is, "Go no further but sign the

1   verdict form because you found in favor of the defendant."

2          If you get past Question 1 -- I submit to you you

3   will not based on the evidence in this case.  If you do, you

4   have to answer these next questions.

5          The next question is, "Do you find from a

6   preponderance of the evidence," the same standard, "that the

7   statements are protected because they were either substantially

8   true statements of fact or were statements of opinion based

9   upon true facts adequately disclosed in the publication at

10  issue, assumed to exist by a party exposed to the

11  communication" -- that's the State, that's the state agency --

12  "or known to the audience to whom the publication was made?"

13  Again, that's the State.  They had all the records.  They had

14  all the evidence.  They had all the facts.

15         They were -- they were absolutely true and

16  absolutely -- you can also -- you can also find that they were

17  opinion based on true facts.  Not only the facts that he

18  discovered on his own but also because the State concluded it

19  in the findings of fact.  The answer to that question is yes.

20         If you -- the instruction is, if you checked yes,

21  that you go no further.  You've found in favor of the

22  defendant.  Your job is over.  It doesn't have to be very long.

23  It can be quick.  The evidence is just that clear.

24         Set aside all of the -- all the red herrings and

25  rabbit trails.  This isn't about articles of incorporation.

1    It's about those three exhibits I showed you, three-and-a-half.

2         Okay.  The next question is asking you -- if you get

3    past 1 and 2, it's going to ask you, "Do you find, from a

4    preponderance of the evidence" -- again, 50.0001 percent --

5    "that the statements were privileged?"

6         Well, what's privileged?  Well, you're going to get

7    an instruction, and it's going to look like this.  It's going

8    to be this.  On the defense of privilege, I instruct you, the

9    judge will tell you, that provided one does not speak with

10   improper motives, which I shall explain in a moment, a person

11   such as the defendant is privileged to make a statement to

12   someone such as Mr. Bellflower or Ms. Connell of the Department

13   of Economic Opportunity about another, such as the plaintiff,

14   even if the statement is untrue -- but they are true, but even

15   if it's untrue, here's where the privilege kicks in -- under

16   the following circumstances.

17        The defendant made the statement in good faith, like

18   he did his homework.  He checked the signatures, saw the

19   account numbers.  It all lines up, okay?  Already had a finding

20   of fact from the department once, so that's the context in

21   which these statements were made.  Already had a finding of

22   fact from the department.

23        Okay.  The defendant made a statement in good faith,

24   had an interest in the subject of the statement, or the

25   statement concerned a subject in which the defendant had a duty

1   to speak because he was the one paying the unemployment

2   benefits.

3           The listener or reader -- that's the State -- had a

4   corresponding interest or duty -- they absolutely had to

5   because it involved unemployment benefits.  The defendant

6   published the statement on a proper occasion, sent it to only

7   the department, and the defendant published the statement in a

8   proper manner, requesting an appeal.  Yes.

9           Now, for this one you're asked a follow-up question.

10  Do you find -- No. 4 at the top, "Do you find from a

11  preponderance of the evidence that the defendant abused the

12  privilege by making the statements with improper motive?"

13          He didn't even know Lareesa Berman.  Didn't -- they

14  didn't have a tiff or something.  He had no -- what does he

15  care?  He just knows that Chris Berman and his wife are taking

16  money that belongs to the company.

17          That's not an improper motive.  He wasn't the one

18  doing it -- doing anything wrong, but yet, of course, we're

19  here to listen to her flipping the tables telling us about

20  that.  So the answer to that question is no.

21          Now, I can sit down right now but you'll be

22  disappointed to hear I won't.  The rest of this deals with

23  damages, and this case is not about damages.  It's about what

24  we just went over.

25          But I'm hired -- I'm here to represent Mr. Kafka.

1    He's the one that's being sued.  His name is on the judgment,

2    and because a part of this lawsuit involves damages, I don't

3    know what's going to go on in that back room, but I would not

4    be doing my job if I didn't discuss damages.  I'll tell you

5    it's not about damages, but it's part of the case that you've

6    heard so I have to comment, but I'll do it very briefly.

7              Ten minutes, right, Judge?

8              THE COURT:  (Nods head up and down.)

9              MR. JONES:  Did the plaintiff sustain any damages as

10   a result of the defamatory statements?  How many documents did

11   you see where it showed she's lost some kind of an income?

12   Zero.  How many witnesses came in here other than her -- come

13   in here -- or even her that came in here and said, "Yes, I

14   didn't do business with her because I heard she's an

15   embezzler"?  Zero.

16             She started to talk about how this lawsuit has

17   stressed her, and you can't recover -- it's improper to

18   recover -- and there was an objection that was sustained.  You

19   can't recover damages for a lawsuit that you bring.

20             She has to show that the damages flow from that

21   e-mail that was given to the State, that stayed with the State,

22   and that no one has ever seen but state employees in the

23   unemployment division.  That's what she has to show you.  Where

24   are those damages?

25             If you answered yes, you go on to No. 6.  No. 6 is

1  asking you for an amount.  There is no amount.  We've heard

2  nothing.  We've heard zero for compensatory damages.

3       Next question is No. 7.  You go on to ask about

4  nominal damages in the amount of.  If you get to this question,

5  and I submit that you won't, the law says that there is -- if

6  someone's accused you of a crime, there would be some nominal

7  implied damages.

8       If you get to this point -- I don't know what you put

9  in there.  How's that?  And that's (indicating).  You can do

10  that.

11       No. 8, this is where she is trying to convince you

12  that there were these terrible ill motives that she cannot

13  prove in any way, shape, or form other than to try to convince

14  you that he forged these two dozen documents back in '06

15  and '07 because -- it was a setup so he can get out of paying

16  unemployment benefits in 2009, that theory.  Yeah, that one.

17  That was done with ill motive, hostility.  That's her argument.

18  That's what she, without any evidence, is trying to convince

19  you of.

20       Was there any such ill motive?  No.

21       That's the verdict form.  Folks, I submit you won't

22  get past Question 1 or 2.

23       THE COURT:  Mr. Jones, you have about five minutes

24  now.

25       MR. JONES:  Thank you.

```
1          I'm concluding with you folks by saying this.  This
2  is the last time I get a chance to speak with you, and that may
3  make you very happy.
4          But I just want to again thank you for your
5  attention, for staying alert and listening attentively to the
6  evidence and the documents.
7          You know, consider what you saw.  Consider what you
8  heard.  Consider who you think's telling the truth.  The
9  evidence is, folks, Mr. Kafka, he had all the documents.  He
10  had the State of Florida telling him this was embezzlement.
11  That was the light in which those statements were made.  Truth.
12          Thank you.
13          THE COURT:  All right.  Ms. Berman?
14          MS. BERMAN:  What attorney said, that this is about
15  revenge, it's not true.  He fired him 2009, and it is 2015.
16  And that I can go to attorney, that's not true.  I cannot
17  afford attorney.
18          And those checks what you see, employment check.  I
19  can comment on that.  When I ask defendant -- and I read from
20  deposition -- "When first time you saw my signature?" what did
21  he answer?  "Online your marriage certificate and your deed or
22  whatever it is."  He didn't say on your employment --
23  employment.  No.  He didn't say.
24          I -- those checks what he produce, it wasn't
25  appropriately.  It's supposed to be from the bank with a stamp.
```

1    You have to subpoena them and bank will put stamp.  They didn't

2    do that.  He just came and print it, and when you print it, you

3    can do whatever you want.  It wasn't in initial disclosure.  He

4    doesn't show me check.  It wasn't.

5           But what I want to say about this, that when my

6    husband become employee -- and I do remember his employee

7    checks.  On -- when my husband receive this, what he show, I

8    couple times sign but just my sign.  I didn't write anything

9    there.  I had that couple times.

10          Defendant knew my signature already.  Then he decided

11   create a story, but he didn't know that I already change my

12   name.  He quickly went and check when I did change my deed, and

13   it was 2007.  He wasn't aware.

14          So he decided to make a copy of this and create it's

15   like I embezzle money.  When I ask him when first time -- "When

16   first time?"

17          "On marriage certificate."  Oh, and he said, "And on

18   your publisher company in 2009," when I open in the end of

19   2010.  He didn't mention that he saw already the couple times I

20   signed employment check.  He didn't.

21          And now he trying to doubt you.  You see how they're

22   doing.  I have nothing to hide.  No.  Those check when you --

23   but what you see, he produce a couple of them, some of them

24   just with my signature.  When I'm go to my bank, I put my

25   signature.  I don't write.

1        If I write, if I write my bank account, I will

2   recognize my -- not spelling, numbers writing, yes.  That what

3   he show produced.  It's not mine.  Who?  Who wrote down that

4   bank account?  Who?  Not me.  Bank will not write down because

5   name is already change.  But Defendant Kafka, would he make

6   mistake?  He did not know when I changed bank account.  He

7   wasn't aware.

8        He claimed about my husband drunk.  To have a

9   vertebrae -- three years he went to employment and hid this,

10  and he came and was still doing his job.  He come back.  He

11  three days was spent there, and he was in such pain, he

12  couldn't do anything.  He wrote a book during the night because

13  he could not sleep.  That was bothering Defendant Kafka, that

14  he wrote a book.

15       He show appeal -- he show you this exhibit about

16  decision appeals, that it was true.  Okay.  "The employer

17  discharged the claimant for falsifying the records and

18  misappropriate funds.  The records reflect that the employer

19  discharged the claimant for falsifying employee records and

20  misappropriation of funds."  Did it say anything -- did it

21  mention my name?  No.

22       He said it was true statement.  Half of the truth is

23  not a true statement.  He told initially in our favor.  Did he

24  tell that next was vacated?  No.  And Mr. Bellflower testified

25  here that he wasn't familiar with the case between my husband.

```
 1   He wasn't familiar.
 2           If somebody write e-mail and said in your favor, oh,
 3   of course I will -- he even put pursue with unemployment.  He
 4   make him -- make them to believe that my -- first, that my
 5   husband did something wrong.  He convince them, but then when
 6   they check everything, nothing.  They didn't find anything
 7   wrong.
 8           He forgot to mention after this, this is the
 9   decision, because that decision was on May 29, 2009, two days
10   after my husband have this hearing and phone cut off.  They
11   telling you he claim.  It was in the record.  You heard it.
12           My husband couldn't understand how it's happened that
13   in his favor because he wasn't able to present his evidence,
14   and you cannot speak after somebody cut off.  You need to
15   postpone this and continue.
16           So they vacate the decision after it was -- so that's
17   why the decision was referee vacated in this case, on October
18   21, 2009.  He didn't say that.
19           Then in this date, 2/18/09, the discharge was for
20   other reason than misconduct.  No misconduct by the employee.
21   They contacted him and he did nothing wrong.  But when my
22   husband understood what happened, he trying to protect his
23   company.  He fill out an application for trademark.  He found
24   out.  Right away it's become misconduct claiming of the
25   embezzling parts.
```

1          My husband wasn't employee in 2005.  Why all of the

2     checks -- why all of the checks 2005?  All of the checks 2005,

3     5/27.  Nothing this to do.  He wasn't employee.

4          Then he present Exhibit D when he said deposit ticket

5     showing the deposit of 8,068.  Should have been 8,040.  How is

6     it embezzlement when my husband put in the bank -- business

7     bank account more money than need?  That's considered --

8     considered embezzlement.

9          Then here it said Exhibit D-1 invoice, and Exhibit

10    D-2, invoice.  Look what this Exhibit D-1.

11         You see D-1?  Proposal, but he saying invoice.

12    Proposal is not invoice.

13         And D-2 -- can I have 50B?

14         COURTROOM DEPUTY:  Did you say 50 or 15?

15         MS. BERMAN:  50B.

16         And if you remember, D-2 was also proposal, the title

17    show.  Also proposal, D-2, proposal.  And let's look again what

18    he said here, invoice, invoice, not proposal.

19         And produce you checks claiming that this was

20    employment without certification.  He just went -- he had these

21    checks, went on computer.  It's very easy to do it.  Print it,

22    make difference, and this.  He didn't certify them.

23         And then when I am asking him, "When first time you

24    saw it?" my certificate of deed and on my company.  If you are

25    honest person, you will say, "I saw you on the employment

1   checks."  He didn't say that.  No.

2          It's not about mad or revenge.  If I was having

3   revenge, I will do this in 2009.  It's not about.  It's about

4   in 2011 he went, forged my check.

5          Even evidence show everything, everything that I

6   didn't do anything wrong.  And yesterday you saw that all of

7   the questioning for me, "How harm you are?" because they know.

8   Today they -- they pick up this -- printed those checks,

9   already make it already, because they didn't expected that I

10  will show that I change.

11         The only -- when I change my -- he did not know which

12  date was change.  That's why he create this check after.  He

13  thought that it was still in 2007, after he create and said

14  that I embezzle money.

15         Listen to him.  It's about the truth.  Who's saying

16  the truth about my husband, that he said?  Here he was on

17  conversation with the vertebrae.  Every time he taking -- that

18  deposition was for two days.  Mr. Kafka create all of this

19  so -- confusion.  You know, when you put so many stuff, it so

20  confused, it's difficult to explain.

21         If attorney ask you, show, "Here, you see, 33, 33."

22  My husband, yeah, he see and couldn't believe it.  He couldn't

23  believe it.  How is that 33, 33, 33 if he sign with Mr. Kafka?

24  Under this article incorporation it said personally known,

25  appears to me notary, which my husband never met.

1              THE COURT:  Ms. Berman, you've got about a minute.

2              MS. BERMAN:  I just want you to believe I didn't -- I

3    right away say that that checks what they present, it wasn't in

4    evidence that -- he never was saying this and never admitted

5    that he knew my signature before that.

6              He knew this.  That wasn't my writing on this check.

7    You will see, it's not -- some kind of account number, that's

8    not my handwriting.  He put -- if he had it, he put e-e-s.  He

9    didn't because he knew.  He knew I didn't sign.  He created

10   this.

11             And that's why he trying to confuse you and put

12   everything -- and put already what -- put in your mind what

13   already jury instruction you have to do.  That's not how.  Put

14   in your mind, "Okay, put here."

15             And questioning me yesterday only how damage.  It is

16   damage when in 2011 said we proved and I know I didn't do

17   anything.  I didn't.

18             THE COURT:  All right, Ms. Berman.  You're out of

19   time.  Thank you.

20             MS. BERMAN:  Thank you so much for being here.  I

21   really appreciate.  I really . . .

22             THE COURT:  All right.  Ladies and gentlemen, we're

23   going to take about a ten-minute break, so if you can be back

24   about 3:40, I'd appreciate it.

25             COURT SECURITY OFFICER:  All rise for the jury.

```
 1        (Jury out at 3:30 p.m.)

 2             COURT SECURITY OFFICER:  Please be seated.

 3             THE COURT:  All right.  We're going to take, like I

 4   said, a ten-minute break, and when the jury comes back I'll

 5   instruct them on the law, all right?

 6             All right.  Court will be in recess.

 7             COURT SECURITY OFFICER:  All rise.

 8        (Recess from 3:31 p.m. until 3:43 p.m.; all parties

 9   present.)

10        (Outside the presence of the jury:)

11             COURT SECURITY OFFICER:  All rise.  This Honorable

12   Court is now in session.

13             Please be seated.

14             THE COURT:  All right.  You can bring the jury in,

15   Mr. Sowards.

16             MS. BERMAN:  Your Honor, I would like --

17             THE COURT:  Hold on a second.

18             MS. BERMAN:  I would like to say I want to strike

19   this evidence.  They're not certified with the bank.  This he's

20   created from the computer.  It wasn't subpoena, and it wasn't

21   in initial disclosure those checks, employment checks.  He

22   never even --

23             THE COURT:  Denied.  The motion's denied.

24             COURT SECURITY OFFICER:  All rise for the jury.

25        (Jury in at 3:44 p.m.)
```

1          COURT SECURITY OFFICER:  Please be seated.

2          THE COURT:  All right, ladies and gentlemen of the

3    jury.  It's my duty now to instruct you on the rules of law

4    that you must use in deciding this case.  When I finish, you

5    will go to the jury room and begin your discussions, sometimes

6    called deliberations.

7          Your decision must be based only on the evidence

8    presented here.  You must not be influenced in any way by

9    either sympathy for or prejudice against anyone.

10         You must follow the law as I explain it, even if you

11   do not agree with the law, and you must follow all of my

12   instructions as a whole.  You must not single out or disregard

13   any of the instructions on the law.

14         As I said before, you must consider only the evidence

15   that I have admitted in the case.  Evidence includes the

16   testimony of witnesses and the exhibits admitted, but anything

17   the lawyers say is not evidence and isn't binding on you.  And

18   Ms. Berman, when she was acting as a lawyer for herself, that's

19   true as well but not when she was acting as a witness.

20         You shouldn't assume from anything I've said that I

21   have any opinion about any factual issue in this case.  Except

22   for my instructions to you on the law, you should disregard

23   anything I may have said during the trial in arriving at your

24   own decision about the facts.  Your own recollection and

25   interpretation of the evidence is what matters.

1    In considering the evidence, you may use reasoning

2  and common sense to make deductions and reach conclusions.

3    You shouldn't be concerned about whether the evidence

4  is direct or circumstantial.  Direct evidence is the testimony

5  of a person who asserts that he or she has actual knowledge of

6  a fact, such as an eyewitness.

7    Circumstantial evidence is proof of a chain of facts

8  and circumstances that tend to prove or disprove a fact.

9  There's no legal difference in the weight you may give to

10  either direct or circumstantial evidence.

11    It is the duty of the attorneys and pro se party to

12  object when the other side offers testimony or other evidence

13  which they believe is not properly admissible.  Therefore, you

14  should not be prejudiced against an attorney or his or her

15  client or the pro se party because the attorney or pro se party

16  has made objections.

17    Upon allowing testimony or other evidence to be

18  introduced over the objection of an attorney, the Court does

19  not indicate any opinion as to the weight or effect of such

20  evidence.  As stated before, the jurors -- and that's you --

21  are the sole judges of the credibility of all witnesses and the

22  weight and effect of all the evidence.

23    When I say you must consider all the evidence, I

24  don't mean that you must accept all the evidence as true or

25  accurate.  You should decide whether you believe what each

witness had to say and how important that testimony was.

In making that decision, you may believe or disbelieve any witness in whole or in part.  The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness, I suggest that you ask yourself a few questions:

(1) Did the witness impress you as one who was telling the truth?

(2) Did the witness have any particular reason not to tell the truth?

(3) Did the witness have a personal interest in the outcome of the case?

(4) Did the witness seem to have a good memory?

(5) Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

(6) Did the witness appear to understand the questions clearly and answer them directly?

(7) Did the witness's testimony differ from the other testimony or other evidence?

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact and ask whether there was evidence that at some other time, a witness said or did something, or didn't say or do something, that was different from the testimony the witness

1    gave during this trial.

2           But keep in mind that a simple mistake doesn't mean a

3    witness wasn't telling the truth as he or she remembers it.

4    People naturally tend to forget some things or remember them

5    inaccurately.

6           So if a witness misstated something, you must decide

7    whether it was because of an innocent lapse in memory or an

8    intentional deception.  The significance of your decision may

9    depend on whether the misstatement is about an important fact

10   or about an unimportant detail.

11          In this case it is the responsibility of plaintiff,

12   Lareesa Berman, to prove every essential part of her claim by a

13   preponderance of the evidence.  This is sometimes called the

14   burden of proof or the burden of persuasion.

15          A preponderance of the evidence simply means an

16   amount of evidence that is enough to persuade you that her

17   claim is more likely true than not.

18          If the proof fails to establish any essential part of

19   a claim or contention by a preponderance of the evidence, you

20   should find against plaintiff, Ms. Berman.

21          In deciding whether any fact as been proved by a

22   preponderance of the evidence, you may consider the testimony

23   of all of the witnesses, regardless of who may have called

24   them, and all of the exhibits received in evidence, regardless

25   of who may have produced them.

1          If the proof fails to establish any essential part of

2    Ms. Berman's claim by a preponderance of the evidence, you

3    should find for the defendant as to that claim.

4          In this case defendant, Thomas Kafka, asserts a

5    number of affirmative defenses.  Even if plaintiff, Lareesa

6    Berman, proves her claim by a preponderance of the evidence,

7    defendant, Thomas Kafka, can prevail in this case if he proves

8    an affirmative defense by a preponderance of the evidence.

9          I caution you that the defendant does not have to

10   disprove the plaintiff's claims, but if the defendant raises an

11   affirmative defense, the only way he can prevail on that

12   specific defense is if he proves that defense by a

13   preponderance of the evidence.

14         The claims and defenses in this case are as follows.

15   Plaintiff, Lareesa Berman, claims that Thomas Kafka made false

16   written statements about her which caused her harm.  Plaintiff,

17   Lareesa Berman, claims the statements were as follows:

18         (1) a statement written in an electronic mail from

19   Thomas Kafka to James Bellflower stating, "I asked Connie not

20   to lose sight of the fact that you initially ruled in our favor

21   and we proved that Chris Berman and his wife embezzled money

22   from our company;" and (2) a document sent to Janice Connell

23   stating, "(part of the money was embezzled by his wife.)"

24         Plaintiff claims these statements injured her

25   reputation.

1          Defendant, Thomas Kafka, denies these claims and also

2     claims that these statements were substantially true and made

3     with good motives, privilege, and/or opinion.

4          The parties must prove all claims and defenses by the

5     preponderance of the evidence.  I will now define some of the

6     terms you will use in deciding this case.

7          A statement is a legal cause of loss, injury, or

8     damage if it directly and in natural and continuous sequence

9     produces or contributes substantially to producing such loss,

10    injury, or damage so that it can reasonably be said that but

11    for the statement, the loss, injury, or damage would not have

12    occurred.

13         The parties stipulate that the defendant, Thomas A.

14    Kafka, made the statements that charge that the plaintiff,

15    Lareesa Berman, committed embezzlement.

16         On the first defense of truth and good motives, the

17    issue for your determination is whether the statements made by

18    the defendant were substantially true and were made by the

19    defendant with good motives.

20         A statement is substantially true if its substance or

21    gist conveys essentially the same meaning that the truth would

22    have conveyed.  In making this determination, you should

23    consider the context in which the statement is made and

24    disregard any minor inaccuracies that do not affect the

25    substance of the statement.

1           If the preponderance of the evidence supports this

2      defense, your verdict should be for the defendant.  If the

3      preponderance of the evidence does not support this defense and

4      the preponderance of the evidence does support the claim of

5      plaintiff on the issue of defamation, then you shall consider

6      the defense of opinion.

7           If the preponderance of the evidence supports

8      defendant, Thomas Kafka's defense that his statements were

9      either substantially true statements of fact or were statements

10     of opinion based upon true facts adequately disclosed in the

11     publication at issue, assumed to exist by a party exposed to

12     the communication, or known to the audience to whom the

13     publication was made, then your verdict shall be for the

14     defendant, Thomas Kafka.

15          If the preponderance of the evidence does not support

16     this defense and the preponderance of the evidence does support

17     the claim of plaintiff on the issue of defamation, then you

18     shall consider the defense of privilege.

19          On the defense of privilege, I instruct you that

20     provided one does not speak with improper motives, which I

21     shall explain in a moment, a person such as the defendant is

22     privileged to make a statement to someone such as James

23     Bellflower and Janice Connell of the Department of Economic

24     Opportunity about another such as plaintiff, even if the

25     statement is untrue, under the following circumstances:

1        The defendant made the statement in good faith; the

2   defendant had an interest in the subject of the statement or

3   the statement concerned a subject in which the defendant had a

4   duty to speak; the listener or reader of the statement had a

5   corresponding interest or duty regarding the subject of the

6   statement; the defendant published the statement on a proper

7   occasion; and the defendant published the statement in a proper

8   manner.

9        If the preponderance of the evidence does not show

10  that these circumstances existed, then you must find that the

11  defendant had no privilege to make such a statement, even with

12  proper motives.  However, if the preponderance of the evidence

13  does show that the defendant spoke under circumstances creating

14  such a privilege, then you should decide whether, as plaintiff

15  claims, defendant made the statement with improper motives

16  abusing that privilege.

17        One makes a false statement about another with

18  improper motives if one's primary motive and purpose in making

19  the statement is to gratify one's ill will, hostility, and

20  intent to harm the other rather than to advance or protect the

21  defendant's interests, right, or duty to speak to James

22  Bellflower and Janice Connell on that subject.

23        If the preponderance of the evidence does not support

24  plaintiff's claim that the defendant abused any privilege he

25  had and the preponderance of the evidence does support the

 1   defense of privilege, then your verdict should be -- should be

 2   for the defendant.

 3         However, if the preponderance of the evidence

 4   supports plaintiff's claim that the defendant abused any

 5   privilege he had, then your verdict should be for plaintiff in

 6   the total amount of her damages.

 7         If you find for the defendant, you will not consider

 8   the matter of damages, but if you find for the plaintiff, you

 9   shall award her an amount of money that will fairly and

10   adequately compensate her for such loss, injury, or damage as

11   the preponderance of the evidence shows was caused by the

12   statements in question.

13         You shall consider the following elements of damage:

14         The first, any injury to reputation or health and any

15   shame, humiliation, mental anguish, and hurt feelings

16   experienced in the past or to be experienced in the future.

17   There is no exact standard for fixing the compensation to be

18   awarded on account of such elements of damage.  Any award

19   should be fair and just in light of the evidence.

20         The next one, if you find for plaintiff but find that

21   no loss, injury, or damage has been proved, you must award

22   nominal damages.  Nominal damages are damages of an

23   inconsequential amount which are awarded to vindicate a right

24   where a wrong is established but no damage is proved.

25         Now, the third, if you find for plaintiff and against

1  defendant, you should consider whether, in addition to

2  compensatory or nominal damages, punitive damages are warranted

3  in the circumstances of this case as punishment and as a

4  deterrent to others.

5       Punitive damages are warranted if you find by the

6  preponderance of the evidence that the defendant's primary

7  purpose in making the statement was to indulge ill will,

8  hostility, and an intent to harm plaintiff, Ms. Berman.

9       If you decide that punitive damages are warranted

10  against defendant, then you must decide the amount of punitive

11  damages, if any, to be assessed as punishment against him and

12  as a deterrent to others.  This amount would be in addition to

13  the compensatory and/or nominal damages you have previously

14  awarded.

15       In making this determination, you should consider the

16  following:

17       (1) the nature, extent, and degree of misconduct and

18  the related circumstances, including the following:

19       (A) whether the wrongful conduct was motivated solely

20  by unreasonable financial gain;

21       (B) whether at the time of loss, injury, or damage

22  the defendant had a specific intent to harm plaintiff, and the

23  conduct of the defendant.

24       You may in your discretion decline to assess punitive

25  damages.

```
 1           Of course, the fact that I have given you
 2  instructions concerning the issue of plaintiff's damages should
 3  not be interpreted in any way as an indication that I believe
 4  that the plaintiff should or should not prevail in this case.
 5           Your verdict must be unanimous; in other words, you
 6  must all agree.  Your deliberations are secret, and you'll
 7  never have to explain your verdict to anyone.
 8           Each of you must decide the case for yourself but
 9  only after fully considering the evidence with the other
10  jurors.  So you must discuss the case with one another and try
11  to reach an agreement.
12           While you're discussing the case, don't hesitate to
13  reexamine your own opinion and change your mind if you become
14  convinced that you are wrong, but don't give up your honest
15  beliefs just because others think differently or because you
16  simply want to get the case over with.
17           Remember that in a very real way you are judges,
18  judges of the facts.  Your only interest is to seek the truth
19  from the evidence in the case.
20           When you get to the jury room, choose one of your
21  members to act as the foreperson.  The foreperson will direct
22  your deliberations and speak for you in court.
23           A verdict form has been prepared for your
24  convenience.  The verdict form provides a set of questions that
25  you must answer and accompanying instructions that you must
```

1    follow in order to reach your verdict.

2            Take the verdict form with you to the jury room.

3    You'll have these jury instructions to take with you as well.

4    When you've all agreed on a verdict, your foreperson must fill

5    in the form, sign it, and date it, then you'll return it to the

6    courtroom.

7            And, Madam Clerk, can you put the verdict form up for

8    them?

9            All right.  So I'm not going to go through the entire

10   verdict form with you.  It is self-explanatory, but you do have

11   to read it carefully because it can be a little confusing.

12           So just to take the first question as an example, it

13   says, "Do you find from the preponderance of the evidence that

14   the statements were substantially true and made with good

15   motives?"  And then so there are check boxes there, one for

16   yes, one for no.  The foreperson will either put a check box or

17   an X -- a check or an X in either yes or no.

18           And then after each question is an instruction that

19   tells you what to do, so in other words, it will tell you

20   whether to go to another question or to the end of the form or

21   some other option.

22           So here it says, "If you answered yes to Question 1,

23   you should not proceed further except to date and sign the

24   verdict form and return it to the courtroom," okay?

25           So let's take that for a minute, so then you would

1    skip to page 3.  Okay.  And just those last two lines, you

2    would go all the way to where the date is.  The foreperson

3    would fill in the date, the day, and then sign the verdict

4    form, okay?  And then that would be all.

5          Now, if we go back to page 1 -- so that was if you

6    answered the question yes.  And now it says, "If you answered

7    no, please answer Question 2," so then you go on to Question 2.

8          So I don't want you to be confused because when the

9    attorneys were doing their argument, they were checking a

10   number of boxes.  That was for demonstrative reasons.  So if

11   you just follow the instructions on the verdict form and just

12   read them carefully -- like I said, it is self-explanatory but

13   I know there's a lot of legal terminology in there as well,

14   so . . .

15         Now, if you wish to communicate with me at any time,

16   please write down your message or question and give it to the

17   court security officer.  The court security officer will bring

18   it to me, and I'll respond as promptly as possible, either in

19   writing or by talking to you in the courtroom.

20         Please understand that I may have to talk to the

21   lawyers and the parties before I respond to your question or

22   message so you should be patient as you await my response.

23         But I caution you not to tell me how many jurors have

24   voted one way or the other at any time.  That type of

25   information should remain in the jury room and not be shared

 1    with anyone, including me, in your note or question.

 2           All right.  So at this time I'm going to ask you to

 3    go back to the jury room and deliberate your verdict.  You'll

 4    have all the exhibits with you.  You'll have the verdict form,

 5    and you'll have the jury instructions.

 6           Thank you.

 7           COURT SECURITY OFFICER:  All rise for the jury.

 8       (Jury out at 4:07 p.m.)

 9           COURT SECURITY OFFICER:  Please be seated.

10           THE COURT:  Mr. Sowards, can you tell them to hold

11    off for a second before they start deliberating?

12           COURT SECURITY OFFICER:  Yes, sir.

13       (At sidebar, out of the hearing of the jury:)

14           THE COURT:  I really don't have to do this at

15    sidebar.

16           Were there any objections to the instructions that I

17    read other than as you previously stated?

18           MR. JONES:  No, Your Honor.

19           MS. BERMAN:  I object to the -- it says that I need

20    to -- I need to -- it's burden of proof of me, but it's

21    already -- it's libel statement and burden of proof, as he said

22    he already prove except that he wasn't show any proof --

23           THE COURT:  Well --

24           MS. BERMAN:  -- and those checks what they admitted,

25    it wasn't certified, Your Honor.

1          THE COURT:  Those objections will be overruled.  I

2   gave you plenty of opportunity to object to these instructions

3   before, and you never have.  And I gave you opportunities to

4   object to evidence as the evidence came in.

5          MS. BERMAN:  I objected to it and --

6          THE COURT:  Well, then I overruled your objection at

7   the time.  There's no point in continuing to object to evidence

8   that's been admitted.

9          MS. BERMAN:  With the article incorporation, I show

10  this, how he created.  The jury don't know that.

11         THE COURT:  Okay.  Objection's overruled.  Thank you.

12      (End of discussion at sidebar.)

13         THE COURT:  All right.  Tell Mr. Sowards to tell them

14  they can begin their deliberations.

15         Tracee, before you go in, it's -- so it's ten after

16  4:00.  I don't know how long I'm going to let them go.  I may

17  let them go past 5:00, assuming they haven't reached a verdict

18  by then.  It's probably not going to be a whole lot past 5:00

19  though.

20         So I assume everybody will be either in the courtroom

21  or immediately outside of the courtroom.

22         Is that correct, Ms. Berman?

23         MS. BERMAN:  I'm sorry?

24         THE COURT:  I'm trying to figure out, in case we need

25  to contact you in case the jury comes back either with a

1  verdict or a question, will you be either in the courtroom or

2  right outside the courtroom?

3          MS. BERMAN:  Maybe here or outside.

4          THE COURT:  All right.  Just stay close to the

5  courtroom so that we can find you if -- when the jury comes

6  back, all right?

7          MS. BERMAN:  Okay.

8          THE COURT:  And then other than that, court will be

9  in recess.

10          COURT SECURITY OFFICER:  All rise.

11     (Recess from 4:10 p.m. until 4:55 p.m.; all parties

12  present.)

13     (Outside the presence of the jury:)

14          COURT SECURITY OFFICER:  All rise.  This Honorable

15  Court is now in session.

16          Please be seated.

17          THE COURT:  Okay.  I'm told that we have a verdict.

18          Let me first caution everyone in the courtroom that

19  whatever the verdict is, I don't want to see any displays of

20  emotion.  I don't want to hear any audible reaction to the

21  verdict.

22          The jury's entitled to whatever verdict they found,

23  and they're entitled to not have to listen to anything or see

24  anything like that.

25          Do you understand that, Ms. Berman?

1          MS. BERMAN:  Yes.

2          THE COURT:  Mr. Berman, do you understand that?

3          MR. BERMAN:  Yes.

4          THE COURT:  And the defense, do you understand that,

5    Mr. Kafka?

6          MR. KAFKA:  (Nods head up and down.)

7          THE COURT:  All right.  Is there anything to take up

8    before we bring the jury in?

9          MR. JONES:  No, Your Honor.

10          THE COURT:  All right.  Ms. Berman?

11          MS. BERMAN:  No.

12          THE COURT:  All right.  Mr. Sowards, bring the jury

13    in.

14          COURT SECURITY OFFICER:  Yes, sir.

15          All rise for the jury.

16       (Jury in at 4:57 p.m.)

17          COURT SECURITY OFFICER:  Please be seated.

18          THE COURT:  All right, ladies and gentlemen of the

19    jury.  Have you reached a verdict?

20          THE JURORS:  Yes, Your Honor.

21          THE COURT:  And who is the foreperson?

22          A JUROR:  (Indicating.)

23          THE COURT:  Mr. Alvarez?

24          A JUROR:  Yes, sir.

25          THE COURT:  All right.  If you could hand the verdict

1    to Mr. Sowards.

2            A JUROR:  (Complies.)

3            THE COURT:  Okay.  I'm now going to publish the

4    verdict.

5            Question No. 1, do you find from the preponderance of

6    the evidence that the statements were substantially true and

7    made with good motives?  Answer, yes.

8            And then the verdict is signed and dated by the

9    foreperson.

10           Ms. Berman, would you like the jury polled?

11           MS. BERMAN:  Would you --

12           THE COURT:  That means that I ask each juror if

13   that's their verdict.

14           MS. BERMAN:  Yes.

15           THE COURT:  Okay.

16           Mr. Alvarez, is that your verdict?

17           A JUROR:  Yes.

18           THE COURT:  Ms. Newman, is that your verdict?

19           A JUROR:  Yes.

20           THE COURT:  Mr. Gaudry is that your verdict?

21           A JUROR:  Yes.

22           THE COURT:  Ms. Rodriguez, is that your verdict?

23           A JUROR:  Yes.

24           THE COURT:  Mr. Peacock, is that your verdict?

25           A JUROR:  Yes.

1          THE COURT:  Ms. Dixon, is that your verdict?

2          A JUROR:  Yes.

3          THE COURT:  And, Ms. Crowley, is that your verdict?

4          A JUROR:  Yes.

5          THE COURT:  Okay.

6          Okay.  I'm going to direct the clerk to file and

7     record the verdict.

8          Ladies and gentlemen, on behalf of the parties, the

9     lawyers, and the people of the United States of America, I wish

10    to thank you for your time and consideration of this case.  I

11    also wish to advise you of some very special privileges enjoyed

12    by jurors.

13         No juror can be required to talk about the

14    discussions that occurred in the jury room except by court

15    order.  For many centuries, our society has relied upon juries

16    for consideration of difficult cases.  We have recognized for

17    hundreds of years that a jury's deliberations, discussions, and

18    votes should remain their private affair as long as they wish

19    it.  Therefore, the law gives you a unique privilege not to

20    speak about the jury's work.

21         And then our local rules do not permit the parties,

22    the lawyers, or their representatives to initiate any

23    communication with you about the trial.  However, you may speak

24    to the lawyers or anyone else about the trial.  You also have

25    the right to refuse to speak to anyone.

```
 1            A request may come from those who are simply curious
 2   or from those who might seek to find fault with you.  It will
 3   be up to you to decide whether to preserve your privacy and the
 4   sanctity of the verdict, the process, and your fellow jurors.
 5            So let me say at this time again thank you very much
 6   for your service.  I hope it has -- hasn't been too much of an
 7   inconvenience to you, and --
 8            MS. BERMAN:  Your Honor --
 9            THE COURT:  Ms. Berman, do you want to take up
10   something before the jury's discharged?
11            MS. BERMAN:  Yes.  I want to --
12            THE COURT:  All right.  We'll --
13            MS. BERMAN:  Yes.  I want to say something.
14            THE COURT:  Well, no.  Wait.  Wait.
15            MS. BERMAN:  That last evidence --
16            THE COURT:  No.  No.  That's not proper --
17            MS. BERMAN:  -- it wasn't true.
18            THE COURT:  Ms. Berman, wait.  We'll take a sidebar,
19   and I'll find out what you want to say.
20            MS. BERMAN:  If you can -- if you allow me --
21            THE COURT:  No.  I will not --
22            MS. BERMAN:  -- to present my evidence --
23            THE COURT:  No.  I won't --
24            MS. BERMAN:  -- it will be in my favor.
25            THE COURT:  No.  You keep quiet.
```

1           Let's have a sidebar.

2      (At sidebar, out of the hearing of the jury:)

3           MS. BERMAN:  Your Honor, that evidence, the last one,

4  was not in their initial disclosure.  It's forged.  It wasn't

5  stamped.  They ask -- you need to subpoena this -- this

6  employment.  What kind of employment is this?  It's against the

7  rule.  I object to that evidence.  You need to subpoena them.

8           THE COURT:  This --

9           MS. BERMAN:  They know it's not admissible --

10          THE COURT:  Ms. Berman --

11          MS. BERMAN:  It's not admissible evidence.

12          THE COURT:  Okay.  You will have the opportunity to

13  file posttrial motions, okay?

14          MS. BERMAN:  Posttrial motions?

15          THE COURT:  Yes.  That's the appropriate time to

16  bring this up, all right?

17          MS. BERMAN:  Your Honor, I objected to this.  They --

18          THE COURT:  I understand your objection.

19      (End of discussion at sidebar.)

20          MS. BERMAN:  They don't allow me to introduce the

21  evidence, you know.

22          THE COURT:  All right.  Thank you, ladies and

23  gentlemen.  You're discharged.

24          COURT SECURITY OFFICER:  All rise for the jury.

25      (Jury out at 5:03 p.m.)

1          COURT SECURITY OFFICER:  Please be seated.

2          THE COURT:  All right.  Judgment will be entered on

3     the verdict in due course.

4          MS. BERMAN:  How long I can do these motions for

5     objection?  How many time do I have?

6          THE COURT:  Well, Ms. Berman, I can't advise you.

7     You're representing yourself, and just as you've been

8     conducting this case throughout, you need to consult with the

9     rules, with the law, and the applicable authorities.  I'm not

10    here to instruct you on what to do, so you'll just have to

11    determine that for yourself.

12         All right.  Is there anything further from the

13    defendant?

14         MR. JONES:  No, Your Honor.

15         THE COURT:  All right.  Anything else, Ms. Berman?

16         MS. BERMAN:  No.

17         THE COURT:  All right.  Court will be in recess.

18    Thank you.

19         COURT SECURITY OFFICER:  All rise.

20       (The proceedings were concluded at 5:04 p.m.)

21                         -  -  -

22

23

24

25

1               CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4  UNITED STATES DISTRICT COURT )

5  MIDDLE DISTRICT OF FLORIDA   )

6

7          I hereby certify that the foregoing transcript is a

8  true and correct computer-aided transcription of my stenotype

9  notes taken at the time and place indicated therein.

10

11         DATED this 9th day of August, 2015.

12

13                              s/Shelli Kozachenko
                                Shelli Kozachenko, RPR, CRR
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25